IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

- - - - - - - - - - - - - - - x
IN RE:                         :
                               :
AVANTAIR, INC.,                :   Case No. 8:13-bk-09719-CPM
                               :   Chapter 7
                 Debtor        :
- - - - - - - - - - - - - - - x
                               U.S. Courthouse
                               801 N. Florida Avenue
                               Tampa, Florida
                               Held March 24, 2014
                               3:27 P.M.


                    TRANSCRIPT OF HEARING

1-Amended Motion for Approval of Sale Free and Clear of Liens
and to Approve Sale and Bid Procedures N104SL (to include
omitted Exhibit "D") Filed by Lynn Welter Sherman, Attorney for
Trustee on behalf of Trustee Beth Ann Scharrer

2-Motion for Reconsideration of Order Granting Motion to
Approve Compromise and Motion to Approve Sale RE:N169SL Filed
by Keith T Appleby on behalf of Creditor Global Aerospace, Inc.

3-Motion for Approval of Sale Free and Clear of Liens and to
Approve Sale and Bid Procedures N109SL Filed by Lynn Welter
Sherman, Attorney for Trustee on behalf of Trustee Beth Ann
Scharrer

4-Objection to Motion for Order Directing Rule 2004 Examination
of Dallas Airmotive, Inc. Filed by Marvin H Mohney on behalf of
Creditor Dallas Airmotive, Inc.


            (Motions Continued on Next Page)


        BEFORE THE HONORABLE CATHERINE PEEK MCEWEN
            UNITED STATES BANKRUPTCY JUDGE


        *Proceedings Digitally Recorded by Court Personnel;
    Transcript Produced by Court-Approved Transcription Service.*

_____

                JOHNSON TRANSCRIPTION SERVICE
                   7702 Lake Cypress Drive
                  Odessa, Florida  33556
                     (813) 920-1466

CONTINUED MOTIONS

5-Motion for Final Relief from Stay based upon Default Motion for Order Granting Final Stay Relief in Favor of Midsouth Services, Inc. and Clear Aircraft, Inc. Filed by Michael C Markham on behalf of Clear Aircraft, Inc., MidSouth Services, Inc.

6-Motion for Reconsideration of Order Granting Expedited Motion to Approve Compromise of Controversy With Fractional Owners of N104SL Filed by Keith T Appleby on behalf of Creditor Global Aerospace, Inc.

7-Motion for Reconsideration of Order Granting Expedited Motion to Approve Compromise of Controversy with Fractional Owners of N109SL Filed by Keith T Appleby on behalf of Creditor Global Aerospace, Inc.

8-Motion for Approval of Sale Free and Clear of Liens and to Approve Sale and Bid Procedures N138SL Filed by Lynn Welter Sherman, Attorney for Trustee on behalf of Trustee Beth Ann Scharrer

9-Motion for Approval of Sale Free and Clear of Liens and to Approve Sale and Bid Procedures N134SL Filed by Lynn Welter Sherman, Attorney for Trustee on behalf of Trustee Beth Ann Scharrer

10-Motion for Approval of Sale Free and Clear of Liens and to Approve Sale and Bid Procedures N146SL Filed by Lynn Welter Sherman, Attorney for Trustee on behalf of Trustee Beth Ann Scharrer

11-Motion for Approval of Sale Free and Clear of Liens and to Approve Bid Procedures N176SL Filed by Lynn Welter Sherman, Attorney for Trustee on behalf of Trustee Beth Ann Scharrer

12-Motion of Kevin McKamey, Steven Santo, David Haslett and Tom Palmiero for Approval of Defense Costs Under Directors' and Officers' Insurance Policy and for Relief From the Automatic Stay Under 11 U.S.C. § 362 Filed by Steven R Wirth on behalf of David Haslett, Kevin V. McKamey, Tom F. Palmiero, Steven Santo

APPEARANCES
(Via CourtCall)

LW Air I through V, LLC:        GREGORY PLOTKO, Esquire
                                Kramer Levin Naftalis & Frankel
                                1177 Avenue of the Americas
                                New York, NY 10036
                                212.715.9100
                                gplotko@kramerlevin.com

For Various Owners:             AMANDA APPLEGATE, Esquire
                                Aerlex Law Group
                                2800 28th Street
                                Suite 130
                                Santa Monica, California  90405
                                310-392-1271
                                Aapplegate@aerlex.com

For Steven Santo, et al:        CHRISTINA COSTLEY, Esquire
                                Katten Muchin Rosenman, LLP
                                515 South Flower Street
                                Suite 1000
                                Los Angeles, California  90071
                                213.788.7445
                                christina.costley@kattenlaw.com

For Signature Flight Support:   MICHAEL CROSNICKER, Esquire
                                LeClairRyan
                                70 Linden Oaks
                                Suite 210
                                Rochester, New York 14625
                                585.270.211
                                michael.crosnicker@
                                leclairryan.com

For Teterboro Rams and
Bravia Avanti Investors, LLC:   BRIAN GART, Esquire
                                Berger Singerman
                                350 E. Las Olas Boulevard
                                Suite 1000
                                Ft. Lauderdale, Florida  33031
                                954-525-9900
                                Bgart@bergersingerman.com

(Appearances Continued on Next Page)

CONTINUED APPEARANCES

For Hutchison Advisors:            NICOLETTE VILMOS, Esquire
                                   Broad and Cassel PA
                                   390 N Orange Avenue
                                   Suite 1400
                                   Orlando, Florida 32801-1640
                                   nvilmos@broadandcassel.com

(In the Courtroom)

For Beth Ann Scharrer
Interim Chapter 7 Trustee:         LYNN WELTER SHERMAN, Esquire
                                   Adams and Reese LLP
                                   101 E Kennedy Boulevard
                                   Suite 4000
                                   Tampa, Florida 33602-5152
                                   813.402.2880
                                   lynn.sherman@arlaw.com

Special Counsel to the
Trustee:                           ROBERT ELGIDELY, Esquire
                                   Genovese, Joblove &
                                    Battista, P.A.
                                   200 E Broward Boulevard
                                   Suite 1110
                                   Ft Lauderdale, Florida 33301-3535
                                   954.453.8022
                                   relgidely@gjb-law.com

For Dallas Airmotive, Inc.:        MARVIN MOHNEY, Esquire
                                   Law Office of Marvin Mohney
                                   541 Bay Court
                                   Heath, Texas  75032-7630
                                   214-698-3011
                                   Marvinmohney@aol.com

General Counsel for
Dallas Airmotive, Inc.:            JOSEPH KULIK, Esquire
                                   Dallas Airmotive, Inc.
                                   6114 Forest Park Road
                                   Dallas, Texas 75235
                                   214.956.3001

(Appearances Continued on Next Page)

CONTINUED APPEARANCES

For MidSouth Services, Inc.
and Clear Aircraft, Inc.:       MICHAEL MARKHAM, Esquire
                                Johnson Pope Bokor Ruppel
                                & Burns LLP
                                911 Chestnut Street
                                Clearwater, Florida 33756-5643
                                727.461.1818
                                mikem@jpfirm.com

Fractional Owners as
Set Forth in Document 277:      JAY VERONA, Esquire
                                R. QUINCY BIRD, Esquire
                                Shumaker Loop & Kendrick L L P
                                101 E Kennedy Boulevard
                                Suite 2800
                                Tampa, Florida 33602-5150
                                813.229.7600
                                Jverona@slk-law.com
                                Qbird@slk-law.com

For Global Aerospace, Inc.:     KEITH APPLEBY, Esquire
                                Hill, Ward & Henderson, P.A.
                                101 E Kennedy Boulevard
                                Suite 3700
                                Tampa, Florida 33602-5195
                                813.221.3900 3139
                                kappleby@hwhlaw.com

                                ROGER CLARK, Esquire
                                The Clark Law Group
                                11400 W Olympic Boulevard
                                Suite 1150
                                Los Angeles, California 900641585
                                310.478.0077
                                rclark@cgold.cc

For Corrections Corporation
of America:                     DONALD R. ANDERSEN, Esquire
                                Stites & Harbison, PLLC
                                303 Peachtree Street, N.E.
                                Suite 2800 SunTrust Plaza
                                Atlanta, GA 30308
                                404-739-8800
                                dandersen@stites.com

(Appearances Continued on Next Page)

```
                          CONTINUED APPEARANCES

For Piaggio North America:      AMANDA CHAZAL, Esquire
                                Stichter Riedel Et Al
                                110 E Madison Street
                                Suite 200
                                Tampa, Florida 336024718
                                813.229.0144
                                Achazal@srbp.com
```

P R O C E E D I N G S

1

2      COURTROOM CLERK:  Avantair, Incorporated, 13-9719.

3      THE COURT:  All right.  I'll take appearances.  We'll

4  go through the roll call for the phone appearances first.

5      Amanda Applegate for various owners?

6      MS. APPLEGATE:  Present.

7      THE COURT:  Christina Costley for Santo, et al?

8      MS. COSTLEY:  Yes, I'm here.

9      THE COURT:  All right.  Let's see.  Michael

10  Crosnicker for Signature Flight Support?

11      MR. CROSNICKER:  Present, Your Honor.

12      THE COURT:  All right.  Brian Gart with Teterboro

13  Rams?

14      MR. GART:  Yes, Your Honor.  Thank you.  And I'm also

15  representing another creditor, an interested party, Bravia

16  Avanti Investors.

17      THE COURT:  How do you spell the first word?

18      MR. BART:  It's Bravia, Your Honor, B-r-a-v-i-a,

19  Avanti Investors, LLC.

20      THE COURT:  All right.  Thank you.

21      Andrew Gold --

22      MR. GART:  Thank you.

23      THE COURT:  -- representing Mr. McKamey?

24      (No response.)

