IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

- - - - - - - - - - - - - - - x
IN RE:                         :
                               :
AVANTAIR, INC.,                :   Case No. 8:13-bk-09719-CPM
                               :   Chapter 7
                Debtor         :
- - - - - - - - - - - - - - - x
                                   U.S. Courthouse
                                   801 N. Florida Avenue
                                   Tampa, Florida
                                   Held August 16, 2013

TRANSCRIPT OF HEARING

1-FEH on Involuntary Petition

2-Expedited Motion for Relief from Stay and for Turnover of
Records Filed by Steven M Berman on behalf of Piaggio Avanti
P-180 Aircraft, et al

3-Motion for Relief from Stay (Fee Paid.) Re: Piaggio Avanti
P-180 Aircraft FAA N187SL; Two (2) Pratt & Whitney Canada
Pt6a-66 Engines, Serial Numbers PCE-RW0057 and PCE-RW0058; Two
(2) Hartzell Propellers, HC-E5N-3A, Serial Number KU135 and
HCE5N- 3AL, Serial Number HF260., Motion for Turnover of
Property of the Estate. Filed by Adam L Alpert on Behalf of
Dorian Punj, Pegasus III, LLC, Lockton Enterprises, Inc.

(Motions Continued Next Page)


BEFORE THE HONORABLE CATHERINE PEEK MCEWEN
UNITED STATES BANKRUPTCY JUDGE


*Proceedings Digitally Recorded by Court Personnel;*
*Transcript Produced by Court-Approved Transcription Service.*

(Continued Motions)

4-Application to Employ Lynn Welter Sherman and the Law Firm of Adams and Reese, LLP as General Counsel for Chapter 7 Trustee Filed by Beth Ann Scharrer

5-Emergency Motion for Relief from Order Granting Interim Chapter 7 Trustee's Emergency Motion to Prohibit Access to Premises and for Relief of the Automatic Stay, or in the Alternative, for Adequate Protection Filed by John J Lamoureux on Behalf of Creditor AvAero Services, LLC

6-Expedited Motion for Relief from Stay Re: Piaggio Avanti P-180 Aircraft, SN 1107; Registration Number N140SL; and All Related Records, Documents, and Log Books. And Request for Hearing Filed by Herbert R Donica on Behalf of MBN LSN, LLC; Debonair, LLC; Aviation Service, LLC; LLS Flight Service, LLC; QSI Ventures, LLC

7-Motion for Relief from Stay and for Turnover of Records Re: Piaggio Avanti P-180, Registration Number N187SL. (Expedited Hearing Requested) Filed by Zachary J Bancroft on Behalf of H&E Services, Inc., Gary West

8-Motion for Relief from Stay Re: Piaggio Avanti P-180, Registration Number N188SL. (Expedited Hearing Requested) Filed by Zachary J Bancroft on Behalf of James Laier, William Benton, David Dyer, H&E Services, Inc., Hamilton James, Potomac Management, LLC, Willellen Air, LLC

9-Motion for Relief from Stay Re: Piaggio Avanti P-180, Registration Number N139SL. (Expedited Hearing Requested) Filed by Zachary J Bancroft on Behalf of Creditor Dec Leasing, LLC, Gary West, Helium Aviation, LLC, Snowmass Creek Flight Ops, LLC, and Yang Investments, LLC

10-Motion for Relief from Stay and for Turnover of Records Re: Piaggio Avanti P-180, Registration Number N163SL. (Expedited Hearing Requested) Filed by Zachary J Bancroft on Behalf of MJD Aircraft LLC, Garner Investments, LLC, Capital Partners, Inc., David Manners, Tuscany Ventures, LLC, Neil Galatz, Duke Resorts, LLC, Blackstreet Capital Management, LLC

11- Motion for Precautionary Relief from Stay

APPEARANCES (Via CourtCall):

```
Prepetition Counsel
for the Debtor:                    JEREMY JOHNSON, Esquire
(a.m. session only)               RYAN WAGNER, Esquire
                                  McDermott, Will & Emory
                                  340 Madison Avenue
                                  New York, NY 10173-1922
                                  212 547 5400
                                  jrjohnson@mwe.com
                                  rwagner@mwe.com

For the Involuntary
Petitioners:                      BRUCE AKERLY, Esquire
                                  Cantey Hanger LLP
                                  1999 Bryan Street
                                  Suite 3300
                                  Dallas, Texas  75201-6822
                                  214-978-4129
                                  bakerly@canteyhanger.com

For Certain Owners of
Aircrafts:                        AMANDA APPLEGATE, Esquire
                                  Aerlex Law Group
                                  2800 28th Street
                                  Suite 130
                                  Santa Monica, California  90405
                                  310-392-1271

For the FAA:                      JOSEPH CONTE, Esquire
(a.m. session only)               Federal Aviation Administration
                                  Office of the Chief Counsel
                                  800 Independence Avenue SW
                                  Washington, DC 20591
                                  202-267-5158

For Signature Flight
Support Corporation:              MICHAEL CROSNICKER, Esquire
                                  LeClairRyan
                                  70 Linden Oaks
                                  Suite 210
                                  Rochester, New York 14625
                                  585.270.2113
                                  michael.crosnicker@leclairryan.co

For Teterboro Rams:               BRIAN GART, Esquire
                                  Berger Singerman
                                  350 E. Las Olas Boulevard
                                  Suite 1000
                                  Ft. Lauderdale, Florida  33031
                                  954-525-9900
                                  bgart@bergersingerman.com
```

                    (Telephonic Appearances Continued)

For QSI Ventures,
LLS Flight Service,
Aviation Service,
Debonair, LLC,
MBN LSN, LLC:                    HERBERT R. DONICA, Esquire
                                Donica Law Firm, P.A.
                                106 S. Tampania Avenue
                                Suite 250
                                Tampa, Florida  33606
                                813-878-9790
                                herb@donicalaw.com

Mary Peterson and
former employees:               MICHELLE NADEAU, Esquire
                                Kwall, Showers & Barack, PA
                                133 N. Fort Harrison Avenue
                                Clearwater, Florida  33755
                                727-441-4947
                                mnadeau@ksblaw.com

For H&E Services and
Other Owners on 163,
139, 187 and 188:               L. CAROL OWEN, Esquire
                                Baker, Donelson, et al
                                211 Commerce Street
                                Suite 800
                                Nashville, Tennessee 37201
                                615-726-5747
                                cowen@bakerdonelson.com

For a Number of
Clients on 136 and 176:         JOHN R. PERKAUS, Esquire
(a.m. session only)             Perkaus & Farley
                                1343 N Wells Street
                                Suite 100
                                Chicago, Illinois 60610
                                312-266-2111

LW Air I through V, LLC:        GREGORY PLOTKO, Esquire
                                PETER SMITH, Esquire
                                Kramer Levin Naftalis & Frankel
                                1177 Avenue of the Americas
                                New York, NY 10036
                                212.715.9100
                                gplotko@kramerlevin.com
                                psmith@kramerlevin.com

ALSO PRESENT (Via CourtCall)
Representing the FAA:           DALE DONEGAN

```
CONTINUED APPEARANCES (In the Courtroom):

For Beth Ann Scharrer
Interim Chapter 7 Trustee:      LYNN WELTER SHERMAN, Esquire
                                Adams and Reese LLP
                                101 E Kennedy Boulevard
                                Suite 4000
                                Tampa, Florida 33602-5152
                                813.402.2880
                                lynn.sherman@arlaw.com


For Petitioning Creditors
Soldier Creek Ranch LLC
and Joel Trammell:              ROBERT GLENN, Esquire
                                Glenn Rasmussen, P.A.
                                100 S Ashley Drive
                                Suite 1300
                                Tampa, Florida 33602-5309
                                813.229.3333
                                rglenn@glennrasmussen.com
Fractional Owners as
Set Forth in Docket 102:        STEVEN BERMAN, Esquire
                                SARAH GLASER, Esquire
                                C. PHILIP CAMPBELL, Jr., Esquire
                                Shumaker Loop & Kendrick L L P
                                101 E Kennedy Boulevard
                                Suite 2800
                                Tampa, Florida 33602-5150
                                813.229.7600
                                sberman@slk-law.com
                                sglaser@slk-law.com
                                pcampbell@slk-law.com


For Hutchison Advisors, Inc.
and Piaggio, Tail N156SL
and Tail N160SL:                ROY KOBERT, Esquire
(a.m. session only)             Broad and Cassell
                                390 N Orange Avenue
                                Suite 1400
                                Orlando, Florida 32801-1640
                                407.839.4269
                                rkobert@broadandcassel.com


         (Courtroom Appearances Continued on Next Page)
```

(Courtroom Appearances Continued)

For Fractional Owners of
Planes 187, 188, 163
and 139:                          COURTNEY GILMER, Esquire
                                  Baker Donelson
                                  211 Commerce Street
                                  Suite 800
                                  Nashville, Tennessee 37201
                                  615.726.5747
                                  cgilmer@bakerdonelson.com


For Taxiway Alpha, LLC:           ROBERT SORIANO, Esquire
(a.m. session only)               Greenberg Traurig, PA
                                  625 E Twiggs Street
                                  Suite 100
                                  Tampa, Florida 33602-3925
                                  813.318.5700 5757
                                  sorianor@gtlaw.com


For AvAero, LLC:                  JOHN LAMOUREUX, Esqiure
                                  Carlton Fields P A
                                  PO Box 3239
                                  Tampa, Florida 33601-3239
                                  813.229.4224
                                  jlamoureux@carltonfields.com


For Corrections Corporation
of America:                       DONALD R. ANDERSEN, Esquire
                                  Stites & Harbison, PLLC
                                  303 Peachtree Street, N.E.
                                  Suite 2800 SunTrust Plaza
                                  Atlanta, GA 30308
                                  404-739-8800
                                  dandersen@stites.com


For Dallas Airmotive, Inc.:       MARVIN MOHNEY, Esquire
                                  Law Office of Marvin Mohney
                                  541 Bay Court
                                  Heath, Texas   75032-7630
                                  214-698-3011


(Courtroom Appearances Continued on Next Page)

( Courtroom Appearances Continued)

For Global Aerospace, Inc.:
KEITH APPLEBY, Esquire
Hill, Ward & Henderson, P.A.
101 E Kennedy Boulevard
Suite 3700
Tampa, Florida 33602-5195
813.221.3900 3139
kappleby@hwhlaw.com

ROGER CLARK, Esquire
The Clark Law Group
11400 W Olympic Boulevard
Suite 1150
Los Angeles, California 900641585
310.478.0077
rclark@cgold.cc

For Bar-S Investments, LLC:
(a.m. session only)
PHILIP MARTINO Esquire
Quarles & Brady
101 E Kennedy Boulevard
Suite 3400
Tampa, Florida 33602-5195
813.387.0263
philip.martino@quarles.com

For Wahoo II:
(a.m. session only)
MAHLON H. "TRIPP" BARLOW, Esquire
Sivyer Barlow & Watson Pa
401 E Jackson Street
Suite 2225
Tampa, Florida 33602-5233
813.221.4242
mbarlow@sbwlegal.com

For Earl Holland,
Fractional Owner:
BARBARA LEON, Esquire
The Solomon Law Group, P.A.
1881 W Kennedy Boulevard
Tampa, Florida 33606-1606
813.225.1818
bleon@solomonlaw.com

(Courtroom Appearances Continued on Next Page)

(Courtroom Appearances Continued)

For Mike Allred,
Fractional Owner:            B. GRAY GIBBS, Esquire
(a.m. session only)          B Gray Gibbs PA
                             100 2nd Avenue S
                             Suite 1207
                             St. Petersburg, Florida 337014360
                             727.892.9901
                             gibbs@gibbslawgroup.com

For Piaggio North America:   HARLEY RIEDEL, Esquire
(a.m. session only)          Stichter Riedel Et Al
                             110 E Madison Street
                             Suite 200
                             Tampa, Florida 336024718
                             813.229.0144
                             hriedel@srbp.com

For MidSouth Services, Inc.
and Clear Aircraft, Inc.:    MICHAEL MARKHAM, Esquire
(a.m. session only)          Johnson Pope Bokor Ruppel
                             & Burns LLP
                             911 Chestnut Street
                             Clearwater, Florida 33756-5643
                             727.461.1818
                             mikem@jpfirm.com

For Lockton Enterprises, Inc.:BRIAN HOLLAND, Esquire
(a.m. session only)          Lathron & Gage LLP
                             2345 Grand Blvd.
                             Suite 2200
                             Kansas City, Missouri 64108
                             816.460.5329
                             bholland@lathropgage.com

For All of the Owners of
N173SL, and Some of the
Owners of 105, 108, 132,
143, 172 and 188:            ADAM LAWTON ALPERT, Esquire
                             Bush, Ross, P.A.
                             1801 North Highland Avenue
                             Tampa, Florida  33602
                             813-224-9255
                             aalper@bushross.com

(Courtroom Appearances Continued on Next Page)

(Courtroom Appearances Continued)

For the U.S. Trustee:          J. STEVEN WILKES, Esquire
                               Office of U.S. Trustee
                               501 E. Polk Street, 12th Floor
                               Tampa, Florida  33602
                               813-228-2000
                               steven.wilkes@usdoj.gov

ALSO PRESENT:
Chapter 7 Trustee:             BETH ANN SCHARRER

<u>Tampa, Florida, August 16, 2013, 9:43 a.m.</u>

COURTROOM CLERK:  13-9719, Avantair, Inc.

THE COURT:  All right.  I'm going to call roll first with respect to those who are appearing by phone.  If you're here, you can say so and then for the record state the party you represent.

All right.  We'll start from the top of my list that I have from CourtCall.  Bruce Akerly.

MR. AKERLY:  Here, Your Honor, representing the Involuntary Petitioners.  My local counsel is also present in the courtroom.

THE COURT:  Thank you.  Brett Amron.

(No response.)

THE COURT:  Not here.  Amanda Applegate.

MS. APPLEGATE:  Present, representing numerous owners on various aircraft as detailed in our revised appearance agreement yesterday.

THE COURT:  Thank you.  Joseph Conte.

MR. CONTE:  Present, Your Honor, representing the Federal Aviation Administration.

THE COURT:  Thank you.  Michael Crosnicker.

MR. CROSNICKER:  Present, Your Honor, representing Signature Flight Support Corporation.

THE COURT:  Signature Flight what?

MR. CROSNICKER:  Support Corporation.

1          THE COURT:  Support.  Thank you.

2          MR. CROSNICKER:  No problem.

3          THE COURT:  Dale Donegan.

4          MR. DONEGAN:  Present, representing Federal Aviation

5     Administration.

6          THE COURT:  Thank you.  Herb Donica.

7          MR. DONICA:  Good morning, Your Honor.  I'm

8     representing QSI Ventures; LLS Flight Service; Aviation

9     Service; Debonair, LLC; MBN LSN, LLC.

10          THE COURT:  All right.  Good morning back to you and

11     thank you.

12          All right.  Hugh Fuller.

13          (No response.)

14          THE COURT:  Is Hugh Fuller listening?

15          (No response.)

16          THE COURT:  All right.  Hugh Fuller is not here.

17          Brian Gart.

18          MR. GART:  Yes.  Good morning, Your Honor, Brian

19     Gart, Berger Singerman, representing Teterboro Rams.

20          THE COURT:  Good morning back to you and thank you.

21          Next, Jeremy Johnson.

22          MR. JOHNSON:  Good morning, Your Honor, from

23     McDermott Will & Emory, the prepetition counsel to Avantair.

24          THE COURT:  Thank you.  Good morning all of you.

25          Okay.  Michelle Nadeau.

1           MS. NADEAU:  Here.  I represent Mary Peterson and a

2    group of former employees.

3           THE COURT:  A former employee?

4           MS. NADEAU:  Yes.

5           THE COURT:  Thank you.  L. Carol Owen.

6           MS. OWEN:  Yes, Your Honor, I'm here, and I represent

7    H&E Services and a number of other owners on 163, 139, 187 and

8    188.

9           THE COURT:  All right.  Thank you.  John R. Perkaus.

10          MR. PERKAUS:  Present, Your Honor, representing a

11   number of clients on 136 and 176.  Thank you.

12          THE COURT:  Thank you.  Gregory Plotko.

13          MR. PLOTKO:  Present, Your Honor.  I am representing

14   LW Air I through V, LLC.  I'm also here with my co-counsel

15   Peter Smith.

16          THE COURT:  All right.  Thank you.  Next -- well,

17   Peter Smith, I guess, has already been announced.

18          All right.  Ryan Wagner.

19          MR. WAGNER:  Present, Your Honor.  Also on behalf of

20   -- appearing as prepetition counsel to Avantair.  Thank you.

21          THE COURT:  All right.  Thank you.

22          Is there anyone else on the phone whose name I did

23   not call and wishes to make an appearance?

24          (No response.)

25          THE COURT:  No.  Okay.  So the only no shows we have

1  are Brett Amron and Hugh Fuller.  If anyone wants a list of

2  those who signed in to participate by phone, we can make that

3  happen.  Ms. Arciola can give you a copy for those in the

4  courtroom.

5          Now, those in the courtroom, let's start with you.

6          MS. SHERMAN:  Lynn Welter Sherman, proposed counsel

7  for Interim Trustee Beth Ann Scharrer, and Ms. Scharrer is in

8  the courtroom with me today.

9          THE COURT:  Thank you.

10         MR. GLENN:  Good morning, Your Honor.  Bob Glenn on

11 behalf of the Petitioning Creditors and on behalf of two of the

12 Petitioning Creditors, Soldier Creek and Joel Trammel as owners

13 and as creditors with regard to the rest of the case.

14         THE COURT:  All right.  Thank you.

15         MR. BERMAN:  Good morning, Your Honor.  Steve Berman,

16 Sarah Glaser and Phil Campbell representing a number of

17 fractional owners, the listing of the fractional owners we

18 represent are set forth at Docket 102, which was our amendment

19 to our notice of appearance and they're specifically set forth

20 with respect both to their names and the aircraft in which they

21 have an interest.  We're also assisting Amanda Applegate and

22 John Perkaus in that representation, Your Honor.

23         THE COURT:  All right.  Thank you.

24         MR. KOBERT:  Good morning, Your Honor.  Roy Kobert

25 making an appearance at Docket Entry 23, and was here at the

1  last hearing representing Hutchinson Advisors, Inc., fractional

2  owner in two Piaggio, Tail N156SL and Tail N160SL.

3           THE COURT:  All right.  Thank you.

4           MS. GILMER:  Good morning, Your Honor.  Courtney

5  Gilmer of the Tennessee Bar.  I have been admitted pro hac vice

6  in representing fractional owners on Planes 187, 188, 163 and

7  139.

8           THE COURT:  All right.  Spell your last name for me,

9  ma'am.

10          MS. GILMER:  G-i-l-m-e-r.

11          THE COURT:  Thank you.

12          MS. GILMER:  Thank you

13          MR. SORIANO:  Good morning, Your Honor.  Robert

14  Soriano for Taxiway Alpha, LLC, a lessor of a facility in

15  California.

16          THE COURT:  Thank you.

17          MR. LAMOUREUX:  Good morning, Your Honor.  John

18  Lamoureux of Carlton Fields on behalf of AvAero Service, LLC.

19          THE COURT:  Can you spell that.

20          MR. LAMOUREUX:  It's capital A-v, capital A-e-r-o

21  Service, LLC.  They're the landlord at the St. Pete/Clearwater

22  Airport, Your Honor.

23          THE COURT:  All right.  Thank you.

24          MR. ANDERSEN:  Your Honor, my name is Donald R.

25  Andersen with the law firm of Stites & Harbison.  I represent

Corrections Corporation of America, known as CCA, which has

been assigned a fractional interest in three of the aircraft:

N138SL, N162SL, and N164SL.

THE COURT:  Is Corrections Corp. of America in the

incarceration field?

MR. ANDERSEN:  I believe they operate corrections

facilities, Judge, yes.

THE COURT:  And so your client uses some rights to

use aircraft to transport prisoners?

MR. ANDERSEN:  That's a good question.  I don't know

the answer.  I know they transport their employees, but I don't

know about the prisoners.  I could find out for you.

THE COURT:  No, I'm just curious.  My institutional

knowledge is that they carry them around in vans and they never

go directly where they're supposed to and they travel around

until they get to their spot.

MR. ANDERSON:  I'll try to learn more, Judge; I'll

have more information.

THE COURT:  I had a guy that took six days to get out

of Miami to Tampa via a circuitous route, all the while being

the guest of local jails.  Okay.  Go ahead.

MR. MOHNEY:  Your Honor, my name is Marvin Mohney.

I'm a member of the Texas Bar admitted pro hac vice in this

case and I'm appearing for Dallas Airmotive, Inc.

THE COURT:  All right.  Will you spell your last

1  name, please, sir?

2          MR. MOHNEY:  It's M-o-h-n-e-y.

3          THE COURT:  Thank you.

4          MR. APPLEBY:  Good morning, Your Honor.  Keith

5  Appleby with the Hill, Ward & Henderson law firm as co-counsel

6  for Global Aerospace, Inc.  And we also have Roger Clark.

7          MR. CLARK:  Good morning, Your Honor, Roger Clark of

8  the Clark Law Group.

9          THE COURT:  All right.  Thank you.  Same client;

10 right?

11         MR. CLARK:  That is correct.

12         MR. MARTINO:  Good morning, Your Honor.  Philip

13 Martino appearing on behalf of Bar-S Investments.  We have a

14 fractional interests in 160SL and 165SL.

15         THE COURT:  Thank you.

16         MR. BARLOW:  Your Honor, Tripp Barlow from Sivyer,

17 Barlow & Watson here in town.  I represent Wahoo II, W-a-h-o-o

18 Roman Numeral II.

19         THE COURT:  Thank you.  Anybody else?

20         MR. BARLOW:  No, ma'am.  Fractional owner in Tail No.

21 152 and Tail No. 1 -- strike that -- 157 and Tail No. 142.

22         THE COURT:  You know, I don't have a spreadsheet

23 here, so you can just say -- y'all can just say "fractional

24 owner."  Somebody will make me a spreadsheet one day I hope.

25         MR. KOBERT:  Your Honor, if I may, Roy Kobert.  It

1  helps because I'm trying to find out who my other fractional

2  owners are who are in the courtroom.

3        THE COURT:  Well, I'm glad that we have a dating

4  service here.

5        MS. LEON:  Good morning, Your Honor.  Barbara Leon of

6  the Solomon Law Group on behalf of fractional owner Earl

7  Holland.

8        THE COURT:  All right.  Thank you.

9        MR. GIBBS:  Good morning, Your Honor.  Gray Gibbs

10 representing Mike Allred who owns interest in 395 Sierra Sierra

11 or SS, and 140SL, purchased three weeks before the bankruptcy

12 was filed.

13       THE COURT:  Thank you.

14       MR. RIEDEL:  Good morning, Your Honor.  Harley Riedel

15 on behalf of Piaggio North America.  My client, or its Italian

16 affiliate, is the manufacturer of these planes.

17       THE COURT:  All right.  Thank you.

18       MR. MARKHAM:  Good morning, Your Honor.  Michael

19 Markham for MidSouth Services and Clear Aircraft.

20       THE COURT:  Thank you.

21       MR. HOLLAND:  Good morning, Your Honor.  Brian

22 Holland on behalf of Lockton Enterprises, fractional owner as

23 to 187.

24       THE COURT:  Lockton, L-o-c-k-t-o-n?

25       MR. HOLLAND:  Correct, Your Honor.

1    THE COURT:  All right.  Thank you.

2    MR. ALPERT:  Good morning, Your Honor.  Adam Lawton

3  Alpert on behalf of all of the owners of N173SL and then also

4  on behalf of some of the owners of 105, 108, 132, 143, 172 and

5  188.

6    THE COURT:  And by your first statement, when you say

7  "all of the owners," does that mean that you don't believe that

8  this Debtor has any interest in that particular tail number?

9    MR. ALPERT:  With respect to 173, that's correct.

10    THE COURT:  All right.

11    MR. WILKES:  Good morning, Your Honor.  J. Steven

12  Wilkes on behalf of the United States Trustee.

13    THE COURT:  All right.  Thank you.

14    Well, Mr. Glenn, it looks like your little paper that

15  you filed is benefitting a lot of lawyers around the country

16  and locally.

17    MR. GLENN:  Always happy to be of service, Your

18  Honor.  It has attracted a good deal of attention, and

19  particularly when you realize that because there's been no

20  order for relief yet.  The actual notices of filing of this

21  case have not gone out.  So I expect that there will be more.

22  I'm not sure if I hate to say that or I'm happy to say that,

23  but there will be.

24    With regard to the involuntary petition, it has not

25  been timely controverted.  The time to answer or respond to the

1 petition was extended pursuant to the Court's order and with

2 our concurrence as Petitioning Creditors as well as certain

3 other parties.  No response has been filed.

4         We have also filed, and I'm not sure that it was

5 necessary, but just to keep the ball rolling from a paperwork

6 standpoint, we did file a motion for the entry of an order for

7 relief and are prepared to hand up an order for relief, unless

8 the Court wishes to provide some.

9         THE COURT:  All right.  I was going to call for some

10 announcements, and your announcement is one that I, frankly,

11 expected.

12         Does anyone have any objection?  Now, if you're on

13 the phone, please state your name so that our FTR -- or I mean

14 our digital audio operator can catch your name.  Does anyone

15 have an objection to my entering the order for relief?

16         (No response.)

17         THE COURT:  No.  All right.  You want to walk it up

18 here?  Is it important that I should note the time and get it

19 entered right away?

20         MR. GLENN:  The entry of the order for relief

21 certainly does start a number of times running, so it probably

22 is important.  With regard to this particular order for relief,

23 I have not done a lot of editorializing, but I did provide in

24 here the findings with regard to the service based on the

25 certificate of service that we filed, that the Debtor had

1   appeared at least for the purposes of asking for more time.

2          It orders relief under Chapter 7 of the Bankruptcy

3   Code.  And pursuant to Rule 1007, the order has been filed

4   within seven days by the Debtor of a list containing the names

5   and address as set forth in that rule, and within fourteen days

6   the schedules that are required by 1007.

7          The one directs the United States Trustee, who would,

8   I'm sure, do this anyway, to appoint an interim trustee, which

9   is a slightly different animal from the previous trustee.

10  However, we have asked in our motion that -- or at least have

11  suggested the appointment of Beth Ann Scharrer, who was already

12  involved in the case of course and has done a fair amount of

13  work and has counsel in the case.  And we've also asked for the

14  issuance by the clerk of notice -- the order provides a

15  direction to the clerk to provide the notices pursuant to

16  Section 342 of the Bankruptcy Code.

17         And that's basically all there is in here.  I'm happy

18  to add anything that the Court wants or take anything out that

19  the Court doesn't want.  But that is the order for relief.

20  It's a two-page order.

21         THE COURT:  Have you showed the proposed order to Mr.

22  Johnson and Mr. Wagner who represent the putative Debtor?

23         MR. GLENN:  I have not, Your Honor.

24         THE COURT:  All right.  Why don't you walk it up

25  here.  Oh, have you showed it to Mr. Wilkes?

1          MR. WILKES:  He has not.  And I don't have an

2     objection to the entry of the order.  I just rise to inform the

3     Court and the parties that standard practice is, absent the

4     recusal, rejection or removal issues of Trustee Scharrer, she

5     will remain as Interim Trustee pending the 341.

6          THE COURT:  All right.  Thank you.

7          Let me read this into the record for everyone who

8     hasn't seen it.  It's titled Order for Relief:

9          "On August 16, 2013, the Court considered (A) the

10    involuntary petition, Docket No. 1 filed by the Petitioning

11    Creditors:  Soldier Creek Ranch, LLC; Joel Trammell; and

12    Michael L. Allred, as Co-Trustee of Michael L. Allred Revocable

13    Trust; and (B) the motion of the Petitioning Creditors, Docket

14    No. 94, for the entry of an order for relief in this case.

15    Based on the record of this case and the presentation of

16    counsel for the Petitioning Creditors, the Court finds as

17    follows:

18          "Number (1), on July 25, 2013, the Petitioning

19    Creditors filed their involuntary petition against Avantair,

20    Inc., the Debtor.  The involuntary petition was appropriately

21    served on the Debtor as reflected by the certificate of

22    service, Docket No. 4, of counsel for the Petitioning

23    Creditors.  Additionally, the Debtor appeared through counsel

24    and filed an emergency ex parte motion of Involuntary Debtor

25    Avantair, Inc. for extension of time to respond to involuntary

petition, Docket No. 57, seeking an extension through August
13, 2013.

"The Court granted the Debtor's extension request,
Docket 58.  The Debtor filed no further papers or responses to
the involuntary petition.  Based on the foregoing findings, the
Court determines that the involuntary petition has not been
timely controverted by the Debtor and the Petitioning Creditors
are entitled to the entry of an order for relief pursuant to
Section 303(h) of the Bankruptcy Code.

"It is thereupon ordered as follows:  Number (1),
relief under Chapter 7 of the Bankruptcy Code is ordered by the
Court.  Number (2), as required by Rule 1007(a)(2) Federal
Rules of Bankruptcy Procedure, within seven days after the
entry of this order for relief, the Debtor shall file a list
containing the name and address of each entity included or to
be included on Schedules D, E, F, G, and H as prescribed by the
official forms.  The Debtor shall file within fourteen days the
schedules, statements and other documents required by Rule
1007(b)(1), and the Debtor shall file promptly any other lists,
schedules, and reports required by Rule 1007 or otherwise
required by the Bankruptcy Code or the Federal Rules of
Bankruptcy Procedure.

"The United States Trustee is directed to appoint
promptly an interim trustee pursuant to Section 701 of the
Bankruptcy Code.  (4) promptly upon the Debtor's filing of the

1  list prescribed by Rule 1007(a), the clerk of this court shall

2  issue appropriate notices pursuant to Section 342 of the

3  Bankruptcy Code of the entry of this order for relief."

4          So that is the verbatim proposed order, which is not

5  different from the summary Mr. Glenn just rose to provide.

6          So let me ask, Mr. Thompson (sic) and Mr. Wagner, is

7  there any objection on your part -- your client's part to my

8  entering this order right now?

9          MR. JOHNSON:  No objection, Your Honor.  I'm sorry,

10 Your Honor.  This is Jeremy Johnson, no objection, Your Honor.

11         THE COURT:  All right.  Thank you.

12         MR. JOHNSON:  We have prepared drafts of many of

13 those documents by another counsel of the Interim Trustee and

14 we will continue to work with whatever management we have left

15 in an effort to cooperate with those deadlines.

16         THE COURT:  That's super.

17         MR. JOHNSON:  The Interim Trustee -- counsel for the

18 Interim Trustee has filed a 2004 of -- I think -- and I'm not

19 sure if it was ordered, but I believe that process may be

20 moving along.  Most of the officers have resigned, which

21 creates difficulties in trying to comply, but we'll make our

22 best efforts to comply with the terms of the order.

23         THE COURT:  All right.  As I recall from the first

24 conference, you still had general counsel involved; right?

25         MR. JOHNSON:  Yes.  The only remaining members that

1  hadn't resigned were the president of the company, Steven

2  Santo, and the general counsel of the company, Allison Roberto,

3  the two.  But I'm not sure I can necessarily characterize them

4  as involved, but they did not resigned pre-involuntary petition

5  filing.

6           THE COURT:  All right.  Thank you.

7           Ms. Scotten, do you want to go ahead and walk this

8  down to the case manager and see if we can get this order for

9  relief entered while we have the rest of the hearing.  Thank

10 you.  And do you know whether the email's hit the docket?  It

11 did?

12          MS. SCOTTEN:  (Inaudible).

13          THE COURT:  Pardon me?

14          MS. SCOTTEN:  (Inaudible).

15          THE COURT:  Okay.  Did everyone see the emails that I

16 received?  That was the next announcement I was going to make.

17 Okay.  I don't know, I guess I'm so out there everyone knows my

18 email address.

19          I got three emails.  One was just from a creditor I

20 think in New Mexico or Mexico even asking how to lodge a claim.

21 And I think my law clerk responded to him that -- where to find

22 the proof of claim and that we recommend he get an attorney.

23 And I don't remember his name or his company's name.

24          But then I get these two.  So for those who haven't

25 read them, I'll read it.

1      Mr. Lamoureux, did you see these, importantly?

2      MR. LAMOUREUX:  Your Honor, I saw them right before

3 the hearing.  The U.S. Trustee provided me a copy of it.

4      THE COURT:  Okay.  The subject is AvAero is just a

5 front corporation for Kevin V. McKamey, Avantair EVP.  It comes

6 from somebody who is anonymous but has the email address

7 Garnet4847@mypacs.net.

8      I put these on the docket.  I wrote when I received

9 them by email, at least when I opened them.  I redacted my own

10 email address.

