IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

```
IN RE:                           :
                                 :
AVANTAIR, INC.                   :   Case No. 8:13-bk-09719-CPM
                                 :
          Debtor                 :   Chapter 7
                                 :
---------------------------------:
BETH ANN SCHARRER, Trustee       :   Adv. No. 8:13-ap-00898-CPM
          Plaintiff              :
vs.                              :
LANDMARK AVIATION                :
PIEDMONT HAWTHORNE               :
  AVIATION, LLC                  :
BIG SKY AVIATION, INC.           :
TETERBORO RAMS, LLC              :
AXCESS AVIATION MAINTENANCE      :
  SERVICES, INC                  :
          Defendants             :
                                 :
---------------------------------
```

U.S. Courthouse
801 N. Florida Avenue
Tampa, Florida 33602
Held October 17, 2013

TRANSCRIPT OF HEARING
*[NATURE OF PROCEEDINGS BEGIN ON NEXT PAGE]*

BEFORE THE HONORABLE CATHERINE PEEK MCEWEN
UNITED STATES BANKRUPTCY JUDGE

PROCEEDINGS DIGITALLY RECORDED BY COURT PERSONNEL
TRANSCRIPT PRODUCED BY COURT-APPROVED TRANSCRIPTION SERVICE

---

**JOHNSON TRANSCRIPTION SERVICE**
7702 Lake Cypress Drive
Odessa, Florida 33556
(813) 920-1466

*[NATURE OF PROCEEDINGS]*

MATTERS SET FOR 10:00 A.M.
[Re: 8:13-bk-09719] 1-Emergency Motion to Reimpose Automatic
Stay as to N169SL and as to New Jersey Action by Teterboro
Rams, LLC, filed by Lynn Welter Sherman, Attorney for Trustee
on behalf of Trustee Beth Ann Scharrer (Doc. #272); Limited
Objection (Doc. #289); Response (Doc. #286); 2-Expedited
Motion for Final Relief from Stay based upon Default - QSI
Ventures, LLC, filed by Herbert R. Donica on behalf of
Creditor QSI Ventures, LLC (Doc. #282)

MATTERS SET FOR 10:00 A.M.
[Re: 8:13-ap-00898] Emergency Motion for Preliminary
Injunction Extending the Automatic Stay Pursuant to Section
105 and Incorporated Memorandum of Law, filed by Lynn Welter
Sherman, Attorney for Trustee on behalf of Plaintiff Beth Ann
Scharrer, Trustee (Doc. #3); Response (Doc. #10)

MATTERS SET FOR 10:30 A.M.
[Re: 8:13-bk-09719] 1-Verified Motion for Relief from Stay Re:
eviction and removal of collateral and Motion for Adequate
Protection, filed by John J. Lamoureux on behalf of Creditor
AvAero Services, LLC (Doc. #245); 2-Motion for Approval of
Sale of Socata TBM 700 Aircraft Owned by Aircraft Support,
LLC, filed by Lynn Welter Sherman, Attorney for Trustee on
behalf of Trustee Beth Ann Scharrer (Doc. #250); 3-Motion for
Relief from Stay Re: Aircraft Identified as Piaggio P-180,
Serial No. MSN 1052 and FAA Registration number N102SL, filed
by Robert B. Glenn on behalf of Petitioning Creditor Soldier
Creek Ranch LLC (Doc. #254); 4-Motion for Relief from Stay and
for Turnover of Records Re: Certain Airframes, Engines,
Propellers, and their related parts, Equipment and Records,
filed by Donald R. Kirk on behalf of Interested Parties LW Air
V LLC, LW Air IV LLC, LW Air III LLC, LW Air II LLC, LW Air I
LLC (Doc. #255); Limited Objection (Doc. #296)

APPEARANCES:

| | |
|---|---|
| For Various Owners and 23 of the Avantair Former Aircraft (Appearing by Phone) | AMANDA APPLEGATE, Esquire Aerlex Law Group 2800 28th Street Suite 130 Santa Monica, California 90405 310-392-1271 |
| For Various Owners and 23 of the Avantair Former Aircraft | JAY VERONA, Esquire C. PHILIP CAMPBELL, JR., Esq. R. QUINCY BIRD, Esquire Shumaker, Loop & Kendrick, LLP 101 E. Kennedy Blvd. Suite 2800 Tampa, Florida 33602-5150 813-229-7600 jverona@slk-law.com qbird@slk-law.com pcampbell@slk-law.com |
| For Signature Flight Support Corporation (Appearing by Phone) | MICHAEL CROSNICKER, Esquire LeClairRyan 70 Linden Oaks Suite 210 Rochester, New York 14625 585-270-2113 michael.crosnicker @leclairryan.com |
| For Teterboro Rams | BRIAN K. GART, Esquire ZACHARY P. HYMAN, Esquire Berger Singerman 350 E. Las Olas Boulevard Suite 1000 Ft. Lauderdale, Florida 33031 954-525-9900 bgart@bergersingerman.com zhyman@bergersingerman.com |

```
APPEARANCES:   (Continued)

For QSI Ventures                    HERBERT R. DONICA, Esquire
                                    Donica Law Firm, P.A.
                                    106 S. Tampania Avenue
                                    Suite 250
                                    Tampa, Florida 33606
                                    813-878-9790
                                    herb@donicalaw.com


For QSI Ventures                    LEE K. GARLOVE, Esquire
(Appearing by Phone)                Middleton Reutlinger
                                    401 South Fourth Street
                                    Suite 2600
                                    Louisville, KY 40202


For LW Air I through V, LLC         MICHAEL V. LEEMAN
                                    Carlton Fields
                                    4221 W. Boy Scout Blvd
                                    Suite 1000
                                    Tampa, Florida 33607
                                    813-229-4329
                                    mleeman@carltonfields.com


For LW Air I through V, LLC         GREGORY PLOTKO, Esquire
(Appearing by Phone)                Kramer Levin Naftalis & Frankel
                                    1177 Avenue of the Americas
                                    New York, NY 10036
                                    212-715-9100
                                    gplotko@kramerlevin.com


For Beth Ann Scharrer               LYNN WELTER SHERMAN, Esquire
Chapter 7 Trustee                   Adams and Reese LLP
                                    101 E. Kennedy Boulevard
                                    Suite 4000
                                    Tampa, Florida 33602-5152
                                    813-402-2880
                                    lynn.sherman@arlaw.com
```

APPEARANCES:   (Continued)

| | |
|---|---|
| For the Pinellas County Tax Collector | WILLIAM C. FALKNER, Esquire<br>County Attorney's Office<br>315 Court Street #6<br>Clearwater, Florida 33756<br>727-464-3354<br>bfalkner@co.pinellas.fl.us |
| For AvAero, LLC | JOHN LAMOUREUX, Esquire<br>Carlton Fields P A<br>PO Box 3239<br>Tampa, Florida 33601-3239<br>813-229-4224<br>jlamoureux@carltonfields.com |
| For Corrections Corporation of America | DONALD R. ANDERSEN, Esquire<br>Stites & Harbison, PLLC<br>303 Peachtree Street, N.E.<br>Suite 2800 SunTrust Plaza<br>Atlanta, GA 30308<br>404-739-8800<br>dandersen@stites.com |
| For Dallas Airmotive, Inc. | MARVIN MOHNEY, Esquire<br>Law Office of Marvin Mohney<br>541 Bay Court<br>Heath, Texas 75032-7630<br>214-698-3011 |
| For Global Aerospace, Inc. | KEITH APPLEBY, Esquire<br>Hill, Ward & Henderson, P.A.<br>101 E. Kennedy Boulevard<br>Suite 3700<br>Tampa, Florida 33602-5195<br>813-221-3900<br>kappleby@hwhlaw.com |

```
APPEARANCES:  (Continued)

For Global Aerospace, Inc.        ROBERT D. GOLDBERG, Esquire
(Appearing by Phone)              The Clark Law Group
                                  11400 W. Olympic Boulevard
                                  Suite 1150
                                  Los Angeles, CA 90064
                                  310-478-0077
                                  rgoldberg@cgold.cc


For Various Owners of             B. GRAY GIBBS, Esquire
Two Airplanes                     B. Gray Gibbs, P.A.
                                  100 2nd Avenue S.
                                  Suite 1207
                                  St. Petersburg, FL 33701
                                  727-892-9901
                                  gibbs@gibbslawgroup.com


For Piaggio North America         HARLEY RIEDEL, Esquire
                                  Stichter Riedel Et Al
                                  110 E. Madison Street
                                  Suite 200
                                  Tampa, Florida 33602
                                  813-229-0144
                                  hriedel@srbp.com


For Iberiabank                    NIALL T. MCLACHLAN, Esquire
(Appearing by phone)              Carlton Fields P.A.
                                  100 SE 2nd Street
                                  Suite 4200
                                  Miami, Florida 33131
                                  305-530-0050
                                  nmclachlan@carltonfields.com


Also Present                      BETH ANN SCHARRER
                                  Ch. 7 Trustee

                                  CHRIS MOORE
                                  Principal of QSI

                                  BRIAN GARNER
                                  Big Sky Aviation

Also Appearing by Phone           ERIC GRABEN
                                  Piaggio North America
```

INDEX:

<u>WITNESSES</u>                                         <u>PAGE</u>

None


<u>EXHIBITS</u>                                          <u>PAGE</u>

Photos of cannibalized aircraft                    44-45

1          Tampa, Florida, October 17, 2013, 10:26 a.m.

2          COURTROOM CLERK:  All rise.  Court is now in

3     session.

4          THE COURT:  Please have a seat everyone.

5          COURTROOM CLERK:  Avantair, Incorporated, Case

6     No. 13-9719 and Adversary 13-898.

7          THE COURT:  All right.  I will take a roll call

8     by phone first, and then we'll take the appearances in the

9     courtroom.  Is Amanda Applegate there?

10          MS. APPLEGATE:  Yes.

11          THE COURT:  You represent who?

12          MS. APPLEGATE:  Various owners and 23 of the

13     Avantair former aircraft.

14          THE COURT:  All right, thank you.  And is Matt --

15     excuse me, Michael Crosnicker there?

16          MR. CROSNICKER:  Yes, Your Honor.  I represent

17     Signature Flight Support Corporation.

18          THE COURT:  All right.  That's in Dallas?

19          MR. CROSNICKER:  Their home base is actually in

20     Orlando --

21          THE COURT:  Oh.

22          MR. CROSNICKER:  -- but, yes, the hangar that's at

23     issue in this case is in Dallas.

24          THE COURT:  All right, thank you.  Lee Garlove?

25          MR. GARLOVE:  Yes, Your Honor.  I am listening only

 1   on behalf of QSI Ventures.  Mr. Donica, I believe, is in the

 2   courtroom.

 3            THE COURT:  Yes, he is.  All right, Brian Gart?

 4            MR. GART:  Your Honor, we're here in the courtroom.

 5   We had arranged for CourtCall just as a precaution.

 6            THE COURT:  Okay.  All right, thank you.  Zach

 7   Hyman?

 8            MR. HYMAN:  Same --

 9            THE COURT:  You're here too.  Okay.  All right,

10   Gregory Plotko?

11            MR. PLOTKO:  Yes, Your Honor.  Good morning.  I am

12   representing LW Air I through V.  And my co-counsel should be

13   in the courtroom, Michael Leeman.

14            THE COURT:  Yes, he is.  Thank you.  All right,

15   Robert Schmidt?

16            MR. PLOTKO:  Mr. Schmidt, he's from my office, and

17   will not be able to attend.

18            THE COURT:  All right, thank you.  Robert Goldberg?

19            MR. GOLDBERG:  Yes, Your Honor.  Just monitoring for

20   Global.  Mr. Appleby is in the courtroom.

21            THE COURT:  All right, thank you.  John Bingham?

22        (No response.)

23            THE COURT:  Is John Bingham on the phone?

24        (No response.)

25            THE COURT:  No?  All right, he's not going --

```
 1              MR. RIEDEL:  I think that's my client
 2    representative, Your Honor.
 3              THE COURT:  Right.
 4              MR. RIEDEL:  And I think he's not appearing.  I
 5    think Mr. Graben may be on the phone, though, my co-counsel.
 6              THE COURT:  He's the next name on my list.  Eric
 7    Graben?
 8              MR. GRABEN:  Here, Your Honor, by phone.
 9              THE COURT:  All right, thank you.  And that's for
10    Piaggio.
11              MR. GRABEN:  Yes, ma'am.
12              THE COURT:  And the person that was speaking, of
13    course, was Mr. Riedel.  All right, and then Niall McLachlan?
14        (No response.)
15              THE COURT:  For Iberiabank?
16        (No response.)
17              THE COURT:  All right.  He did not join.  And that's
18    it for the telephone appearances.  So now let's go with those
19    in the courtroom, please.
20              MS. SHERMAN:  Good morning, Your Honor.  Lynn Welter
21    Sherman representing Beth Ann Scharrer, as Chapter 7 Trustee.
22    She is in creditors' meetings this morning, Your Honor, and as
23    soon as she frees up, she'll be joining us.
24              THE COURT:  All right.  Is there significance to the
25    fact you're on the other side of the room today?
```

1          MS. SHERMAN:  Well, I don't get to visit with Brian

2    and Zach very often.

3          THE COURT:  Okay.

4          MS. SHERMAN:  And the 10:00 o'clock hearings have

5    been resolved, Your Honor, so --

6          THE COURT:  All right, thank you.

7          MR. VERONA:  Good morning, Your Honor.  Jay Verona,

8    Shumaker Loop & Kendrick.  I represent the same fractional

9    owners as Ms. Applegate.  They're listed in my notice of

10   appearance, which is Docket Item 277.

11         THE COURT:  All right.

12         MR. VERONA:  With me are Philip Campbell and Quincy

13   Bird from our firm.

14         THE COURT:  All right, thank you.

15         MR. CAMPBELL:  Good morning, Your Honor.

16         THE COURT:  Good morning.

17         MR. DONICA:  Good morning, Your Honor.  Herb Donica,

18   here for QSI, which is now the sole owner of Tail No. 140.

19   And with me today is Mr. Chris Moore, the principal of QSI.

20         THE COURT:  All right, thank you.

21         MR. DONICA:  Thank you

22         MR. HYMAN:  Good morning, Your Honor.  Zachary Hyman

23   with Berger Singerman.  I'm here with my colleague, Brian

24   Gart, and we represent Teterboro Rams.

25         THE COURT:  All right, thank you.

```
 1                 MR. FALKNER:  Good morning, Your Honor.  Bill

 2  Falkner representing the Pinellas County Tax Collector.

 3                 THE COURT:  All right, thank you.

 4                 MR. LAMOUREUX:  Good morning, Your Honor.  John

 5  Lamoureux with Carlton Fields on behalf of AvAero Services.

 6  They are the landlord at the St. Pete-Clearwater airport.

 7                 THE COURT:  Thank you.

 8                 MR. APPLEBY:  Good morning, Your Honor.  Keith

 9  Appleby on behalf of Global Aerospace.

10                 THE COURT:  All right, thank you.

11                 MR. RIEDEL:  Harley Riedel on behalf of Piaggio

12  America, Incorporated.

13                 THE COURT:  All right, thank you.

14                 MR. ANDERSEN:  Donald R. Andersen on behalf of

15  Corrections Corporation of America.

16                 THE COURT:  All right, thank you.

17                 MR. LEEMAN:  Good morning, Your Honor.  Michael

18  Leeman on behalf of the LW Air Entities I through V.

19                 THE COURT:  All right, thank you.

20                 MR. GARNER:  Good morning, Your Honor.  Brian Garner

21  representing Big Sky Aviation.

22                 THE COURT:  All right, thank you.  You're new to the

23  party, huh?

24                 MR. GARNER:  Yes.

25                 THE COURT:  All right.  What does Big Sky Aviation
```

1    do?

2              MR. GARNER:  We're an aircraft repair facility and

3    we have a lien on the Socata.

4              THE COURT:  All right, thank you.

5              MR. MOHNEY:  Your Honor, it's Marvin Mohney

6    representing Dallas Airmotive, Inc.

7              THE COURT:  All right, thank you.

8              MR. GIBBS:  Good morning, Judge.  Gray Gibbs.

9    I represent various owners of two of the airplanes.  Don't

10   have anything on the calendar today.  Just here to see if

11   there's any conversation about that mythical omnibus order.

12             THE COURT:  Okay.  And also you filed a motion for

13   final stay relief, didn't you?

14             MR. GIBBS:  Right, for that mythical omnibus order.

15   You can just sign it and I'll be on my way.

16             THE COURT:  Well, let me see what's in there.

17             MS. SHERMAN:  Your Honor --

18             THE COURT:  We've got a separate file where we

19   upload things directly.

20             MS. SHERMAN:  I'm not sure that one's sets for

21   hearing today.

22             MR. GIBBS:  It's not.  It's not set for today.

23             MS. SHERMAN:  As much fun as it is to hear 200

24   motions in one day, I'm only prepared for the ones that were

25   set for hearing today.

1          THE COURT:  I'm not going to hear it.

2          MS. SHERMAN:  Okay.

3          THE COURT:  I'm going to discuss it as a

4    housekeeping matter, but what I just heard made me think that

5    the omnibus order was in my folder, but it's not.

6          MS. SHERMAN:  It's not, Your Honor.  The omnibus

7    order has been circulated and circulated and circulated among

8    all the various constituencies.  I thought we were down to

9    something everybody was in consensus on, and there's one

10   provision of the order that I think we're going to need to

11   vet with Your Honor this morning and we'll be done.

12         THE COURT:  That's fine, we can do that.  Did you

13   bring a copy?

14         MS. SHERMAN:  I brought three copies and I think I

15   circulated by email -- to everybody who has been chiming in at

16   the prior hearings  -- yesterday by email.

17         THE COURT:  Okay.  There is a transcript, is there

18   not?

19         MS. SHERMAN:  Yes, Your Honor.  This is a provision

20   that I think goes beyond what was discussed in the transcript.

21   And if there was unanimity in including it, that was one

22   thing, but if there is not --

23         THE COURT:  If there's not, I'm not going to include

24   it because we didn't discuss it at the hearing.

