IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION


- - - - - - - - - - - - - - - - :
IN RE:                          :
                                :
AVANTAIR, INC.                  :     Case No. 8:13-bk-09719-CPM
                                :
          Debtor                :     Chapter 7
                                :
- - - - - - - - - - - - - - - - :


                              U.S. Courthouse
                              801 N. Florida Avenue
                              Tampa, Florida 33602
                              Held November 22, 2013


TRANSCRIPT OF HEARING

1-Continued Hearing on Motion to Approve Compromise of
Controversy with fractional owners of N169SL, filed by Lynn
Welter Sherman, Attorney for Trustee on behalf of Trustee
Beth Ann Scharrer (Doc. #270, 372, 398, 407); 2-Continued
Hearing on Motion to Approve Sale Free and Clear of Liens
and to Approve Sale and Bid Procedures N169SL, filed by Lynn
Welter Sherman, Attorney for Trustee on behalf of Trustee
Beth Ann Scharrer (Doc. #271, 372, 398, 407)



BEFORE THE HONORABLE CATHERINE PEEK MCEWEN
UNITED STATES BANKRUPTCY JUDGE



PROCEEDINGS DIGITALLY RECORDED BY COURT PERSONNEL
TRANSCRIPT PRODUCED BY COURT-APPROVED TRANSCRIPTION SERVICE

_____

**JOHNSON TRANSCRIPTION SERVICE**
7702 Lake Cypress Drive
Odessa, Florida 33556
(813) 920-1466

```
APPEARANCES:


For Various Owners              AMANDA APPLEGATE, Esquire
of Aircraft                     Aerlex Law Group
(Appearing by phone)            2800 28th Street
                                Suite 130
                                Santa Monica, California 90405
                                310-392-1271


For Various Owners              JAY VERONA, Esquire
of Aircraft                     R. QUINCY BIRD, Esquire
                                Shumaker, Loop & Kendrick, LLP
                                101 E. Kennedy Blvd.
                                Suite 2800
                                Tampa, Florida 33602-5150
                                813-229-7600
                                jverona@slk-law.com
                                qbird@slk-law.com


For Hutchison Advisors,         ROY S. KOBERT, Esquire
Inc. (Appearing by phone)       Broad and Cassel
                                390 N. Orange Avenue
                                Suite 1400
                                Orlando, Florida 32801
                                407-839-4200
                                rkobert@broadandcassel.com


For Beth Ann Scharrer           LYNN WELTER SHERMAN, Esquire
Chapter 7 Trustee               Adams and Reese LLP
                                101 E. Kennedy Boulevard
                                Suite 4000
                                Tampa, Florida 33602-5152
                                813-402-2880
                                lynn.sherman@arlaw.com


For Corrections Corporation     DONALD R. ANDERSEN, Esquire
of America of Tennessee         Stites & Harbison, PLLC
                                303 Peachtree Street, N.E.
                                Suite 2800 SunTrust Plaza
                                Atlanta, GA 30308
                                404-739-8800
                                dandersen@stites.com
```

```
APPEARANCES:
(Continued)


For Dallas Airmotive, Inc.      MARVIN MOHNEY, Esquire
(Appearing by phone)            Law Office of Marvin Mohney
                                541 Bay Court
                                Heath, Texas 75032-7630
                                214-698-3011


For Global Aerospace, Inc.      KEITH APPLEBY, Esquire
                                Hill, Ward & Henderson, P.A.
                                101 E. Kennedy Boulevard
                                Suite 3700
                                Tampa, Florida 33602-5195
                                813-221-3900
                                kappleby@hwhlaw.com


For Piaggio North America       AMANDA E. CHAZAL, Esquire
                                Stichter Riedel
                                110 E. Madison Street
                                Suite 200
                                Tampa, Florida 33602
                                813-229-0144
                                achazal@srbp.com


For TurboProp East              ISABEL W. COLONNA, Esquire
(Appearing by phone)            1 West Street
                                Suite 70
                                Pittsfield, MA 01201
                                413-896-5844


Also by Phone                   Ana Alfonso
                                Richard Mikels
                                Unknown Others




Reporter's Note                 Quotations are for readability
                                purposes and not intended to
                                reflect direct quotes
```

```
 1          Tampa, Florida, November 22, 2013, 1:30 p.m. calendar

 2                            * * * * *

 3      (Courtroom recording systems were started at 1:39:54 p.m.

 4  with hearing in progress.)

 5          THE COURT:  .....representing Aerlex Law Group.

 6          Isabel Colonna?

 7          MS. COLONNA:  Good afternoon, Your Honor.  Present.

 8          THE COURT:  Thank you.  And you represent TurboProp

 9  East.

10          Mr. Holland?

11          COURTCALL OPERATOR:  Mr. Holland has not dialed in.

12          THE COURT:  All right, thank you.

13          Roy Kobert?  I can barely --

14          MR. KOBERT:  Good afternoon, Your Honor.  Roy Kobert

15  appearing.

16          THE COURT:  Okay, good.  That's for Hutchison

17  Advisors, Inc.

18          Marvin Mohney?

19          MR. MOHNEY:  Present, Your Honor.

20          THE COURT:  All right.  That's for Dallas Airmotive,

21  that appearance.

22          And last but not least, Margot Schonholtz.

23          COURTCALL OPERATOR:  She has not dialed in, Your

24  Honor.

25          THE COURT:  All right, thank you.  All right, in the
```

1   courtroom, we have?

2           MR. ANDERSEN:  Your Honor, Donald R. Andersen

3   speaking today.

4           THE COURT:  All right.

5           MR. ANDERSEN:  On behalf of CCA of Tennessee.  Thank

6   you, Judge.

7           THE COURT:  All right, thanks.  Glad your voice is

8   back.

9           MR. ANDERSEN:  Thank you, Your Honor.

10          MR. BIRD:  Good afternoon, Your Honor.  Quincy Bird,

11  and I'm joined by Jay Verona, on behalf of a group of co-

12  owners including the co-owners of N169SL.

13          THE COURT:  All right, thank you.

14          MS. CHAZAL:  Good afternoon, Your Honor.  Amanda

15  Chazal with Stichter, Riedel, Blain & Prosser, on behalf of

16  Piaggio.

17          THE COURT:  All right.  Will you spell that, because

18  Ms. Mills has not been around in this case before?

19          MS. CHAZAL:  Chazal or Piaggio?

20          THE COURT:  Both.  She probably knows the Chazal

21  part.

22          MS. CHAZAL:  Piaggio is P-i-a-g-g-i-o.

23          THE COURT:  Thank you.

24          MR. APPLEBY:  Good afternoon, Your Honor.  Keith

25  Appleby of Hill Ward Henderson on behalf of Global Aerospace.

1          THE COURT:  All right.  Thank you.

2          MS. SHERMAN:  Good afternoon, Your Honor.  Lynn

3   Welter Sherman representing Beth Ann Scharrer as the Chapter 7

4   Trustee, and she was unable to attend this afternoon's

5   hearing.

6          THE COURT:  All right.  Thank you.  Okay, so now we

7   have the controversy over the compromise and the sale.  And as

8   I understand it, that involves a determination of, "What is a

9   plane?"  Is that correct or not?

10         MR. ANDERSEN:  Judge, I think that it candidly is --

11  I think it's a little different than that.  It's not simply

12  "What is a plane?"  I think it's more an issue of what are

13  interests in a plane.  And I'll preview a little bit of what

14  I will talk about, but I went back and had to look at some

15  property textbooks, and they reminded me that the issue is

16  always not the thing, but the interests in the thing and

17  who owns the interests and what those interests are.

18         So with all due respect, Your Honor, I think even if

19  we determine what the plane is, we'll still have to work on

20  the issue of what the interests are and who holds them.  And

21  that's -- so I think that'll be the overall issue today.

22         THE COURT:  Okay.

23         MR. BIRD:  I think we would essentially agree with

24  the substance of Mr. Andersen's comment, and I will not speak

25  on behalf of Lynn but -- it being her motion, but I think we

1   can move forward.

2          THE COURT:  Okay.  All right, so how do you want to

3   -- how do you want me to proceed.  Do you need to hear more

4   about what the Trustee's requesting to do?  I think I got a

5   sense of that.

6          MS. SHERMAN:  Your Honor, I think everybody's

7   probably heard enough from me on the motion.  I mean, clearly

8   we'd like to move forward with the compromise.  The proposed

9   compromise and a sale would bring $50,000 of much needed funds

10  into this estate for the benefit of all creditors.

11         I believe this is really pretty much an owner -- a

12  fractional owner issue, to be decided amongst the fractional

13  owners, and so it's probably appropriate to have Mr. Andersen

14  argue his objection, and then Mr. Verona and anybody else who

15  had -- I'm sorry, Mr. Bird or anybody else who had a response,

16  to argue those as well.

17         THE COURT:  Okay.  The first limited objection that

18  I have on the docket is by Mr. Andersen, so we'll start with

19  that one.  And then we'll go to the next one.

20         The next one was filed by -- well, it's a response

21  by Mr. Bird and Mr. Verona.

22         And then the joinder is Lockton.  Now, who

23  represents Lockton.  That was another --

24         MS. SHERMAN:  Brian Holland and Adam Alpert, and

25  he's not on the phone, Your Honor.

```
 1              THE COURT:  You know what?  I think -- didn't we --
 2    I'm trying to think if we cured their issue yesterday.
 3              MR. VERONA:  I think he was just joining in ours.
 4              MS. SHERMAN:  I believe he joined in Mr. Verona and
 5    Mr. Bird's response.
 6              THE COURT:  Oh, okay.
 7              MS. SHERMAN:  It was a me-too to them.
 8              THE COURT:  Okay, I got the -- all right, all right.
 9              MR. APPLEBY:  Your Honor, I would just say as well
10    that Mr. Alpert, I know, got pulled into another hearing much
11    like this one, that has gone all day that he's been in since
12    this morning.
13              THE COURT:  Okay.
14              MR. APPLEBY:  I ran into him on the way in.
15              THE COURT:  All right.  Then we'll start with Mr.
16    Andersen and then we'll shift over to Mr. Bird.  Okay.
17    Yesterday, you said you wanted to take some time.
18              MR. ANDERSEN:  Your Honor, if I may, what I'd like
19    to start off with is to talk procedurally about the limited
20    objection that we filed.  The CCA does not have an objection
21    to the compromise of settlement, that this is a -- that the
22    aircraft is an asset or is property of the estate.  And it
23    does not have an objection to the sale of the aircraft free
24    and clear of liens.
25              The objection that it has is limited to the
```

1    distribution of the proceeds that are set forth in that

2    settlement agreement.

3              THE COURT:  That's what Ms. Sherman described as the

4    waterfall, and it was the tail end remains.

5              MR. ANDERSEN:  Exactly, Your Honor.

6              THE COURT:  Except the compromise contemplates that

7    it -- when you say you have no objection, the compromise

8    contemplates that the tail end would be distributed in a

9    certain fashion.  So, in essence, you do object to the

10   compromise.

11             MR. ANDERSEN:  That's true, Judge.

12             THE COURT:  Okay.

13             MR. ANDERSEN:  But that's the -- and what I was

14   trying to do is just to be clear as to the extent of our

15   objection.

16             THE COURT:  Okay.

17             MR. ANDERSEN:  And to perhaps put this into

18   context, as the Court will recall, CCA has an interest in

19   three different aircraft, one of which is N162SL.  Two other

20   others, to round it out, are N138SL and the third is N162S --

21   excuse me, 164SL.

22             THE COURT:  And which one was the one that was sort

23   of a shell?

24             MR. ANDERSEN:  That one is 162SL, Your Honor.

25             THE COURT:  All right.

1          MR. ANDERSEN:  And frankly, that's the -- probably

2   the main reason for our objection at this point.  As the Court

3   will recall -- and I've got photographs here if the Court

4   needs to look at them again, but the Court obviously looked

5   at them carefully at the last hearing.

6          That aircraft has been totally dismantled.  The

7   engines are taken off of it.  The airframe has -- the landing

8   gear has been taken off of it.  In fact, I wasn't here this

9   morning for the hearing on the auction, although I did see the

10  order that's being circulated, so it looks like the auction is

11  going to go forward.

12         And that airplane is actually out there on the

13  premises at the airport at Clearwater.  And it's the objective

14  of the 162SL fractional interest holders to have that airplane

15  included in the auction because it frankly can't move from

16  there.  It doesn't have wheels and it would be very difficult

17  to move it at all.

18         And so one of the things that -- to frame the issues

19  here, Your Honor, we have reached an agreement among the

20  fractional shareholders on N162SL, to submit a settlement

21  agreement that is substantially identical to the one that the

22  Court has before it today on 169SL.

23         And the only difference -- let me put it this --

24  I'll put it this way.  The only material difference of

25  which I'm aware, particularly as to the waterfall, is that

1   the proposed distribution for the aircraft that's out at

2   Clearwater, 162SL, would provide that the ballots remaining --

3   and I've got a copy here for the Court.  If I may approach the

4   bench, I'll be happy to --

5           THE COURT:  Yes, please.  Give it to Ms. Mills.

6           MR. ANDERSEN:  (Presenting document.)  It's turned

7   to the correct page, I believe, Judge.

8           THE COURT:  Thank you.  All right.  I've got an

9   unfiled settlement agreement in my hand, and I have flipped

10  over to page 4.  The settlement agreement purports to be

11  between the settling owners and Beth Ann Scharrer with respect

12  to --

13          MR. ANDERSEN:  It's at the very end, Judge.  It's

14  more or less near the end.  It will identify the airplane.

15          THE COURT:  I'm looking for the -- I'm looking for

16  the description of the aircraft.

17          MR. ANDERSEN:  If you look at the very last page,

18  Judge.

19          THE COURT:  Okay.  I see.  N162SL, all right.  So

20  I'm on page 4.  You want me to look at small letter "f," that

21  paragraph?

22          MR. ANDERSEN:  Actually, small paragraph "e."

23          THE COURT:  "e."  This paragraph says, "Fifth, to

24  the extent of any remaining net proceeds, the balance shall

25  be divided as determined by the Bankruptcy Court.  This

1  settlement does not preclude any party, including any

2  Fractional Owner, from asserting an interest in the proceeds

3  from the sale of any other Aircraft or any other parts of any

4  other Aircraft, including engines and propellers managed by or

5  in the possession of the Debtor."

6          MR. ANDERSEN:  And, Judge, this -- I'll compare that

7  paragraph with "e" in the proposed settlement that we're here

8  about today, which said that "the balance shall be divided

9  among all Fractional Owners" -- and that's a defined term,

10  meaning the fractional owners in that aircraft -- "based

11  upon their respective ownership interests in the Aircraft (as

12  determined by the Bankruptcy Court in the Adversary Proceeding

13  or agreed to by all of the Fractional Owners in writing)."

14  And that's the text of the proposed settlement that we're here

15  about today.

16          Again, to put this in procedural context, the

17  settlement on 162SL, just so the Court will be aware, has

18  been circulated for signature, has been signed by all of the

19  fractional share owners except for, I believe, two.  And Ms.

20  Applegate's on the phone and she can verify this.  But one

21  gentleman who's in the hospital, and a second person who,

22  I believe, has said that their signature's in the mail.

23          And so as soon as those are received, this will

24  be ready to be uploaded.  And obviously because we want to

25  include this airplane in the auction in three weeks, time is

1  of the essence, so we definitely intend to move forward on

2  that.

3        THE COURT:  Okay.  Let me -- -and that's good, and I

4  guess your language would be acceptable to everybody because

5  it leaves open the door.  But with respect to 169SL, do you

6  contend that it contains any engines or landing gear of 162SL,

7  138SL or -- what was the third one?

8        MR. ANDERSEN:  164SL, Your Honor.

9        THE COURT:  164SL.

10        MR. ANDERSEN:  The answer to that is that at this

11  point, what we know is that 162SL, the parts from 162SL have

12  been distributed among the fleet of aircraft.  To actually

13  determine where those parts have gone would require going to

14  the records and trying to determine from the records where the

15  parts have gone.

16        And as I understand it, the records themselves are

17  incomplete and perhaps inadequate, and it would actually

18  require going to the airplane that's the subject of this

19  motion here today, and looking at that airplane and comparing

20  the parts on that airplane with the original parts from 162SL.

21        And we attached to our motion what's called the

22  Build Record for 162SL.  So there actually is a document that

23  identifies the major components of what was once 162SL.  But

24  as we stand here today, all we know is that those parts have

25  been distributed -- or either are on a shelf somewhere as a

1    spare part or they've been distributed to other aircraft in

2    the fleet.

3           And as we also -- the information we also have is

4    that the overall records of Avantair indicate that parts were

5    fairly freely interchanged among the aircraft.

6           THE COURT:  Wasn't that done by agreement of the

7    parties, with the understanding that as long as there was

8    some, you know, part in the plane -- and I'm not talking about

9    the things that I understand make up a plane, which are the

10   fuselage, the wings, the tail structures, the power plant and

11   the undercarriage.

12          Wasn't there an agreement that said that anybody

13   could use anybody else's?

14          MR. ANDERSEN:  Judge, the answer to that is I

15   haven't been able to find that agreement.

16          THE COURT:  Oh.

17          MR. ANDERSEN:  And I brought a copy of what we refer

18   to as the -- I mean, what are referred to as the program

19   documents.  If I may approach the bench, I'd like to provide

20   them.

21          THE COURT:  Yes, because somebody made a proffer

22   that there was such language in some program or brochure.

23          MR. ANDERSEN:  (Presenting documents.)  I've also

24   understood or heard that to be the case, Judge, but when one

25   actually looks at the documents, I don't see that in the

 1  program documents.

 2          And I thought -- I mean, frankly, Judge, because we

 3  have -- because this is an important issue and because we have

 4  time and perhaps this may be the first opportunity we've

 5  really had to go through the program documents, I'd like to go

 6  through them in some detail with the Court this afternoon.

 7          THE COURT:  Certainly.  Let me tell the people on

 8  the phone what you have put in front of me.