25      THE COURT:  All right.  Not here.

```
 1              Gregory Plotko representing LW Air?

 2              MR. PLOTKO:  Present, Your Honor.

 3              THE COURT:  And last but not lease, Nicolette Vilmos

 4    for Hutchison Advisors?

 5              MS. VILMOS:  Yes, Your Honor.  Thank you.

 6              THE COURT:  Now, in the courtroom I'll take

 7    appearances.

 8              MS. SHERMAN:  Good morning, Your Honor -- good

 9    afternoon, Your Honor.  Lynn Welter Sherman representing Beth

10    Ann Scharrer as Chapter 7 Trustee, and Ms. Scharrer was not

11    available to make the hearing this afternoon.

12              THE COURT:  All right.  Thank you.

13              MR. WIRTH:  Good afternoon. Your Honor.  Steven Wirth

14    on behalf of Steven Santo, David Haslett, Tom Palmiero and

15    Kevin McKamey.

16              THE COURT:  All right.  Thank you.

17              MR. ELGIDELY:  Good afternoon, Your Honor.  Robert

18    Elgidely as special counsel to the Trustee.

19              THE COURT:  All right.  Thank you.

20              MR. MOHNEY:  Your Honor, Marvin Mohney appearing for

21    Dallas Airmotive, Inc.

22              THE COURT:  Thank you.

23              MR. MARKHAM:  Michael Markham for MidSouth Services

24    and Clear Aircraft.

25              THE COURT:  All right.  Thank you.
```

1          MR. VERONA:  Good afternoon, Your Honor.  Jay Verona

2   and Quincy Bird for the 200 or so fractional owners.

3          THE COURT:  All right.  Thank you.

4          MR. CLARK:  Your Honor, Roger Clark and Keith Appleby

5   on behalf of Global Aerospace.

6          THE COURT:  All right.  Thank you.

7          MR. ANDERSEN:  Your Honor, Don Andersen on behalf of

8   CCA of Tennessee.

9          THE COURT:  All right.  Thank you.

10          MS. CHAZAL:  Good afternoon, Your Honor.  Amanda

11   Chazal on behalf of Piaggio America, Inc.

12          THE COURT:  And thank you.  And that's everybody?

13          Okay, not everybody.  Who's with you, Mr. Mohney?

14          MR. MOHNEY:  I'm sorry.  I'll introduce, this is

15   general counsel for Dallas Airmotive, Joseph Kulik.

16          THE COURT:  All right, good.  Thank you.  How do you

17   spell the last name?

18          MR. KULIK:  K-u-l-i-k, Your Honor.

19          THE COURT:  Thank you.

20          All right.  We have -- we'll take up the insurance

21   issue, the O&D.  Do y'all have settlements?

22          MS. SHERMAN:  Your Honor, Mr. Markham would like to

23   be excused.  His item, which is No. 6 on the calendar, which is

24   a motion for relief from stay by MidSouth Services, he would

25   like to bump that to the April 28th calendar.  The propellers

1  and engines were not identified in the motion for relief from

2  stay and it's not entirely clear which propellers and engines

3  they're moving for stay relief with respect to.  So we're going

4  to kick that, if we could, Your Honor.

5          THE COURT:  Are you going to file an amended motion

6  -- or a supplement to it rather?

7          MR. MARKHAM:  That's fine, Judge.  It's part of the

8  issue.  As I've told the Court many times, my client isn't a

9  fractional owner; it was a lessor.  And so there are eight

10 aircraft out there that have always been titled in my client's

11 name and my client's name only, so we don't have some of the

12 other issues.

13         Now, we may have issues with props remaining.  I know

14 that there are a couple of props out in Dallas that my client

15 thinks belong to his claims that are on some of Mr. Verona's

16 clients' planes is what I'm told.  We need to try to work

17 through that.  We just worked through this past week returning

18 a prop to Plotko's client that was apparently on one of our

19 planes.

20         My concern with these omnibus procedures is that even

21 the last omnibus order, Judge, says that -- has some statement

22 to the effect that if you sell it -- if you sell the aircraft,

23 you could be subject to sanctions for violating the stay.  And

24 I guess my question to the Court is -- I can appreciate how,

25 you know, the process is working for the fractional owners

1  because a lot of those are figuring out what's going on and

2  then they're coming back and selling the plane here.  That's

3  not going to happen with my client's plane.  So to agree to an

4  order that's got that in it is to agree to a kind of a forever

5  cloud on title.

6          At some point, I've got to get perfect clear title so

7  my client can move forward.  And so these conditional

8  provisions in the omnibus orders just aren't helpful.

9          THE COURT:  Well, why don't we say you can do

10 whatever you want so long as you don't do it with props or

11 engines that are not yours.

12         MR. MARKHAM:  I'm fine with that, Your Honor.  And I

13 don't have an issue about props and engines that aren't mine.

14 And we've been working that out with the individual people that

15 we've had issues with.

16         THE COURT:  Well, take yours off and set them

17 someplace and tell them to come get them.

18         MR. MARKHAM:  And we've done that.  We've delivered

19 them, we've made them available --

20         THE COURT:  Good.

21         MR. MARKHAM:  -- we've exchanged them.  We've done

22 all that, Judge.  But when you talk about the aircraft

23 themselves, I've got to get to the point where the Trustee is

24 not claiming any interest in these aircraft.

25         THE COURT:  She's not.

1          MR. MARKHAM:  Well, I don't know.  You'll have to

2    hear from the Trustee's counsel on that issue.

3          THE COURT:  Is she claiming an interest in a lease or

4    the aircraft themselves?

5          MS. SHERMAN:  Your Honor, these leases are in fact

6    disguised as security agreements.  They were terminated under

7    Article 2(a), not Article 9, prepetition.  Depending whether

8    there was equity in the airplanes or not, we may or may not

9    have a problem with the underlying transaction.

10          So consistent with what we have been doing on all the

11   other planes, we haven't been determining ownership, which

12   requires an adversary proceeding.  We've been granting people

13   stay relief whether it's a fractional plane or any other.

14          If Mr. Markham's client wants a determination -- a

15   determination of ownership, we're probably -- we either need to

16   sit down and resolve it and maybe do some informal discovery,

17   or we're going to need an adversary proceeding.

18          THE COURT:  Or I could say that they could take them

19   subject to any security interest.

20          MS. SHERMAN:  Which I don't think is going to help

21   Mr. Markham out.  So we -- I'm hopeful we can resolve it

22   between now and April 28th.  But if we can't, it's the same

23   reason, you know, you can't have your cake and eat it too.

24   It's --

25          MR. MARKHAM:  Well, Judge, it's really not the same

1  reason.  Even if the Trustee could somehow make an argument

2  that these were disguised financing arrangements, they're still

3  Article 2(a) leases one way or the other.  We gave all the

4  notices under Article 2(a) prepetition --

5          THE COURT:  Okay.

6          MR. MARKHAM:  -- okay?  We didn't terminate the

7  leases.  We advised the Debtor that we were retaining them

8  subject to our rights under Article 2(a), which is, you can

9  preserve your right to damages.  We did that; all right?  We

10 filed a proof of claim that outlines, you know, our damage

11 claim and crediting for value against each one of these

12 aircraft in our proof of claim.

13          We're happy to sit down with the Trustee, Your Honor.

14 But I'm just alerting the Court, when we come back on the 28th,

15 an order that reserves some rights in the estate doesn't help

16 me.  I'm not -- I've been letting this issue go for all these

17 months because the Trustee's been busy doing a lot of things

18 and I don't want to interfere with what you're trying to do.

19          THE COURT:  Okay.  Get it resolved by April the 28th.

20 Read Grubbs; I'm sure you've read Grubbs already.

21          MR. MARKHAM:  Many times, Your Honor.  You know, even

22 if it's a Grubbs thing, if the planes are upside down, they're

23 upside down and it wouldn't matter one way or the other.

24          THE COURT:  True.  Is there a prior lien?  3 p.m.

25          MR. MARKHAM:  Yeah, Judge, every one of my client's

```
 1  planes have liens to his lender.
 2          THE COURT:  Okay.
 3          MR. MARKHAM:  So I don't know -- I mean, we're happy
 4  to sit down, and if -- you know, between now and the 28th and
 5  try to get it worked out.
 6          THE COURT:  Okay.  All right.  Then the sixth thing
 7  on my calendar, which is Document 646, gets continued in open
 8  court to April the 28th at 3 p.m.  We'll post the docket.
 9  Y'all will get an email.  You may be excused.
10          And now let's get the -- Mr. Elgidely up here --
11          MR. MARKHAM:  Thank you, Judge.
12          THE COURT:  -- and Mr. Wirth and whoever else is
13  involved in that insurance issue.
14          MR. WIRTH:  Judge, I believe we've worked out a
15  resolution of this motion.  It's effectively on the same terms
16  as the advancement motions -- the prior advancement motions
17  have been settled on.
18          There will be no determination of whether this is
19  property of the estate.  The defense costs may be advanced by
20  the insurer.  And the reasonableness of the fee -- of the
21  defense cost being advanced will be determined by the insurer.
22  The Trustee would reserve its right to seek an expedited
23  hearing going forward for fees being advanced if they thought
24  those fees were unreasonable.
25          THE COURT:  Okay.  All right.  Have you already sent
```

1    in a proposed order on the other ones that were like this?

2            MR. ELGIDELY:  Have not, Your Honor.

3            THE COURT:  Why don't you make it one order and give

4    the reference to both hearing dates; okay?

5            MR. WIRTH:  Judge, I think it's going to require more

6    than one order because, if you recall -- we could probably do

7    one order on the Trustee's claims, but this motion relates to a

8    litigation pending in California.  So I think the separate

9    state law cases will require separate orders.