11      This is what this one says:  "Dear Honorable Judge

12 McEwen:  I'm sure that you already knew this, but" -- and then

13 there's a long URL, which I didn't click.

14      Next paragraph:  "AvAero is just a shell company for

15 Kevin McKamey, Avantair's executive vice president."  Another

16 URL, which I did not click on.  "If he is allowed access, the

17 rest of Avantair management might as well be allowed access

18 too, and more engines and parts may disappear along with

19 maintenance records.  Thank you.  A concerned former Avantair

20 employee."

21      In my own handwriting, when I posted this on the

22 docket, I wrote:  "Note:  I did not click on the links included

23 in this email.  Papers submitted for the record in this case

24 must be in proper form, signed, filed, and served as required

25 by the applicable rules of procedure and principles of due

1 process."

2       All right.  The next one is longer.  "Subject:

3 McKamey/AvAero."  This time the person had, you know, the

4 gumption to tell me who he is.  It's Charles Icester,

5 I-c-e-s-t-e-r (sic).

6       "Your Honor, I read in the Tampa newspaper that

7 AvAero is requesting unfettered access to the crime scene at

8 Avantair.  I'm sure that you're aware that AvAero is a front

9 company for McKamey as is Kevco.  To allow him or any of the

10 'office tenants' access to the premises will have the same

11 effect as unlocking the doors.  Many (most/all) of those

12 tenants are his pals.  Hopefully the facility at KMCO housing

13 maint. and operational records has also been secured.

14       "I was a long-term employee at VNR, nine years.  Only

15 a handful of others have been on the property longer.  I've

16 observed Mr. McKamey's modus op and can assure you that he

17 operates with impunity.  Federal Aviation Regulations, custom's

18 requirements, and even generally accepted sexual harassment

19 guidelines apply to all others but not him.

20       "I can only imagine his personal resolve to comply

21 with any of your orders.  I have been in frequent contact with

22 investigator Vivian Vega, DOT-OIG.  As the first employee to

23 contact her voluntarily after the collapse, I was able to

24 provide her with some hopefully productive leads.

25       "In your now key role in unraveling this tangled web,

1  understand that the employees as well as creditors are cheering

2  you on.  You have our support and whatever cooperation can be

3  offered.  By my estimation, several hundred millions -- million

4  dollars in wealth has vaporized, but Kevin still has the palm

5  trees.  Regards, Charles E. Eycester" -- E-y-s-t-e-r is his

6  actual name -- "ex instructor pilot."  And he gives a phone

7  number there.

8         So I thought you all should know that I got these

9  things and I have not done anything with them except read them,

10  not clicked on the links that were involved.  And you may

11  download a copy from your -- from the PACER.

12         Now, where should we start, Ms. Sherman, with the

13  rest of our docket?

14         MS. SHERMAN:  Your Honor, I'm kind of at a loss as to

15  where to start, having just --

16         THE COURT:  Me too.  That's why I'm pushing it to

17  you.

18         MS. SHERMAN:  -- having just read that last email.  I

19  suppose it might be good to update the Court and the parties as

20  to where things stand as far as securing facilities and

21  records.

22         THE COURT:  Oh.  And that reminds me; another

23  announcement.  Over the weekend -- was it this past weekend or

24  the weekend before?

25         MS. SHERMAN:  The weekend before.  The weekend after

1  Ms. Scharrer was --

2        THE COURT:  -- the weekend before, I received a call

3  on my cell phone.  It was Ms. Sherman advising me that she was

4  with Ms. Scharrer at the place, wherever the place was, St.

5  Pete I guess, and that there were 30-some-odd doors and many of

6  them were unlocked, and that they would be imminently filing a

7  motion to give them authority to do something, lock it up or

8  whatever.

9        I arranged for a case manager to be on call.  The

10  motion was uploaded and, as you all saw, I granted it.

11        Okay.  Go ahead.

12        MS. SHERMAN:  Well, let's start with that, Your

13  Honor.  So the first thing Saturday morning, Ms. Scharrer and I

14  went to the Clearwater location.  We found it unlocked.  It's

15  in the court file an affidavit of Ms. Scharrer as to the

16  condition of the premises when we got there.

17        There are lots of computer servers.  There are

18  airplanes, some with whole wheels and engines that look like

19  they might be able to fly tomorrow if the FAA would allow them

20  to fly.  There are others that are shells that are sitting up

21  on jacks, and they're sitting in a giant -- all of this is in a

22  giant hangar area together with other planes of other tenants,

23  primarily a Dr. Chipman who keeps planes there.

24        And the way the building is set up, when you walk

25  into the front office space, you can access the hangar, and

1  from the hangar, you can, in turn, access the back of the

2  office space.

3        So we looked around and tried to figure out -- the

4  Debtor has books and records and desks and chairs and computer

5  servers and paper files throughout the entire office, and

6  that's all in Mr. Lamoureux's motion for relief from stay.  And

7  he has also walked through the premises with me.

8        And so it wasn't really feasible to lock up any

9  particular corner of the premises, and the only thing to do was

10 to lock up the entire premises.  That has been done.  None of

11 the doors -- all the doors are locked.  Well, they're

12 inoperable except one, and there is one person who has a key to

13 that, and that is the -- I'm sorry, two -- Ms. Scharrer as

14 Trustee and an agent of the landlord who has been instructed to

15 let no one in without the Trustee's permission.  And he has --

16 they have been doing that.  Hence Mr. Lamoureux's motion for

17 relief from stay.

18        So all the pieces parts of the airplanes -- and some

19 of the parts are laying near the airplanes in the hangars and

20 then there's a bunch of them on shelves.  Some of them have

21 tags showing what planes they came off of, some of them do not.

22 I'm told those parts are worth, ten, twenty, fifty, eighty

23 thousand dollars depending on what they are.  You think car

24 repairs are expensive?  Plane repairs must be exponentially

25 more different.

1          THE COURT:  Mr. Gibbs would tell you that from

2   personal knowledge.  He's probably the only person in here who

3   at one time had his own fleet.

4          MS. SHERMAN:  I believe he still does.  But, yes,

5   they are quite expensive.

6          So we got the records and the paperwork in Clearwater

7   secured.  We immediately sent letters to any FBO or -- Avantair

8   was leasing hangar for office space that we were aware of,

9   specifically Signature Aviation in Dallas and Galaxy in

10  Orlando.  Signature in Dallas, I was able to contact their

11  general counsel, in-house counsel, and he secured the premises

12  there and has assured us that nothing will be coming or going

13  and no one will be coming or going, and that the paper records

14  and physical property there are safe and, absent a court order,

15  will not be going anywhere.

16         I had to physically go to the Orlando location.  At

17  the Orlando location the Debtor has a complete hangar that it

18  was subleasing from Galaxy Aviation.  That contains parts and

19  aircraft, some desks, some computers, and a limited amount of

20  records.  Those locks are keypad locks where you type in a

21  computer code, and we were able to find the paperwork to change

22  the computer codes.  And the fire marshal at Clearwater Airport

23  and Galaxy Aviation and myself are the only three people that

24  have codes to those doors.  So anything in the hangar in

25  Orlando has been secured.

1      Also in Orlando --

2           THE COURT:  You mentioned the fire marshal in

3   Clearwater?

4           MS. SHERMAN:  I'm sorry.  The fire marshal in Orlando

5   Airport.

6           THE COURT:  Oh, okay.

7           MS. SHERMAN:  They have to have by rule -- they

8   actually own a hangar and sublease it.  They have to have

9   access.  If the gas leaks out of a plane and something catches

10  fire, they need to be able to get in.

11          THE COURT:  Who represents Galaxy?

12          MS. SHERMAN:  Galaxy has got in-house counsel by the

13  name of Olga I want to say Parra, P-a-r-r-a.

14          THE COURT:  All right.

15          MS. SHERMAN:  And we have been in contact with Ms.

16  Parra as well.

17          THE COURT:  All right.  Thank you.

18          MS. SHERMAN:  Also in Orlando is a records room.  And

19  the records room is about 3,000 square feet.  I think there are

20  four or five doors leading into the records room in a shared

21  hangar.  And I believe that's Hangar 460.  And those rooms were

22  subleased by Avantair from Galaxy Aviation.

23          Now, when you go into those rooms, there are file

24  cabinets, some of which are labeled, some of which are not

25  obviously labeled, at least to the untrained eye; there are

1    binders containing records; there are paper records out loose

2    on various people's desks.  It looks like everybody went on

3    lunch break and didn't come back, which is, I suspect, pretty

4    much what happened.

5           They are probably, for somebody who knew how things

6    were sorted when the music stopped, something that someone

7    could make sense of.  It would take your or I or someone else,

8    even someone with some aviation training, a little bit of time

9    to figure out how they were sorted and to try and figure out

10   what went with what planes.  Those rooms have also been

11   secured.

12          THE COURT:  Even though they're in a shared hangar?

13          MS. SHERMAN:  Well, there's a hangar area and there's

14   some office space.  You have to have a key to get in the front

15   door.  But all entry doors into the room where those records

16   are located -- actually, there's two rooms -- have been

17   secured --

18          THE COURT:  All right.

19          MS. SHERMAN:  -- so no one can have access.

20          We've notified all the major repair facilities that

21   we were aware of that had parts that the automatic stay was in

22   effect and if they were in the midst of conducting mechanic's

23   lien auctions or anything like that, don't hand them over to

24   anybody else, don't sell them, don't do anything with them at

25   least pending further order of the court.

1          And as far as I know, all the repair facilities have

2   honored those requests, although I know some of them have had

3   people show up and say:  That's my engine, get it to me.  But

4   as far as I know, they haven't done so.

5          The Debtor kept its computerized records for parts on

6   the Avtrak system, which is some sort of software that is

7   supposed to track what parts are on what planes and what life-

8   limited parts are on what planes so that you can tell at a

9   glance how many hours or cycles are on all the life-limited

10  parts.

11         Initially, that had been turned off.  It was turned

12  on with read-only access to allow one of the former maintenance

13  directors to provide us with some lists:  where were the

14  planes, and what engines were on the planes, and what engines

15  did those planes initially come from.  The same with the

16  landing gear and propellers.  Those were partially prepared,

17  those Excel spreadsheets.

18         When I got a call from the lawyer representing Avtrak

19  saying:  We're getting all kinds of calls from all kinds of

20  people demanding access, people are calling saying I want to

21  switch the entire Avantair account to my own name.  And it was

22  getting -- making them rather uncomfortable shall we say.

23         So we had to shut down all Avtrak access.  There was

24  a concern that although it was read-only somebody would be

25  tampering with files.  So the Avtrak files are being preserved.

1  No one can tamper with them and, at this point, no one can

2  access them even on a read-only basis.

3       Depending on what happens today, I believe Avtrak has

4  the ability to allow access on a read-only basis.  But they

5  would like some guidance as to who or what they should be

6  allowing access to.

7       THE COURT:  Who represents Avtrak?

8       MS. SHERMAN:  I believe she's filed a notice of

9  appearance.  I'm sorry, Your Honor, I'll find it in a moment

10 for Your Honor.

11       THE COURT:  Somebody's entered an appearance?

12       MS. SHERMAN:  Yes, they filed a notice of appearance

13 in the case.  It's a law firm.  And it may not say Avtrak; it's

14 the name of the parent corporation.  I think it might be Camp

15 something, but I -- there's too many names in my head right

16 now, Your Honor, and I'm having trouble keeping them all

17 straight.

18       THE COURT:  I'm hoping you all will create

19 spreadsheets one day.  Okay.

20       MR. KOBERT:  Your Honor, at Docket Entry 89 is an

21 appearance by creditor Camp Systems International, Inc.

22       THE COURT:  Okay.  Thank you, Mr. Kobert.

23       MR. KOBERT:  Robin Abramowitz.

24       MS. SHERMAN:  That's correct, Your Honor.

25       Thank you, Mr. Kobert.

1          THE COURT:  Thank you.

2          MS. SHERMAN:  We've gotten in touch with all the

3   banks where we understood the Debtor had bank accounts to let

4   them know freeze the accounts, send any money in the accounts

5   to the Trustee.  And we've begun receiving bank statements.

6   The primary bank accounts were at Wells Fargo.  And they wanted

7   a subpoena before surrendering the records, but they have been

8   surrendering the records now and they're coming in waves.  A

9   bunch of them arrived yesterday.  We really haven't had a

10  chance to look through them.

11         THE COURT:  At the last hearing it was represented to

12  me by the Debtor's counsel that there was no money.  Is that

13  what you have found?

14         MS. SHERMAN:  Your Honor, there was I believe

15  $19,000, and I could be wrong, left in one of the Wells Fargo

16  bank accounts.

17         THE COURT:  Okay.  Virtually nothing.  All right, go

18  ahead.

19         MS. SHERMAN:  That's correct, Your Honor.

20         Ms. Scharrer has diverted the mail at the Clearwater

21  location to a P.O. Box so that she will be receiving it.  There

22  was also mail being received at the Orlando location primarily

23  relating to maintenance and things of that sort.  That mail has

24  also been diverted.  And I believe the third address where the

25  Debtor might have mail was the address shown on the Sunbiz

1    records which appear to be a residential address and so any

2    mail to Avantair that was to be delivered to that address has

3    also been diverted.

4              THE COURT:  How about the Signature address?

5              MS. SHERMAN:  I'm sorry?

6              THE COURT:  Dallas.  Dallas.

7              MS. SHERMAN:  I don't believe they were receiving

8    mail at that address, Your Honor.

9              THE COURT:  All right.  Just for safety's sake you

10   might want to consider that.

11             MS. SHERMAN:  Yes, Your Honor.

12             THE COURT:  All right.  Go ahead.

13             MS. SHERMAN:  We've been in touch with the FAA

14   Special Team.  They actually reached out to me I want to say on

15   the Monday or Tuesday after Ms. Scharrer was appointed.

16   Apparently there is a Special Team that has been assigned to

17   the Avantair fleet as well as FAA counsel, Joe Conte, who is on

18   the telephone.

19             We've been in touch with most of the major creditor

20   contingents that have appeared, most of the major repair

21   facilities who have called.  And we've been in touch -- we're

22   trying to work with the manufacturer, Piaggio, who is

23   represented by Mr. Riedel locally and Marshall Winn out of

24   state, to try and get with them to determine and get lists of

25   -- and they're supposedly being uploaded to an FTP address

1  right now -- what parts were on what planes at the time they

2  were delivered from the manufacturer.

3          Unlike a car --

4          THE COURT:  That's super.  So it would be like a

5  baseline.

6          MS. SHERMAN:  Yes, Your Honor.  Unlike a car, the

7  parts that come on a plane are all -- or at least a great

8  number of them are separately serial numbered.  And I think

9  there's a 138 life-limited parts that have their own serial

10 numbers on a Piaggio P180.  And there's some sort of, I think

11 they call it a "bill book" that you get from the manufacturer

12 with each plane that describes each and every component that's

13 on the plane.

14         And so everything in the entire Piaggio fleet as it

15 stood before some of the planes were given back to Mr.

16 Markham's clients and some of the planes were given back to LW,

17 all those planes, we're getting the baseline on what was on

18 those planes.

19         Piaggio also was gracious enough to volunteer one of

20 their employees to come at the expense of Piaggio and inventory

21 all the parts that were in the Clearwater location, and those

22 are new parts as well as used parts.  They are in rooms all

23 over.  Some are tagged, some are not tagged.  I believe it took

24 them three or four days to finish Clearwater, and I don't know

25 that they've finished Orlando as we stand here today.

1          THE COURT:  And they did that at their own expense?

2          MS. SHERMAN:  Yes, Your Honor.

3          THE COURT:  Go ahead.

4          MS. SHERMAN:  We've also gone through the Debtor's

5   fractional ownership records, which are spreadsheets, and the

6   FAA Registry to try and get a handle on what fractional

7   interests the Debtor may have retained in any of these

8   aircraft.  It appears that the Debtor may have retained a

9   fractional interest in four of the aircraft, which I believe

10  are N104SL, N146SL, N147SL, and N149SL.

11         Mr. Markham's clients, which are MidSouth and Clear,

12  have filed a UCC against those interests and I believe also

13  have FAA filings -- security interests against those fractional

14  interests.

15         THE COURT:  So based on your review they may be --

16  have a perfected position?

17         MS. SHERMAN:  They may, Your Honor.  It's a little

18  early to have all of that analysis done.  Those were recorded,

19  I believe, within 90 days of the bankruptcy case, so there's

20  some further looking that needs to be done as far as that.  But

21  it's really premature to tell.

22         THE COURT:  Perfected, may be voidable.

23         MS. SHERMAN:  I'm sorry?

24         THE COURT:  Perfected, may be voidable.

25         MS. SHERMAN:  Perhaps, Your Honor.

1        We've also done a UCC search to try and get a handle

2   on the extent to which any creditors may claim a lien on non-

3   aircraft-type things that you would perfect through a UCC

4   filing.   There are -- there's a filing by Dell which appears to

5   cover some leased computer equipment.   I don't know if it's all

6   the computers or some subset of the computers.

7        There is also a blanket UCC that's been filed against

8   all assets of the Debtor by a Barry Gordon as collateral agent.

9   And piecing that together with some of the Debtor's SEC filings

10  and the exhibits from those filings and having had

11  conversations with some of the folks who were involved at the

12  time, it appears that there were some secured convertible notes

13  issued to a bunch of folks, some of which may have been

14  insiders and some of which may have been on the board, that

15  made investments in the November 2012 through March 2013 time

16  frame.

17       And it looks like, per the SEC filings, that's about

18  $7 million in the aggregate.   We haven't seen the actual

19  documents themselves yet.   What was attached to the SEC filings

20  were not complete.   I don't know how much money was actually

21  advanced and how much may have been repaid.   So depending on

22  the outcome of that, there may or may not be --

23       THE COURT:   What is identified as the collateral?

24       MS. SHERMAN:   Your Honor, it has basically every form

25  of collateral you can name.

```
 1            THE COURT:  Blanket.

 2            MS. SHERMAN:  Blanket, Your Honor.  It does mention

 3   collateral -- I'm sorry -- commercial tort claims as collateral

 4   generically.  And I don't believe that is how you would perfect

 5   as to commercial tort claims.  And after-acquired property

 6   clauses under Article 9 don't attach to the commercial tort

 7   claims.  So that would be one area we've identified that we

 8   believe the UCC might not cover, assuming everything else

 9   checks out as far as the bona fides of the underlying

10   transaction.

11            THE COURT:  Are you aware of any commercial tort

12   claims?

13            MS. SHERMAN:  Your Honor, I don't know whether there

14   are going to be claims against any of the former directors and

15   officers at this point.  If you read everything that's on the

16   blogs on the internet, perhaps there are; I don't know.  It's

17   really premature.  But there may be commercial tort claims

18   against some of the former insiders.

19            There are director and officer liability policies.

20   There's a main policy for $10 million and an excess policy for

21   $5 million, and they do not appear to have insured-versus-

22   insured exclusions that would preclude a suit by the company

23   against the directors and officers, assuming one does exist.

24   So that is another avenue to be explored.

25            We have located four or five vehicles and a custom
```

1  Harley Davidson that are titled in the Debtor's name which do

2  not appear to have liens on the title.  Those are sitting at

3  the Clearwater location.  The keys were located in a drawer at

4  that facility, and those have been moved to another location

5  and safe.

6           THE COURT:  The vehicles, describe them, please.

7           MS. SHERMAN:  One is a --

8           THE COURT:  Just by, you know, year and make.

9           MS. SHERMAN:  -- hybrid SUV that's some sort of

10 Buick.  I believe the Debtor purchased it used; found some of

11 that paperwork.  It's not going to be terribly valuable.

12 There's a pickup truck and an old Ford Taurus and a Subaru;

13 none of them are going to be terribly valuable.  I'm told the

14 Harley Davidson hasn't run in quite some time.  So I -- without

15 more knowledge of either Harley Davidsons or what might be

16 required to fix it, I don't know the extent to which that may

17 have value.

18           And so with that, that's pretty much the bird's eye

19 view of the extent to which we have gone and tried to, in

20 essence, locate all the marbles and the big ticket items and

21 make sure that they don't go anywhere until the Trustee has an

22 opportunity to figure out who's on first and what the Debtor's

23 interest in all those marbles may be.

24           We've also spent a substantial amount of time trying

25 to figure out the FAA Regulations and understand those as they

1   relate to the current status of the Piaggio fleet.  Mr. Conte

2   is on the phone.  And I know Your Honor typically does not

3   allow people on the telephone to make presentations.  He sent

4   me an email this morning that I can read to the Court if you

5   would prefer Mr. Conte not to --

6          THE COURT:  No.  My telephone policy is for a trial

7   people on the phone may not make inquiry.  But for a regular

8   hearing -- since we're not having a trial today, this is a

9   regular hearing -- Mr. Conte may make a presentation.

10          Go ahead, Mr. Conte.

11          MR. CONTE:  Good morning, Your Honor.  I let the

12   Trustee know that last night the FAA issued 23 emergency orders

13   of suspension against -- regarding 23 of the former Avantair

14   aircraft.  We intend to issue -- and I sent the Trustee a copy

15   of one of those emergency orders.

16          The orders were sent out by FedEx last night and by

17   certified mail last night.  The representatives for those

18   aircraft should get the FedEx packages sometime this morning.

19   We intend to issue 13 -- 12 or 13 emergency orders of

20   suspension regarding 12 or 13 other aircraft today.  And next

21   week, for about 19 aircraft for which we have evidence that

22   they are not in any sort of flyable condition, instead of using

23   our emergency authority, we intend to issue notices of proposed

24   suspension.

25          In regard to the 23 aircraft that were the subject of

1   last night's emergency order of suspension where we suspended

2   the airworthiness certificates, those owners and those

3   representatives have appeal rights to the NTSB.  Our intention

4   is -- you know, if they choose not to litigate it, we have our

5   Special Emphasis Investigation Team.

6           We've developed a checklist of 100 or so items to --

7   that one would have to look at in order to consider whether the

8   aircraft is airworthy or not.  And it's not just looking at the

9   part.  The significant problem with Avantair is they have

10  trouble tracking the life limits on life-limited parts.  And to

11  the extent that they moved one part from one aircraft to

12  another, we have evidence where they failed to carry over the

13  time and service of that part.

14          So, for example, if an engine had 2,000 hours on it

15  on Aircraft No. 1, and they moved it off of Aircraft No. 1 to

16  Aircraft No. 2, they oftentimes zeroed out the time and service

17  of that engine where that engine might have a 5,000-hour

18  overhaul limit.  And so 2,000 hours of time on the engine was

19  not counted for and that, from an FAA perspective, is an

20  aviation safety problem.

21          So I can provide the Court this morning, if you'd

22  like, the N numbers of the aircraft that were subject to the

23  emergency orders of suspension that were issued last night.

24  Later this afternoon, when we issue the 12 or 13 additional

25  emergency orders of suspension, I can give the Court those N

1  numbers as well.

2        THE COURT:  Let's see.  I have before me -- I'm not

3  sure how it magically appeared; somebody obviously walked it up

4  here -- a Federal Express certified return receipt requested

5  letter or copy of a letter dated August 15th.  This is relating

6  to N159SL, and it's Care of Amanda Applegate.

7        I guess this is representative of the emergency order

8  of suspension.  It explains findings from an investigation.  It

9  includes admissions of Avantair officials.  It includes the

10 FAA's sampling of Avantair's fleet with specific examples of --

11 problems I guess is a loose word, but problems.

12       It lists aircraft that lack key components, such as:

13 no left engine, no right engine, loose interior and exterior

14 panels, et cetera.  It addresses aircraft that has been removed

15 from Avantair's operations, specifications.  Some more aircraft

16 that lack key components such as engines or props.

17       The order addresses failures to properly preserve

18 aircraft and parts.  And then lastly, it includes the

19 determination of the emergency.  It is signed by Peter J.

20 Lynch, Assistant Chief Counsel for Enforcement through Attorney

21 John C. Stewart, Jr.

22       So I have been given this example of the emergency

23 order.  Am I to take this and put it on the record as an

24 example?

25       Where did you get this?

1          COURTROOM CLERK:  Ms. Sherman.

2          MS. SHERMAN:  Your Honor --

3          THE COURT:  Oh, Ms. Sherman --

4          MS. SHERMAN:  -- this was a copy that was mailed to

5   you this morning together with an explanatory email.  Mr. Conte

6   wasn't sure whether he would be participating live by phone or

7   not.

8          THE COURT:  Okay.  Let me ask Mr. Conte.

9          Mr. Conte, is this a document that is available

10  anywhere online?

11         MR. CONTE:  It's not available online, Your Honor.

12  But we can, if you'd like, send you PDF copies of the signed

13  version of this document that went out last night.  This

14  version is identical to 18 other emergency orders of suspension

15  issued last night other than the N number for those other 18

16  aircraft.

17         Four of the emergency orders that went out last

18  night, instead of looking like the order that's before you now,

19  are -- were in regard to four aircraft that FAA inspectors

20  recently re-inspected and for which we found specific

21  discrepancies.  And so those four orders are a little bit

22  different than the one before you now.

23         But this order reflects our order against N159SL and

24  18 other aircraft; same allegations, just different N number.

25         THE COURT:  Okay.

1          Mr. Kobert, before you speak, let me say -- I'm going

2    to ask if folks representing parties in interest think that

3    there should be some sort of an omnibus filing, if I request

4    the FAA to do that, in this case either by providing the

5    documents to Ms. Sherman to upload, or whatever, so that all

6    parties will be on notice of the findings that the FAA has made

7    with respect to the various aircraft.

8          MR. KOBERT:  Your Honor, Roy Kobert on behalf of

9    several fractional owners.  We would support that.

10          In part, Judge, at least on one of our airplanes,

11   since there are 16 fractional owners, the first fractional

12   owner is listed on file in Kansas City with the FAA, and that

13   fractional owner is a related party, as it turns out, to

14   Avantair.  So all the notices and liens have been going to

15   Avantair's address.  So, in essence, we would probably never

16   get this notice since it was going just to the first of 16

17   owners.  So the filing of it will provide transparency and

18   allow the fractionals to understand the FAA's perspective on

19   their particular tail.

20          THE COURT:  Okay.  That may be the case with some of

21   the orders, but certainly the one that I just read goes to Ms.

22   Applegate, who is co-counsel with -- I mean with --

23          MR. BERMAN:  She's my co-counsel, Your Honor.

24          THE COURT:  -- with Mr. Berman's group, yes.

25          MR. BERMAN:  Yes, Your Honor.  And we would support

1  that sort of a filing.  The only thing that I would actually

2  request is Ms. -- is if Ms. Applegate has any privacy concerns

3  with respect to a public filing.  I don't know what information

4  is in this.  I'm just looking at it now as is the Court, so I

5  don't know if there are any privacy concerns that would sort of

6  advocate for a not-public filing.

7         But we'd like the information.  And if aviation

8  lawyers, including Ms. Applegate, can comment on whether or not

9  there would be any problem with filing --

10         THE COURT:  Okay.  Let me ask Ms. Applegate.  She's

11  on the phone.

12         Ms. Applegate, would you have any problem with the

13  letter that you received going public?

14         MS. APPLEGATE:  I haven't actually seen the letter

15  yet as I've (indiscernible) to our office yet.  But assuming it

16  just has the entity name on it, that is part of the public

17  record already, so I would have no objection.

18         THE COURT:  Okay.  It does say -- the letter goes

19  care of you, and then it says "Representative of owners N15SL,

20  Aerlex Law Group."

21         Okay.  I think that this information is good

22  information, and it's information that I think will guide the

23  parties, especially those who are seeking stay relief, in maybe

24  making their arguments.

25         And so, Ms. Sherman, I would like for you to get

1  copies of all of these from Mr. Conte, the 23 that have been

2  issued, the 12 to 13 that will be issued soon, and then the 19

3  that will be issued next week, which are, I guess, less --

4  they're just suggestions, I guess, notices of proposed

5  suspension so they wouldn't be orders of suspension.

6       MS. SHERMAN:  Your Honor, this might be a good time

7  to address this.  I received yesterday an Excel spreadsheet

8  that was the Debtor's last records with every fractional owner

9  name, every fractional owner address and their emails.  Now,

10  I've been hesitant to disseminate that list.  There are a lot

11  of mechanics out there, there are a lot of consultants out

12  there, there are a lot of people out there tracking these

13  owners and looking to put together various groups.  And I

14  certainly don't want that list perhaps to be on the public --

15       THE COURT:  Eventually that list is --

16       MS. SHERMAN:  -- but what I was going --

17       THE COURT:  Within 14 days that list is going to be

18  public, or 7 days as the case may be.

19       MS. SHERMAN:  What I would -- if possible, the FAA

20  had asked me could I provide them with the contact information

21  and the email addresses at least so the safety notices could

22  get to those owners.  And again, without -- it was given to me

23  with a stick and a threat and a promise that I would not under

24  any circumstances let that get out there in the public domain.

25  But if I can provide at least to the FAA so that we're sure

1  that all the fractional owners are getting these notices?

2        THE COURT:  Oh.  You may provide it to the FAA.  Now,

3  it may become a public record at that point.  So --

4        MS. SHERMAN:  Your Honor, as long as --

5        THE COURT:  But I'm not --

6        MS. SHERMAN:  -- I have a court order --

7        THE COURT:  -- really that concerned, because I

8  believe the order that I just entered is going to require the

9  Debtor to file all that stuff anyway.  Maybe not the phone

10  numbers and email addresses, I understand that, but the

11  addresses certainly.

12        MS. SHERMAN:  That's fine, Your Honor.  So then it

13  will be all right for me to provide that information to the

14  FAA?

15        THE COURT:  Yes.

16        MS. SHERMAN:  Thank you, Your Honor.

17        MR. KOBERT:  Your Honor, Roy Kobert again on behalf

18  of certain fractionals.  I would support that.  If we could

19  redact just the phone number and email, the addresses I think

20  are fine for contact purposes.  And if the FAA -- if Mr. Conte

21  could also provide us -- at least I know of one airplane where

22  an application was made with the FAA to actually change the

23  tail number, and I'd like to know if he can provide -- not

24  today --

25        THE COURT:  No.  You ask for that off the record.

1          MR. KOBERT:  Yes, Your Honor.

2          THE COURT:  If he wants to cooperate, fine.  If it's

3   something that is discoverable in a relevant contested matter,

4   you can get it that way.  The Trustee's authorized to give the

5   list to Mr. Conte; it may become public.  The Trustee is

6   authorized to give the list to any of you all with the phone

7   numbers and addresses -- I mean the phone numbers and emails

8   redacted.

9          MR. GART:  Your Honor --

10         THE COURT:  Yes?  Who is this?

11         MR. GART:  Brian Gart for Teterboro Rams.  Your

12   Honor, my client is a lienholder on at least 41 of the

13   aircraft, and I certainly don't need to see the list that Ms.

14   Sherman was speaking of.  I'm -- my guess is that it will

15   become part of the schedules in a short time.  But we would

16   like to know and see which of the aircraft will be subject to

17   the orders of suspension or the notices of proposed suspension

18   as soon as possible.

19         THE COURT:  That's why I've asked Mr. Conte to give

20   all those to Ms. Sherman, and Ms. Sherman will upload those on

21   the docket under a notice of filing.

22         MR. GART:  Thank you, Your Honor.

23         THE COURT:  You're welcome.

24         All right.  Now, we have -- Mr. Conte, did you have

25   anything else to add?

1           MR. CONTE:  No, Your Honor.  And actually, we

2    appreciate getting the actual addresses of the various

3    fractional owners because some of the emergency orders of

4    suspension, Avantair itself is the agent for service of process

5    and that is problematic for us too.  We want the actual owners

6    to get the suspension -- emergency suspensions or notices of

7    suspensions so that they know the FAA position -- safety

8    position on their aircraft.  So nothing further to add.

9           THE COURT:  All right.  Thank you.

10          So we'll segue back to -- or circle back to Ms.

11   Sherman, the rest of your presentation.

12          MS. SHERMAN:  Yes, Your Honor.  Thank you.  So we

13   started looking and trying to figure out what the fleet looked

14   like when the music stopped and the petition was filed and what

15   was where and in what condition.

16          So there's roughly 55 Piaggio P180s with all these

17   different owners.  And as we know from the last hearing and

18   from what Mr. Conte just put on, at different points in time,

19   different parts have been taken off one airplane and put on

20   another airplane, that it originally did not come from the

21   manufacturer.

22          THE COURT:  Scrambled eggs.

23          MS. SHERMAN:  Yes, Your Honor, scrambled eggs.  Or as

24   Mr. Alpert suggested, Mr. Potato Hat (sic).

25          But we have all -- and some of these planes as they

1  sit right now have engines and propellers and landing gear but

2  not the ones that came from the manufacturer.  There are other

3  fairly expensive parts on these airplanes, whether it's the

4  locks that allows you to get WiFi in the aircraft, which I'm

5  told costs $75,000, or something else.  The planes are in

6  various states of scrambling.