25         MS. SHERMAN:  We're going to get to that in a

```
 1  moment, Your Honor, and I'll let everybody weigh in, the
 2  people who favor the provision and those that don't.
 3           THE COURT:  What is this?  A democracy?
 4           MS. SHERMAN:  Well, Your Honor, I don't want to
 5  upload it as an agreed order if it's not, if everybody's not
 6  on board and --
 7           THE COURT:  It doesn't have to be.  Just upload it
 8  as one that comes on after hearing, and then I'll look at it,
 9  I'll compare it with my notes and the transcript.  And then
10  we're done.  And then Mr. Gibbs doesn't have to come to
11  hearings unnecessarily.
12           MS. SHERMAN:  Your Honor, we're going to get to it
13  first thing this morning -- or not first thing, but pretty
14  close to first thing this morning.
15           THE COURT:  Okay, go ahead.
16           MS. SHERMAN:  And hopefully we can get it resolved.
17           THE COURT:  You've been so good about shepherding
18  these proceedings in terms of how you want to order things.
19  I'll let you go ahead.  Go ahead.
20           MS. SHERMAN:  If we could, Your Honor, I think
21  the first thing on the calendar was the emergency motions
22  relating to Teterboro Rams.  And we have been able to reach
23  an agreement with Teterboro Rams.  It was -- as Your Honor
24  probably knows, a settlement agreement was reached with the
25  fractional owners of N169SL pursuant to which those fractional
```

1   owners acknowledged that the estate does in fact have an

2   interest in that aircraft.

3         And the settlement agreement provides for a

4   mechanism for actually selling the plane and how those

5   proceeds will be divided.  Teterboro Rams asserts a lien

6   against that aircraft, and in fact one of the aircraft that's

7   in their possession that they were proposing to sell.

8         Originally, I believe that the papers filed in New

9   Jersey were proposing to sell N169SL and another plane to pay

10  not only for the work that was done on Nl69SL but all the work

11  that was done on, I think, 40 or 50 other airplanes that were

12  managed by Avantair as part of the fractional program but were

13  owned by different fractional owner groups.

14        We also filed as part of that settlement a complaint

15  to determine extent, validity and priority of any of the liens

16  on the plane.  There were two little ones for a thousand

17  dollars, and those aren't really in dispute.  We just needed

18  to verify with the lienholders that they weren't seeking any

19  amounts beyond those asserted in the lien.

20        And the big lien was that of Teterboro Rams.  We

21  have been in negotiations with Mr. Gart and Mr. Hyman, the

22  fractional owners, and I think we have reached a consensus

23  pursuant to which the Teterboro Rams will have an allowed

24  secured claim in a specified amount that I believe Mr. Gart

25  can tell you down to the penny that will be paid out of the

1    proceeds of the sale of the aircraft.

2           That aircraft, if it's not sold by January 31, 2014,

3    there will be the ability to obtain some extensions of that

4    deadline by paying $10,000 -- I believe a $10,000 payment for

5    a one-month extension -- and there's a series of six possible

6    extensions on that.

7           Hopefully the sale will be concluded well prior to

8    that date, but this is one of the planes that has two Dallas

9    Airmotive engines sitting on it and we have not been able to

10   locate at this point one of the plane's original engines.

11   And so with any luck, we'll find it quickly and the sale will

12   proceed at pace, but the extensions are in the event that it

13   takes longer than anticipated to track down that engine.

14          And so I think we'll be able to put together an

15   agreed order.  The fractional owner group agrees with the

16   compromise as does Teterboro Rams, I believe.  I'm sure I left

17   out some of the fine details -- finer details that Mr. Gart

18   may need to chime in on.  It's specific only as to N169SL.

19          THE COURT:  Do you all have a proposed form of order

20   that you've already hammered out with all these details in it?

21          MS. SHERMAN:  Your Honor, this compromise was

22   reached this morning between the hours of 7:00 a.m. and when

23   we walked into the courtroom, so we do not have the order, but

24   I'm hopeful that we should be able to get it uploaded very

25   quickly.

1          Oh, one of the points is that the storage costs will

2   be assumed by, and the responsibility of the owners of the

3   plane, effective on Monday.  So we're going to need to upload

4   the order quickly.

5          The order will provide that, notwithstanding the

6   relinquishment of possession, that Teterboro Rams will

7   continue to have a lien on the airplane.  Just in case

8   anything happens and the order is ever overturned, Mr. Gart

9   was concerned:  We don't want to have to wait until the order

10  becomes final and nonappealable because then we're racking up

11  a bunch of storage charges.

12          THE COURT:  Okay.  So there's a deemed possessory

13  interest?

14          MS. SHERMAN:  Yes, Your Honor.

15          THE COURT:  Is a $10,000 a month payment something

16  that is going to be applied towards reduction of the lien

17  amount?

18          MS. SHERMAN:  Yes, Your Honor.  I'm sorry --

19          THE COURT:  That's okay.

20          MS. SHERMAN:  Yeah, they're payments down on the

21  lien.

22          THE COURT:  All right.

23          MS. SHERMAN:  I think perhaps that Mr. Verona and

24  Mr. Gart are going to tell me all the things I've forgotten.

25          THE COURT:  Okay.  Is Mr. Verona's client group all

```
1    the other owners?

2              MR. VERONA:  Yes, Your Honor.

3              THE COURT:  Okay.

4              MR. VERONA:  And the only other detail that I wanted

5    to add was that my understanding is that the lien amount is

6    $95,00, and that Dallas Airmotive is actually going to pay

7    $10,000 on that.

8              THE COURT:  To do what?  Why would Dallas Airmotive

9    do that?

10             MR. VERONA:  Because they have an interest in

11   releasing the --

12             THE COURT:  So they're just going to help pay down

13   quicker.

14             MR. VERONA:  Yes.

15             THE COURT:  All right.  Mr. Gart, anything you want

16   to add?

17             MR. GART:  Your Honor, I think that covered it.

18   As between Ms. Sherman and Mr. Verona, they covered all the

19   points.  I wanted to be clear -- have the Court be clear that

20   as a result of this agreement, it's limited only to 169.

21   We're not consenting to the jurisdiction of the Court or

22   agreeing to any other -- the sale of any other -- the aircraft

23   in which --

24             THE COURT:  That's what she said.

25             MR. GART:  Right.  And that the possessory liens
```

```
 1    will continue until sold, even though they're taking over the
 2    storage costs as of --
 3             THE COURT:  I just said that.  Give me something I
 4    haven't heard.
 5             MR. GART:  Yeah.  I'm just going back over the list,
 6    Your Honor, because it was -- we had resolved everything just
 7    moments ago, so --
 8             THE COURT:  Tell me if January 21st is a federal
 9    holiday.
10             MR. GART:  We had agreed to January 31st.
11             THE COURT:  Oh, 31st.  I heard 21st.  That's
12    something I didn't hear.
13             MR. GART:  After the 31st, they can --
14             THE COURT:  Okay.
15             MR. GART:  -- buy 30-day extensions for $10,000 a
16    payment and continue the right to sell the aircraft in this
17    court.  After those six extensions, if they still haven't sold
18    the aircraft, we're free to go ahead and set the sale in New
19    Jersey.
20             THE COURT:  Okay.  So that's July 31st is the
21    outside outside date.
22             MR. GART:  Right.  We don't think that they'll --
23             THE COURT:  So you're going to --
24             MR. GART:  -- need that much tome.
25             THE COURT:  Are you going to go forward and set up
```

1    the sale so that it could happen on August the 1st?

2              MR. GART:  Yeah, my understanding is that counsel

3    for the Trustee and the fractional owners are going to

4    finalize the sale process, include us in that and we'll go

5    ahead and try to get it sold here in this court.

6              THE COURT:  Right.  But if it doesn't happen, does

7    your agreement contemplate that you will go ahead and do what

8    is necessary up north to have a sale scheduled for August the

9    1st.

10             MR. GART:  Right.  We're going to have the sale --

11             THE COURT:  Okay.

12             MR. GART:  -- set for a date immediately after that

13   outside date.

14             THE COURT:  Okay.

15             MR. VERONA:  Your Honor, I just want to be clear

16   that on a jurisdictional issue, it is being consented to as to

17   this particular plane.

18             THE COURT:  Right.

19             MR. VERONA:  Okay.

20             THE COURT:  He said not with respect to any other.

21             MR. VERONA:  Okay.  That's what I thought he said,

22   but I wanted to make doubly sure.

23             THE COURT:  Mr. Mohney?

24             MR. MOHNEY:  Yes, Judge.  My client's name got

25   mentioned and --

```
1              THE COURT:  So your helping to solve the problem?

2              MR. MOHNEY:  Yes, Your Honor.  If you'll recall,

3    this is an aircraft that had two engines owned by Bank of

4    America on it that my client leased and loaned to the Debtors.

5              As part of this agreement, what -- we're caught up

6    in a New Jersey lien enforcement litigation.  This is going to

7    resolve that litigation, and my client's going to be allowed

8    to pick up its engines upon paying the $10,000.

9              THE COURT:  Oh, so it'll be a plane with no engines

10   that's being sold.

11             MR. MOHNEY:  Yes.  They're looking for the original

12   engines to the aircraft, of which they've identified one.  And

13   I think their motion to sell covers the original engines for

14   the aircraft and not the Bank of America engines.

15             THE COURT:  What if the engines are on somebody

16   else's plane?

17             MR. MOHNEY:  One of them is for sure but that's --

18             MS. SHERMAN:  Your Honor, that's -- you know, we're

19   all joined at the hip in this case, much as we hate to be.

20   And that's exactly what we're finding on all of these, is

21   everybody's engines seem to be somewhere else or on somebody

22   else's plane.  And Dallas Airmotive has got some loaners

23   floating around out there.  And the unscrambling process is

24   going to be tedious and complicated and expensive.

25             THE COURT:  Oh, so you're going with the
```

```
 1   unscrambling process rather than the stop-the-musical-
 2   chairs process?
 3              MS. SHERMAN:  I believe that everybody's stay
 4   relief motions and all the omnibus stay relief orders have
 5   been drafted with the concept in mind that because you can
 6   separately lien engines and propellers with the FAA, and there
 7   are in fact on some of the engines and propellers, we're going
 8   to have to unscramble to that extent.
 9              I don't know -- I think Mr. Andersen may have some
10   views on this that he's going to express later when we get to
11   the omnibus order part.  I don't know how much further people
12   are going to want to unscramble or where we're going to wind
13   up on people asserting -- people with the donor planes
14   asserting an interest in some of the planes that have all
15   their moving parts.
16              But that's -- we've been deferring that issue and
17   kicking it down the road thus far, and the omnibus order
18   pretty much continues to kick it, subject to the one paragraph
19   that we're going to discuss later, but the --
20              THE COURT:  So we'll be arguing about this in the
21   motion -- when we hear the motion to sell.
22              MS. SHERMAN:  Yes, Your Honor.  The motion to sell
23   was filed and uploaded, and it has been served, not only on
24   the fractional owners of N169SL, we also served it by email on
25   every single fractional owner of every other plane shown on
```

```
 1    the Debtor's books and records, so that if anybody else wanted

 2    to weigh in on claiming an interest in N169SL or any of the

 3    pieces and parts on it, they would have an opportunity to do

 4    so.

 5              THE COURT:  All right.

 6              MS. SHERMAN:  But it does contemplate original

 7    engines and original propellers with the airframe.

 8              THE COURT:  All right.  Mr. Garcia, let's go ahead

 9    and have an order directing response, to make it easy on

10    everybody.  Anyone that wants to weigh in will not be able to

11    wait until the hearing.  They'll have to file something in

12    advance.  Let me see.  That would be --

13              COURTROOM CLERK:  I have it.

14              THE COURT:  You have it to set?

15              COURTROOM CLERK:  271?

16              THE COURT:  You have it to set?

17              COURTROOM CLERK:  Yes.

18              THE COURT:  Okay.

19              COURTROOM CLERK:  And a motion to compromise.

20              THE COURT:  A motion to compromise?  Which one?

21              COURTROOM CLERK:  Fractional owners --

22              THE COURT:  We're not talking about 270, are you?

23              MS. SHERMAN:  Your Honor --

24              THE COURT:  Which is on for today, isn't it?

25              MR. VERONA:  No.
```

1    MS. SHERMAN:  That's a different one, Your Honor.

2    That's the TBM Socata.  It should have been --

3    THE COURT:  Well, this is N169.

4    MS. SHERMAN:  N169SL, there was a motion to sell

5    that was uploaded.  I believe.

6    MR. VERONA:  Yeah, 270.

7    MS. SHERMAN:  Number 270.  And the settlement

8    agreement is --

9    THE COURT:  I have 270, motion to approve compromise

10   of controversy with fractional owners of N169SL.

11   (Counsel conferring.)

12   THE COURT:  Let me see if I can find it.  271, I'm

13   hearing?

14   (Counsel conferring.)

15   THE COURT:  Motion to approve sale free and clear.

16   MS. SHERMAN:  Yes.  It's 271.

17   THE COURT:  Of the N169.

18   MS. SHERMAN:  Yes, that's -- Document 271 is the

19   motion to sell, and 270 was the settlement agreement.

20   THE COURT:  Okay.  271, that's the one that we need

21   to have an order directing response go out on.  All right, and

22   you can look for a time when you might be setting that.  I

23   think 14 days is an appropriate time for a response, so make

24   it 14 days and you can schedule a hearing sometime after that.

25   Okay, Mr. Mohney?

1        MR. MOHNEY:  Judge, just a minor point, and I didn't

2    want to waive this.  Just in connection with picking up the

3    engines, our client's going to inspect them and run a

4    performance test on the engines prior to paying the settlement

5    amount.

6        THE COURT:  And that will be where it stands right

7    now -- or where they are right now?

8        MR. MOHNEY:  Either that or where it's ferried to.

9    There's contemplation of moving it to another facility, and

10   we're in agreement to allow the engines to be used, providing

11   they're airworthy, to move it to another facility, and so it's

12   insured.

13       THE COURT:  And then you'll inspect it.

14       MR. MOHNEY:  And then we'll go do a final

15   performance run o the engines.

16       THE COURT:  Okay.  So that's part of the -- that's

17   going to be part of the proposed order on the emergency motion

18   to reimpose the automatic stay?

19       MS. SHERMAN:  Yes, Your Honor.  And Mr. Gart

20   reminded me of one cleanup detail.  We'll need to enter an

21   order in the adversary proceeding --

22       THE COURT:  On the --

23       MS. SHERMAN:  -- as to the separate count on

24   Teterboro Rams allowing their claim in the amount we've set

25   forth.

```
1              THE COURT:  All right.  Do any of the other --

2              MS. SHERMAN:  Or a partial judgment, however we

3    decide we need to --

4              THE COURT:  Okay, do any of the other lienors -- are

5    they going to dispute that?  Because you've asked for the

6    Court to determine the extent, validity and priority of liens.

7    So are we now resolving that Teterboro is in first place?

8              MS. SHERMAN:  Well, there's two $1,000 liens.

9    They're very small, Your Honor.  I'm not sure it's going to

10   matter, depending on the sales price.  We can certainly say

11   it's valid and prior, and whether the two $1,000 liens come

12   before them or after them, I guess in theory we could resolve

13   later.  I think it's going to be moot.

14             THE COURT:  We can reserve the right to those small

15   lienors to assert an objection as to the priority.

16             MR. GART:  The practical reality, Your Honor, is we

17   have a possessory lien, that they couldn't come before us, so

18   -- if they don't stipulate to it, we could have a subsequent

19   hearing if they object but--

20             THE COURT:  Well, then maybe we should put in the

21   order that they'll have 14 days to seek a hearing regarding

22   the priority or not of Teterboro.  And then that way, the

23   guesswork's taken out of it.  We'll know in 14 days.

24             MR. GART:  We're going to have plenty of time to do

25   that, Your Honor, so --
```

1          THE COURT:  Right.

2          MR. VERONA:  Your Honor, for purposes of drafting

3    these orders on the motion for preliminary injunction and the

4    motion to reimpose the automatic stay, are we essentially

5    granting those to the extent that --

6          THE COURT:  Of the parties' agreements.

7          MR. VERONA:  Right.

8          THE COURT:  Yes.

9          MR. VERONA:  Okay.

10         THE COURT:  Including the Dallas Airmotive agreement

11   and including giving the small lienors or anybody else 14 days

12   to object to what apparently is a determination by the parties

13   that Teterboro is in first place.

14         MR. VERONA:  Thank you.

15         THE COURT:  So we've resolved the matter in the

16   adversary proceeding, we've resolved the first matter in the

17   case.  All right, let's go -- shift over to Mr. Donica's

18   matter.  I guess that's where you would go next, right,

19   Ms. Sherman?

20         MS. SHERMAN:  Your Honor, actually, if we could I --

21   if we could take a few housekeeping matters before we get to

22   Mr. Donica's, then I think it's going to expedite most of the

23   rest of the calendar --

24         THE COURT:  Okay.

25         MS. SHERMAN:  -- because all of these are going to

1   key back to the omnibus order.

2         THE COURT: Okay.

3         MS. SHERMAN: A couple of updates for everybody in

4   the room, in case you didn't know, we have received -- Avtrac

5   was kind enough to provide us with downloads for every plane,

6   which would show what the Debtor believed were the parts, by

7   serial number, on each of the aircraft. And it includes the

8   aircraft that were returned prepetition.

9         And so we have those, they've been provided to

10   VanAllen Group, who was the outside consultant that the

11   fractional owners, some -- not quite yet all of them -- have

12   been paying their share of to fund the records reconstruction

13   and organization process that is almost complete at this point

14   in time.

15         We've had some stops and starts as VanAllen Group

16   has been working for free and hoping that people would

17   actually pay them. Folks have been, for the most part,

18   very good about kicking in their share of that records

19   construction. It's $1,300 per aircraft for VanAllen's work

20   and the rent on the storage room to take us through October

21   14th.

22         We've had a lot of planes that have chipped in,

23   and it is in fact a condition now of the omnibus orders going

24   forward that if you want to access the records, you're going

25   to have to pay to play. And so that's been going very well.

1          THE COURT:  That's fair.  I'd surcharge it anyway

2     probably.

3          MS. SHERMAN:  It's just a lot easier when everybody

4     agrees to kick in.  And everybody's been pretty cooperative

5     because we're all joined at the hip.

6          We have put together -- the schedules have never

7     been filed by the Debtor, and representatives of the Debtor

8     have failed to appear at the creditors' meeting.  We have

9     continued it thorough October 31, 2013.

10         THE COURT:  We had officers of the court that were

11    on the phone when all these rulings were made.

12         MS. SHERMAN:  Yes, Your Honor.  I do have draft

13    schedules that were given to me as a "these aren't final yet"

14    that McDermott Will & Emery had started preparing when they

15    were anticipating filing a Chapter 11.  We also have some

16    spreadsheets that were back-up they had provided us.