 9          The first document is called Avantair Fractional

10  Aircraft Ownership Program Aircraft Interest Purchase

11  Agreement.

12          The second document is Avantair Fractional Aircraft

13  Ownership Program Management and Dry Lease Exchange Agreement.

14          And the third document is Rider to the program

15  documents dated October 29, 2012 between Avantair, Inc.,

16  Seller/Manager, and CCA of Tennessee, Inc., Purchaser/Owner.

17          MR. BIRD:  Your Honor, if I may be of some

18  assistance to the Court and Mr. Andersen in this.  Because

19  these documents are substantially similar to the ones at issue

20  with 169SL, I would direct the Court's and Mr. Andersen's

21  attention to paragraph 19 of what I believe to be the dry

22  lease, the second of the four documents.

23          And if the Court would read that, and Mr. Andersen

24  maybe review it as well, you may see that exchange agreement

25  that was being discussed.

1            MR. VERONA:  17.  17.

2            MR. BIRD:  Paragraph 17.

3            THE COURT:  Okay.

4            MR. BIRD:  Specifically, Your Honor, I would direct

5    your attention to romanette (i) --

6            THE COURT:  I'm looking for that paragraph first.

7            MR. BIRD:  It's on page 3 of 11, Your Honor.

8            THE COURT:  Okay.  All right.  And you want me to

9    look at 17.  Romanette (i)?

10           MR. BIRD:  Yes, Your Honor.

11           THE COURT:  (Reviewing document.)  Is it romanette

12   (iii)?  I don't see the thing about the parts.  I just see

13   leasing aircraft for its own use and for others' use.  Where

14   does it talk about parts?

15           MR. BIRD:  Well, Your Honor, I do believe there's

16   a -- I guess that provision's not directly on point, but

17   we would argue that part of the management agreement with

18   Avantair would be this free exchange and to keep the -- as

19   part of the provision allowing the planes to be leased on an

20   as-needed basis would allow them to maintain it.  But frankly,

21   Your Honor, that's not an issue for our owners.  That would be

22   an issue between his ownership group and Avantair if there's

23   been a breach of the management agreement.

24           THE COURT:  Not if they have an interest in

25   something was taken off their plane without permission and

 1  put on your plane?

 2          MR. BIRD:  Certainly, Your Honor, and --

 3          THE COURT:  So someone read something to me, I

 4  thought -- I don't remember what the hearing date was -- that

 5  said that the people agreed to taking off parts.  That was not

 6  accurate?

 7          MR. BIRD:  No, Your Honor.  If that was the question

 8  before the Court, it's imprecise.

 9          MR. ANDERSEN:  And, Judge, for purposes of

10  clarification, I frankly believe that to have been the case,

11  and I may have even been the source of that proffer.  But I've

12  looked these documents over carefully and I don't see it in

13  there, Judge.  So I apologize to the Court if I've somehow --

14  if I've made that error.  But I've looked through here and I

15  don't see it.

16          And I think I can -- I'd like to go through the

17  documents to some degree, Judge, because I think I can --

18  I think it will shed light on the question.

19          THE COURT:  Okay, go ahead.  Mr. Bird was just

20  trying to cut to the chase, but thank you, Mr. Bird.  Go

21  ahead, Mr. Andersen.

22          MR. ANDERSEN:  Judge, I think the starting point

23  with these documents -- and first of all, these are the

24  documents for CCA of Tennessee, and I think they're

25  substantially similar to the other program documents.

1            Just for the Court's benefit, they are slightly

2    different because there are actually three documents.   The

3    first is the Aircraft Interest Purchase Agreement, the second

4    is the Management And Dry Lease Exchange Agreement, and the

5    third is the Rider to these two documents.

6            And the reason there was a third document, a rider,

7    as it related to CCA of Tennessee, is that it originally

8    sought to acquire a 21.875 percent interest, but the aircraft

9    weren't identified.  And so the rider basically says that this

10   21.875 percent will be distributed among the three airplanes

11   that I've been referring to, and that's actually on page 2 of

12   the rider.

13           It says the percentage interest -- percentage

14   shares.  The purchaser's interest in the aircraft shall be

15   comprised of percentage shares in the following aircraft:

16   An undivided 9.375 percent interest in -- and I'll just

17   paraphrase -- N164SL, and then an undivided 9.375 percent

18   interest in N162SL, and an undivided 3.125 percent interest in

19   N138SL.

20           And then that paragraph on page 2 -- and I'm looking

21   at Section 3, the first full paragraph on page 2, ends that

22   any of the interest in the aforementioned aircraft may be

23   substituted pursuant to Section 2, paragraph 3 of the Aircraft

24   Interest Purchase Agreement, so long as the total interest

25   totals 21.875 percent.  And we'll come back to what that

1    substitution provision is here momentarily.

2           But, Your Honor, I'm trying to highlight the terms

3    that I think are the most helpful in understanding what the

4    grant of interest in these aircraft was.  And perhaps I need

5    to digress for just a moment here, too.

6           There's a common use of the term, Certificates of

7    Title in Aircraft or Titles in Aircraft.  And they're unlike

8    automobiles.  There are not titles -- title certificates

9    issued by any governmental agency in aircraft.

10          If these were automobiles, the Department of Motor

11   Vehicles would issue a Certificate of Title and that would be

12   the document of title.  For example, if someone held a lien

13   on it, they might actually hold the Certificate of Title

14   themselves, rather than the purchaser holding it.

15          But as relates to aircraft, there aren't

16   Certificates of Title.  And in fact, the FAA title system

17   was initiated back in 1938, and it was initiated because, as

18   aviation was growing in the early 1920s and '30s, the states

19   were all trying to deal with uniform issues of aeronautics

20   law, as they referred to it at the time.  And it became fairly

21   clear by 1938 that what was happening was there was a real --

22   for lack of a better term -- mishmash of conflicting laws

23   among the various states relating to aircraft.

24          And so that was actually the origin of what was

25   called the Civil Aeronautics Act of 1938.  And much of that

1    Act actually had to do with aviation safety and regulation of

2    flight and airplanes.

3           But one of the provisions in that Act was -- created

4    an Aircraft Registry.  And the reason for that was because one

5    of the purposes for the 1938 Act was to promote aviation.  And

6    it was felt that in order to promote aviation, it would be

7    necessary for those dealing in aircraft to be able to rely

8    upon some source to determine the state of title for aircraft.

9    And so they created in 1938 the Aircraft Registry.  And they

10   created it on the same model as existed back at that time for

11   real estate registries.  And so it's more or less a *res* notice

12   system.

13          And so the Federal Aviation Act, as it was enacted

14   in 1938, is mainly still in effect.  And I do have a copy of

15   the relevant provision I'd like to show to the Court, and I

16   think I've got another copy here for counsel.  I'm pretty

17   sure.

18          THE COURT:  Is that what -- the Registry place is

19   somewhere in the middle of the United States?  Oklahoma or

20   something?

21          MR. ANDERSEN:  Oklahoma City, Judge.  Yes, Your

22   Honor.

23          THE COURT:  Why'd they pick there?  Because it's

24   hurricane-proof and tornado-proof and --

25          MR. ANDERSEN:  Judge, I believe that the name--

1          THE COURT:  -- earthquake-proof.

2          MR. ANDERSEN:  No.  Your Honor, the name of the

3    facility is the Senator Mike Monroney --

4          THE COURT:  Ah.

5          MR. ANDERSEN:  -- FAA Aircraft Registry in Oklahoma

6    City.  So I think they did that in honor of Senator --

7          THE COURT:  It was pork.

8          MR. ANDERSEN:  Senator Monroney, yes, Your Honor.

9    Well, and he frankly was very active on these aviation law

10   issues at the time.  But in any event, what this statute does

11   is -- first of all, let me go to Section C, when it talks

12   about applicable laws.

13          And it says the validity of a conveyance, lease or

14   instrument that may be recorded under this section is subject

15   to the laws of the state, the District of Columbia or the

16   territory or possession at which the conveyance, lease or

17   instrument is delivered, regardless of the place it was the

18   subject -- the subject, I guess that's the airplane or engine

19   -- of the conveyance, lease or instrument is located or

20   delivered.

21          So what's interesting about this statute -- and

22   there's actually a U.S. Supreme Court case that's called

23   Philko Aviation v. Schacket, and it was decided back in 1983.

24   And I was fortunate enough to do the amicus brief for the

25   America Finance Association in that case.

1          But it basically deals with the issue of federal

2     preemption, and the extent to which this statute preempts

3     state law.  And what Congress intended here was to leave the

4     issues of validity of interests, whatever they may be, to

5     state law.  And it was really emphasizing, if you want to

6     go up to Section A, the effect of filing.

7          And this is the *res* notice effect.  And it basically

8     just -- it basically says -- and I'll just paraphrase it:

9     Until a conveyance, lease or instrument is filed for

10     recording, it is valid only against the person making the

11     conveyance, lease or instrument, that person's heirs or

12     devisees.  And, three -- and this is kind of the bona fide

13     purchaser portion of it -- a person having actual notice of

14     the conveyance, lease or instrument.

15          So the effect of this filing is that once this

16     filing occurs, it's constructive notice to the whole world.

17     And that's what Congress intended to do in 1938, and that's

18     what the -- that's exactly what the Registry continues to do

19     even now.

20          Now, the exception to that if something is not

21     recorded, it still may be valid as against persons having

22     actual notice of that interest.  And then the question of what

23     are the interest is a question to be determined under state

24     law.

25          And for the Court's benefit, the issue in the Philko

1   <u>Aviation v. Schacket</u> case actually involved a sale out of

2   trust.  And back in the 1980s, there was a recession, and many

3   dealers were selling airplanes not once but twice because they

4   could get more money that way and they'd pay the lender once

5   and keep the money the other time, and then there would be

6   title disputes.  And the question was, well, would you resolve

7   those based on the UCC and the UCC provisions relating to

8   sales out of trust, or would that be resolved under the

9   Federal Aviation Act?

10          And the Supreme Court said, no, those are state law

11  issues.  The only thing the Federal Aviation Act does is

12  provide the recording place and the effect of recording.

13  So ---

14          THE COURT:  So a BFP consumer would prevail in that

15  scenario.

16          MR. ANDERSEN:  As defined under that statute which

17  is a little bit -- frankly that was an issue in the <u>Philko</u>

18  case.

19          THE COURT:  No, I meant under local law.  If a

20  dealer sells something out of trust, in violation of, say,

21  the lender's lien, the consumer takes it free.

22          MR. ANDERSEN:  As long as that's a dealer in those

23  goods, exactly.

24          THE COURT:  Right, okay.

25          MR. ANDERSEN:  Yes, that's exactly right.  And that

1    was the issue in that case.  And so, you know, in this case,

2    the question would be, if interest in these airplanes were to

3    be sold, who would acquire what interest in them?  And it

4    would depend upon what other interests were out there of

5    which they had actual notice.

6            Because the interests that are actually recorded in

7    the FAA on these aircraft -- and I didn't have extra copies of

8    this but I've shown it to all of the counsel, and I'd like to

9    share it with the Court, because I'm not sure if the Court may

10   -- I'm not sure if the Court's seen this before.  (Presenting

11   documents.)

12           THE COURT:  Okay.  For those on the phone, let me

13   give you a description of what he was -- Mr. Andersen was just

14   talking about and what he's just handed me.

15           The definition for the validity statute is 49 United

16   States Code 44108, and the title of that section, that

17   statute, is Validity of Conveyances, Leases and Security

18   Interests.  Subsection (a) is the part that provides that the

19   central registry is to be the place of constructive notice.

20           The second thing that he's just now handed me is a

21   United States of America USDOT FAA Aircraft Bill of Sale

22   concerning N164SL.

23           All right, go ahead and tell me what you want to

24   tell me about this.

25           MR. ANDERSEN:  Yes, Your Honor.  And I'm using that

1    simply as an example.  That was the only one I happened to

2    have in my file with me today.  But that document is the type

3    of document that is filed in the FAA Aircraft Registry.

4            Typically, entire aircraft sales agreements aren't

5    filed in the FAA Aircraft Registry.  Instead, all that's filed

6    is that particular form.  And as far as I know, in this case,

7    that's the type of form that was typically filed on behalf of

8    each of the fractional share interest holders in each of the

9    program aircraft.

10           So I just wanted to share that with the Court

11   because if someone goes to the Registry, that's what they're

12   going to have notice of.  They're just going to see that bill

13   of sale there.

14           But the statute says if they have actual notice of

15   other interests, then they may be -- then they're not going to

16   be a bona fide purchaser, at least as it's defined under that

17   federal statute.  So, Your Honor, that's the background of

18   what I wanted to talk about in terms of the aircraft interest

19   purchase agreement.

20           And the documents that actually grant an interest to

21   the fractional shareholders in these aircraft are actually

22   what are referred to as the program documents, which were the

23   documents that I referred -- that I provided to the Court

24   earlier.

25           And so if one looks at these documents -- and I

```
 1   assume that these are all substantially similar for all the
 2   various fractional shareholders.  I mean, they will start off
 3   with information identifying the parties, the aircraft, the
 4   percentage interest.  They'll also have a provision for annual
 5   allocated hours.  On this one, that's number 5 and it lists
 6   175.
 7            And then it goes -- and then it has a provision for
 8   the purchase price, number 9.  In this case, it was $756,000.
 9   And then 10 is the term.  And I've highlighted the provisions
10   that I think are the most material.  The term of this interest
11   that's being granted here is five years.  So this is not a fee
12   simple absolute, it's not a fee simple in perpetuity.
13            In fact, I tried to think back to my estates class
14   which for me, gosh, 37 years ago.  And I tried to remember --
15   decide if this was a reversionary interest or whether this was
16   just a fee for a term.  But, anyway, this term is for five
17   years.
18            And it's also subject to being terminated earlier,
19   if one reads the last paragraph, the last three lines -- or
20   the last two lines, "Unless sooner terminated in accordance
21   with and subject to the terms and conditions of the program
22   documents."  So this is the first term that begins to define
23   what this grant is.
24            The next paragraph that defines the grant is
25   paragraph 12, and it says that, "The Seller shall sell or
```

1   cause to be sold to Purchaser the Interest -- and it uses the

2   term "Interest" as a defined term.  And then it says at the

3   end of that --

4            THE COURT:  Where is "Interest" first defined?

5   Let's see.

6            MR. ANDERSEN:  Judge, I've looked for it and I think

7   it's actually defined later.  I don't think it's defined at

8   that point.  But let me see if I can answer the question.

9            THE COURT:  Okay, go ahead.  It's okay, keep going.

10            MR. ANDERSEN:  Okay.  And then it says -- and then

11   it also says that that interest is subject to the terms and

12   conditions of the program documents.  So whatever's being

13   conveyed here is this -- is this five-year term of an interest

14   that can be terminated sooner, and it's subject to the terms

15   and conditions of the program documents.

16            The next provision, Judge, that I think is important

17   is when we go to the issue of -- is paragraph 16, which is the

18   co-ownership.  And it says that, "The Purchaser acknowledges

19   that the Interest is an indivisible and undivided Interest in

20   the Aircraft, and that Purchaser is a tenant-in-common with

21   all other Owners of an Interest in the Aircraft (the Co-

22   Owners)" which is another defined term.

23            And that term actually is defined down below in

24   paragraph 17, where it says, "Purchaser, Seller and/or any

25   other person who may now or in the future hold any ownership

1    in the Aircraft is referred to herein as a Co-Owner."  That's

2    the definition in paragraph 17.

3          So it says that the purchaser is acquiring this

4    five-year interest, which is an indivisible and undivided

5    interest in the aircraft, and that the purchaser is a tenant-

6    in-common with all other owners of an interest in the

7    aircraft, the co-owners.

8          And I haven't cited the cases, but I have gone back

9    and looked at Florida law on tenants-in-common and frankly

10   much -- there's not a great deal of law on tenants-in-common.

11   The earliest cases actually go back to the 1850s, and there's

12   one that actually involves co-owners of a steamboat, and which

13   I thought was interesting because we've got an airplane case

14   here and those were the co-owners of a steamboat who were

15   involved in a dispute.

16         But I think essentially tenants-in-common, as the

17   term is -- the legal term is used, it entitles a party to

18   possession of the thing, and it gives them possession of a

19   thing as long as it doesn't interfere with the possession of

20   the other co-owners in the thing.  And they don't have a right

21   -- the co-owners don't have a right to sell it.  They just

22   have this right of possession and use of the thing.

23         The typical method of disposing of this among co-

24   owners is by way of a partition of the property or sale of the

25   property, but this paragraph 16 goes on to say the purchaser

1    waives whatever right it may have to demand the partition or

2    sale of -- sale or partition of the aircraft and agrees that

3    the sole and adequate means by which the purchaser may divest

4    itself of the interest during the term shall be the transfer

5    of a security interest to the bank.  And it goes on and

6    describes what kind of bank it has to be and how that security

7    interest has to be approved.

8           But, again, the owner's rights here are defined --

9    or described as being a tenant-in-common, but those rights,

10   again, are limited, even by the extent to which they could

11   demand a partition of the property.

12          It next goes on to say in the next paragraph -- the

13   paragraph numbered 16 -- there are two paragraphs there.  "The

14   Purchaser acknowledges that in order to provide each Co-Owner

15   with sufficient use of the Aircraft, the Purchaser shall not"

16   -- and I would have circled the word "not" here, it's not real

17   clear -- "but the Purchaser shall not be entitled to use the

18   Aircraft in excess of the Purchaser's available flight hours."

19          So we have to go back to the first page to see what

20   the actual number of flight hours are.  But that's the extent

21   of the right to use the aircraft.  And then it goes on to say

22   in the next paragraph -- and those are flight hours per year.

23   It goes on in the next sentence, rather, to say that the right

24   to utilize those flight hours basically expires if they're not

25   used within the particular year.

1          And then at the end of that paragraph, it says, "The

2    Purchaser acknowledges that it has granted to Seller hereunder

3    the right to repurchase the Interest upon the termination of

4    the program documents, including termination because of

5    Purchaser Owner's default, at Seller's option."

6          So this is -- the purchaser's acknowledging the

7    seller's right to repurchase at seller's option, and --

8          THE COURT:  Is there a provision here that sets out

9    what the compensation would be for that?