10           THE COURT:  That's fine.  I mean, you can do it

11   however you want.  I mean, if they were specific with case

12   names or case numbers, you could have it be an omnibus order.

13   I don't care.

14           MR. WIRTH:  Okay.  And, Judge, also, there's the same

15   reporting requirements that -- to the Trustee regarding fees.

16           THE COURT:  Okay.

17           MR. ELGIDELY:  That's correct, Your Honor.

18           THE COURT:  Good.  All right.  Then -- next time you

19   can come in by phone, you know.

20           MR. ELGIDELY:  Understood, Your Honor.  I had other

21   matters here today before Judge Delano, so --

22           THE COURT:  Okay.  All right.  Good.  Thank you all.

23           MR. WIRTH:  Thank you, Judge.

24           THE COURT:  All right.  You can leave, Mr. Wirth.

25           And then what about -- let's see.  Who is it that

1   made an appearance for Mr. Santo, et al?

2           MS. COSTLEY:  Christina Costley, Katten Muchin.

3           Okay.  Do you want to -- if you want to hang up, you

4   wouldn't offend me; okay?

5           MS. COSTLEY:  Thank you, Your Honor.

6           THE COURT:  All right.  And also -- well, Mr. Gold's

7   not here.

8           All right.  What about the 2004 exam motion?  And

9   then I think everything else relates -- has common issues.

10          MR. VERONA:  Your Honor, I think we've resolved that

11  with DAI.  Attached to DAI's objection was a proposed agreed

12  protective order, a rather lengthy one.  We have sat down --

13  "we," meaning my office and Mr. Mohney and in-house counsel,

14  have sat down and marked up that proposed order.

15          And what I'd like to do is submit a proposed order

16  granting in part our motion for a 2004 exam, directing that

17  they're going to produce the agreements that they claim are

18  confidential pursuant to the agreed protective order as

19  modified by agreement of the parties.

20          THE COURT:  Okay.  And so the one that I have in my

21  folder that doesn't talk about a hearing, I can throw that

22  away; is that right?

23          MR. VERONA:  In the proposed order?

24          THE COURT:  Yes.

25          MR. VERONA:  Yes.

```
 1              THE COURT:  Done.  Then you have one that you're
 2    going to walk up here?
 3              MR. VERONA:  No.  I'm going to -- we're going to have
 4    to do it and submit it.
 5              THE COURT:  Okay.  So, Mr. Mohney, you've resolved
 6    this in a way that -- and you're both on the same page; right?
 7              MR. MOHNEY:  That's correct, Your Honor.  We've
 8    worked through the language and they're going to edit the
 9    document.  We'll take a look at the final copy and submit it
10    for entry.
11              THE COURT:  Okay.
12              MR. MOHNEY:  And that should resolve the 2004 motion.
13              THE COURT:  Okay.  So then am I sustaining in part
14    your objection?  How is it dealt with in the proposed order,
15    Mr. Verona?
16              MR. VERONA:  I think we'll sustain it in part and
17    overrule it in part.  We will, of course, reserve our rights to
18    seek an actual examination once we see the documents.  I think
19    Mr. Mohney understands and is fine with that.
20              MR. MOHNEY:  Your Honor, it's without prejudice to
21    any parties, either for the 2004 or Rule 26, under the
22    contested matters in the adversary proceedings.
23              THE COURT:  Okay.  All right.  So then No. 5, Ms.
24    Garcia, just mark it sustained in part and overruled in part
25    pursuant to the agreement of the parties, and then without
```

1   prejudice for further exams.

2           THE COURT:  Okay.  All right.  Now Ms. Sherman.

3           MS. SHERMAN:  Your Honor, if you could take the

4   motions for reconsideration, that's No. 3 on the Court's

5   calendar, which is a motion for reconsideration of the order

6   approving compromise on N169SL, which is Doc. 616.  There's a

7   similar motion for reconsideration on the order approving

8   compromise with N104SL, which is Doc. 630 and is No. 7 on the

9   Court's calendar.  And there's a third motion for

10  reconsideration as to 109SL, which is Doc. 631, which is No. 8

11  on the Court's calendar.

12          THE COURT:  Okay.

13          MS. SHERMAN:  Those were all filed by Global

14  Aerospace and I don't want to --

15          THE COURT:  There's a joinder, though, isn't there?

16  I thought there was somebody that had a joinder in that.  Well,

17  there was -- maybe it was unwritten and maybe it was Mr.

18  Andersen?  Am I recollecting correctly or no?

19          MR. ANDERSEN:  Judge, we never formally joined with

20  that request for reconsideration.

21          MS. SHERMAN:  Your Honor, I don't want to steal Mr.

22  Clark's motion, but I just wanted to put the motion for

23  reconsideration in context.

24          The motions were all teed up procedurally as a

25  dispute between CCA, a single creditor that has a fractional

1  interest in N162SL and two other planes, and the owners of

2  169SL where CCA wanted to claim an interest in the waterfall

3  from the sale of N169SL, even though CCA is not in fact a

4  fractional owner of that plane.  So we have a fairly small sum

5  involved and two very limited parties, the fractional owners of

6  N169SL and CCA.

7       Global got involved and filed almost a nisi brief

8  regarding the issue.  And one of the arguments by both CCA and

9  Global was that when parts were removed from N162SL that they

10 were converted if they were not replaced.  And if Your Honor

11 recalls, we had hearings on several different days, and one day

12 I guess the recording machine didn't record.

13      And we had really very limited evidence.  We had the

14 documents from Mr. Andersen's client, they're agreements.  We

15 had a couple of affidavits from NetJets as to what industry

16 practice was.

17      But we didn't really have much evidence before the

18 Court as far as what actual parts were missing; when they were

19 taken off; why were they taken off:  Were they shipped out for

20 repairs, were they put on another plane, were they chucked in

21 the trash, were they sold on Craig's List?; and where the parts

22 were now.  So we were operating on somewhat of a limited

23 record.

24      The order that was ultimately entered, Your Honor

25 determined that CCA did not have a interest in those parts.

1　And the order that was ultimately entered was the standard:

2　For the reasons stated on the record in open court that shall

3　constitute the findings of the Court.

4　　And I understood Your Honor's ruling, and maybe I'm

5　oversimplifying it, was that whether it was a conversion or

6　whether it was a breach of contract, it gave rise to a capital

7　"C" Claim for damages against the Debtor, not an in rem

8　interest and into another plane.

9　　But there are all kinds of statements that were made

10　on the various records, and they're quoted at length in Mr.

11　Clark's motion for reconsideration, that are undoubtedly going

12　to whether they were in fact the Court's findings, whether it

13　was the Court questioning a party or playing devil's advocate

14　with a party during the course of the hearings -- they were

15　lengthy -- that are going to undoubtedly find their way into

16　other proceedings involving other parties other places.

17　　The Trustee's concern is specifically the directors

18　and officers policy. We've made a policy limits demand under

19　the directors and officers policy. And if the Court found that

20　there was or was not a conversion, or if a particular sentence

21　from one of the transcripts taken out of context would suggest

22　that the Court had made such a ruling, it may impact the D&O

23　fund.

24　　Similarly, under the policies that plead insurance,

25　if the Court did make a ruling one way or the other on the

conversion issue or if the transcripts were argued to say that
Your Honor did make a ruling one way or the other, it could
have collateral consequences to a lot of other parties in a lot
of other contexts.

So as I understand it, Mr. Clark, his thrust of his
motion for reconsideration is that he would like to see a
sentence added to the order that expressly says that the Court
did not make specific findings one way or the other on the
conversion issue so that as we all go out into the world and
have --

THE COURT:  Which type of conversion?  The conversion
that Mr. Andersen spoke of that would mean that the ownership
is still reposited to the original owner, or the kind of
conversion that is a tort?  In other words, for title purposes
or for tort purposes?

MS. SHERMAN:  Well, Your Honor, I'm not sure that
anyone distinguished during the course of the record, and I
would submit to the Court as I'm standing here today, probably
both, capital conversion for tort purposes or a conversion for
purposes of transferring ownership.

THE COURT:  I think as to the one that you just
mentioned, I did.  I said that ownership -- that the part on
the plane that went somewhere else is not still owned by the
original owner given the contractual provisions that generally
permit both removability and replaceability.  So in terms of

1 | title, title did not stay with the original owner.

2 |         MS. SHERMAN:  I guess I never understood that to be a

3 | conversion argument.  I understood that to be a title argument.

4 | So maybe it's semantics, Your Honor.

5 |         THE COURT:  But Mr. Andersen used the word

6 | "conversion," and you talked about the hot car; right?

7 |         MR. ANDERSEN:  Yes, Your Honor.

8 |         THE COURT:  I'm saying that these are not hot parts.

9 |         MS. SHERMAN:  And I think that Mr. Verona and Mr.

10 | Clark and the Trustee -- well, I know the Trustee -- are all in

11 | support of a clarifying sentence being made in that order as

12 | far as the tort of conversion to clarify that Your Honor did

13 | not make specific findings concerning the --

14 |         THE COURT:  I only went as far as I needed to, and

15 | that is:  There was a breach of contract claim.  There is a

16 | breach of contract claim for the way that the parts were not

17 | replaced.  The owners had an expectation under the contract of

18 | certain things happening.  But when the musical chair -- I keep

19 | talking about the musical chair game.  When the music stopped,

20 | there were not sufficient replacement parts.  That's a breach

21 | of contract.