7          Prior to the bankruptcy filing, it appears that

8  certain planes were returned to LW Air, and I believe those

9  were five, airframes and certain propellers and engines that

10  may or may not have been the propellers and engines that were

11  originally installed on those airplanes when they left Piaggio.

12  And this is significant --

13      THE COURT:  And that's Mr. Markham's people?

14          MS. SHERMAN:  LW Air is some folks on the phone.

15          THE COURT:  Hold on.

16          MS. SHERMAN:  Mr. Schmidt I believe is who I've been

17  talking to.

18          MR. PLOTKO:  That's correct.  Mr. Schmidt is not on

19  the phone, but that's Mr. Plotko and Mr. Smith.

20          THE COURT:  Oh, right.

21          MR. PLOTKO:  (Indiscernible) was taken.

22          THE COURT:  Right.  Okay.

23          MS. SHERMAN:  So some were returned to LW Air with

24  parts on them that may not have been the original parts from

25  Piaggio, and some of them weren't returned in complete, full

1    packages with all the parts you need to make a full airplane.

2    The same thing happened with Mr. Markham's clients, MidSouth

3    and Clear.   And I believe they received seven airplanes.

4          And so we have 12 airplanes, which are technically

5    airframes and engines and propellers and parts, that have gone

6    back pre-bankruptcy and are in the possession of third parties,

7    that may or may not have parts that didn't originally come on

8    those planes.

9          And if that wasn't confusing enough, we have some

10   loaner engines from Dallas Airmotive in the mix.   They have

11   filed a limited objection to the motion for relief from stay,

12   and they're represented here today by counsel.   And I won't try

13   and steal his thunder, but as I understand it, there was a

14   contract between Avantair and Dallas Airmotive where Dallas

15   Airmotive would service engines.   And while one engine is on

16   the ground being serviced, you don't want the plane to have to

17   sit there, you put a loaner engine on the airplane and off it

18   goes.

19         So as it stands right now, there are Dallas Airmotive

20   engines, I believe some of them may be on the airplanes that

21   were returned prepetition and some of them are on the airplanes

22   that are sitting at Teterboro Ram that Teterboro Ram claims a

23   mechanic's lien on.   And that would be Mr. Gart's client.

24         So we have not only the problem of deciding as

25   between various owner groups how to unscramble the eggs, but

1    we're going to throw into it at least one vendor we know of

2    that has some engines out there.

3              THE COURT:  Okay.  Is that Mr. Mohney's --

4              MR. MOHNEY:  Yes, Your Honor.

5              THE COURT:  -- client?  And so -- and Mr. Amron would

6    have been here on the phone if you weren't here in person;

7    right?

8              MR. MOHNEY:  Yes, Your Honor.  He's our local

9    counsel.

10             THE COURT:  Okay.  All right.  Thank you.

11             MS. SHERMAN:  And then we have some mechanic's lien

12   claimants.  There are folks all over the country who have done

13   work on these planes, some of who have possession of either

14   planes or parts.  Some of the aircraft are parked on various

15   facilities where storage charges are accruing and we're

16   claiming that we've got storage liens on some of them.

17             For example, Mr. Gart's client, Teterboro Ram, I

18   believe they're owed four-hundred-and-some-thousand dollars for

19   work done on 41 planes.  And apparently under New Jersey law,

20   they can sell two of the four planes in their possession to pay

21   themselves for the work they did on all of the planes.

22             So we have somewhat of a mess.

23             THE COURT:  It's daunting.

24             MS. SHERMAN:  It is daunting, Your Honor.  And when

25   the case first filed and Ms. Scharrer and I were trying to

1   figure out what to do and the stay motions started coming in,

2   the question became -- and everybody's saying:  We want our

3   airplanes.  And I'm envisioning people showing up at the hangar

4   door in Clearwater saying:  Give us our airplane.

5           And my question is:  Define airplane.  Is it what is

6   presently attached to your tail number?  Is it what was on it

7   when the music stopped, the musical chairs theory?  Is it what

8   was on your airplane when it first left Piaggio?

9           And it's an interesting conundrum and one that --

10          THE COURT:  What does the industry standard answer

11  provide us?

12          MS. SHERMAN:  I don't know that there is an industry

13  standard.  And I don't know that the Trustee necessarily has a

14  dog in that fight except to the extent that once we decide what

15  parts we are going to unscramble, if there are spare parts that

16  the Debtor owned, those should -- depending on how we decide to

17  unscramble this egg and whether it's the -- you know,

18  "everything that came with the original plane" theory, or the

19  musical chairs, "where were you when the music stopped" theory,

20  there may be some parts that belong to the estate.  I just

21  don't know at this point.  And we still don't have the

22  inventory yet.

23          But that -- it's a very interesting conundrum as far

24  as when people show up exactly what they are to get possession

25  of.  And we've reached out to all of the owner groups; we've

1   talked to some consultants.  And, you know, kind of the

2   question is:  Okay, it's really an owner group issue; what

3   would you like me to hand to whom?

4          And as if that's already not complicated enough,

5   airplanes aren't like cars.  And so the engines, per the

6   manufacturer's specifications, if they are not run -- going to

7   be run and flown every seven days at least, there are certain

8   maintenance procedures which involve doing some compression

9   tests and sticking some sort of lubricant and (indiscernible)

10  in them to make sure nothing bad happens.  It's a different

11  procedure if it's 9 to 28 days, and it goes on and on.

12         But that wasn't complicated enough.  We have the fuel

13  tanks, some of which may be full.  And if you leave fuel

14  sitting in an airplane, it separates into water, something

15  microbial grows I am told, and that's a whole other issue.

16         But I get -- the Trustee at this point is the

17  custodian of some of these planes.  We do not have money in the

18  estate to maintain the planes.  And someone needs to make a

19  decision who is going to take custody of what pieces and parts

20  and who is going to be responsible for maintaining those pieces

21  and parts for the benefit of whomever is determined to be the

22  owner.

23         And right now, I don't know that all the owner

24  groups, even on the planes that are subject to the stay relief

25  motions, have received notice of what's going on.  I don't know

1  that all the lienholders -- and some of these folks, the owners

2  financed their fractional interest.  So if you finance your

3  fractional interest, the lender -- at least some of the

4  recorded liens that were attached to I believe one of Mr.

5  Alpert's stay relief motions, filed a lien not only on the

6  airframe but on the engines and on the propellers.

7         So if the propellers are sitting on Plane B and

8  Fractional Owner A had a lender, Fractional Owner A's lien is

9  going to be on the propellers if they wind up staying on B.

10  And I don't know that any of those lienholders have been

11  notified.  And it becomes a convoluted, very complicated, and I

12  suspect very expensive mess to unravel.

13         And then we have the paper trail that has to follow

14  the hard goods once a decision is made where they go.  And I'm

15  at a loss for a brilliant suggestion on what to do, and I know

16  all the owner groups have their --

17         THE COURT:  Maybe you should have objected to my

18  entering the order for relief.

19         MS. SHERMAN:  But -- and it's unfortunate, because we

20  are in fact custodian, at least on the planes that are sitting

21  in Clearwater and sitting in Dallas and sitting in Orlando of

22  these planes.  And somebody needs to maintain them for the

23  benefit of the ultimate -- whoever is decided to be the

24  ultimate owner.  And I guess you can lift the stay and

25  everybody can do replevins all over the world.  We, in theory,

1  could throw up our hands and abandon.

2          THE COURT:  That's not helpful to anybody.

3          MS. SHERMAN:  And I -- so we're kind of here saying

4  we're waiting for the brilliant suggestion from somebody.

5          THE COURT:  Okay.

6          MS. SHERMAN:  We've got a lot of consultants who've

7  offered to help.  But again, it's not really our fight.

8          THE COURT:  Okay.  Let me say that that presentation

9  was absolutely excellent.

10          MS. SHERMAN:  Thank you, Your Honor.

11          THE COURT:  The work that you all did to try to

12  triage what you have and what faces you was very well thought

13  out.  I hear that you have a plea for help at the end of your

14  presentation.

15          And now I want to ask -- where is Mr. Soriano.  He

16  was here.

17          Mr. Soriano, what was -- you were involved in a

18  Chapter 7 where we had to sort out -- weren't you? -- a bunch

19  of airplane secured lien contests in a Chapter 7 and folks

20  argued that it's improper -- I think Mike Tessitore was in

21  there -- it's improper for a 7 to be run for the benefit of the

22  secureds.

23          MR. SORIANO:  That's true.  I think maybe Mr.

24  Enchantment?  Was that the case?

25          THE COURT:  What is it?

1          MR. SORIANO:  Mr. Enchantment?

2          THE COURT:  No.

3          MR. SORIANO:  But it does remind me -- Mr. Kobert and

4   I were talking about this case, well, actually Taylor Bean &

5   Whitaker where you have that same exact problem.  The only

6   difference is --

7          THE COURT:  Paper.

8          MR. SORIANO:  -- Taylor Bean & Whitaker had a

9   tremendous amount of cash in the estate to sort it through and

10  pay experts to do that.  I have had a lot of experience,

11  actually, recently with repossessing aircraft and trying to

12  resell them on behalf of clients, and it is a complicated

13  process and it's not uncommon to see the kind of

14  cannibalization that's taken place here.

15         THE COURT:  Right.  We had that same problem and it

16  was a Chapter 7.  And in the end of the day it worked out, and

17  I don't remember how it worked out.  I looked for that case

18  earlier.

19         MR. SORIANO:  I don't recall that, Your Honor.

20         MR. KOBERT:  Your Honor, was that World Aircraft?

21  You're not talking about the helicopter case?

22         THE COURT:  No, not the helicopter case.

23         Ms. Scotten, would you mind contacting Mike Tessitore

24  and seeing if he can tell us what case that was?

25         Because there may be somewhat of a template, although

1 clearly that first case was not as complicated as what Ms.

2 Sherman just described.  Okay.

3          MR. KOBERT:  Your Honor, I just emailed him.  Roy

4 Kobert.  Let's see if I get a response.

5          THE COURT:  Okay.  I -- we have things that are on

6 the calendar.  Based on the presentation of Ms. Sherman, I'm

7 not sure how to approach these motions for relief truthfully.

8 I guess I could grant them all and say y'all go fight.  But

9 that is so not helpful if you've got a bankruptcy process that

10 might provide an orderly way for everyone to claim their fair

11 share, subject to liens of course.

12          I could grant everything and let you all fight out

13 things in State Court, and that's going to multiply the

14 problems and the expense for everybody.  And that was really

15 the rationale for why I kept that Chapter 7 that I was just

16 speaking of in bankruptcy.  But it's a problem.

17          And I will tell you that there was a price to pay in

18 the Chapter 7 in that the trustee had to get paid.  If the

19 trustee is going to be the one who's going to be the traffic

20 cop, or the air controller, whatever you want to call it,

21 they're not going to work for free.  So if you want to rent

22 this courthouse, you have to pay the rent if you want the

23 process to be all global and all transparent to all owners and

24 all lienors in one forum.

25          MR. BERMAN:  Your Honor --

```
 1            THE COURT:  Mr. Berman wants to speak.

 2            MR. BERMAN:  We filed the first motion for relief

 3   from stay, and I have given some thought -- considerable

 4   thought to the challenges --

 5            THE COURT:  You also filed a motion for the

 6   appointment of a trustee, so you were fully onboard with having

 7   someone else marshal things.

 8            MR. BERMAN:  Absolutely, Your Honor.  And I've had

 9   lots of discussions about these issues.  And before you give me

10   the opportunity to argue my two motions, which I think are on

11   the calendar today, the motion for relief from stay, which was

12   filed as an expedited motion and there's a reason for that, as

13   well as a motion for a 2004 examination, we've given some

14   thought to the problems that the Trustee faces.

15            And the first problem that I think exists is a

16   records problem.  The Trustee now has possession of electronic

17   records, paper records in multiple locations.  And my clients,

18   and I represent owners of 20 aircraft, which is a large block,

19   but they have an interest, just like all the other fractional

20   owners, have an interest in getting good information about

21   their aircraft.  They need it to fly if these planes are

22   eventually --

23            THE COURT:  And with one custodian, we can make that

24   happen.

25            MR. BERMAN:  And I'm not arguing for a different
```

1  scenario.

2         THE COURT:  Y'all just have to bring your copier and

3  get permission and --

4         MR. BERMAN:  Well, I had a suggestion --

5         THE COURT:  -- have a -- and pay for a Trustee's

6  representative to be a babysitter.

7         MR. BERMAN:  And I had a suggestion as to how to do

8  that.  There can be an electronic database like an electronic

9  data room that's made available, and files can be uploaded in

10  different configurations and accessible to people on different

11  security protocols so that a fractional owner would have access

12  to --

13         THE COURT:  Okay.  I'm not going to order any of that

14  absent a motion.

15         MR. BERMAN:  I understand.  I'm just sort of -- you

16  asked for solutions.  I'm suggesting --

17         THE COURT:  No.  I'm talking -- let's look globally.

18         MR. BERMAN:  That is a piece --

19         THE COURT:  Here, or in multiple forums across the

20  United States, in the home counties of mechanic's lienors,

21  other secureds?

22         MR. BERMAN:  Well, I think there's some combination.

23  I think the records issues do need to be resolved here, and we

24  agree.  And as this Court is well aware, trying to resolve

25  surcharge issues at the back end of the case is not usually the

1  best way to approach things.

2          So we would suggest -- and this will be up to the

3  Trustee and the creditors, some system to surcharge for the

4  process of putting these records together, because that

5  benefits all of the fractional owners in accordance with their

6  ownership interests.

7          THE COURT:  And the lienors.

8          MR. BERMAN:  And the lienors.  And so that deals with

9  the records.

10          THE COURT:  Except maybe the mechanic's lienors.

11  They don't give a hoot.  They've got their one little piece or

12  so and they know what it is.

13          MR. BERMAN:  I think there's a system that can be set

14  up to address the records, and we do agree that Ms. Scharrer

15  should be responsible with those -- with respect to those

16  records and be compensated for her time in organizing them and

17  making them available for the benefit of the fractional owners.

18          The other piece of things, which is the subject of my

19  motion for relief from stay and many of the other fractional

20  motions which followed, is what to do with the aircraft.  And

21  the competing interests are first of all that you do have

22  planes in different state of repair or disrepair.

23          You have planes -- some of my clients' 20 planes have

24  had their parts put in other planes.  And if I have an engine

25  that was moved from one of my 20 to one of the other 20, then

1  that's a problem that my group can solve amongst themselves.

2  If, alternatively, one of my 20 planes' engines was moved into

3  someone else's plane, then that's a separate problem that is

4  going to need to be resolved.

5          THE COURT:  Is it or is it not?  That's the two --

6          MR. BERMAN:  Well, it's not a bankruptcy problem

7  necessarily.

8          THE COURT:  Well, no, it's maybe a legal problem.

9  What is a plane?  Is it the baseline plane, or is it, as Ms.

10  Sherman said, you know, when the musical chairs stop, is it

11  what is existing that moment?

12         MR. BERMAN:  I think the answer to that question will

13  be resolved by applicable non-bankruptcy law, state law and

14  federal law.

15         THE COURT:  And that's what I'm going to ask.  I'm

16  asking that.

17         MR. BERMAN:  I don't know the answer.  Ms. Applegate

18  may be able to speak to that; she is an aviation attorney.

19  This is a very, very specialized area of the law.  My sort of

20  focus on what --

21         THE COURT:  What would Judge Cristol say?

22         MR. BERMAN:  I think he would be an awesome advisor

23  to the Court if he were available and not a sitting judge, to

24  help out.

25         I think that's going to be determined by non-

1    bankruptcy law.  And the issue of what to do with these planes

2    is further compounded by the fact that in all of the planes,

3    other than four planes and one fractional interest in each of

4    those four planes, so out of 620 fractional owners, only 4 of

5    those with the Debtor and with the estate and maybe even

6    subject to liens.  So for the most part, we're talking about

7    non-estate property.

8            THE COURT:  Right.

9            MR. BERMAN:  Now, it may be that the estate might

10   assert an interest in a, you know, a WiFi box that's on a plane

11   that wasn't originally on the plane that was paid for by the

12   Debtor and is in someone's plane or is in a hangar somewhere.

13   But for the most part, we're talking about property that was

14   paid for by my clients and the other fractional owners.

15           THE COURT:  Give me your global view of how this

16   should proceed with respect to the planes that the estate has

17   no interest in other than maybe adding a doodad to it.  It's:

18   I lift them all and you all can go fight and spend a ton of

19   money, or we don't lift and we figure out an orderly process

20   right away on how to address these.

21           MR. BERMAN:  I think that expeditious relief is in

22   everyone's best interest.  Now, this Court has subject matter

23   jurisdictional problems, I think, with grabbing a hold of all

24   the planes and sorting those issues out.  That said, the Court

25   does have before it motions for relief from stay which can and

1    should be adjudicated.  I don't think that adjudication process

2    should be prolonged.  I do think that adjudication process

3    would be a way for you to sort out who gets what plane and what

4    part goes with what plane.

5              It's our position that --

6              THE COURT:  You know what?  I don't have to sort out

7    what part goes with what plane.  If I lift it, that's y'all's

8    problem.

9              MR. BERMAN:  And that's what we've asked for, Your

10   Honor.

11             To address an issue -- and I haven't talked to Ms.

12   Sherman about this and I know this is happening somewhat

13   dynamically.  But to address an issue -- an additional issue,

14   and there has been sort of a camp out there that says:  No, no,

15   no, don't rush on the stay relief, let's slow things down, keep

16   all the planes where they are and let's, you know, get the

17   records and sort out everything.  That process as I understand

18   from Ms. Applegate may take upwards or longer than 90 days to

19   truly understand every part in every plane.  And that comes at

20   a substantial cost, especially to people who are not trying to

21   assert liens against the property.

22             So I think the Court has at least two decent

23   alternatives.  One, you lift the stay today with respect to the

24   owners of those aircraft.  You let the owners take their

25   aircraft back and sort out these issues under applicable non-

1  bankruptcy law for jurisdictional reasons and other reasons.

2  You don't necessarily lift the stay with respect to non-owners

3  of the aircraft because if there are creditors out there and

4  they want to assert their claims, that's something that should

5  probably be addressed through an appropriate stay relief

6  process.   And I know Mr. Gart filed his motion just yesterday.

7         The other alternative I think is a very expedited

8  process to adjudicate the stay relief motions.   And in so

9  doing, you could determine who gets what plane and what that

10  plane is.   Does it include the parts which were originally on

11  it?   Which hopefully Mr. Riedel's client will be able to tell

12  us what parts came with what planes.   And it sounds like those

13  lists may be available because they built the planes

14  originally, so that shouldn't take much time.

15         THE COURT:   If the baseline theory prevails.

16         MR. BERMAN:   Right.   Well, that will be an issue that

17  is presented.   And then I think Mr. Riedel's client is also

18  doing an inventory of sort of the parts that are onsite in St.

19  Pete and Orlando, maybe we have the same thing done in Texas.

20  That process shouldn't take that long.

21         The other issue, and Ms. Sherman sort of alluded to

22  it, and this is the thing that I had spoken to her about, is

23  the possibility -- and I know this may come at some cost, but

24  if the process is not prolonged, we can maybe minimize the cost

25  of an aviation-type ombudsman to look out for the interests of

1  each of these fractional owners.

2          We do it in healthcare cases, we do it in some other

3  cases.  This is a case that doesn't necessarily have a model.

4  And that would be a way --

5          THE COURT:  Are you suggesting a certain kind of

6  committee?

7          MR. BERMAN:  Not necessarily a committee, Your Honor,

8  although maybe a committee would work, but a person who is not

9  necessarily the hired expert or advocate of any owner in

10  particular but could be someone who knows aviation, who knows

11  parts and planes and can say these parts naturally go with

12  these planes or they don't.

13          THE COURT:  Aren't I -- am I not precluded from

14  appointing a special master, which is what you're suggesting?

15          MR. BERMAN:  No, I'm not suggesting a special master.

16  I'm suggesting someone who would be appointed --

17          THE COURT:  Functionally you are.

18          MR. BERMAN:  No, because I'm not asking for the

19  master to make decisions.

20          THE COURT:  These parts go with this plane.

21          MR. BERMAN:  I'm asking for -- I'm not even asking.

22  I'm suggesting that someone who looks out for the rights and

23  the interests of each of the fractional owners would be a way,

24  possibly, to ameliorate the risk that Ms. Sherman talks about.

25          Now, ideally, I filed a motion for relief from stay

1    as an expedited motion and I'd like it to be granted today.

2    What I don't want to happen is for this process to turn into a

3    Bankruptcy Court replevin court where we have six-month-long

4    litigation to determine who gets what.

5            If we're talking about a couple of weeks or three

6    weeks to sort out these issues and we have a system in place, I

7    would support that.  But I wouldn't support extending this

8    Court's jurisdiction to cover the adjudication of the rights

9    between plane owners completely as if this Court were going to

10   handle replevins, which is essentially what we're talking

11   about.

12           So those are the two approaches that I see under the

13   circumstances:  A decision to lift the stay because it's not

14   property of the estate, and let people do what they need to --

15   or it's not even lifting the stay --

16           THE COURT:  And then leave the planes in the custody

17   of Ms. Sherman while the State court replevins wind out?

18           MR. BERMAN:  No.  No.  You -- the Trustee should be

19   relieved of any obligation with respect to the planes, and an

20   orderly process outside of Bankruptcy Court can proceed.  The

21   alternative to that --

22           THE COURT:  And so Mr. Lamoureux's client ultimately

23   gets no rent.  The Trustee should be charging rent and then

24   remitting rent to Mr. Lamoureux's client.

25           MR. BERMAN:  Well, if the Trustee were to store and

1   maintain and service these planes without, you know, a funded

2   estate, then, yes, I would agree.  But we're not talking about

3   an operating Debtor entity here.

4          I think that the --

5          THE COURT:  What do we do about the Dallas Airmotive

6   engines that are on planes that are the subjects of these

7   motions?

8          MR. BERMAN:  I think you have a classic situation

9   where you have nondebtor-versus-nondebtor disputes which are

10  going to have to be litigated somewhere and resolved, either

11  negotiated -- and my clients have been negotiating with

12  mechanic's lienors and other vendors since before this case was

13  filed to resolve some of those claims.  That process will

14  continue, and there may be and will likely be a litigated

15  process.

16         If you want to sort of have an orderly system of stay

17  relief to make sure that you're giving relief to the right

18  people with respect to the right aircraft, that process can and

19  should be doable within a short period of time.  That's what we

20  wanted to avoid any prolonged litigation over.

21         I think technically the Court could acknowledge that

22  the stay doesn't apply to these aircraft and simply enter a

23  comfort order with respect to the owners and sort through the

24  other issues.  Ms. Sherman obviously has D & O claims.  We have

25  suggested that there be certainly a surcharge to cover the

1   records process which needs to move forward.  And there may

2   very well be other property of the estate but, generally, these

3   planes are not going to be property of the estate.  So either

4   option makes some sense, Your Honor.

5          THE COURT:  How do you -- if Ms. Scharrer hires a

6   consultant to create a database with every sheet of paper in it

7   in some organized form, and let's say it takes, I don't know,

8   a-couple-hundred-thousand dollars to do that, what kind of

9   subscription fee do we charge for access?

10         MR. BERMAN:  Well, I think you do it on the front end

11   through surcharge so you don't have problems sorting that out.

12   I suggested a model --

13         THE COURT:  I know, but what?  Six hundred owners,

14   you each pay $5 -- I mean, 10,000, whatever it is?

15         MR. BERMAN:  I've suggested that the Trustee budget

16   what this project is going to cost, and I know that Ms. Sherman

17   has been considering what that budget would look like.  This

18   Court would have to approve, presumably, a budget.  And then

19   the owners -- you can do it a couple of ways.  You can do it by

20   percentage ownership.  And in my filing yesterday, my new

21   notice of appearance, I've shown the Court what each of my

22   clients has --

23         THE COURT:  And what if they don't pay?  What if

24   someone's not able to pay?

25         MR. BERMAN:  This Court has worldwide jurisdiction to

```
 1  enforce its orders.  You can enter --
 2          THE COURT:  I can't make a person that's penniless
 3  pay a ten-thousand- or five-thousand-dollar share to Ms.
 4  Sherman.  I will not let those two ladies be taken advantage
 5  of.
 6          MR. BERMAN:  And I'm the first one who -- well, I'm
 7  maybe not the first one, but I suggested a surcharge approach
 8  at the beginning of this process as soon as I heard the Trustee
 9  was appointed.  And we asked for the Trustee to be appointed.
10          THE COURT:  Yes.  And at the same time moved for stay
11  relief.
12          MR. BERMAN:  Well, two different issues.  We wanted
13  the Trustee --
14          THE COURT:  Right.
15          MR. BERMAN:  -- appointed to take control of the
16  things that are property of the estate, and I think the records
17  are clearly property of the estate, with the exception of the
18  log books, which I think belong to the planes.  But I don't
19  think the Trustee should be burdened with the other property
20  which is not estate property.
21          I think there are systems for dealing with both:
22  that the sort of technical, legal approach with respect to stay
23  relief -- as you just acknowledged, the stay doesn't apply to
24  nondebtor property.  And the planes -- in all of my 20 planes,
25  save 2, the Debtor has no fractional ownership, and in those
```

1  two, have one-tenth or sixteenth fraction.  So you can lift the

2  stay with respect to the other owners and allow the parties to

3  do what they -- what the Bankruptcy Court doesn't necessarily

4  do for them.

5          THE COURT:  Maybe Ms. Sherman sells the one-tenth

6  ownership, or whatever it was, to all the other owners.

7          MR. BERMAN:  Nothing to prevent her from doing that.

8          THE COURT:  But we have to figure out what the thing

9  consists of.

10          MR. BERMAN:  Right.  And I actually had that

11  conversation with Ms. Sherman with respect to her fractions.

12          THE COURT:  Okay.

13          MR. BERMAN:  The other approach is to set an FEH in

14  short time for us to prove up the issues in our respective

15  owner motions for relief from stay.  I think the vendors and

16  mechanic's lienors have different issues than the owners.  I

17  don't think they need expedited relief like the owners need.

18  If there are liens that have attached to planes prepetition --

19          THE COURT:  If I give you a comfort order, I give

20  them a comfort order, and then it's a free-for-all, and that's

21  fine with me.  If the owners -- it could be a democracy.  If

22  the owners don't want to have something happen in this court,

23  even though I might not have jurisdiction over particular

24  planes, then you have a food fight in State Court.

25          You can't tell me that you want a comfort order for

1  your group but I have to tell Mr. Gart:  No, you've got to go

2  through the long way.

3          MR. BERMAN:  Two different issues.  Mr. Gart's motion

4  reflects that -- I know his motion is not even set today.  But

5  his motion reflects that he contracted with the Debtor and

6  these are prepetition claims against the estate.

7          You can certainly say in a comfort order --

8          THE COURT:  No.  In terms of the secured interest,

9  you're saying that's outside of bankruptcy.  So they could go

10 through, do their mechanic's lien thing --

11         MR. BERMAN:  If they have a lien -- if they have a

12 lien, their lien -- if their lien existed prepetition and they

13 had a right to assess a lien and state law gives them a lien,

14 that lien doesn't change by virtue of whatever orders you're

15 going to enter.

16         THE COURT:  Right.

17         MR. BERMAN:  We understand that.

18         THE COURT:  And if I'm going to lift the door --

19         MR. GART:  Your Honor, there is a concern with that.

20 I just don't want that to go unsaid.  So --

21         THE COURT:  Okay.  You know what, don't worry about

22 it.  Until I make -- you know, set a hearing and we have

23 everyone weigh in on their particular issues, silence is not a

24 bar to anything in my courtroom.

25         MR. GART:  I would like a moment to be heard, Your

1  Honor, at the appropriate time.  But I --

2          THE COURT:  Okay.  I'll come back to you.

3          MR. GART:  Thank you.

4          THE COURT:  Are you finished, Mr. Berman?

5          MR. BERMAN:  Yes, Your Honor.  Those would be my two

6  approaches with respect to the stay relief that I think should

7  hopefully address the Court's concerns.

8          THE COURT:  Okay.

9          MR. BERMAN:  Thank you.

10          THE COURT:  Mr. Andersen; right?

11          MR. ANDERSEN:  Yes, Your Honor.  Judge, I represent

12  Corrections Corporation of America.  It has an assigned

13  fractional interest in three aircraft, two of which are the

14  same aircraft that Mr. Berman has been speaking on behalf of.

15  But I have a very different view, so it's not as though those

16  individual fractional shared interests are all aligned in their

17  approach.

18          THE COURT:  That's why I said we might have to have a

19  democracy once we get the schedules firmed up and everyone has

20  notice.

21          MR. ANDERSEN:  And, Your Honor, we think that this

22  court provides a very good venue for resolving many of these

23  issues.

24          THE COURT:  Even if I don't have subject matter

25  jurisdiction?

1          MR. ANDERSEN:  Well, I think that's the first issue,

2   and I think that's -- I think that's a serious question.  But I

3   do think that there are some -- I think there's some things

4   that should be considered.  And I'm speaking a little bit out

5   of turn because I'm not a bankruptcy expert.  I'm a board

6   certified aviation lawyer and I've been in Bankruptcy Court

7   before some.  And I know Footnote 17 from <u>Pepper v. Litton</u>, so

8   I've read --

9          THE COURT:  Well, I don't, so --

10         MR. ANDERSEN:  That was Justice Douglas's admonition

11  about the inherent equitable powers of the Bankruptcy Court.

12         THE COURT:  Oh, well, I think we've been trumped in a

13  more recent Supreme Court decision.

14         MR. ANDERSEN:  I think so too.  And I'm showing my

15  age.  I apologize, Judge.

16         THE COURT:  That's okay.

17         MR. ANDERSEN:  But in any event, my client's

18  interests I think are demonstrated by the fact that they were

19  -- my client was only interested in air transportation.  It

20  just needed hours in an airplane to fly its employees around

21  the country, and the way it did it is it entered into this

22  fractional share program.  And I'll try to be very brief --

23         THE COURT:  It's like a timeshare.

24         MR. ANDERSEN:  Exactly, Your Honor.  And it has some

25  regulatory origins I think that may be helpful for me to

1  describe to the Court if I may.  But the FAA Regulations are

2  different for commercial air carriers than they are for owners

3  of aircraft.  And the fractional share concept developed

4  initially so that aircraft could be operated under the private

5  air transportation rules rather than the commercial air

6  transportation rules.

7          And the concept developed where there might be one or

8  two or three owners who would just share -- have their

9  airplanes in the same hangar and they'd share back and forth.

10  And the FAA said that's okay.  But as the concept grew where

11  you'd have these fleets of 40, 50, or 60 aircraft, the FAA

12  looked at this and said:  Wait a minute, this looks a lot like

13  you're running a commercial air carrier here.

14          And the people who are operating it said:  Oh, no,

15  the way we've resolved this is each of these people who are

16  paying for this transportation are actually assigned an

17  interest in an aircraft.  So they're really operating their own

18  aircraft and, therefore, they should be treated like private

19  air transportation rather than commercial air transportation.

20          To fast forward through a regulatory process, the FAA

21  said:  We'll go along with that, but you've got to follow some

22  special rules which are in what's called Part 91 Subpart (k) of

23  the Federal Aviation Regulations, which do prescribe the safety

24  requirements and the organizational requirements for these

25  fractional share programs.

1           So entities like my client who would want to buy air

2     transportation, they would go to the fractional share program,

3     they would say:  We want X number of hours per month.

4           And they would say, as in this case:  We're going to

5     give you 3.25 percent interest in N I think it's 138SL, we're

6     going to give you a 9.25 percent interest in N162SL, and a 9.25

7     percent interest in N164SL.

8           My client never looked at those airplanes as far as I

9     I know.  They never asked what color they were, how they --

10    what the interior was, kicked the tires.  And frankly, when

11    they called for transportation, those airplanes probably didn't

12    show up; instead it was just another airplane in the fleet.

13          And so, as it stands now, if our client is treated

14    now as an owner of aircraft -- N138SL is supposedly in very

15    good condition down in Palm Beach with both of its engines.

16    N162 -- I'm sorry, that was N164SL is down in Palm Beach in

17    very good condition.  N138SL, which is one of the airplanes

18    that Mr. Berman's group represents some of the fractional share

19    interests in, is in Sacramento, California with one engine off

20    of it.  And N162SL, which is another aircraft which I think Mr.

21    Berman represents a fractional share interest in, is actually

22    over in a hangar over in Clearwater, and we believe it probably

23    -- it was cannibalized and probably didn't even have engines on

24    it at the time that the interest was assigned to our client.