17         We have what I believe is a fairly complete employee

18    list.  There are 600.  I think there are somewhere in the

19    neighborhood of 700 fractional aircraft owners.  And then we

20    had the Debtor's Schedule F draft.  And Ms. Scharrer, who's

21    been collecting the mail now for about 60 days, has had her

22    assistant put together anybody that's sent bills or collection

23    notices that wasn't on the Schedule F.

24         So when all is said and done, we are going to have

25    about 2,000 people on the creditors' matrix.  We would like to

```
1   get a 341 meeting set, if need be.  And we've certainly done

2   this in other cases.  We can issue a -- get a 2004 subpoena

3   and have a 2004 examination at the creditors' meeting, to the

4   extent we need some testimony.

5          But we would like the clerk's office to undertake

6   the noticing of the creditors' meeting if we could, and we

7   need a little input from the Court.  Right now, it's set for

8   October 31.  I'm not sure if we snail-mail notices now, even

9   if we upload the matrix today, we would have sufficient notice

10  of the creditors' meeting.

11         THE COURT:  Well, the mail takes, what?  Three or

12  four days?

13         MS. SHERMAN:  Yes, Your Honor.

14         THE COURT:  Today is the 17th.

15         MS. SHERMAN:  We probably had a dozen folks at that

16  first creditors meeting, but I'm not sure whether the number's

17  going to grow when everybody, other than the people who are

18  already involved in the case, the big players, are going to be

19  coming --

20         THE COURT:  You'll have all the local employees, for

21  sure, unless they're re-employed and have other, better things

22  to do.  I don't know that that's enough notice.  We don't even

23  have schedules filed yet.

24         MS. SHERMAN:  And Your Honor, we have -- I'm not

25  sure who is going to verify those schedules, as we sit here
```

1  today.

2  THE COURT: Somebody that's going to be sitting for

3  the coincident 2004 exam.

4  MS. SHERMAN: I'm not sure that the former directors

5  and officers -- given the fact that a lot of them are the

6  subject parties to lawsuits. I know at least one of them has

7  indicated an intention to take the Fifth Amendment because of

8  a pending investigation by the Inspector General.

9  THE COURT: All right. Well, I'm sure this isn't

10  the first involuntary where people have left and vamoosed, so

11  you'll just have to do the best you can.

12  MS. SHERMAN: Well, we'll see what we can do as far

13  as picking the right person for the Rule 2004 exam --

14  THE COURT: You can have Ms. Scharrer sign them

15  under a qualified declaration. She can only do the best she

16  can do.

17  MS. SHERMAN: Yeah, we're going to --

18  THE COURT: She's a Chapter 7 Trustee trying to put

19  the pieces together after the fact.

20  MS. SHERMAN: Yes. And it's going to be a

21  substantial amount of time and money to do this, to try and

22  correct what's already there --

23  THE COURT: So who has scheduled --

24  MS. SHERMAN: -- and I hate to spend the money --

25  THE COURT: Who scheduled the 341 meeting?

1      MS. SHERMAN:  It's on the docket.  It's been

2   continued on the docket.  I believe the current date is

3   October 31st.

4      THE COURT:  Well, that's not going to work, so --

5      MS. SHERMAN:  We put it out far enough that we would

6   have this hearing in advance and --

7      THE COURT:  So pick --

8      MS. SHERMAN:  -- we were hoping that the clerk's

9   office would give notice if I can get the -- if I can get the

10  matrix uploaded this week --

11     THE COURT:  Ms. Garcia, would you please ask

12  Mr. Kilcoyne to come to the courtroom.  Given the budgetary

13  constraints, I don't know what our limitations are on

14  noticing.  We're trying, you know -- I mean, you know

15  that we've been trying to move noticing more towards the

16  attorneys these days.

17     MS. SHERMAN:  Well, 2,000 pieces of mail is going to

18  be a very expensive mailing --

19     THE COURT:  Yes.

20     MS. SHERMAN:  -- for an estate with not a lot of

21  cash right now but we'll --

22     THE COURT:  The United States Government doesn't

23  have a lot of cash right now either.

24     MS. SHERMAN:  Your Honor, if we could send some of

25  these by email.  I know that we've sent the fractional owners

1    by email, owner list.  I don't know that we have the employee

2    list for email, though.  It's only going to cut it down by,

3    like, 700.  We're still going to have 1300 notices to go out.

4    Perhaps we'll get lucky and Mr. Kilcoyne will tell us that he

5    can notice.

6            While we're waiting for him, Your Honor, all the

7    planes are out of the Orlando hangar at this point, which is

8    great.  We've got folks over there today telling us what it's

9    going to take to get what's over there, the ground service

10   equipment, furniture, fixtures and equipment that's worth

11   moving, and the parts relocated and off that airport.

12           The fractional owners that have had stay relief are

13   all embarking on the slow and tedious process of trying to

14   locate their pieces and put them back together again, as far

15   as engines and propellers.  And I think for the most part, you

16   know, everybody's being fairly cooperative, but we don't have

17   a total universe of data yet, and it's moving slowly.

18           We filed that settlement agreement with N169SL, and

19   I'm told that we are going to have other settlement agreements

20   that are similar to that one that we are going to be filing in

21   the next couple of weeks, so hopefully we'll be selling some

22   planes in the bankruptcy case.

23           And we have worked very hard to try and put together

24   the omnibus order, the stay relief order, from the last

25   hearing.  The omnibus stay relief order, I think I prepared

1  the initial draft and circulated it and folks started weighing

2  in.

3         And what happened was, people started realizing

4  that:  I'm going to be picking up a plane with somebody else's

5  engines and propellers on it and I kind of want to know what

6  my rights and responsibilities are as to those engines and

7  propellers.  And the person who picks up my plane, I want

8  to make sure they let me know they've got my engines and

9  propellers, and we all need to know what their rights and

10 responsibilities are.

11        And so there was a paragraph drafted and put

12 into the stay relief order that deals specifically with the

13 parties' respective rights and obligations once they pick up

14 a plane with other people's goodies attached to it.  And that

15 is the --

16        THE COURT:  What would they do if we didn't have

17 Bankruptcy Court?

18        MS. SHERMAN:  Well, Your Honor, there's --

19        THE COURT:  They'd pick it up and they'd work it

20 out.  They wouldn't be accused of theft or conversion.

21        MS. SHERMAN:  And I think it's paragraph 10 of the

22 limited omnibus stay relief order that's at issue.  I believe

23 Mr. Plotko had some concerns about that paragraph, and I'm not

24 sure whether Mr. Andersen did or not.  And I know that some of

25 the fractional owners in the room were the ones who put the

```
 1   paragraph in and liked -- thought it was advantageous to have
 2   it there.
 3           So I think I probably at this point -- I'd like to
 4   hand one up to the Court, if I may, Your Honor.
 5           THE COURT:  Okay.
 6           MS. SHERMAN:  And I'll open to the right page
 7   because it is an omnibus order that says:  If you want a
 8   limited order, here's what you do, and the limited order is
 9   attached.  And if you want a final order, here's what you do,
10   and the final order's attached.
11           So the limited order -- the form limited order and
12   form omnibus -- final order are actually exhibits to the
13   procedures order.  And so I'm going to flip you to the right
14   page, but we're looking at, I believe, paragraph -- I believe
15   it's paragraph 10 of the limited omnibus order.  And I have
16   two extra copies --
17           THE COURT:  Okay.
18           MS. SHERMAN:  -- for anybody in the courtroom
19   that --
20           THE COURT:  These are the process orders.  These are
21   to govern the process that we talked about last time, right?
22           MS. SHERMAN:  Yes.  And this is a condition of stay
23   relief, and it deals with -- if you'd like, Your Honor, I
24   could read it onto the record or --
25           THE COURT:  Please.
```

1      MS. SHERMAN:  Okay.  I believe this is the

2  paragraph.  Mr. Plotko, you're on the phone.  Is paragraph 10

3  the one that we're addressing?

4      MR. PLOTKO:  That's correct.  I also think it's

5  paragraph 2(d) of the order establishing the omnibus

6  procedures --

7      COURTROOM CLERK:  Who's speaking, please?

8      MR. PLOTKO:  -- in two places.

9      THE COURT:  Who?

10     MS. SHERMAN:  That was Mr. Plotko.

11     THE COURT:  Oh.

12     MS. SHERMAN:  He said it's in two places.  He says

13  it's also in paragraph 2(d) which is the one that grants

14  additional relief to the people who were first out of the

15  gate, that mirrors what's in the omnibus --

16     MR. PLOTKO:  Oh, I'm sorry, maybe 3(d).

17     MS. SHERMAN:  Yes.

18     MR. PLOTKO:  3(d), sorry.

19     MS. SHERMAN:  It's the same language, Your Honor.

20  So with that, I'll let Mr. --

21     THE COURT:  Do you want to read it into the record

22  so that other people on the phone will know?

23     MS. SHERMAN:  Would you like me to do that, Your

24  Honor, or would you like Mr. Plotko --

25     THE COURT:  One of us should do it.

1          MS. SHERMAN:  Okay.  Here we go.  "Absent other

2    agreement, the cost of storing, removing, and transporting

3    engines and propellers shall be paid for by the owners of the

4    aircraft to which the engines and propellers originally were

5    attached.  The owners shall be responsible for insuring the

6    engines and propellers being transported if they wish to have

7    them insured.

8          "If a fractional owner removes engines or propellers

9    that are not original to the aircraft, they shall notify the

10   Trustee, records custodian and the owner of such engine or

11   propeller, if possible, and the original owner shall be

12   responsible for the costs of removing and transporting such

13   engine or propeller to their airframe.

14         "To the extent a fractional owner has an engine on

15   its airframe that does not belong to them, then the fractional

16   owner in possession shall notify the owner of the engine, (if

17   such fractional owner knows who the engine's owner is) and

18   shall cooperate with the engine owner to return the engine to

19   the engine owner.

20         "If a fractional owner cannot locate the owner or an

21   engine or propeller, such fractional owner shall store and/or

22   preserve such part or component using industry standard norms

23   pending identification of the correct owner or further order

24   of the court."

25         And with that, I will grab a sip of water and let

1   Mr. Plotko take it from here.

2          THE COURT:  Well, one thing, before you do that,

3   I would insert something about the line that says "shall

4   cooperate with the engine owner to return the engine to the

5   engine owner."  I would add, "upon such terms as they shall

6   agree or as otherwise ordered by the Court."  Because it

7   appears as if the person in possession may have to bear the

8   cost.  Go ahead, Mr. Plotko.

9          MR. PLOTKO:  Thank you, Your Honor.  We represent

10  five owners, who are actually 100 percent owners of their

11  planes.  We terminated our management agreements prior to the

12  petition date.  We actually obtained possession, custody and

13  control of those planes.  Once the filing occurred, our

14  vendors are basically compelling us to go seek an order

15  lifting the stay, which we did.  We filed our motion, we

16  filed our proposed order.

17         And in this process of, I guess, creating an omnibus

18  order dealing with temporary lift stay relief, we've seen, for

19  the first time last week, a very complex provision that deals

20  with the rights and obligations of parties for storage,

21  removal, transporting engines and props.  And frankly it

22  took us a little bit by surprise.

23         We were looking for immediate lift stay relief, much

24  like a lot of the fractional owners have already achieved.  We

25  haven't been able to access one of our planes and one of our

1    engines and other parts.

2         So my initial comment was:  This is really outside

3    the scope of the relief we're seeking.  And it's not in the

4    order we uploaded last night.  And we feel like this is a good

5    provision that maybe has to be dealt with, but it should be

6    dealt with on a separate track with notice to all parties with

7    enough time to be heard on it.  It's definitely outside the

8    scope.

9         A few of the immediate issues that we've had with

10   this provision is that it really doesn't deal with the fact

11   that if someone asks for a propeller from at least one of my

12   client's planes, what do I do then?  Am I immediately forced

13   to -- you know, if the plane was running -- land the plane,

14   take the propeller off, wait and go find my propeller?  And

15   store that propeller?

16        What if I can't find the person whose propeller it

17   is?  How long do I have to store that propeller for?  And is

18   there a time limit on that?  Do I get to recoup my costs for

19   storing that propeller?  After a certain amount of time, do I

20   have to abandon it?

21        There are a lot of open, complex issues.  We just

22   think it's outside of the scope of what relief we were

23   seeking.  And ultimately -- I've been having conversations

24   with Dallas Airmotive, with Signature, and with the Trustee

25   about the form of our order.  Everyone seems to be in

1   agreement with it.  And now it seems like we're being --

2   this new provision is being imposed on something which I

3   thought was frankly a limited relief.

4          THE COURT:  All right.  Hold your thought for a

5   minute.  You too, Mr. Andersen.  Mr. Kilcoyne is here.

6          We had a question, Mr. Kilcoyne about the extent

7   to which the clerk's office may undertake noticing of a 341

8   meeting.  There are going to be about 2,000 names on the list

9   in this involuntary Chapter 7 case.  It's going to be

10  expensive to notice.  I don't know whether we can undertake

11  noticing and then ask the Trustee to include us as maybe a

12  possibility for being reimbursed or how we -- how do we do

13  this?

14         MR. KILCOYNE:  We can take care of it.

15         THE COURT:  We can take care of it?

16         MR. KILCOYNE:  As of today, we can.

17         THE COURT:  All right.  Get your noticing in before

18  what?  January 7th?  Or 14th?  All right, thank you for coming

19  up.

20         Ms. Chazal, you didn't make an appearance.

21         MS. CHAZAL:  No, Your Honor.  I'm here to observe,

22  with the office of Stichter, Riedel, Blain & Prosser.

23         THE COURT:  All right, thank you.

24     (Court and counsel conferring regarding unrelated Pro

25  Bono Clinic.)

1          THE COURT:  All right.  We can notice -- you may

2    notice by email if you wish, or you can have it all go snail-

3    mail.

4          MS. SHERMAN:  I think we'd better send it all snail-

5    mail, Your Honor, on this one.  It's not going to save that

6    much.

7          THE COURT:  So are we going to pick a new date?  Do

8    you have to find a place to schedule it?

9          MS. SHERMAN:  I'm hopeful we can fit -- we didn't

10   have that many at the first one.  I don't know, I'm hopeful

11   we can have it in the usual creditors' meeting room.

12         THE COURT:  Okay.

13         MS. SHERMAN:  Unless Your Honor had another

14   suggestion.  We don't have funds for renting space and, for

15   a number of reasons, I don't want to volunteer my firm

16   conference room.

17         THE COURT:  How much does it cost to rent one of the

18   HCBA Building rooms, the big Cohen ballroom?

19         MS. SHERMAN:  I don't know, Your Honor.

20         THE COURT:  I bet it's not that expensive.  If you

21   need to.  Just think about it.  Maybe you take a first shot at

22   trying to schedule it in the regular way, and if there's an

23   overflow crowd, maybe adjourn and reschedule.

24         MS. SHERMAN:  Yes, Your Honor.

25         THE COURT:  With no notice except to those who are

1   there, I guess.  All right.

2            MS. SHERMAN:  Yes, Your Honor.

3            THE COURT:  So we'll do that.  So pick a day and all

4   that.  Ms. Scharrer is here; she's returned from her 341

5   meetings.

6            MS. SHERMAN:  And she'll be pleased to know that the

7   clerk's office will be noticing the creditors' meeting.

8            THE COURT:  But not for October 31st.

9            MS. SCHARRER:  Okay.

10           THE COURT:  Okay.  Mr. Andersen, do you want to do a

11  follow-on to Mr. Plotko's comments concerning paragraph 10 and

12  the companion in 3(d) in the other order?

13           MR. ANDERSEN:  Yes, our order -- excuse me.  Yes,

14  Your Honor.  Our comments not only go to paragraph 10 but also

15  to the same concept, but we think there are other paragraphs

16  in the omnibus order that are beyond the scope of the limited

17  stay relief that was originally granted and that I think was

18  contemplated by the Court at the last hearing.

19           If I may do this, Judge, I'd like to just preface my

20  remarks.  CCA, Corrections Corporation of America, is not an

21  aircraft.  We don't say were an aircraft.  We are a party and

22  we have interests that were assigned to us in three different

23  aircraft, 138SL, 162SL and 164SL.  We paid the same amount for

24  our interest in all of these three aircraft, and they're all

25  three in different states of disarray.

1        Sadly, one of our aircraft has been what's

2   euphemistically referred to as a donor aircraft.  In the

3   trade, they're typically referred to as cannibalized aircraft.

4   And I've got some photographs, Judge.  I'd like to -- I can

5   either show them from here, or I'd like to approach the bench

6   if I can demonstrate to the Court what I'm talking about.

7            THE COURT: Sure.

8            MR. ANDERSEN:  (Presenting photos.)

9        (Counsel conferring.)

10            MR. ANDERSEN:  Your Honor, may I just display them

11   to the other attorneys in the courtroom?  If that's okay.

12            THE COURT:  Sure.  I don't know, do you want me to

13   put this on the record as a demonstrative aid?

14            MR. ANDERSEN:  Yes, Your Honor, if you would.

15            THE COURT:  Okay, I'll describe it.  The first

16   picture is Tail 162SL.  It appears not to have any landing

17   gear.  It appears to have no engine, at least on the right

18   wing.  And there appears to be some significant piece on the

19   ground on the lower left-hand corner of the picture.

20        The second picture is the same plane but taken more

21   from the front view showing, again, the no engine.  Plus, it

22   looks like whatever those flaps are that are supposed to be in

23   front of the wing aren't there.

24        I can't tell what the third picture is because I

25   can't see the tail number.  I presume it's the same one

1    because it looks similar.

2         The fourth picture is a picture that's shot through

3    the door -- the entry door, that is -- of N162.  There's a

4    sign taped to the side of the fuselage that says, "CK and gear

5    change-out due 10-23-12."

6         The next picture is a picture from inside the

7    cockpit which shows that a lot of things are missing.  It

8    looks like the gutted cockpit of a racecar that's flipped out

9    and had been on fire at one point in time.

10        The next picture is a fuselage, but I can't see the

11   tail because the tail is outside of the right-hand margin.

12   Presumably it's the same one.

13        The next picture is another picture of the cockpit

14   instrument panel with more of a view of the right-hand side of

15   the panel than the previous one I mentioned.

16        The next one is a picture of the inside of the

17   fuselage which looks like an old World War II plane with

18   nothing inside of it, not even benches.

19        And the last one is N162 again, and it shows now

20   the right-hand wing, and again no engine.

21        Okay, those are pretty stark-looking things.  So

22   it's a junker almost.