10         MR. ANDERSEN:  There is, Your Honor, and we'll --

11   it's actually -- what we'll do here in a moment, the way this

12   is structured, the terms and conditions of this contract, seem

13   to be -- they actually start at page 5.  And so my impression

14   is that with respect to each of the aircraft, they would fill

15   out this first part and then they'd refer to the terms and

16   conditions.  So that's actually in the terms and conditions.

17         And then 17 we've talked about, the definition of

18   co-owner.  There's a provision here that is cited by the

19   movants in their brief, and it does say, "The interest

20   acquired by Purchaser shall be an indivisible and undivided

21   Interest in the Aircraft as a tenant-in-common with other Co-

22   Owners."

23         "The program documents are not intended to create a

24   Time-Sharing Agreement or Joint Ownership Agreement as such

25   terms are defined in the Federal Aviation Regulation

1    19.501(c), or any agency, joint venture, partnership,

2    association, cooperative arrangement, business organization or

3    other relationship by and among the Purchaser and any other

4    Co-Owners" -- and they're using it as a defined term -- "and

5    through which any person may be held liable for the omissions

6    or commissions of any other persons."  So that's a phrase

7    describing the legal relationships.

8         And perhaps this is an appropriate time to talk

9    about the Federal Aviation Regulations and this idea of

10   fractional shares.  As we've discussed in the past, the

11   fractional share program is countenanced by the FAA as more

12   or less an exception to commercial air transportation for

13   hire, and the -- if an aircraft -- if an operator -- if

14   Avantair, for example -- and at least program documents will

15   show that it did do this in some instances.

16        If Avantair was chartering these planes and people

17   were just renting them by the hour and Avantair provided the

18   pilot and provided the plane, then that would mean that that

19   was like a charter which is governed by Part 135 of the

20   Federal Aviation Regulations, which is a pretty onerous --

21        THE COURT:  That would be a commercial use as

22   opposed to the non-commercial.

23        MR. ANDERSEN:  In essence, Judge, but the FAA --

24   frankly the problem here that the FAA ran into is that the FAA

25   had to compare the commercial use under Part 135 with what

1    might be done, for example, in an airport if there were two

2    people that had their airplanes in the hangar next to each

3    other and one said, "I'm going out of town tomorrow but I've

4    got to take somebody else another place, can I borrower your

5    plane?"

6          And the FAA said -- "Sure, you can borrow my plane,"

7    and then they would kind of swap back and forth.  "And the

8    next time you need one, I'll loan you my plane."  And that

9    was -- that was really the origin of the sharing agreements.

10          And the FAA realized that because that wasn't being

11    held out to the public as air transportation and it was

12    limited to the particular people involved, that that would

13    be considered to be a private --

14          THE COURT:  Non-commercial.

15          MR. ANDERSEN:  Non-commercial operation.  The rub

16    kind of came about frankly as people became dissatisfied with

17    the onerous requirements of Part 135, they sought ways to get

18    around it, quite frankly.  And some people still do it without

19    even looking at the regulations.  And unfortunately, they call

20    those Part 135-1/2 operations because they're not legal at

21    all, but people are out there doing it.

22          But the idea was that if a pool of aircraft could be

23    set up that would be shared among these various people having

24    ownership interests in those aircraft, then it would be like

25    the folks in the hangar with the planes next to each other and

1    they just trade back and forth.

2         And that group, from the planes in the hangar to the

3    planes in this city and the planes in that city, and as the

4    whole thing grew, the FAA became more and concerned that

5    this was really -- and the people who were managing it were

6    deriving profit from it and the providing pilots and so forth,

7    the FAA became concerned about the safety of those operations

8    and finally decided that they needed to enact some regulations

9    relating to that.

10         And those regulations are actually the regulations

11   that relate to these various types of agreements, time-sharing

12   agreements, joint ownership agreements, and then specifically

13   what we're talking about here, the fractional share agreement.

14         Now, the FAA didn't go about defining what these

15   interests were that people had to have an aircraft, as much as

16   they simply said that part of doing this type of program is

17   that you've got to have people who have an interest in the

18   aircraft.

19         And then the FAA enacted some very extensive

20   regulations, and the fractional share regulations are very

21   extensive.  They require that there be a manager like

22   Avantair, that there be records maintained by Avantair, and

23   that there be persons responsible for the maintenance of the

24   aircraft, and for the safe operation of the aircraft and so

25   forth.

1      So my point here is that the FAA regulations don't

2  define what these interests are.  The FAA is simply trying to

3  regulate this type of operation.  And here, it's important in

4  this document, to distinguish this fractional share program

5  from a time-sharing agreement or a joint-ownership agreement.

6  And then obviously, there's some concern here about liability

7  because they don't want to create any type of vicarious

8  liability under which one would be liable for the negligent

9  acts of another.

10      Now, going on to the terms and conditions, Your

11  Honor, that starts at page 5, and it says, "Upon payment in

12  full of the purchase price, the Seller shall deliver the

13  Interest" -- again, it's the defined term -- "the Interest,

14  free and clear of all liens and encumbrances to Purchaser,

15  together with an FAA Form 8050-2 Bill of Sale," which is the

16  form provided to the Court.

17      So this document is distinguishing the interest from

18  the bill of sale.  It's talking about delivering the interest

19  and the bill of sale.

20      It goes on to define the particular states.  The

21  reason those states are listed is because those are states

22  that don't have sales taxes.  And so obviously they don't want

23  -- they're trying to avoid having to pay sales tax here.

24      The next provisions, I'll just -- the Capetown

25  Convention is actually an international recording system much

1   like the FAA recording system in Oklahoma City.  The Capetown

2   recording system was developed in the last, probably 10 or 15

3   years to recognize that many of these aircraft were the

4   subject of international transactions, and therefore there

5   needed to be an International Registry, and so that's what

6   number 2 is referring to.

7        Number 3 says -- it's entitled, "Right to sell or

8   lease."  And it says, "Purchaser's Interest" -- and here it

9   comes pretty close to defining it -- "is a proportionate

10  Interest in the Aircraft on a shared ownership basis as

11  described in this Agreement."  The interest is a

12  "proportionate Interest in the Aircraft on a shared

13  ownership basis as described in this Agreement."

14        And then it goes on to say that, "To the extent the

15  Seller retains or reacquires ownership of an Interest in the

16  Aircraft, the Seller shall have the right to sell or lease any

17  or all such Interest to any persons or legal entities without

18  prior notice to the Purchaser."

19        So we're going to come to those terms and conditions

20  that deal with the seller's right to do that here momentarily.

21        Paragraph No. 4 talks about the seller's use for the

22  aircraft.  And I'll paraphrase again but, "Seller, to the

23  extent it retains an interest in the Aircraft, or manager" --

24  and seller and manager in this case are Avantair, they're the

25  same one -- "may use the Aircraft for maintenance, training,

 1    demonstration, FAR 135" -- that's the commercial charter we

 2    talked about -- "and positioning flights."  And then here's

 3    the  broadest term -- "and for any other use."

 4              So the seller can use this airplane for any other

 5    use.

 6              THE COURT:  If it retains an interest in the

 7    aircraft.

 8              MR. ANDERSEN:  Oh, no, Judge.  If I may go --

 9              THE COURT:  Didn't it say "Seller, to the extent it

10    retains an Interest in the Aircraft"?

11              MR. ANDERSEN:  And then it goes on to say "or

12    manager."

13              THE COURT:  Oh, okay.

14              MR. ANDERSEN:  Or manager that used the aircraft for

15    all these uses or any other use.  And then it says -- the last

16    sentence in that paragraph says, "Seller or manager shall

17    retain any compensation or reimbursements received in

18    connection with such use."  "And Seller" shall not (sic) be

19    responsible -- shall --

20              THE COURT:  No, seller shall be --

21              MR. ANDERSEN:  "Shall be responsible to pay for and

22    indemnify and hold harmless Purchaser from any and all costs

23    incurred in connection."

24              But in terms of compensation or reimbursements, the

25    manager has the right to use the aircraft for any use and to

1   keep any compensation or reimbursements from that use.

2           So essentially up to this point, we've established

3   that the fractional interest holders' use is going to be

4   limited to 175 hours in this case, and that's all.  And then

5   the manager can use the aircraft for any other use and keep

6   all the compensation and the reimbursement for the use of the

7   aircraft.

8           The next paragraph in the terms and conditions deals

9   with the sale of an interest.  And here I'll -- to some

10  degree, I'll try to paraphrase it but, "At the end of the

11  term, the Purchaser shall have the option (a) to sell the

12  Interest and withdraw from the Program, (b) sell the Interest

13  and purchase another Interest or, (c) retain the Interest and

14  renew the Program."

15          And then it says, "In the event the Purchaser elects

16  to sell" -- and this goes to the issue of alienability and the

17  rights of an owner to sell their property interest.  And here,

18  this document says that the purchaser may only sell the

19  interest to a replacement purchaser as instructed by the

20  seller.

21          So right now the pool of people or entities to whom

22  this could be sold has got to be -- and we'll come to this

23  definition of replacement purchaser in a moment.  That it has

24  to be a replacement purchaser and it has to be one that the

25  seller approves of and --

```
 1              THE COURT:  At the market value.  There's the
 2    answer.
 3              MR. ANDERSEN:  At the market value.  And we'll --
 4    yes, Your Honor.  And we'll come to that, because that's down
 5    here a little bit further.  And the fractional interest holder
 6    receives the sale proceeds less a 7 percent marketing fee.  So
 7    that's the reimbursement to the fractional shareholder at that
 8    point.
 9              And it says, "And less any amounts owing to manager
10    under the MDLA."  So the -- the next paragraph talks about the
11    purchaser may elect to sell the interest and purchase a new
12    interest.  And, again, it's necessary that they first sell
13    the interest to a replacement purchaser as instructed by the
14    seller.  So if they want to get a new interest, they're still
15    responsible for selling this to a replacement purchaser as
16    instructed by the seller.
17              And then down about halfway through the last full
18    paragraph on page 5, it says, "In the event the Purchaser
19    elects to retain the Interest and renew, then they enter into
20    new program documents," and that they can do that for a
21    maximum of four times.  And it's interesting, the last
22    sentence says, "The Program documents shall continue in full
23    force and effect until Purchaser enters into new Program
24    documents."  And we'll see this kind of play out in some of
25    the other terms as we go along.
```

1          The next paragraph talks about an upgrade option,

2    and during the term, the purchaser shall have the option to

3    sell the interest and purchase an interest in a new aircraft.

4    But, again, they still have their interest to a replacement

5    purchaser as instructed by the seller.

6          (Court and counsel conferring regarding water, tea and

7    honey.)

8          MR. ANDERSEN:  So the next paragraph is Repurchase

9    Upon the Purchaser's Breach.  And it says, "In the event the

10   Purchaser fails to pay any" -- and I want to paraphrase pretty

11   liberally.

12         In the event that purchaser fails to pay any invoice

13   within 45 days, the seller shall have the right to require the

14   purchaser to sell the interest as instructed by the seller, at

15   market value again.  And then here they pay a remarketing fee

16   of 15 percent.  And they have to pay the seller for all the

17   expenses.  And I'm sure they also have to continue to pay the

18   monthly fees until the transfer is made to a replacement

19   purchaser.  And I'm sure they also have to pay anything else

20   that's due under the -- yeah, and any other amounts due under

21   the MDLA.

22         So in the event of a breach here, we've got -- and

23   I'll be very liberal, Judge, if you don't mind, but there's a

24   lot about this document that's very similar to a security

25   agreement.

1          And if I can go back to the pre-UCC -- you know, the

2     originals of the UCC, I think the very beginning of Article 9

3     talks about, you know, this article shall cover any document

4     intended to be a security interest, whether you call it a

5     conditional sales contract or whatever name you give it.  If

6     it's intended to create a security interest, then it can be

7     governed by Article 9.

8          And this particular document, while it transfers

9     rights to the fractional interest holder, it specifically says

10    that if these payments aren't made in a timely fashion, then

11    the seller has the right to sell the interest.  Not that the

12    purchaser does that.  Or, no, the seller has the right to

13    require the purchaser to sell the interest to a replacement --

14    to a replacement purchaser.

15         And then basically to satisfy all the other debt

16    that is owed to the seller.  And at the end of the day, if

17    there's anything left, you know, that would be analogous, I

18    guess, under the security agreement to the owner's equity in

19    the property, and then that's what's ultimately distributed.

20    But here in this agreement, the seller does have the right to

21    require the purchaser to sell the interest if they don't pay

22    any -- fail to pay invoices within 45 days of the invoice.

23         And there is more to that paragraph, but I'll go

24    on down to paragraph 4.  There are also early termination

25    options.  And these are the early termination options of

1   the purchaser.  And the purchaser may exercise the early

2   termination option by, again, selling the interest to a

3   replacement purchaser as instructed by the seller at the

4   market value.

5            And they must -- and then subparagraph 3 or little

6   -- it's three iii's, says they have to continue to pay the

7   monthly fees during this time until the transfer of the

8   interest.  I think that's the main thing I wanted to point

9   out there.

10           But this is really the -- this is really the only

11  right that the fractional share interest holder has to sell or

12  to alienate this property interest, is to do it through this

13  early termination option and to do it by selling it to a

14  replacement purchaser as instructed by the seller.

15           Now, paragraph 5 talks about substitution of

16  interest.  And this is interesting because it says, "For the

17  efficiency of the program."  So regardless of whatever the

18  interest to the fractional shareholder might be, but for the

19  efficiency of the program -- the plane's getting old or for

20  whatever reason, they don't need as many planes, whatever --

21  the seller may substitute for the interest, an interest in

22  another Piaggio Avanti P180 substantially similar to the

23  aircraft with a fair market value approximately equal to the

24  market value of the interest, the substitution interest.

25           And the one thing I thought was noteworthy is

1   the last sentence in that paragraph said, "The Seller, as

2   Purchaser's agent in fact, attorney-in-fact, pursuant to the

3   power of attorney executed and delivered to Seller herewith,

4   may act on Purchaser's behalf in all these regards."  So

5   apparently Avantair could do this without the purchaser

6   even executing any documents.

7         6 deals with the replacement of the aircraft.

8   Again, I'll highlight the provisions.  Here, it says the

9   seller shall have the option, but not the obligation, to

10  replace the aircraft.  So the fractional interest holders

11  don't have any right to replace the aircraft at all.  It's

12  up to the seller to decide whether they want to do that.

13        And then it contains provisions on what happens if

14  the airplane is going to be repaired or if it's going to be

15  replaced or if, for whatever reason, it's -- the seller

16  decides that the airplane is not going to be replaced.  And

17  I think this basically tracks the other provisions, which

18  provide that the fractional share interest holders would

19  receive the market value at the time of the loss.

20        And it's interesting, it also says, "In the event of

21  replacement of the Aircraft, the Purchaser shall continue to

22  pay all fees, costs and expenses pursuant to the Program

23  documents and shall continue to have the right to utilize the

24  Program throughout the time the Owner is awaiting transfer of

25  the replacement Interest."  So I guess that's contemplating

1    the replacement interest if this airplane is not replaced.

2            7 does define market value.  It means the fair

3    market value, again, of the interest at the time of

4    determination.  And it provides for an appraisal process

5    to determine the value of -- the market value at that

6    particular time.

7            Paragraph 8 deals with replacement purchasers.  And

8    this is the term that's used throughout the document to define

9    who it is that the fractional interest can be transferred to.

10   And it says, "In the event of any sale of the Interest by

11   Purchaser to a Replacement Purchaser, Seller agrees to use its

12   good faith efforts to assist Purchaser with the resale of the

13   Interest to a Replacement Purchaser and thereby reduce the

14   period of time in which the Purchaser will be required to

15   continue paying the monthly fees and other amounts owed under

16   the Program documents."

17           And it says, "Notwithstanding the foregoing, the

18   Seller shall not be liable for any failure to obtain a

19   Replacement Purchaser of the Interest."  So, I mean, I think

20   what this means is even if one wants to sell the airplane

21   early and if Avantair can't find a replacement purchaser, then

22   they just have to keep paying -- the can't alienate their

23   interest and they have to keep paying the monthly fees.

24           The next page is Section 3.  It's the Covenants of

25   the Purchaser.  And the first one, I would -- I'll go over

1   these quickly.  Citizenship is important just because any

2   aircraft registered in the United States have to be owned by

3   U.S. citizens.  And if they're owned by people who aren't U.S.

4   citizens, you have to jump through a lot of hoops and create

5   trusts and --

6           THE COURT:  Is that relevant to any of the aircraft

7   we're talking about here?

8           MR. ANDERSEN:  I don't think so, Judge.  I just

9   wanted to explain --

10          THE COURT:  Okay.

11          MR. ANDERSEN:  Explain why that would be there.

12  The next one I think that's relevant is the one under Aircraft

13  Use and Management.  And it says, first of all, "That the

14  Purchaser shall cause the Aircraft to be maintained and

15  insured pursuant to the MLDA," which is the lease agreement

16  we'll see in a moment.  And the failure to provide maintenance

17  is an act of -- "The failure to provide for such maintenance,

18  insurance, or a default by Purchaser under the terms of the

19  MDLA shall be a material default hereunder."

20          So it's the purchaser here that's got the obligation

21  to cause the aircraft to be maintained and insured.

22          Then it says, "The Purchaser shall only use the

23  Aircraft for its own pleasure and business and the carriage

24  of its officials, employees, and guests, and will not use the

25  Aircraft for the purpose of transporting passengers or cargo

1  in air commerce for compensation or hire, except in accordance

2  with FAR Part 91."

3       So what means, again, is these fractional share

4  interest holders can't use this airplane for charter, even

5  though, as we'll see, that Avantair can.  The fourth paragraph

6  does say that, "Each Co-Owner is a third-party beneficiary to

7  representations made by the other Co-Owners, as that term is

8  defined in the agreement."