22 |         The Eleventh Circuit says that a tort of conversion

23 | can exist coincident with a breach of contract, <u>Misabec</u>

24 | <u>Mercantile, Inc. De Panama v. Donaldson, Lufkin & Jenrette ACLI</u>

25 | <u>Futures, Inc.</u>, 853 F.2d 834, Eleventh Circuit 1988.  In that

1    case there was not the something more, as I understand the

2    holding, not the something more that would have led to a

3    conversion claim.  The court says this:  A simple breach of

4    contract does not ordinarily constitute civil theft or

5    conversion.

6         So I didn't go -- I didn't cover the waterfront.  I

7    was only making a distinction between the hot car argument, is

8    title still possessed in the original owners or is it not, not

9    the tort of conversion.  And I think I said that.

10        MR. VERONA:  Your Honor, I think that when the term

11   "conversion" was being thrown around, I think most of the

12   lawyers -- but I can only speak for myself.  I was thinking of

13   the tort of conversion and I agree, you didn't need to rule on

14   that in order to determine who has title to the parts in all

15   the airplanes.

16        You ruled as a matter of law that the language of the

17   program documents either were plain on their face or they were

18   ambiguous.  You carefully quizzed Mr. Andersen about whether he

19   could produce or could have produced contract affidavits as to

20   the industry standard regarding moving parts around.  And after

21   much hemming and hawing, I think he acknowledged that our

22   affidavits --

23        THE COURT:  He didn't hem and haw.

24        MR. VERONA:  Well, okay.

25        THE COURT:  He possesses a good degree of credibility

1  and candor with the Court.

2          MR. VERONA:  Okay.  Well, it took about eight pages

3  of the transcript, that's all I --

4          THE COURT:  The industry standard is to grant this

5  permission, but the allegation is someone, i.e. this Debtor,

6  took advantage of that.

7          MR. VERONA:  Okay.  Notwithstanding all of that, the

8  subsequent -- I think at the original hearing when you

9  announced your ruling, you were very clear on that.  And I

10 think you were asked to expound upon that.  And there were some

11 comments made concerning conversion that I think could be taken

12 out of context.

13         My primary concern is I'd like to make sure that when

14 this matter goes up on appeal, that it is as appellate-proof as

15 possible.  Global has asked that one line be added to the order

16 that basically says that the Court wasn't expressly determining

17 conversion, and we don't have a problem with that because --

18         THE COURT:  Didn't need to.

19         MR. VERONA:  Right, exactly.  So we'd like to see

20 that --

21         THE COURT:  The difference was title or ownership

22 versus claim for damages.

23         MR. VERONA:  Exactly.

24         THE COURT:  So if you all have agreed to language,

25 then we don't even have to have much of a hearing today; right?

1          MR. VERONA:   Correct.

2          THE COURT:   Great.

3          MR. CLARK:   Your Honor, I'm not completely clear that

4    that's necessarily the case.   And in regard to the case that

5    the Court cited making the distinction between title and the

6    tort of conversion --

7          THE COURT:   No, that's not -- that's not what this

8    case says.   This case says that a simple breach of contract

9    without more does not arise to the tort of conversion.   In

10   other words, this case stands for the proposition that breach

11   plus something can amount to the tort of conversion.

12         MR. CLARK:   Right.   And those are a couple of issues

13   I would like to address because, in light of some of the

14   statements that have gone on the record over a series of three

15   or four different hearings, I do agree with Ms. Sherman that

16   they could be taken out of context at some point in time.   And

17   I'd like to take a few moments and visit some of these issues

18   because of why I think it's so important to have this

19   absolutely clear.

20         And let me start first with the -- back up to the

21   management agreement because this is a point of the management

22   agreement that the Court really hasn't been directed to

23   previously with any detail.

24         Section 6 of that agreement is called Covenants,

25   Representation, and Warranties of the Manager.   And pursuant to

1  that section, Avantair specifically warranted to the fractional

2  owners that Avantair would maintain the airworthiness of the

3  aircraft in good standing and arrange for the inspection,

4  maintenance, repair and overhaul of the aircraft in accordance

5  with all maintenance programs and standards established by the

6  manufacturer in this case, Piaggio, as well as the FAA, and

7  that the manager would keep the aircraft in good operating

8  condition at all times.

9       Now, we know that in August of 2013, the Federal

10  Aviation Administration and the Office of Chief Counsel of

11  Enforcement for the FAA issued an emergency order of suspension

12  and a companion notice of the proposed certificate action.  And

13  based upon its administrative investigation, the Office of

14  Chief Counsel for Enforcement found that specifically each

15  aircraft that it inspected had been stripped of key components

16  and those aircraft were not flown for several years.

17       The FAA also concluded that Avantair was guilty of

18  systemic failure to properly track maintenance --

19       THE COURT:  Big breach, big breach of contract.

20       MR. CLARK:  Well, and also this is what I'm getting

21  to, because the Court also said that the failure to maintain

22  the parts, which are life-limited, which is very critical in

23  aviation, basically made these parts unairworthy, unsafe, and

24  unuseable, which is essentially the same thing, I think, as

25  Avantair taking the parts off the aircraft and --

1          THE COURT:  Huge breach.

2          MR. CLARK:  -- doing something with them.  And as a

3    result, the FAA concluded that there was an emergency affecting

4    safety and air commerce and it was necessary for the FAA to

5    take immediate action to ground the entire fleet.

6          Now, with those actions -- and it's not clear to me

7    at this point if the Court has taken judicial notice of the

8    actions of the FAA.  I know that those -- the notice of

9    proposed certificate action and the emergency suspension order

10   are in the court file.

11         THE COURT:  I made them file those so everyone would

12   know.

13         MR. CLARK:  Yes.  Yes, thank you.  And so therefore,

14   to the extent that that constitutes facts before this Court,

15   it's clear that Avantair was in breach, as the Court just

16   pointed out, of many parts of the management agreement,

17   including the part that I just referenced.

18         Now, in regard to the issue of conversion,

19   conversion, as the Court well knows, is a subject much broader

20   than theft or civil theft or even criminal theft, but basically

21   states that one authorized to make particular use of a chattel

22   and then uses it in a manner exceeding that authorization is

23   subject to liability -- to conversion to another whose right to

24   use or control of that chattel is seriously violated.

25         So Avantair here was authorized to make use of these

1  aircraft but was also required to keep them in airworthy

2  condition and to maintain them in accordance with the rules of

3  the FAA and the Piaggio requirements.  Its failure to do that,

4  as already reflected by the findings of the FAA, was an act by

5  Avantair in excess of its authorization.  So that convert --

6  that itself constitutes conversion, even --

7          THE COURT:  Well, under <u>Misabec</u> you may have a great

8  case.

9          MR. CLARK:  I'm sorry, Your Honor?

10          THE COURT:  I said under <u>Misabec</u> you may have a great

11  case, but I don't need to go there.  What difference does it

12  make?  My issue was just title or not title.  That was the

13  objection that Mr. Andersen raised.

14          MR. CLARK:  Right.  Right.  Well, as I've said, you

15  know, in the past, and I will say it again today, there

16  continues to be some concern on behalf of Global that in light

17  of how the Court's articulating this, that this issue can come

18  up at some later time by some fractional owners.  Therefore,

19  we're hesitant that if the Court is construing the contract to

20  any extent or if it's making any type of factual findings to

21  support its determination, that that could, at this point,

22  create an issue that might create a problem somewhere down the

23  road.

24          We don't have a problem if the Court is basing its

25  decision strictly on equitable grounds because that avoids any

1  possible argument that the contract's been construed in a

2  certain way or that there were any certain factual findings

3  made --

4         THE COURT:  Well, I think I put a backstop because I

5  forgot to, in the first hearing, to say -- and someone used the

6  phrase, I can't remember exactly what it was, but it would be

7  cumbersome, it would be -- this isn't the right phrase -- too

8  hard to sort out where each part goes from the beginning all

9  the way -- you know, going backwards to reconstruct the claim,

10 every single nut, bolt, everything.  That would be something

11 that just, you know, we couldn't do.

12        I don't know if I have jurisdiction to even force

13 someone to bring a plane over here so I can take a screw off of

14 it and put it on a Debtor-owned plane.  It would be an

15 impossible conundrum.  And that was a backstop that I didn't --

16 but that was a fallback.  That was not the original reason for

17 the ruling.

18       The original reason for the ruling was I found that title

19 -- true title did not remain in the owners because of what they

20 permitted this charter service, or whatever you want to call

21 it, to do.  And so I said it's a breach.  I didn't go so far as

22 to say that it was breach plus.  But I don't need to because it

23 wasn't important to the issue.

24        MR. CLARK:  I would suggest --

25        THE COURT:  I mean why is dicta on some other issue

1  that's not even germane to what was before me on the

2  compromises, why is that something that you think that some

3  appellate court is going to say she's already ruled that there

4  was no tort of conversion?

5       MR. CLARK:  Well, my concern would be that because

6  Global is a party in interest that there could be a

7  determination at a later time that whatever finding the Court

8  has made collaterally estops Global from taking a position that

9  might be contrary to that and therefore it could somehow impact

10 issues that --

11      THE COURT:  Okay.  I'm going to say it for the fifth

12 time:  I wasn't dealing with the tort of conversion.  I'm not

13 precluding it.  The Eleventh Circuit says that they can co-

14 exist.  A simple breach -- I didn't say it was a simple breach.

15 I never said that.  That would be a preclusive statement.  I

16 never said it was only a simple breach.

17      MR. CLARK:  Well, Your Honor, we do have -- if that

18 is the case, Ms. Sherman and I did have some language in an

19 order that we would request the Court to review and see if that

20 doesn't then accurately set forth what the Court is ruling

21 today.  And --

22      THE COURT:  I'm not changing my ruling.  I'm not

23 ruling anything.  I'm making my ruling the same as it has been

24 consistently since day one.