25          So it's not as though we've got owners who have

1  specific interests other than the fact that in order to meet

2  these regulatory requirements they had to be assigned an

3  ownership interest, and those ownership interests had to be

4  recorded in the FAA Aircraft Registry in Oklahoma City.

5          And in the FAA Regulations -- and Mr. Conte is on the

6  phone, he can -- I'm certain he can elaborate on this --

7          THE COURT:  Yeah, I was going to ask Mr. Conte if

8  138SL, 162SL, or 164SL are the subject of any of the 23 letters

9  that have gone out or will be the subject of the 12 to 13 that

10  are to go out imminently.  Mr. Conte?

11         MR. CONTE:  13SL (sic), 162SL, and 164?

12         THE COURT:  Yeah, 138, 162, and 164.

13         MR. CONTE:  Those three aircraft have not been

14  subject of anything yet.  All I can say is that two of those

15  aircraft will be subject to notice of proposed suspensions next

16  week, and one will be subject to an emergency suspension order

17  later today.

18         THE COURT:  Okay.  Thank you.

19         Go ahead, Mr. Andersen.

20         MR. ANDERSEN:  Your Honor, if I may?  Essentially, as

21  our client looks at this problem, it doesn't have any interest

22  in acquiring airplanes all around the country in various states

23  of disrepair with which it then has to negotiate with other

24  people to get parts from other airplanes to try to put them on

25  those airplanes at litigation expense, at repair expense, at

1   transportation expense.  And so lifting the stay -- essentially

2   what I'm saying -- and I guess I'm arguing in advance for not

3   lifting the stay at this time and for this Court keeping

4   jurisdiction, and I know we have to come back to the

5   jurisdictional issues.

6           But what I'm arguing as a solution is that the

7   Trustee continue, as has been done, to assemble an inventory of

8   these aircraft and that a solution be proposed that would

9   basically maximize the value of the fleet.

10          And if I may, from an aviation standpoint,

11  unscrambling the egg makes no sense at all.  Trying to find out

12  where these engines were originally and putting them back on

13  the airplane they came from, or finding the individual life-

14  limited parts, you know, digging through the airplane to find

15  the part and then sending it back to the airplane from which it

16  came is a very expensive process and it really doesn't maximize

17  the value of the fleet.

18          And at the end of the day, we also don't favor the

19  musical chair approach.  I mean, we'll benefit on one of the

20  airplanes apparently because we're in the right chair on one of

21  them.

22          THE COURT:  So is your suggestion we sell all with

23  the consent of all owners?

24          MR. ANDERSEN:  Judge, either with -- my view is that

25  -- is to sell them all, arrange to sell them all.  And whether

1  the consent of all the owners is required or not -- again, here

2  I'm stepping into deeper water than I should --

3        THE COURT:  On the planes that the Debtor has no

4  interest in, there is no place in the Code where I can sell.  I

5  can sell co-owners' interests -- I can approve the sale of

6  such.

7        MR. ANDERSEN:  Then, perhaps, if I may address the

8  ownership interest -- ownership issue, and this is my own

9  thinking on it --

10        THE COURT:  And if we can get consent of even a part

11  of it -- well, of course, then you have the scrambled eggs

12  issue touching those that may not consent.

13        Go ahead.

14        MR. ANDERSEN:  What I'm thinking, Judge, and I'm

15  thinking about three different concepts.  One is that each of

16  these putative owners paid for transportation by paying hourly

17  fees, and they also paid for certain maintenance fees.  But my

18  view of it is that they were not expecting that those

19  maintenance fees were necessarily going to buy the next part

20  that went on their individual airplane or the next engine that

21  went on their individual airplane.

22        Instead, in the aggregate, these maintenance would be

23  -- create a pool which would then be used to provide the

24  maintenance on the fleet.  So I guess my point is to some

25  degree the owners -- these putative owners have implicitly

 1  consented to the Debtor, Avantair, taking these funds,

 2  purchasing parts and putting them on various airplanes.  And so

 3  I guess I'm coming around to some type of implied consent type

 4  of a view, which is that when participants shared in this

 5  program, you know, they were implicitly consenting to the fact

 6  that their funds would be used to purchase parts that go in

 7  other airplanes.

 8        And so now to the extent that parts are on any or all

 9  of these airplanes that were purchased with the funds from

10  everyone, that there is some implied consent there for Avantair

11  to have -- to establish some type of an interest in the

12  aircraft.

13        The other thought I've had is whether there's some

14  type of an equitable lien.  And again here I'm stepping into

15  really deep water because I don't know whether equitable liens

16  will do any good or not.  They might even -- and I've litigated

17  Florida mechanic's liens and statutory --

18        THE COURT:  Well, if there's an ownership interest,

19  you wouldn't need an equitable lien.  Are you talking about an

20  equitable lien on the engine that at one time belonged to one

21  of your planes and is somewhere else?  Is that what you're

22  suggesting?

23        MR. ANDRESEN:  Judge, I'm, suggesting on either the

24  engine or the part, yes.  I'm saying that there'd be an

25  equitable lien on the --

1          THE COURT:  On the missing part that's somewhere

2   else?

3          MR. ANDERSEN:  Yes, Your Honor, that's exactly right.

4          THE COURT:  Okay.  And what's the third thing?

5          MR. ANDERSEN:  The third possibility is and it's been

6   raised -- many of the owners when they get on these telephone

7   calls start talking about how their parts were stolen from one

8   airplane to another.  And my personal view is that they weren't

9   -- parts were not stolen.  Everyone knew that they were

10  maintaining a fleet of aircraft and from time to time parts

11  would need to be exchanged.

12         Now, that's premature, I suppose, on my part, but

13  that's just my view of it.  But to the --

14         THE COURT:  So that's a waiver argument?

15         MR. ANDERSEN:  It's possibly a waiver or possibly --

16  possibly even a constructive trust argument, Judge.  To the

17  extent that parts from another airplane are now on -- from an

18  original airplane are now on another airplane, the Debtor was

19  acting as a constructive trustee for the owner of those

20  original parts.

21         So I mean, those are just three possibilities I think

22  that the Court might explore in terms of finding a basis for

23  saying that the Debtor does have an interest in these

24  airplanes.

25         And then what I'm told by my bankruptcy partners is,

1  if there is an interest, Section 363(h) might allow the Trustee

2  to then sell the interest of the remaining --

3         THE COURT:   If the Trustee -- if the estate has an

4  interest in the plane, yes.   You can -- you can sell things

5  that are co-owned.   That's what 363(h) is.

6         MR. ANDERSEN:   Yes, Your Honor.   And I think that's

7  the general direction I'm proposing that might be considered

8  and might be explored, to enable the Trustee to perhaps do some

9  form of triage and look at these airplanes and say these are

10  the ones that have the most value, perhaps they can be sold for

11  the greatest amount.   And then sell off the rest of the fleet,

12  and some of them are just parted out with the idea that --

13         THE COURT:   Well, let me ask you as an aviation

14  expert:   What is a plane?   Is it the original plane with its

15  original parts except those that have become defunct and

16  replaced with new parts?   Or is a plane what is put together as

17  a plane with parts that originated from another plane on the

18  day that the music stops?

19         MR. ANDERSEN:   Judge, I mean, from a legal

20  standpoint, I think that at least -- I think from a legal

21  standpoint the owners of the original plane continue to be

22  owners of the parts of that original plane, at least the

23  engines and propellers after they're removed.

24         Part of the reason I say that, and this is maybe --

25  you were asking what an industry standard or convention is.

1  The FAA does allow interests in engines and propellers to be

2  separately registered -- excuse me -- separately recorded in

3  the FAA Aircraft Registry.  So engines and propellers are the

4  types of things that if someone buys an airplane, and they

5  typically buy the airplane and they'll identify the engines and

6  propellers.

7          You know, the musical chairs theory is really

8  problematic because --

9          THE COURT:  How about landing gear; is that something

10 that is like engines and props?

11         MS. APPLEGATE:  Your Honor, this is Amanda Applegate,

12 may I be heard?

13         THE COURT:  Yes, ma'am.

14         MS. APPLEGATE:  Okay.  I too, like Mr. Andersen, I

15 sort of practice in this area, and I would agree with Mr.

16 Andersen that generally the airframe, the engine and propeller

17 could be considered the parts that would go with the aircraft

18 when you're defining the term "aircraft."

19         With respect to whether or not this is akin to

20 timeshare, I have a very different view than Mr. Andersen.

21 When the FAA looked at fractional programs and created 91

22 Subpart (k), they did it under Part 91, and that is for private

23 ownership.  If the FAA had thought that this was more akin to

24 commercial, they would have put it under Part 135.  But they

25 decided to put it under 91 because it was private ownership.

1          Further, if Mr. Andersen's clients wanted to just buy

2   time, they could have purchased charter transportation or a jet

3   card.  But in fact, they purchased a share in a particular

4   aircraft, and probably depreciated that asset as a true owner

5   of that aircraft.  And so I would just say that, you know,

6   fractional ownership is different than timeshare.

7          And the owners of these aircraft did not just buy

8   time, they paid a purchase price for their fractional share and

9   recorded that percentage sale with the FAA to evidence their

10  ownership of that aircraft.

11          THE COURT:  All right.  Thank you.

12          All right, Mr. Andersen, anything else?

13          MR. ANDERSEN:  Your Honor, if I may take a quick look

14  at my notes?  Essentially, Your Honor, our view is that an

15  orderly, efficient liquidation in Chapter 7 would maximize the

16  value of the fleet for creditors such as my client because of

17  the various conditions of the aircraft.

18          And, Your Honor, we think that trying to unscramble

19  the egg, while it may try to put the pieces back to their -- to

20  some potential or legal ownership, would be an extremely

21  expensive and very -- and frankly, self-defeating process.

22          And lifting the stay would be a particular problem

23  because we don't even have agreement among the co-owners.  And

24  what's more, if there are parts in different airplanes, we're

25  going to have to deal with liens, we're going to have to deal

1  with other fractional share owners of other aircraft, and that

2  will be an extremely expensive process which would not be

3  beneficial to anyone.

4          THE COURT:  I agree.  All right.  Anything else?

5          MR. ANDERSEN:  I think (inaudible) --

6          THE COURT:  Okay.  Let me ask the man who started all

7  this.

8          Mr. Glenn, what was your vision of how this would

9  play out?

10          MR. GLENN:  Your Honor, for me to suggest that I

11  anticipated what has occurred here today would be overstating

12  my powers of observation greatly.

13          I don't -- our objective when we started was to have

14  an independent party in charge of assembling the information

15  that is available to make some sense out of this scrambled egg.

16          THE COURT:  Were you aware that there were very few

17  planes in which the Debtor had an actual ownership interest?

18          MR. GLENN:  No, Your Honor. I thought that actually

19  most of the planes were subject to some sort of ownership in

20  Avantair and that would be the hook for jurisdiction.  In

21  addition to -- the hook being there are still some contracts

22  out there that have not been rejected that may be another hook

23  for this sort of -- for this sort of jurisdiction.

24          But frankly, it didn't occur to me, and I presume

25  that it's correct, that there are four -- only four of these

1  planes that have ownership in the Debtor, and certainly it
2  might have been different at the outset if we had known that.
3       I'm taken with some of the arguments that have been
4  made about what these arrangements actually are and how maybe
5  the only way that you can kind of even out the treatment of
6  various owners who had a percentage interest in a plane.
7       THE COURT:  Call them equity interests.
8       MR. GLENN:  They really didn't --
9       THE COURT:  Call them investors.
10      MR. GLENN:  In a very real sense they certainly were
11  that.  And -- but the notion that we are now going to --
12      THE COURT:  When a person owns a share of stock, what
13  do they own?
14      MR. GLENN:  They have an undivided interest in a
15  business.  And is this the same thing?  It may very well -- may
16  very well be.  There is certainly some appeal to that -- to
17  that kind of approach.  On the other hand, and the reason that
18  has some appeal, is that when stay relief -- if stay relief
19  were granted and Mr. Berman takes off for his 20 owners, what
20  happens to --
21      THE COURT:  I don't know that they all can take off.
22      MR. GLENN:  What happens to -- well, they can't take
23  off.  I mean, they certainly -- as a plane takes off, they
24  certainly can't do that.  But he proceeds to enforce whatever
25  interests his clients want him to do.  Well, what happens to

1   the other fractional ownerships in those planes?  What happens

2   to the -- those of us who may have an interest in some engine

3   that's on one of those planes he takes back?  The complications

4   are overwhelming.

5        And it seems to me that while we pursue some of these

6   theories about how we might be able to make some sense out of

7   this case, that the Trustee be allowed to continue to do the

8   same fine job that she is doing about gathering information.

9        If someone wants to file some sort of litigation to

10  determine that these are essentially equity ownerships, they

11  can do that.  To the extent that people want to tee up their

12  motions for relief from stay in a way that presents evidence to

13  the Court about why stay relief should be granted, they can do

14  that.

15       But I think it is going to take a few weeks to get to

16  the point where we can make any sense out of this case.

17       THE COURT:  We've got to have schedules.  We've got

18  to have full disclosure.  We've got to give 600-some-odd owners

19  and however many lienors that we can find notice of whatever it

20  is that we do.

21       It would be my hope that we could shortcut some of

22  the legal arguments and get 100 percent vote of the owners to

23  allow Ms. Scharrer to sell everything, everything, to one

24  entity that may want to put this fleet back together and spend

25  the money to do so.

```
 1            I'm not cutting off anybody; I'm thinking out loud at

 2   this minute.  Has anybody ever been in a case where a timeshare

 3   building full of condos was sold free and clear of the

 4   individuals' interests in the timeshare units?

 5            Mr. Martino rises.

 6            MR. MARTINO:  Yes, unfortunately I have.  And the

 7   answer is it depends upon how it's titled.  If it's titled --

 8   many timeshares are sold, you actually get a deed to the

 9   property.  It's an undivided --

10            THE COURT:  A fractional --

11            MR. MARTINO:  -- one-minuscule ownership.  And at

12   that point, that deed, under state law, is treated as ownership

13   and you can't make that go away in the bankruptcy process.  On

14   the other hand, there are some that are simply contract rights

15   and you do have more latitude.  The problem is:  What are you

16   left with?

17            And, you know, I've sat here -- and I've got a

18   fractional ownership interest client with two of them.  We're

19   struggling really hard to protect the people from the

20   foreseeable consequences of the way they decided to own these

21   interests.  And we're trying to forge jurisdiction by consent,

22   and I kind of remember some cases that say you can't do that.

23            I'm glad that you're sitting up there and I just have

24   to answer that one question.

25            THE COURT:  You know, Judge Paskay issued a worldwide
```

1  injunction in Lykes, and it worked.  In Berkley Multi-Units, we

2  had multi-level of in pari passu mortgage interest holders.  We

3  dealt with that.

4          MR. BERMAN:  Your Honor, Mego Financial Corporation,

5  it's a case in which we involved, it was in the District of

6  Nevada.  Chief Judge Zive had that case, and that was a

7  timeshare case.  And the answer to your question is the same as

8  Mr. Martino's, which is, it depends on titling.

9          In this case, the one before you, the individual

10 owners, my clients, own a piece and they have a registered

11 ownership interest with the FAA.  So that's their property

12 right.

13         THE COURT:  I'm just talking out loud, Mr. Berman.

14         MR. BERMAN:  No, and I'm not quarreling with the

15 Court.  But Mego is a good source of a lot of published

16 decisions, and Judge Zive had to deal with those issues.

17         Now, in Mego, the bigger problem was substantial

18 mortgage debt on the real estate, and the mortgage debt

19 blanketed a lot of the ownership interests --

20         THE COURT:  And that's what I had in the aviation

21 case that I can't remember the name of.  There was no equity

22 for the estate.  It was just a matter of figuring out who's got

23 what piece of what aircraft.

24         MR. BERMAN:  Right.  But the owners, if they do have

25 a cognizable title interest under applicable law and bankruptcy

1  law, still keep that, notwithstanding the bankruptcy case, and

2  the bankruptcy case is administered just to deal with the other

3  -- whatever is property of the estate.

4         THE COURT:  Okay.

5         Ms. Gilmer had risen.  But, Mr. Kobert, you've been

6  up twice.  I'll -- you know, go ahead, tell me what you want to

7  tell me.  And then Ms. Gilmer.

8         MR. KOBERT:  Very, very briefly, Judge, to cover some

9  of the points.  First off, on the issue of -- you raised the

10  issue of the owners being akin to equity.  Avantair does have

11  stockholders, shareholders.  I think as a fractional owner we

12  are not in that same ilk.  If there was 100 percent --

13         THE COURT:  I was just thinking out loud.

14         MR. KOBERT:  Okay.  First, to deal with very quickly

15  what's on the calendar.  One of my tails of my client is on Mr.

16  Berman's plane, so I suppose I fall in the go-slow camp.  I

17  would ask at this preliminary hearing that you don't grant stay

18  relief today.

19         We do have a notice of hearing problem; Your Honor

20  alluded to it, due process.  A lot of the fractional owners

21  aren't even here, don't know about these procedures because we

22  don't have schedules, et cetera.

23         I realize there's a cost to status quo.

24         THE COURT:  And what do I do if I grant Mr. Berman's

25  but there's another fractional owner for -- I think in two of

1    the planes you've got other fractional owners.  They may

2    dispute what to do with the plane.

3              MR. KOBERT:  Or has every fractional owner been

4    notified?  I don't know.

5              THE COURT:  Right.  No, I don't know.

6              MR. KOBERT:  And I'm not saying it hasn't been.  I

7    didn't check the service because I don't even know who my

8    fractional owners are, and now I'm going to find out who some

9    of them are when I get the report from Ms. Sherman.

10             And what I want the Court to understand is, and I

11   think you've alluded to it, is prior to the involuntary being

12   filed, I dealt with this issue when I talked to the

13   fractionals.  It's like herding cats.  The first thing I said

14   is:  We need a single-purpose entity.  We need one SPE.  Maybe

15   it takes nine-sixteenths to do something, but getting sixteen-

16   sixteenths of anything is impossible.  And that's the problem

17   from the get-go.

18             THE COURT:  Maybe not if we show what the parade of

19   horribles is.

20             MR. KOBERT:  And that would help, Judge.  I think --

21   dealing with the other issues we talked about, the other thing

22   we learned this morning is that even if relief was granted, I

23   guess you can take the plane up I-275, but you're not flying it

24   anywhere.

25             THE COURT:  Right.

1          MR. KOBERT:  So in the interim, the cost of storage,

2     whether it be with what we have now or a fractional, or who's

3     going to pick the storage place.  Is the one fractional going

4     to provide insurance for the others?  We've heard issues about

5     insurance running out July 31.

6          THE COURT:  Right.

7          MR. KOBERT:  My client stepped up and paid the August

8     insurance, I suppose to Mr. Berman's clients' benefit.  Or

9     maybe we're overinsured, God forbid.  That's the worst thing

10    that can happen.  This is the parade of horribles.  I just want

11    to go a little slower.  I'm not saying to deny the relief, but

12    I'm concerned about going too fast because we have so many

13    issues.

14          As far as some of the comments and suggestions made,

15    I think they're interesting.  I think they should be shared

16    with Ms. Sherman and we should bring that forward on a motion

17    hearing --

18          THE COURT:  That's why we're talking out loud right

19    now; okay?

20          MR. KOBERT:  Thank you, Judge.

21          THE COURT:  I think that the consent thing could be

22    supplied by having, just like other auctions have, different

23    owners put different things in in one common batch.  So Ms.

24    Scharrer sells four planes under 363(h) and at that same

25    auction, bidders are entitled to bid for the whole shebang.

1 All the owners, if they say, can throw their stuff in.

2          MR. KOBERT:  And there's the opportunity, Judge,

3 almost like buying and selling claims, if certain owners don't

4 want to participate, maybe they're willing to sell their

5 fraction to another fractional owner.

6          THE COURT:  Anyway --

7          MR. KOBERT:  Yes, Judge.

8          THE COURT:  -- those kinds of discussions are things

9 we have to have, albeit fast.  Like I said, those two ladies

10 can't be hurt, landlords can't be hurt; that's not fair.

11          MR. KOBERT:  Agreed.

12          MR. GART: Can I mention one other group that

13 shouldn't be hurt, Your Honor?

14          THE COURT:  The mechanic's lienors?

15          MR. GART:  And, Your Honor, I'm sorry to interrupt

16 and I --

17          THE COURT:  That's Brian Gart.  Wait a minute.  Mr.

18 Gart, let me finish the thought then, so that you won't be

19 concerned.

20          Once the money is in the pot, then we figure out how

21 to carve it up according to priorities.

22          MR. GART:  I understand the Court's frustration and

23 concern.  I certainly, having been involved in many aviation

24 cases, can appreciate the dilemma the Court's facing.

25          THE COURT:  I'm not facing anything.  I think that

1  everyone should have an interest in looking at this very

2  clearly.   The alternative of lifting stays is going to create a

3  proliferation of litigation.

4          MR. GART:  Your Honor, I just want you to be aware

5  that Teterboro Ram is two guys, Dennis Espinosa and Ryan Cino,

6  doing work up in Teterboro, and they were providing maintenance

7  on the aircraft for the benefit of the owners.  And they're

8  storing the aircraft now at the rate of $1500 a day at their

9  expense.  And they can't afford to continue to do this while we

10 sort this out.

11         The mechanic's lienholders, I think you mentioned in

12 one comment thinking out loud, that we don't care.  That may be

13 a little harsh, but we certainly don't need to wait around

14 while they put Humpty Dumpty back together again.

15         THE COURT:  My point was your people might be in

16 first place, especially if the Debtor doesn't have an interest

17 in whatever it is that you have.

18         MR. GART:  Well, first place may be a great place to

19 be in if it means that we get paid soon in light of the storage

20 charges.  But the other concern, Your Honor, is I heard Mr.

21 Berman suggest that the owners should not be stayed, the non-

22 owners would be stayed because they contracted with the Debtor.

23 Well, that's not even accurate.

24         THE COURT:  I've already covered that.  If it's

25 nondebtor property, there is no stay as to anyone's action

1  against such property.

2          MR. GART:  Exactly, Your Honor.

3          THE COURT:  I already said that, so you don't need to

4  restate it.  Tell me something new.  And I did say I'd give Ms.

5  Gilmer the chance to say something, and I did tell you I would

6  come back to you.  But let's go ahead and finish, Mr. Gart.

7  What else do you want to say?

8          MR. GART:  Your Honor, the only other concern is

9  that, while we understand that this may need to be sorted out

10  for all of the owners.  We, again, don't need it all sorted out

11  for us and for the mechanic lienholders that I represent today

12  or in the future.  And so this idea of being surcharged for

13  that, that's going to be a problem for our clients.

14          THE COURT:  Understood.

15          MR. GART:  And lastly, Your Honor, again, we filed

16  the stay relief motion as a precaution because we saw this

17  moving on different tracks and we're very concerned it not.

18  Thank you.

19          THE COURT:  What specific -- let's see.  Let me go

20  back to your appearance.

21          MR. GART:  Your Honor, Teterboro has provided

22  maintenance with respect to 41 of the aircraft.  We're owed --

23          THE COURT:  Forty-one.  And are all 41 of those

24  aircraft aircraft in which the Debtor has no interest?

25          MR. GART:  Oh, I believe so; that is correct.  And in

```
 1  addition, four of those aircraft are at the Teterboro location
 2  and, subject to reviewing the FAA's notices of either proposed
 3  suspension or of suspension, they can be sold and ferried to
 4  owners or put in -- allowed to go forward in the foreclosure
 5  process that was proceeding prior to the commencement of the
 6  involuntary.
 7            THE COURT:  All right.  Thank you.
 8            Okay, Ms. Gilmer.
 9            MR. GART:  Thank you, Your Honor.
10            THE COURT:  You're welcome.
11            MS. GILMER:  Thank you, Your Honor.  Courtney Gilmer,
12  and we do have four motions for relief that were set for
13  hearing today.  It adopted 54, 55, 56, and 59.  And Mr. Gart's
14  discussion about the four planes that are in possession at
15  Teterboro Rams is timely because two of those four planes are
16  planes which we have filed motions for relief on before the
17  Court today.
18            None of the four planes for the four motions for
19  relief, none of those four planes have any interest of the
20  Debtor.  They're all owned entirely by --
21            THE COURT:  Not even a WiFi box?
22            MS. GILMER:  In terms of the registration records
23  with the FAA for the airframe, the propellers, and the engine,
24  the Debtor does not reflect an interest.
25            THE COURT:  Can you tell me that anything on -- that
```

```
 1  there is nothing on those planes that the Debtor would have an
 2  interest in?
 3            MS. GILMER:  We don't know that yet, Your Honor.
 4            THE COURT:  Then I'll set yours for trial.
 5            MS. GILMER:  In terms of -- can I talk about the
 6  practicalities?  Because I think there might be another road.
 7  And the reason that we filed our motions for relief and asked
 8  for an expedited hearing are the practicalities, some of which
 9  Mr. Gart addressed.  $360 a day per plane, when I can make
10  arrangements to scoot it next door for half of that.  But
11  because --
12            THE COURT:  I can give you partial relief from stay.
13            MS. GILMER:  I think that would be great, Your Honor.
14  Just to have the ability for these owners -- they're already
15  incurring so many damages.  The scrambled egg is going to be an
16  expensive breakfast.
17            THE COURT:  So what about your clients' sentiment to
18  a big, old auction?
19            MS. GILMER:  I don't think that an auction of the
20  planes prior to proceeding through a repair and maintenance
21  process, especially in light of this FAA action, I don't see
22  much of a market for these aircraft that are subject to FAA
23  emergency directives and that are not deemed airworthy.  The
24  value of these planes is putting the pieces back together and
25  getting that airworthiness certificate from the FAA allowing
```

1  them to get into the air.

2        THE COURT:  But what if someone wanted to have all of

3  these planes and create a new entity, was willing to undertake

4  the repair and do all those things, put a pot of money for you

5  all to fight over?  Perhaps mechanics' liens would be at the

6  top, especially those that we're dealing with planes that are

7  not the Debtor's.

8        MS. GILMER:  I'm not sure how we fund that process,

9  Your Honor, through another surcharge.  And why should my

10 clients, whose planes are in relatively good condition,

11 especially the one sitting in Teterboro that could be through

12 the process and on the market quickly, why should they be

13 hampered by Mr. Andersen's planes with CCA that apparently are

14 shells.

15       THE COURT:  Well, what if one of your planes has one

16 of his doodads on it?

17       MS. GILMER:  Then, I think as we work through the

18 inventory process that Ms. Sherman was discussing, then that is

19 worked out at the state law level and --

20       THE COURT:  Who participates in hiring the consultant

21 who's going to do the inventory?

22       MS. GILMER:  I'm not sure about how that gets sorted

23 out, Your Honor.  I concede that's a difficult issue.

24       THE COURT:  No need to inventory, no need to upload a

25 single document if there's a 100-percent buy-in to one sale of

1  the whole thing, a hundred percent of the assets, whatever they

2  are, with complete consent of the owners, get sold.  That's

3  just something that, you know, I'm thinking about as being a

4  possibility.

5          Let me give you the name of the case.  It was

6  Southeastern Airlines.

7          You weren't in that, Mr. Soriano?

8          MR. SORIANO:  If I was, Your Honor, I can't remember

9  what I did.

10          MR. BERMAN:  I was in that case for a brief time.

11          MR. SORIANO:  It sounds familiar.

12          THE COURT:  It's 06-6729.

13          MR. BERMAN:  That was an airline case, Your Honor.

14  That was an actual airline if I remember correctly.

15          THE COURT:  But there were planes.  It was a Chapter

16  7.

17          MR. BERMAN:  I understand.

18          THE COURT:  All they did was sell -- they agreed to

19  -- how to carve up proceeds among secured creditors with

20  different priorities.  And it looks like Angela Esposito was

21  the trustee.

22          Okay.  Go ahead, Ms. Gilmer --

23          MS. GILMER:  Your Honor, I would argue --

24          THE COURT:  -- because I'm about to start into the

25  regular calendar.  I'm just -- I was looking at the global, you

know, five-mile-high view as to how to handle all this.

MS. GILMER:  I just do think that some alternative to allow owners, if there's going to be some other process, whatever that process may be, to allow owners to mitigate their damages.

One of our planes, 139SL, is sitting outside baking, for lack of a better term, at Palm Beach International.  And we cannot get in and do anything to protect our interest in that plane to mitigate our damages and to secure what little value might be left for the owners.

THE COURT:  If I let you off the reservation, are you going to bring back the Debtor's stuff and the other owners' stuff that may be on that airplane?

MS. GILMER:  If I don't, Your Honor, then I think those actions, to the extent they were the Debtor's property, would be subject to the Court's jurisdiction; and to the extent that they were property of other owners, that is subject to state law action.

THE COURT:  One moment.  That just proliferates the litigation.  Okay, I have the order whereby we sold the fleet in Southeast Airlines and authorized a surcharge.  It's Document No. 139 in that case.  I'm going to give this to Ms. Sherman.  It's the only copy I have.

Ms. Arciola, would you give that to her?

Okay.  Let's start in on the regular calendar.  We'll

1  take a -- oh, I'm sorry.

2          MR. CLARK:  Your Honor, I did have -- just have

3  several brief comments.  Once again, my name is --

4          THE COURT:  And this is the holistic, global view;

5  right?

6          MR. CLARK:  Correct.

7          THE COURT:  You're Mr. Clark?

8          MR. CLARK:  That is correct, Your Honor.  And like

9  Mr. Andersen sitting to my right, my background is in aviation

10  not in bankruptcy.

11          The followup and some comments that he made about

12  maximizing the value of the fleet.  I think it's important to

13  recall that the focus here today has been on fractional

14  interest that these individual owners have.  However, each

15  fractional owners' interest was taken subject to the program

16  documents.

17          And under those program documents, the manager, which

18  was Avantair, had sole discretion to do many of the things that

19  is now being complained about.  In other words:  could exchange

20  aircraft, substitute aircraft, provide aircraft out of the corp

21  fleet, had the ability apparently under the contract documents

22  to move parts from one craft to another in order to provide the

23  most efficient operation of the entire fleet.

24          THE COURT:  So you're saying there's a waiver in any

25  interest, that it's the musical chairs when it stops version.

```
 1            MR. CLARK:  There may be.  So -- but under this
 2   program document, the owners are required to pay a monthly
 3   maintenance fee.  And my understanding is that the Trustee now
 4   succeeds to these maintenance documents.  So there's already --
 5   or these program documents.  So there's already a process in
 6   place by which owners can be assessed a monthly maintenance fee
 7   which by contract documents are to provide for the maintenance
 8   and storage of the aircraft.
 9            Now, I also point out that with these emergency
10   orders being issued by the FAA, these airplanes are not going
11   anywhere, with the possible exception of the ones -- the 18 or
12   so next week there's going to be notice of possible suspension.
13            So it's important, of course, to preserve the value
14   of the aircraft.  But under these program documents, the
15   Trustee does have the mechanism to take control of them,
16   preserve them, and assess appropriate fees under these program
17   documents against the owners and, therefore, agreeing with Mr.
18   Andersen, that maximizes the value of the fleet to give this
19   Court the opportunity to take some time and work out these
20   obviously (indiscernible) type issues.  Thank you.
21            THE COURT:  Thank you.
22            MS. SHERMAN:  Your Honor, the folks that actually
23   understand the aviation stuff have made some very interesting
24   points.  And if you accept Mr. Andersen's proposition that --
25   and you look at the program documents, I think we can certainly
```

1  find a toehold for this Court's jurisdiction if that's what we

2  want to do.

3       The Debtor even can swap people from plane to plane.

4  The Debtor also had the ability to send owners:  I'm proposing

5  to do this.  And if a majority of them didn't affirmatively say

6  no, kind of a negative notice thing, the Debtor was free to do

7  it as far as maintaining the planes and taking certain other

8  actions with the planes.

9       THE COURT:  So there was a majority vote?  There was

10  a democratic process put in?

11       MS. SHERMAN:  Basically the Debtor says:  I'm going

12  to do this.  And unless a majority said no before a deadline,

13  the Debtor was free to do it.  So I think we have a toehold for

14  jurisdiction and I think we have a mechanism for perhaps

15  resolving this.

16       And what I was going to propose to Your Honor was

17  sort of a middle ground on the stay relief -- and I wish I

18  could take credit for it, but somebody far smarter than I

19  actually was the one who thought of it -- and that would be to

20  allow every owner or a single owner's representative -- I don't

21  think you need 16 people trouping in -- but some representative

22  for every plane to go out wherever these planes are and

23  inventory a laundry list of parts.

24       And whether we call that propellers and engines and

25  the tail number, or propellers and engines and a certain

1  portion of the life-limited parts -- I'm not smart enough to

2  know what that list should be -- but go out and inventory them.