23        MR. ANDERSEN:  It is, Judge.  That's --

24        THE COURT:  So why are you here?

25        MR. ANDERSEN:  Well, because -- there's several

```
 1   reasons.  I think that the limited stay relief that the Court
 2   has previously granted allowed the parties to -- all those
 3   fractional interest holders -- to preserve the aircraft such
 4   as they were, to inventory the aircraft such as they were, to
 5   store them such as they were, to work with Ms. Sherman, who's
 6   done an extraordinary job in terms of assembling records
 7   relating to these aircraft.  In other words, and in other
 8   manners preserve the status quo.
 9        But the concern with this proposed omnibus order,
10   as it's now expanded -- and I think as Mr. Plotko is to some
11   degree describing -- is that it, like -- I can't remember
12   which of the -- I want to say it was a Casey Stengel who said,
13   "Where there's a fork in the road, take it."  Well, I think
14   this is a fork in the road.  And as we expand this omnibus
15   order, we're headed down one of those forks in the road.  And
16   I think that candidly, Judge, it's premature to do that at
17   this time.
18        What I'd like to say is this:  As a fractional
19   share interest holder in these three different airplanes,
20   we've participated in conference calls with all of the other
21   fractional share interest holders in these same airplanes.
22   And we've talked about the benefits, the pros and cons, if
23   you will, of participating and resolving this through the
24   bankruptcy process and so-called opting in, which one of the
25   airplanes has already done with 169SL.
```

1          And I have to say I haven't heard any dissent among

2    any of the fractional interest holders, once the process is

3    explained to them, from the idea of resolving this through the

4    bankruptcy process.

5          They all understand that their airplanes, if they

6    have parts on them -- and on 162SL they don't even have parts

7    -- but even the airplanes that do have parts and engines and

8    propellers, know that almost every one of those airplanes

9    doesn't have its original engines and doesn't have its

10   original propellers.

11         And so there's no way that they're going to sell

12   those airplanes free and clear.  And maybe through a process

13   such as the path we're about to embark upon, people can kind

14   of get together and swap and at some expense, substantial

15   expense, reconfigure their airplanes so that theoretically

16   they can sell them to somebody who would believe that they

17   were getting free and clear and title from people who really

18   owned them.

19         But almost unanimously -- and I haven't heard any

20   dissent -- all of these fractional share interest holders

21   recognize that this Court can sell these aircraft in whatever

22   condition they're in under Section 354.  And they can be sold

23   free and clear of any other interest.  And that also presumes

24   that, as this Court is doing now, there's notice to interested

25   parties, there's notice to lienholders.  Lienholders have an

1  opportunity to assert their liens.  And the process recognizes

2  the rights of --

3          THE COURT:  The process also says if you sell a co-

4  owner's interest, you have to allocate the proceeds.  So at

5  the end of the day, everybody's got to cooperate.  Or not.

6  And I'll make a decision.

7          MR. ANDERSEN:  And that's exactly where we're going,

8  Judge.  That's exactly where we're gong.  Because the concerns

9  that I've got can't -- or that my client has and that I've

10  got, are that the omnibus order provides for a couple of

11  things.  One, it does provide for this moving of engines

12  around.  Now, that's an expense.  Whether that's ultimately

13  necessary, I think candidly it's premature to decide that.

14          These parties are ready to opt in.  The settlement

15  agreements are being circulated.  They've all been on the

16  phone.  They've all talked about opting in.  They're ready

17  to do it.  Once that happens, then this Court -- I think as

18  you've said, Judge, then this Court can begin to provide some

19  direction as to the process that this takes.

20          THE COURT:  Tell me why paragraph 10 doesn't make

21  common sense.  Outside of this bankruptcy, what would you all

22  do?

23          MR. ANDERSEN:  Judge --

24          THE COURT:  You wouldn't work it out like this?

25          MR. ANDERSEN:  No.  The other alternative --

1          THE COURT:  Or would you say:  Forget it, it's on my

2     plane, I don't care what the title and registration says.  I'm

3     keeping it, I'm selling it, and if you want to sue me for

4     conversion, have at it, pal.

5          MR. ANDERSEN:  No.  Well, Judge, I think the

6     alternative is -- just to be very straightforward, is to

7     recognize that rather than incur the expense of physically

8     moving these engines around the -- if the respective owners

9     are all -- have all opted into this case, rather than moving

10    these engines physically from one airplane to another, the

11    engines that are on -- I'll use another of our airplanes as an

12    example, 164SL has both of its engines on it, but they're not

13    the original engines.

14         But there could be some -- you know, there could be

15    some accommodation made to say, okay, these are -- when this

16    airplane was sold, it was sold without the engines that were

17    originally on it.  If we have to assign some credits, then

18    that can be done.  But the engines don't have to physically be

19    removed and the props don't have to be physically removed, and

20    moved around the country to wherever the airplanes are.  So in

21    terms of common sense --

22         THE COURT:  Wouldn't they have to be re-moved if

23    you're only selling the frame?  I'm talking about "moved"

24    versus "removed."

25         MR. ANDERSEN:  Say it -- I'm sorry?

1        THE COURT:  Can you sell a plane with someone else's

2   engines in it?

3        MR. ANDERSEN:  I think that if the party who has the

4   interest in those engines is also a part of this case and also

5   -- and also basically agrees to the process, then the airplane

6   can be sold with those other engines on it without actually

7   removing --

8        THE COURT:  Doesn't 10 start with the phrase,

9   "absent other agreement"?

10       MR. ANDERSEN:  (No response.)

11       THE COURT:  Do you need to see the language?

12       MR. ANDERSEN:  I think I remember it fairly well.

13   And I think that, as I remember, what the Court was saying a

14   moment ago --

15       THE COURT:  I mean, this seems to me like a

16   gentlemanly way of working things out.  Paragraph 10 says:

17   If we don't agree otherwise, let's have the original people

18   that own the stuff pay for the storage, let's have the people

19   who own the original stuff bear the cost of insurance, if they

20   want to have them insured.

21       MR. ANDERSEN:  Although I --

22       THE COURT:  If they have something on an airplane

23   that is not theirs, isn't it unreasonable to require them to

24   tell the owners who own the stuff that's on the airplane that

25   you have it?  Is that not just fair dealing and good flow of

1    information?

2          MR. ANDERSEN:  Judge, I --

3          THE COURT:  Then it says:  To the extent an owner

4    has an engine that belongs to somebody else -- it says here,

5    you notify the owner of the engine and cooperate regarding the

6    return.  The engine owner may say:  Keep it.  The engine owner

7    may say:  Okay, I want it and I'll pay it, to get it over

8    here.  Are these just ground rules for fair dealing?

9          MR. ANDERSEN:  I think that they can be.  Let me

10   back up a moment.  I think -- the answer to your question is

11   yes, they are ground rules for fair dealing.  Absolutely.  And

12   the preface, "absent other agreement" creates the opportunity

13   for some other arrangement to be made.

14         THE COURT:  Right.  Between the two groups.

15         MR. ANDERSEN:  Between the two groups.  But if

16   there's not an agreement, then this is what describes the --

17         THE COURT:  Tell me what is so onerous about saying

18   that the owner of the engines bears the cost of insurance?

19   And not -- for example, you've got 164 with someone else's

20   engine.  Do you really want to insure those engines?  It's

21   fine.  I guess you can.

22         This is just saying that if you want to lay that

23   burden off on the true owners, you can do that, if the true

24   owners want to insure it.  It just allocates basic duties of

25   the people that own the stuff.

1          MR. ANDERSEN:  I think -- and I agree with that,

2    Judge.  The question -- the issue, though, I think -- and,

3    again, this is why I think this is premature for this to be in

4    this limited stay relief order because ultimately -- and let

5    me get right down to the point here.

6          I mean, the elephant in the room for us is that like

7    with an airplane like 162SL, CCA paid the same dollars for its

8    percentage interest in that airplane that it paid for its

9    interest in 164 and 138.  There was email correspondence in

10   the last day or two about, you know, with the 162SL owners in

11   which they were, for the first time, shown a copy of the

12   proposed settlement agreement, that was similar to the one

13   that was used in 169SL.

14         And it basically says:  You're going to get whatever

15   this cannibalized airplane is worth on the market and you can

16   share the proceeds from it.  And that's all that you're going

17   to get out of this, because that was where this fractional

18   interest that you purchased from Avantair was assigned.  So --

19         THE COURT:  What if you get your engines back?

20   Don't you think the sale proceeds will be greater?

21         MR. ANDERSEN:  The answer is they will be greater,

22   but they'll be -- but that still candidly will not make up for

23   the fact that the other parts that are missing from that

24   airplane are goodness knows where, and the other --

25         THE COURT:  The other parts are not titled.  There's

1   a significant argument that propellers and engines should be

2   treated separately.

3          MR. ANDERSEN:  Well, and I understand.  Let me --

4   with respect to the engines --

5          THE COURT:  Let me ask you something.  How would

6   reasonable people deal with the fact -- just let's take two

7   airplanes, two groups.  You don't think they would deal with

8   each other in this way that's described in paragraph 10:

9          MR. ANDERSEN:  I think if there were -- if there

10  were only two -- well, let me -- it depends on -- and I know

11  I'm equivocating, but it depends on which two we're talking

12  about.

13         If we're talking about the 162SL and we're talking

14  about somebody that's got a complete airplane, and they both

15  paid -- they both paid Avantair the same amount for their

16  interest in the airplane, would the people that have 162SL be

17  satisfied if all they got was their engines back?  And I don't

18  think that they would be satisfied if all they got was their

19  engines.

20         THE COURT:  Well, we can't make them think that

21  they are not.  You've got what you've got with the frame.

22  It's not that much.  Apparently you do have an interest in

23  some engines.  So you put them back together as best you

24  can.  And you all gave permission to Avantair to charter

25  these, run these, do these things.  And that's at your own

```
 1  risk.  You had a contract and you gave permission to Avantair
 2  to move parts.
 3          MR. ANDERSEN:  Well, I guess what I'm getting at,
 4  Judge, is that everybody did that.
 5          THE COURT:  Yup.
 6          MR. ANDERSEN:  And candidly, it's the luck of the
 7  draw --
 8          THE COURT:  Yup.
 9          MR. ANDERSEN:  -- as to whether we are 162SL
10  or whether we're an airplane that has everything together
11  on it.
12          THE COURT:  I guess you could have withdrawn the
13  airplane from the pool.
14          MR. ANDERSEN:  Contractually, I'm not sure that --
15  I honestly don't know that we could, Judge, but I think when
16  all of the fractional share participants understand that there
17  are benefits --
18          THE COURT:  Are you suggesting that everyone that
19  buys into the sale process puts all their money in and we
20  prorate it?
21          MR. ANDERSEN:  Yes, Judge.  that's exactly where I'm
22  going.  And the reason I'm going there --
23          THE COURT:  And 10 doesn't -- 10 doesn't say that
24  that couldn't happen.
25          MR. ANDERSEN:  No, but what 10 does -- what 10 and
```

1    what 2 -- which deals with repair -- both do, is that they

2    provide just by virtue of this limited stay relief, without

3    the parties opting into the bankruptcy proceeding -- I mean,

4    this Court is actually being asked in this limited stay order

5    to determine rights *inter se* with an order that says:  Absent

6    an agreement otherwise, this is how the world's going to be,

7    and it's going to be that way because this Bankruptcy Court

8    ordered it.  Those parties who have not opted in are going

9    to have the benefit of this Court's order dictating or

10   providing --

11           THE COURT:  They don't have to opt in at all, in

12   which case those that are the winners, those that have a

13   complete airplane, can just take the thing and go.

14           MR. ANDERSEN:  Well, and that's where I'm going --

15           THE COURT:  Is that good for your?

16           MR. ANDERSEN:  Judge, they won't --

17           THE COURT:  Or would you rather have the engines

18   back?

19           MR. ANDERSEN:  But they won't -- they won't do that,

20   and that's why I was --

21           THE COURT:  How do you know?

22           MR. ANDERSEN:  Because when I have been -- when I've

23   talked to people on 164SL and 138SL, both of which are fairly

24   complete, every one of them recognizes the benefit of opting

25   in because they are concerned that they can't sell their

1    airplanes free and clear, number one.

2           Number two, they know they don't have the engines on

3    those airplanes that came with them.  And absent some relief

4    from this Court, there's no guarantee that they're going to

5    get those engines back.  They're going to be left to hopefully

6    a gentleman's agreement or they're going to be left to their

7    State Court remedies.  But they don't want to go to that

8    expense unnecessarily.  They're reasonable.

9           And what they say is:  We can see that -- we want to

10   sell these airplanes free and clear, we want to do this.  We

11   want to be protected from liens.  We don't want to be in New

12   Jersey with a lien.  We don't want to be in Texas with a lien.

13   You know, we'd like the liens to be all resolved here.  And

14   we're prepared to do that.  Nobody wants to take advantage of

15   the lienholders.  We just want to do it efficiently.  And so

16   all of these --

17          THE COURT:  Well, we offered to have an efficiency

18   type of a setup, because we said whatever the Trustee has,

19   she can sell, certainly.  If anyone wants to join an auction

20   of some sort, they can join.

21          But now you're telling me that if they join and

22   if the estate has no interest in those planes, that I'm

23   supposed to impose upon all those who join a ground rule

24   that says you will all -- we will only conduct a sale for the

25   non-estate planes if you all agree to allocate -- prorate the

1   proceeds after payment of all liens.  Is that what you're

2   saying?

3            MR. ANDERSEN:  No, Judge, because I think -- what

4   I'm saying is that I think there will be few, if any -- I

5   won't say "if any," but there will be very few non-estate

6   planes.  I think that the majority of these airplanes -- and

7   we've all been dealing with each other through this process,

8   and the vast majority of the fractional --

9            THE COURT:  I thought that the Trustee in her first

10  presentation said that there's only four planes that the --

11  let's see.

12           MS. SHERMAN:  Your Honor, there are four that --

13           MS. APPLEGATE:  Your Honor, it's Amanda Applegate.

14  May I be heard?

15           THE COURT:  No, not yet.  I've asked the Trustee's

16  counsel a question.

17           MS. SHERMAN:  There are a lot of people who have

18  been talking to us and have indicated an intention to opt in,

19  those were your words, settle with the Trustee and acknowledge

20  an interest of the estate in the planes and sell the planes

21  through the bankruptcy estate.

22           I have a written agreement right now for one.  I

23  have some drafts from some others.  Until they're singed on

24  the barrelhead, they are what they are, and we know if we have

25  a signed agreement, then we'll file it with the court.  Until

```
 1  then -- I'm anticipating more, but until we have them, we

 2  don't have them.  And it may be -- it's more than just the

 3  four I referenced.  Those are the four that we have drafts

 4  circulating right now on.  If those come to fruition, great.

 5  If not, they won't, but I --

 6           THE COURT:  Do you have different ground rules in

 7  your mind about how the op-ins will be sold and the proceeds

 8  will be allocated?

 9           MS. SHERMAN:  Well, Your Honor, the current -- and I

10  think Mr. Andersen's concern is that by including paragraph

11  10, we are presupposing that at the end of the day the rule is

12  going to be, before we've actually heard it, and I anticipate

13  we'll hear it when we get to the settlement agreement on

14  N169SL and the motion to sell.

15           We're presupposing that the rule is going to be:

16  You get to keep whatever is affixed to your airframe on the

17  day the music stopped.  You can go find your engines and you

18  can go find your propellers.

19           And I think what Mr. Andersen is saying is that the

20  people who have donor planes may come in objecting to those

21  motions, and they may think that that's not a fair allocation.

22           And I guess there is concern that once we include

23  paragraph 10, the train has left the station.  I think there

24  are other provisions in the order that say it's not a

25  determination of ownership or any rights of anybody --
```

1          THE COURT:  Okay, let me stop you --

2          MS. SHERMAN:  -- but it is sort of a slippery slope.

3          THE COURT:  Stop.  I get what his point is.  Let me

4     ask you something.  Let's say you get opt-ins from, say, ten

5     groups.  Is it your -- is it Ms. Scharrer's intent that the

6     ten be sold as one and that all of the owners that are in

7     those ten will prorate the net proceeds, so that the owner of

8     the gutted plane will have the same share as the owner of a

9     plane that's fully intact, albeit with somebody else's

10    engines?

11         MS. SHERMAN:  That is not a provision of any of

12    the set -- well, it's not the provision of this settlement

13    agreement because it's the only one.

14         THE COURT:  Well --

15         MS. SHERMAN:  And I don't know that it's going to be

16    a provision in any of the others and it may be an issue --

17         THE COURT:  I think he's advocating that you do

18    it that way.  Is that what -- is that what I'm hearing,

19    Mr. Andersen?

20         MR. ANDERSEN:  Yes, Your Honor.  And I realize that

21    that's an issue that has not been resolved.  But the concern

22    is that we are going down this slope with provisions like 10.

23    This is an issue that -- this is why I keep calling it the

24    elephant in the room.  It's an issue that for the fairness and

25    the interest of what --

1          THE COURT:  You're saying that this gives some

2    groups a leg up if they get their engines back.

3          MR. ANDERSEN:  I think that it does.

4          THE COURT:  And it doesn't allow other groups to

5    hold hostage engines so that they can get leverage for a

6    prorated type of a sale.

7          MR. ANDERSEN:  I'm not sure -- I'm honestly not

8    sure if I understand the Court's --

9          THE COURT:  Okay.

10         MR. ANDERSEN:  -- last point.  The concern that I've

11   got is that provisions like 10, which basically call for --

12         THE COURT:  You're not worried about 10 with respect

13   to 162.  You're worried about 10 with respect to 164.

14         MR. ANDERSEN:  And 138, for that matter.

15         THE COURT:  And 138.  You have other people's parts

16   on 138?

17         MR. ANDERSEN:  Yes, Your Honor.

18         THE COURT:  Okay.

19         MS. ANDERSEN:  And we have other people's parts on

20   all -- every -- as far as I understand, and we've got a lot of

21   information that flows within this group.  I mean, there are

22   very few planes that don't have -- let me put it as there are

23   very planes that do have just their original parts --

24         THE COURT:  Okay.

25         MR. ANDERSEN:  -- or their original engines or

```
 1   propellers.

 2           THE COURT:  All right.

 3           MR. ANDERSEN:  So the concern that I've got is this

 4   provision, also Section 2 -- I think it's Section 2 --

 5           THE COURT:  2 is the repair and then 3(d) is the

 6   mirror of 10.

 7           MR. ANDERSEN:  Yes, Your Honor.  And those are --

 8   I don't think those are really contemplated by the initial

 9   limited stay concept.  Those actually provide, or grant rights

10   to people to start doing repair work on the aircraft and --

11           THE COURT:  We did talk about that.  We said that

12   they could.  Didn't we talk about that at the hearing?  That

13   they could undertake to do performance things, like turn the

14   engines on and keep them going?

15           MR. ANDERSEN:  And those would be things, Judge,

16   that are what I would call preservation of the aircraft.

17   But repair in my mind would be actually going through the

18   recertification process.  Repair would be once the

19   recertification process is started, there's always a

20   punchlist of things that have to be done.

21           THE COURT:  Yeah, but we talked about that we said

22   that there was -- that the FAA couldn't go through it as fast

23   as some other people could go through it.  And we contemplated

24   that people would be able to do that.  Remember the emergency

25   -- what was that thing?  It was Mr. Conte -- there were some
```

1    suspensions of some sort.