9       The next provision I think that's significant is

10  the Covenants of the Seller.  "The Seller at the time of the

11  transfer shall own and by this Agreement, the Bill of Sale,

12  the Seller shall convey to Purchaser good and marketable title

13  to the Interest" -- again that defined term -- "free and

14  clear of any and all leases, liens, claims, rights and

15  encumbrances," and then says, "Other than the rights of

16  Co-Owners as provided in the Program documents."

17       It does go on to define the aircraft conditions.  It

18  says on the transfer date it has to have a valid airworthiness

19  certificate, the manufacturer's inspections must be done, the

20  aircraft must be airworthy, and all the airworthiness

21  directives complied with.  And then it says -- then it

22  talks about status of aircraft maintenance.  There's a

23  representation by the seller that the aircraft has been

24  properly maintained.

25       And then I'll go down to page 9, the section on

1   General Terms.  And it says, "None of the rights and

2   obligations of the Purchaser under the Program documents" --

3   this is paragraph 1 -- "may be assigned by Purchaser except in

4   their entirety, provided the Purchaser receives the Seller's

5   prior written consent."  So, again, these fractional share

6   interests can't be alienated without the seller's agreement.

7          The other document that makes up the program

8   documents is this management dry lease and exchange agreement.

9   And I won't go through it in as much detail.  It basically,

10  Judge, provides, again, in paragraph 10, a term of five years

11  unless they are terminated in accordance with the terms and

12  conditions of the program documents.  It does talk about fees

13  and invoicing, and how fees are to be paid by the fractional

14  share interest holders to the seller.

15         And I don't want to omit -- and maybe I've jumped

16  over it already.  I did notice that in the Respondents' brief,

17  they talked about a paragraph says that the owners' fractional

18  share interest holders shall be entitled to depreciation and

19  so forth.  And that's in one of these two documents, and --

20         THE COURT:  What's normal depreciation?

21         MR. ANDERSEN:  Beg your pardon?

22         THE COURT:  Tax attributes?

23         MR. ANDERSEN:  Exactly, Judge.  Exactly.  So I think

24  I may have jumped over it.  If I have, I wanted to mention it.

25         But going down to page 2 of the lease, the

1  Relationship of the Parties, it does talk again about the --

2  it says, "The owner acknowledges that the Owner is the

3  Operator of any Program Aircraft furnished to the other and

4  holds sole authority over initiating, conducting or terminated

5  a flight ('operational control')."  And that's the phrase that

6  the FAA is the most concerned about.

7          Because the FAA says that the issue of operational

8  control really is the main thing the FAA is concerned about

9  because they want to make sure that whoever has operational

10 control, that they can look to one entity and say that's

11 who has operational control of the airplane.  And if it's

12 violating the rules and regulations, this is who's going to

13 be responsible for it.

14          And if this was a charter operator, if Avantair was

15 flying this in a Part 135 operation, Avantair would be the

16 operator.  It would be a Part 135 operator and would have to

17 follow all those rules and regulations.  But here, as long as

18 the fractional holder is the operator, then it operates it

19 under the rules relating to private aircraft, the Part 91

20 rules, which are the less stringent rules.  So that's the

21 significant thing.

22          And that basically is the control that the owner has

23 that con -- the owner's got in this case 175 hours that they

24 can use over five years -- or excuse me, 175 hours a year that

25 they can use, and their control is that they can have the

```
 1    authority over initiating, conducting or terminating a flight

 2              And then it does go on to say, "Unless the manager

 3    chooses to operate the flight under Part 135."  So I think

 4    that's the relevant provision there.  But that's the main

 5    section which actually describes the operator's or the

 6    fractional share interest holders' control and that actually

 7    is controlled on a particular flight.

 8              The next section I'd go to is on page 7 of the

 9    lease.  And this has to do with maintenance.  And it says,

10    "The manager shall main" -- paragraph 2, "The manager shall

11    maintain the airworthiness certification of the Aircraft in

12    good standing, arrange for inspection, maintenance, repair and

13    overhaul of the Aircraft in accordance with the maintenance

14    programs and standards established by the manufacturer and

15    approved by the FAA."

16              THE COURT:  Okay, so you have a breach by Avantair.

17              MR. ANDERSEN:  Yes, Judge.

18              THE COURT:  With respect especially to N162.

19              MR. ANDERSEN:  Yes, Your Honor.  Absolutely.  And

20    it goes on to say -- and it also goes on to say, "Arrange for

21    the" -- and it also goes on to say, "Keep the aircraft in good

22    operating condition" which is -- "and also maintain the

23    cosmetic appearance."  And I think the Court referred --

24              THE COURT:  Where's the remedy section that goes

25    with that?
```

```
 1              MR. ANDERSEN:  Judge, I'm going to try to -- I don't
 2    really think -- I don't think I'm aware of a remedy section
 3    that goes with that.
 4              THE COURT:  Okay.
 5              MR. ANDERSEN:  Unless it's in here somewhere other
 6    than payment --
 7              THE COURT:  So you've pointed out two things that
 8    are relevant to me -- because I'm trying to keep my eyeball on
 9    the waterfall problem.
10              MR. ANDERSEN:  Right.
11              THE COURT:  You identified in the first document the
12    obligation to remit the proceeds of sale of the co-owner's
13    interest in the plane; hold it and hand it owner.  And I guess
14    you're saying that to the extent some pieces parts from your
15    airplane are on their airplane, the proceeds need to be held
16    for the benefit of your co-owner group.
17              MR. ANDERSEN:  That's precisely the point, Judge.
18              THE COURT:  And then secondly, to the extent that
19    they're not there, I guess, you're saying that you have a
20    contractual claim against Avantair for a violation -- for
21    breach of the duties under Section Roman VI, paragraph 2 of
22    the MDLA.
23              MR. ANDERSEN:  That's correct, Your Honor.  And
24    I think there's more to -- and I think that there's -- I
25    think there's even -- those are exactly the things.  And as
```

1   it relates to the first question about the parts from our

2   aircraft being on somebody else's aircraft, there's -- I can

3   jump ahead, Your Honor, to the next page, paragraph 8, which

4   is -- in paragraph 7, which is entitled Aircraft

5   Modifications.

6          And this is -- I don't want to make more of this

7   than it is.  Earlier we saw that the owners have the

8   obligation to pay for the maintenance on the airplane.

9   Now, they actually do it by paying a monthly maintenance fee.

10  But they're supposed to be paying for the maintenance on the

11  airplane.

12         Now, paragraph 7 says that, "The Manager may, in its

13  sole discretion" -- and again it says, "at owner's expense."

14  That means the fractional share interest holders on this --

15  whatever airplane that's involved here -- "upgrade, alter or

16  modify the Aircraft, (i) to comply with the Manager's

17  interpretations of the Federal Aviation Regulations, (ii) to

18  be consistent with industry standards, (iii) to comply with or

19  otherwise permit the Aircraft to be operated under Part 135,

20  which -- and (iv) maintain the marketability of the Aircraft,

21  or (v) provide for consistency in equipment, accessories or

22  parts with respect to the Aircraft and any other Program

23  aircraft."

24         So, Judge, when we look at 162SL --

25         THE COURT:  What does that last phrase, romanette

```
 1  (v) mean?  Why would they throw in "and any other Program

 2  Aircraft"?  Are they charging the owners to provide for

 3  consistency in other owners' aircraft?

 4          MR. ANDERSEN:  I think what they're saying -- I

 5  think what they mean there is that if they decide among the

 6  fleet of these Avantair airplanes, that they want to be sure

 7  that they all use the same type of -- I'll use a radio as an

 8  example -- so that the pilots are all familiar with the same

 9  -- everything's computerized and, you know, they don't have to

10  go from one to another.  The Avant --

11          THE COURT:  Oh, I see.  Consistency among the group.

12          MR. ANDERSEN:  Exactly, Judge.

13          THE COURT:  Okay.

14          MR. ANDERSEN:  Yeah.  But this is significant

15  because here, at the owner's expense, the manager may in its

16  sole discretion do any of these things to --

17          THE COURT:  But they're all for good causes.

18          MR. ANDERSEN:  Well, and I think that's exactly

19  right.  For example, if we look at 162SL, which doesn't

20  have any landing gear, somebody else's airplane has got --

21  presumably has got 162SL's landing gear on it.

22          Now, it probably has -- I mean, it's clear that

23  if they have those landing gear on them, number one, they have

24  to have landing gear to comply with the Federal Aviation

25  Regulations, to comply with FAR Part 135, or to maintain the
```

1  marketability of whatever aircraft it is that now has 162SL's

2  landing gear on it.

3          In other words, at some point, the manager -- the

4  manager could have gone out -- could have gone back to Piaggio

5  and bought brand new landing gear and --

6          THE COURT:  And charged the owners.

7          MR. ANDERSEN:  Precisely.  But instead, they took

8  that landing gear off of 162SL and they put it on whatever

9  airplane it's on now.  That's just using the landing gear as

10  an example.  The airplane's been cannibalized.

11          It's flight surfaces, flight control surfaces are

12  gone, its windshield is gone.  All the radios are gone

13  from it.  The airplane is -- you know, those parts are all

14  somewhere out in the fleet.  And while I make that point

15  with regard to 162SL as being --I think it's emblematic --

16  emblematic of the problem --

17          THE COURT:  What are you going to do -- let me ask a

18  practical question.  What are you going to do with respect to

19  aircraft that other groups own and the Trustee does not assert

20  an interest in it?  How are you going to get, for example,

21  your windshield off of that thing?  Or get compensation for

22  the windshield in the hands of one of those other co-owner

23  groups?

24          MR. ANDERSEN:  Well, Judge, the -- I'd like to --

25  I would like to think -- and I'll dodge the question a little

 1    bit if you don't mind, but I'd like to --

 2           THE COURT:  What I don't want is the Bankruptcy

 3    Court to be used to bring a target within your sights so it's

 4    easy and convenient.  If we didn't have this, you all would be

 5    worrying about 40 planes and you're trying to find parts

 6    across 40 planes.

 7           How, practically, would you do that?  Would you sue

 8    all of the owners and say, "I want an injunction, Judge, for

 9    everyone to give me an inventory so I can find my cup holder,

10    my radio, et cetera"?

11           MR. ANDERSEN:  Judge, I think if the Bankruptcy

12    Court were not an available forum or an appropriate forum,

13    then I think you'd have to go in -- you'd have to go into

14    State Court.  Now, all of these -- all of these fractional

15    owners have all signed contracts here in Florida.  So

16    presumably it could be done here in State Court in Tampa.

17           But one could assert claims going through the

18    aircraft records and trying to identify where pieces and parts

19    have gone and assert claims against those -- you know, against

20    the people that have those airplanes.

21           I think that would be a -- I think that would be --

22    that's the last thing I think anybody wants to do, but I think

23    that would be what would -- I think that's what would be

24    necessary.

25           I think -- I know there's a lot of -- to be very

1   practical, a lot of dispute about this.  But I think that to

2   the extent those other aircraft owners think that it's

3   necessary to convey title free and clear of any liens or

4   interests of other parties, the only avenue that they have

5   to do that practically is through this Bankruptcy Court,

6   and therefore I think there's a strong incentive for them

7   to opt in.

8           I realize that there are a lot of people out there

9   who probably are just -- would just say, "That's absolutely

10  wrong and that's not going to happen."  But to the extent I'm

11  referring to the Federal Aviation Act, I think that people who

12  are buying program aircraft from Avantair are all on actual

13  notice.  And that statute's funny; I mean back in 1983 in the

14  Philko case, we had to deal with the term "actual notice" and

15  thought why in 1938 did they use the term "actual notice"?

16          You know, notice seems to imply something

17  constructive.  And if you need to put "actual" next to it is

18  kind of a peculiar way to define it.  But I guess it means

19  that, you know, that they're on notice that the aircraft that

20  they are seeking to acquire an interest in has got somebody

21  else's parts and property on it.

22          And to the extent that someone's going to invest a

23  lot of money in buying those aircraft, they're going to buy

24  that title free and clear, and the way that that can be done

25  is through a Court's -- this Court's sale of the aircraft of

 1   those fractional share holders opt in.

 2        The third thing I would say is that we're here today

 3   not necessarily because this is the time we would have chosen

 4   to bring this up, but if 169SL is sold pursuant to an order

 5   approving the sale that says the proceeds are limited to the

 6   fractional share holders of that airplane, and the airplane is

 7   then sold free and clear of all other interests, we've waived

 8   our rights to make those claims, I think.

 9        And so we have to be here today making this

10   particular argument on this particular plane.  And I think if

11   it's not -- and if this argument's not -- and if this issue's

12   -- I think this issue's important not just for this airplane

13   but it's important for others who may be contemplating a

14   similar settlement.

15        And I'll digress a moment on the practical side.

16   The Trustee is really not taking a position on which side of

17   this is the correct position.  And the Trustee has been

18   willing -- and Ms. Sherman can correct me if I'm wrong, to

19   approve the proposed settlement on 162SL, which simply says

20   that this issue of distribution of the proceeds is going to be

21   determined by the Court.

22        And so the airplane, 162SL in three weeks when the

23   landlord kicks Avantair off the property, and that hulk is

24   sitting over there without any wheels, you know, the Trustee

25   is going to be able to -- assuming this -- you know, assuming

```
 1   that this document is filed in the next few days, which I

 2   fully expect it will be, and it's approved by the Court, it's

 3   going to be possible for 162SL to be sold free and clear of

 4   any liens.  That money will then come into the estate to be

 5   distributed and in a manner to be determined by the Court.

 6           So, Judge I -- you know, whether to say it's my

 7   expectation that most people will opt in or not, I'm not a

 8   mind reader and I don't have a crystal ball.  But I certainly

 9   would think it would be in their interest to opt in if they

10   really -- if they had a purchaser who wanted to be sure

11   they had title free and clear of the interests of others,

12   particularly given the pervasive nature of the interchange of

13   all of these parts, which is the first question the Court

14   asked is, is there something in here that lets Avantair do

15   this?  And I haven't found it.

16           In fact, it looks like to the extent Avantair has

17   taken parts off another plane, the owners of that plane to

18   which the parts are going to, it's at their expense.  They

19   really should be paying for those -- paying for those parts.

20   And that's an incredibly cumbersome process, but I think

21   that's -- but I think that's the way these program documents

22   are drafted.

23           If somebody takes the flight control surfaces and

24   they take the landing gear and the windshield off of 162SL and

25   they put it on their airplane, this paragraph 7 says that's at
```

1     the owners' expense of that airplane that it's going to.

2            And I don't know of anything yet anywhere that

3     indicates that somebody is coming back to the fractional share

4     interest holders of 162SL for all these parts that were taken

5     off of it.

6            THE COURT:  So are you suggesting that the owner

7     group of 169 should pay the value of the parts that are on 169

8     that come from 162?

9            MR. ANDERSEN:  Or from any other aircraft, Judge.

10           THE COURT:  Okay.

11           MR. ANDERSEN:  Or from any other aircraft.

12           THE COURT:  And how do you ascertain the value of

13    those things?

14           MR. ANDERSEN:  Well, and that comes to the -- I

15    mean, that ultimately comes to the final part of the motion.

16           THE COURT:  So you're suggesting that the ownership

17    groups for the aircraft that are sold have to first pay for

18    any parts on the plane that come from another aircraft before

19    the thing can be sold?

20           MR. ANDERSEN:  No.  Actually, Judge, I think that's

21    impractical.  I mean, I think that these parts have been

22    traded so pervasively -- and this is one thing we go through

23    in our brief.  But these parts have been so pervasively

24    exchanged that trying to find --

25           THE COURT:  You want a straight proration, is what

1  you want?

2       MR. ANDERSEN:  I think so, yes, Judge.  I don't know

3  if I heard you clearly but --

4       THE COURT:  A straight proration.

5       MR. ANDERSEN:  More or less.  And when I say more

6  or less, let me be -- I know I'm doing all around here, but

7  I've also read the responses, and they say this is totally

8  impractical, so let me try to be as clear as I can.

9       I think the most efficient administrable process is

10  straight proration based upon the fractional share interest

11  holders in the fleet.  In other words, to the extent aircraft

12  opt in and are sold by the Trustee -- and whether they opt in

13  or not is -- right now it's up to them.  Now, whether the

14  trustee would at some point be willing to assert a claim

15  against some of those planes, I don't know.  That's not up to

16  me.  But legally that's possible that that could be done.

17       So to the extent that one way or another aircraft

18  come into this estate and they're sold through the Trustee,

19  then the most efficient and administratively practical way to

20  do it is simply to say these people have, just like in this

21  case, 23.65 percent of the interest and somebody else has got

22  9.75 percent of, you know, 45 -- 44 airplanes, I guess it is

23  right now.  And this is the pool of money that comes in from

24  the sale of those planes.  And we prorate it based upon the

25  interest.

1          Now, you know, the argument that's been made by

2   the other side or by the movants is that this is impractical

3   because some of these people don't pay the same thing for

4   their shares, and that's probably correct.  And whether that

5   -- there needs to be some adjustment for that, maybe that's

6   also necessary.

7          But the long and short of it is that if these parts

8   were actually to be either credited or returned, it would be

9   impossible to return them all, I think.  To just go out and

10  take these airplanes apart and return these pieces of

11  airplanes.

12         Even if they were to be returned, Judge, they would

13  be used parts.  They might have come off a 162SL when it was

14  -- when the part was fairly new.  But now it may be near the

15  end of its limited life.  And so even if the part came back,

16  there would still need to be some credit for the use of the

17  part.  And under this Section 7, that's something the owners

18  of that plane are supposed to be -- you know, it's at their

19  expense, and Avantair is supposed to be collecting that -- you

20  know, somehow they're supposed to be collecting that money.

21  I don't think they did.

22         THE COURT:  There's another practical problem.  What

23  if some ownership groups don't agree to have their planes sold

24  in this fashion?  Why should they be entitled to share in the

25  proceeds of a few planes?

1          MR. ANDERSEN:  I can't --

2          THE COURT:  If we don't get 100 percent of the

3  planes here so that the pool is representative of everything

4  that's on all the planes, how do you decide who gets to

5  participate and who doesn't?