25      MS. SHERMAN:  Your Honor, we'd simply be asking for a

1  clarification just for future reference --

2          THE COURT:  I'll say it again:  I made no

3  determination about the tort of conversion.  I did not find or

4  rule that this was only a simple breach of contract.  I said

5  they can co-exist because the Eleventh Circuit tells us that if

6  it's a breach-plus situation.

7          I have not been asked to rule on the plus.  The plus

8  is not relevant to the determination of whether the bolt on the

9  plane -- on the original plane that is now in a plane five

10  times removed still belongs to the owners of the original

11  plane.  It wasn't relevant.  It still isn't and I'm not

12  changing my ruling.

13          I will be happy to clarify again that there's no

14  ruling on conversion except for the title issue.

15          MS. SHERMAN:  Would Your Honor --

16          THE COURT:  It's not a hot car.  It's not a hot bolt

17  or screw, in other words.

18          MS. SHERMAN:  We had -- language that Mr. Verona and

19  Mr. Clark and I had looked at prior to the hearing used the

20  simple term "conversion."  But in light of your comment today

21  about conversion having two meanings, we may want to change it

22  to the common law court conversion.  But it was adding a

23  paragraph that says:  The Court makes no legal or factual

24  determination or conclusion whether the Debtor, through its

25  alleged acts and omissions, committed one or more acts that

1  constitute the common law tort of conversion.

2       And I think that's consistent with what you've said,

3  but we'll now have it in a single piece of paper --

4       THE COURT:  And --

5       MS. SHERMAN:  -- rather than 15 different

6  transcripts.

7       THE COURT:  -- the Court was ruling only on the issue

8  of title --

9       MR. CLARK:  Your Honor, just -- I don't mean to

10 overspeak --

11      THE COURT:  -- based on the analogy of the hot car.

12 The thief cannot transfer title to someone else.

13      MR. CLARK:  I just want to correct one thing because

14 we've gone through several variations of the order, which I

15 understand the Court doesn't want to deal with.  But from

16 Global's perspective, the issue of conversion wasn't going to

17 be confined just to the common law tort of conversion because I

18 believe the tort of conversion as used in Global policy would

19 include civil as well as criminal --

20      THE COURT:  Civil theft, that would be a statute.

21      MR. CLARK:  Well, it could be civil or criminal

22 conversion.  But I do -- if you'd beg my indulgence, because I

23 just want to make sure I understand what the Court's ruling is.

24 Because my understanding in cases like Carib Aviation, which is

25 an Eleventh Circuit case, and some older Florida Supreme Court

1  cases, is that you can actually have conversion and breach of

2  contract if they're on all fours with one another, meaning that

3  you don't have to have something more than the breach of

4  contract.

5        Because if the possessor of the property, in this

6  case Avantair, exceeded its authority under the terms of that

7  contract, that's a breach of contract.  But it's also a

8  conversion on the four squares of that contract, it does not

9  require something more.

10        My concern is that there's going to be an argument

11  made later that --

12        THE COURT:  Criminal intent?  Don't you have to have

13  that?

14        MR. CLARK:  You do not have to have criminal intent,

15  Your Honor.  You don't even have to have any type of wrongful

16  intent as well.  If the Court will bear with me for a second, I

17  would refer the Court to the Florida Supreme Court case of Star

18  Fruit.  It's an older case but still good law.  It just says

19  the essential element of conversion is wrongful depravation of

20  property to the owner.

21        The cases of Seymour, which is at 638 So.2d 1044 says

22  that the tort of conversion, or conversion for that matter,

23  will lie even based upon nothing more than a mistaken belief

24  that the person taking possession or abusing his authority had

25  the right to possession.  It does not require any type of

1  specific intent or intent to take something from someone else.

2  It can be a mistaken belief.  The key term is that it is

3  removed in such a way that deprives the owner of possession.

4       The <u>Carib Aviation</u> case, which we've cited, was a

5  case where --

6       THE COURT:  And that's a year before this -- three

7  years before this other case, <u>Misabec</u>.

8       MR. CLARK:  But this is -- exactly to your point,

9  though, Your Honor, is that the pilot leased an airplane, was

10  going to fly it from Miami to Orlando and that's what the lease

11  provided for.

12       The pilot made a detour to the Bahamas and picked up

13  some marijuana, and flying back to the mainland, ran out of

14  fuel and the aircraft went into the water.  The pilot testified

15  he never had any intent to steal that airplane, that airplane

16  was going to end up right back in Orlando and it was going to

17  be returned to the owner.

18       The court -- the Eleventh Circuit concluded in that

19  case that that taking of the airplane, deviating from the

20  flight path for Orlando, going -- making an extra stop into the

21  Bahamas, exceeded the authority granted to that pilot under

22  that lease agreement; therefore, it was conversion, even though

23  there was no intent to steal or permanently deprive the owner.

24       Now, similarly here, with Avantair, we have a

25  practice, which the FAA called "systemic," of taking parts.

1   And Avantair wasn't doing this for the efficiency of the

2   program I would submit to the Court, but was doing it for its

3   own economic self-interest because it was not using funds to

4   buy parts and put them back on the airplane.

5          These airplanes, some of them have not flown for

6   years when Avantair had an obligation to keep them currently

7   airworthy and available.

8          THE COURT:  And they didn't have the money to do

9   that.

10          MR. CLARK:  Did not have the money and so they --

11   basically it can be characterized as some kind of a Ponzi

12   scheme because it's taking money from other people to keep

13   funding some airplanes operating to the detriment of the other

14   fractional owners of some aircraft.

15          But here we have the grounding orders being issued in

16   August.  You know, the bankruptcy is occurring in the summer of

17   2013 --

18          THE COURT:  Can I ask a question?  All I said is:

19   I've not found that it's a simple breach; it's a big breach.

20   But it's a breach, and if something else can co-exist with

21   that, that's fine.  I don't need to go there.

22          It was a title issue.  Is it:  Do you still own the

23   stuff that was originally on your plane, or is it -- which is

24   the Humpty-Dumpty theory that Ms. Sherman gave these analogies

25   in the first hearing -- or is it the musical chair game and you

1   get what you get when the music stops?  That's all I was

2   deciding.

3         I mean, if you're trying to get me to say that there

4   is a tort of conversion just based on your proffers, I'm not

5   going to do that either.  There's no purpose for it in the

6   context of the compromise motions.

7         MR. CLARK:  Right.  And we weren't asking for the

8   Court to make that determination because I don't think the

9   facts are in the record.  As we had argued earlier anything --

10        THE COURT:  You keep putting them in the record.

11        MR. CLARK:  -- we thought that would be -- well, but

12  it -- Your Honor, respectfully, I don't have a witness to this;

13  I'm just making a speaking statement.  But as we said earlier,

14  we suggest that, if the Court was going to make a factual

15  determination, it would be appropriate to have evidentiary

16  hearings on this and we need to take the examinations of --

17        THE COURT:  I made a factual determination that no

18  one -- and no one said that there would be a dispute of fact --

19  that the industry standard is X even if the contract -- well,

20  if the contract weren't clear enough on its face.

21        The owners gave permission for things to be taken

22  off.  They gave it and things -- the original never to be

23  returned.  They gave that permission.  That's what made me say

24  that this is not a title issue, it's a breach of contract;

25  could be more than just a breach of contract.  But as distinct

from the title issue, it's a breach.

      MR. CLARK:  Is the Court, in the reference to "more," is the Court ruling that there's an additional element that has to be established beyond the breach of contract or is the Court saying that they can co-exist?

      THE COURT:  Let me read you again from the Eleventh Circuit case; okay?  This is what they said.  Okay.  "A conversion action is not an appropriate means of vindicating a claim which essentially alleges breach of contract."  It goes on and it says somewhere, "A simple breach of contract does not ordinarily constitute civil theft."

      I don't have to get to that if I just look at is it a breach or is it a title issue.  It's a breach; it's not a title issue.

      MR. CLARK:  But in regard to that particular language, though, the court is referring to civil theft conversion and does include civil theft.  The conversion is a much broader concept, Your Honor, and also refers to "ordinarily" which, to me, suggests that sometimes breach of contract and conversion can exist on all fours together without more.

      THE COURT:  It says, "Misabec's complaint made claims of conversion, civil theft, breach of contract, and breach of fiduciary duty.  Misabec has failed to show that any genuine issue of material fact exists regarding its conversion claim."

1          It's just saying that if it's just a simple breach

2    alone, you don't have conversion.  I didn't rule it was just a

3    simple breach alone.  I ruled it was a breach, and the breach

4    means that the owners gave permission to change the parts out.

5    It's not the car that's been stolen and then turned around and

6    sold to somebody else because title would always remain in the

7    original owner.

8          MR. VERONA:  Your Honor, the motion requests that the

9    Court -- and this is on page 6 of Document 668.  Global

10   requests the Court reconsider modifying its order to include

11   the limitation that in making its ruling approving the

12   compromise and sale, the Court is not deciding one way or

13   another whether Avantair is guilty of conversion against

14   fractional owners.

15         Everybody's agreed to it.  And I don't understand

16   what the purpose of this proffer is other than to seek an order

17   saying that there was a conversion, and that requires evidence,

18   which, you know --

19         THE COURT:  It's not needed.  I don't need to go

20   beyond -- I just -- I needed to figure out whether or not title

21   remained in the original owners of all their original parts or,

22   alternatively, whether they gave permission to have parts

23   removed and put into a different plane, et cetera, et cetera,

24   albeit with an expectation that some replacement would find its

25   way to their plane.  I found the latter; that's a breach of

1    contract.

2          MR. VERONA:  And the Trustee has agreed to the relief

3    sought in the motion; my clients have agreed to it.  So it

4    seems to me we ought to just submit the proposed order --

5          THE COURT:  Well, give it to me.

6          Mr. Andersen?

7          MR. ANDERSEN:  Your Honor, if I may just simply state

8    in my place.