3          Take the steps to maintain the engines per the

4  manufacturer's specifications, and take the steps to drain the

5  fuel tanks so we don't have microbials growing.  And then

6  report back to the Court with an FAA cert:  These are the other

7  owners, these are people who claim a lien on the propellers and

8  the engines that are on our planes.  And we have a consultant

9  do it.

10         We received -- a number of folks have been calling

11 and saying:  Hey, we can be a consultant, we can do this, that

12 and the other.  And it's putting the cart ahead of the horse,

13 but Mr. Gibbs is sitting here in the courtroom.  He happens to

14 be a lawyer, but he also happens to run a charter air business.

15 And in fact, his company was taking some of the Avantair

16 customers around when their planes weren't flying at the end as

17 a charter business.

18         So whether it was the ombudsman that Mr. Berman

19 suggested -- but I think if the fractional owners all agreed

20 that we would hire somebody to look at the planes, make

21 recommendations as to what needed to be done as far as

22 maintaining the planes and how much it would cost.  And then

23 report back to the Court on what was going on with the planes

24 and if they need to be moved inside or moved someplace cheaper.

25 I know Mr. Gart doesn't want to provide, you know, free

1  storage.  And I know that Ms. Gilmer doesn't want to pay twice

2  the storage she needs to pay.

3         But do some of these minimal reshuffling, securing,

4  doing the maintenance on things while we're figuring out and

5  providing notice to the world.  It might be an acceptable

6  middle ground so that when we come back here and everybody

7  makes their arguments, after the world has had notice, what

8  should happen to the planes and are we going to do the musical

9  chairs theory or the back-to-the-bill-book theory, we'll at

10 least all know what we're talking about and the planes will not

11 be in harm's way in the meantime.

12        So that's my big picture, global view.  And it can be

13 Mr. Gibbs; it can be somebody else.  I mean, Mr. Gibbs says

14 he's got the manpower and the technical knowhow and the ability

15 to do this, but the owner groups are going to have to all agree

16 that they're going to -- to fund it because it's not going to

17 be free.

18        THE COURT:  So we need to have, let's see, a hundred

19 and how many representatives?  155 representatives?

20        MS. SHERMAN:  I don't think we have that many planes

21 left.  I believe there's 60 --

22        THE COURT:  Minus the 12?

23        MS. SHERMAN:  -- 30 some.  There was 55 minus 12, so

24 I think there's 43.

25        THE COURT:  Oh.  I wrote down 155.  Sorry.  That's

1    55, okay.

2          Before we move into the calendar, anyone else want to

3    be heard on the global view of how this could/should work -- a

4    suggestion on how it could or should work?

5          Mr. Mohney?

6          MR. MOHNEY:  Your Honor, Marvin Mohney for Dallas

7    Airmotive.

8          THE COURT:  And you've got some engines of your

9    client's in planes --

10         MR. MOHNEY:  That's correct, Your Honor.

11         THE COURT:  -- of the Debtor or these fractional

12   owners.

13         MR. MOHNEY:  Right.  There's an additional fact that

14   I'd like to call to the Court's attention.

15         My client does engine servicing and the Debtor was

16   one of its customers -- or clients.  We filed a response last

17   night and attached to it a listing of engines that we have and

18   their various status of work in process.  We have approximately

19   20 engines at Dallas Airmotive.

20         THE COURT:  And these are your company -- your

21   client's engines, or these are the Debtor's?

22         MR. MOHNEY:  These are engines that Dallas Airmotive

23   (sic), pursuant to their program, gave to us to rehabilitate.

24         THE COURT:  Okay.  So they belong to fractional

25   owners and to some extent maybe the Debtor.

1          MR. MOHNEY:  Correct.  And we don't know who those

2    people are.  We have their serial numbers.  We've given their

3    serial numbers.  But all of our dealings have been with

4    Avantair, that's the manager of the program.  So in my mind,

5    that lends itself more to the unscramble the egg approach than

6    it does for the musical chairs approach of a global resolution.

7          We have a separate issue that Ms. Sherman mentioned

8    and Your Honor mentioned, which is, we have some loaner engines

9    that are out there.  Four of them are leased engines.  Two of

10   our leased engines are on an aircraft that is subject of a lift

11   stay motion of Mr. Berman and of being held and proposed for

12   auction by Mr. Gart's client.  We'd like to get our engines

13   back and get the right engines on the right planes.

14          THE COURT:  Is there any argument that the mechanic's

15   lien attaches to the engine that your client is leasing since

16   there was maybe not privity?

17          MR. MOHNEY:  I think there's certainly an argument

18   about that.

19          THE COURT:  But you don't know?

20          MR. MOHNEY:  I have not looked into that, Your Honor.

21          THE COURT:  And Mr. Gart's going to say:  We have it

22   all.

23          MR. MOHNEY:  And my client put the engines that it

24   has and has done work on, asserts its possessory mechanic's

25   liens as well.

```
 1              THE COURT:  Okay.

 2              MR. MOHNEY:  It has not been paid on the engine work.

 3              THE COURT:  And that's all -- this list in your

 4  paper --

 5              MR. MOHNEY:  That's correct, Your Honor.  It's

 6  Exhibit --

 7              THE COURT:  It is page 7 of 11.

 8              MR. MOHNEY:  That's correct, Your Honor.  It's

 9  Document --

10              MR. GART:  And, Your Honor, we would suggest that

11  that will become the owner's problem.

12              THE COURT:  Yes, I know.

13         Okay.  We have a line.  Did you finish, Mr. Mohney?

14              MR. MOHNEY:  I'm sorry.  I am finished, Your Honor.

15  Thank you.

16              THE COURT:  Okay.  Thank you.

17              MR. GIBBS:  Hi, Judge.  I'm Gray Gibbs and I just

18  thought I would followup on Ms. Sherman's comments about the

19  possibility of a consultant coming in.  I think that my

20  aviation company does have the manpower and the ability to do

21  that.  We have a 135 certificate, so we deal a lot with the

22  FAA.

23         And just to speak to the unscrambling of the egg.  I

24  completely agree with Mr. Andersen.  I think props and engines

25  are clearly owned by the owner of the airplane.
```

1          THE COURT:  What about landing gear?

2          MR. GIBBS:  Well, if you get a bill of sale, you get

3   a bill of sale that mentions by serial number the props and the

4   engines but not the gear.  So I think that props and engines in

5   an airplane makes an airplane.

6          THE COURT:  And the gear is not part of the frame?

7          MR. GIBBS:  Pardon?

8          THE COURT:  The gear is not part of the frame?

9          MR. GIBBS:  I would say no.  However, here's the

10  point:  I think that whoever becomes the consultant's first

11  call needs to be to Mr. Conte.  The FAA is going to dictate

12  when these airplanes fly again.  If they say:  You need to find

13  your old gear, or you can never prove how many landings are on

14  this gear, therefore, you're going to have to replace it, you

15  might go like:  Oh, now we have to go find the right gear.

16          I mean, the reason they're suspending the operation

17  of the airplanes, at least one of them -- and Mr. Conte can

18  speak to it -- is because you have no clue -- if it's a life-

19  limited part that has 100,000 cycles on it, if it's a part that

20  you don't know where it came from or how many cycles have been

21  put on it --

22          THE COURT:  It needs to be replaced.

23          MR. GIBBS:  Exactly.  So if you say, well, we're just

24  going to go with airframe, gear and -- I mean airframe, props

25  and engines, you may have 133 parts you're going to have to

1   replace.   That may be an insurmountable problem anyway.

2          But to me, the first step is get with the FAA, find

3   out what they're thinking in terms of if and why, how we can

4   put these airplanes back together to where we can deliver them

5   to their owners to where they'll be in flyable condition.   If

6   it were me, I wouldn't ask for 100 or 55 representatives or 33.

7   I would let Beth Ann Scharrer hire a consultant.

8          Even if she is ultimately going to just abandon the

9   property, agree to the lifting of the stay and return it to the

10  owners, she needs to figure out what she's going to return to

11  them.   And that I think you do have jurisdiction to do.

12          So I would say appoint a consultant --

13          THE COURT:   She would have to figure out what to

14  return to them, meaning what is actually the estate's?

15          MR. GIBBS:   Right.   Exactly.   Well, and you can't --

16  I mean, obviously, we cannot return to Mr. Berman an airplane

17  with engines that he doesn't own.   So --

18          THE COURT:   Sure we can, and then they can fight

19  about it outside.

20          MR. GIBBS:   Well, right, which is just -- nobody's

21  done any good -- I mean, to me, I would put the owners on

22  notice that we are going to put these airplanes back together

23  to where they are in the best condition we can get them to you.

24  And then just be aware, we are going to abandon the property

25  after that's done.   You better go get either centralized

1    management, you better file a state court receivership because

2    you cannot come in here -- if you own an undivided fifteen-

3    sixteenths, you don't own it all.

4          And I think it's just like the condo association, if

5    you own it, you don't have to sell.  And so I don't think it's

6    a democracy.  I think they have to come up with centralized

7    management.  They can elect a leader and do powers of attorney.

8    They can do -- they can all put their interests in an LLC or

9    something like that, or they can appoint a receivership.  But

10   they'd be on notice that that's coming.

11         Whenever we get it, that's who we're going to give

12   the property back to, but first we have to figure out what

13   we're giving back to them.  And that's what I think the first

14   job is.

15         THE COURT:  Well, we can just give it all back to

16   them and -- we can get an inventory, give it all back to them

17   and then do motions for turnover of the estate's piece of it.

18         MR. GIBBS:  But you can't even give them their

19   engines because you don't know where their engines are.  I

20   mean, at the very least, the engines and props.

21         THE COURT:  No, no.  I don't mean -- I say abandon --

22         MR. GIBBS:  Right.

23         THE COURT:  -- any interest except that that is

24   clearly the estate's.  Let the owners take them.

25         MR. GIBBS:  Well, if you do that, you really do a

1  huge disservice for them because --

2          THE COURT:  To whom?

3          MR. GIBBS:  If Mr. Berman gets an airplane back and

4  he finds out his engine's not on it, how's he going to find his

5  engine?

6          THE COURT:  That's his problem.  He's asking for that

7  problem.

8          MR. GIBBS:  Well, he's -- he's not after that

9  problem.  He should be begging you to go put his airplane back

10 together and --

11         THE COURT:  That's not what he's asked for.

12         MR. GIBBS:  Well --

13         THE COURT:  He's asked for me to lift the stay.

14         MR. GIBBS:  Well, I know I heard him say that.  But

15 he's like a dog chasing a car.  What's going to happen when he

16 catches it?

17         THE COURT:  Maybe his firm gets rich because of all

18 the litigation that will ensue.

19         MR. GIBBS:  I'm sorry, Your Honor, say --

20         THE COURT:  I said maybe his firm will get rich

21 because of all the litigation that will ensue until somebody

22 decides is the cost of this litigation worth it.

23         MR. GIBBS:  Right.  Well, again --

24         THE COURT:  Okay.  How much -- okay.  Let's say that

25 this consultant could be your other company, and let's say you

1  cost whatever you cost.  Who's going to pay for it when there's

2  no money?

3        MR. GIBBS:  Well, I think what you do is you suggest

4  to them that they should contribute $500 apiece to cover the

5  cost of that.  And if they don't, that's fine.

6        THE COURT:  All 600 owners?

7        MR. GIBBS:  Sixteen owners per airplane.  And if they

8  don't, whenever they get their airplane back, they're going to

9  have a lien because you can give the -- you can give the

10  consultant a lien on the airplane --

11        THE COURT:  Oh, boy, then that really muddies the

12  water.  You've got the Gart lien, you've got the ownership

13  interest of somebody else that owns the engine, then you.

14        MR. GIBBS:  That's true.  But the Gart -- but they

15  are going to get their airplane put back together by one

16  person, centralized, that knows -- that is dealing with the FAA

17  and gets it done as expeditiously as possible, rather than 40

18  other people trying to find their own engine out there.

19        I mean, it ultimately is the best service to the

20  owners to get one centralized party that can say:  I want to

21  see the records.

22        THE COURT:  I agree.  I agree.  But that will be a

23  democracy because among their little units they will have

24  voted, they will have voted to do a thing.  And then we're only

25  dealing with 55 minus 12, or whatever it is, people to get

```
 1  votes from.

 2          MR. GIBBS:  Well, we've been messing around with this

 3  for what, six weeks now, and I think I heard one attorney say

 4  he had sixteen -- hundred percent.  I mean, it is difficult to

 5  get them to agree to anything.  And if you let the Trustee just

 6  hire the consultant, then at least it starts moving --

 7          THE COURT:  Okay.  Let me fin -- okay.  Thank you.

 8          Anybody else that wants to talk about the global

 9  view?  We're going to make a little break for lunch.

10          MR. BERMAN:  I have one more -- one more comment,

11  Your Honor, on the global issues, if I may.

12          THE COURT:  Why do you keep moving from lectern to

13  lectern?

14          MR. BERMAN:  I like to be mobile.

15          THE COURT:  You're confusing me.  Go ahead.

16          MR. BERMAN:  Your Honor, a couple of points in

17  response.

18          THE COURT:  I thought for a minute you were in Mr.

19  Andersen's camp because you were on that side of the room.

20          MR. BERMAN:  Location doesn't necessarily determine

21  alliances in this courtroom, Your Honor.

22          There was a management program.  And many of my

23  clients with respect to the 20 aircraft on whose behalf I'm

24  speaking, did terminate those agreements prepetition.  So I

25  don't know that that solves the problem necessarily.
```

1        Ms. Gilmer's suggestion and Mr. Campbell's suggestion

2   I think should be considered when you look at things globally.

3   And I'm happy to argue my motion for relief from stay after the

4   recess.  But --

5        THE COURT:  Which one was Mr. Campbell?

6        MR. BERMAN:  Mr. Campbell made a suggestion to me --

7        THE COURT:  Oh, because he hasn't said -- okay.  I

8   was thinking -- did I miss a statement in my notes from Mr.

9   Campbell?

10        MR. BERMAN:  No, no.  And Ms. Gilmer's suggestion.

11   You know, the owners, according to Mr. Gart, are incurring fees

12   on a daily basis --

13        THE COURT:  Yeah.

14        MR. BERMAN:  -- right now, involuntarily.

15        THE COURT:  Right.

16        MR. BERMAN:  So the suggestion of allowing the owners

17   to take physical possession of their aircraft temporarily

18   without any authorization to sell, fix, do anything, just take

19   physical -- whether we move it to a hangar next door that's

20   cheaper or we move it down the street.

21        We take physical possession for a couple of purposes:

22   One, to do an inventory.  And you left the -- you solve the

23   problem of whose going to do the inventory and how it gets paid

24   for by having each owner group do their own inventory on their

25   aircraft subject to the Trustee's participation and

1  involvement.

2         THE COURT:  How are you going to get unanimity of the

3  individual owner groups?

4         MR. BERMAN:  There's a --

5         THE COURT:  Does it go to your house?  Does it go to

6  my house?

7         MR. BERMAN:  Your Honor, there are representatives of

8  each of the aircraft, certainly of the 20 for whom I'm -- on

9  whose behalf I'm speaking, and those representatives have to

10 make decisions.  And in this --

11        THE COURT:  Do they have the proxy or power of

12 attorney from all of the other owners?

13        MR. BERMAN:  I don't know the answer, but Ms.

14 Applegate would know the answer to that question.  My simple

15 suggestion was you, on a limited basis, grant relief to allow

16 us to take physical possession to cut off these expenses that

17 are accruing on a daily basis.  We do an inventory, and then

18 the owners can decide a couple of different choices.

19        THE COURT:  How do you get physical possession from

20 Mr. Gart's client whose lien depends on holding possession?

21        MR. BERMAN:  Well, because you can say whatever liens

22 existed as of the petition date continue on and aren't

23 disrupted.  You can enter an order that whatever liens existed

24 aren't disrupted by a temporary movement.  We're talking about

25 trying to save money.  And at $1500 a day, that is a crazy burn

1  on --

2        THE COURT:  No kidding.

3        MR. BERMAN:  -- aircraft that may be worthless.

4        Let the owners do an inventory and come back to you

5  in two weeks or three weeks to put on a presentation.  Maybe

6  it's an evidentiary presentation on a stay relief motion.

7  Maybe it's a status report to say:  Okay, for tail number

8  whatever, this is the inventory, this is the status of the

9  aircraft.  We worked with the FAA and this is what they say

10 needs to be done in order to make this airworthy.  And guess

11 what?  My 16 owners have determined that they want to do thus

12 and so with respect to that plane.

13       And it may very well be that they'll want Ms.

14 Scharrer to sell the plane.  But I can tell you today, I don't

15 have authority from my owners of my 20 aircraft to sort of put

16 them into the estate and have the estate sell them.  Maybe some

17 of the owners will want to do that, and maybe some won't.  But

18 until we get the opportunity to look at our planes, talk with

19 the FAA, figure out what needs to be done, we can't make those

20 sorts of decisions.

21       And ultimately, these are business decisions that

22 will be driven by the owners of the aircraft.  If the plane is

23 worth X dollars in its current condition and it will take Y to

24 fix it --

25       THE COURT:  So what you're telling me is some of

1 these stay motions were premature because all -- the business

2 decision was not informed by all of these complications.

3          MR. BERMAN:  No.  I'm saying that the stay relief

4 motions were timely because the Debtor doesn't have an interest

5 in these planes.  The owners may choose to have the Debtor sell

6 them along with other estate property if they want to sort of

7 throw them into the auction.  But we don't know what the

8 condition of the plane is.

9          That's why, when I filed my motion for relief from

10 stay, I asked for a trustee, because I wanted someone who was

11 trustworthy to take control of the records.  And I asked for a

12 2004 examination because I want to know all of the books and

13 records that go with my aircraft, because my owners need to

14 decide what to do with their particular aircraft.  And it may

15 be different decisions aircraft by aircraft.

16          I think if there's a question of who do you appoint

17 to do the expert analysis and how does it get paid for, you

18 solve that problem by letting the owners of each aircraft do

19 it.

20          THE COURT:  You're going to give Dallas back its

21 engine?

22          MR. BERMAN:  I'm sorry?

23          THE COURT:  You're going to give Dallas back its

24 engine?

25          MR. BERMAN:  All of those discussions -- yes.  My

1  clients have been having, through Ms. Applegate and Mr.

2  Perkaus, have been having discussions with mechanic's lienors

3  and other vendors since before the case was filed resolving

4  those sorts of disputes.

5          I think if -- you don't have to make a decision what

6  you're going to do ultimately with each of the 43 remaining

7  aircraft today.  But you can allow the owners to take

8  possession for the limited purpose of cutting off expenses,

9  doing an inventory and coming back on an evidentiary basis and

10 saying:  Okay, here's the aircraft, here's how we own it,

11 here's how the Debtor doesn't own it, and here's what needs to

12 be done with it with respect to this aircraft.

13         That's the 20,000-foot view, and I would advocate --

14 I certainly want to have the opportunity on my motion after the

15 recess, Your Honor.

16         THE COURT:  Yeah.  We're going to take a recess.

17         Mr. Wilkes, you can wrap it up.

18         Ms. Scotten, would you please somehow get word to my

19 12 o'clock meeting that I'm going to join late.

20         MR. WILKES:  Thank you, Your Honor.

21         MR. RIEDEL:  I yielded my podium to Mr. Wilkes.

22         THE COURT:  Okay.

23         MR. RIEDEL:  If I could have just a minute, Your

24 Honor?

25         THE COURT:  You will.

```
 1            MR. WILKES:  With regards to Mr. Berman's position

 2   that limited relief for -- to take possession of the airframes

 3   would not jeopardize mechanic's liens or materialman liens is

 4   not accurate because Mr. Berman's whole argument is that this

 5   Court doesn't have jurisdiction over the airframe to begin

 6   with.

 7            If you do not have jurisdiction over the airframe to

 8   begin with --

 9            THE COURT:  I know.  I can't preserve the priority if

10   I yank it from their hands.

11            MR. WILKES:  That's correct.

12            MR. GART:  I'm glad he said it first, Your Honor.

13            MR. RIEDEL:  Thank you, Your Honor.  On behalf of

14   Piaggio, my client has been working with the Trustee, as Ms.

15   Sherman said, to inventory these.  They know the planes better.

16   If any of these planes need parts, we're the sole source of any

17   new parts that come in, obviously, for addition to these.

18            I think that it's important that there is a snapshot,

19   a photograph taken now -- you know, ideally as of the petition

20   date -- but now at least.

21            And if those parties who have requested relief from

22   the stay, you know, volunteering therefore to do something, if

23   limited stay relief were given to them to have access to

24   planes, do an inventory, to file that report, to -- with the

25   consent of the Trustee and, obviously, this might require the
```

1  consent of a mechanic's lienholder who has possession -- to

2  move the plane to save money, and the Trustee consents, that

3  the stay would lifted for that purpose as to those aircraft,

4  which might be 20 in the case of Mr. Berman's clients.  You

5  really have the Trustee, at no cost to her, getting information

6  that's available to all parties and for Your Honor to look at

7  coming back.  And Ms. Gilmer can do the same thing, have

8  access.

9        And those parties who don't want relief from stay and

10  who don't have clients who want to inspect the aircraft, don't

11  have to.  That would be for the Trustee to come up with a

12  report or whatever, perhaps a surcharge, perhaps a consultant,

13  but try and come up with some proposal to come back and have

14  all that information.

15        THE COURT:  Yeah.  I do think we need to take a step

16  back and everyone needs to consult with clients about the

17  parade of horribles.  And I do think that minimizing expense is

18  good.  I don't know what I can do about mechanic's liens.  I

19  guess, Ms. Gilmer, you would just pay -- your clients would

20  just pay.  And Mr. Gart would go away.

21        Okay.  And she's shaking her head yes.

22        MR. CONTE:  Your Honor, this is Joe Conte from the

23  FAA.  May I be heard on one point?

24        THE COURT:  Yes.

25        MR. CONTE:  So to the extent that any of the owners

1   are going to go through the recertification process, on just

2   the four aircraft that we actually looked at and that were the

3   subject of specific findings on the orders issued last night,

4   it took a team of FAA inspectors, probably seven or eight

5   inspectors total, two weeks to develop those specific findings

6   on those four aircraft.

7           And so on the recertification process, Dale Donegan,

8   who is the contact person where people have to surrender their

9   certificates to our offices in Fort Worth, there will be a

10  gatekeeping kind of process where we're not even going to go

11  out and look at the aircraft unless the owner or the owners

12  present certain documents to us ahead of time.

13          And so it would be -- I want to disabuse anybody of

14  the notion that the FAA has the resources to look at all of

15  these aircraft in the next two, three, or four weeks.  We're

16  going to look at aircraft that kind of meet certain standards

17  in terms of recordkeeping, in terms of certification from

18  someone in the private sector that they believe it's airworthy

19  and they've looked at all the records.  And then we're going to

20  come in behind that and kind of audit what they've done.  But

21  that's not a quick process.

22          So I just wanted to alert you and the owners to that.

23          THE COURT:  I'm happy to have your float in the

24  parade of horribles, sir.

25          Okay.  We need to take a break.  We'll come back,

1   including those on the phone, please, that I haven't reached.

2   I want global approaches.  Maybe we're having a group think

3   tank here, which is good because you're all here at the same

4   time and you can all hear it and you don't have to have a bunch

5   of conference calls.

6          And then I'd like to take a step back, give some time

7   for folks to consult, and come back on the motions for stay

8   relief except for some, perhaps, limited relief that is geared

9   towards decreasing the costs of storage.

10         I think when we come back we can talk about an

11  approach whereby folks could file some proposal to do some

12  things, whether it be a consultant, permit the owner groups to

13  inspect, a mechanism whereby owners could weigh in or vote for

14  a total sale of all of this stuff and let it be one rich

15  person's problem.  And then carve up the money according to the

16  priorities that we would have to.

17         In the Berkley Multi-Units case, when the property

18  sold, the in pari passu mortgage holders, they just had to

19  share pro rata.  There's a way to do it fairly.

20         You think about the cost of doing what your groups

21  need to do, the cost of the internal marshaling of the group to

22  consensus and the state court suits and the state court

23  defenses to mechanic's liens.  You weigh the cost of all of

24  that versus the potential for not getting your fair share but

25  getting something with a big sale.

1          So when we come back, I will pick up there.  We'll

2    pick up with the global sense.  Then we'll come back and we'll

3    talk about the individual motions and we'll schedule a time

4    whereby -- and it will be after the schedules get out.  We can

5    come back and talk about how to make sense of this thing.  It

6    is a problem.

7          I'm willing to do this, but if y'all make it so that

8    it's not easy, I'm just going to let everybody go and then you

9    can deal with all the junk that's going to hit you in state

10   court.  And all of your clients, all of them, will spend more

11   money, I am sure, than if you did it all consensually here.

12         That's my thinking at this point, but of course I

13   haven't made up my mind.  Thank you all --

14         MR. RIEDEL:  Your Honor, just as a quick note, I will

15   not be able to come back for the afternoon session because of

16   calendaring.  But I will share my thoughts on a global solution

17   with Ms. Sherman and she'll be able to -- to the extent that's

18   relevant at all.

19         THE COURT:  Okay.  That's Mr. Riedel for Piaggio.

20   Okay, thank you all.  Come back at 1:30, please.

21         And, CourtCall, if you could reopen at 1:30 for those

22   that want to call back in, I would appreciate it.  Thank you.

23         (Luncheon recess held from 12:15 p.m. to 1:48 p.m.)

24         COURTROOM CLERK:  13-9719, Avantair, Inc.

25         THE COURT:  All right.  We are resuming in session

1   this afternoon.  It's now 1:45.  We said we'd come back at

2   1:30.  I assume that those who are not here are not here by

3   design.

4          Mr. Holland has left to catch a plane.  He has Mr.

5   Lockton or an entity by the name of Lockton as his client.  But

6   he has left Mr. Alpert and Ms. Gilmer to sort of stand in his

7   shoes.

8          Let me go back through the roll call on the phone and

9   see if some folks have not returned.

10          Is Mr. Akerly still with us?

11          MR. AKERLY:  Yes, Your Honor, I am.

12          THE COURT:  Mr. Amron, have you finally joined?

13          (No response.)

14          THE COURT:  No.  Ms. Applegate, are you there?

15          MS. APPLEGATE:  Yes, I am.

16          THE COURT:  Mr. Conte, are you there?

17          (No response.)

18          THE COURT:  He did not rejoin in the afternoon.

19          Mr. Crosnicker, are you there?

20          MR. CROSNICKER:  Yes, Your Honor.

21          THE COURT:  Mr. Donegan, are you there?

22          MR. DONEGAN:  I am.

23          THE COURT:  Okay.  So there is at least one FAA

24   person here.

25          Mr. Donica I know is there because I asked him about

1  something.

2          And has Mr. Hugh Fuller finally joined?

3          (No response.)

4          THE COURT:  No.  Mr. Gart's there I know because we

5  had some colloquy before officially calling the case.

6          Mr. Jeremy Johnson, are you aboard?

7          (No response.)

8          THE COURT:  Okay.  He did not return.

9          Ms. Nadeau, are you here?

10         MS. NADEAU:  Yes, Your Honor.

11         THE COURT:  All right.  L. Carol Owen, are you here?

12         MS. OWEN:  Yes, Your Honor.

13         THE COURT:  Mr. Perkaus, are you here?

14         (No response.)

15         THE COURT:  Okay.  Did not return in p.m.

16         UNKNOWN SPEAKER:  Your Honor, he's going to join us

17 in a little bit.  He's running --

18         THE COURT:  Okay.  I'm being told that Mr. Perkaus

19 will join us at some point in time through CourtCall.

20         Is Mr. Plotko still there?

21         MR. PLOTKO:  Yes, Your Honor; Mr. Plotko and Mr.

22 Smith.

23         THE COURT:  Mr. Smith is there.

24         And Mr. Wagner?

25         MR. WAGNER:  Yes, Your Honor, I'm on.

1          THE COURT:  Oh, you are here.  Okay.

2          MR. WAGNER:  Yes.

3          THE COURT:  Good.  In the courtroom, Ms. Leon is

4  here, Mr. Andersen is here, Mr. Mohney's here, Mr. Glenn is

5  here, Mr. Berman is here, Ms. Sherman is here, Mr. Alpert is

6  here, Ms. Gilmer is here, Ms. Beth Ann Scharrer the Trustee is

7  here, Mr. Lamoureux is here, Mr. Appleby is here, and Mr. Clark

8  -- did I say that right?

9          MR. CLARK:  Yes, ma'am.

10          THE COURT:  -- Mr. Clark is here.  Mr. Campbell is

11  sitting in the back, and there's some other people sitting in

12  the back.  Mr. Wilkes is sitting in the back.

13          Okay.  So let's return to the global discussion for

14  those who haven't had a chance to weigh in on that, and then

15  we'll transition to the motions.  Anybody on the phone --

16  anybody in the courtroom who hasn't weighed in that wants to?

17          (No response.)

18          THE COURT:  Okay.  Let's go to the phones.  Let's

19  see.  Just jump in somebody.

20          MR. AKERLY:  Your Honor, this is Bruce Akerly,

21  counsel for Involuntary Petitioners.  The only -- I concur on a

22  number of the comments with respect to -- those comments with

23  respect to making sure we identify the estate's interests in

24  any of these assets.

25          But in that regard, with respect to the pending

1   motions by those folks who believe that either -- that they

2   should have access to their ownership group's aircraft or the

3   estate has no interest in those aircraft, one of the

4   allegations and one of the reasons for the filing of the

5   petition was the fact that, as you recall at the last hearing,

6   my client went out to one of the hangars where nine or ten

7   aircraft were located, and they were in a various state of

8   cannibalization. And it's our concern that parts have been

9   placed from one aircraft onto another aircraft.

10         And again, I think the estate does have some

11   interest, even if it's only one-sixteenth, in some of these

12   aircraft. And it's very important that the estate keep its

13   arms around these assets for a sufficient amount of time so

14   that the Trustee and owners of aircraft in which the estate may

15   have an interest have the ability to make sure that all

16   aircraft have the parts that belong to their aircraft or those

17   parts have been located and properly identified.

18         This is important particularly in light of the fact

19   that the FAA has now indicated that it is sending out letters

20   with respect to pulling airworthiness certification. Those

21   aircraft, to the extent those ownership groups, including my

22   client, want to get their aircraft back in order, they are

23   going to have -- then have it recertified, and so they're going

24   to want to make sure that the proper parts are in those

25   aircraft.

1          And so I would weigh in on the side that that

2     activity take place within the confines of the bankruptcy

3     estate and under the umbrella of the Trustee so we can make

4     sure and have assurance that there's a sufficiently organized

5     and good process for that.

6          So that's the only thing I would add at this point,

7     just that we all try to agree upon a mechanism or a process

8     where all owners share in that process and the ability to

9     verify their aircraft.

10          THE COURT:  All right.  Let me ask you a question.

11     When you say "parts," are you talking the engine and the prop,

12     or are you talking all parts going back to the baseline

13     approach?

14          MR. AKERLY:  All parts.  All parts because there are

15     -- and in fact, if you remember, there was an email that you

16     read at the first hearing I believe that was presented by

17     perhaps Mr. -- well, one of the ownership attorneys that

18     mentioned an elevator or -- I'm not an airline person, but it

19     identified that certain other types of parts from aircraft have

20     been taken from one aircraft to another to make that aircraft

21     work.  They used the word "rob."  Whether that's rob, beg,

22     borrow, steal, I don't know.

23          But in any event, I think we need to make sure that,

24     again, whatever is necessary to obtain airworthiness

25     certification, we need to make sure that that is preserved.

1    THE COURT:  Okay.  Well, you want -- you're in favor

2  of the unscramble the eggs, put Humpty Dumpty back together

3  again according to the original way.  Except there are

4  documents -- well, first of all, there apparently may be a body

5  of law that says a plane is the frame, the prop and the engine.

6  And there is also a body of documents that apparently allow

7  Avantair to do exactly that which you are suggesting should not

8  have been done.

9    And so there's a waiver argument there in terms of

10 being able to claim back an aileron, or whatever the thing was,

11 an elevator, from another plane.  So I think there's a legal

12 question there.

13   MR. AKERLY:  Yeah.  And that is going to have to be

14 determined in a proceeding I think that would properly be in

15 front of you.

16   THE COURT:  No.  Because if the Debtor doesn't have

17 any interest in it, then all the owners can fight in every

18 state of the nation where they may live and good to whoever

19 gets it into court first.  And you all will have a lot -- enjoy

20 a lot of remuneration, you lawyers.

21   Okay.  Who's next on the phone?

22   (No response.)

23   THE COURT:  Anybody with a global view, the 10,000-

24 foot view, aerial view?

25   MR. DONICA:  Your Honor, this is Herb Donica.  I

1   represent several of the interest owners.  I've been told by

2   our Louisville counsel -- I'm local counsel for a Louisville

3   law firm -- that we have within our motion 14 out of the 16

4   owners, the other two ownership interests are not property of

5   the Debtor.  There are other investors, have you, and we're in

6   the process of working with them.