2            MR. ANDERSEN:  Yes, Judge.

3            THE COURT:  And didn't we talk about how they could

4    get back recertification.  They can't get back recertification

5    if they just leave them as is.  So didn't we contemplate

6    repairs?

7            MR. ANDERSEN:  I think we've -- yes, we have

8    contemplated repairs.  I guess the issue for me, Judge -- and,

9    again, I'll come back to the CCA's interest here.  Is CCA

10   doesn't want to be bound by an order that allows other

11   fractional shares of interest holders to say:  Okay, we now

12   are going to embark upon the repair of this airplane, the

13   recertification, the repair.  We're going to open the

14   checkbook.  We don't -- you know, we don't know exactly how

15   much this is going to cost at the end of the day.  We don't

16   know how much anybody's going to get from this airplane --

17           THE COURT:  Mr. Andersen, what if I just decide to

18   dismiss this case.  What would you do?

19           MR. ANDERSEN:  Judge, I mean -- I'll answer your

20   question directly.  It would be a real mess.

21           THE COURT:  Okay, then --

22           MR. ANDERSEN:  The answer --

23           THE COURT:  -- you all have to -- it's got to be one

24   for all and all for one here.

25           MR. ANDERSEN:  I agree with that, Judge, and

1    that's --

2            THE COURT:  Do you think it's unreasonable for

3    people to want to get the planes recertified?

4            MR. ANDERSEN:  No, but what I think it is, that if

5    they want to do that, then they should opt in.  They're very

6    close to opting in.  This order, Judge, frankly, gives some

7    people -- gives folks the right to go out and do things.  And

8    if they are satisfied with it, then the next step is they can

9    get their final stay relief and then they just walk away, so

10   they haven't --

11           THE COURT:  Except if they walk away with someone

12   else's engines knowingly and without permission, they could be

13   subject to causes of action outside of bankruptcy, such as

14   conversion.

15           MR. ANDERSEN:  Well, and I think they'll have -- and

16   I think they know that.  And for that reason, I guess -- if I

17   were betting on it, which I guess I am -- I think they will

18   opt in.  Judge, I'm in favor of --

19           THE COURT:  Doesn't this provision keep them --

20           MR. ANDERSEN:  -- resolving these things together.

21           THE COURT:  Doesn't this provision incentivize them

22   to opt in?  Because it's saying:  You can go recertify but

23   take those engines off and give them to the person that they

24   belong to.  And then it'll be your problem how you're going to

25   recertify without engines.

1          MR. ANDERSEN:  I guess, again, I think my view of

2    it would be that that's -- that until they opt in, they

3    shouldn't have that benefit.  I think it is an incentive to

4    opt in because once they opt in, they'll get that benefit --

5          THE COURT:  10 is an incentive to opt in because if

6    we say that they've got to give their engines up to the true

7    owners, what are they going to do with a fuselage?

8          MR. ANDERSEN:  Then they're going to have to try

9    to get their engines back.  And this order, to some degree,

10   is --

11         THE COURT:  It will help them.  It will help the

12   engines go to the place they need to be.  Same with

13   propellers.

14         MR. ANDERSEN:  But once they do that, then -- once

15   they've given up the engines that are on there and once

16   they've used this order to get the engines back, then what

17   incentive do they necessarily have to opt in?

18         I mean, there's an answer to that, which is that

19   they probably still want to sell -- if they're reasonable,

20   they still want to sell the airplane free and clear, they

21   still want to deal with lienholders in one forum.  There are

22   other reasons that they would want to opt in.  But I'm not so

23   sure that you would get quite the same level of participation

24   if people just had the right to go and get their engines --

25         THE COURT:  And vice versa.

1          MR. ANDERSEN:   -- from somewhere else pursuant to

2   this order.

3          THE COURT:   Your 162 needs to have its engines.

4          MR. ANDERSEN:   Yes.

5          THE COURT:   It will maximize the proceeds of the

6   sale of 162.

7          MR. ANDERSEN:   And I fully expect that even without

8   this limited stay relief order, the fractional share interest

9   owners of 162SL are going to opt in.   They've got to opt in.

10  And they will.

11         THE COURT:   Don't you want your engines?

12         MR. ANDERSEN:   When we get our engines, then we

13  would expect there to be an order just like this -- excuse me.

14  When we opt in, we would expect there to be an order just like

15  this.   I realize we're talking about a chicken and an egg

16  situation.

17         THE COURT:   Yeah, this incentivizes people to get

18  together.   It can get you back your engines.   If I leave this

19  paragraph in there, you get your engines back on one plane.

20  And, yes, you've got to give up your engines on another plane.

21  But maybe someone else has the engines for 164.   And by this

22  same paragraph, you'll get your own engines back for 164.   The

23  losers are going to be the ones where the engines are kaput.

24         MR. ANDERSEN:   Well, and can --

25         THE COURT:   And is it fair for someone, that has

```
 1   working engines of someone else, to take advantage of that, if
 2   their engines are kaput?
 3            MR. ANDERSEN:  I think, Judge, if all of the
 4   fractional share interest holders, or the vast majority of
 5   them, opt in, then that level of fairness can be achieved.
 6   And ultimately where I'm going with this is with -- 162SL,
 7   when the emails went around to the 162SL members two days ago,
 8   they were told:  Your airplane is junk.  And we'll look for
 9   the engines.  And, okay, we found your engines and they've got
10   about a third of their time, so maybe you'll get some money
11   out of that.
12            That's -- you know for fractional share interest
13   holders like those in 162SL, that's not what they would
14   perceive to be fairness.
15            THE COURT:  That's what they would get outside of
16   bankruptcy, sir.
17            MR. ANDERSEN:  But if they are in bankruptcy, if
18   they opt in, and others opt in, then I think -- and this is
19   what I think --
20            THE COURT:  Well, you have to have that conversation
21   with Ms. Scharrer.  You're asking to have everybody prorate
22   the proceeds.
23            MR. ANDERSEN:  That's right, and --
24            THE COURT:  That doesn't offend me.  That does not
25   offend me but getting the -- to maximize the proceeds, let's
```

1   see what we have to sell.  Okay, let's say the Trustee gets

2   162 in its present state because the engines are kaput.  But

3   you say that maybe they are.  So, okay, let's use your

4   example.

5           MR. ANDERSEN:  There's a fair amount, Judge.

6           THE COURT:  There are engines somewhere that need to

7   come back to 162 with a third of their time on it.

8           MR. ANDERSEN:  Yes, Your Honor.

9           THE COURT:  Okay, that's going to bring a price.

10  164 needs to maybe swap engines out.  That's going to bring a

11  price.  And when you are selling things, you want to maximize

12  their sale value.  Why wouldn't you want to have the engines

13  that go with 162 on 162?  Or sold with 162, if not on it?

14  There's no reason.

15          MR. ANDERSEN:  I think that you -- I think that you

16  would either want them physically or you would want to have

17  some recognition that there was -- your value in something

18  that somebody else sold.  Either a direct credit or a

19  recognition that through the bankruptcy process that our

20  parts are on some other airplanes and --

21          THE COURT:  Okay, so why doesn't 10 do just that?

22          MR. ANDERSEN:  I think that -- I think that 10

23  does --

24          THE COURT:  The "absent other agreement" thing

25  allows you to say we're not going to make you move the engine

```
 1    over here.  Just let's have an agreement that we're going to

 2    get a credit when your plane with my engines is sold.

 3                MR. ANDERSEN:  And, Judge, honestly I don't have --

 4    when we were circulating these drafts, I circulated my

 5    comments.  And basically my comments were:  I'm okay with this

 6    as long as people have opted in.  This involves the Bankruptcy

 7    Court determining rights inter se between these fractional --

 8                THE COURT:  Okay, I've heard enough.  Ms. Sherman is

 9    there a reason for me to leave this in there, on behalf of the

10    estate?

11                MS. SHERMAN:  Your Honor, there's -- it's two

12    different places.

13                THE COURT:  I can --

14                MS. SHERMAN:  I think as a practical matter,

15    everybody is going to be -- if we're not all good stewards and

16    good citizens, we'll be acting at our peril.

17                THE COURT:  Right.

18                MS. SHERMAN:  It wasn't something I don't think that

19    we had specifically discussed at the original hearing --

20                THE COURT:  Just tell me does it affect the estate

21    if it's not in there.  Yes or no.  If anyone sells their plane

22    with your engine on it --

23                MS. SHERMAN:  Or alternatively --

24                THE COURT:  -- that's going to be a problem.

25                MS. SHERMAN:  -- takes the engine off and throws it
```

in a corner and lets it rot and ruin and doesn't tell us --

THE COURT: Okay. That is not part of the stay relief I'm granting. I'm not allowing someone to destroy estate property.

MS. SHERMAN: Well, I guess they would do it at their peril.

THE COURT: That's right.

MS. SHERMAN: So, you know, I think it's in paragraph 10 and it was --

THE COURT: You destroy property of the estate, there's a cause of action under 549 or something like that.

MS. SHERMAN: And there was a similar paragraph, and it's paragraph 3(d) --

THE COURT: 3(d), and then there's something --

MS. SHERMAN: -- of the order establishing omnibus procedures.

THE COURT: Mr. Andersen pointed -- he said there were other paragraphs. He specifically pointed to paragraph 2.

MS. SHERMAN: I'm not sure which paragraph he was referring to and which of the orders he was referring to.

MR. ANDERSEN: Judge, may I just clarify that? I think I was referring to paragraph 2(b) in the interim stay relief order. I think it's 2(b). And the only objection there is not to be doing things to preserve the property.

1   It's just the added step of repairing.

2          MR. VERONA:  Judge, I know Ms. Applegate wanted to

3   be heard on this before you --

4          THE COURT:  Right.  Thanks for reminding me.  Okay,

5   now Ms. Applegate.

6          MS. APPLEGATE:  Well, I just wanted to comment on a

7   few points that Mr. Andersen has made.  You know, first of

8   all, I would say that, you know, the 23 groups that we

9   represent are all in various stages.  So I don't think it's

10  correct when Mr. Andersen says that he thinks all or almost

11  all of the groups are going to ask him.

12         And I think, in fact, Mr. Gibbs is in the room and

13  has filed a motion for final stay relief on two aircraft.  And

14  I think the co-owners of 140SL have also filed a motion for

15  final stay relief.  But we've actually seen three groups file

16  for final stay relief, and we've seen one group settle so far,

17  so I just wanted to lend that sort of perspective.

18         And then with regards to the engine issue, you know,

19  in my mind there are two different ways to do it.  It would

20  be move all the engines or to deduct cap appraisals on the

21  engines, and assess a value to the engines, and then have

22  some sort of credit approach.

23         The only -- in order to accomplish that, you would

24  have to have everyone agree to that, I think.  I don't think

25  that that's something that could be imposed on these groups

1  that are seeking, and I think will likely get final stay

2  relief.  And so if everyone isn't on board, that doesn't

3  work.

4           And so I understand Mr. Andersen's perspective where

5  he wants everybody to opt in and he wants to make it difficult

6  for a group to get their engines if they don't opt in, so that

7  they can be encouraged to opt in, but I don't think that that

8  is for the greater good.

9           These planes have been sitting since June.  Every

10  day that they sit, they become less valuable, and they're

11  incurring costs.  And if the owner groups want to get their

12  engines and get the aircraft airworthy again and get it sold,

13  I think that's in the best interest of the aircraft owner,

14  Piaggio, Aviation General, I mean, you know, so I don't think

15  that we can, sort of, highjack the process and not include how

16  they can possibly get their engines to their aircraft if

17  that's what they want to do.

18           THE COURT:  Mr. Gibbs rises.

19           MR. GIBBS:  Since Amanda mentioned me, I thought I

20  might as well throw my two cents worth in.  And we do have two

21  motions filed for stay relief.  We've identified our engines.

22  I think that the paragraph 10, just like Your Honor mentioned

23  -- I mean, it's nothing but a paragraph of fair dealing.  But

24  it also adds some detail to what we're supposed to do.  We

25  actually have somebody else's engine on one of their planes

1  and we want --

2           THE COURT:  So what are you guys going to do?  Let's

3  -- you've asked --

4           MR. GIBBS:  We're going to pack it up and take good

5  care of it, just like the paragraph 10 says.  And when we find

6  -- and we're going to contact the owner, just like paragraph

7  10 says.  And we're going to -- if you sign paragraph 10, we

8  get to say it cost us this much to take it off and store it --

9           THE COURT:  You get to say that anyway.

10          MR. GIBBS:  Well, except, you know, I mean --

11          THE COURT:  Outside of bankruptcy, you'd get to say

12  that.

13          MR. GIBBS:  Well, we could argue about that, and I'm

14  sure we could get that resolved.  But with paragraph 10, it

15  just kind of -- it just kind of sets forth the fair dealing.

16  Hey, we took it off, we got it stored, it's ready to be

17  shipped but you owe us $800 for that cost.

18          And likewise, when we go to North Carolina to get

19  our engine now, we know we've got to pay to get it off, we've

20  got to pay to ship it, and that that's -- and if we want it

21  insured, it's all on us.  I mean, paragraph 10 is --

22          THE COURT:  It's just good etiquette.

23          MR. GIBBS:  It is.

24          THE COURT:  It's commercially reasonable, it's what

25  everyone would be held to outside of bankruptcy.

1          MR. GIBBS:  Right.  And our engines -- like I said,

2     one of our engines is in North Carolina, another plane's in

3     Dallas, and somebody else's engine is on there.  With

4     paragraph 10, we know exactly how --

5          THE COURT:  It makes sense --

6          MR. GIBBS:  -- to go about doing it.

7          THE COURT:  It makes sense, but Mr. Andersen doesn't

8     want to get his engines back.

9          MR. GIBBS:  Well, you know, I have to say, he wants

10    everybody to share because he's got the weak link.  But he's

11    going to run everybody out of opting in anyway, because I

12    mean, if I've got an airplane that's worth $2 million and his

13    is worth $200,000, why would I want to share with him?

14         THE COURT:  You wouldn't.

15         MR. GIBBS:  I will just -- he will run them out.

16    I might mention when he -- come to find out, frankly the

17    fuselage is not where the value is.  I mean, the value is in

18    the engines.  If he's got a --

19         THE COURT:  He doesn't want them.

20         MR. GIBBS:  His engines with no fuselage may very

21    well be worth more than 164 if the engines have no time on

22    them or they have a million dollar lien on them from Dallas

23    Airmotive.

24         So, I mean, the truth is that in fact we'll buy your

25    engines right now.  Call me.  We're looking or engines we can

```
 1   buy, so --

 2             THE COURT:  See.  Let's make a deal.

 3             MR. GIBBS:  The fuselage, we don't really care

 4   about.

 5             THE COURT:  Let's make a deal.  Ms. Sherman, last

 6   comment on this issue, please.

 7             MS. SHERMAN:  I think this is stay relief, and stay

 8   relief doesn't determine property rights.

 9             THE COURT:  Right.

10             MS. SHERMAN:  And so as long as we're all clear on

11   that, I think there's all the appropriate caveats in here.

12             THE COURT:  I'm not signing it with him.  Let them

13   work it out.  I'll sign it if it says this:  Absent other

14   agreement, the Court recommends that the cost of sharing --

15   it's really simple.  It's a nice template for people, you

16   know, who might be rogues.  They should be shown this.  This

17   is the way we should deal with these things.  But if you

18   don't, you get stay relief, you sell a plane with somebody

19   else's engines, you may do the time, particularly if it's

20   estate engines or estate propellers.

21             MS. SHERMAN:  So, Your Honor, the paragraph --

22             THE COURT:  That would be damage to the estate.

23   That would be a willful damage to the estate.

24             MS. SHERMAN:  And we don't -- we probably don't have

25   much collection here on most of the fractional owners, given
```

1    the fact that they could afford to buy fractional interests in

2    the first place.  So I think we're probably pretty well

3    covered on that.

4            So is paragraph 10 coming out and the other -- the

5    parallel paragraph in the other?

6            THE COURT:  Or you can add what I just said:  The

7    Court recommends that.  Just a recommendation.  It makes

8    sense, it's commercially reasonable, it's polite, it's good

9    etiquette.  It provides a framework for how business people

10   should deal with other when they by happenstance happen to

11   have each other's stuff.

12           MS. SHERMAN:  If Your Honor tells me what you'd like

13   me to write in paragraph 10, I can stop herding cats and we

14   can --

15           THE COURT:  Yeah.

16           MS. SHERMAN:  -- send this to you.

17           THE COURT:  Just put:  Absent other agreement, the

18   Court recommends the following, colon.

19           MS. SHERMAN:  Okay.  And I will correct the

20   complimentary provision that was granting additional stay

21   relief.

22           THE COURT:  And then you can add somewhere in here

23   that if someone sells estate property without permission from

24   this Court, then they risk a sanction for willful violation of

25   the automatic stay.

1        I won't give anyone else that benefit, though.

2   They can duke it out in State Court on conversion claims.  It

3   just makes everything more expensive.  I understand that it

4   probably doesn't have any business being in a stay procedure

5   order, because it really doesn't deal with the stay issues, as

6   you said, Ms. Sherman, however it makes sense.  And for the

7   life of me, I don't understand the opposition of Mr. Plotko or

8   Mr. Andersen, respectfully you all.

9        I think if you didn't have this bankruptcy, you'd be

10  wanting just this, if it weren't in your contract already.  So

11  we've resolved that.  Now the omnibus order will get entered

12  with those changes.

13          MS. SHERMAN:  Thank you, Your Honor.

14          THE COURT:  Let's go through the rest of the

15  calendar.

16          MS. SHERMAN:  Your Honor, the next --

17          THE COURT:  Does anyone need a break?  I don't, but

18  if you'd like to have a little break, you may.