6          MR. ANDERSEN:  I think, Judge, the --

7          THE COURT:  660 owners for one -- sharing in the

8  waterfall from one plane is going to have it be, you know,

9  little teeny, tiny checks.

10         MR. ANDERSEN:  I mean, and as I addressed that in

11 our brief, Judge, the way I proposed it was to say -- I'm

12 going to use the term "pay to play."  I don't know whether

13 that's the right term or not.  But I would think that the

14 distribution should go to the parties that have opted into

15 these or are participating in these proceedings.

16         If someone's a fractional owner of an airplane and

17 they're before this Court and other people are before this

18 Court and they've opted in, for their own reasons, and we know

19 that 169 is --

20         THE COURT:  But we'd have to have 100 percent

21 participation for each plane.  I couldn't take a 1/16th owner

22 in from a plane that's not subject to sale and allow that one

23 to share in the proceeds.

24         MR. ANDERSEN:  If I may -- and this is where I'll be

25 -- I'm going to be over my head in a heartbeat, but if --

```
 1   under 363, if the Trustee has an interest, and the way these
 2   settlements are --
 3           THE COURT:  Right.  They're giving the Trustee an
 4   interest.
 5           MR. ANDERSEN:  And they're actually -- in the
 6   documents --
 7           THE COURT:  And then they can partition it and then
 8   the Trustee has an obligation to compensate the co-owners for
 9   the value of their interests.  So what you're saying is that
10   if even 1/16th of the ownership group agrees to give a portion
11   of that to the Trustee, the Trustee's got her hooks on the
12   plane.
13           MR. ANDERSEN:  Yes, Judge.
14           THE COURT:  So, for example, your 3 percent interest
15   in one of these planes that you all have, CCA.  If CCA says,
16   "Trustee, I'll give you half of that, sell my plane," then
17   you're saying to all the owners that are on that particular
18   tail number would participate in the proceeds of all the
19   planes that she sells, not just that one.
20           MR. ANDERSEN:  And they would also be limited to
21   the extent that -- to the extent this was the remedy that the
22   Court said, "This is the way we're going to distribute the
23   proceeds," they would also be limited in their recovery to
24   whatever came through this method of distribution.  So they
25   wouldn't -- it's not as though they --
```

 1          THE COURT:  They wouldn't be giving up their rights

 2   to chase down planes that don't come into the Trustee program.

 3          MR. ANDERSEN:  That's correct, Judge.

 4          THE COURT:  They could still go sue for their

 5   windshield, if the windshield happened to be on there and they

 6   were inclined to spend the money to --

 7          MR. ANDERSEN:  And I think perhaps assuming there's

 8   some limitations on double -- you know, more than one

 9   satisfaction.  I mean, I think somebody could raise it as a

10   bar to the extent they've already been paid for it, but I

11   think they would legally have those rights to pursue claims

12   outside the bankruptcy.

13          And again, that's assuming that the Trustee does not

14   at some point decide that there is an interest in all of these

15   planes and that they could be -- and that those interests

16   should be determined in some type of adversary proceeding

17   against the owners of those planes, and the planes brought

18   into this -- brought into this case.

19          You know, the provisions -- the terms of these

20   settlement agreements have some prefatory language which

21   recognized the basis for the Trustee's claims, and they

22   recognize, among other things, that -- you know, the fact that

23   they're, I believe -- let's just go right to the language.

24          THE COURT:  Many of the things that you read, for

25   example, about the managers' --

```
 1              MR. ANDERSEN:  In general, yes, Your Honor.  Let's
 2    see here.
 3              THE COURT:  -- control?
 4              MR. ANDERSEN:  (Locating document.)  Yeah, here we
 5    are.  Yeah.  "WHEREAS, the Trustee asserts that the bankruptcy
 6    estate of the Debtor has an interest in the Aircraft by virtue
 7    of, among other things, various parts and equipment installed
 8    by Debtor on the Aircraft prior to the Debtor's bankruptcy."
 9              THE COURT:  Where is that?
10              MR. ANDERSEN:  That's on the bottom of page 1 of --
11    let's see.  I'm actually looking at the 162SL settlement
12    agreement, but it's the same on 169.
13              THE COURT:  You're talking about the one that you
14    just handed up?  The draft?
15              MR. ANDERSEN:  Yes, but I think if you look at --
16    it's identical for the one for 169, Your Honor.
17              THE COURT:  Okay.
18              MR. ANDERSEN:  The prefatory language is identical.
19              THE COURT:  Okay.
20              MR. ANDERSEN:  And it basically says the reason that
21    (indiscernible) is compromised by saying, "The Trustee asserts
22    that the bankruptcy estate of the Debtor has an interest in
23    the Aircraft by virtue of, among other things, (a) various
24    parts and equipment installed by the Debtor on the Aircraft
25    prior to the Debtor's bankruptcy," which is exactly what we've
```

1   been talking about.

2          And then it does say, "The Debtor's rights to use

3   the Aircraft in the conduct of its business."  And (c)

4   "the possession and preservation of the Aircraft and the

5   logbooks....relating thereto (collective, the 'Trustee's

6   Claims')."  But this settlement agreement specifically is

7   predicated on the fact that these parts -- that the Debtor put

8   parts and equipment on these aircraft prior to the bankruptcy.

9          So, you know, where all this is going -- I know

10  where I'd like to see it go, but whether it goes that way, I

11  don't have a crystal ball.  But what I can say is, today, if

12  this 169SL settlement agreement is approved limiting the

13  proceeds only to the fractional share holders of 169SL, then

14  to the extent people have an interest in the parts on that

15  airplane, they're going to be barred from pursuing them in

16  this court or in a State Court, because it's going to be sold

17  free and clear of -- free and clear of the liens.

18          Now, if the proceeds come into this court, then

19  that's something that can be determined at a later -- you

20  know, at a later date, and could be done in the way that I'm

21  proposing.  It may be done through some creative negotiation,

22  which recognizes that maybe -- you know, maybe the fractional

23  share holders keep 75 percent of the proceeds and they carve

24  out 25 percent to compensate, you know, the pool.  And somehow

25  or another, one determines that some people are like 162SL and

1    their planes are donor planes and they need to be compensated.

2         And other people are selling planes that are, for

3    all practical purposes complete, and therefore they don't

4    need this subsidy, if you will.  But that could -- I'm just

5    saying that could be -- that could be something determined by

6    negotiation.  I don't think that's something that -- I mean,

7    from the Court's standpoint --

8         THE COURT:  Well, in the worst case scenario, I'd

9    have to decide it.

10         MR. ANDERSEN:  It would, and we referenced --

11         THE COURT:  But there are some cases -- I know about

12    the cases.  I asked you all to look at, for example, Berkley

13    Multi-Units.  This was a very earlier hearing in this case,

14    but there was a time when there were multiple mortgages given

15    on multiple commercial properties operated by Berkley Multi-

16    Units.

17         And they were essentially securities, but they were

18    interests in land.  And they were recorded at or around the

19    same time.  And there were a number of tranches -- excuse me,

20    a number of individuals who would become, say, a layer one, or

21    a layer two or a layer three mortgagee.  And Judge Paskay --

22    and I don't remember what the analysis was.

23         He felt, I guess, that it would be unfair to reward,

24    you know, the first one when there were so many.  And he

25    basically treated each layer in *pari passu* notwithstanding

Page 66

```
 1    when they, you know, got to the res, since you used the res
 2    notice phrase.
 3             And there evidently was some equitable basis for
 4    doing that.  I don't know if any of you took me upon the
 5    suggestion or not.
 6             MR. ANDERSEN:  Judge, we refer in our brief --
 7             THE COURT:  I saw the Wilhelmina thing?
 8             MR. ANDERSEN:  The Wilhelmina case, which is not a
 9    bankruptcy case.
10             THE COURT:  Right.
11             MR. ANDERSEN:  But it is -- and I don't know how to
12    pronounce the word.  I know how to spell it.  I always say
13    cy pres (pronouncing sy-pray) but --
14             THE COURT:  Yeah, that's how I would say it.
15             MR. ANDERSEN:  But, you know, that is a -- as I
16    understand it -- and I frankly remember it from law school
17    because I had to edit a Law Review article and somebody wrote
18    about it, otherwise I wouldn't know anything about it either.
19    But basically it's the idea of a next best distribution when
20    it's impractical to distribute --
21             THE COURT:  Economics would probably -- if we took
22    into account everything that the owners of N169 suggest in
23    their paper, it would be a nightmare to really come up with a
24    value and offsets and so forth for each and every piece.
25             MR. ANDERSEN:  I think, Judge --
```

```
1              THE COURT:  But let me go --
2              MR. ANDERSEN:  All right.
3              THE COURT:  I don't want to cut you short.  Are you
4    concluded pretty much?
5              MR. ANDERSEN:  I was going to point out one
6    additional paragraph to you just so that --
7              THE COURT:  Oh, all right.  Go ahead.
8              MR. ANDERSEN:  -- of the lease just so that -- for
9    the Court's benefit because I think this is also a fairly
10   significant term, Your Honor.
11             THE COURT:  That's the MDLA?
12             MR. ANDERSEN:  Yes, Your Honor.
13             THE COURT:  Okay.
14             MR. ANDERSEN:  And that's on page 8.  It's paragraph
15   8, which is entitled Manager's Use of the Aircraft.  And this
16   again goes to the limited right of the fractional share
17   holders to use the aircraft and the unlimited right of the
18   manager to use it.
19             It says, "The Owner acknowledges that the Manager
20   shall have the right, when the Aircraft is not being used by
21   Owner or any other Program participant, to use the Aircraft
22   for any purpose in its sole discretion, including without
23   limitation, operation under Part 135.  Manager may retain any
24   compensation or reimbursement received by management in
25   connection with such use of the Aircraft."
```

1           This is similar to the provision in the aircraft

2    purchase agreement --

3           THE COURT:  But different.  But different because

4    the proceeds are held for the benefit of the co-owners in the

5    first one, right?

6           MR. ANDERSEN:  No, I don't think so, Judge.  I think

7    they're actually held -- if we go back to the first one -- let

8    me find that term.  It's --

9           THE COURT:  Oh, it's paragraph 4 on page 5.  Let's

10   see, "Seller or Manager shall retain any compensation or

11   reimbursements received in connection with such use, and

12   Seller shall be responsible to pay for and shall" -- oh,

13   costs, I see.

14          MR. ANDERSEN:  Costs.  Exactly, Judge.  Just the

15   costs.  So this is -- again, this is similar, but this

16   emphasizes that the manager may use this property --

17          THE COURT:  Isn't that permission to take your

18   pieces parts off of your plane and put them on another plane?

19          MR. ANDERSEN:  I would say to use the airplane would

20   mean to operate it, rather than to actually take the parts

21   off, Judge.  I mean, I really do -- I think "to use" means to

22   use it -- well, in fact it does say that.  It says, "To use

23   the aircraft for any purpose at its sole discretion."

24          THE COURT:  Yeah.  Even as a donor plane.  Doesn't

25   that operate against you and give you merely just a contract

1   claim?

2            MR. ANDERSEN:  I would say not, Judge, because I

3   think -- I mean, quite honestly, I think the term "use"

4   particularly when it uses -- when it finishes the sentence by

5   saying "operation under Part 135," it's referring to "use" as

6   operating.

7            THE COURT:  So you're talking about -- and now I'm

8   going to butcher it because it's Latin, *ejusdem generis*.  Is

9   that what you're saying?

10           MR. ANDERSEN:  Oh.

11           THE COURT:  Use is modified by maintenance,

12   training, demonstration and positioning.

13           MR. ANDERSEN:  Oh, we're on two different

14   paragraphs, I'm sorry.

15           THE COURT:  And FAR 135.

16           MR. ANDERSEN:  I'm sorry, Judge.  I jumped back to

17   the lease agreement.  You're back on the --

18           THE COURT:  Yup.

19           MR. ANDERSEN:  -- purchase agreement.  Okay.  And

20   we're looking at paragraph 5.

21           THE COURT:  What does it mean, "Manager may use the

22   aircraft for maintenance"?

23           MR. ANDERSEN:  What that means to -- what that

24   means, Judge, is that it's necessary when new parts are put on

25   the plane or when a new engine -- or if there's a problem with

```
 1   the engine, then they can go out and they can run the engine.

 2   And while this may not --

 3            THE COURT:  Or in some respects, they have to run

 4   the engine every so often, as we've learned.

 5            MR. ANDERSEN:  Yeah, and they have to do it to

 6   comply with the Federal Aviation Regulations.  And this may

 7   sound like madness to most lay people.  But people really do

 8   take airplanes up on test flights right after the maintenance

 9   is done to make sure they work all right, so --

10            THE COURT:  Okay.  So your definition of "use" is

11   going to be different from maybe what I'm going to hear in a

12   minute.

13            MR. ANDERSEN:  Presumably.  And let me just argue a

14   little bit more for my definition.  If we go back to the lease

15   itself on paragraph 8 --

16            THE COURT:  Okay.

17            MR. ANDERSEN:  Section 8.

18            THE COURT:  Page 8?

19            MR. ANDERSEN:  On page 8, Section 8.  It says, "The

20   Manager shall have the right, when the Aircraft is not being

21   used by Owner."  So I would say to use -- and the only use the

22   owners can do is to operate it for x-number of hours.  So when

23   the aircraft's not being used by the owners -- by the owner,

24   then the manager may use the aircraft.

25            So I would say used is being used -- the word "use"
```

1    is being used in the same way as it relates to the owners

2    using the aircraft.  And when they're not using the aircraft,

3    during that period of time they're not using it, then the

4    managers can use the aircraft.

5            And they can use it, and there's no limit to that.

6    So they can use that aircraft -- as long as it doesn't

7    interfere with this limited number of hours that they've

8    granted to the fractional holders, they can use that airplane

9    as much as they want to.

10           So and to some degree, Judge, this is something I

11   thought about and I'll share this and I'll sit down.  But

12   if these fractional interest holders were really owners of

13   property -- if I owned a car, for example, and maybe two or

14   three of us owned a car, and we had a particular garage that

15   took care of the car, the last thing in the world we would do

16   as owners of that property is tell the garage owner, "When

17   you've got my car, you can use it any time you want to, you

18   can go anywhere you want to go with it.  You can rent it out

19   to people if you want to rent it out to people.  You can

20   charter it."  Not that you charter cars.  "But you can use it

21   as a taxi cab, I guess.  And you keep all the profits from

22   that.  And even though it's my car, that's okay with me,

23   that's what you're entitled to do."

24           And I think frankly, Judge, when we go back to this

25   whole question about what really are the property interests

1    here of the fractional shareholders, I think that really casts

2    a real cloud over what those interests really are.

3            I mean, this is very close -- candidly, it's very

4    close to being a lease to the fractional shareholders, but a

5    lease with some economic interest in the residual value.

6            THE COURT:  Doesn't that hurt you?  Doesn't that

7    hurt your client's position?

8            MR. ANDERSEN:  Potentially it could, Judge.

9            THE COURT:  Okay.  Let me go over to the other

10   side now.

11           MR. ANDERSEN:  Okay, thank you, Judge.

12           THE COURT:  You're welcome.  Mr. Bird, setting aside

13   that last comment, and then let's call these ownership

14   interests in the planes and, thus, in the pieces parts, how

15   can the Trustee -- how can you demand that the Trustee not

16   adhere to 363(j).

17           MR. BIRD:  Well, Your Honor --

18           THE COURT:  What would be your authority for saying

19   that you're going to hold hostage the Trustee from exercising

20   her duty under 363(j) to pay the co-owners the value of their

21   interest in the thing being sold.

22           MR. BIRD:  Well, Your Honor, I appreciate the

23   question, and I would say that, first of all, the Trustee is

24   not being held hostage at all.  She's on our side of the

25   courtroom because she supports our position.  And more

1    importantly, the co-owners is a term of art in the contract

2    and in the program documents as Mr. Andersen referred to them.

3    And those co-owners are owners of that specific aircraft.

4              THE COURT:  But it includes the parts that make up

5    the whole.

6              MR. BIRD:  Well, Your Honor, under the settlement

7    agreement as to 169SL, as is before the Court here, it does

8    contemplate returning certain parts to those aircraft.  The

9    issue, as Your Honor has noted several times now, is the

10   waterfall.  And I would respectfully say that it's not only

11   the fifth step of the waterfall that is at issue here; it's

12   the second one, which is the expenses that go into marketing

13   the aircraft, restoring the aircraft.

14             THE COURT:  No, sir.  363 allows a deed-up for that.

15             MR. BIRD:  Well, I would also say, Your Honor, that

16   under 363(h), there is the ability to sell the interests of

17   co-owners --

18             THE COURT:  Yes.

19             MR. BIRD:  -- but not to distribute those proceeds

20   to non-owners of the aircraft.

21             THE COURT:  Non-owners of the parts.  If what she's

22   selling includes parts that belong to somebody else, then

23   those people are co-owners --

24             MR. BIRD:  Of those parts.

25             THE COURT:  Well, of those parts, and indeed with

1   you all, with all the interest holders in 169SL.

2          MR. BIRD:  Well, our position, Your Honor, is

3   that -- and, again, we are not defending Avantair's conduct

4   underneath the program documents.

5          THE COURT:  I know that.  I came into this hearing

6   with a very different impression.  My mindset, and I think

7   I've said this a couple times, is:  If you all agreed to allow

8   your stuff to be cannibalized, then you've waived an argument

9   that at the end of the day you're going to get the value out

10  of the legs that went -- that used to be on your plane but are

11  now on somebody else's plane.

12         But apparently that's not in here.  And so my

13  impression now is very different.  And if the legs on one

14  plane are over on your plane, then you've got extra co-owners.

15         MR. BIRD:  That's true, Your Honor, but --

16         THE COURT:  And 363(j) says what it says.

17         MR. BIRD:  Well, Your Honor, I think the first step

18  would be to the contract documents, and I think if you'd give

19  me a moment to redirect your attention there.