9          THE COURT:  Sure.  Pull your microphone a little bit

10   closer to you.  Thank you.  You can sit down if you like.

11         MR. ANDERSEN:  Thank you, Your Honor.

12         MR. VERONA:  May I approach, Your Honor?

13         THE COURT:  Yes.

14         MR. ANDERSEN:  Just for clarity on the record, Your

15   Honor.  CCA of Tennessee and CCA do not wish to re-litigate,

16   re-argue any of this.  If the order as presented reflects the

17   Court's ruling, then we have no objection to the form of the

18   order.  However, I do think it's important to emphasize that we

19   want to reserve all of the arguments that we made at the

20   original argument, including those relating to whether there

21   was authority under the program documents.

22         THE COURT:  Right.  Right, because you're going to

23   appeal that.  Yeah.

24         MR. ANDERSEN:  Yes, Your Honor.

25         THE COURT:  Right.

 1          MR. ANDERSEN:  Thank you.

 2          THE COURT:  Now, you might want to find out what the

 3 waterfall is, though, on some of these before you spend time.

 4 I mean, if it's only a little bit of money, those probably

 5 aren't good subjects of appeal.

 6          MR. ANDERSEN:  And that's constantly an issue of

 7 analysis, and I've reviewed that with our clients, Your Honor,

 8 so I will do that.

 9          THE COURT:  Yeah, all your arguments and objections

10 regarding the waterfall provision are reserved.

11          MR. ANDERSEN:  Thank you, Your Honor.

12          THE COURT:  Okay.  So where are we now?

13          MR. CLARK:  Mr. Appleby has those proposed orders,

14 Your Honor.

15          THE COURT:  And what is the -- where is the new

16 language?

17          MR. APPLEBY:  Your Honor, the changes to this order

18 from Docket No. 597 other than an order amended at the

19 beginning, there's a slight change to the first footnote on

20 page 2 right above the numbered paragraphs, the corrected dates

21 to reflect the hearings where we discussed this.  And actually,

22 Your Honor, I think we probably should add today's date as

23 well.

24          THE COURT:  Well, I'm going to need to have a

25 proposed order on the actual motion for reconsideration.

```
 1              MR. CLARK:  We have one, Your Honor.

 2              MR. APPLEBY:  I'm sorry, Your Honor.  Let me pass

 3  that over.

 4              THE COURT:  I still think the January 15th hearing

 5  date has to be in here.

 6              MR. APPLEBY:  Well, Your Honor, we've referenced that

 7  in the footnote on Footnote 1.

 8              THE COURT:  Well, it came before me on January 15th

 9  as well.

10              MR. APPLEBY:  That's correct, Your Honor.

11              THE COURT:  Okay.  And where's the conversion

12  language?

13              MR. APPLEBY:  It's paragraph 9, Your Honor.

14              THE COURT:  9.  How do I make it clear that -- the

15  distinction between what you all mean and what I meant?

16              MR. VERONA:  Just say a common law tort of

17  conversion.

18              THE COURT:  He says that there's the statutory as

19  well, Chapter 812.

20              MR. VERONA:  Well, the issue is what were you

21  intending.

22              THE COURT:  I was intending that it was a title issue

23  or not, title remained versus breach of contract.

24              MS. SHERMAN:  Should we say "common law conversion"?

25  We can say "criminal conversion."  I don't know that you found
```

1  the common law tort of conversion or the criminal conversion

2  which would be a statute.  I don't -- I think Your Honor said

3  you didn't find any -- you didn't have to find whether it was

4  any of the above.

5        THE COURT:  Right.  The question is whether it was a

6  hot car or not.

7        MS. SHERMAN:  Right.

8        THE COURT:  And I found it not because the owner gave

9  permission for parts to be removed and put on a different plane

10 and that belies any intent to have the original part back.  So

11 that's a breach of contract, not a title issue.

12       MR. CLARK:  Your Honor, I think that paragraph 9

13 should read as stated but possibly an additional line that

14 says, as the Court just said, is that --

15       THE COURT:  Except for purposes of retention of

16 title --

17       MR. CLARK:  I think that's what the Court just said.

18       THE COURT:  -- how about that?

19       MR. CLARK:  Yes.

20       THE COURT:  Is that okay to everybody?  Except for

21 purposes of retention of title.

22       MR. VERONA:  Can I just have a minute to --

23       THE COURT:  Sure.  Or, except for purposes of

24 transferability of title; how's that?  Does that sound better?

25       MR. CLARK:  I apologize, Your Honor.  Can you --

```
 1              THE COURT:  Except for purposes of transferability of
 2    title.
 3              MR. VERONA:  I'm just a little bit confused --
 4    forgive me -- what that adds or how that clarifies anything.
 5              THE COURT:  Because I'm saying that title doesn't --
 6    the original title owners did not retain title to those parts.
 7              MR. VERONA:  Okay.  I understand.  So I'm okay, then,
 8    with the --
 9              THE COURT:  Except for purposes of transferability of
10    title.
11              MR. VERONA:  That's fine.
12              THE COURT:  Is that fine?
13              MR. CLARK:  Would that be in a separate paragraph,
14    Your Honor, basically saying that --
15              THE COURT:  No.  I'm going to put a comma after
16    "conversion."
17              MR. CLARK:  And, Your Honor, I would -- I understand,
18    I think, what the Court is ruling today.  At this point as I
19    speak, I'm not sure what the full ramifications of it are.  I
20    cannot stipulate to the accuracy or whether we would agree to
21    that particular language, but at least I understand what the
22    Court is saying.
23              THE COURT:  It was the reason for the decision that
24    the planes can be sold free and clear of the original owners'
25    interest in the nut, the bolt, the chair, the cup holder.
```

1        MR. CLARK:  Yes.  And that I understand.

2        THE COURT:  That's all I was ruling.

3        MR. CLARK:  Well, intellectually what I'm struggling

4   with is how that's separate from the tort of conversion, which

5   is the only point that I'm making.  And that's why I hesitate

6   to stipulate to any particular language.

7        THE COURT:  Because of what you just said, the

8   original transfer can be okay and then what you do with it

9   afterwards can be not okay.

10       MR. CLARK:  Well, I don't want to re-argue this, but

11  there are circumstances here which we argued that there may be

12  instances where the original transfer was in violation of

13  obligations.  But that's a factual determination that we've

14  argued that would have to be made at a later time.

15       THE COURT:  And that's at least a breach of contract,

16  not -- it doesn't affect title.

17       MR. CLARK:  And as the Court has said, it's at least

18  a breach of contract but it could also be conversion as well.

19       THE COURT:  Yes.  And I think I said that at a prior

20  hearing, that they could co-exist.

21       MR. CLARK:  Thank you.

22       THE COURT:  To rule otherwise would be to sustain the

23  objection that CCA made, which is, you bring everything back to

24  the original owners and you can't sell the plane with the other

25  parts in it.

1          MR. ANDERSEN:  Your Honor, if I may, just for the

2    sake of clarification of CCA's original objection, our original

3    objection was not to the sale; it was only to the --

4          THE COURT:  -- the waterfall.

5          MR. ANDERSEN:  -- distribution of the proceeds.

6          THE COURT:  But your distribution was based on that

7    argument.

8          MR. ANDERSEN:  And we were simply asking that that be

9    determined at a later date; in other words, in accordance with

10    an order of the Court as opposed to a determination based on

11    the motion that was presented at that time.  Our objection was

12    that those issues should be determined at a later date.

13          THE COURT:  Well, I determined them then.

14          MR. ANDERSEN:  And I understand, Judge.  And if I

15    may, the only other clarification I would make is simply this:

16    CCA's position has not been that parts should be reassembled or

17    taken back.  Our position, really right from the very

18    beginning, has been that the next best remedy, given what we

19    view as a --

20          THE COURT:  -- conundrum.

21          MR. ANDERSEN:  -- conundrum of the mixture of all

22    these parts and airplanes is for the proceeds to be distributed

23    in accordance with the respective shares of the various

24    fractional owners in the entire fleet.

25          THE COURT:  Right.  But the rationale for that was

1 that your stuff is on the plane that got sold.

2           MR. ANDERSEN:  That's correct, Your Honor.  Thank

3 you.

4           THE COURT:  And I'm saying your stuff was not on the

5 plane that got sold.  It might have been originally your stuff,

6 but what you have is a breach of contract claim.

7           MR. ANDERSEN:  Thank you, Judge.

8           THE COURT:  Okay.  All right.  Are we done?  Oh,

9 we've got the other sale motions.

10           MR. CLARK:  I think what Ms. Sherman has -- I don't

11 want to jump the gun, but I think this would apply to all of

12 the outstanding motions as well, because I think the issues are

13 all the same.

14           THE COURT:  Yes.

15           MS. SHERMAN:  Yes, to N104SL and N109SL, as well as

16 N169SL.  And we'll have to create companion orders that match

17 the ones we just handed up for N169 and submit those.

18           THE COURT:  Right.  And then where's the -- oh, here

19 it is.  Here's the order granting.  But I haven't entered an

20 order on any of the other ones yet; right?

21           MS. SHERMAN:  Correct, Your Honor.  On the motion to

22 compromise, we only have 169, and 104, and 109 at this point.

23 And those were the only three that would therefore require

24 (inaudible).

25           THE COURT:  Okay.

1          MS. SHERMAN:  And Mr. Appleby graciously volunteered

2     to do all the drafting.