7          I anticipate within a few days we'll represent all 16

8   owners.  At that point, I don't think there's any allegation

9   that the Debtor could have an interest in the planes owned by

10  this ownership group.  But I'm concerned that the global

11  resolution that's been proposed is -- will result in the same

12  amount of expense that the owners would have on their own.

13         I don't know if it's the best thing to do other than

14  to cut these people loose and let them go get their plane.  I

15  think if you want to condition that upon having each movant

16  submit a list of separate property, when we talk about the

17  engines, the landing gear, those items that may not be subject

18  to a security interest, we can do that so that the Trustee is

19  informed as to what's out there.

20         For example, if we're in possession of somebody

21  else's motor or the motor might partially belong to the Debtor,

22  then we should be required to cooperate with that process.  But

23  in terms of going and managing our aircraft, I think that we

24  should be turned loose to do that.

25         THE COURT:  All right.  Thank you.

1          Anyone else on the phone?

2          (No response.)

3          THE COURT:  Okay.  We're finished with the global

4     view.  So let me tell you what I'm thinking about with respect

5     to the other motions, and then you can argue separately if you

6     want to argue for more or less of what I'm thinking.

7          I like the idea of giving the ownership groups access

8     to inventory:  what's in the plane, on the plane.  That needs

9     to be done I think somewhat in concert with the Trustee.  The

10    Trustee may have a particular part on the plane.

11         I think it is fair to allow ownership groups to move

12    non-estate-owned claims, meaning the estate has no ownership

13    interest in the planes, to cheaper space.  That would be

14    subject to the rights of mechanic's lienors, meaning, if the

15    thing is in a state where there must be a bond put up or

16    payment in cash for release of the mechanic's lien, then that

17    must be done.

18         It would be subject to the estate's rights for

19    turnover of any individual parts or, I don't know, attributes,

20    accessories, the WiFi box for example, to get those things

21    turned back to the estate.

22         I believe that the Trustee could -- and this has

23    nothing to do with the motions for stay relief -- but organize

24    a sale of the four that the estate has an interest in.  Of

25    course that would be permitted with credit bids, unless there's

1   cause for not allowing credit bids.  And we could fashion that

2   as an opt-in type of a process where, if the planes -- the

3   other owners of other planes that -- in which the estate has no

4   interest, if they want to participate, fine.  If they want to

5   do it as part of one sale and share the burden of the expenses,

6   fine.

7          If those owners want to allow the planes to be sold

8   in a batch or a lot, then they must agree up front on how the

9   proceeds would be split and what surcharges would be permitted.

10  Absent agreement up front, I'm not refereeing the food fight at

11  all.

12         And so I'm thinking that that's the minimum relief,

13  the points that I said, the access to inventory and to move

14  them, I think that's the minimum relief I should give to all

15  non-estate-owned claims.

16         MR. GART:  Your Honor -- Your Honor, may I be heard?

17         THE COURT:  Is that Mr. Gart?

18         MR. GART:  It is, Your Honor.  Your Honor, I wanted

19  to just jump in and raise a concern.  We looked at the issue

20  during the break, and as far as we can determine, turning over

21  possession -- one of the reasons we in fact sought stay relief

22  is that if we were to turn over possession, while it doesn't

23  defeat the lien, it does preclude us from setting or proceeding

24  with an auction upon stay relief.

25         And unless the owners are prepared to consent to

1  peaceful repossession for auction purposes, we could not reset

2  our auction.  So --

3          THE COURT:  Mr. Gart, did I not just say it's subject

4  to either putting up a cash bond or payment to get it out --

5          MR. GART:  That's fine, Your Honor.  I just wanted --

6          THE COURT:  To pry it loose from your hands, they

7  have to get it out of your hands legally.

8          MR. GART:  That's fine, Your Honor.  Thank you.  If

9  we can fashion something along those lines, then we can put an

10 end to the storage charges.  But I don't want to, by giving up

11 possession, in any way defeat the auction rights upon stay

12 relief.

13         THE COURT:  If I confirm that no stay -- well, if I

14 confirm that no stay exists but that for some reason we leave

15 things in place and just grant access to inventory the planes

16 and allow the movement, the movement includes paying the

17 mechanic's liens.  I'm not going to -- you know, I'm not going

18 to deprive your client of that right.

19         Now, as I understand it, your client is holding

20 things that in no way the estate has an interest in; is that

21 right?

22         MR. GART:  Your Honor, that's my understanding.  We

23 have no objection to an estate representative or an owner

24 representative having access for purposes of inventorying parts

25 and equipment or determining that the estate has no equipment

1   on these aircraft.  But again, that's my understanding.

2             THE COURT:  Okay.  All right.  So let's go through

3   the motions.  The first one on my calendar is Mr. Berman's.

4             Mr. Berman, what relief do you seek today?

5             MR. BERMAN:  Your Honor, we are of a like mind with

6   Your Honor, and that was precisely the discussion that I had

7   with Ms. Sherman and Ms. Scharrer before we restarted this

8   afternoon.

9             With respect to the aircraft, the relief we'd like

10  today is precisely what you have suggested, which is:  First,

11  access be given to a representative of each ownership group for

12  each plane to both take physical possession and move the

13  aircraft, if we can do that in a way to save costs.  And if

14  there is a valid lien on those aircraft, then we'll have to

15  comply with applicable state law to do whatever we're going to

16  do to move it.  But we want to, obviously, cut that burn as

17  quickly as possible.

18            If there's a dispute over what the lien is and the

19  extent of it, I suppose that can be resolved in some state

20  court forum quickly.  If it can't, maybe we'll have to come

21  back here to resolve that.

22            Only two of our twenty planes --

23            THE COURT:  If it's non-estate property --

24            MR. BERMAN:  Then we'll just deal with it in state

25  court.

1          THE COURT:  -- you deal with it in state court.  I'm

2    not going to have my staff consumed with babysitting what

3    should be out in state court unless everybody is onboard for a

4    100-percent consensual sale.

5          MR. BERMAN:  We would like there to be an inspection

6    of each of the aircraft, so that we can have a list to come

7    back to the Court with, and make a report for each plane on a

8    plane-by-plane basis:  what equipment is there, what's usable,

9    what the condition of the plane is.

10          And hopefully in the next few weeks, we'll be able to

11   get a handle on, you know, the extent of the cannibalization of

12   the parts and make an evidentiary presentation to you on the

13   remaining relief in the motion for relief from stay.

14          At first I advocated before the lunch break that each

15   ownership group should be able to choose their own inspector.

16   And after consulting with Ms. Applegate, it appears to be a

17   more efficient process if there's one inspection group that

18   does the inspection work for all of the aircraft.

19          I think the Trustee can and should make that

20   determination.  The Trustee should have no financial

21   responsibility for that inspection.  And that financial

22   responsibility should be borne by the owners.

23          THE COURT:  Okay.  Then no inspection would be taking

24   place until there's a hundred-percent upfront money in deposit.

25          MR. BERMAN:  I think that's fine if that's the

1   Court's direction.  I don't know what the cost of each

2   inspection is.  There are some folks out there who have done

3   some of the inspection work already.  I know that Mr. Riedel's

4   client has already done some parts inspection work.  I think

5   the information can be shared and we can try to minimize the

6   cost of the inspection.  But I think that's an important first

7   step.  Because if we're going to go down at least one of three

8   roads --

9           THE COURT:  I don't care how you inventory.  If I

10  give you access --

11          MR. BERMAN:  Fine.

12          THE COURT:  -- and you do it group by group, fine.

13  But if it's going to be one person, then everybody's got to

14  have their money in the bank upfront.  And that's going to

15  maybe delay things, maybe not.

16          MR. BERMAN:  And I will leave that and trust the

17  Trustee and her counsel to either say, hey, this is going to

18  work or it's not going to work.  I think that's going to be the

19  most efficient methodology from a cost perspective.

20          Then with respect to -- and by the way, I think it is

21  appropriate for the -- for the Court to indicate that the

22  estate shall not have any further financial responsibility with

23  respect to housing the aircraft from today forward because

24  you're now revesting -- I mean, I moved for stay relief and I'm

25  asking you to allow us to take physical possession to preserve

1   the status quo.  We're not going to do anything other than

2   access and do an inspection.  But it shouldn't be the estate's

3   responsibility.

4          If the other owners' counsel for the other aircraft

5   want to speak to that, they certainly can.  But I am --

6          THE COURT:  So you mean you'd cut a separate deal

7   with John Lamoureux?

8          MR. BERMAN:  Yeah.  I mean, if there are lien

9   creditors out there that have valid liens and we want to

10  resolve them, we can negotiate and resolve them, and that may

11  eliminate some of the -- some of the, you know, cross-issues in

12  this case.  But it shouldn't be the estate's responsibility on

13  a move-forward basis to house the equipment.

14         And as Ms. Sherman pointed out, the ownership groups

15  for each aircraft should have the responsibility to maintain

16  the equipment in accordance with, you know, the manufacturer's

17  spec, so that if it turns out that one of my planes has an

18  engine that belongs to another law firm's client, that there's

19  no further waste to that equipment.  Because it may be that

20  we'll have to move engines back and forth to --

21         THE COURT:  It depends on what the law says about who

22  owns that thing.

23         MR. BERMAN:  And we don't obviously know what the law

24  says.  But if you're giving us access, we will have the

25  responsibility.

1          THE COURT:  I'm thinking two steps:  Inventory that

2    is complete enough so that Ms. Scharrer can see whether some of

3    her improvements or accessions -- accessories, whatever, are on

4    a plane so that she can go that, or the value of that thing,

5    later.  And then you all move the planes.  Move them, or leave

6    them and cut a deal with Mr. Lamoureux, with Galaxy, with

7    Signature.

8          MR. BERMAN:  Right.  And I wasn't suggesting that all

9    of our --

10          THE COURT:  Or Palm Beach or wherever they are,

11    Sacramento.

12          MR. BERMAN:  I wasn't suggesting that all of our

13    clients would want to move their planes.  But if they can make

14    cheaper arrangements to save on storage costs while we go

15    through this sort of discovery process, then I'd like to have

16    the opportunity to do that.

17          THE COURT:  Right.  And if stay relief is granted,

18    it's granted for all purposes, including the landlords to begin

19    lien enforcement actions for landlord liens, et cetera, if

20    there's not a consensual resolution for storage.

21          MR. BERMAN:  And I think that the stay relief issues

22    that are the permanent possessory stay relief issues should be

23    put off for an evidentiary hearing.

24          THE COURT:  Why?

25          MR. BERMAN:  Why?  Because there are questions --

1  you've raised questions and Ms. Scharrer has raised questions

2  about what the parts are.  If we're going to lift the stay,

3  then we should be able to take the planes back completely.  If

4  we're going --

5          THE COURT:  That's what I'm suggesting:  Please take

6  them back.  And then if you go with a WiFi box, you're going to

7  pay her for the WiFi box, or you're going to take it off and

8  give it to her so she can sell it somewhere else for $75,000.

9          MR. BERMAN:  Right.  And we obviously don't have a

10  problem with that.  My suggestion was we do this in steps, and

11  the first step is access and inventory.

12          THE COURT:  That's right.  And then you give the

13  report, and then you are allowed to move it.  Or it will sit

14  there and it will accrue storage charges under --

15          MR. BERMAN:  I was suggesting we be allowed --

16          THE COURT:  -- not under the estate.

17          MR. BERMAN:  -- we be allowed to move it now, with

18  the Trustee's consent, to a cheaper facility if we want to move

19  it, and then start an inventory/inspection process.

20          THE COURT:  That's fine.

21          MR. BERMAN:  And then we come back to you and we do

22  one of two things.  We make a report to you and we say:  Hey,

23  we figured out how to deal with all these planes, and some of

24  the planes are going to be sold consensually with the Trustee,

25  some of the planes are going to move to another operator, some

1    of the planes are just going to be taken back by their owners.

2            We'll present to you owner by owner what they want to

3    do with respect to their planes.  Maybe it will be global,

4    maybe it will be in different pieces.  And we also would be

5    prepared to present evidence on the stay relief issues at that

6    point in time.

7            And I'm suggesting --

8            THE COURT:  What evidence would I need?  If I've got

9    an inventory and the WiFi box is on your plane, you're going to

10   take it off and give it back to her or you're going to pay her

11   for it.

12           MR. BERMAN:  If we don't need to have an evidentiary

13   hearing -- there were some suggestions that you need to have

14   evidence on the stay relief issues -- then we would be

15   prepared --

16           THE COURT:  If you all agree to the inventory and

17   what it shows, it's what it shows.

18           MR. BERMAN:  Okay.  Fair enough, Your Honor.

19           I think that's an appropriate step-by-step process so

20   that it may be that there's consensus to solve some or all of

21   the planes, and it may be that there's not.  And each path will

22   have different consequences to the owners.

23           THE COURT:  Right.  And then you --

24           MR. GART:  Your Honor --

25           THE COURT:  -- carefully think this through because

1  I'm thinking that I might, at the cost of the United States

2  Courts, have this transcript typed up so that once all the

3  owners are known, they can simply access this and see every

4  fact that they should utilize in making a business decision on

5  what course to follow.

6        Mr. Gart, you were about to say something?

7        MR. GART:  Your Honor, I would just ask that with

8  respect to every order for -- granting stay relief today,

9  that's set for hearing today, include the same language with

10 respect to paying off the mechanic's liens or bonding them off

11 until the mechanic's liens are paid; otherwise, we're going to

12 have a nightmare later.

13       THE COURT:  Oh, really?  Like state law won't

14 control?

15       MR. GART:  Well, Your Honor, I'm concerned --

16       THE COURT:  I mean, I'll say it.  I'll say it for

17 comfort sake.

18       MR. BERMAN:  Well, Your Honor, my only concern with

19 making a determination that liens need to be paid sort of

20 presupposes that liens exist.  If there are liens out there --

21       THE COURT:  State law rights of mechanic's lienors

22 are preserved.

23       MR. BERMAN:  Will be preserved, right.

24       THE COURT:  So if you really want to have the plane

25 in your hand now and not litigate in state court, you will pay

1   him, or you will negotiate it, or you'll put up a bond.

2           MR. BERMAN:  Whatever the law requires.

3           THE COURT:  Whatever the law requires.

4           MR. BERMAN:  Understood.

5           MR. GART:  I'm just -- for Mr. Berman's benefit and

6   others, to the extent that they want to take possession of the

7   planes, they're going to have to satisfy the lien or find

8   another accommodation pursuant to state law.  And then our stay

9   relief will come up with respect to the auction of at least the

10  four planes that are in New Jersey, and we'll deal with it

11  then, unless Your Honor is granting stay relief for that

12  purpose as well

13          THE COURT:  I'm thinking that we should try to do as

14  much as we can now.  But to the extent that you have anything

15  on an estate-owned plane, I'm not going to lift the stay for

16  any purpose on that one.

17          MR. GART:  No, we don't, Your Honor.

18          THE COURT:  Well, I don't know that.  I don't know if

19  Ms. Sherman agrees.

20          MR. BERMAN:  And Mr. Gart's motion is not up today.

21          THE COURT:  I know it's not up today.  But what

22  difference does it make?  If I say you can move it, why can't I

23  say that they can go forward?  It's really a comfort order.  If

24  no stay exists, no stay exists.  Let's not pretend that it

25  does.

1           MR. BERMAN:  I agree, Your Honor.  I agree.

2           MR. GART:  Thank you, Your Honor.

3           MS. SHERMAN:  Your Honor, as far as the inspection

4  and what we've outlined -- Mr. Berman outlined, as long as it's

5  clear that the estate has no further obligation for

6  maintenance, putting chainlink fence around these, safeguarding

7  them in a hangar, and we're dealing with whole aircraft and

8  tail numbers and the engines that are affixed and parts that

9  are currently affixed to them, that's what's moving.

10          THE COURT:  That's right.

11          MS. SHERMAN:  The other question, Your Honor, you

12  indicated you didn't think we had to come back.  Unfortunately,

13  we may have to.

14          THE COURT:  Now -- well, wait a minute.  The engines

15  that are, for example, in Mr. Gart's client's hands, if those

16  engines that aren't affixed to a plane aren't involved with the

17  Debtor, then yeah, those can be moved, subject to the lien

18  rights.

19          MS. SHERMAN:  Well, I think we can't decide whether

20  the estate has an interest in the engines until we've decided

21  whether we're going to use the musical chairs theory or the

22  unscramble Humpty Dumpty theory.

23          I mean, I hate to get sounding silly in nursery

24  rhymes, but if we are -- if it's the engines that originally

25  came on the airframe that control, it's going to be one

question.  If it's the engines that are hanging on the airframe

now, it's a different question.

        Unfortunately I had this issue in the Kiwi bankruptcy

case a gajillion years ago in New Jersey, and one of the

aircraft lessors --

        THE COURT:  You don't look that old.

        MS. SHERMAN:  -- took the position that my client's

leased engines and loaner engines -- the Dallas Airmotive

situation -- had become accessions to the plane.  And the law

of accessions is kind of like fixtures and pornography, you

know it when you see it but there's no clear cut to ask.

        So once the inventory comes back and we figure out

where the engines are on the planes that the estate may have a

fractional ownership in, we may have to have Your Honor decide

which theory --

        THE COURT:  Okay.  But that would only be four

engines -- four times two, eight engines.

        MS. SHERMAN:  And propellers.  And the other question

we have, Your Honor --

        THE COURT:  How many sets of propellers?  I really

did not even look up what this thing is.

        MS. SHERMAN:  Two propellers and two engines.  And I

did bring a glossy brochure for Your Honor -- so you can have

an idea.  It's a beautiful plane.

        THE COURT:  Okay.  So it's a small set of -- it's a

```
 1   small set of those things that we may need to hold back.  It's

 2   eight propellers and eight engines.

 3              MS. SHERMAN:  And there are also, unfortunately, lots

 4   and lots and lots and lots and lots of very expensive parts

 5   that are not installed on aircraft.  And somebody is going to

 6   have to decide --

 7              THE COURT:  We're only talking about the planes.

 8              MS. SHERMAN:  -- on that at some point in time too.

 9              THE COURT:  We're only talking about the planes.

10              MS. SHERMAN:  Yes, Your Honor.

11              THE COURT:  We're not talking about the shelves with

12   all the stuff on it.

13              MS. SHERMAN:  Okay.  And so all the owners will be on

14   notice that if that engine needs to be preserved or that fuel

15   tank needs to be drained, it is on their dime, all the

16   fractional owners.

17              THE COURT:  Right.  And that --

18              MS. SHERMAN:  And the Trustee consents --

19              THE COURT:  And does that include the fuel

20   containers, or whatever you call them, and the engines that you

21   contend are the Debtor's?

22              MS. SHERMAN:  To the extent the estate has a

23   fractional ownership in those four aircraft, the estate will go

24   along with what all the other owners would like to do on that

25   airplane.
```

1          THE COURT:  Okay.

2          MR. BERMAN:  I think that probably deals with the

3    property issues.  The records issues, which Ms. Sherman also

4    addressed with me at our meeting, I wanted to suggest the

5    approach -- because they're sort of already down that road and

6    you've given them relief to secure the records.  And the

7    suggestion that I would make is that they continue to put those

8    records together.  And whether they upload them to a secure

9    website that's accessible to the owners or they have paper

10   files in a room that can be accessed with a librarian or

11   something like that, however the Trustee wants to do it --

12         THE COURT:  And again, if the Trustee wants to do

13   that and make that service available, those who want to

14   participate need to put money in the bank so that she can pay

15   to have that set of data available to you all.

16         MR. BERMAN:  And that was my suggestion, as well,

17   that there be a budget for whatever they need to do and then

18   they divide it up amongst the aircraft or whatever.

19         THE COURT:  I don't want them to have to do anything.

20   They will say:  Here's how much this project costs, bring me

21   the money.

22         They're not going to divide it.  They don't care.

23   You can pay all of it.

24         MR. BERMAN:  I understand, Your Honor.  I just want

25   to make sure they're not going out -- because you have granted

1  them relief to secure the records.

2          THE COURT:  Yes.

3          MR. BERMAN:  They physically have possession of the

4  records.

5          THE COURT:  Right.

6          MR. BERMAN:  And they have been organizing them.  And

7  I want to make sure that there's no question about them getting

8  compensated for that work, and so that was going to be my

9  approach with respect to both the records.

10          We do also have a motion for a 2004 examination, and

11  we would like to have the opportunity to examine

12  representatives of the Debtor's in conjunction with the

13  issues --

14          THE COURT:  Is that on today's calendar?

15          MR. BERMAN:  I thought it was.

16          THE COURT:  I didn't see it.

17          MR. BERMAN:  I don't have your calendar in front of

18  me.  Let me get the docket number.

19          MS. SHERMAN:  I don't think it's on the calendar,

20  Your Honor.

21          THE COURT:  I usually don't hear those things.  I'll

22  look at it.

23          Maybe -- Ms. Scotten, would you look at that motion

24  and see if there's anything that looks like it's --

25          MR. BERMAN:  It's Docket 25.  We filed it on July 31.

1           THE COURT:  I want to see if it's overreaching, and

2   if it's not, I can just go ahead and grant that I think.

3           MS. SHERMAN:  We also had -- the estate had filed

4   some motions for a 2004 examination.  It's not relating

5   specifically to the planes but to the bigger picture.  And Your

6   Honor had asked us to upload orders, and we have done that.

7           THE COURT:  Okay.  Well, then, should I finish now on

8   the first motion?

9           MR. LAMOUREUX:  Your Honor, John Lamoureux on behalf

10  of the landlord.  I heard the Court's ruling.  I'm in agreement

11  with Mr. Gart's comments, and I heard the Court:  Whatever sort

12  of mechanic's liens, landlord liens that may exist.

13          I heard from Trustee's counsel something a little bit

14  different than the understanding that I thought we had prior to

15  today's hearing with --

16          THE COURT:  Okay.  Let me ask you for a timeout.  Are

17  you addressing Mr. Berman's motion right now?

18          MR. LAMOUREUX:  Mr. Berman's motion, Your Honor.

19          THE COURT:  Okay, go ahead.

20          MR. LAMOUREUX:  And the question is, is I can sit

21  down reserving my comments so when my motion comes up it can

22  impact -- it may impact Mr. Berman's motion.  The issue that I

23  heard the Trustee say today is that the estate would have no

24  further responsibility to segregate, put up fences or protect

25  the collateral that's owned by these fractional interest

1  holders.

2          That is different than the understanding that I had

3  reached with Trustee's counsel prior to today's hearing.  And

4  those issues impact my motion that deals with what I call the

5  "access order."  And so I can deal with those issues now, I can

6  reserve all those comments until my motion is heard.

7          THE COURT:  Okay.  Tell me what objection you have to

8  my allowing Mr. Berman access to inventory --

9          MR. LAMOUREUX:  It's the issue, Your Honor, of -- it

10 deals with this landlord mechanic's lien issue and whether or

11 not the lease that we have with the Debtor is (1) still in

12 existence, and then (2), what impact that may potentially have

13 on my client's landlord liens on non-estate property.

14         THE COURT:  Okay.  May I ask you a question?  Under

15 Florida law, if your lease is with Ms. Sherman --

16         MR. LAMOUREUX:  That's correct.

17         THE COURT:  -- but she allows Mr. Berman to put stuff

18 inside --

19         MR. LAMOUREUX:  That's correct.

20         THE COURT:  -- and your landlord is not in privity

21 with Mr. Berman, does Florida law create a landlord's lien on

22 that stuff that is in Mr. Berman's ownership?

23         MR. LAMOUREUX:  There is an argument, yes, Your

24 Honor.

25         THE COURT:  What is that argument?  I'm not familiar

1  with it.

2         MR. LAMOUREUX:  I believe it's Code Section 715, Your

3  Honor.  Florida Statute --

4         THE COURT:  715 or 83?

5         MR. LAMOUREUX:  715, Your Honor.  There's a whole

6  procedure by which landlords cant go ahead when collateral that

7  has basically been left over --

8         THE COURT:  That's abandoned property.  That's not --

9         MR. LAMOUREUX:  Well, Your Honor, the Trustee is

10  saying it doesn't have an interest in this property.  So if it

11  doesn't have an interest --

12         THE COURT:  It had management right of managing it.

13  It didn't have an ownership interest perhaps.  It had a right

14  to have it there to manage it for a third party with whom the

15  landlord has no privity.  And as I understand it, 715 is the

16  abandoned property statute.

17         MR. LAMOUREUX:  And, Your Honor, the question then

18  becomes the issue regarding the lease and how long this lease

19  is going to last and whether or not the lease is terminated

20  within 60 days or if it's terminated earlier and the impact

21  that that may have on the equipment that basically is left

22  there.

23         MR. BERMAN:  Your Honor, I was suggesting a very

24  simple approach, which is, whatever the lien rights are are

25  preserved.  We're not seeking to unseat lien rights.

1        THE COURT:  No.  If you move it out -- if there's a

2  landlord's lien, which I, frankly, question, but if there's --

3  enforceable against property of a third party, if you move it

4  out, the landlord's lien is destroyed --

5        MR. BERMAN:  Well, I'm suggesting that you --

6        THE COURT:   -- unless there's a distress for rent

7  issued; right?  Am I remembering it sort of -- anyway.  So if

8  you move it and it destroys an applicable non-bankruptcy state

9  law right of the landlord, then what do we do with that?

10       MR. BERMAN:  But I'm suggesting -- and I will

11  respectfully disagree with Your Honor's conclusion before the

12  break that you didn't have the jurisdiction to preserve those

13  liens.  I think if you're considering stay relief, you

14  certainly have jurisdiction to condition --

15       THE COURT:  It's not stay relief.  Let's put it on

16  the table.  We're calling it something that -- there is no

17  stay.

18       MR. BERMAN:  Well, there is a stay with respect to

19  estate property.

20       THE COURT:  Right.

21       MR. BERMAN:  And there's uncertainty today as to

22  which is the estate property and which is the non-estate

23  property.  So pending that determination, which I'm suggesting

24  would happen at some point in the near future, a few weeks out,

25  you could preserve those lien rights.  And my folks can

1  certainly negotiate with Mr. Lamoureux to try to resolve those

2  issues.  But I'm not looking for anyone to adjudicate today

3  that a lien exists or doesn't exist.

4         I think you can, by virtue of your order, whatever

5  order you're going to enter on my motion today, you can say the

6  lien rights which existed prepetition and up to today are

7  preserved.

8         MR. GART:  It needs to say more than that, Your

9  Honor.

10         MR. LAMOUREUX:  Your Honor, my point in standing was

11  to make sure that -- and I agree -- if that is Mr. Gart

12  speaking on the phone, I agree, I think it might need to say a

13  little bit more than that.

14         The purpose of me standing, Your Honor, rather than

15  sitting down and waiting for my motion, is to make it clear

16  that we have or may have these certain rights.  And I've

17  already spoken with Mr. Berman prior to the Court starting the

18  hearing this morning about sitting down and talking with -- if

19  they've got collateral over at the Clearwater/St. Pete Airport,

20  how do we go about preserving and protecting it.

21         And I stand because what I believe -- I've reached an

22  agreement with Trustee's counsel with respect to how to

23  preserve and safeguard the Piaggio aircraft and other equipment

24  there, that we can talk about when my motion comes up, may not

25  now be on the table.  And I just wanted to make sure that those

1  arguments and those rights that my client has or may have are

2  preserved.

3        THE COURT:  They are preserved --

4        MR. LAMOUREUX:  Thank you, Your Honor.

5        THE COURT:  -- because I can't disrupt them.  So

6  that's the only opposition is just to clarify --

7        MR. GLENN:  Your Honor, just one clarification.  You

8  mentioned that there is no stay.  I mean, there is a stay under

9  362 because it's property of the estate.

10       THE COURT:  Only of the property of the estate.  But

11 we're talking about -- Mr. Berman assures me that none of the

12 planes he's talking about in his motion is a plane that the

13 estate --

14       MR. BERMAN:  Your Honor, two of them are, to be

15 clear.

16       THE COURT:  Oh, two of them.

17       MR. BERMAN:  Two out of the twenty.

18       THE COURT:  Well, then, 18 of them go away.

19       MR. BERMAN:  I understand that.

20       THE COURT:  Two --

21       MR. GLENN:  Your Honor, there's also --

22       THE COURT:  Two do not go away.

23       MR. BERMAN:  I understand that, unless we can move it

24 with the consent of the Trustee to a cheaper location --

25       THE COURT:  Yes.

1          MR. BERMAN:  -- to save money.

2          THE COURT:  Yes.

3          MR. GLENN:  In at least one other motion, there is a

4  notation attached to it that Avantair owns an interest in one

5  of the planes --

6          THE COURT:  I'm not talking about estate property.

7  Right now we're talking about -- I'm only talking about where

8  clearly no stay exists as to any piece of the plane.

9          Ms. Gilmer and Mr. Alpert, for example, together

10 represent 100 percent of the owners -- of one plane or two

11 planes?

12         MS. GILMER:  One plane, Your Honor.

13         THE COURT:  One plane.

14         MR. ALPERT:  I have another plane on top of that with

15 all the owners.

16         MR. GLENN:  What I was saying, Your Honor --

17         THE COURT:  Okay.  There are two planes here where

18 unquestionably the estate has no interest, so let them go.

19         MR. GLENN:  Your Honor, in one of those motions, let

20 me say it again --

21         THE COURT:  Okay.

22         MR. GLENN:  -- there's an attachment that shows a

23 listing from the FAA of ownership interests.  In one case,

24 Avantair is shown, although there is a letter apparently from

25 Avantair saying:  We don't claim an interest in it.  Now, that

1 raises some issues.

2          THE COURT:  I agree.  I'm going to go -- I'm going

3 motion by motion.  Is that thing in Mr. Berman's motion?  No.

4          MR. GLENN:  No, not --

5          THE COURT:  Okay.  Then, my ruling, Mr. Berman, 18 of

6 the planes -- well, all the planes, you may have access to

7 inventory, everything in there in cooperation with the Trustee.

8 You may move the 18 planes that the Trustee does not assert any

9 right in except to the extent that we can trace parts that are

10 not -- I don't know how to say this -- deemed to be part of the

11 plan.  And the rights are preserved to the estate to seek

12 turnover of such parts, if any.  And that would include,

13 perhaps, some engines, some props, and any accoutrements that

14 may have been added, such as a WiFi box.

15          You do so subject to all applicable state law rights

16 of lienholders, whether they be mechanic's lienholders,

17 consensual Article 9 lenders, the landlord's lien, if any.  And

18 I'm looking at 83.10 -- excuse me -- 83.08 and I'm not sure

19 that that would apply but maybe so, maybe not.  But you all can

20 negotiate that.  If you can't, then Mr. Lamoureux may sue and

21 assert the lien.

22          We will come back for a status report on either

23 September the 11th or September 13th.

24          MR. BERMAN:  And, Your Honor, can that -- may I be

25 heard briefly?

```
 1              THE COURT:  Yes.

 2              MR. BERMAN:  Can that hearing, whenever you're going

 3   to set it, be for a sufficient amount of time for us to put on

 4   evidence if there's a question about ownership of --

 5              THE COURT:  Yes.

 6              MR. BERMAN:  -- equipment?  So it would be an

 7   evidentiary hearing if needed?

 8              THE COURT:  Yes.  How much time do you all think per

 9   plane would be needed to say which pieces parts are whose?

10              MR. BERMAN:  May I have a moment, Your Honor?

11              THE COURT:  And I don't mean whose as between

12   nondebtor owners.

13              MR. BERMAN:  Right.  Just to put on the case and say:

14   Here's the stuff that goes with this plane, and this plane is

15   subject to our motion and we want complete relief, or whatever.

16              THE COURT:  Right.

17              MR. BERMAN:  May I have just a moment, Your Honor?

18              THE COURT:  Yes.  But in any event, you will not get

19   complete relief on the two planes that the estate has an

20   interest in.

21              MR. BERMAN:  Understood, Your Honor.

22              MR. ANDERSEN:  Your Honor, may I be heard briefly

23   when Mr. Berman finishes?

24              THE COURT:  On Mr. Berman's motion?

25              MR. ANDERSEN:  Yes, Your Honor.
```

1          THE COURT:  Sure.  But let him finish talking with

2    Mr. Campbell so that he's not distracted.

3          Somebody else wants to pick on your motion, Mr.

4    Berman.

5          MR. BERMAN:  I'm used to it.  I would suspect we

6    could put on evidence, if there was a contest about ownership,

7    in a couple of hours with respect to our 20 planes.

8          THE COURT:  All 20 in a couple of hours?

9          MR. BERMAN:  A couple --

10         THE COURT:  That's great.

11         MR. BERMAN:  Maybe say half a day.  I mean, I'll try

12   to do it as streamlined as possible.