19          MS. SHERMAN:  Your Honor, if we could blow through

20  the stay relief motions, now that we've finalized the wording

21  of the omnibus order, I think it will go pretty quickly.  And

22  if I could have a break to just have a few minutes with the

23  Trustee --

24          THE COURT:  Sure.

25          MS. SHERMAN:  -- and perhaps Mr. Lamoureux on --

```
 1              THE COURT:  Yeah, we can go into the noon hour.  I
 2   don't think I have any calendar conflict, do I, Ms. Garcia?
 3              COURTROOM CLERK:  Not that I'm aware of.
 4              THE COURT:  So let's go forward.
 5              MR. GART:  Your Honor, we'd like to be excused at
 6   some point and I think we --
 7              THE COURT:  Whenever you want, walk out.
 8              MR. GART:  Thank you, Your Honor.  And we had dealt
 9   with the Trustee's motion to reimpose the stay, preliminary
10   injunction in the adversary.  We also have a preliminary
11   hearing today on the Trustee's settlement, which we think
12   would be consistent --
13              MS. SHERMAN:  We do?
14              MR. GART:  Yes.
15              MS. SHERMAN::  I don't know that I saw that set.
16              MR. GART:  And the sale -- as well as the sale.
17              MR. VERONA:  It's not on the calendar.
18              THE COURT:  Well, there's a motion for approval of
19   the sale.
20              MR. GART:  Right.
21              MS. SHERMAN:  I think that's TBM Socata if we're
22   talking about Doc. 250.
23              THE COURT:  It is.
24              MR. GART:  Okay.  So as long as we're not talking
25   about 169, then we'll be excused at the break.
```

1          THE COURT:  Whenever you want to leave.  And folks

2    on the phone, whenever you want to hang up.

3          COURTROOM CLERK:  Judge, we need to call a case from

4    an 11:00 hearing.

5          THE COURT:  We do?

6          COURTROOM CLERK:  Yes.  She's a pro se Debtor.

7    She's not here, but Kelly Ballard is, so we can call it.

8          THE COURT:  Okay.  Then during the break, you all go

9    and we'll take up the Monpoint case.

10       (Courtroom clerk conferring with CourtCall operator.)

11         UNKNOWN SPEAKER:  My client had a reservation to fly

12   out this afternoon.  If we could take up --

13         THE COURT:  Yours will be first.

14         UNKNOWN SPEAKER:  Okay.  Thank you.

15         MS. SHERMAN:  Were we going to take a break now,

16   Your Honor?

17         THE COURT:  Hold on just a second.

18       (Court and courtroom clerk conferring regarding CourtCall

19   procedure.)

20         MS. SHERMAN:  Do you want us to take a break now,

21   Your Honor?

22         THE COURT:  Yes, please.

23         MS. SHERMAN:  Okay.

24       (Recess taken from 11:49 a.m., an unrelated case was

25   heard, and these proceedings resumed at 12:12 p.m.)

1          THE COURT:  All right.  We're back on the record in

2    the Avantair case, and I would like to poll those who had made

3    appearances earlier to see if you're still with us or whether

4    you decided to go have lunch.  Except that now I've misplaced

5    my list.  One moment.

6          MR. RIEDEL:  Your Honor, Mr. Graben dropped off.

7          THE COURT:  Okay.  I'll just go by last names.

8    Applegate?

9          MS. APPLEGATE:  Here.

10          THE COURT:  Crosnicker?

11          MR. CROSNICKER:  Here.

12          THE COURT:  Garlove?

13          MR. GARLOVE:  Present.

14          THE COURT:  Plotko?

15          MR. PLOTKO:  Present.

16          THE COURT:  Goldberg?

17          MR. GOLDBERG:  Yes.

18          THE COURT:  Graben is not there.  Anyone else whose

19    name I did not call that is present by phone?

20          (No response.)

21          THE COURT:  No.  Okay.

22          MR. MCLACHLAN:  Judge, Niall McLachlan for

23    Iberiabank on the motion to sell the --

24          THE COURT:  Whatever that plane is, right?  The

25    Socata.

 1          MR. MCLACHLAN:  Yes, Judge, that's right.  The TBM

 2   700, Judge.

 3          THE COURT:  Okay.  All right, and you were not with

 4   us during the morning segment, right?  Unless you joined late?

 5          MR. MCLACHLAN:  I joined just a couple minutes late,

 6   Judge, yes.

 7          THE COURT:  Okay, good.  All right, then the record

 8   appearances will reflect that.  And in the courtroom, we have

 9   -- I'm going to let you all -- let me get up and point to

10   everybody that's in the room and just say their names out

11   loud.  We've got Ms. Sherman.

12          MS. SHERMAN:  Why don't we let Mr. Donica do all the

13   introductions.

14          THE COURT:  Okay.

15       (Laughter.)

16          THE COURT:  Wait.  Riedel, Lamoureux, Verona,

17   Mohney, Gibbs, Leeman.  The new person, Mr. Garner.  Mr.

18   Donica's here, Mr. Appleby's still here.  Mr. Moore's still

19   here.  Mr. Falkner's still here.  Sherman, Scharrer, Mr.

20   Andersen.  Okay.

21          Mr. Donica, your motion.

22          MR. DONICA:  Thank you, Your Honor.  Our motion is

23   very simple.  It's a little bit different than the other

24   situations.

25          THE COURT:  It'd be the first time there's something

1    simple in this case.  Go ahead.

2            MR. DONICA:  We are no longer a fractional owner.

3    Mr. Moore's company, QSI, owns the entire aircraft.  we have

4    provided the Trustee serial numbers of all the important parts

5    that they had been requesting.

6            We are in possession of the original motors.

7    They're on the planes.  We have located one of our propellers,

8    I believe it's in Clearwater, and we're going to be dealing

9    with Mr. Lamoureux on that.

10           The other prop, we are about to find.  We've been

11   tracing it, and we'll probably be able to find where it is.  I

12   don't think it's in the possession of Avantair or probably not

13   even any of the other unit owners.

14           So we would like to be able to retrieve our original

15   logbooks, whatever maintenance records we need.  Our plane

16   is ready to be certified by the FAA.  We could be flying in

17   just a couple days.  We're ready to go.  Our plane was not

18   dismantled, so we don't have the problems associated with the

19   other owners.

20           I've talked to Ms. Sherman about it.  She wants

21   me to give a 21-day negative notice to the other 600 unit

22   holders.  We have no problem with that as long as we can

23   move forward with our logbooks right away to try to get our

24   certification done within the next week or so.

25           THE COURT:  And what is the purpose of giving the

1    other owners notice?  Ms. Sherman?

2              MS. SHERMAN: Your Honor --

3              MR. DONICA:  I'm not totally sure.

4              MS. SHERMAN:  The omnibus stay relief order, the

5    final omnibus stay relief order contemplates a procedure where

6    all the other fractional owners -- there's 600.  They get

7    email notice.  And we did that actually on the motion to sell

8    N169SL.  So they can look at:  This is the proxy he's going to

9    take, this is the engines he's going to take.  Mr. Andersen

10   and his clients can decide whether they're going to make a run

11   at saying:  Hey, wait a minute, all for one, one for all.  And

12   everybody has a chance to weigh in.

13             Right now, we are giving notice to a very limited

14   subset of people in this case of everything we're doing.  And

15   it's mainly the owners that have some of the better planes

16   that are in better shape that have lawyered up.

17             And so the reason that was in the final omnibus

18   procedures order was so that every fractional order

19   everywhere, whether they've got a lawyer or not, can say:

20   Hey, wait a minute, I have a dog in this fight, I have a

21   problem with that.  If no objections are received, then they

22   move along their merry way.

23             With respect to the records, the originals are like

24   gold.  And I think one of the FAA guys explained to me that a

25   plane is a very expensive paperweight without records, and I

1    think Mr. Gibbs would probably echo that.

2          And so to the extent that any original records -- we

3    explained this at the first hearing.  When Mr. Donica shows up

4    to say, "I want my original records," the pile of papers that

5    have that tail number on it may not necessarily match the

6    parts that are actually on his plane, and it may include

7    pieces of paper that other people in this room are going to

8    need.

9          And so whether it's originals and VanAllen, as the

10   records custodian, retains copies or vice versa, however we

11   do it, we just need to make sure that, you know, before --

12   the records still aren't actually matching all the planes.

13   Whoever takes off with any pieces of paper, there's a trail

14   left behind for the rest of the owners and some ability for

15   them to get to it.  And the thought was that another reason

16   for the notice is so that people can figure out whether any of

17   this paperwork is relevant.

18          THE COURT:  Okay.

19          MS. SHERMAN:  But assuming we file the final stay

20   relief procedures order, and it's the final -- it's the

21   omnibus final order entered after we follow the omnibus final

22   procedures, we have no objections to the motion.

23          THE COURT:  Okay.  Notice to the 600, and that can

24   be by email.  You have an email service provider, Mr. Donica,

25   or are you going to type in 600 addresses?

1          MS. SHERMAN:  Your Honor, I have mail groups set up

2    in my office because we gave them notice on N169SL, numbers I

3    through VII.  And if Mr. Donica can send me the -- what he

4    wants to be sent to those seven tail groups, I'll have my

5    assistant push the button, as long as I don't have to create

6    the pdf.  Or we'll figure out how to share the mail groups

7    with him.

8          THE COURT:  That's very nice.

9          MR. DONICA:  I appreciate that.  Any way we can do

10   it.

11         MS. SHERMAN:  We'll get with Mr. Donica as to the

12   mail groups.

13         THE COURT:  Very nice.  Okay.

14         MR. DONICA:  I will not be typing because most of

15   them will come back undeliverable.

16         THE COURT:  Okay.  Then I'm going to grant the

17   motion.  We'll include the requirement that the 600 other

18   owners or whatever, they get notice and an opportunity to --

19         MS. SHERMAN:  Your Honor, I think we're renoticing

20   the motion as opposed to granting it.  And if you grant it,

21   there's no point giving the notice.

22         THE COURT:  Well, no.  If I give them the right to

23   seek reconsideration.

24         MS. SHERMAN:  On 21 days negative notice?

25         THE COURT:  Based on the fact that they've not been,

1  you know, given due process.

2      MR. DONICA:  We did serve the entire matrix, twelve

3  pages, so I think we've pretty much hit everybody anyway.

4      THE COURT:  All 600 owners?

5      MR. DONICA:  I don't know what's in the twelve

6  pages, but I got a heck of a bill for it.

7      MS. SHERMAN:  The owners don't appear to be in

8  there, Your Honor.  It's a different subset of people.  I'm

9  not even sure where they came from.  I guess it was off the

10  original involuntary --

11      THE COURT:  Under Rule 60, they would have the

12  absolute right to seek reconsideration.

13      MS. SHERMAN:  You know, this has been on notice.

14  It's been on file for ten days.  I understand time is money

15  and everybody's in a hurry.  I'm not sure why we're doing this

16  on expedited relief.

17      One of the propellers Mr. Donica has, I can't figure

18  out where it came from at this point.  I know it's not off

19  N169SL.  I don't know where it's from.  We got ahead of

20  ourselves at some of the first hearings trying to do people

21  favors and rush this process, and the 21 days notice to

22  everybody was for a reason, so that the Trustee and all the

23  other plane owners would have a chance to look at this and try

24  and figure out what's on first.

25      And ten days, especially when we've got a gajillion

1   other matters set for hearing on the same day, it's pretty

2   hard to respond to these.  And if we're going to give it to

3   Mr. Donica on ten days notice, let's just tear up the final

4   omnibus procedures order and we'll just do everybody who puts

5   expedited on ten days notice.

6           THE COURT:  Well, he didn't know who to serve

7   because we didn't have an omnibus order.

8           MS. SHERMAN:  Well, we had the draft.  It's been in

9   the omnibus order since it was first circulated, Your Honor,

10  preserving all the fractional owners.  That's just --

11          THE COURT:  Okay.  So why did you ask for expedited

12  relief, Mr. Donica?

13          MR. DONICA:  Your Honor, we've been waiting since,

14  I think, July to get this plane back flying.  It's been very

15  little that was needed to be done to it.  It's ready to go, it

16  has been.  Time is money and he's -- Mr. Moore is losing a lot

17  of money just waiting for just a few pages of the logbook to

18  show the FAA to get his recertification.  They are ready to

19  go.

20          THE COURT:  Except that you don't have -- you don't

21  have one prop.

22          MR. DONICA:  We have -- we have --

23          THE COURT:  How can you be ready to go with --

24  you've traced one prop to Mr. Lamoureux's facility apparently,

25  and you haven't located the other.

1         MR. DONICA:  We located the other in Santa Monica.

2    We believe now it's somewhere in Dallas.  We're about to find

3    out where that is.  We've offered, from the beginning, to

4    hold the props that we have properly in storage waiting for

5    somebody to come get them.  Other than that, we're ready to

6    go.

7         Mr. Moore has spent a substantial amount of money of

8    his own clearing liens, paying storage on his own.  The estate

9    has not been involved in anything.  He has bought the last two

10   unit owners out so now -- when we started, we were 14 and 16

11   unit owners.  Now we're all 16.

12        THE COURT:  Do you have the serial numbers of the

13   engines?

14        MR. DONICA:  Yes.

15        THE COURT:  You do?

16        MR. DONICA:  Yes.  I believe they're in our motion

17   and --

18        THE COURT:  Do you have the title --

19        MR. DONICA:  -- or notice --

20        THE COURT:  Do you have the titles?

21        MR. DONICA:  Yes.

22        THE COURT:  The title information?

23        MR. DONICA:  Yes.  It was all attached to our notice

24   and our motion.  We had the serial numbers, are in the notice

25   Docket No. 281 on the first page.

```
 1            THE COURT:  This does seem to be a different
 2   proposition, Ms. Sherman.
 3            MS. SHERMAN:  I'm sorry, Your Honor?
 4            THE COURT:  This particular aircraft seems to be a
 5   little bit different position than all the rest.  It looks
 6   like this one is one that's really intact.
 7            MS. SHERMAN:  Well, Your Honor, if -- Mr. Donica
 8   just said all they need is the few pages of the logbooks.  If
 9   they just want to make copies of a few pages of the logbooks,
10   we can give those to him tomorrow without granting final stay
11   relief.  And that's not a problem, and let's notice it up --
12            THE COURT:  Tell me what the danger is in this
13   particular circumstance.  The engines -- the title is not in
14   the estate.  He's taking the props and he's storing them.
15   Somebody else can come get them.  He's not going to do
16   anything with them.  I'm not granting stay relief as to the
17   propellers that they have.
18            He can go and get the propellers that he wants.
19   If he violates the automatic stay with respect to estate
20   property, that would be a problem for him, so he has to make
21   sure that the props that he's tracing are actually non-estate
22   props.
23            I don't see the harm in granting this and giving the
24   fractional owners, you know, 21 days, 14 days, whatever it is,
25   to seek reconsideration.  This is a different one from all the
```

1   others.

2            MS. SHERMAN:  Your Honor, I just have a feeling

3   we've opened a can of worms and we're going to be hearing a

4   different story as to why they're all different, and we're

5   going to be --

6            THE COURT:  You bring me one fractional owner --

7            MS. SHERMAN:  -- doing all of these on ten days

8   notice.

9            THE COURT:  One fractional owner who has acquired

10  the engines, the titles are clearly in that -- are tied to

11  that fuselage.  Bring me that anywhere else in this case.  It

12  isn't going to happen.

13           MS. SHERMAN:  Mr. Donica's plane is one of the few

14  -- or I'm sorry.  His client's plane is one of the few that

15  does have both of the original engines on it.

16           MR. DONICA:  We don't --

17           MS. SHERMAN:  Your Honor, whatever you want to --

18  however you want to handle it is great, if it's 21 days

19  negative notice.  I just -- I don't want to set precedent for

20  us being expected to respond on very short notice, especially

21  when we have a lot of other matters set for hearing on --

22           THE COURT:  I understand your burden.

23           MS. SHERMAN:  -- on a ream of these.

24           THE COURT:  This is a different thing.  This is very

25  different.

1        MS. SHERMAN:  Yes, Your Honor.

2        THE COURT:  Very different.  And if some other group

3   of fractional owners wants to allow someone to buy them out,

4   and they have the original engines and they can trace the

5   props, I would do something similar.  There's no reason to

6   hang them up.

7        MS. SHERMAN:  So we'll be entering the omnibus final

8   order subject to the rights of any of the other fractional

9   owners or whatever else happens with anyone here today -- or I

10  don't even know if anybody else wants to be heard.  21 days to

11  object?

12       THE COURT:  Yeah.

13       MR. DONICA:  And we're willing --

14       THE COURT:  There won't be, though.

15       MR. DONICA:  We're willing to pay --

16       THE COURT:  Except that you can get the -- right now

17  you can get the copies of the missing pages.  Now.

18       MR. DONICA:  I appreciate it.  There may be an issue

19  that we may need some original documents.  In that case, we're

20  willing to pay the service provider to research those, copy

21  them, and to leave copies with the estate of everything that's

22  there now.

23       THE COURT:  Well, no originals can go until the

24  notice period has gone.  But you can get copies of everything.

25       MR. DONICA:  We will -- we anticipate we will be

```
 1   paying the service provider going forward to sort through the

 2   rest of it --

 3              THE COURT:  Right.

 4              MR. DONICA:  -- as we go.

 5              THE COURT:  Yeah, at your own expense, sure.  Okay,

 6   did you object?

 7              MR. LAMOUREUX:  No, Your Honor.  I just wanted to

 8   make it clear.  Mr. Donica and I spoke before the hearing and

 9   he mentioned it.  Clearwater -- my client, the landlord out at

10   the Clearwater-St. Pete, asserts a landlord lien.  And we will

11   be able to resolve those issues, so the propeller is returned

12   promptly.

13              THE COURT:  I'm not affecting your liens at all.

14              MR. LAMOUREUX:  I know that.  I know that, Your

15   Honor.

16              THE COURT:  Lifting the stay preserves the status

17   quo vis-a-vis third parties.

18              MR. DONICA:  Right.  I'll deal with Mr. Lamoureux on

19   that.  We've already agreed to give him the --

20              THE COURT:  Okay.

21              MR. DONICA:  -- information that he was --

22              THE COURT:  21 days for others to seek

23   reconsideration.  Copies of the logbook must be provided now

24   but at the expense of your client.  You can do whatever you

25   want to go get your other props, remembering that if they are
```

1   property of the estate, this order does not provide you

2   permission to use property of the estate.

3          MR. DONICA:  Right.  Well, we're talking about the

4   props that were purchased with the aircraft.  They're free and

5   clear of all -- unless they're held by a service provider,

6   then that lien is specific to us and not to anybody else --

7          THE COURT:  Right.

8          MR. DONICA:  -- or the estate.

9          THE COURT:  You just want to make sure that the prop

10  numbers are not estate property.