20         THE COURT:  Okay.

21         MR. BIRD:  I think the thrust of our argument is

22  threefold, is that the contract says what it does, so the

23  pooling approach that is being proposed in broad strokes by

24  Mr. Andersen is legally indefensible, it's inequitable and

25  assures, again, as Your Honor recognized, the virtual reality

```
 1   of unattended consequences that will eventually consume the

 2   Court's time, diminish returns for the estate, and --

 3          THE COURT:  Unless you just do a straight proration

 4   that apparently the Wilhelmina case, which I've not read,

 5   suggests, or what my mind is telling me happened in the

 6   Berkley Multi-Units case.

 7          MR. BIRD:  Well, Your Honor, I think that would

 8   defeat the equity argument because specifically -- and as

 9   Mr. Andersen very thoroughly noted, that this is a highly

10   regulated arrangement between fractional owners and the

11   management company regulated by the FAA with apparently

12   some pretty lengthy origins.  And we believe that our

13   interpretation of the program documents is supported by

14   federal law.

15          And to Your Honor's point, is that if it were not

16   for the depreciation aspect of the IRS code, which we point

17   out in our motion, I think that defeats Mr. Andersen's

18   argument that those owners of the -- the have-nots, so to

19   speak of -- the owners of those cannibalized planes have

20   realized some benefit of that.

21          There is many different avenues for private

22   aircraft ownership on the market.  Part 91(k) obviously covers

23   fractional ownership programs and presumably it was elected

24   voluntarily by all the program participants.

25          One of the benefits of that, from a practical
```

1  perspective, is the depreciation that the owners can take,

2  that the IRS has recognized specific to Part 91(k) programs.

3  So we would say --

4          THE COURT:  So tell me how that -- you know, there's

5  a missing link there.  There can be a recapture.  So tell me

6  what your point is.

7          MR. BIRD:  My point is, Your Honor, is that there's

8  not only no unjust enrichment, as Mr. Andersen argues in his

9  objection.  There's very little enrichment at all.  And if

10  there has been an enrichment realized, it's been by both

11  sides.

12          If you have a -- there is an implicit understanding

13  in this agreement that airplanes will have unequal flight

14  hours.  And whether or not -- when you sign up under the dry

15  lease, you may or may not have your plane.  And Avantair had a

16  large amount of discretion --

17          THE COURT:  Are you making the arguments for a

18  proration?

19          MR. BIRD:  I'm not, Your Honor, because --

20          THE COURT:  It's too difficult from a practical

21  standpoint to do it with a fine point.

22          MR. BIRD:  Well, I think from a practical

23  standpoint, our approach is simply if you like your plane, you

24  can keep your plane.  And if you don't, you can file a claim

25  to the estate for the deficiency and recover that way.

1            THE COURT:  Okay.  But if the legs on another

2   person's plane are being sold with that other person's plane,

3   why don't they get the proceeds representing the value of the

4   legs?

5            MR. BIRD:  I'm not sure, Your Honor, that we're

6   saying they should not, but I should say that --

7            THE COURT:  Let's just --

8            MR. BIRD:  -- that the pooling approach --

9            THE COURT:  Let's just give a really -- something

10  that's not too obtuse.  The landing gear --

11           MR. BIRD:  Sure --

12           THE COURT:  -- from 162SL are on 169SL.  That's the

13  hypothetical.

14           MR. BIRD:  Yes, ma'am.  And I think under --

15           THE COURT:  You all want to sell 169SL and you want

16  the waterfall to be dropped down to your owner group, and

17  you're going to tell the people that donated the legs, the

18  landing gear, that they don't get a piece of it.

19           MR. BIRD:  Well, Your Honor, both our motion --

20           THE COURT:  Why?

21           MR. BIRD:  We're not saying that, Your Honor.  We're

22  saying that the owners of 158SL are not -- or any other third

23  party program participant has no ownership rights in those

24  legs whatsoever.  Both the --

25           THE COURT:  Why?

1          MR. BIRD:  Why do they not have an ownership in

2   that?

3          THE COURT:  Right.  Let's just use the garage then,

4   if you don't like the airplane.  Four tires were taken, at the

5   garage, off of Mr. Andersen's car and they were put on the

6   garage owner's car, and then he sold that car.  Don't the

7   value of the tires come back to Mr. Andersen and his group

8   that owned the first car?

9          MR. BIRD:  Quite possibly, but not to the owners of

10  other aircraft who do not.  And under the pooling approach,

11  there would be a distribution to --

12         THE COURT:  Okay.  Well, then would you agree, at

13  least then, to the extent that someone can prove that there's

14  a part on a plane, that they participate in the waterfall?

15         MR. BIRD:  As long as they participate in the

16  expenses to restore that plane, yes, and that's contemplated

17  by the omnibus order.

18         THE COURT:  The expenses are born at the Trustee

19  level.  That's a takeout under 363.  Are you talking about

20  some other expenses?

21         MR. BIRD:  Well, I'm talking about the -- and if

22  Your Honor will indulge me for a moment to pull out the actual

23  motion at issue here.  If I may approach, Your Honor, I have

24  my own exhibits that it might help us stay on the same page.

25  If I can provide those to the Court?

1          THE COURT:  Sure.

2          MR. BIRD:  (Presenting documents.)

3          THE COURT:  Where do you want me to go?

4          MR. BIRD:  Your Honor, if you would turn to Tab 1,

5   please, which I believe is Docket No. 270.

6          THE COURT:  This is the motion, right?

7          MR. BIRD:  Yes, ma'am.

8          THE COURT:  Okay.  So where -- what page?

9          MR. BIRD:  Your Honor, I think we're looking at

10  page --

11          THE COURT:  Liens come first.  This is page 3?

12  Liens come first.

13          MR. BIRD:  Yes, Your Honor, I'm sorry.  At the

14  bottom of page 3.  And I'm looking --

15          THE COURT:  Okay, you're talking about -- you're

16  talking about the expenses -- not the expenses of sale.

17  You're talking about the expenses of preservation.

18          MR. BIRD:  Correct, Your Honor, and I think we could

19  presume that the expenses of sale are included in that.  If,

20  for example, 169SL has the landing gear of 162SL -- and I'm

21  not sure that is the case --

22          THE COURT:  Just assume it so we can --

23          MR. BIRD:  Presume it being the case.  That the

24  expenses have been paid to store those legs.  And until -- and

25  that's --

1          THE COURT:  Okay.  I understand your argument now.

2   Okay, so there would have to be some participation.  If you're

3   going to participate in the fifth level, you've got to

4   participate in the second level.

5          MR. BIRD:  Well, yes, Your Honor, and I think that

6   goes to, again, the utter impracticability of the pooling

7   approach as proposed, or as not proposed, and we would contend

8   that no specific plan has been proposed that is practical

9   because one does not exist, that until you can do all the

10  offsetting that we outline in our response to the objection,

11  that you can effectively prorate not just the proceeds but the

12  expenses, then not only is it not equitable, it's not

13  practical.

14          And at the end of the day, once the owners realize

15  that there is no guaranteed return on investment whatsoever,

16  that you're going to lose participants in the program.  I

17  think if the Court is looking for a line to draw in this

18  matter, it may be --

19          THE COURT:  I may just draw the line and say get

20  out, you all go --

21          MR. BIRD:  Well, Your Honor, I think --

22          THE COURT:  -- you all go and have the headache that

23  will be a real headache if you're not here.

24          MR. BIRD:  Sure, Your Honor.  And I think 169SL

25  demonstrates the ability of a group of co-owners as the co-

1   owners of the aircraft, again a term of art defined in the

2   program documents, to work with the Trustee.  And under the

3   omnibus order and the limited stay relief, the recommendations

4   of Your Honor's omnibus order as proposed by -- well, the

5   recommendations that ownership groups can work with the

6   Trustee and other ownership groups to reassemble a plane as

7   necessary.

8           The issue is not indemnifying necessarily Mr.

9   Andersen's group for the landing gear.  The issue is entitling

10  other program participants who, under the ownership documents,

11  under federal law, and just under a practical understanding of

12  the situation, have no interest in those parts whatsoever.

13          THE COURT:  All right.  Tell me about what federal

14  law says that if you take landing gear off one plane, they

15  lose the right -- the owner of those landing gear lose their

16  right.

17          MR. BIRD:  Well, Your Honor --

18          THE COURT:  And we're assuming that -- and we are

19  assuming that a third party took that stuff off without

20  permission.

21          MR. BIRD:  Sure.  And whether or not federal law

22  supports that, I don't --- I don't know how that entitles,

23  again, other third party program participants to the proceeds

24  of the sale of that.  Whether an agreement can be worked out

25  with the original owners of that landing gear is different.

```
 1    And to the extent that the program documents have been

 2    breached by Avantair, that claim is as to Avantair or the

 3    estate.  The burden of indemnifying --

 4              THE COURT:  No, we know that part.  We're just

 5    talking solely about a part that is -- for hypothetical sake,

 6    is undebatably somebody else's that has been put on that

 7    plane.

 8              MR. BIRD:  Sure, Your Honor, and --

 9              THE COURT:  And you're cutting off their right to

10    trace that when the plane gets airborne in the hands of the

11    new owner.  And so how are they ever going to be compensated

12    for that part.

13              MR. BIRD:  Well, Your Honor, we would argue that

14    they become accessories to the plane like fixtures.  With

15    the exception of some titled parts such as the engines,

16    the airframe, and the propeller, there are over 100 time-

17    controlled parts on these aircraft.  And that's just my

18    basic understanding of the issue.

19              Chasing down that rabbit hole, Your Honor, frankly

20    to recover, as Your Honor put it, a cup holder, is not in

21    the best interest of this Court.  It's not certainly in the

22    efficient interest of administering this estate.  That is the

23    duty of the Trustee.  And it has -- there's a questionable

24    relationship between the original owners of that part's

25    entitlement to the proceeds because of the extent that they
```

1   had relinquished rights to Avantair and --

2          THE COURT:  Did they ever relinquish the right for

3   Avantair to commit theft and take off a piece of its plane,

4   their plane, and put it on someone else's plane?

5          MR. BIRD:  Well, Your Honor, we obviously would take

6   a different position of the discretion as to the usage of the

7   plane.

8          THE COURT:  So I've got to construe that paragraph's

9   meaning.

10          MR. BIRD:  I'm not sure you need to construe the

11   paragraph's meaning, Your Honor, but --

12          THE COURT:  Sure.  The term "use."  You say that

13   everyone gave permission to cannibalize, and Mr. Andersen says

14   everyone gave permission to use it in the sense of operating

15   it.

16          MR. BIRD:  Well, we would say that that's not as

17   unpalatable a choice that the Court may see it, because under

18   the federal tax laws, they're entitled to the depreciation

19   that is incurred when you have the diminished value of the

20   plane and, obviously, I believe 162 is the cannibalized plane.

21          THE COURT:  That's not a dollar-for-dollar -- do you

22   think depreciation is dollar-for-dollar compensation?

23          MR. BIRD:  Absolutely not, Your Honor --

24          THE COURT:  Okay.

25          MR. BIRD:  -- but it was contemplated going into

1    this agreement.  And if that was a question --

2            THE COURT:  Are you telling me that these people

3    thought that their landing gear could be taken off and that

4    their agreement is that the consideration for that would be

5    that they would get a tax deduction?

6            MR. BIRD:  Not solely, Your Honor.  They also had

7    access to flights on demand.  And that's one of the benefits

8    of the Part 91(k) program.  If you want to have your own

9    plane, presumably a party can buy their own plane and you will

10   be the only one flying it at all times.

11           But I guess to use a law school analogy, to whatever

12   extent the bundle of sticks that comprised the ownership

13   interest, the property interest in these owners -- and we

14   believe that -- we believe we're supported by federal law that

15   fractional ownership is true ownership entitled to the same

16   benefits and liabilities as conventional ownership.  And to

17   the extent that bundle of sticks has been distributed, those

18   sticks now lie with Avantair.  They do not lie with the

19   program participants.

20           And Mr. Andersen said nothing that changes that.

21   Co-owners are co-owners of a specific aircraft.  They are

22   not program participants.  And very specifically in the

23   regulations governing these types of programs, 14 CFR Section

24   91 is very clear.  And if I can direct Your Honor's attention

25   to Tab No. 8, which is the start of Part 91(k), it's quite

```
 1   extensive.

 2           Section 91.1001(b)(3) reads as follows, "A

 3   fractional owner or owner means an individual or entity

 4   that possesses a minimum fractional ownership in a program

 5   aircraft, not in the program at large, and that has entered

 6   into the applicable program agreements."  Again, this is not a

 7   fly-by-night operation where you are making an agreement with

 8   the fellow that shares a hangar with you or with the garage

 9   owner where you keep your car.  This is a very specific,

10   highly regulated type of program.

11           And going on, Your Honor:  "That has entered into

12   the applicable program agreements, provided, however, in the

13   case of the flight operations described in paragraph

14   (b)(6)(ii) of this section, and solely for the purposes of

15   requirements pertaining to those flight operations, the

16   fractional owner operating the aircraft will be deemed to be

17   a fractional owner in the program managed by the affiliate."

18           Your Honor, the takeaway of paragraph (b)(3) is that

19   with only one narrow exception, the ownership interest is

20   specific to the aircraft, not to the fractional program at

21   large.  And, again, we would not dispute that -- well, we

22   would dispute that beyond the specifically-titled parts of the

23   aircraft, because they are so expensive and it would be highly

24   impractical to pursue them, that those other parts would

25   become fixtures -- exceptions to the plane, like fixtures.
```

```
 1              THE COURT:  What's (b)(6)(ii)?
 2              MR. BIRD:  (b)(6)(ii), Your Honor, talks to -- or it
 3  speaks to affiliates of program managers that may conduct
 4  their own program plan.  So if Avantair had a wholly-owned
 5  subsidiary, for example, a program participant in Avantair's
 6  program --
 7              THE COURT:  Okay.  Well, are you saying the
 8  something as Mr. Andersen?  That they have an interest in the
 9  aircraft?
10              MR. BIRD:  We're certainly say -- yes.  Yes.
11              THE COURT:  Okay.  Well, then tell me how --
12              MR. BIRD:  And we're saying that --
13              THE COURT:  Tell me how this argument means that you
14  -- you have an interest in the aircraft and that you are
15  giving up the right to keep your parts?
16              MR. BIRD:  Your Honor, we'd say that's im -- we'd
17  says that's implicit in the management agreement, and again,
18  to --
19              THE COURT:  Again, it comes down to use.  If
20  everyone waived -- if everyone waived their right to complain
21  about cannibalization, then the musical chair program applies.
22  If they didn't, then why wouldn't they expect to have
23  compensation for the tires in the event of a car, landing
24  gear in the event of an airplane?
25              MR. BIRD:  Well, Your Honor, it's not -- it's not
```

1    their interest that we're talking about with the pooling

2    approach.  The pooling approach, because those proceeds would

3    be generated for the distribution among all the program

4    participants, it would implicitly vest everyone else that

5    participated in the proceeds without requiring them to

6    participate in the expenses of storage, maintenance, and

7    marketing of the aircraft.

8         Okay, Your Honor asked the parties to work these

9    issues out amongst themselves, and I believe our approach does

10   that.  Certainly it does it better than the pooling approach.

11        THE COURT:  Well, we wouldn't be sitting here for,

12   now, two hours if you all had worked it out.

13        MR. BIRD:  Well, Your Honor, frankly, I don't think

14   the owners of 169 contemplated an ownership interest being

15   asserted by someone who does not demonstrably have an interest

16   in that aircraft whatsoever.

17        THE COURT:  Do you have a list of the parts?

18        MR. BIRD:  I do not believe so, Your Honor.

19        MR. VERONA:  Your Honor, may I just make one

20   comment?

21        THE COURT:  There's some exhibit, although I haven't

22   seen it.  Mr. Andersen said it was attached to his motion, but

23   I only got the draft settlement agreement that shows a list of

24   parts.

25        MR. ANDERSEN:  Judge, if I may, the list of parts

1  that I have is that -- each of the aircraft has a list of the

2  original parts to it.  And the only -- and they're called the

3  Build Records.  The Trustee does have all of the Build Records

4  for all of the planes that list all the original parts of all

5  these planes.

6          THE COURT:  Piaggio put that together.

7          MR. ANDERSEN:  Yes, they did.  And so that does

8  exist, and that's what I was referring to is the list of

9  original parts.  And the only list I have is -- the only ones

10  I've asked for -- Ms. Sherman's got --

11          THE COURT:  Is this an academic exercise?  Have you

12  identified any of those original parts to be on 169?

13          MR. ANDERSEN:  Judge, no, I have not.  But I don't

14  think it's an academic exercise because I know that -- for

15  example, we know what the condition of 162SL is, so we know

16  those parts have gone somewhere.  169SL, those co-owners have

17  not demonstrated that what they want to sell and what they

18  want to keep the proceeds for are parts that were originally

19  on their aircraft.

20          And given the pervasive nature of the use of these

21  parts, my understanding is when we look at the books and

22  records, virtually every airplane out there has got parts

23  from another airplane on it.

24          Now, 169SL is the worst case.  I mean, it's

25  got parts that, you know, have rendered it useless and --

```
 1    essentially worthless other than its engines.  But all of the

 2    other airplanes are in the same boat in the sense that their

 3    parts were taken off of those planes and they were put on

 4    others.

 5            So if we were given -- and this is a preliminary

 6    hearing, but if we needed to go to 169SL, we probably could

 7    look at the books and records and we would find that it

 8    contains many parts.  Now, maybe it doesn't have any of the

 9    parts from 169S -- excuse me, 162SL, but it may -- but I'm

10    quite confident that it'll contain -- it'll have many parts

11    from other airplanes.  And that's why we're saying that the

12    right of --

13            THE COURT:  But you're the only one that cares.  All

14    the other groups don't care.  They're saying these people

15    ponied up to release them from the lien, they ponied to do the

16    storage, they ponied up to do this.  Where were you?  Did you

17    volunteer to help that effort?  And if your landing gear is on

18    there, what do you propose as a fair reimbursement for the

19    expenses of preservation?

20            MR. ANDERSEN:  Well, with all due respect, Judge, I

21    think our motion does say that we're going to pay our share of

22    the records work.  And in our motion on 162SL also says that

23    we're going to pay the Trustee's fee, which is part of the

24    opt-in process, which is the --

25            THE COURT:  Well, that's the carveout, but I mean
```

1    the preserva -- okay, let's say your landing gear is on 169.