3          THE COURT:  Okay.  What do we take up next?

4          MS. SHERMAN:  Your Honor, I think the rest of the

5     calendar is going to move pretty quickly.  The motion --

6     amended motion for approval of sale free and clear of liens and

7     to approve sale and bid procedures as to N104SL, which is item

8     No. 2 on the Court's calendar at Dockets 650, 723 and 729, Your

9     Honor, we're going to be -- the last amendment was just to

10    include some omitted lienholders.

11         That plane is going to be sold by Starman Brothers

12    Auctions who previously conducted the auction and we'd like it

13    to be in, so we're going --

14         THE COURT:  The same guy that did the other one?

15         MS. SHERMAN:  Yes, Your Honor.  It's going to be

16    different terms, so we're going to be uploading a motion to

17    approve the retention of Mr. Starman as auctioneer and amending

18    this particular motion to reflect that it will be a Starman

19    auction as opposed to some sort of an auction conducted without

20    an auctioneer by the Trustee.

21         And I believe we have a number of hearings set for

22    April 28th.  If we have time before then and we can have it

23    heard sooner, that would be wonderful.  If not, if we could

24    kick it back in on April 28th, that would be great as well.

25         THE COURT:  What do you have available, Ms. Garcia?

```
 1            COURTROOM CLERK:  How much sooner before April 28th?

 2            MS. SHERMAN:  I think we're going to have to give at

 3  least some notice.  If we could -- you know, two weeks from

 4  Wednesday or something right about that, I should have the

 5  motion by then.  We're tinkering with -- to define the terms of

 6  the auction and retention.

 7            COURTROOM CLERK:  We can do it April 21st.

 8            THE COURT:  That's a week.

 9            COURTROOM CLERK:  I'm sorry, we can do it April 15th.

10  Is that too soon?

11            MS. SHERMAN:  That would be perfect.

12            COURTROOM CLERK:  April 15 at 10:00.

13            MS. SHERMAN:  And Item No. 4 on the Court's calendar,

14  which is the motion for approval of sale free and clear of

15  liens as to N109SL, that will also be a Starman motion, Your

16  Honor.  So if we can do the same thing --

17            THE COURT:  Same date?

18            MS. SHERMAN:  -- and bump it to the same date, that

19  would be great.  And we'll get the amendment and the

20  application to employ filed well prior to that hearing.

21            MR. GART:  Your Honor, may I be heard briefly?  This

22  is a question to the Court as to what date was chosen?

23  Apparently we couldn't hear that over the --

24            THE COURT:  I'm sorry, April 15th.  At what time, Ms.

25  Garcia?
```

1          COURTROOM CLERK:  10 o'clock.

2          THE COURT:  10 o'clock.

3          COURTROOM CLERK:  Who was just speaking?

4          THE COURT:  That was Brian Gart.

5          MR. GART:  Thank you, Your Honor.  This is Brian

6   Gart.  Thank you.

7          MR. CROSNICKER:  Your Honor, this is Michael

8   Crosnicker on behalf of Signature Flight and Support

9   Corporation.  May I be heard briefly as well?

10          THE COURT:  Sure.  Go ahead.

11          MR. CROSNICKER:  We had spoken to Ms. Sherman

12   regarding Signature's storage lien on the N104SL and she had

13   mentioned that she was going to note on the record that

14   Signature's lien would be paid from storage proceeds.  I didn't

15   hear that, so I just wanted to make a point here that Signature

16   does have a lien on that aircraft based on possession under

17   Texas law.

18          MS. SHERMAN:  Your Honor, I was intending to do that

19   at the next hearing when we heard the motion to sell.  But

20   clearly if there's a lien, we have to pay the lien in whatever

21   amount the Court determines from the sale proceeds.

22          THE COURT:  Right.

23          MR. CROSNICKER:  My apologies, Ms. Sherman.

24          MS. SHERMAN:  No problem.  We're on the same page.

25          THE COURT:  Just like we did with the Pinellas County

1  Tax Collector.  There will be a waterfall; right?

2          MS. SHERMAN:  Yes.  They weren't originally named as

3  a lienholder because they didn't have anything on file with the

4  FAA and we weren't aware of the storage lien.  So if we can

5  work out the amount prior to that hearing, we will.  If not, we

6  can amend the adversary to add them as an additional defendant

7  and work it out that way.

8          MR. CROSNICKER:  We can get back to you.

9          MS. SHERMAN:  N138SL, Your Honor, is going to be the

10 third plane.  And I'm going to look to Mr. Bird to make sure

11 I'm saying this correct.  N138SL is the third plane that's

12 going to be using Mr. Starman as an auctioneer?

13         MR. BIRD:  Yes.

14         MS. SHERMAN:  And on that one, Your Honor, we'll need

15 to do an amendment as well.  And the motion to approve

16 compromise of controversy for N138SL is set for April 28th, so

17 it was set after the motion to sell.

18         So we can hear either N138SL both on the same day on

19 April 28th or we can -- I think we need to move the motion to

20 approve compromise up so it's heard at least at the same time

21 as the motion to sell because the motion to sell presupposes

22 that the compromise has been approved and we kind of got the

23 cart before the horse on that one.

24         THE COURT:  So we need to put the compromise motion

25 on April 15th?

1    MS. SHERMAN:  Yes.  Or put this particular sale

2  motion on April 28th with the compromise motion.  I don't want

3  to rearrange the Court's calendar.  I don't know how much time

4  Your Honor has on the 21st, but we need to have them both heard

5  on the same day or at least --

6         THE COURT:  The 15th you mean.

7         MR. VERONA:  15th.

8         MS. SHERMAN:  I'm sorry, the 15th, yes, yes.

9         MR. VERONA:  That would be our preference.

10        THE COURT:  What, the same day?

11        MR. VERONA:  Yes, ma'am.

12        MS. SHERMAN:  Both of them to the 15th I think is

13  what Mr. Verona --

14        MR. VERONA:  Right, the 15th; the sale and the

15  compromise on the 15th.

16        MS. SHERMAN:  On N138SL.

17        THE COURT:  Or we can do the -- we can do the

18  compromise on the 15th and the sale on the 28th.

19        MR. VERONA:  Well, I think from our standpoint, the

20  sooner the better because --

21        THE COURT:  Okay, fine.

22        MR. VERONA:  -- the season for selling is finite.

23        THE COURT:  Oh, that's right.

24        Ms. Garcia, we could put them both on the 15th.  So

25  you have to move the compromise motion to the 15th from the

1 | 28th.  What's left on the 28th?

2 | 　　　　　MS. SHERMAN:  We still have -- we have N134SL, which

3 | is Item 10 on the Court's calendar; N146SL, which is Item No.

4 | 11 on -- and Item No. 12, which is N176SL.  Those three are

5 | also situations where we have the motions to sell set for

6 | hearing today but the motion to compromise is not set for

7 | hearing until April 28th.

8 | 　　　　　So we can either move the motions to approve --

9 | 　　　　　THE COURT:  How much time do we have on the 15th?

10 | 　　　　　COURTROOM CLERK:  All morning.

11 | 　　　　　THE COURT:  Why don't we just put everything that's

12 | on the 28th on the 15th?

13 | 　　　　　MS. SHERMAN:  On the sale motions.  I think there's

14 | other stuff now that's on the 28th as well.

15 | 　　　　　THE COURT:  Okay.  The non-sale related items can

16 | stay on the 28th.

17 | 　　　　　MS. SHERMAN:  Okay.

18 | 　　　　　THE COURT:  But the compromise and sale motions all

19 | need to be on the 15th.

20 | 　　　　　MS. SHERMAN:  And Mr. --

21 | 　　　　　MR. GART:  Your Honor, this is Brian Gart.  Could I

22 | be heard just briefly again?

23 | 　　　　　THE COURT:  Yes.

24 | 　　　　　MR. GART:  Your Honor, Bravia had filed a limited

25 | objection to all of the sale motions that are being heard

1  today, and we would just ask that the limited objection be

2  heard at the now rescheduled hearing on all these sales on the

3  15th.  We're endeavoring to try to resolve this with Ms.

4  Sherman, but in the event that it isn't, we'd like the

5  objection heard that day as well.

6            THE COURT:  Okay.  So --

7            COURTROOM CLERK:  Judge, (inaudible).

8            THE COURT:  On the 28th?

9            (Conversation between the Court and the courtroom

10           clerk regarding notice.)

11           THE COURT:  Okay.  So what do you want to go ahead

12  with that's left on our calendar?

13           MS. SHERMAN:  Your Honor, I think that takes care of

14  the entire calendar today.

15           THE COURT:  So we move 2, 4, 7, 9, 10, 11, 12 to the

16  15th?

17           MS. SHERMAN:  Your Honor, I'm not sure No. 7 was one

18  we were moving.  I might be -- I have a different number.  I

19  think that's a motion for reconsideration on my calendar.

20           THE COURT:  Yeah.  Didn't I skip over that?

21           COURTROOM CLERK:  No, you said 7.

22           THE COURT:  I didn't?  Well, that's the same issue

23  that we just ruled.

24           MS. SHERMAN:  Correct.  So it doesn't need to go to

25  the 15th.

1          THE COURT:  No.  I just need to get the companion

2     order; right?

3          MS. SHERMAN:  Correct.

4          THE COURT:  So 2, 4, 8, 9, 10, 11, 12; right?

5          MR. VERONA:  I think 8's also a motion for

6     reconsideration.

7          THE COURT:  Okay.  So I need a companion order on

8     that one.

9          COURTROOM CLERK:  2, 4 and 9.

10          THE COURT:  2, 4, 9 through 12, those go to April the

11     15th at 10 o'clock.

12          COURTROOM CLERK:  And then we continued Mr. Markham's

13     motion to the 28th.

14          THE COURT:  His is a stay motion.  That can stay on

15     the 28th.

16          Okay.  There's three motions to approve a compromise,

17     Ms. Garcia.  You're saying that's going to be a big job on the

18     part of the clerk to re-notice them?