13         THE COURT:  That's good.

14         Okay, Mr. Andersen.

15         MR. ANDERSEN:  Judge, this is in relation to Mr.

16   Berman because my client, CCA, has a fractional interest in two

17   of the aircraft which are the subject of the motion.  And I

18   know from the discussions that that fractional owner group has

19   had before, one of the aircraft has only one engine and the

20   other aircraft has neither of its engines.

21         And I heard Mr. Berman say:  We may have to move some

22   engines.  And the concern I've got is, as I understand, the

23   relief is being granted -- the Court's granting relief to

24   inventory these aircraft.

25         What I would prefer not to have to do is get involved

1   in some kind of state court litigation with another owner when

2   we trace -- or with a maintenance facility when one of those

3   engines is traced, for example, to Dallas Airmotive, or if the

4   engines from the airplane that have neither of its engines are

5   now traced to another airplane where they're currently a part

6   of that airplane.

7           THE COURT:  I'm sorry, but that is the status of this

8   case.  If the estate doesn't have a hook in it, then you all

9   fight outside.

10          Mr. Mohney's client, for example, maybe you lose

11  under the law of accessions, maybe you don't.  You fight that

12  out.  As I said, I'm not going to sit here and referee little

13  dustups between constituencies that I don't have jurisdiction

14  to unless everybody's in, everybody.

15          MR. ANDERSEN:  And, Your Honor, as I understood it,

16  the Court is considering typing up this transcript so it can be

17  provided to the fractional share owners so they can --

18          THE COURT:  Yes, because I think you all have to have

19  a real heart-to-heart amongst everybody about what is really

20  the best.

21          MR. BERMAN:  And I think we will use that status

22  hearing to report to the Court where the owners stand with

23  respect to their desires.  And that way maybe the Court can

24  fashion some relief that is better for everyone than the relief

25  that is possible under the Code.

1          THE COURT:  I think I'm going to have to treat this

2     as an opt-in type of a thing, absent a hundred-percent buy-in,

3     with an agreed take at the end of the day on how you carve up

4     the proceeds.  Remember, there is a blanket lienor, there's --

5     maybe there's some avoidable liens on some of the planes that

6     the estate has an interest in.

7          Mr. Mohney?

8          MR. MOHNEY:  Yes, Your Honor.  Just a point of

9     clarification for my client.  Is the -- does the Debtor have an

10    interest in the plane to which the Bank of America loaner

11    engines have been attached?  We referenced a couple of planes

12    that they have an interest in, and I wasn't sure if that one

13    which is subject to Mr. Berman's motion and allegedly subject

14    to Mr. Gart's lien was part of that group.

15         MS. SHERMAN:  Your Honor, I don't know to which

16    airframe Mr. Mohney is talking about.  And of course we have

17    not had really a whole lot of time to figure out which

18    fractional -- what planes we have fractional interests in.

19    Preliminarily, it looks like there are four, and those -- I can

20    tell Your Honor those tail numbers.  But that doesn't mean that

21    we're not going to find something else that gives us additional

22    rights, fractional interests in other planes.  But those are

23    N104SL, N146SL, N147SL, and N149SL.

24         And the FAA Registrations, as Mr. Andersen pointed

25    out earlier, they're almost like a perfection thing.  They

1   don't create ownership.  They're a way of registering the

2   ownership.  So we're going to have to go back to the ultimate

3   pieces of paper, the bills of sale.  And people sold out and

4   sometimes they were parked temporarily with the Debtor before a

5   new fractional owner came in.  We're going to have to go back

6   to and inventory all of those before we're going to be able to

7   say definitively these are the planes that the estate has a

8   claim to a fractional ownership in.

9         And as we're talking about everything today, you

10  know, I'm not sure we're all even on the same page as to who's

11  picking up what and who's inventorying what.  And I don't know

12  how we do it without the musical chairs theory or the Humpty

13  Dumpty theory being decided.

14        And we will abide with whatever the Court decides,

15  but I'm almost thinking we need to come back later because I'm

16  not sure that everybody has enough information to really know

17  what we're doing.  But whatever Your Honor rules, as long as

18  it's clear --

19        THE COURT:  In the meantime --

20        MS. SHERMAN:  -- that the Trustee has no more

21  responsibility or expense in safeguarding this, we're fine.

22        THE COURT:  Well, if one of the planes that is moved,

23  in fact, is owned by the Debtor, then the Debtor is going to

24  have a share in the expense to preserve it.

25        MS. SHERMAN:  That's fine.

1          THE COURT:  So --

2          MS. SHERMAN:  That's fine.

3          THE COURT:  You can't have it both ways.

4          MS. SHERMAN:  That's fine.

5          MR. BERMAN:  And the intention was when we come back,

6  whenever this hearing is, everyone should know what their

7  relative positions are better.  The estate will know what its

8  claiming an interest in, and the owners should have a clearer

9  picture.  We'll have an ownership list.  We'll be in a much

10  better position to put on our arguments as to what we control

11  and what we have a right to dispose of or retain or whatever.

12          THE COURT:  Okay.  That -- the argument Ms. Sherman

13  just made throws a monkeywrench in my thinking.  So it's

14  potential -- there is potentially an interest of the estate in

15  every plane?

16          MS. SHERMAN:  Depending on whether we're doing Humpty

17  Dumpty or something else, yes, Your Honor.

18          THE COURT:  I'm not talking about engines that may be

19  in another plane.  I said they could be moved with --

20          MS. SHERMAN:  Not every tail number.

21          THE COURT:  -- the obligation to turn over.  But if,

22  for example, Ms. Gilmer's clientele, they've got 16 owners and

23  they say their 16 -- their club of 16 doesn't include the

24  estate at all.  And you don't know that?

25          MS. SHERMAN:  Right now I have no reason to dispute

1   what she's saying.  What I don't know is when she grounds that

2   plane with that tail and she takes it somewhere, is there an

3   engine, is there a propeller, is there a part that the estate

4   has a right to?  And the only way I know that is whether we

5   know whether we're unscrambling them back to virgin status when

6   they came from Piaggio or whether we're going to stop with some

7   subset of parts and say:  These are accessions and wherever

8   they were when the music stopped --

9            THE COURT:  I'm going to carve out all of the things

10  that are on the shelves.  I've already said I'm going to carve

11  out the eight props and the eight engines that may have to be

12  associated with the four planes that we know of.

13           I said that the inventory would include -- if a non-

14  estate plane is moved -- or an allegedly non-estate plane is

15  moved and there's something on the plane that really belongs to

16  the estate, there will be an obligation to turn over.

17           MS. SHERMAN:  That gets to the final question, Your

18  Honor:  How deep does the inventory go?  There are parts and

19  there are -- there's a point at which it is no longer cost

20  effective to fight about them.  I mean, everybody, as a

21  practical matter, is going to have to inventory the 138 life-

22  limited parts because the FAA is going to require --

23           THE COURT:  I'd throw them all out and start over

24  because there's no reliability whatsoever in any of those

25  parts.

1        MS. SHERMAN:  Well, then, we're throwing out all the

2   planes, Your Honor.  You know, you can have them overhauled,

3   and then they start all over at zero.  And, you know, depending

4   on the part, that makes some sense.

5        But do we do just the engines? just the propellers?

6   Do we throw in the landing gear?

7        THE COURT:  Okay.  Let me put it to you:  What would

8   the Trustee do to rebut an assertion that there is nothing on a

9   plane that belongs to the estate?  How deep does she go?

10  That's up to her.

11       MS. SHERMAN:  I guess I'd have to know whether if any

12  of those parts were on a plane that we have a fractional

13  ownership in or if there's any argument that any of those parts

14  were spares and we're going to do the "go back to the virgin

15  list" theory, then we may have an interest in every single

16  plane.

17       THE COURT:  I'm going to give you two days.  I've got

18  9/11 and -- they're both bad days, 9/11 and Friday the 13th.

19       MS. SHERMAN:  How many planes do we -- how deep down

20  in the inventory do we go?

21       THE COURT:  I'm not telling you how to fulfill your

22  fiduciary duty to rebut an evidentiary showing that the estate

23  has no interest in something.  I've provided --

24       MS. SHERMAN:  What is Mr. Berman to inventory?

25       THE COURT:  -- the clawbacks -- pardon me?

1          MS. SHERMAN:  What is Mr. Berman to inventory and Mr.

2    Alpert to inventory and Ms. Gilmer to inventory?  I just want

3    to make sure to make sure we're all inventorying the same

4    parts.

5          THE COURT:  Ms. Gilmer may not want to inventory as

6    much as you might.  They just want to know what's on there.

7    And according to their business judgment about how far they

8    should inventory is how far they will inventory.

9          MR. BERMAN:  Your Honor, my original suggestion was

10   to have the Trustee run the inventorying, but I don't want that

11   to delay the process.

12         THE COURT:  But what if you want to just see whether

13   ten big things are on there --

14         MR. BERMAN:  And I think that -- I will leave that to

15   the discretion of our FAA lawyers because they know better and

16   the FAA experts or the aviation experts, they know best what

17   needs to be done for us to prove up ownership.  Although I'll

18   be litigating it, they're going to be the ones who will help

19   make those decisions.

20         I originally suggested that the Trustee engage one

21   inspector to do all the inventory.

22         THE COURT:  And I said you all may do that.

23         MR. BERMAN:  Right.  That's up to the Trustee and the

24   parties if that's what they want to do.

25         THE COURT:  But I don't want, for the third time,

1   these ladies to be holding the bag or chasing anybody for

2   payment either.

3          MR. BERMAN:  I'm with you.  I've represented

4   trustees.

5          THE COURT:  If you want Gray Gibbs to be the one, and

6   you all want to come up with a protocol of this is how much we

7   inventory, and he's going to do it on a plane-by-plane basis,

8   you heard what Mr. Conte said, it took seven men and women two

9   weeks.  That's a lot of hours, a lot of hours.  And I can

10  imagine it's going to be very expensive.  And so the budget can

11  be created, but these ladies don't have to lift a pinky until

12  they get the money in hand.

13         MR. BERMAN:  And there have been folks who have

14  performed some inventory and services prepetition, and it may

15  be that that's the most efficient route to go.  But the parties

16  can discuss that amongst themselves about how to accomplish

17  that.

18         THE COURT:  I don't care how you inventory whatever

19  it is you want to inventory.

20         MR. BERMAN:  Understood, Your Honor.

21         THE COURT:  I'm just saying you have access to do it.

22         MR. BERMAN:  We'll -- with the Court's permission,

23  we'll prepare a draft order on our motion and circulate it.

24         THE COURT:  Yes.  And so you move the 18 subject to

25  the landlord rights, the mechanic's lien's rights, and the

1  estate's rights.  And anything that's on those 18 planes that

2  really belongs to the estate, your clients will be under the

3  obligation to turn over that thing or things.

4          MR. BERMAN:  Yes, Your Honor.  And then final --

5          THE COURT:  Okay.  And your 2004 motion, I believe

6  that we've already called for an order, so we're fine with

7  this.

8          MR. BERMAN:  Okay.  And --

9          THE COURT:  Hold on.  As a matter of fact, who's the

10 one -- oh, the Chapter 7 Trustee's order I have and I'm going

11 to sign that.  And I don't know if we have one from your group.

12         MR. BERMAN:  I'll find out when I get back to the

13 office if we've uploaded it.

14         THE COURT:  It's possible Ms. Arciola will find it in

15 the meantime.

16         MR. BERMAN:  I think it was Docket 25.

17         MR. GLENN:  Your Honor, while you're on those 2004s,

18 are those going to be noticed to everyone, or do you want

19 everyone who wants a similar relief to file their own 2004

20 motion?

21         THE COURT:  Y'all can do it the expensive way or you

22 can do it the non-expensive way.

23         MR. BERMAN:  We're happy for people to cross-notice

24 if that's acceptable to the Court.

25         MR. GLENN:  That's what I was asking.

1          MR. BERMAN:  It would make sense to have one --

2          THE COURT:  Rent the convention center and have a

3   hundred people in there.

4          MR. GLENN:  I think in the final analysis there may

5   not be that many people.

6          THE COURT:  Okay.  I'm not going to put this in an

7   order unless somebody submits an order that says this, but it

8   is for the benefit of all, these 2004 exams shall be open to

9   any party in interest, party in interest, including co-owners.

10          MR. ALPERT:  Your Honor, if I may?  I'm hoping I can

11  short circuit some of the calendar.  With respect to Docket No.

12  52, with respect to Lockton Enterprises, Pegasus III and Dorian

13  Punj, which, that's the Plane N187 that --

14          THE COURT:  Where is that on -- oh, I see.  It's the

15  next thing on the calendar.

16          MR. ALPERT:  -- Ms. Gilmer has the remaining owner on

17  that plane.  We're fine with the same relief that Mr. Berman

18  will get.  And we'll use -- we'll work on the form of order

19  with Mr. Berman and use that same approach.

20          THE COURT:  Perfect.

21          MR. ALPERT:  And then I think you had some additional

22  ones?

23          MS. SHERMAN:  I have 187, Your Honor.  I believe

24  that's one where they had been a prepetition surrender worked

25  out.  The physical plane didn't get delivered but there's

1   sixty-some thousand being held in escrow by Mr. Cooling.  And

2   as long as long as the stay order is without prejudice to us to

3   decide later who is entitled to that deposit -- it was a

4   payment of past-due management fees --

5          THE COURT:  Wait a minute.  A payment of past-due

6   management fees --

7          MS. SHERMAN:  In order to get the plane back pre-

8   bankruptcy.  But the deal was the plane had to be exactly as it

9   had come from the manufacturer.  So the 62,000 was placed in

10  escrow.  They took a look at the plane and said:  Uh, uh, uh,

11  uh, uh, wrong parts.

12         Sixty-two thousand is sitting in escrow.  And I just

13  want to make sure that's what we're doing --

14         THE COURT:  Okay.  So a condition precedent to the

15  estate's ownership in that fund was that the -- that particular

16  tail number would come back in baseline condition.

17         MS. SHERMAN:  Your Honor, that was more or less what

18  the agreement provided.  We can talk about the funds later.  I

19  just want to make sure that the stay relief is without

20  prejudice to us --

21         THE COURT:  Yes.

22         MS. SHERMAN:  -- whatever rights we have in that

23  fund.

24         THE COURT:  Okay.  Yes.

25         MS. GILMER:  That's correct, Your Honor.

1          THE COURT:  And it will be continued to be maintained

2     as an escrow fund with whom?

3          MS. SHERMAN:  I believe it's a gentleman named Mr.

4     Cooling who is -- is he an attorney?

5          MS. GILMER:  Mr. Cooling is counsel for Lockton who

6     is with Mr. Alpert.

7          THE COURT:  Okay.  Well, and where is Mr. Cooling,

8     what state?

9          MS. GILMER:  Mr. Cooling is located in Kansas City,

10    and Mr. Holland is also representing Lockton that was here

11    previously.

12         THE COURT:  Okay.  Ms. Sherman, do you care where the

13    escrow fund is held?

14         MS. SHERMAN:  As long as it's with a law firm.

15         THE COURT:  Okay.  We'll leave it where it is.

16         MR. ALPERT:  Then, lastly, are you going to require

17    each of the unit owners who have filed their own motions for

18    relief from stay to get this similar order, or is this sort of

19    going to be an omnibus approach?

20         THE COURT:  It's an omnibus approach.

21         MR. ALPERT:  Okay.  Thank you.

22         THE COURT:  In fact, I wish there could be some sort

23    of an omnibus order that says -- well, maybe it should be plane

24    by plane.

25         MR. ALPERT:  That's fine.

```
1              THE COURT:  If at least one owner moves --

2              MR. ALPERT:  I represent all the owners of N173.

3              THE COURT:  If one owner moves, all owners in the

4    group get similar relief except for planes that are owned by

5    the Debtor.

6              MR. ALPERT:  But what I'm asking to clarify is we

7    actually do have to file a motion for relief from stay and we

8    can't simply ride along with this kind of omnibus approach for

9    all owners, that's the question.  Do we have to come in, file

10   motions next week or, as the owners, can we --

11             THE COURT:  Are they the same planes?

12             MR. ALPERT:  I'm sorry, say that again?  I represent

13   all the owners of N173.  There's no motion on today with

14   respect to --

15             THE COURT:  Submit the motion --

16             MR. ALPERT:  Perfect.

17             THE COURT:  -- and -- with his proposed order.

18             MR. ALPERT:  That works.

19             MS. SHERMAN:  We can likely do an agreed --

20             THE COURT:  Sure.

21             MS. SHERMAN:  -- order that's identical to all the

22   others.

23             THE COURT:  Absolutely.

24             MR. SMITH:  Your Honor, this is Mr. Smith on behalf

25   of owners who own 100 percent of their respective aircraft.
```

1    And until the last comment, I thought -- to the extent we're

2    subject to the stay at all, which would be questioned, I

3    thought that the relief would apply to all owners without

4    separate motion.  I just wanted to clarify, based on the last

5    comment, that at least one owner of every plane ought to

6    actually be filing something?

7            THE COURT:  Yes.  I think that's the way to go

8    because I think the Trustee needs to look at each plane, plane

9    by plane, and if an agreed order -- I'll call for an order that

10   would be mirror image to whatever it is I'm going to sign on

11   behalf of Mr. Berman and then Mr. Alpert with that little tweak

12   about the escrow fund, unless the Trustee doesn't want to agree

13   for some reason.  Maybe the Trustee finds out that no, you

14   don't have -- you don't represent all the owners.  Maybe the

15   Trustee still has an interest in the LW plane, I don't know,

16   for some reason.

17           But I think it's appropriate for you all to do that.

18   And does it mean we have to have 55 or 55 minus 12, whatever it

19   is?  I don't know, I think it provides clarity.

20           MR. SMITH:  So we submit something like a consent

21   order?

22           THE COURT:  Sure.

23           MR. SMITH:  Thank you.  And since I'm speaking -- I

24   apologize -- could we clarify one other item that was mentioned

25   earlier in the conversation?

1          THE COURT:  Yes, Mr. Smith.

2          MR. SMITH:  Again, if we're subject to this at all,

3     if there is access to an aircraft for moving it and for

4     inventory and so on, I think there was a comment that certain

5     maintenance would be required to preserve the value of

6     aircraft, like draining a tank or something.  So without seeing

7     the actual order, I'm assuming that maintenance could be

8     conducted on aircraft, again, at the expense of the owner; no

9     charge to the estate to preserve the value or to refurbish the

10    aircraft to --

11         THE COURT:  Right.  And it should be done to industry

12    standards, whatever that is.

13         MR. SMITH:  Thank you, Your Honor.

14         MR. CLARK:  Your Honor, Roger Clark.  In terms of the

15    Court's partial lifting of the stay allowing removal of

16    aircraft --

17         THE COURT:  It's partial lifting if applicable, or

18    confirming no stay exists.

19         MR. CLARK:  One concern that I have, and this is a

20    clarification point, as to I think my count is 42 of those

21    aircraft which are subject to grounding orders from the FAA as

22    of close of business today, they're not going anywhere except

23    the other side of the airport, if that far.  But there may be

24    log books, maintenance records onboard the aircraft, and those

25    are very portable.

1          And I just wanted clarification that any owner that

2  has a right to move an aircraft cannot remove any log books or

3  maintenance records that might be in those aircraft.  Those

4  have to stay in the aircraft at the present time until further

5  order of the Court.

6          THE COURT:  Yes.  I can't imagine one owner messing

7  with the books or the log book to the detriment of the other

8  owners.

9          MR. CLARK:  Because those will be important,

10 obviously, to track these various parts.

11         Another point, there's 19 aircraft that are noticed

12 of proposed suspension of their airworthiness certificates,

13 going to come out next week.  Those airplanes are apparently

14 flyable or possibly flyable.  They have current airworthiness

15 certificates.  And I haven't had a chance to compare which

16 aircraft are being represented today with those 19.  Are those

17 aircraft -- is it -- the Court says those aircraft may be moved

18 to the extent that those aircraft (indiscernible) can be flown?

19         THE COURT:  If they are the subject of a motion

20 today, if they're subject to an agreed order on a motion --

21         MR. ALPERT:  We're not flying them.  I just talked to

22 the other movants.  We're not flying them.

23         MR. CLARK:  Okay.

24         THE COURT:  I'll tell you what, for liability sake, I

25 wouldn't fly any of these planes.  I wouldn't let anyone fly

any of these planes for any purpose whatsoever until you know

exactly what the set is that the FAA is looking at.  And even

if they're outside of that set, given what we've learned today

about not knowing about the hours on life-limited parts, I

would say it would be reckless.  It would almost be malicious

to put the planes in service for any reason.

          MR. CLARK:  If there is someone who is reckless who

wants to fly an airplane, however, could we have the scope of

the order then requires any of the logs or maintenance records

that might be on those flyable aircraft to stay with the

aircraft and not be removed until prior notice to this Court

with an opportunity to copy those records by interested

parties?

          THE COURT:  The log books stay with the planes,

period.  Right?  That is part of the plane.

          MS. SHERMAN:  Your Honor, if they are already on the

plane.  If they are already in the records room, we're going to

have to go pay somebody to go find those.  And I don't --

that's getting a step ahead.  But wherever -- they're sitting

presently on the plane.

          And as to the FAA point, my understanding was these

had all been subject to a 440-something-79 exam already.  None

of them have airworthiness certificates as we sit here today.

They just hadn't tried to suspend them.  But they all had to be

reinspected before they were going to fly.  And they have

1   little red tags in the window that say, "Do not fly," or

2   something similar.  So they shouldn't be going anywhere.

3           THE COURT:  Someone would have to -- somebody would

4   have to be suicidal to want to even get into the cockpit.

5           MS. SHERMAN:  One apparently did move, Your Honor, so

6   -- not post-bankruptcy.

7           THE COURT:  So I guess the purpose of Mr. Clark's

8   comment is that to the extent that I'm allowing movement of

9   planes with log books in them, that is an exception to the

10  orders that prohibit people from removing documents.  Is that

11  your point?

12          MR. CLARK:  Yes, ma'am.

13          THE COURT:  Okay.  Then it should say specifically

14  that the couple of orders that are in there, that would be an

15  exception.  But they don't move anywhere off the plane.

16          Okay.  Next.  And, Mr. Alpert, you're going to work

17  with Ms. Gilmer on the Calendar Item No. 3 that's Docket No.

18  52; right?

19          MR. ALPERT:  Yes, Your Honor.  We discussed that.

20          THE COURT:  Do you want September 11th or do you want

21  September 13th?

22          MR. ALPERT:  Neither date sounds wonderful, but yeah,

23  it doesn't matter; whatever suits your calendar.

24          THE COURT:  Would it be helpful for us to set them

25  all together so that you all could observe each other's

1   evidentiary hearings in case you have a problem with a

2   propeller that's on one plane and you think it ought to be on

3   your plane?

4           MR. BERMAN:  Yeah, I think it makes some sense.  And

5   I don't know -- I hate to crowd up too much of the Court's

6   time, but it may make some sense to try to grab the days, both

7   days --

8           THE COURT:  Fine, we'll do it.

9           MR. BERMAN:  -- to allow for bleed over if needed.

10          THE COURT:  Fine.  Fine.  Okay.

11          Now, the next calendar item.  We'll take a break from

12  stay relief and we will approve Ms. Sherman's retention.  You

13  can give me an order approving.  Thank you.

14          MS. SHERMAN:  Thank you, Your Honor.

15          THE COURT:  All right.  Next is Mr. Lamoureux.  The

16  landlord who may or may not have liens against certain planes.

17          MR. LAMOUREUX:  Hi, Your Honor.

18          THE COURT:  What do you want?

19          MR. LAMOUREUX:  Well, Your Honor, if I can, I've got

20  something I'd like to hand up.  I think it will be helpful just

21  so you can sort of see what we're looking at.  If I may

22  approach, Your Honor?

23          THE COURT:  Yep.

24          MR. LAMOUREUX:  And if anyone would like sort of a

25  diagram of what the Clearwater/St. Pete Airport looks like and

1  the (indiscernible) it's right there.

2      Your Honor, I want to also deal with upfront the

3  issue that was raised this morning regarding the emails that

4  you received.  At one time this Kevin McKinney (sic) was a

5  principal with AvAero Services, LLC.  He ceased being an

6  associated principal with that entity about four or five years

7  ago, Your Honor.  He's not involved.  And in my discussions

8  with the client, there is no love loss between my client and

9  Mr. McKinney (sic).  So --

10      THE COURT:  So that's old bad blood, those emails.

11      MR. LAMOUREUX:  That must be old bad blood, Your

12  Honor.  But I've asked my client and he has confirmed that in

13  fact he is not associated with them at all.

14      THE COURT:  As you know, when people say bad things

15  about other people in my courtroom, it's irrelevant to me until

16  and unless it relates to a contested matter where someone gets

17  on the stand and makes those statements and I have a chance to

18  assess the credibility.

19      Okay.  So you've got --

20      MR. LAMOUREUX:  I've got our motion for relief from

21  what I call the "access order," Your Honor.  On August 3rd, you

22  entered Document No. 74, which was the order granting the

23  Chapter 7 Trustee's emergency motion to prohibit access to the

24  premises.  I call that the "access order," Your Honor.  One

25  thing that I think is important, at the time that the order was

1  entered, we got a multi-tenant complex here,; it's not a single

2  tenant.

3          From what I've handed up to the Court, you can see

4  there's an aerial view, you know, it's a the master concept

5  plan, and I've highlighted in yellow sort of the hangar and

6  office complex on either side.

7          If you go to the next page, Your Honor, what's called

8  Hangar 3 is the -- is the complex which the Debtor basically

9  occupies.  You can also see to the left-hand side, Your Honor,

10  is what's called Hangar 1.  That is -- at one time the Debtor

11  leased both properties, and Hangar 1 has then been subleased to

12  the Florida International Guard and to another entity called --

13  I think it's called Corporate Jet Solutions.

14          And the third diagram, Your Honor, is an architect's

15  sort of diagram of Hangar 3.  The top portion, Your Honor, you

16  can see in the middle part is the actual hangar space.  And on

17  both the left- and the right-hand sides are these gigantic

18  doors that close.  And then on the upper half, Your Honor, is

19  what they call the "east office area" on the first floor, and

20  then on the lower portion of that diagram is the "west office

21  area."

22          The west side, Your Honor, is just a single story,

23  while the east side, Your Honor, is a two-story complex.

24          THE COURT:  Okay.  So I would take the bottom half of

25  the third page and sit it on top of the top part of the first

1   half of the page.

2           MR. LAMOUREUX:  Right.  And I think it's important,

3   Your Honor, to at least have that so you know what we're

4   talking about.  In addition, Your Honor, Pinellas County,

5   Florida, they're basically the owner of all this property.

6   We're the tenant, AvAero Services is the tenant or sublessor

7   who then leased -- at one time the Debtor had all of this, and

8   really then at one time they had just Hangar 3.  And it's

9   supposed to be a much smaller spot.  And then the Debtor then

10  had subtenants, which were the Florida International Guard and

11  Corporate Jet Solutions.  So you can sort of understand who the

12  players are.

13          THE COURT:  Right.  And is Dr. Shipman (sic) a non-

14  party subtenant?

15          MR. LAMOUREUX:  Of us.

16          THE COURT:  Right.

17          MR. LAMOUREUX:  Of us, correct.

18          THE COURT:  Okay.  So you're saying that we've

19  blocked access to people who legitimately need access to their

20  own stuff that's not Debtor property, never could be, never

21  would be, and never will be.  And do you have an agreement with

22  Ms. Sherman and Ms. Scharrer?

23          MR. LAMOUREUX:  It's not only we have Chipman, but we

24  also, given the access order, we couldn't even sublease out

25  additional portions of the hangar because everyone was

1    excluded.

2           THE COURT:  Okay.  So let me go back.  Have you now

3    worked out an agreement?

4           MR. LAMOUREUX:  Well, I thought we had.

5           MS. SHERMAN:  Yeah.

6           MR. LAMOUREUX:  Okay.  And the agreement -- well, the

7    agreement that we had, Your Honor, was that with respect to the

8    actual hangar space, on the -- if you go back to the

9    architectural diagram.  The hangar space on the first floor on

10   the right-hand side, what we were going to do is basically

11   erect a fence across a portion of the hangar, and basically

12   have those Piaggio planes, and there's I think a jet engine and

13   some other parts, basically pushed over to the right.

14          THE COURT:  So they would be in the east floor.

15          MR. LAMOUREUX:  They would have been on the right-

16   hand side of the hangar as you look at it, Your Honor.

17          THE COURT:  Okay.  So it's going to be the -- what

18   would that be, the south half of the hangar?

19          MR. LAMOUREUX:  It sits at --

20          MS. SHERMAN:  Where the text is, Your Honor.

21          THE COURT:  Right.

22          MS. SHERMAN:  Basically where the text is, that end.

23          MR. LAMOUREUX:  I assume that's the south end, but it

24   kind of sits at a diagonal.

25          THE COURT:  I'm just using the east and west as my

1  demarcation for the south half.

2          MR. LAMOUREUX:  And so what we had agreed, Your

3  Honor, was that there was going to be a fence across.  All the

4  offices on either side have doors that open into the hangar

5  space, they were going to all be locked.  They were going to be

6  locked.  We were going to have a hangar, and then my client

7  could then use the left-hand side --

8          THE COURT:  Which, to me, would be the north.

9          MR. LAMOUREUX:  The north-end side.  And we would not

10  then have to deal with the concerns that the estate has that

11  other people would come in and have access to these airplanes

12  and that sort of thing.

13          THE COURT:  And records.

14          MR. LAMOUREUX:  And records.  And the records, Your

15  Honor, are -- well, at one time this Debtor had the entire

16  facility.  They were supposed to move into just the east side,

17  Your Honor, on the two-story.  They didn't.

18          They have stuff in almost every office on both sides.

19  There's equipment, there's furniture all over the place.

20          THE COURT:  Just move it into those bays and free up

21  the office space.

22          MR. LAMOUREUX:  Well, the question is, Your Honor,

23  that is the Debtor's responsibility.

24          THE COURT:  Right.

25          MS. SHERMAN:  Well, wait, Your Honor.  We've agreed

1  to all --

2          THE COURT:  Yeah.  I don't know why we're having to

3  have argument on this part.

4          MR. LAMOUREUX:  Well --

5          MS. SHERMAN:  If you look at the drawing, Your Honor,

6  there's a -- on -- the west office area is on the left-hand

7  side.  There's kind of an open piece on the far left-hand side,

8  and that's actually got a garage door.  So all the big stuff

9  that's either on the hangar floor, that's movable, or in the

10  offices on the west office area is going to run down to that

11  far end and we're going to key that off separately.

12          So then, Dr. Chipman, who is already in the west

13  office area will have access to his stuff --

14          THE COURT:  Is that Chipman or Shipman?

15          MS. SHERMAN:  I believe it's Chipman.

16          MR. LAMOUREUX:  Chipman, I think it is, Your Honor.

17  And he has --

18          MS. SHERMAN:  He's got some really neat old fighter

19  planes.

20          MR. LAMOUREUX:  He has like a MiG jet in there and

21  he's got some former East Block fighter jet also in there.

22          THE COURT:  I used to build those at Chan's Hobby

23  Shop when I worked there.

24          MR. LAMOUREUX:  These you can fly, Your Honor.

25          MS. SHERMAN:  They're really nifty looking.  But

1  anyway, so he will, and any tenants who want can have the whole

2  west office area except that one end.  They will have access

3  into the hangar space, just the left-hand side of the hangar

4  space.  And we will lock up all the back doors that lead into

5  the east area office space.  Because once you get in one door,

6  you can go up and around and down and through and over, and you

7  have access to everything.  So we'll secure locks there.

8          As far as fencing off of the airplanes, I mean to the

9  extent stay relief has been granted, that's going to be on

10  whoever's plane it is, I suppose.  Or if they're not property

11  of the estate, I don't know whether the estate should be

12  incurring expenses to build fences around things.

13          Mr. Lamoureux's client has asked that we don't drill

14  holes in the floor, that we use like the Gasparilla gates that

15  are kind of free-standing.  And we'll have to work on that once

16  we figure out who has got stay relief.  And maybe the

17  individual owners will pay -- the lease, as structured right

18  now, it's a thousand a plane a month anyway.  And maybe they'll

19  want to lease hangar space where it is.

20          But once they've got stay relief, they can chain off

21  their own planes and we'll lock up the offices, I guess.

22          THE COURT:  Well, where are the four planes that the

23  estate thinks it has an interest in, if it's just that few?

24          MS. SHERMAN:  Some of them are in Clearwater, and so

25  those may -- we're going to have to chain those off, Your

Honor.  And some of them are in Orlando, and the Orlando

landlord -- which actually the Airport Authority needs to have

that back by the 28th.  But we're just going to have to figure

out the logistical details.