11         MR. DONICA:  Right.  We will.

12         THE COURT:  Okay.  You can give me the proposed

13  order.  Run it by Ms. Sherman, please, first.

14         MR. DONICA:  Will do.  Thank you, Your Honor.

15         THE COURT:  Thank you.

16         MR. DONICA:  And, Your Honor, may we be excused.

17         THE COURT:  You are excused.

18         MR. DONICA:  Thank you.

19         MS. SHERMAN:  Your Honor, if we could, while we're

20  on the stay relief motions, Mr. Glenn had filed a motion for

21  relief from stay, and I believe it's seeking the limited --

22  it's N102SL, and I believe it's seeking limited stay relief.

23         THE COURT:  And he's not here.

24         MS. SHERMAN:  Mr. Glenn came in before the hearing.

25  He had some sort of minor surgery yesterday and he was --

1    asked me if I would represent to the Court why he was not

2    here.  And we had already indicated to Mr. Glenn, as long as

3    he wants the omnibus order, whatever it turned out to be

4    today, that the estate had no objection.  And he could upload

5    the omnibus order --

6             THE COURT:  Good.

7             MS. SHERMAN:  -- with the correct information

8    plugged in.

9             THE COURT:  Then I'll grant it on that basis.  Thank

10   you.

11            MS. SHERMAN:  The next one is the stay relief order

12   by LW Air.  LW Air is Mr. Plotko's client.

13            THE COURT:  Right.

14            MS. SHERMAN:  It's a bird of -- a bit of a different

15   feather.  They terminated -- it was the single owner of all

16   the planes, LW Air, I, II, III, IV and V.  They terminated the

17   leases pre-bankruptcy.  And the planes, with whatever engines

18   and propellers were attached, were given to LW Air pre-

19   bankruptcy.

20            And I believe they are seeking a limited stay relief

21   order, but I'll defer to Mr. Plotko as to exactly what they're

22   seeking.  I know it's changed -- or we had discussed it might

23   change when I spoke with him late yesterday.  To the extent

24   that what they're seeking is consistent with the omnibus stay

25   relief order, the estate has no objection.

1          THE COURT:  Okay.  Mr. Plotko, tell me about yours.

2          MR. PLOTKO:  Thank you, Your Honor.  As I mentioned

3    before, we are five different owners of airplanes and parts.

4    We terminated our management agreement with Avantair prior to

5    the petition date and we were able to obtain our aircraft

6    including all of our engines and most of our propellers and

7    parts that were on those planes.

8          After the bankruptcy filing occurred, some of our

9    vendors, including Dallas Airmotive and Signature, they would

10   start -- they actually stopped working on the overhauls,

11   stopped working on whatever maintenance they were doing

12   because of the bankruptcy, and therefore that compelled us to

13   file the motion for a modification of the automatic stay.

14         The relief we're seeking pretty much tracks the

15   omnibus order.  It does not contain that paragraph 10 and it

16   does contain some modifications to it so that it applies to

17   third parties, and that it makes clear that it applies to

18   third parties.

19         I've shared a copy of the order with Dallas

20   Airmotive, Signature and the Trustee.  As of last night, I

21   thought I had a consensus with all the parties to agree to the

22   relief in the orders.  The order does provide for all non-

23   bankruptcy rights to be preserved, and it also states that

24   nothing is a determination of whether the stay is applicable

25   or not, or whether the assets are property of the estate or

1    not.

2            We have paid the VanAllen Group $1,300 per plane, or

3    $6,500, and we're asking for the Court to enter the limited

4    stay relief in the form we uploaded or docketed last night and

5    so that we can actually go forward and continue preserving our

6    planes.

7            THE COURT:  Okay.  The limited objection by Dallas

8    Airmotive, I'm not sure what you're asking for.  He's --

9            MR. MOHNEY:  Yes, Judge.  The point that we raised

10   there -- and I think we've addressed it in the order that

11   was uploaded -- was just that at this point the Trustee's

12   provision is this doesn't determine property of the estate or

13   an adjudication of whether the stay does or doesn't apply.

14           Since there's a provision in there that they want

15   us to do work on engines, and we have some other agreements

16   regarding other engines, we just wanted it clear in the order

17   that we're authorized to deliver to them the engines.  We'll

18   provide notice to the VanAllen Group when we do so, and

19   receive payment for the work that we've done.  And to me,

20   that's a provision we've discussed with the Trustee.

21           I suspect something like that should be in other

22   orders, but if we're being called upon to do work and to

23   deliver property, then of course we need to arrange for

24   payment and be authorized to give the property to someone else

25   without a final determination of whether it's estate property

1    or not.

2              THE COURT:  I thought the prior order said that

3    folks could remove planes subject to the estate's interest.

4    I would assume it would apply to engines too.

5              MR. MOHNEY:  That's correct, Judge.

6              THE COURT:  And we've allowed other owners to pay

7    lienors, like Teterboro, for example.  We gave an order that

8    says you can pay them.

9              MR. PLOTKO:  Your Honor, this is Mr. Plotko.  I

10   think we've addressed in that the form of order.  It is our

11   intent to work with Dallas Airmotive.  I mean, in fact, we

12   already have an arrangement in place to --

13             THE COURT:  Okay.  The proposed form of order that

14   Mr. Leeman uploaded, or someone did last night, that's an

15   agreed form of order?

16             MS. SHERMAN:  Your Honor, I'm not sure --

17             MR. PLOTKO:  I think the --

18             MS. SHERMAN:  Mr. Plotko, have I actually seen

19   that?  I have not been on my email since about 4:00 o'clock

20   yesterday.  I'm not sure that I actually looked at --

21             MR. PLOTKO:  It is the same order.

22             MS. SHERMAN:  I'm sorry?

23             MR. PLOTKO:  It's the same order we -- yeah, I sent

24   you yesterday afternoon.

25             THE COURT:  Ms. Garcia, give this to her.

1          (Courtroom clerk presents document to counsel.)

2          THE COURT:  Take a minute to look at it.  It was

3    uploaded as a proposed order, Docket Entry -- I think it's

4    302-1.

5          MS. SHERMAN:  (Conferring with counsel.)  Mr. Mohney

6    has the redline.  That will be more helpful.

7          (Reviewing documents.)

8          THE COURT:  I don't know that I'm going to be able

9    to confirm on a final basis that the planes are movant's

10   aircraft.

11         MS. SHERMAN:  Your Honor, I don't know if --

12         MR. PLOTKO:  Your Honor, we're not asking Your Honor

13   on a final basis to do anything with regard to a determination

14   -- a factual determination.  It's just for the automatic --

15   the temporary relief from the automatic stay.

16         THE COURT:  Well, that's what your wherefore clause

17   says.  That you want me to determine or confirm on a final

18   basis that the automatic stay does not apply to the aircraft,

19   which means that the estate has no interest in it.

20         MR. PLOTKO:  I'm sorry.  Are you looking at the

21   motion, Your Honor?

22         THE COURT:  I thought I was.  It's Document 255?

23         MR. PLOTKO:  Right.  The motion seeks both limited

24   and final relief so, yes, we will come back to you,

25   potentially, for that relief, but for now with respect --

1          THE COURT:  I'm just looking at your wherefore

2    clause.  It says -- it asks me to do one thing.  You want me

3    to enter an order that's attached or that has now been

4    uploaded, I guess, in a different form, confirm on a final

5    basis that the automatic stay does not apply to the aircraft,

6    which would mean I have to determine that there is no interest

7    in the aircraft owned by the estate.

8          MS. SHERMAN:  I think the order that Mr. Plotko

9    uploaded does not -- when he originally filed the motion, he

10   said:  Do you have a problem?  And I said:  I think if you'll

11   stick with the limited stay relief order format, you know,

12   we'll be fine with it.  And I believe he has conformed his

13   order to the limited stay relief with just the little tweak

14   for Dallas Airmotive that was mentioned.  He's not seeking the

15   final determination --

16         THE COURT:  Okay, so --

17         MS. SHERMAN:  -- and it has caveats in there that it

18   isn't.

19         THE COURT:  Does the proposed order then have a

20   blank for having a final hearing?

21         MS. SHERMAN:  Your Honor, under the new omnibus

22   procedures, he needs to file a notice --

23         THE COURT:  Okay.

24         MS. SHERMAN:  -- email it to 600 people, and do the

25   21 days negative notice.  And it has some other information in

1  it.

2          THE COURT:  Okay.  You mean follow the process, the

3  stay procedure process.

4          MS. SHERMAN:  That's correct, and I believe that's

5  Mr. Plotko's intention, is to follow that.

6          THE COURT:  Okay, then --

7          MR. PLOTKO:  I can -- that's correct.  I can

8  confirm.

9          THE COURT:  Now, Mr. Leeman, do you have a clean

10  copy with you?

11          MR. LEEMAN:  I do have a clean copy, Your Honor, and

12  could bring it up.  We also uploaded it through the --

13          THE COURT:  Right.  That's the one that I printed

14  out that I gave to Ms. Sherman.

15          MS. SHERMAN:  It is, Your Honor.

16          THE COURT:  But there's some handwriting on it.

17          MR. LEEMAN:  Oh, no.  I think that that was the one

18  that was filed in CM-ECF.  Then there's the other way to

19  upload the orders in whatever little system that is that you

20  guys have.

21          THE COURT:  Right.

22          MR. LEEMAN:  I think there should be a clean copy in

23  there.  I also have a clean copy here.

24          THE COURT:  Oh.  But I won't have it that quickly.

25          MR. LEEMAN:  Oh, okay.

1        THE COURT:  It goes through this long chain of

2   getting --

3        MR. LEEMAN:  All right.  I do have a clean one.

4   I will bring it up.  And also just maybe to assuage some of

5   the concerns.  The uploaded order does say it's granted in

6   part as provided herein.  So I understand the differences

7   between what's requested in the motion and the ultimate order

8   but --

9        THE COURT:  Okay.

10        MR. LEEMAN:  -- but I do think it's been -

11        THE COURT:  Okay, just why don't you give me what

12   you have --

13        MR. LEEMAN:  Okay.

14        THE COURT:  -- and Ms. Sherman can keep what she --

15   what I gave her that has some handwriting on it.  Nothing

16   substantive.

17        Okay, then we're -- I'm going to grant that in

18   the form of order that is not opposed by the Trustee, that

19   Mr. Leeman will deliver to me in just a second.

20        Okay, next?  What do you want to go to next?  Are

21   we down to just the sale?

22        MS. SHERMAN:  We've got the sale and we've got the

23   landlord's motion for relief from stay.  I think the sale

24   should be pretty non-controversial, hopefully.  This is a

25   plane; it is not a Piaggio P180.  Did you want to --

1          MR. LEEMAN:  Yes, may I approach?

2          THE COURT:  Yes, please.

3      (Document presented to Court.)

4          THE COURT: Thank you.

5          MR. LEEMAN:  You're welcome.

6          THE COURT: Go ahead.

7          MS. SHERMAN:  It was a plane that was owned by

8  Aircraft Support, LLC, which is a hundred percent subsidiary

9  of the Debtor.  It's a Socata TBM700 aircraft and we've

10  identified it by serial number in the motion.

11          It was a part of the fractional plea and as best we

12  understand, this was the plane that the corporate officers

13  flew on on business or personal business, as the case may be.

14  The Debtor was making the payments on the plane and they were

15  a guarantor on the loan.

16          The loan is with Iberiabank and it's in the

17  approximate amount of 1.2 million.  There was a payment of

18  default in June, on June 27, 2013.

19          The bank approached the Trustee and said:  Gee,

20  rather than me just going out and selling this plane under

21  Article 9, and if there's any gravy for you in the plane --

22  and we believe the value of the plane to be substantially in

23  excess of the 1.2 million that's owed to the bank, they

24  proposed that the bank would retain, or we would retain, as

25  the Trustee as the 100 percent owner of the membership

```
 1    interests, and the bank, would retain a broker that had been

 2    selected by Synovus to market the plane.

 3            And then the proceeds would go first to reimburse

 4    Iberiabank to the extent that they have advanced money for

 5    insurance and storage and preservation and maintenance

 6    postpetition to preserve the plane.  Second, to their lien.

 7    Third, to any other liens.  And I believe Big Sky is the other

 8    entity that has a lien on the plane.  And then the balance

 9    would go to the estate.

10            The minimum sales price that we've proposed was

11    1.6 million, and if the plane were to sell at that number,

12    that would result in approximately 200,000 to the estate.  I'm

13    told that there's -- well, actually I've seen it.  There's a

14    letter of intent out there that is contingent on the condition

15    of the plane presently.

16            Once we have an offer that is acceptable, we would

17    be filing it with the Court on 20 days negative notice with an

18    opportunity to anybody to object.  I understand that

19    Iberiabank and the broker have received from Big Sky some

20    paperwork which would indicate that they in fact have done

21    work on this plane.

22            There was concern that maybe the plane was liened

23    for work done on a Piaggio as opposed to the TBM Socata

24    because they have liens on some of those as well.  And there

25    was, I believe, a little bit of a typo in the claim of lien
```

1    form that made it unclear.

2           I believe we have verified and have come up with a

3    number, and I need to confirm that with counsel who is here

4    today for the first time in the courtroom that that's the

5    case.  And that's what we would be proposing, is a waterfall.

6    And if we need Your Honor's help to determine the amount of

7    the Big Sky lien, we would be back to ask for it.

8           So we're asking for approval to conduct the sale.

9    We've attached a proposed bid form to the motion that would be

10   required for any prospective -- well, it's actually not a bid

11   form.  The terms of sale include a lot of disclaimers as far

12   as airworthiness and as-is/where-is, you've inspected it, you

13   haven't relied on representations.

14          THE COURT:  Typical Chapter 7 Trustee stuff.

15          MS. SHERMAN:  Yes, Your Honor.  With the tweak that

16   it's not property owned by the estate.  It's property owned by

17   a subsidiary of the estate, and the Trustee would have stepped

18   into the Debtor's interest as the hundred percent member of

19   that subsidiary.

20          THE COURT:  This is the only asset in that LLC?

21          MS. SHERMAN:  To my knowledge, Your Honor, and I

22   don't -- I'm not aware of any other liabilities.

23          THE COURT:  All right.  And the Debtor is the

24   managing member and sole member of the LLC?

25          MS. SHERMAN:  Yes, Your Honor.

1          THE COURT:  Okay.  Then clearly she can do this,

2    obviously, and I see the disclaimer.  Okay.  And if Big Sky is

3    in the mix, again how much does the estate get out of this

4    sale, assuming that the one six holds?

5          MS. SHERMAN:  Roughly 200,000 was the last

6    spreadsheet that I was furnished.

7          THE COURT:  Okay.

8          MS. SHERMAN:  You know, the number changes with

9    Iberiabank --

10         THE COURT:  Mr. Garner, any comment?

11         MR. GARNER:  I'm all for it.

12         THE COURT:  He's all for it.  Okay.

13         MS. SHERMAN:  Well, Big Sky and the Trustee would

14   both be out of the money if Iberiabank decides to --

15         THE COURT:  Right.

16         MS. SHERMAN:  There is an outside date of December

17   31 for a sale.  And if at that point it hasn't sold --

18         THE COURT:  That's fine, and --

19         MS. SHERMAN:  --- they'll get stay relief to the

20   extent it might apply, and all bets are off.  But the hope was

21   that maybe perhaps we could bring a little bit of money out of

22   this for both Big Sky and the Trustee by all working together.

23         THE COURT:  Right.  And Iberiabank is also willing

24   to pay to rent the courthouse?

25         MS. SHERMAN:  I'm sorry?

1        THE COURT:  Iberiabank is also willing to pay to

2   rent the courthouse?  Is there a carveout?

3        MS. SHERMAN:  I'm sorry?  Rent the courthouse?

4        THE COURT:  If you're going to rent the courthouse

5   to have sales, you should pay the rent.  Is there any carveout

6   provision?

7        MS. SHERMAN:  Well, we're getting $200,000, assuming

8   it sells for enough, Your Honor.

9        THE COURT:  Okay.

10        MS. SHERMAN:  That's in essence the carveout.

11        THE COURT:  What about --

12        MS. SHERMAN:  It's technically not property of the

13   estate.  It was a fairly --

14        THE COURT:  Yeah, but you could just abandon it.

15   And, you know, instead if she's spending estate money to sell

16   it, there should be some quid pro quo for the benefit of

17   having an expedited efficient process that will pay the lien

18   in full.

19        MS. SHERMAN:  I will defer to counsel for

20   Iberiabank, who is on the phone, as to McLachlan --

21        THE COURT:  We do secured creditor sales all

22   the time here, but I always say if you want to rent the

23   courthouse, you've got to pay the rent because the carrying

24   costs and the -- whatever it is that the lender would bear

25   outside of bankruptcy are, you know, very much ameliorated

1    if you have it in bankruptcy.

2          So I would expect that when it comes time to divvy

3    up the proceeds, that I would see something in there that

4    would be a credit for costs.  I'm asking Mr. McLachlan that;

5    he can't see me because he's on the phone.

6          MR. MCLACHLAN:  Yes, Judge.  And I understand that,

7    but I do think that the motion is appropriate, and to the

8    extent provided in the motion, Doc. No. 250.

9          THE COURT:  Well, I'm going to reserve jurisdiction

10   to see whether there is some cost shifting.  This is not my

11   rule, rent the courthouse, pay the rent.  It's Judge Gerber's

12   rule and I believe in it.

13         And I understand that you've done some things to

14   make the aircraft more salable, and I'll take that into

15   consideration as well.  But I'll grant the motion with that

16   reservation of rights.

17         MS. SHERMAN:  Thank you, Your Honor.

18         THE COURT:  If the Trustee doesn't ask for anything,

19   then the Trustee doesn't ask for anything.  If the Trustee

20   asks for something reasonable, then we'll have a hearing on

21   it.