2            MR. ANDERSEN:  Right.

3            THE COURT:  They paid to keep 169 together, and to

4    keep it from being liquidated by a mechanic's lien, let's say,

5    or whatever the other expenses are.  That, in essence, helped

6    to preserve your landing gear.  So what do you want to do to

7    contribute to that?  If we're talking about putting a value on

8    the landing gear, shouldn't that be subject to an offset?

9            Or are you just going to say they're good samaritan

10   volunteers?

11           MR. ANDERSEN:  No.  I'm not going to -- what I may

12   say is that they're -- what I may say is even worse, Judge,

13   and that is -- I mean, the Court pointed out a minute ago that

14   -- and I cited Florida law to the effect that basically a

15   thief can't pass good title.

16           If somebody took these parts off of 162SL and they

17   did it without authority, that constituted conversion.  The

18   fact that some other party has done something to preserve

19   those parts, perhaps there is some type of quantum meruit

20   claim.  I'm not going to say that we --

21           THE COURT:  You're talking estoppel then.

22           MR. ANDERSEN:  -- we want a free ride.

23           THE COURT:  You're saying they're estopped.  If

24   they're voluntarily preserving something knowing that it's

25   somebody else's, they're estopped to complain about that when

1    you decide to say, "Give me my stuff back."

2            MR. ANDERSEN:  I think that's probably the right

3    result, Judge.

4            MR. BIRD:  Well, Your Honor, we'd also say that

5    it's, again, not solely limited to 169SL.  Under the program

6    documents, more owners -- program participants, beyond just

7    the co-owners of 169SL were entitled to fly.

8            I think this would be opening a Pandora's box to

9    track every owner on every plane so you can appropriately

10   value the amount of depreciation and --

11           THE COURT:  Well, why do you all get to be the

12   winners and then the shells like 162, they end up being the

13   losers?  I mean, what if we did this in the -- you know, the

14   nature of the Ponzi scheme game.

15           MR. BIRD:  Sure.  Well, it's not a Ponzi scheme.

16   It's highly regulated.

17           THE COURT:  I get that but, I mean, you're the net

18   winner.  Shouldn't you have to put some back towards the net

19   losers?

20           MR. BIRD:  And arguably, Your Honor, we have.

21   I think, again, going to maintaining the aircraft --

22           THE COURT:  I know.  You're saying --

23           MR. BIRD:  -- marketing the aircraft --

24           THE COURT:  You're saying the carveout to the

25   Trustee --

1          MR. BIRD:  Correct.

2          THE COURT:  -- is that.

3          MR. BIRD:  Yes, absolutely.  And I think, again,

4  it's a very complex relationship, going back to the bundle of

5  sticks, as to the co-owners and Avantair, but it's not a

6  complex relationship as between co-owners that are program

7  participants.  Frankly, and if Your Honor is inclined to do

8  it, we would say that -- I would direct your attention to Tab

9  No. 6, page 8, paragraph 8, which is the manager's use of

10  aircraft provision that Mr. Andersen cited during his

11  argument.

12          Again, it's substantially equal.  I just think that

13  to stay in this binder is probably more effective.  We would

14  say that "any purpose in its sole discretion, including,

15  without limitation, operation under FAR Part 135," that use,

16  when read in the context of the full document, includes

17  maintenance, includes keeping planes in the air and could

18  potentially include using donor aircraft --

19          THE COURT:  What about --

20          MR. BIRD:  -- to use their preferred euphemism.

21          THE COURT:  What about the companion agreement

22  that seems to suggests what I said, the *ejusdem generis*?

23          MR. BIRD:  Right, Your Honor, and I believe --

24          THE COURT:  And that's a little bit different

25  language.  And don't we read those together because these are

1    executed contemporaneously?  They're part of one program.

2           MR. BIRD:  If Your Honor will direct my attention

3    back to that --

4           THE COURT:  And what -- you know what, on the

5    other hand, what do I make of the -- what do I make of the

6    difference in language between the two.  Why was one very

7    different from the other, and yet it's the same heading?

8           MR. BIRD:  Well, Your Honor, I think for the

9    purposes of practicability and the efficient administration of

10   the estate, there may be, down the road, a way for Mr.

11   Andersen to convince even myself that they have some type of

12   ownership interest in 169SL or in the program fleet.  But I

13   think our method, it allows them to be -- to maintain that

14   claim as to Avantair.

15          I don't know where the Court will find the ability

16   to -- if we adopt this cooling approach to --

17          THE COURT:  We don't have to adopt anything.  Why

18   can't we just sell it and have me decide later.  You all have

19   got the gun to the Trustee's head.  You're saying, "If this

20   doesn't come out this way, we're not doing it."  I'm putting

21   the gun back on you all.

22          MR. BIRD:  Sure, Your Honor, and I think -

23          THE COURT:  I don't see how --

24          MS. APPLEGATE:  Your Honor, it's Amanda Applegate.

25   I represent the same group of owners that Mr. Bird represents.

1   May I be heard.

2            THE COURT:  Yeah, sure.  I was going to finish my

3   sentence.  If I think that 363(j) is something that I need to

4   determine, you know, whether that is being violated by this

5   agreement in derogation of someone's rights, depending on how

6   I would construe use, then I can't approve it, and that's just

7   going to be disastrous for everybody.

8            So I was hoping there would be a middle ground.  But

9   go ahead, Ms. Applegate.

10           MS. APPLEGATE:  I just wanted to speak to the

11  general understanding of fractional ownership.  You know, my

12  background is that I worked for NetJets, which is the largest

13  fractional ownership company, has about 70 percent of the

14  market share --

15           THE COURT:  I can't hear you very well.  Are you on

16  a speaker phone?

17           MS. APPLEGATE:  Yes.  Let me change that.  Sorry.

18           THE COURT:  Okay, why do all -- CourtCall rules are

19  very specific.  You can't be on a speakerphone.  This morning

20  we heard why that was.  Some man we couldn't hear, we could

21  all of a sudden hear clearly.

22           MS. APPLEGATE:  Okay.  Is this better, Your Honor?

23  I apologize.

24           THE COURT:  It's a little bit better.  Go ahead.

25           MS. APPLEGATE:  Anyway, I was just saying that in

1    all fractional programs, parts are moved around from aircraft

2    to aircraft.  That is standard within the industry.

3           And so the question, I think, before the Court is

4    the fact that at the time that the music stops, certain parts

5    were affixed to certain aircraft.

6           And I would argue that under general aviation law,

7    the parts affixed to those aircraft belong to those aircraft

8    with the exception of the engines and propellers.

9           And that's why in the motion to settle for 169, we

10   contemplate that the engines and propellers will be returned

11   to the owners but that everything else would stay affixed to

12   the aircraft.

13          THE COURT:  What about the undercarriage?

14          MS. APPLEGATE:  It's not contemplated that it's a

15   separate unit.  You don't put a -- if you were to finance your

16   aircraft, the landing gear and undercarriage wouldn't be a

17   separate line item on that lien with the bank or on a title

18   search with the FAA.

19          THE COURT:  Okay, and the --

20          MS. APPLEGATE:  Only the engines and propellers.

21          THE COURT:  All right.  Give me your citation to

22   general aviation law first.  And then secondly the industry

23   standard.  And I would like to know, as a subpart to that,

24   whether the industry standard says you can move parts off of a

25   plane but you can leave the parts that -- you can leave the

1   plane that they came from barren.  Is that industry standard?

2           MS. APPLEGATE:  Okay.  With regards --

3           THE COURT:  So general aviation law --

4           MS. APPLEGATE:  Right.  So with regards to when you

5   buy of sell an aircraft, when you record that aircraft with

6   the FAA, you're going to list the engines and propellers

7   separately.  Additionally, you're going to file a contract of

8   sale on the International Registry with the propellers and

9   the engines, because those are treated as separate units.  No

10  other part on the aircraft is treated that way when you are in

11  the process of buying or selling an aircraft.

12          THE COURT:  Could an aircraft work with just those

13  three things?  The fuselage and tail structure, the engines

14  and the props?

15          MS. APPLEGATE:  No, because you would define the

16  air -- so the aircraft would be the engines and propellers and

17  the airframe.  And then the airframe would be defined to be

18  everything affixed to the airframe.

19          THE COURT:  Okay.  So the airframe includes the

20  pieces parts.

21          MS. APPLEGATE:  Correct.  So they're attached to it

22  at the time of sale.

23          THE COURT:  Right.  Okay, that makes up the whole

24  plane.  That includes the parts.  So that's general aviation

25  law, all right?  So now we've got an airframe that is complete

1   with parts, engines and props.  Then you tell me industry

2   standard says you can move them around.  Does the industry

3   standard also say you can leave one donor plane barren when

4   you start this move-around process?

5           MS. APPLEGATE:  No.  And I think that's where

6   Avantair breached their contractual duties to the owners.

7   So if you take a upstanding program like NetJets, they're

8   moving parts around on a daily basis.  And as they do that,

9   if the part is broken or out of time, they're ordering a

10  replacement part.

11          That's the portion of this that didn't happen with

12  Avantair.  They didn't order the replacement parts that they

13  should have ordered.  And so there was a parts shortage and

14  they decided to harvest the parts from a certain aircraft.

15  That's where the breach occurred by Avantair.

16          THE COURT:  Okay.  So I need to have trial testimony

17  on industry standard, unless there's some scholarly journal,

18  aviation journal you can point me to.  In other words, who

19  says it's the industry standard for these types of

20  arrangements?

21          MS. APPLEGATE:  I don't have that at the moment,

22  Your Honor.

23          MR. BIRD:  Your Honor, it may be sufficient that

24  that was the understanding when entering into the program

25  documents, if we're going to define what usage means when it

1    comes to the manager's use of aircraft.

2         Obviously, the preferable way would be to discovery

3    the industry standard, but if the course the performance of

4    the contract specifically issue with 169, and signed also by

5    Mr. Andersen's co-ownership group, contemplates -- well, is

6    read in the context of that --

7         THE COURT:  I've got to find an ambiguity, don't I?

8    Before we get into intent?  Right?

9         MR. BIRD:  Yes, Your Honor.

10        THE COURT:  And what do Justice Scalia and Brian

11   Garner say about how you construe this word "use"?  What are

12   the principles?  (Reviewing dictionary.)

13        Well, the dictionary says several things.  Number

14   one -- I'm looking at Black's, by the way.

15        The application or employment of something,

16   especially a long, continued possession and employment

17   of a thing for the purpose for which it is adapted, as

18   distinguished from possession and employment that is merely

19   temporary or occasional.

20        Number two, a habitual or common practice.  Number

21   three, a purpose or end served, as in the tool had several

22   uses.

23        Let me see what Garner's Dictionary of Legal

24   Usage says.  I recognize Garner is the editor of Black's.

25   (Reviewing dictionary.)  And that's no help.

1          Okay.  Now let me hear from the Trustee, if you'd

2     like.

3          MS. SHERMAN:  Your Honor, I think that the Debtor's

4     rights, and that therefore the Trustee's rights, in and to

5     the planes under the program documents, I think, as Mr. Bird

6     pointed out, is what the basis of the Trustee's claim is in

7     and to the aircraft.

8          And it's a different argument than I think perhaps

9     the rights of the owners in each others' aircrafts, because

10    the owners have rights in -- different rights in each other --

11    to use each others' aircrafts under the program documents than

12    the Trustees did.  So I'm not going to get in the owner versus

13    owner conversation as far as that goes.

14         I think this is an issue that certainly needs to

15    be decided vis-a-vis the owners, and I do believe that the

16    Court's ruling on this issue is going to affect the opt-in,

17    although I'm not sure whether you're going to send people

18    flooding through the gates acknowledging that the estate has

19    an interest in these planes or whether you're going to send

20    them all scurrying somewhere else.

21         THE COURT:  They're going to go hide.

22         MS. SHERMAN:  And whether that's going to depend on

23    what the buyers with actual notice -- which are what most of

24    them I have talked to have been, and I think there's a couple

25    of people who are listening in on the phone -- are eager to

1    hear how this Court rules on this issue so they can make some

2    determinations of whether they would ever buy a plane on the

3    open market or through the Court.

4          My understanding of the issue has always been the

5    law of accessions.  I didn't brief it for today's hearing

6    because it wasn't my argument; it's Mr. Andersen's argument

7    and it's Mr. Bird's argument.  I know there is case law out

8    there on what becomes an accession to an airplane.

9          It's typically in a situation where a borrowed part

10   such as Dallas Airmotive's engines lined up on a plane and we

11   have a lienholder and a bankruptcy is filed, and everybody's

12   having a fight, that it gets to whether the parts are readily

13   removable without damage to the aircraft and some other

14   things.

15         And to me, I think that is and always has been the

16   issue vis-a-vis owners.  But, again, it's not my argument to

17   make.  I don't want to make arguments for other folks.  I

18   would like to see -- the estate's got a lot of time and energy

19   in these planes and these records.  And to the extent we can

20   turn this into money for the unsecured creditors, that would

21   be great if it could happen.

22         If compensation could be to the fractional owners of

23   various planes out of whatever the estate's carve-out is and

24   that was the great equalizer, that might be one option, but

25   we have a ton of priority claimants in the form of former

1   employees who will be taking from the pot first, so I don't

2   know whether the carveout, in effect, would be enough of an

3   equalizer because by the time it's eaten up, there may not be

4   much left to trickle down to the other fractional owners.

5        But I'm a little concerned with findings of fact and

6   conclusions of law that may affect the whole case on what is

7   legal argument and no evidence at this point.

8        THE COURT:  Okay.

9        MS. SHERMAN:  But again --

10        THE COURT:  Well, I think it comes down to -- well,

11   maybe three points.  I'll start off with what is an airframe.

12   I asked Ms. Applegate.  She's an expert.  She says it's

13   everything.  It's a complete airframe.

14        Second, what does the contract's meaning, in two

15   different places, with similar yet different phraseology

16   when -- in terms of the word, quote, "use" close quote.

17   And three, does any of that make a difference if the law of

18   accessions controls.

19        It could be that you'd need a trial on what the word

20   "use" means if I find that there's an ambiguity there.  And

21   then we'd have to go to the parties' intent.

22        The omission of the uses that are mentioned in the

23   purchase agreement paragraph from the similarly worded, but

24   not the same, paragraph in the MDLA, is interesting to me.

25   One must think that that was deed by design, that the

1   difference is by design.  So what do I take from that?

2   It could be sloppy scrivening.

3        You all want to have a sale soon.  How soon is the

4   sale?

5        MR. VERONA:  Your Honor, I think the -- I think the

6   settlement agreement provides that we're to sell it by January

7   31st, and then we have the option of extending that.  By

8   January 31st, we have to start paying -- we have to pay

9   Teterboro on account of their allowed lien.  And then we have

10   the option under that settlement agreement to extend that --

11        THE COURT:  To kick it out for several months.

12        MR. VERONA:  -- for six months -- six periods of one

13   month each.  I think the practical issue, as far as getting a

14   determination on this, is the fact -- and Ms. Applegate

15   might speak to this more intelligently than me, being in the

16   business, is that without some certainty as to how these

17   monies are going to flow, fractional owners are not going

18   to continue to contribute money to get these planes into

19   marketable, saleable condition, and they will -- and I think

20   it will be a disincentive to fractional groups to opt in,

21   the uncertainty.

22        Now, our opinion, of course, is if you adopt a

23   straight prorating approach or try to have a week-long trial

24   with experts on what would be an equitable way to distribute

25   these monies, it's going to create a disincentive to people

1    opting into the program.

2            But maybe the solution is to give us a reasonably

3    short period of time to brief the accessions issue and --

4            THE COURT:  Yeah, it looks like it's coming down to

5    accessions.  I mean, the use issue maybe is relevant only

6    insofar as it creates a breach of contract or not.  It seems

7    to me it does.

8            MR. VERONA:  And maybe provide some written

9    explanation with authorities as to what the industry standard

10   is.

11           THE COURT:  Yeah, the industry standard of moving it

12   around and the law of accession, so I take back what I said

13   before.  The use is relevant only if we look at -- start

14   looking at breach of contract.

15           Because if industry standard says, yeah, we swap

16   back and forth, or if the contract means that, the seller

17   could do that unfettered, then the corresponding obligation to

18   replace the part is the problem and that's the breach.  And so

19   that doesn't really provide much in terms of the ownership

20   issue.  So I guess I need industry standards and accession

21   help.