19          COURTROOM CLERK:  It's an all-creditor motion, so all

20     creditors have to get notice.

21          THE COURT:  Well, how were they noticed for this one?

22          COURTROOM CLERK:  I don't know.  That's what I was

23     just getting ready to check.

24          THE COURT:  Well, whoever noticed this one has to

25     notice the change or get some people to help with that expense.

1    MS. SHERMAN:  Your Honor, we served the fractional

2    owners, all of them, by CM -- by email and we served the entire

3    CM/ECF list.  And then if it's not a 100-percent plane, we've

4    been serving any non-fraction -- non-settling fractional owners

5    by snail mail.  And if we could serve the hearing notice by

6    email and snail mail on that same group of people, that's

7    something my office can do --

8         THE COURT:  Okay.

9         MS. SHERMAN:  -- very easily as far as the hearing

10   dates.  So if you want us to send out the hearing notice --

11        THE COURT:  Notice --

12        MS. SHERMAN:  -- moving those three and then

13   scheduling the rest -- putting everything onto April 15th, we

14   can do that.

15        THE COURT:  Well, the ones that are noticed for today

16   that we're going to continue in open court, those don't need to

17   be the subject of any paper-generated notice.

18        COURTROOM CLERK:  Right.

19        THE COURT:  Okay.

20        COURTROOM CLERK:  It's just moving --

21        THE COURT:  It's moving the three that are on the

22   28th.  We're going to leave on Mr. Markham's and we're going to

23   leave on this application for payment of an administrative

24   expense.

25        So you'll take care of the three that are already set

1   -- the three motions to approve compromises that are already

2   set for the 28th; right?

3          MS. SHERMAN:  Assuming we can serve it on fractional

4   owners by email and not snail mail to the entire creditor

5   matrix, because that's 6,000 people.  I'm looking at I think

6   maybe --

7          THE COURT:  Well, how was it originally noticed?  Ms.

8   Garcia, did we --

9          MS. SHERMAN:  The motion wasn't served on the world.

10  I don't know how the hearing notice went out.

11         THE COURT:  She'll look at that.

12         COURTROOM CLERK:  First Class mail.  I mean, look.

13         THE COURT:  It went to everybody?

14         COURTROOM CLERK:  Yeah.  I mean, I guess I could make

15  a pro memo from today's hearing that says the hearings that are

16  scheduled for April 28th --

17         THE COURT:  No.  Because somebody on that list --

18         COURTROOM CLERK:  -- is going to be -- right.

19  Sixteen pages of creditors.

20         MS. SHERMAN:  Your Honor, on those, then, if we have

21  to, we can bump the sale hearings to the 28th, keep the ones on

22  the 15th that I think -- 104 and 109.

23         THE COURT:  Okay.  Let me see which ones --

24         MS. SHERMAN:  We can have them on the 15th and at

25  least get two of them in.

```
1            THE COURT:  Hold on.  Give me that thing back, Ms.
2    Garcia, I've got to see which ones that they relate to.
3            138SL, 134SL, and 107SL.
4            MR. MOHNEY:  Your Honor, I think it's also 146SL.  It
5    should be No. 9 and No. 11 are the ones in which Dallas
6    Airmotive has an interest.
7            THE COURT:  Okay.
8            COURTROOM CLERK:  146.
9            THE COURT:  146, there is no motion for approval of a
10   compromise filed with respect to 146.
11           MS. SHERMAN:  Your Honor, they should have been --
12   all been filed.  The motion to approve compromise and motion to
13   sell and then pending adversary were all filed in batches.  I
14   have --
15           THE COURT:  And 176; there's 176 as well.
16           MS. SHERMAN:  Your Honor, I believe there's a motion
17   to approve compromise on the docket on both of those.
18           THE COURT:  All right.  Let's see where that one was
19   noticed.  What a mess.
20           MR. MOHNEY:  Your Honor, I have docket numbers if it
21   would help with respect to those two (inaudible).
22           THE COURT:  With respect to --
23           MR. MOHNEY:  146 and --
24           THE COURT:  -- 176?
25           MR. MOHNEY:  -- and 138.
```

1           COURTROOM CLERK:  There's 711; Document 711 is 107SL.

2           THE COURT:  And when is 711 set?  Well, that's set

3   for the 28th.

4           COURTROOM CLERK:  Right.

5           THE COURT:  No.  He's saying a different one.  Okay.

6   Now I'm really confused.  Okay.  You have an interest, Mr.

7   Mohney, in 146, and what's the other one?

8           MR. MOHNEY:  138 and 146, Your Honor.

9           THE COURT:  Hold on.  138 is -- the motion for

10  approval of compromise is on the 28th.

11          MR. MOHNEY:  Okay.  And then --

12          THE COURT:  And so 146, though -- when is 146 set,

13  Ms. Garcia?  That would be --

14          MR. MOHNEY:  It's Docket 668, Your Honor.

15          THE COURT:  That's the motion for compromise?

16          MR. MOHNEY:  Yes.

17          THE COURT:  Okay.  When is 668 set?

18          MS. SHERMAN:  That may be the one that's not set for

19  hearing at all yet, Your Honor.

20          THE COURT:  Okay, 668 needs to be set for April the

21  15th.  Now, what goes -- what's the number that goes with 176

22  -- Tail No. 176?

23          COURTROOM CLERK:  That's 672.

24          THE COURT:  And when is that set?

25          COURTROOM CLERK:  (Inaudible) April 28th.  It's not?

1          THE COURT:  No.

2          COURTROOM CLERK:  Then that one needs to be set as

3   well.

4          THE COURT:  Then that one needs to be set for April

5   15th.  So 668 and 672 will be set on April 15th to coincide

6   with the continuance in open court of those two sale motions

7   that are set on today's calendar.

8          COURTROOM CLERK:  Okay.

9          THE COURT:  But we will leave on the 28th, then, Tail

10  Nos. 138, 134, and 107.  And we will take 138 -- is that on

11  today's calendar?

12         MS. SHERMAN:  I'm sorry, Your Honor?

13         THE COURT:  138 on today's calendar is going to be

14  continued in open court to April the 28th at 3:00, not the 15th

15  at 10:00.

16         That's No. 9 on our calendar today, Ms. Garcia.

17         And No. 107 -- oh, 107 is not on our calendar for

18  today, is it?

19         MS. SHERMAN:  No, Your Honor.  I believe that was the

20  most recent one that was uploaded.

21         THE COURT:  Is 134 on our calendar today?  No.

22         MS. SHERMAN:  The motion to sell 134 is on the

23  calendar today.

24         THE COURT:  What number is that one?

25         MS. SHERMAN:  Docket No. 686 and it's on the calendar

1  as --

2          COURTROOM CLERK:  134, is that what you said?  It's

3  Item 10.

4          THE COURT:  Item 10, that one needs to go to the

5  28th; okay?  So Items 9 and 10 are continued in open court to

6  April the 28th to coincide with those motions for compromise,

7  the rest go to April 15th.  So, Nos. 4, 11, and 12 go to April

8  15th, and the motion to sell 107 needs to be set for April

9  28th.

10          COURTROOM CLERK:  Which document was that?

11          THE COURT:  What number is that one, Ms. Sherman?

12          MS. SHERMAN:  Your Honor, I don't have that one in my

13  hearing notebook because it wasn't set for hearing today.

14          THE COURT:  Okay.

15          MS. SHERMAN:  I apologize.

16          THE COURT:  Well, we've got to get that one tied to

17  the motion to approve the compromise; right?  So that one needs

18  to be on the 28th.

19          MS. SHERMAN:  Correct.  Hopefully they would both get

20  set for the same date.

21          THE COURT:  Okay.  Well, we've got the compromise

22  motion set --

23          MR. GART:  Your Honor, that's Document 711.

24          THE COURT:  Thank you.

25          COURTROOM CLERK:  And the sale is 712.  So both of

1  those are which date?

2          THE COURT:  Yes.  The 28th.  You already have one of

3  them on -- you have 711 on the 28th, you don't have 712.

4          COURTROOM CLERK:  Okay.

5          THE COURT:  Yet.  Okay.

6          Now, let me show you the changes or tell you another

7  change on the motion for reconsideration order.  The

8  explanation of the amendment, the footnote, I also said this --

9  this is at Footnote 1:  This order also clarifies that the

10 Court considered, quote, conversion, close quote, only for

11 purposes of transferability of title to parts in, slash, part

12 of the N169SL aircraft.

13         And so when this hits the docket, you can make the

14 changes for the other motions for reconsideration similarly.

15         I think -- now are we done?  Even though we spent a

16 half an hour just rescheduling things?

17         MS. SHERMAN:  Yes, Your Honor, I believe we are.

18 Thank you.  And it's before 5:00.

19         THE COURT:  I know.  Great.

20         MR. CLARK:  Thank you.

21         THE COURT:  Thank you.  And when you leave, do tell

22 the CSO's that you're out of Courtroom 8B.

23         MS. SHERMAN:  Yes, Your Honor.

24         THE COURT:  Thank you.

25              (Hearing concluded at 4:42 p.m.)

CERTIFICATE OF TRANSCRIBER


    I certify that the foregoing is a correct transcript

prepared to the best of my ability from the digitally recorded

audio proceedings and logs in the above-entitled matter.




_____     April 1, 2014
Marilyn L. Taylor, CVR                  Date
Transcriber




FEDERALLY CERTIFIED TRANSCRIPT AUTHENTICATED BY:

_____
Kimberley S. Johnson, CVR-CM
Certified Verbatim Reporter Master

JOHNSON TRANSCRIPTION SERVICE
7702 Lake Cypress Drive
Odessa, Florida 33556
(813) 920-1466