THE COURT:  Okay.

MS. SHERMAN:  And I'm confident we don't need to

monopolize your time with this.

THE COURT:  Okay.  Can you give us, with a proposed

order, the floor plan with the color coded as to what relief

I'm giving in terms of the access.  Is that something you all

can work together with some colors on this?

MR. LAMOUREUX:  We can, Your Honor.  In addition, one

of the things that we agreed to do, since there is concern that

former officers and directors and employees may come in and try

to engage in shenanigans, is to -- if we get an order that

lists what these former directors, what their names are, that

they cannot come onto the premises, we will hand that order to

every one of our tenants that says these guys cannot come onto

the premises and if you allow them, you're risking contempt of

this Court.  And so we said we'll tell our people:  If they're

on the list, they can't come in.

THE COURT:  They don't risk contempt; they will be in

contempt.

MS. SHERMAN:  So we'll put together the persona non

grata list --

```
 1              THE COURT:  That's fine.

 2              MS. SHERMAN:  -- and that protects everyone.

 3              THE COURT:  And that can come in on the order that

 4  goes with Mr. Lamoureux's motion for relief.

 5              MS. SHERMAN:  Yes, Your Honor.

 6              MR. LAMOUREUX:  And there has been an agreement, the

 7  subleases, with the order, International Guard and Corporate

 8  Jet Solutions, those were assigned prepetition to my client.

 9  The Trustee has agreed that, to the extent that those lease

10  payments come in, they're going to turn them over to my client.

11  Then -- those are the short terms.

12              With respect to the open issues, then there's going

13  to be issues regarding, obviously, lease payments, rent, how

14  much, how long.

15              THE COURT:  Well, let's just take those up the normal

16  way --

17              MR. LAMOUREUX:  We will --

18              THE COURT:  -- motion for payment of administrative

19  expense -- I mean motion for allowance, et cetera.

20              MR. LAMOUREUX:  Right.  And, obviously, we've talked

21  today about --

22              THE COURT:  We've got lease rejection issues.

23              MR. LAMOUREUX:  Correct.  Correct.  And we've talked

24  today also about, you know, landlord issues and those type of

25  things.
```

1        THE COURT:  Well, let me ask you this.  With respect

2   to the landlord's lien that could be asserted against the

3   Debtor, which you know is avoidable --

4        MR. LAMOUREUX:  Yes.

5        THE COURT:  -- unless -- is there an Article 9

6   feature to the lease?

7        MR. LAMOUREUX:  I don't recall, Your Honor.  I --

8        THE COURT:  She didn't mention that there's a UCC-1

9   in --

10       MR. LAMOUREUX:  Yeah.  I don't recall.  I don't want

11  to say no --

12       THE COURT:  Okay.

13       MR. LAMOUREUX:  -- but I don't recall that, Your

14  Honor.

15       THE COURT:  State law rights are reserved, if any.

16       MR. LAMOUREUX:  Right.

17       THE COURT:  Okay.  And so what about this motion for

18  stay relief, which Mr. Wilkes points out.  What, are you trying

19  to get out on the cheap here?

20       MR. LAMOUREUX:  No, Your Honor.  I mean it was really

21  -- it was primarily a motion for adequate protection.  That's

22  what we're looking for.  We wanted to make sure --

23       THE COURT:  Don't call it a motion for stay relief or

24  I'm going to charge you --

25       MR. LAMOUREUX:  Oh, we did.  We did.  And, oh, by the

1  way, we did pay the fee.

2          THE COURT:  Oh, you did?

3          MR. WILKES:  They did pay the fee, Your Honor.

4          MR. LAMOUREUX:  I trumped the Trustee.  We did pay

5  the fee, Your Honor.

6          MR. WILKES:  J. Steven Wilkes on behalf of the United

7  States Trustee.  The creditor's counsel uploaded the motion

8  using the improper CM/ECF event code, which did not trigger

9  them paying a filing fee with the event code.  They did pay the

10  filing fee I think on the same day that they moved.

11          THE COURT:  Okay.

12          MR. WILKES:  In going through my CM/ECF traffic for

13  that morning, I saw this motion that wasn't filed correctly and

14  it prompted an objection by our office.  At this time, the

15  United States Trustee would be withdrawing its objection.

16          THE COURT:  Okay.  I am going to grant the motion for

17  relief from the order granting the --

18          MR. LAMOUREUX:  What I call the "access order."

19          THE COURT:  -- access prohibition --

20          MR. LAMOUREUX:  Okay.

21          THE COURT:  -- in the manner in which you two

22  described.  I would like to have the Avantair architect

23  rendering color coded to show what will be done -- what will be

24  permitted, in terms of access by others; what the landlord will

25  permit the Debtor to -- the Trustee to do to preserve the

1    property of the estate.  It will clarify the thing about the

2    rents.  All rights to seek administrative rent or rejection of

3    the lease, assumption of the lease, lease-rejection damages,

4    all of that is preserved for a future day.

5          MR. LAMOUREUX:  Okay.

6          THE COURT:  I'm denying stay relief without

7    prejudice.  And I am at this moment also denying any adequate

8    protection payments because of the probably unquestionable

9    entitlement of the landlord to an administrative rent claim.

10         Will you draw that order, please, with Ms. Sherman's

11   input?

12         MR. LAMOUREUX:  Absolutely, Your Honor.

13         THE COURT:  Thank you, Mr. Lamoureux.

14         MR. LAMOUREUX:  Thank you.

15         THE COURT:  Boy, we're moving fast now.  Okay.  Mr.

16   Donica's is next.

17         Mr. Donica, remind me how many aircraft you're

18   talking about here.  Just one?

19         MR. DONICA:  I am local counsel to a law firm in

20   Louisville.  We have only one plane.  We collectively represent

21   14 of the 16 unit interests.  The other two are privately

22   owned, not owned by the Debtor.

23         I believe that we are pretty much entitled to the

24   same relief that Mr. Berman had negotiated, excluding the two

25   planes that he had that had ownership interest in the Debtor.

1 But ours is quite a bit simpler, it's just one plane.

2          THE COURT:  All right.  Then why don't you share the

3 laboring oar with Mr. Berman and -- or maybe you let him do it

4 and you adopt it however, and work together to get an order

5 that looks alike so that it's easier on me.  And involve Ms.

6 Sherman in that.  And I'm going to either grant the limited

7 relief or confirm in limited fashion no stay exists, subject to

8 mechanic's lienors, landlord lienors, traditional lienors and

9 turnover orders that may come from this Court with respect to

10 different parts of the airplane.

11          MR. DONICA:  Right.  But --

12          THE COURT:  Thank you, Mr. Donica.

13          Okay, the next one --

14          MR. DONICA:  Your Honor, there is one other thing,

15 though.  We also had asked for turnover of the log books.  We

16 haven't confirmed that we have all of the records and the log

17 books.  We want a turnover of those materials that pertain to

18 this aircraft.

19          THE COURT:  Well, if the log book is in there, that's

20 fine.  If not, make arrangements with the Trustee to pay the

21 cost of doing that thing.

22          MR. DONICA:  Certainly.

23          THE COURT:  Okay.

24          MR. DONICA:  That's perfectly acceptable.

25          THE COURT:  Now, the next motion is one by Zach

1  Bancroft, and I don't remember him ever making an appearance.

2          MS. GILMER:  Your Honor, Courtney Gilmer.  Mr.

3  Bancroft and I are with the same firm and so I'm appearing for

4  those motions --

5          THE COURT:  Oh.

6          MS. GILMER:  Those are my motions.

7          THE COURT:  Okay.  All right, then, you've got one on

8  N187SL.

9          MS. GILMER:  Yes, Your Honor.  I have Docket Entry

10  No. 54, 55, 56 and 59.  And those four numbers are 139SL,

11  163SL, 187SL, and 188SL.

12          THE COURT:  Okay.  Does the estate claim an interest

13  in any of those four so far?  No.

14          MS. GILMER:  No, Your Honor.  Based on our review of

15  the books and records, the estate does not claim an interest in

16  any of those four planes.

17          THE COURT:  Okay.

18          MS. GILMER:  And I will work with Mr. Berman and Mr.

19  Alpert and the other parties with the motions for relief on

20  behalf of fractional owners to craft an order, pursuant to your

21  directions --

22          THE COURT:  Okay.

23          MS. GILMER:  -- regarding access; inventory;

24  maintenance, as necessary; access to books and records; and the

25  ability to move the plane, if desirable, in order to mitigate

1  damages.

2      THE COURT:  Okay.  Yes, and I keep forgetting,

3  there's the maintenance element done in accordance with

4  industry standards, that's permitted.  And I did -- Mr. Berman

5  is standing right here -- and I did also say subject to the

6  rights of third parties who claim an ownership interest in any

7  pieces or parts.

8      Is that why you were standing?

9      MR. MOHNEY:  Your Honor, just a little bit more.

10 I've spoken with Ms. Gilmer about it and I've reviewed the

11 engines that they identified.  We've overhauled a couple of

12 those engines and we have them, but we haven't been paid.  As

13 long as we're covering the repairman's lien rights, we're fine

14 with a similar form of order.

15      THE COURT:  Right.  So if they've got the engine and

16 they've repaired it, you've got to go deal with them.

17      MS. GILMER:  Absolutely.

18      THE COURT:  Okay.

19      MS. GILMER:  Thank you, Your Honor.

20      THE COURT:  Thank you.  And that's it.

21      MR. GART:  Your Honor, it's Brian Gart.  May I be

22 heard just one more moment, please?

23      THE COURT:  Yeah, let me get your motion up.  I may

24 be able to shortcut this one.  What's your docket number?

25      MR. GART:  It's Document Number -- Docket No. 98,

 1  Your Honor.

 2          THE COURT:  Oh --

 3          MR. GART:  And that was the reason --

 4          THE COURT:  -- Ms. Gilmer, you're going to prepare

 5  the orders on all four; right?

 6          MS. GILMER:  That's correct.

 7          MR. GART:  Your Honor, I'm going to look at the

 8  order --

 9          THE COURT:  Hold on, Mr. Gart.  I'm sorry, I was

10  talking over you.

11          Ms. Arciola wanted me to clarify that Ms. Gilmer is

12  responsible for the order on her four motions and that they

13  will all look alike, except for that escrow feature in Mr.

14  Alpert's.

15          Okay.  Now you said to go to 90?

16          MR. GART:  98, Your Honor.  No worries.  Thank you.

17          THE COURT:  A precautionary motion.

18          MR. GART:  Your Honor, in the light of the Court's

19  ruling today and as to the inapplicability of the stay, I was

20  hoping not to come back.

21          THE COURT:  I don't want you to have to come back.

22  Let's see, does the estate at this point claim any interest in

23  188, 169, 161 or 163?  I'm looking at the numbers that were

24  read to me.  No.  It is possible, though, that the estate may

25  have an interest.

1          MR. GART:  My thought, Your Honor, is we are set to

2    issue or serve an order to show cause that's returnable and to

3    be heard by the New Jersey State Court on September 6th; that

4    we'd be permitted to go ahead and serve that order to show

5    cause, give -- the Debtor is not a named defendant in that

6    action and doesn't, we don't believe, have an interest in the

7    aircraft.

8          Certainly, pursuant to Your Honor's earlier rulings

9    and the orders that I hope to review and work on with the

10   parties that have sought stay relief, they'll have -- the

11   Debtor -- or the Trustee and these parties, the owners, will

12   have an opportunity to have access to determine an inventory of

13   the equipment on the plane and determine whether the Debtor has

14   any equipment on the plane that they would assert an interest

15   -- or the Debtor -- or the Trustee would assert an interest in.

16         So under the circumstances, we'd ask for an order

17   that determines the stay doesn't apply and allow us to go to

18   the order to show cause hearing and ask the state court to go

19   ahead and set the sale but not allow that sale to occur until

20   the Trustee is satisfied that no property of the estate is

21   being sold.

22         THE COURT:  How does that sound, Ms. Sherman?

23         MS. SHERMAN:  Your Honor, my concern is that I don't

24   know.  With the timing we've been getting from consults on the

25   conducting of the physical inventories, it's going to be fairly

1  long.  We will only have had the hearing before Your Honor on

2  September 9th and September 13th by then.  So we won't know --

3          THE COURT:  11th and --

4          MS. SHERMAN:  I'm sorry, 11th and 13th.  So we won't

5  know whether we're playing musical chairs or Humpty Dumpty.

6  And so if the order to show cause date could be returnable

7  sometime after that hearing, we'll have a better idea of who

8  has an interest in the planes that Mr. Gart proposes to sell.

9          THE COURT:  Well, what he just said is he wouldn't

10  allow the sale to be held.

11          MR. GART:  That's correct, Your Honor.  The hearing

12  in September is the order to show cause hearing, and if the

13  Trustee needs to --

14          THE COURT:  And the Debtor is not a party.  The

15  Debtor is not a party.

16          MR. GART:  The Debtor is not -- but if the Trustee

17  needs more time to have access and make the determinations that

18  the estate has no interest on any of the equipment on these

19  aircraft, we certainly can work with her with respect to the

20  setting of that sale.

21          MS. SHERMAN:  Your Honor, my concern was that we just

22  -- I think the way an order to show cause works is if you don't

23  show up on September 6th --

24          THE COURT:  You're not a defendant.

25          MS. SHERMAN:  Well --

1          MR. BERMAN:  We have a problem with that approach,

2    Your Honor.

3          THE COURT:  There is no due process if they -- and

4    there is no deprivation of any right unless your client -- I

5    mean, your estate is a defendant.

6          MS. SHERMAN:  Unless it falls into the hands of the

7    BFP, Your Honor.  If Mr. Gart is willing to make -- if the

8    order to show cause could be returnable after that date, we'll

9    know whether we need to send somebody.

10          THE COURT:  Is that what happens?  Is the upshot of a

11    mechanic's lien foreclosure that someone that should have been

12    noticed, wasn't noticed, loses their rights?

13          MR. BERMAN:  If they sell it as a result of the order

14    to show cause and the right parties weren't noticed, then

15    parties' rights can be affected.  I was rising --

16          THE COURT:  I'm just -- no.  You say "can be."  I

17    know that for land purposes, unless you name someone, the lien

18    travels like a wart on the thing.  And I was just saying:  Is

19    that the same thing as a mechanic's lien?

20          MR. BERMAN:  I don't know the answer to that

21    question, but I do have a problem with stay relief or an order

22    being entered on Mr. Gart's motion that grants final relief.

23    The motion was just filed yesterday.  I haven't even reviewed

24    it with my client representatives and my co-counsel.

25          My suggestion was going to be that you address Mr.

1  Gart's motion and the final stay relief at this next hearing

2  that we're going to have.

3         THE COURT:  These two guys are paying what in

4  storage?  Remind me again, Mr. Gart.

5         MR. GART:  They are paying $1500 a day, Your Honor.

6         MR. BERMAN:  Well, we're going to move the planes --

7         MR. GART:  Not necessarily, Mr. Berman.

8         MR. BERMAN:  Well, if the request that Mr. Gart's

9  motion be heard today is being made ore tenus, we would object

10 to that and would like to have an opportunity to look at the

11 motions before any final relief is granted.

12        THE COURT:  All he is saying is:  Can we duke it out

13 in state court?

14        MR. BERMAN:  That's fine.  But the date of the state

15 court hearing should come after we've done the inventory,

16 because we don't know what position to take with respect to the

17 planes that they're trying to sell.

18        The reason that we got involved with Teterboro is

19 because they were threatening to sell aircraft before we had a

20 chance to know what was going on.  We're in that same position

21 today until we get access to the aircraft.

22        MR. GART:  Your Honor, I think we're talking past

23 each --

24        MR. BERMAN:  If I may be heard, Your Honor?

25        THE COURT:  Hold on.

1          MR. GART:  We are talking past each other.

2          THE COURT:  Y'all cannot talk on the phone and in the

3    courtroom at the same time.

4          So Mr. Berman is responding to your request and he's

5    telling me why he thinks it's unfair to go ahead with your

6    motion now, even though clicking away in storage lien is $1500

7    a day that maybe Mr. Berman's client won't even be responsible

8    for at the end of the day.  It's going to be unfair to someone.

9          So let me have Mr. Berman finish.  And then Ms.

10   Gilmer is at the other lectern and she wants to be heard.

11         So go, Mr. Berman.

12         MR. BERMAN:  Thank you, Your Honor.  I'm just

13   suggesting that on a day's notice we haven't had a chance to

14   look at the motion, the bona fides of the motion, or what

15   position to take.  I'm not suggesting it be prolonged.

16         I did think it made some sense, if you're granting

17   some interim relief to the parties, to get access to the

18   aircraft and maybe move them to a cheaper location and do the

19   inventories.  And that's the extent of the stay relief relief

20   you are granting today.

21         THE COURT:  You're not going to take it away from

22   them unless you bond it off or pay it.

23         MR. BERMAN:  Or comply with whatever the state law

24   is; I don't even know what the state law requirements are.

25         THE COURT:  Right.  Me neither.

1          MR. BERMAN:  Okay.  So whatever we need to do, we

2  understand that.  But I don't want, for instance, to be not

3  only trying to get ready for a trial on September 11th and the

4  13th and defending an order to show cause hearing in New Jersey

5  state court on aircraft that I haven't even seen yet.

6          So my suggestion was, No. (1), you give parties more

7  than a day to review a motion before ruling on it, at least

8  completely.  If you want to enter some interim relief, that's

9  certainly fine.  And (2), that we have a further hearing.

10  Whether it's on September 11th, or we have a hearing next week

11  on Mr. Gart's motion, it doesn't matter, but I'd like an

12  opportunity to take a look at it.

13          It's very difficult to know; if Mr. Gart's motion, if

14  it's granted as written, then you may be adjudicating rights of

15  the owners with respect to those --

16          THE COURT:  I adjudicate nothing.  He just wants me

17  to say no stay is in place.

18          MR. BERMAN:  Well, and I don't know that that's the

19  case until I look at the motion and we have a chance to look at

20  the aircraft.

21          MR. GART:  May I be -- may I respond, Your Honor?

22          THE COURT:  Wait.  Don't you want to hear what Ms.

23  Gilmer has to say so that you can do it all at once?

24          MR. GART:  Oh, I'm sorry.  Certainly.

25          MS. GILMER:  Your Honor, just to echo the same

1  concerns.  We've not had the opportunity to review.  Two of my

2  four planes, 163 and 188, are present at Teterboro Rams.  And

3  while Teterboro Rams is taking the position that they're

4  incurring the $1500 per day, they're certainly charging that to

5  my clients and putting that as part of their lien, which will

6  have to be paid off.

7        And so I think the prejudice is to the ultimate

8  owners of the aircraft, and that's why we would like an

9  opportunity to review the motion and respond.  And the order

10  that we've been discussing today for the stay relief for the

11  owners will protect whatever lien rights Teterboro Rams has,

12  doing what it's continuing to do, but will allow us to sort

13  through all of those other issues prior to the New Jersey state

14  court auction process.

15        THE COURT:  What if y'all don't pay them and so the

16  storage is continuing to click?  When do they get off the hook

17  for what they're having to pay to wherever it is that they're

18  renting?

19        MS. GILMER:  I think we just need an opportunity to

20  review the motion and respond and have the Court rule on it.

21        THE COURT:  Mr. Mohney, did you want to talk to Mr.

22  Gart?

23        MR. MOHNEY:  Yes, Your Honor; just a small thing.

24        THE COURT:  All right.  What do you want to tell Mr.

25  Gart?

1        MR. MOHNEY:  Mr. Gart may not have been aware of this

2   prior to filing our motion yesterday.  But engine -- I'm sorry,

3   Aircraft 169SL is the one that has Bank of America's engines

4   and my client's leased engines on it and we are not named

5   parties in the lawsuit.  And I think he previously mentioned

6   that all the interested parties had been named, and they're

7   not.

8        THE COURT:  So not all of the interested parties have

9   been named, Mr. Gart.  You may have to go back to square one

10  anyway.

11       MR. GART:  Judge, we will certainly give Dallas -- I

12  forget the name of the engine lessor.  Is it Dallas Motor or --

13       MR. MOHNEY:  It's Dallas Airmotive.

14       MR. GART:  Yeah.  I'm sorry.  Dallas Airmotive would

15  certainly get served with the order to show cause and --

16       THE COURT:  And Bank of America.

17       MR. GART:  And anyone else who asserts an interest

18  that we've learned about.  So we can address that.

19       THE COURT:  Except the Debtor.

20       MR. GART:  And we're not -- we've not named the

21  Debtor and we certainly are providing the Trustee with access

22  to determine whether the estate has any interest in any

23  equipment on the aircraft before we'd go forward with the sale.

24       Is everyone done?  Or is the Court prepared to

25  hear --

```
 1            THE COURT:  Everyone's done.  Can I just say this:
 2   Why don't you just make the show cause order returnable after
 3   the 13th?  It's just a week.
 4            MR. GART:  Your Honor, we would just like to serve
 5   the show cause order, and I will work with state court counsel
 6   to have the hearing on the show cause order later.  But no sale
 7   was going to be set.  No sale was going to happen on the 6th.
 8   The sale wouldn't be set until the show cause hearing.
 9            THE COURT:  Okay.  But that's not what they're
10   worried about.  They don't want to have to draft a response to
11   the show cause order that they will then appear at a hearing to
12   argue.  They want to have the answer due after the September
13   13th set of hearings.  So can you give them until after the
14   13th to send in their answers or whatever you call the response
15   to an order to show cause?
16            MR. GART:  I'm told, Your Honor, that we can't get
17   another -- we can't get an adjournment of the hearing on
18   September 6th in New Jersey state court, but I certainly will
19   work to do so.
20            What I am asking for is not unlike in every other
21   case where parties with a lien, a mechanic's lien, a secured
22   interest, are allowed to proceed to final adjudication but not
23   sale.  And if the estate or the owners have a basis for
24   opposing that relief in this court, let them come in and do so.
25   But there is really no reason to hold my client up from
```

1  proceeding with its state court rights.

2          And to the extent that I think it was counsel for --

3  is it Ms. Gilmer?  I don't believe that her clients' aircraft

4  are even the subject of the show cause order, if I'm correct.

5          THE COURT:  She says two.

6          MS. GILMER:  Two of our planes are at Teterboro Rams.

7          MR. GART:  But they're not the subject of the show

8  cause order.

9          MS. GILMER:  I haven't seen the show cause order.

10          MS. OWEN:  This is Carol Owen.  I'm Ms. Gilmer's

11  partner.  Let me revise that statement to say 188SL is a plane

12  in which our clients have an interest.

13          MR. GART:  Okay, so one of the aircraft.  But, Your

14  Honor, again, we're just going to -- as far as we can but not

15  sale until the owners have been served and anyone with an

16  interest has had an opportunity to be served with the show

17  cause order and the Trustee has satisfied herself that the

18  estate has no interest in any of these aircraft.

19          THE COURT:  But how do they combat -- how are they --

20  or what form are they going to be permitted to reject your

21  order to show cause or --

22          MR. GART:  They'll have an opportunity.  They'll have

23  an opportunity to respond --

24          THE COURT:  When?

25          MR. GART:  -- to the order to show cause.

1              THE COURT:  When?

2              MR. GART:  Again, it's being heard on September 6th.

3              THE COURT:  That's the point.  Some of these people

4      are involved in a showdown down here.

5              MR. BERMAN:  And, Your Honor, there is no way all of

6      those people could have been served, because we don't even have

7      an accurate list of the owners.  Ms. Sherman says that she was

8      able to retrieve from the Debtor's books and records an

9      ownership list, but no one else has seen it.  I don't think Mr.

10     -- I'm not aware that Teterboro had the ownership list for all

11     these aircraft before anyone else did.  I don't know why

12     there's a rush on this when we're not rushing to adjudicate

13     rights with respect to the aircraft.

14             THE COURT:  Well, there's a rush because of the

15     storage lien, I can tell you that.

16             But, Mr. Gart, if you don't even have the full

17     universe of people that you need in order to sell good title to

18     these aircraft -- are you telling me that the New Jersey court

19     is just immovable?  That just doesn't make sense to me.

20             MR. GART:  No, Your Honor.  They would have --

21     everyone we would serve would have an opportunity to reply by

22     August 28th.  We can certainly go to the state court and ask

23     for a different date for the order to --

24             THE COURT:  That's what I'm saying --

25             MR. GART:  -- but we've been told --

1        THE COURT:  -- let's get a different date.

2        MR. GART:  -- but we've been told by New Jersey

3  counsel that we would not get an adjournment from the state

4  court.  So, that's why we were trying to keep that date.

5        THE COURT:  Okay.  Well, then this Court can say that

6  the possibility of the estate's interest in these 41 aircraft

7  precludes you, by reason of the automatic stay, from holding

8  such hearing.

9        MR. GART:  Okay.

10        THE COURT:  If you don't want to play ball with

11  everybody, I'm going to invoke the estate's potential interest

12  in these things and you won't have a hearing.

13        MR. GART:  I was just trying to avoid coming back.

14        THE COURT:  I don't want to have you come back, but

15  you've got to work with me.  All these people want is a return

16  date that is after the September 13th hearings.  That's their

17  only issue:  Don't make me answer and get involved in

18  litigation while I'm also trying to get involved in litigation

19  on a bigger piece in Tampa, Florida.

20        MR. GART:  Okay.  So, Your Honor, we will provide or

21  attempt to obtain a date after the hearings on the 11th and

22  13th.  If not, I'll ask to have the stay relief motion set.

23  They --

24        THE COURT:  No.  I'm going to grant it.  No hearing

25  may be held, no answer may be required prior to September 19th.

1  That gives the counsels several days to recover, get their

2  answers in, and then the hearing could be held later in

3  September.

4          MR. BERMAN:  So no return date and no hearing prior

5  to September 19th?

6          THE COURT:  Right.

7          MR. BERMAN:  Okay.  Thank you, Your Honor.

8          THE COURT:  And so I'm granting it.  You don't have

9  to come back, Mr. Gart.

10         MR. GART:  Thank you, Your Honor.

11         THE COURT:  You can have your wedding.

12         MR. GART:  Thank you.  That wasn't the only reason,

13 Your Honor.

14         THE COURT:  I know.  Would you please work with --

15 run your order by Mr. Berman, Ms. Gilmer, Ms. Owen, and Ms.

16 Sherman.

17         MR. GART:  Your Honor, my only hesitancy is that it's

18 granted, subject to what?  I don't have a new hearing date.

19 So, what's the September 19th date?

20         THE COURT:  I'm granting the motion effective

21 September 19th.  No answer may be -- you may do whatever you

22 want to do in the meantime so long as what you do does not

23 involve a deadline for any of these parties to file an answer

24 before September 19th, or hold a hearing before September 19th.

25         MR. GART:  In the New Jersey state court?

1          THE COURT:  Correct.

2          MR. WILKES:  The United States Trustee --

3          MR. GART:  That's fine.

4          MR. WILKES:  The United States Trustee would ask that

5     no default on the order to show cause be permissible prior to

6     September 19th also.

7          MR. BERMAN:  No answer, defaults, hearings or

8     sales --

9          THE COURT:  Right.

10         MR. BERMAN:  Okay.

11         THE COURT:  But he can put in process, he can file

12    the papers --

13         MR. BERMAN:  Yes.

14         THE COURT:  --  he can serve the papers.

15         MR. BERMAN:  As long as we get served.  I'd like my

16    clients -- at least one of the lawyers on our team to get

17    served with these papers.  I'd like to be served with them so

18    that I know what's going on, because I know some of our

19    aircraft are involved, and that we'll respond appropriately

20    after the 19th.

21         THE COURT:  Okay.  And I should say also and note:

22    The sale date may not be held until the Trustee reasonably has

23    the opportunity to get an inventory, if the Trustee chooses to

24    do so.

25         MR. GART:  Your Honor, that considerably delays my

1  client now that I've asked the question and that's why I asked

2  the question.  Because we can have an order to show cause

3  that's returnable, you know, within a week after those

4  hearings, but they would have to respond on an expedited basis.

5  They'll be served; they'll have notice; there's just no reason

6  to hold us up at that point.

7          THE COURT:  Well, you had before offered not to have

8  a sale until the Trustee did her thing and you were open-ended

9  on that.

10          MR. GART:  I was.

11          THE COURT:  Now you're saying you're not as

12  open-ended as you were earlier?

13          MR. GART:  The Trustee is not a party to this, Judge.

14  We're talking about a fight between lienholders and owners,

15  which I was hoping Your Honor wouldn't take the bait, but you

16  did.

17          THE COURT:  I don't understand that comment.

18          MR. GART:  You're allowing Mr. Berman to get you

19  involved in adjudicating rights between owners and lienholders

20  that doesn't involve the estate.

21          THE COURT:  No.  It might involve the estate because

22  Ms. Sherman stood up and said:  I'm not going to guarantee you

23  that the four that I named are the only four.  And besides, she

24  may be advocating for the baseline and she wants to get stuff

25  off of the airplanes that would be estate property, which has

1   not been ruled on.

2          MR. GART:  Okay, Your Honor, I will provide, then,

3   that no answer, no defaults.  What else did everyone want?  I

4   mean --

5          THE COURT:  No hearing until September 19th.  I mean

6   it's only a two-week delay.  And I said "reasonable right of

7   inspection."  I don't know what the Trustee's position is about

8   a sale of property that may involve property of the estate.  It

9   would be potentially a void act if you don't name them in the

10  suit.  I don't know what the state law would say about good

11  title or not.

12         So I don't think that either Ms. Scharrer or Ms.

13  Sherman at this point have any firm belief that there is estate

14  property on there, but there could be.  And so they just want

15  to look at the inventory, that's all.

16         MR. GART:  We're more than happy to cooperate with

17  the Trustee's efforts.  I just did not want to have this Court

18  get involved in adjudicating rights as between the owners --

19         THE COURT:  I'm not.

20         MR. GART:  -- and mechanic lienholders.  And I think

21  that's -- we've gone down that road just a little bit today.

22  But we'll make sure that nothing is returnable --

23         THE COURT:  No, we're not going down any road.

24         MR. GART:  -- until after the 19th.

25         THE COURT:  I'm preserving for the Trustee the right

1  to have time to see whether there is any little thing on any of

2  those 41 that she wants.

3          MR. GART:  We understand, Your Honor.

4          THE COURT:  Okay.  Good.

5          Does anyone have a motion that's not set for hearing

6  that they want to go forward on?

7          (No response.)

8          THE COURT:  Okay.  Then I think we're done.  Thank

9  you all.

10         MR. BERMAN:  Thank you, Your Honor.  Oh --

11         THE COURT:  Oh, wait a minute.  Mr. Berman has got to

12 have the last word.

13         MR. BERMAN:  No, no, no, I'm not.  I don't know when

14 I'm supposed to come back to court.  You said September 11 and

15 13.  I didn't hear a time.

16         THE COURT:  9:30.

17         MR. BERMAN:  Okay.

18         THE COURT:  We're going to have two full days.

19         MR. BERMAN:  Thank you, Your Honor.

20         THE COURT:  Mr. Glenn, why did you bring this stuff

21 to me?

22         MR. GLENN:  I'm sorry, Your Honor.  And looking back

23 on it, I don't know what could have possessed me to start this

24 case or move for a Trustee or anything else.  Although, I will

25 say, having done so, we apparently got the right Trustee and

1  counsel.

2         THE COURT:  Yes.  And let me say this; you can't

3  argue this:  This has been to the benefit of all, whether there

4  is or is not estate property involved, or a stay is or is not

5  in place, it has helped everybody.

6         MR. GLENN:  It has, Your Honor.  The alternatives

7  were just so dismal that you're absolutely correct.

8         THE COURT:  It's almost a walk-away.  Outside of

9  bankruptcy, it's almost a walk-away.

10         MR. GLENN:  It was.

11         THE COURT:  Thank you all.  Have a nice weekend.

12         MS. SCHARRER:  Your Honor, maybe not everybody.

13         THE COURT:  Oh, well.  There's that, it's that blind

14  rotation thing.

15         MS. SCHARRER:  That's right.

16         THE COURT:  Sorry.

17         Okay, let's clear out.  Go enjoy the rest of your day

18  and the weekend.

19                   (Hearing concluded at 3:32 p.m.)

20

21

22

23

24

25

CERTIFICATE OF TRANSCRIBER


    I certify that the foregoing is a correct transcript prepared to the best of my ability from the digitally recorded audio proceedings and logs in the above-entitled matter.




_____     August 25, 2013
Marilyn L. Taylor, CVR                   Date
Transcriber



FEDERALLY CERTIFIED TRANSCRIPT AUTHENTICATED BY:


Kimberley S. Johnson, CVR-CM
Certified Verbatim Reporter Master

JOHNSON TRANSCRIPTION SERVICE
7702 Lake Cypress Drive
Odessa, Florida 33556
(813) 920-1466