22         MS. SHERMAN:  Your Honor, if we get to the point

23   where there's not going to be money to flow down to the

24   estate, or it's going to be a dribble, we'll take that issue

25   when we get there.  The thought was, when we filed this

```
 1   motion, was that there was going to be several hundred

 2   thousand.  And so that was -- that was a nice tip.

 3          THE COURT:  Okay.  All right, thank you.  Let me go

 4   back to Mr. Glenn's.  I forgot to acknowledge the Signature

 5   limited response.  I think it's taken care of in the form of

 6   order that I agreed to enter.

 7          I'd like for the form of order to look like the one

 8   that Mr. Leeman gave me insofar as Mr. Leeman's proposed order

 9   deals with the Dallas Airmotive limited objection.  And it

10   says -- it refers to it specifically and it says it's resolved

11   by this order.  So Mr. Glenn should parrot that phrase.  And

12   Signature counsel, let me see, is Mr. Crosnicker?

13          MR. CROSNICKER:  Crosnicker, Your Honor.  Yes, I'm

14   here.

15          THE COURT:  Okay, so get with --

16          MR. CROSNICKER:  Yeah, we don't have any objection

17   to the form of order because he tracked the omnibus order and

18   indicated to us that they would pay any amounts for storage

19   costs before taking possession of the plane.  So Mr. Plotko

20   satisfied or concerns and we didn't have any objection with

21   the form of order.

22          THE COURT:  Okay.  I've got that with respect to

23   the LW.  But on Soldier Creek, are you going to get with

24   Mr. Glenn?

25          MR. CROSNICKER:  Well, Your Honor, I believe it's
```

1  resolved there too, because the Trustee informed the Court

2  that Mr. -- that the Soldier Creek order would be the same

3  as the omnibus order that the parties had negotiated --

4            THE COURT:  Right, but I --

5            MR. CROSNICKER:  -- so I don't have any --

6            THE COURT:  Yes, but my point is I want the phrase

7  in there that tracks the fact that I took into consideration

8  your objection.

9            MR. CROSNICKER:  Oh, that's fine, Your Honor.

10           THE COURT:  Okay, good.  Thank you.  All right, now

11 we're down to Mr. Lamoureux.

12           MS. SHERMAN:  Do we need to talk?

13           MR. LAMOUREUX:  Yeah, we -- Your Honor, we were

14 having some discussions when the Court started, and I think

15 we came a little bit late.  I think we're probably five, ten

16 minutes away in trying to wrap our discussions up.

17           THE COURT:  Good.  Okay, then let's do this. So let

18 me talk about housekeeping.  Ms. Garcia knows that she's going

19 to enter an order directing response on the motion to sell the

20 Piaggio.

21           COURTROOM CLERK:  Right.

22           THE COURT:  14 days.  Set the hearing after that.

23           We've got some other matters that were new, or that

24 we haven't set for hearing.  Just wanted to see whether any

25 of those things are things that we should discuss, even

1    preliminarily, regarding scheduling.

2            Those are the expedited motion for stay relief filed

3    by Mr. Mohney.

4            MR. MOHNEY:  Your Honor, I spoke with Ms. Garcia

5    this morning and it's been set for the 29th at 10:00 o'clock.

6            THE COURT:  Okay.

7            MR. MOHNEY:  We've been exchanging an order with the

8    Trustee and are awaiting comments.

9            THE COURT:  Okay.  The motion that I have referenced

10   earlier that Mr. Gibbs filed, the scheduling on that, would

11   the 29th work?

12           MR. GIBBS:  Yes, Your Honor.

13           THE COURT:  Okay.  We'll do it at the same time

14   as Mr. Mohney's.  And then there's the unopposed motion

15   for limited relief filed by Mr. Kobert.  He had made some

16   appearances here before, but apparently his group wants

17   something on a limited basis.  Should I set that for the 29th

18   as well?  Ms. Sherman?  Ms. Scharrer?

19           MS. SHERMAN:  That makes sense, Your Honor.

20           THE COURT:  Okay.

21           MS. SHERMAN:  I think it's limited relief.

22           THE COURT:  Good.  Yes, it does.  That's what it

23   says.  Okay, here you go.  All right, let's take a ten-minute

24   break -- well, make it 15 minutes, okay?  Come back at 1:00.

25   That'll give Ms. Garcia time to get a little something to eat.

```
 1    And anyone that doesn't come back is excused.  And anyone that

 2    wants to hang up, hang up.  If you all hang up, that's fine.

 3    Thank you all.

 4              MR. RIEDEL:  Thank you, Your Honor.

 5              UNKNOWN PHONE SPEAKER:  Thank you, Your Honor.

 6              (Recess taken from 12:57 p.m. to 1:23 p.m.)

 7              COURTROOM CLERK:  All rise.  Court is now in

 8    session.

 9              THE COURT:  Please have a seat.  I'll take roll

10    again so we'll have appearances for this segment.  Okay,

11    Applegate?

12        (No response.)

13              THE COURT:  Not here.  Crosnicker?

14              MR. CROSNICKER:  Present.

15              THE COURT:  Garlove?

16        (No response.)

17              THE COURT:  Not here.  Plotko?

18              MR. PLOTKO:  Present.

19              THE COURT:  Goldberg?

20        (No response.)

21              THE COURT:  Not here.  McLachlan?

22        (No response.)

23              THE COURT:  Not here.  Anyone on the phone whose

24    name I didn't call?

25        (No response.)
```

1          THE COURT:  Good.  In the courtroom, we have Mr.

2    Andersen, Mr. Falkner, Ms. Scharrer, Ms. Sherman, Mr. Appleby,

3    Mr. Lamoureux, Mr. Mohney, Mr. Verona, Mr. Garner, for the

4    Avantair hearing.  The rest of you in the courtroom who are

5    here, are you here for Avantair or something else?

6          (Inaudible.)

7          THE COURT:  Something else?  Okay.  All right,

8    Mr. Lamoureux, you've been so patient.  I was hoping that

9    you were out here talking with Mr. Riedel and that Piaggio

10   had agreed just to buy everything lock, stock and barrel

11   and --

12         MR. LAMOUREUX:  I will tell --

13         THE COURT:  -- end my case.

14         MR. LAMOUREUX:  I will tell you that I did speak

15   with Mr. Riedel about that and they are strongly considering

16   buying a significant amount of the stuff but --

17         THE COURT:  Okay.

18         MR. LAMOUREUX:  -- I don't want to speak out of

19   turn.

20         THE COURT:  So tell me, is there something you have

21   to announce --

22         MR. LAMOUREUX:  Yeah, I think we have --

23         THE COURT:  -- regarding the landlord's motion?

24         MR. LAMOUREUX:  -- an announcement, Your Honor, with

25   respect to our --

1               THE COURT:  Go ahead.

2               MR. LAMOUREUX:  Okay.  We reached the following,

3   and if I can just read down.  Beginning on October 15th,

4   the monthly rent for the facility will be $16,500 per month.

5   And that's going to include rent, estimated taxes, utility.

6   Basically that's going to be the all-in number on a monthly

7   basis.

8               THE COURT:  Beginning November?

9               MR. LAMOUREUX:  Beginning October 15th.  And let me

10  give you the periods, okay?

11              THE COURT:  Okay.

12              MR. LAMOUREUX:  The monthly rent, which shall run

13  from October 15th through November 14th.  That's the first

14  period.

15              THE COURT:  Okay.

16              MR. LAMOUREUX:  And then from November 15th through

17  December 14th, okay?

18              THE COURT:  Okay.

19              MR. LAMOUREUX:  Let's talk about when the payments

20  are due.  An entirely monthly rent payment will be due at the

21  beginning of the rental period, okay?

22              THE COURT:  Okay.

23              MR. LAMOUREUX:  For the first rental period, that

24  would be due October 31, okay?

25              THE COURT:  I'm confused.

1       MR. LAMOUREUX:  The --

2       THE COURT:  You're telling me that the rental period

3  is October the 15th --

4       MR. LAMOUREUX:  October 15th through November 14th,

5  however --

6       THE COURT:  But you're saying you want it in

7  advance.

8       MR. LAMOUREUX:  -- starting October 31, that's when

9  -- instead of them paying on the 15th -- they've got to get

10  the cash in, Your Honor -- they're going to pay us that first

11  payment for the entire month is then going to be due October

12  31.

13       THE COURT:  Okay.

14       MR. LAMOUREUX:  Okay?  There'll be no proration of

15  the rental for partial use.

16       THE COURT:  Okay.

17       MR. LAMOUREUX:  Failure to make a timely rental

18  payment will constitute default and the automatic stay will be

19  terminated after two days, you know, prior written notice to

20  the Trustee and counsel of the payment default if it's not

21  cured.

22       THE COURT:  Two business days.

23       MR. LAMOUREUX:  Well, I don't know.

24       THE COURT:  Come on.  Friday at midnight to Saturday

25  at midnight.  Saturday at midnight to Monday.  You could start

1    throwing stuff out --

2              MR. LAMOUREUX:  Okay.

3              THE COURT:  -- on Monday morning?.  Nah.

4              MR. LAMOUREUX:  Two business days.  Thank you, Your

5    Honor.  Beginning on November 4th --

6              THE COURT:  Okay.

7              MR. LAMOUREUX:  -- the Trustee will remove all the

8    furniture, fixtures and equipment from the single story office

9    and place over on the two-story side.  The one issue that

10   we're working on is on the single story side, Your Honor,

11   there's a roll tooth (phonetic) -- like a big roll-in room.

12             Some of the Debtor's assets are large.  And we're

13   looking at whether or not they can roll that into that room

14   and lock it down, or if those assets can be bunched together,

15   maybe padlocked, and placed into the corner of a hangar.

16             Those are the two options, and I've just got to talk

17   to the client as to which one, about that.  But that looks

18   like what we're going to do, and I'll work with Ms. Sherman on

19   that.

20             The automatic stay with respect to the Debtor's

21   assets will terminate and the lease will be deemed rejected by

22   the Trustee on December 15th, 2013, allowing the landlord to

23   exercise all it's state law rights, remedies, claims for the

24   assets including the FF&E and equipment.

25             THE COURT:  The rent for the period November 15th

1  through December 14th is due November 15th?

2          MR. LAMOUREUX:  Is due November 15th.

3          THE COURT:  Okay.

4          MR. LAMOUREUX:  Not speaking out of turn, Your

5  Honor, I think it is the Trustee's intention to hold an

6  auction.  Whether it is on-site or off-site, is left to be

7  done, but I at least wanted the Court to be aware of that.

8          THE COURT:  Okay.

9          MR. LAMOUREUX:  As the Court is aware, there are a

10  number of cannibalized planes.  I think there are now five

11  cannibalized planes in the hangar.  And even though they

12  are owned by fractional shareholders, Your Honor, and the

13  automatic stay does not apply, we're looking for basically a

14  comfort order that the automatic stay with respect to those

15  cannibalized planes is terminated as of October 17th, but

16  we'll take no action until October 24th.

17          The reason being is to provide all these plane

18  owners:  Hey, look, the automatic stay is terminated and we're

19  going to be, you know, proceeding forward.

20          I can tell the Court that we have -- I've spoken

21  previously before the hearing with Mr. Verona.  I believe he

22  has at least one, maybe --

23          MR. VERONA: Two.

24          MR. LAMOUREUX:  -- maybe two planes there, about

25  resolving landlord liens and that sort of thing.  And we have

1   worked with Iberia previously to get their plane out, and

2   we've worked with a person with a propeller to get their prop

3   out, and we've been told there's another one.  But we'll work

4   with these fractional shareholders or owners to get their

5   planes out.

6           With respect to -- here's the other issue, Your

7   Honor, that I wanted to alert the Court to.  The landlord had

8   an agent out there who leased a hangar.  It's part of this big

9   premises that the landlord owns.  It owns this hangar, another

10  hangar and some other space.

11          That tenant was called Corporate Jet Solution.

12  Corporate Jet Solution was the entity that was allowing the

13  Trustee on, bringing in the jets that were stored in the

14  hangar, rolling them in and out.  They have left the premises.

15  They've gone to a new location up in Brooksville and they're

16  no longer there.

17          A new tenant called Clearwater Aviation is coming

18  in.  Technically, the lease is going to start November 1,

19  although I believe they are transitioning right now into that

20  space.  They are going to be, or are, the landlord's agent.

21          Here's the issue, Your Honor.  They're willing to be

22  the agent, but they're not going to, in essence, perform those

23  services for free.  They charge 50 bucks an hour, billed on a

24  quarterly hour basis, and you have to have badges to get on,

25  or someone with a badge has got to let you on to the -- on to

1   the site.  And they're going to bill people if they want

2   access.

3          The Trustee -- and so the Trustee and her counsel

4   need to get out there.  We'll authorize our agent but they're

5   going to have to deal with them on that money issue.  The

6   Trustee is going to --

7          THE COURT:  No access absent payment.

8          MR. LAMOUREUX:  Right.  The Trustee is going to

9   reach out to the por -- out to the aviation authority to see

10  if they can get some temporary access to obviously minimize

11  the estate, but I at least wanted the Court to be aware of

12  that.

13         THE COURT:  All right.

14         MR. LAMOUREUX:  There was also a security deposit,

15  Your Honor, that was deposited.  All rights that the Trustee

16  would have and that we would have as to how those payments

17  would be applied, will be issues that we will deal with at

18  another time.

19         The other issue, Your Honor, is the rental payment

20  of sixteen five.  My client takes the position that the rent

21  is far greater than that, in excess of 30.  In order to

22  resolve these type of issues and get some cash flow in them,

23  we've agreed on these amounts.

24         This amount, this settlement, is not admissible as

25  to what the value is of the rent, when we get into how much

1    it's administrative --

2              THE COURT:  This is not a settlement of the

3    administrative priority.

4              MR. LAMOUREUX:  Correct.

5              THE COURT:  This is only a payment for use --

6              MR. LAMOUREUX:  Correct.

7              THE COURT:  -- and it's temporary.

8              MR. LAMOUREUX:  Correct.  And it can't be used --

9    you know, well, we only paid -- we paid sixteen five.  And

10   this is trying to resolve those issues.  And if and when we

11   have those disputes and we can't resolve them and we've got to

12   try them, we'll deal with those issues at that time.

13             MS. SHERMAN:  That's correct, Your Honor.

14   Everybody's reserving all rights --

15             THE COURT:  That's fine.

16             MS. SHERMAN:  -- to argue about reasonable rental

17   value, applications, security deposits.  This is just what

18   we've agreed upon for 60 days -- the next 60 days.

19             MR. LAMOUREUX:  I think that -- was that pretty much

20   it?

21             MS. SHERMAN:  I believe that's it.  And, Your Honor,

22   we may need -- I don't know, but it's possible --

23             THE COURT:  And reasonable rental value would be an

24   issue only after termination of the -- or rejection of the

25   lease.

1          MS. SHERMAN:  Your Honor, yes.  The rent reserved

2     in the lease is not the 35 number, but this is an issue for

3     another day.

4          THE COURT:  Fine.

5          MS. SHERMAN:  I think if the landlord wants to

6     deviate from the rents and the lease and take it up, then

7     we'll figure that out at a later time.

8          THE COURT:  That's fine.

9          MS. SHERMAN: It is possible that we may need some

10    assistance from Your Honor in the form of a court order

11    getting Ms. Scharrer and/or me and/or our agent a badge to

12    get on and off the airport.

13          I've been working with operation services.  It took

14    me two hours to sweet-talk my way in last night because the

15    landlord's agent was not available.  And they made somebody

16    available, and I'm supposed to chat with Mr. Tillman this

17    afternoon.

18          THE COURT:  Put a paragraph in this that says the

19    Trustee and her counsel shall be granted access by the --

20    whatever the governing body is, provided they satisfy the

21    reasonable security screening requirements of that entity.

22          MS. SHERMAN:  Actually, I'm told it's a driving

23    test, Your Honor, to make sure you know where the runways are

24    so you don't get run over or run into planes.

25          (Laughter.)

1          MS. SHERMAN:  I kid you not.

2          THE COURT:  So you're 16 again, taking that little

3    driving test.

4          MS. SHERMAN:  And when you drive a mini-Cooper,

5    you're very careful about big planes so -

6          THE COURT:  I'm sure.

7          MS. SHERMAN:  Thank you, Your Honor.

8          MR. LAMOUREUX:  Thank you, Your Honor.

9          THE COURT:  Okay, thanks.  Mr. Lamoureux, you will

10   provide the form of order --

11         MR. LAMOUREUX:  I will, Your Honor.

12         THE COURT:  -- and run it by Ms. Sherman.

13         MR. LAMOUREUX:  Thank you.  And I will, Your Honor.

14         MS. SHERMAN:  Your Honor, may that include our

15   agents as well, whoever our auctioneer person is, that they

16   will be granted access, provided they otherwise --

17         THE COURT:  Yes.

18         MS. SHERMAN:  -- satisfy the qualifications?

19         THE COURT:  Yes.

20         MS. SHERMAN:  Thank you, Your Honor.

21         THE COURT:  Okay.  I've got some *pro hac vice*

22   motions that I will be accepting orders on.  I don't know if

23   the lawyers are still here for that.

24         Let's see.  I think one was Mr. Plotko, one was

25   Mr. Schmidt.

1          MR. LAMOUREUX:  May I be excused, Your Honor.

2          THE COURT:  You may.

3          MR. PLOTKO:  I'm sorry, Your Honor.  Mr. Plotko's

4    on --

5          THE COURT:  Okay.  Go ahead and -- you've designated

6    Donald Kirk as your local designate.  That's fine.  Send in a

7    proposed order, please.  And then Mr. Schmidt's --

8          MR. PLOTKO:  Will do.

9          THE COURT:  -- no longer on the line, huh?  Oh, he's

10   with the same firm.

11         MR. PLOTKO:  That's right.  He's at my firm, but

12   he's not on the line.

13         THE COURT:  Okay.  Well, then go ahead and have him

14   submit a proposed order as well.  Okay?

15         MR. PLOTKO:  Thank you, Your Honor.

16         THE COURT:  And Mr. Mohney, the Teterboro issue, you

17   are also in agreement.  I see you filed a limited objection to

18   that one too.  You're in agreement with the resolution that

19   they announced, right?

20         MR. MOHNEY:  Yes.  We're part of that agreement,

21   Your Honor, and we anticipate being part of the order as well.

22         THE COURT:  Okay.  Just make sure that there's some

23   mention in the order of your paper, which is 289.

24         MR. MOHNEY:  Okay.  We'll do that, Your Honor.

25         THE COURT:  Okay, good.  Thank you all.

1          MR. MOHNEY:   Thank you.

2          MS. SCHARRER:   Thank you, Judge.

3          MS. SHERMAN:   Thank you, Your Honor.

4          MR. PLOTKO:   Thank you.

5      (Proceedings concluded at 1:35 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>CERTIFICATE</u>

I certify that the foregoing is a correct transcript prepared on an expedited basis to the best of my ability from the logs and digitally recorded audio proceedings of the above-entitled matter.


_____      October 25, 2013
Cheryl Culver (CER, CCR)                Date
Transcriber



I certify that the foregoing is a federally certified transcript authenticated by:


_____
Kimberley S. Johnson (CVR-M)
Certified Verbatim Reporter Master

JOHNSON TRANSCRIPTION SERVICE
7702 Lake Cypress Drive
Odessa, Florida 33556
813-920-1466
kgjjts@aol.com