22           And Mr. Andersen, are you aware of what the industry

23   standards are for these operations, these types of operations,

24   because if it is common and this is done all the time,

25   industry standards are one of the things that I can look to,

```
 1   then really when the music stops, it just gives rise to a
 2   contract claim.
 3           MR. ANDERSEN:  Judge, the answer to that is I don't
 4   know what the industry standard is.  I think that there is an
 5   issue as to whether one leaves an airplane in the condition of
 6   162SL.  And Ms. Applegate spoke to that briefly by saying
 7   that, you know, a reputable company like NetJets wouldn't do
 8   that.  So that would suggest to me that it's not industry
 9   standard to cannibalize one and leave it in disrepair, but I
10   don't know.
11           THE COURT:  Well, it might be industry standard to
12   take parts off of a plane, and then the last one, when the
13   money runs out, is just the loser and there's a contract
14   claim.  Alternatively, they're arguing that this law of
15   accessions controls.  And if your cup holder gets on somebody
16   else's plane, too bad for you.
17           MR. ANDERSEN:  I think -- and, Judge, I think, from
18   the standpoint of --
19           THE COURT:  But you're going back to:  Well, what's
20   the source of it?  What's the source of the cup holder?  If
21   someone stole the cup holder off of your plane or car --
22           MR. ANDERSEN:  I think there's an interplay --
23           THE COURT:  -- does that make it an accession?
24           MR. ANDERSEN:  I think that's the interplay between
25   the law of accession and --
```

```
 1              THE COURT:  And the industry standards.

 2              MR. ANDERSEN:  Either one.  And in other words --

 3              THE COURT:  No, the interplay between them both.

 4   If it was industry standard to permit this, then it is an

 5   accession and you can't get it back, because it's not theft if

 6   industry standard permits that.

 7              MR. ANDERSEN:  Okay, I understand the Court.

 8   I understand your point, Your Honor, yeah.  I do understand.

 9              THE COURT:  Let me just say something about the

10   carveout.  It's 50,000 plus a percentage above a certain

11   amount, right?

12              MR. ANDERSEN:  Yes, Your Honor.

13              MS. SHERMAN:  Yes, Your Honor, on this plane.

14              THE COURT:  Okay.  There is an up side, I mean, in

15   terms of saying we're not going to permit a pooling argument.

16   You get to be pooled in with the unsecureds that get a right

17   to the pot that the Trustee's trying to create.

18              I wonder if we could create a priority class with

19   respect to that pot because the proceeds might be coming

20   directly from something that somebody at one time had an

21   interest in, I don't know.

22              MR. ANDERSEN:  I understand, Judge.

23              THE COURT:  I don't know if the code allows that.

24   And, you know, John Lamoureux would be the first one to say,

25   "Absolutely not."  So forget that idea.
```

```
 1              MR. ANDERSEN:  I'll scratch it out, Judge.  I think
 2   I understand the Court's question, which is -- questions.  If
 3   I may just reiterate, just so I'm clear, and address the right
 4   ones.  The question is -- obviously if one is -- the law of
 5   theft is when you can't transfer title.
 6              THE COURT:  Right.
 7              MR. ANDERSEN:  If it's a theft.  So if there is some
 8   industry standard that would ratify or justify that, then it's
 9   not a theft.
10              THE COURT:  Right.
11              MR. ANDERSEN:  Then the law of accessions.  And
12   that's where I'm a little -- I'm a little less certain,
13   because if I remember there was a discussion, I thought --
14              THE COURT:  Accessions is an Article 9 concept.
15              MR. ANDERSEN:  Exactly.  And so I'm not sure really
16   -- I mean, I know accession applies when you're talking about
17   parts that are interchangeably put on other pieces of property
18   and whether they're fixtures and accessions and whether they
19   then become part of what security interest attaches to.  But
20   I'm not sure exactly how accessions applies.
21              THE COURT:  Well, maybe it all turns on industry
22   standard.
23              MR. ANDERSEN:  And the only -- and the last thing
24   I'd say about that, Judge, is we do have a merger integration
25   clause, too, so I'm not so sure that -- you know, the contract
```

 1    documents simply don't seek accountancy.

 2              THE COURT:  Then you put me back to construing what

 3    "use" means.

 4              MR. ANDERSEN:  I understand that, Judge.

 5              THE COURT:  Which that means if there's an

 6    ambiguity, industry standard becomes relevant.

 7              MR. ANDERSEN:  Right.

 8              THE COURT:  There are very different ways the

 9    decision tree branches can flow here.

10              MR. ANDERSEN:  I understand.

11              THE COURT:  And we are operating against time.

12              MR. VERONA:  As a suggestion, Your Honor, maybe,

13    you know -- we're coming up on Thanksgiving, but maybe a 10 to

14    14-day period to submit written argument on these specific

15    issues, attaching authorities concerning industry standard.

16    And if there's a dispute, I guess we'd have to have an

17    evidentiary hearing, if there's a dispute about industry

18    standard.

19              THE COURT:  Before January 31st.

20              MR. VERONA:  Well, actually the January 31st is when

21    we have to start paying Teterboro.  So the motion, as I read

22    it, doesn't have a specific date when the plane is going to be

23    sold because it contemplates reassembling the plane.  And

24    bidding starts when the plane is reassembled, so it is --

25    there is not -- other than it --

1          THE COURT:  Reassembled using what parts?

2          MR. VERONA:  Meaning getting the engines and the

3    props, if they're not on the plane, from -- finding them,

4    locating them, and getting them back on the planes

5    consistent --

6          THE COURT:  What about the other parts?

7          MR. VERONA:  Pardon me?

8          THE COURT:  What about the other parts that go on

9    the airplane?

10          MR. VERONA:  I think it's just the -- I believe it's

11   just the engines and the props.

12          THE COURT:  Everything else is good?

13          MS. SHERMAN:  Your Honor, looking at Docket 271,

14   which is the sale -- motion to approve the sale and

15   procedures, we were talking about the deadline for

16   submitting a qualified bid.

17          It was 45 days after the later of the entry of an

18   order approving the motion to sell or the date which the

19   Trustee files a notice that the original engines and

20   propellers for the aircraft have been located and that

21   arrangements have been made to cause said engines and

22   propellers to be attached to the airframe.  So once we

23   track the --

24          THE COURT:  Whichever is greater?

25          MS. SHERMAN:  Whichever is the later.  So there was

```
 1    not a specific time frame.  This one was one where actually, I
 2    believe -- and Ms. Applegate can tell us whether there's been
 3    any movement on this.  One of the engines was MIA and so we
 4    needed to leave it open.
 5          The settlement agreement also does contemplate that
 6    folks that do the waterfall do make what we'll call protective
 7    advances for storage and insurance and putting lipstick on the
 8    pig and some other things before it's sold, that they will be
 9    paid in the waterfall right after lienholders and before the
10    Trustee's carveout.
11          So the notion that -- that is addressed in the
12    settlement as far as fractional owners to kick in money to
13    preserve the plane or fix it up.  They are going to be paid
14    before the piece of the waterfall that Mr. Andersen and Mr.
15    Bird are discussing how to split up.  So that is --
16          THE COURT:  So it doesn't matter, in essence.
17    They're going to get paid back dollar for dollar.
18          MR. VERONA:  Well, except that what I think Ms.
19    Applegate would tell you, based on her knowledge of the owners
20    themselves and her interaction with them, is that if there is
21    uncertainty as to what the last step of the waterfall is,
22    these people are not going to get involved.  They're going --
23    they're more just going to walk away.
24          THE COURT:  I understand.  But this one is concrete.
25    This one's here.
```

1          MR. VERONA:  Correct but --

2          THE COURT:  Until I rule against the fifth

3  waterfall, if I do.

4          MR. VERONA:  This one --

5          THE COURT:  Then you all are going to just walk

6  away.

7          MR. VERONA:  Right.  This one is here, but clearly

8  whatever you rule on this one is going to have an impact.

9  I mean, I think most people are going to assume that you're

10 going to rule consistently across the board on other sales --

11         THE COURT:  One would hope.

12         MR. VERONA:  Exactly.  So it's an important ruling.

13         MR. ANDERSEN:  Judge, if I may, you know, there

14 are -- even though I represent only one client, CCA, and I

15 don't represent multiple fractional share interest holders

16 and multiple airplanes, you know, I've been in communication

17 with the ones who are involved with our aircraft, and Ms.

18 Applegate's also in communication with the same people.

19         And, you know, there is interest on the part of

20 those who are in the situation of 162SL, and we had reached

21 an agreement on 138SL to ask for the same type of approval of

22 a settlement as we're going to file for on Monday, hopefully,

23 on 162SL.

24         Now, we're not getting the -- that document hasn't

25 been circulated yet for signature and so we don't know how

```
 1  many people ultimately are going to sign it.  But there are
 2  other people who were interested in getting -- who are
 3  interested in opting in in parts because, you know, they are
 4  on the short end of the stick and they believe that there is
 5  unjust enrichment for the people who feel as though they got,
 6  you know, the best airplanes and who think just want to walk
 7  off with them and --
 8           THE COURT:  Do we know where your engines and props
 9  are?
10           MR. ANDERSEN:  We do.  In fact, on 162SL, Ms.
11  Gilmore's client had them up in Teterboro and flew them
12  someplace else, to Texas or somewhere recently, and so we
13  do know where those engines are.  They're --
14           THE COURT:  So presumably put the engines back and
15  the props back, even though it doesn't have landing gear,
16  that's probably the biggest amount of its value.
17           MR. ANDERSEN:  Well, and the fact of the matter,
18  Judge, is that that's about what one would do because it
19  wouldn't make sense to restore the airframe.  But the engines
20  have value and in fact, you know, all the people in 162SL
21  recognize that fact, and they -- they've made a calculus that
22  -- to be specific, the engines on 162SL have 1,000 operating
23  hours left on each of them.  And I believe -- and Ms.
24  Applegate may be able to help me on this -- but I believe
25  that the total number of hours is 5,000 hours.
```

1          And in general, when I've dealt with PT-6 engines in

2    the past on repossessing planes or doing work for banks and

3    aircraft lenders, I think the value of a good PT-6 engine is

4    somewhere around 600,000, or at least a recently overhauled

5    one is 600,000.

6          So if you take a fifth of 600,000, that means

7    there's going to be $200,000 -- those engines are worth 2 to

8    $300,000.  And if you take my client's 9 percent of that

9    $200,000, that's $18,000.  And so my client says that's good,

10   that there might be some money from the engines but that

11   doesn't really solve our problem.

12         Our problem is we started off with an airplane that

13   probably should be worth a million dollars and now it's a

14   hulk.  And so that's why we're seeking the relief we're

15   seeking, Judge.

16         THE COURT:  Does anyone on the phone want to add

17   anything?  And please say your name before you speak.

18         MS. APPLEGATE:  It's Amanda Applegate.  I was just

19   going to add that I think Mr. Andersen made a good point,

20   that 162, while the photographs make it look like a complete

21   disaster, which I'm not disputing, the engines are the most

22   valuable part, and those engines do have a considerable amount

23   of time on them.  And further, 162 doesn't happen to have any

24   liens on it because it couldn't fly and get work done on it.

25         So at the end of the day, the difference between

1  his "have not" and some of the "haves" really isn't that

2  significant.  And I sent Mr. Andersen a calculated formula on

3  that and, you know, I understand he hopes the planes are going

4  to be worth 3.5 million, but none of them are going to be

5  worth 3.5 million.  And there's not a significant amount of

6  difference between that if you've got good engines like what

7  162 has.

8          THE COURT:  All right, thank you.  Anyone else on

9  the phone?

10         (No response.)

11         THE COURT:  Okay.  I've got a copy of the Berkley

12  Multi-Units case.  And although I remembered correctly that a

13  bunch of mortgagees were treated in *pari passu*, apparently

14  that's what they agreed to do.  They signed equal dignity

15  mortgages.  So this doesn't give us any guidance whatsoever

16  on an equitable way of fashioning a remedy.

17         So I guess -- where do we go from here?  You wanted

18  14 days, you said, Mr. Verona?

19         MR. VERONA:  That's what I suggested, Your Honor.

20         MR. ANDERSEN:  That would be fine, Judge.

21         THE COURT:  14 days.  Now, 14 days from today is

22  December the 6th, I think.  Okay, December the 6th.  And then

23  let's see when we can come back.

24         MR. ANDERSEN:  Judge, if I may, just simply because

25  I've got some -- I've got to make an office move during that

1  time.  Can we get -- if the 6th is a Friday, can we get until

2  the following Monday?

3          THE COURT:  Sure but -- yeah.  Let me see what the

4  calendar looks like the month of December.  I think it's --

5          MR. VERONA:  We're coming back on the 12th.  I'm

6  certainly not trying to rush you but --

7          THE COURT:  No, you're not.

8          MR. VERONA:  But what I was going to say is if --

9          THE COURT:  The 12th shows that we have -- well --

10          MR. VERONA:  If we shorten the 14 days a little bit

11  -- and I recognize it's the holidays, but that might give you

12  a reasonable amount of time to look at everything and be in a

13  position to rule on the 12th.

14          THE COURT:  You know what, I think we have an hour.

15  And what else did we put on that docket?

16          MR. VERONA:  I don't know off the top of my head.

17          THE COURT:  No, we didn't put anything.  It looks

18  like we put --

19          MS. SHERMAN:  Mr. Fendrick has a motion for relief

20  from stay set --

21          THE COURT:  Right, it was December --

22          MS. SHERMAN:  -- on some landing gear.

23          THE COURT:  Right.

24          MS. SHERMAN:  I don't remember whether Mr.

25  Lamoureux's latest emergency motion made it to the 4th

1  or the 12th.

2  THE COURT:  Let me see.  Let's see, we have the

3  claw-out notices there on the 4th.  Apparently she's not put

4  Mr. Lamoureux's in, in either place.  It'll work on the 12th.

5  And if we have to go into the noon hour, I think -- well,

6  maybe we can.  I don't know what my personal schedule has

7  during that noon hour in terms of a meeting.  Let's see what

8  else is on that day.  (Reviewing calendar.)

9  Oh, there's going to be a long argument at 10:00.

10  I was going to see if you could come in at 10:30.

11  MR. VERONA:  What time are we scheduled for on the

12  12th?

13  THE COURT:  11:00.  Well, let me see if I can speed

14  things up in the morning, and why don't you -- why don't you

15  come at 10:45.  Come at 10:45 and we'll see if we can at least

16  start the ruling, and then Mr. Fendrick's motion for relief

17  can be taken up after that.

18  MR. VERONA:  And if we brief by 12/6, does that

19  leave you enough time?

20  MR. ANDERSEN:  Or 12/9, Judge.

21  THE COURT:  12/9.

22  MR. ANDERSEN:  Okay, thank you.

23  THE COURT:  Yup.  All right, great.  Well, thank you

24  all.  This was most interesting.

25  MR. VERONA:  Thank you.

1          MR. ANDERSEN:  Thank you, Judge.

2          THE COURT:  Thanks for walking us all through the

3     contract terms.

4          MR. ANDERSEN:  Thank you, Judge.  And may I ask

5     also, just to preview this.  The N162SL, I hope we can get

6     that uploaded on Monday because I notice that the auction is

7     in the middle of December, so I don't know if that can be

8     heard -- I mean, I don't think that there'll be any objection

9     to it.  It basically just said sign here and --

10          THE COURT:  Well, maybe you all want to be selfish.

11    Maybe you all want to be the fifth level.  Maybe there's

12    nothing -- maybe here won't be anything after --

13          MR. ANDERSEN:  I think it's $18,000, Judge.

14          THE COURT:  Pardon me?

15          MR. ANDERSEN:  I think it's $18,000 on that 162SL.

16          MS. SHERMAN:  I believe on N162SL, the bottom level

17    of the waterfall is to fractional owners as determined by the

18    Court.  So if Your Honor decides in the big picture that every

19    -- it's the musical chairs theory, then that will be the

20    manner determined by the Court and they will be able to be

21    salvaged.

22          THE COURT:  Okay.  So they're willing -- they're

23    willing to go ahead and say, "Just sell it and we'll fight

24    about the other stuff later."

25          MS. SHERMAN:  That's correct, Your Honor.

1              THE COURT:  That's perfect, okay.

2              MS. SHERMAN:  They're willing to share if that's the

3     way Your Honor goes.  And if you don't rule on the sharing,

4     then they'll be -- they'll take their money and go.

5              THE COURT:  Okay.  And the sale is -- the auction is

6     December twenty --

7              MR. VERONA:  14th?

8              MS. SHERMAN:  I think we're going to be able to bump

9     it to January 10th, Your Honor, which gives us a little longer

10    to advertise since we have to move everything.

11             THE COURT:  File it and we'll get heard whenever.

12             MR. ANDERSEN:  Thank you, Judge.

13             THE COURT:  Matter of fact, why don't you do

14    negative notice, 21 days.

15             MS. SHERMAN:  Well, there's the settlement, Your

16    Honor, and there's the motion to sell as well.  I don't know

17    whether we can typically do --

18             THE COURT:  You filed these two together.

19             MS. SHERMAN:  Well, no, I just don't know if we

20    will be able to do a motion to sell on negative notice without

21    sending it to the entire creditor matrix, which is now 3,000

22    people.

23             THE COURT:  Well, you --

24             MS. SHERMAN:  But I'll work with Mr. Andersen to --

25    I need to plow through the rules and see if there isn't a way

```
 1  we can short-circuit that.

 2          THE COURT:  Well, you didn't short-circuit it on the

 3  other one.  You served it on everyone, right?

 4          MS. SHERMAN:  We served it on all the fractional

 5  co-owners by email.  We didn't have the matrix at that point

 6  in time.  So perhaps we could do the same thing with that one

 7  and shorten it.

 8          THE COURT:  That's fine.

 9          MR. ANDERSEN:  Thank you, Judge.

10          THE COURT:  All right.  You all go enjoy your

11  weekends.

12          MR. VERONA:  Thank you.

13          MS. SHERMAN:  Thanks, Your Honor.

14          MR. ANDERSEN:  Thank you very much, Judge.

15          THE COURT:  You're welcome.  Mr. Bird, take your

16  notebook back, and you can recycle it for some other hearing.

17          MR. BIRD:  Thank you, Your Honor.

18          THE COURT:  I'm going to keep the contract documents

19  with the highlights that Mr. Andersen gave me, as well as the

20  49 U.S.C. 44108, the bill of sale, and the rider -- well, the

21  contracts include those three documents.  The rider, the

22  purchase agreement and the MDLA.  All right, thank you all.

23          MR. ANDERSEN:  Thank you, Judge.

24          MR. VERONA:  Thank you, Your Honor.

25          THE COURT:  Thank you, Ms. Mills, for giving up your
```

1    afternoon here.  And we're off the record.

2             (Proceedings concluded at 4:15 p.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## CERTIFICATE

I certify that the foregoing is the official verbatim transcript, which has been prepared on an expedited basis to the best of my ability from the logs and digitally recorded audio proceedings of the above-entitled matter.


_____          December 6, 2013
Cheryl Culver (CER, CCR)                  Date
Transcriber



I certify that the foregoing is a federally certified transcript authenticated by:

_____
Kimberley S. Johnson (CVR-M)
Certified Verbatim Reporter Master

JOHNSON TRANSCRIPTION SERVICE
7702 Lake Cypress Drive
Odessa, Florida 33556
813-920-1466
kgjjts@aol.com