```
                IN THE UNITED STATES BANKRUPTCY COURT
                 FOR THE MIDDLE DISTRICT OF FLORIDA
                          TAMPA DIVISION

- - - - - - - - - - - - - - - -x
IN RE:                          :
                                :
AVANTAIR, INC.,                 :   Case No. 8:13-bk-09719-CPM
                                :   Chapter 7
                 Debtor    :
- - - - - - - - - - - - - - - -x
                                    U.S. Courthouse
                                    801 N. Florida Avenue
                                    Tampa, Florida
                                    Held December 12, 2013
                                    10:57 a.m.


                       TRANSCRIPT OF HEARING
```

1-Continued Hearing on Motion to Approve Compromise of
Controversy with Fractional Owners of N169SL Filed by Lynn
Welter Sherman, Attorney for Trustee on behalf of Trustee Beth
Ann Scharrer

2-Continued Hearing on Motion to Approve Sale Free and Clear of
Liens and to Approve Sale and Bid Procedures N169SL Filed by
Lynn Welter Sherman, Attorney for Trustee on behalf of Trustee
Beth Ann Scharrer

3-Motion for Clarification on Agreed Order on Trustee's
Emergency Motion to Reimpose the Automatic Stay Filed by
Zachary P Hyman on behalf of Creditor Teterboro Rams

                  (Motions Continued on Next Page)

           BEFORE THE HONORABLE CATHERINE PEEK MCEWEN
                 UNITED STATES BANKRUPTCY JUDGE


        Proceedings Digitally Recorded by Court Personnel;
    Transcript Produced by Court-Approved Transcription Service.

_____

(Continued Motions)

4-Expedited Motion to Approve Compromise of Controversy with Fractional Owners of N162SL Filed by Lynn Welter Sherman, Attorney for Trustee on behalf of Trustee Beth Ann Scharrer

```
                            APPEARANCES
                          (Via CourtCall)

For Corrections Corporation
of America:                     DONALD R. ANDERSEN, Esquire
                                Stites & Harbison, PLLC
                                303 Peachtree Street, N.E.
                                Suite 2800 SunTrust Plaza
                                Atlanta, GA 30308
                                404-739-8800
                                dandersen@stites.com


For Global Aerospace:           ROGER CLARK, Esquire
                                The Clark Law Group
                                11400 W Olympic Boulevard
                                Suite 1150
                                Los Angeles, California 900641585
                                310.478.0077
                                rclark@cgold.cc


For Teterboro Rams:             ZACHARY HYMAN, Esquire
                                Berger Singerman
                                350 E. Las Olas Boulevard
                                Suite 1000
                                Ft. Lauderdale, Florida  33031
                                954-525-9900
                                Zhyman@bergersingerman.com


LW Air I through V, LLC:        GREGORY PLOTKO, Esquire
                                Kramer Levin Naftalis & Frankel
                                1177 Avenue of the Americas
                                New York, NY 10036
                                212.715.9100
                                gplotko@kramerlevin.com


For Dallas Airmotive, Inc.:     MARVIN MOHNEY, Esquire
                                Law Office of Marvin Mohney
                                541 Bay Court
                                Heath, Texas  75032-7630
                                214-698-3011
                                Marvinmohney@aol.com


Fractional Owners:              AMANDA APPLEGATE, Esquire
                                Aerlex Law Group
                                2800 28th Street
                                Suite 130
                                Santa Monica, California  90405
                                310-392-1271
                                Aapplegate@aerlex.com
```

```
                    (Continued Appearances via CourtCall)

For Hutchison Advisors, Inc.
and Piaggio, Tail N156SL
and Tail N160SL:                  ROY KOBERT, Esquire
                                  Broad and Cassell
                                  390 N Orange Avenue
                                  Suite 1400
                                  Orlando, Florida 32801-1640
                                  407.839.4269
                                  rkobert@broadandcassel.com


For Potential Investor:           ANA ALFONSO, Esquire
                                  Willkie Farr & Gallagher LLP
                                  787 Seventh Avenue
                                  New York, New York 10019
                                  212.728.8000


                         (In the Courtroom)

For Beth Ann Scharrer
Interim Chapter 7 Trustee:        LYNN WELTER SHERMAN, Esquire
                                  Adams and Reese LLP
                                  101 E Kennedy Boulevard
                                  Suite 4000
                                  Tampa, Florida 33602-5152
                                  813.402.2880
                                  lynn.sherman@arlaw.com


For AvAero, LLC:                  JOHN LAMOUREUX, Esquire
                                  Carlton Fields P A
                                  PO Box 3239
                                  Tampa, Florida 33601-3239
                                  813.229.4224
                                  jlamoureux@carltonfields.com


For Global Aerospace, Inc.:       KEITH APPLEBY, Esquire
                                  Hill, Ward & Henderson, P.A.
                                  101 E Kennedy Boulevard
                                  Suite 3700
                                  Tampa, Florida 33602-5195
                                  813.221.3900 3139
                                  kappleby@hwhlaw.com


                  (Appearances Continued on Next Page)
```

                    (Continued Appearances in the Courtroom)

Fractional Owners as
Set Forth in Document 277:      JAY VERONA, Esquire
                                R. QUINCY BIRD, Esquire
                                Shumaker Loop & Kendrick L L P
                                101 E Kennedy Boulevard
                                Suite 2800
                                Tampa, Florida 33602-5150
                                813.229.7600
                                Jverona@slk-law.com
                                Qbird@slk-law.com

Aero Precision Repair and
Overhaul Co., Inc.:             W. KEITH FENDRICK, Esquire
                                Holland & Knight LLP
                                PO Box 1288
                                Tampa, Florida 33601-1288
                                813.227.8500
                                keith.fendrick@hklaw.com


For Capital Holdings 100, LLC
and owner of N162SF.:           ADAM LAWTON ALPERT, Esquire
                                Bush, Ross, P.A.
                                1801 North Highland Avenue
                                Tampa, Florida  33602
                                813-224-9255
                                aalpert@bushross.com


For Piaggio North America:      AMANDA CHAZAL, Esquire
                                Stichter Riedel Et Al
                                110 E Madison Street
                                Suite 200
                                Tampa, Florida 336024718
                                813.229.0144
                                Achazal@srbp.com


For LW Air:                     DONALD KIRK, Esquire
                                Carlton Fields Jorden Burt
                                4221 W Boy Scout Blvd Ste 1000
                                Tampa, Florida 336075780
                                813.229.4334
                                dkirk@cfjblaw.com


ALSO PRESENT:
Chapter 7 Trustee:              BETH ANN SCHARRER

```
 1                   P R O C E E D I N G S
 2           COURTROOM CLERK:  Avantair, Incorporated, Case No.
 3  13-9719.
 4           THE COURT:  All right.  I'm going to call the roll
 5  for the phone appearances.  Is Ms. Applegate there?
 6           (No response.)
 7           THE COURT:  No.  Mr. Clark?
 8           COURTCALL OPERATOR:  Your Honor, her line is live.
 9           THE COURT:  All right.  I'll call again.  Ms.
10  Applegate?
11           MS. APPLEGATE:  Present.
12           THE COURT:  All right.  And you represent?
13           MS. APPLEGATE:  Various fractional owners, the same
14  as Shumaker Loop.
15           THE COURT:  All right.  Thank you.
16           All right.  Roger Clark?
17           MR. CLARK:  Your Honor, I'm here on behalf of Global
18  Aerospace.
19           THE COURT:  All right.  Isabel Colonna?
20           COURTCALL OPERATOR:  Your Honor, this is the
21  operator.  She disconnected a few minutes ago.  She had a
22  listen-only line, so I think she disconnected to call back for
23  a live.
24           THE COURT:  All right.  Thank you.
25           COURTCALL OPERATOR:  You're welcome.
```

1          THE COURT:  Zachary Hyman?

2          MR. HYMAN:  Zachary Hyman of Berger Singerman on

3  behalf of Teterboro Rams.

4          THE COURT:  Thank you.  And let's see.  I have Roy

5  Kobert.

6          MR. KOBERT:  Yes, Your Honor.  Roy Kobert appearing

7  on behalf of Hutchison Automotive, fractional owner on Tail 156

8  and 160.

9          THE COURT:  All right.  And then Marvin Mohney?

10          MR. MOHNEY:  Present, Your Honor, on behalf of Dallas

11  Airmotive, Inc.

12          THE COURT:  And Gregory Plotko?

13          MR. PLOTKO:  Yes, Your Honor.  I'm here on behalf of

14  LW Air I through V.

15          THE COURT:  And Margot Shonholtz?

16          MS. ALFONSO:  Your Honor, this is her partner Ana

17  Alfonso.  I'm listening in her place.  We represent a potential

18  investor.

19          THE COURT:  All right, Ana Alfonso instead of Ms.

20  Shonholtz.

21          And I think that does it for the phone appearances.

22  So now let's take the appearances that are in the courtroom.

23          MR. ANDERSEN:  Your Honor, Donald R. Andersen on

24  behalf of the Corrections Corporation of America.

25          THE COURT:  All right.  Thank you.

1          MR. VERONA:  Good morning, Your Honor.  Jay Verona

2    and Quincy Bird for a group of fractional owners, Document 277

3    has the list of them.

4          THE COURT:  All right.  Thank you.

5          MS. SHERMAN:  Good morning, Your Honor.  Lynn Welter

6    Sherman representing Beth Ann Scharrer as Chapter 7 Trustee.

7    Ms. Scharrer's in a creditors' meeting this morning, but as

8    soon as she breaks out of those, she'll be able to join me.

9          THE COURT:  All right.  Thank you.

10          MR. LAMOUREUX:  Good morning, Your Honor.  John

11    Lamoureux with Carlton Fields on behalf of AvAero Services,

12    LLC.  We're the landlord out at Clearwater/Saint Pete Airport.

13          THE COURT:  All right.  Thank you.

14          MR. FENDRICK:  Good morning, Your Honor.  Keith

15    Fendrick for Aero Precision Repair & Overhaul, Inc.

16          THE COURT:  Say again?

17          MR. FENDRICK:  Aero Precision Repair & Overhaul

18    Company, Inc.

19          THE COURT:  All right.  Thank you.

20          MS. CHAZAL:  Good morning, Your Honor.  Amanda Chazal

21    on behalf of Piaggio America, Inc.

22          THE COURT:  Okay.  Thank you.

23          MR. APPLEBY:  Good morning, Your Honor.  Keith

24    Appleby with the Hill, Ward, Henderson law firm as local

25    counsel for Global Aerospace.

1          THE COURT:  All right.  Thank you.

2          MR. ALPERT:  Good morning, Your Honor.  Adam Lawton

3  Alpert representing Capital Holdings 100, LLC, and owner of

4  N162SL.

5          THE COURT:  All right.  Thank you.

6          MR. KIRK:  Your Honor, Donald Kirk on behalf of LW

7  Air.

8          THE COURT:  Thank you.  And that's it.  All right.

9  Thank you all for making your appearances.

10          And we are going to take up the approval of the

11  compromise regarding the N169SL and the opposition.  And then

12  at the end we'll take up -- it looks like the dispute with the

13  Teterboro and Dallas Airmotive.  Is that on here?  Yeah, it's

14  on here.

15          And then you've got another compromise motion with a

16  different plane, Ms. Sherman?

17          MS. SHERMAN:  Yes, Your Honor.  Mr. Fendrick has a

18  motion for relief from stay that is set.  They were repairing

19  landing gear.  And we talked to Mr. Fendrick prior to the

20  hearing; I think we can send him on his way.  He might not want

21  to sit around for the full show.  I'm not sure how long the

22  N169SL show is going to last, but --

23          THE COURT:  Okay.

24          MS. SHERMAN:  They would essentially be looking for

25  the same stay relief order that we gave to Dallas Airmotive,

1  Inc., that they would serve the order on all fractional owners

2  for a period of -- if they haven't been paid within 15 days,

3  the stay is lifted to allow them to exercise their rights

4  against the property under applicable non-bankruptcy law.

5       The only wrinkle with this motion that wasn't present

6  in the Dallas Airmotive because it was engines, is the landing

7  gears aren't separately registered with -- or kept track of

8  with the FAA.

9       So Mr. Mohney's order on Dallas Airmotive said he was

10  authorized to basically release the engines and to deal with

11  the people who have them on their billed books.  Mr. Fendrick's

12  client, depending on how Your Honor rules today on the parts

13  issue, may be dealing either with the person on whose plane the

14  landing gear was last installed or the person whose plane

15  originally had the landing gear.

16       And so we'll tweak that one provision of the order

17  for Mr. Fendrick.  And I'm not sure whether Your Honor's ruling

18  is going to address that.

19       THE COURT:  I don't know -- you know, there was a --

20  one of the opposition papers, it was a limited opposition, was

21  don't rule on non-debtor property issues.  And could this

22  possibly be non-debtor property?

23       MS. SHERMAN:  Well, Your Honor, if we want to grant

24  the relief from the stay, if within 15 days somebody hasn't

25  paid them, that's fine.  The idea is just to give the owners a

1 head start.

2      And I don't know, I guess if it's not property of the

3 estate and you're not going to give guidance to lienholders on

4 to whom they should deliver it -- there's some concern, Your

5 Honor, that there are plane owners who are going to repair

6 facilities and saying:  I know you've got a bunch of landing

7 gear and I need some, will you sell it to me?

8      And, you know, maybe it violates the good citizen

9 rule that we decided that we weren't going to include in the

10 order as far as engines and propellers, and maybe Your Honor's

11 not inclined to give any direction to Mr. Fendrick's client as

12 to who they should --

13      THE COURT:  What would we do outside of bankruptcy?

14      MS. SHERMAN:  Figure it out under state law.

15      THE COURT:  That's right.  And the repairman will

16 enforce the repairman's lien.  It may include a sale.

17      MS. SHERMAN:  Then we'll leave that descriptive

18 language out, Your Honor, of the order and just grant them

19 relief from stay if, after 15 days having had the order served,

20 they haven't been paid by the owner of the landing gear,

21 whoever that may be.

22      THE COURT:  That's fine.

23      MR. FENDRICK:  And, Your Honor, we will have to

24 operate under Florida Statute 713, and we'll just have to

25 operate under state law to determine, I guess, what

1   presentations may convince us that --

2           THE COURT:  So go forth and do it.

3           MR. FENDRICK:  We will, Judge.

4           THE COURT:  I'll grant the motion on an interim

5   basis.

6           MR. FENDRICK:  And, Judge, when we file the order, we

7   will attach a list of all the parts we have in our possession

8   so there's notice; the best description we have, we'll attach

9   it.

10          MS. SHERMAN:  And the order provides that the list

11  and the order will be served on all fractional owners by email.

12          THE COURT:  That would be helpful.

13          MS. SHERMAN:  And so people who claim an interest

14  have 15 days to show up or it's going to go the 713 route.

15          THE COURT:  Right.  And that will also help, I guess,

16  the state court, if it ends up in state court, because the

17  state court will know that everybody got notice.

18          MR. FENDRICK:  Right, Your Honor.

19          THE COURT:  All right.

20          MR. FENDRICK:  Thank you for taking this first.

21          THE COURT:  You're welcome.

22          MS. SHERMAN:  Your Honor, there's another matter that

23  was resolved, which was -- this is going to shock you -- the

24  Teterboro Rams motion.

25          THE COURT:  It is going to shock me.

1          MS. SHERMAN:  I don't know if Mr. Hyman was --

2          THE COURT:  What did I say just yesterday, Ms.

3    Garcia?  Don't say it out loud.

4          MS. SHERMAN:  Your Honor, apparently the issue was,

5    after stay relief was granted, the New Jersey judge was under

6    the impression that she needed to dismiss the New Jersey case

7    or be in violation of the stay.  And I'm not sure whether that

8    was because of argument made by counsel or something in the

9    wording of the order.

10          But everybody involved had agreed that we would add

11    -- and that's Dallas Airmotive, the Trustee, Mr. Verona's

12    clients, everybody that was involved in that litigation -- we

13    would enter an order that adds an additional sentence to

14    Document 393, which was the initial order, to provide that, in

15    addition, Teterboro is granted relief from the stay to allow

16    the parties to request from the New Jersey court that the New

17    Jersey action remain open but placed on an active list or other

18    similar proceedings designated by the New Jersey court pending

19    notification of a default under this order or other order from

20    this Court.

21          THE COURT:  Fine.  That resolves the third item on

22    the calendar that's on the 10:45 docket.

23          MS. SHERMAN:  Those were probably the two simplest

24    ones.  N162SL may be quicker than N169SL.  But we've got all

25    the same parties, I think, who are going to be hanging out for

1    both, so I don't know which order you want to take those in.

2         THE COURT:  All right.  And do you have a proposed

3    order for me on the Document No. 393 expansion?

4         MS. SHERMAN:  Your Honor, we'll upload that this

5    afternoon.

6         THE COURT:  All right.  Thank you.

7         All right, Mr. Hyman, if you want to ring off, you

8    may.

9         MR. HYMAN:  Your Honor, if I may very briefly?  We

10   have come to an agreement as to most of the terms and we

11   believe that we should be able to agree to the other issues

12   presented by the motion.  However, we did request that our

13   motion be granted in part so that if the other issues presented

14   by the motion aren't fully resolved, that we can come back

15   before the Court at the hearing on the 19th and address those.

16        THE COURT:  So what Ms. Sherman just said doesn't

17   resolve everything?

18        MR. HYMAN:  It resolves everything that needs to be

19   resolved at the immediate juncture.  We're in the process of

20   discussing and making sure that Teterboro's interests will be

21   protected in the event that the aircraft is moved outside of

22   the state of New Jersey and if there is a default.  However, we

23   believe that we should be able to resolve that without needing

24   Court intervention.

25        THE COURT:  Did I limit it -- I mean, I thought the

1   movement was wherever they could find a place to move it to.

2           MR. HYMAN:  It was.  However, in Dallas Airmotive's

3   response to our response, they mentioned that in the event of a

4   default, if the plane is in -- and right now the owners want to

5   move it to Massachusetts.  And we don't take issue with their

6   moving it to Massachusetts, and there are too many moving parts

7   to really prohibit them from doing that.

8           However, we wanted to ensure that Teterboro's

9   interests were protected and reserve the right to come back to

10  the Court if necessary to try to seek relief in the event of a

11  default outside of the state of New Jersey.

12          THE COURT:  I thought that Tetreboro's rights were

13  protected because we, in the prior order, said that the

14  possessory lien will remain even though actual possession does

15  not remain with Teterboro.

16          MR. HYMAN:  That is correct, Your Honor.  However, in

17  Dallas Airmotive's motion -- and this is why, by the way, Your

18  Honor, we believe that Teterboro's interests will be protected

19  and that this can be resolved without judicial intervention.

20          However, to reserve our client's applicable rights, I

21  felt it appropriate to briefly bring the other aspect to the

22  Court's attention, although we do not think or anticipate that

23  we'll be appearing before you again to address this issue.

24          THE COURT:  Well, I'm confused that there's any issue

25  remaining out there; maybe possibly the storage bill.  The

1   storage bill --

2          MR. HYMAN:   The storage bill has been resolved.

3          THE COURT:   That's been resolved?

4          MR. HYMAN:   The issue is, Your Honor, is that if

5   there is -- if the plane is in Massachusetts -- and this is, by

6   the way, an attenuated "if" at that -- and if there is a

7   default, Teterboro is caught in a position where it has -- and

8   also assuming, by the way, Dallas Airmotive has removed the

9   engines from the aircraft, Teterboro would potentially be in a

10  position where they would either have to incur significant

11  expense in moving the aircraft back to New Jersey to sell it,

12  because a New Jersey Sheriff would not sell an aircraft located

13  in Massachusetts or would have to incur expenses to move it

14  back.

15         We anticipate, however, that we should be able to

16  resolve this with the fractional owners just as we resolved the

17  other issues presented by the motion.

18         THE COURT:   The New Jersey Sheriff can't sell as-is,

19  where-is a presumed possessory interest or liquidate a presumed

20  possessory interest that is fictionally in New Jersey?

21         MR. HYMAN:   We're not entirely positive as to what

22  and how a New Jersey Sheriff would deal with it.  Our New

23  Jersey counsel, after we reviewed Dallas Airmotive's response

24  and when we looked at it, New Jersey counsel and our client had

25  reservations about the circumstances, which is why we were just

1   bringing it to the Court's attention very briefly.

2           THE COURT:  All right.

3           MR. HYMAN:  We're trying to brief the Court.

4           THE COURT:  All right.  Submit the proposed order by

5   granting it to the extent that Ms. Sherman read into the record

6   and denying the balance of the motion without prejudice for

7   Teterboro to raise it again if, if, if; okay?

8           MR. HYMAN:  Yes.

9           THE COURT:  All right.  Thank you.

10          MR. HYMAN:  And as I said, it's an attenuated if.

11  Thank you, Your Honor.

12          THE COURT:  You're welcome.  And if you ring off, my

13  feelings won't be hurt.  Okay.

14          So now, you were standing at the lectern, Mr. Verona,

15  did you want to comment on Teterboro?

16          MR. VERONA:  No.  I think you just (inaudible).

17          THE COURT:  Okay.  All right.  So now I need to make

18  a ruling on the -- the what is a plane and the Humpty-Dumpty or

19  the musical chairs, whatever, whatever.  And I guess I'm ready

20  to rule.

21          Does anybody want to bring anything else to my

22  attention?

23          I've got Global's; I've got the fractional owners'

24  memo with the affidavits; I've got CCA's memo; I have Mr.

25  Kirk's -- Mr. Kirk's request for me not to rule on things that

1  don't involve property of the estate.

2        Anything else anybody thinks that I should have read?

3        MS. SHERMAN:  Your Honor, there were some

4  representations made at the hearing last time that I'm not sure

5  were clear as to whether the Trustee -- what the Trustee does

6  or doesn't support.  And I just want to make it clear as a big

7  picture, it is not the Trustee's position that stripping planes

8  was authorized by the program documents, and it is not the

9  Trustee's position that violating FAA rules regarding record

10 keeping and life-limited parts was authorized by the program

11 documents.

12        And we would echo LW Air's position that whatever

13 ruling the Court makes on this is a ruling that should be

14 binding on the owners of N169SL and CCA, and it shouldn't be

15 something that's going to be coming back to haunt other

16 creditors or the Trustee later on when we're dealing with

17 director and officer liability issues and insurance issues and

18 other things.

19        THE COURT:  Okay.

20        MS. SHERMAN:  But we do support the compromise and

21 the motion to sell.  It's our motion.

22        THE COURT:  Right.  All right.  I do have one

23 question for Mr. Andersen before I finalize my thoughts, and

24 that is:  Was this fractional -- assuming that the fractional

25 ownership programs were operated in conformance with FAA rules,

```
 1  the parts were tracked appropriately and logged, there wasn't
 2  -- well, if that had occurred, if everything were appropriately
 3  logged and documented, is it your contention that the industry
 4  standard for these kinds of programs does not permit rotation
 5  of parts among the planes?  That's not the custom and the
 6  standard in the industry?
 7          MR. ANDERSEN:  Judge, the only evidence in the
 8  record, and I understand -- I appreciate the significance of
 9  what I'm saying.  But the only evidence in the record we have
10  right now is the evidence in the form of the affidavits from
11  NetJets as to their practice.  And frankly, those affidavits
12  leave, in my mind, a lot of questions about exactly how that
13  practice at NetJets operates.
14          So to say that -- I guess I'm backing up a little bit
15  to say that I don't necessarily agree that that is the custom
16  and practice, and I'm not sure what their custom and practice
17  is.  It certainly is very different from what was going on with
18  Avantair.  And at the least -- and maybe this is the answer to
19  your question, at the least, it would have to comply with FAA
20  regulations with regard to record keeping and tracking of the
21  records.
22          But our position is that the contract documents do
23  not authorize that type of program to the extent that it
24  results in transferring interest in property among the
25  fractional-share aircraft holders.
```

1    THE COURT:  And that's a question of law?  I'm just

2    trying to --

3    MR. ANDERSEN:  I believe that it is, Judge, because

4    -- and if I may just answer that more directly?  But I think

5    the first question in my mind is:  Does -- is custom and

6    practice appropriate to consider here given the contract

7    documents?  If it is appropriate, has it been established?

8    And third, and this is perhaps a question of law,

9    even with that custom and practice, I haven't seen anything

10   other than some legal conclusions in those affidavits that say

11   when parts are moved from one airplane to another, they, quote,

12   "belong," close quote, to the other aircraft.  And that frankly

13   is at best a legal conclusion, and at worst it really kind of

14   begs the question.

15   And I think the authorities that we've cited show

16   that, to the extent that parts are owned, there's a property

17   interest by the original fractional-share interest holders,

18   that those property interests are preserved when those parts

19   are moved from one aircraft to the other.  And that's the

20   result under the common law of accessions.

21   The common law of accessions and the

22   interchangeability doctrine still provide that those parts --

23   that the owners of the aircraft on which those parts are placed

24   do not acquire a property interest just because they're placed

25   on there.

```
 1              And I don't see anything in those affidavits where

 2   they specifically say -- where they specifically address this

 3   ownership issue other than this conclusion that when they go

 4   from one to the other they then belong to that aircraft.   So

 5   our position would be -- and this is a long issue (sic) to your

 6   question:   If there is --

 7              THE COURT:   I'm trying to see if there are fact

 8   disputes if -- if I conclude that there is an ambiguity.   In

 9   other words, if I gave an opportunity for trial, is there

10   anything that you would bring to the table in terms of

11   testimony that is different from how fractional ownership

12   programs are run in the industry?

13              MR. ANDERSEN:   I think there would be a cross-

14   examination, frankly, of the people who provided these

15   affidavits to ask them, you know, exactly how they account for

16   the movement of these parts and how they account for the

17   ownership in the interest of these parts.

18              THE COURT:   They account movement by logging them

19   into two different logbooks, according to the affidavits.   Now,

20   I'm not talking about sloppy rotation or sloppy

21   cannibalization.   I'm talking about something that is done

22   appropriately in terms of moving parts among planes to keep the

23   program running efficiently.

24              And I'm just asking:   Is there going to be some

25   expert that you would bring that would say no, that's not what
```

1  is done in the industry?  I'm not talking about sloppy --

2          MR. ANDERSEN:  I understand, Judge.  I understand the

3  question.  Assuming everything is done -- the log books and the

4  record keeping are all (A) done correctly and accurately, and

5  (B) done in accordance with the FAA regulations, I think the

6  remaining issue is whether this type of interchange or part

7  swapping is appropriate to the extent that -- and this custom

8  and practice authorizes or involves basically stripping,

9  destroying, cannibalizing, whatever word you want to use, the

10 property of one set of fractional interest holders to the

11 benefit of other fractional interest holders.

12          And I think there is a question -- I don't think

13 these affidavits address that.  I think these affidavits talk

14 about business as usual.

15          THE COURT:  They talk about a business that doesn't

16 have financial problems.

17          MR. ANDERSEN:  And a business that is willing to

18 honor its obligations to the various fractional interest

19 holders, which obviously is not the case here.  So -- whether

20 this custom and practice --

21          THE COURT:  Well, you have a witness that says in the

22 industry when somebody is ready to get out of the program, that

23 there's an all-hands-on-deck call to get all the original parts

24 back to the plane so the fractional holders can take the plane

25 as it was originally constructed out of the program.

1          MR. ANDERSEN:  Not with regard to all of the parts.

2    I think this Court has recognized -- let me think about the

3    program documents a minute, too, as I'm answering this

4    question.

5          When someone gets ready to get out of the program

6    under these program documents, the program documents are pretty

7    specific about what happens.  And my recollection of them is

8    that they don't actually involve selling the airplane.  What

9    they involve is the fractional-share interest holder selling

10   their interest to another qualified buyer or back to the

11   manager, Avantair.  So I don't think --

12         THE COURT:  What does the buyer get?  Does the buyer

13   get the right to have the plane reconstructed with the original

14   parts?

15         MR. ANDERSEN:  Well, I guess my point here, Judge, is

16   I don't think the buyer -- assuming the buyer -- we're talking

17   about the owners of the fractional-share interest airplane, I

18   don't think they ever get the airplane back.  They'll never

19   get --

20         THE COURT:  Right.  But the buyer of them.

21         MR. ANDERSEN:  The buyer of that interest.  Judge --

22   and this is why this is a tough issue.  To the extent that

23   we're talking about property interests in these aircraft, if

24   someone is a -- acquires -- is an assignee or a successor to

25   the rights of the original interest holders, then I think they

1  would be entitled to make claims just standing in the shoes of

2  the original owners to the extent that these airplanes have

3  been destroyed or cannibalized.

4       So my answer to that is I don't think there would be

5  necessarily an all-hands-on-deck effort as a practical matter

6  to say let's bring all the parts back.  But I think that to the

7  extent that parts have been removed and they haven't been

8  accounted for and they're in the hands of a third party, the

9  owners of another fractional-share airplane, there would have

10 to be an accounting for that value.

11      THE COURT:  My last question --

12      MR. ANDERSEN:  Yes, Your Honor?

13      THE COURT:  -- if we had a trial, would you have

14 testimony that would be different about the purpose for the

15 record keeping when you move the parts, and that is, to make

16 sure that the life-limited or the, whatever you call it, hours-

17 limited factor is properly tracked?

18      MR. ANDERSEN:  I think that there are two purpose --

19 and I realize these are less-than-direct answers, and I

20 apologize, Judge, but I've got -- I'm trying to do the best I

21 can.  I think there are two reasons for doing the record

22 keeping.  One is the FAA regulatory reason, and that reason has

23 to do with the safety of the airplanes and it has to do with

24 making sure the parts aren't used beyond their normal or their

25 life limits.

1          I think, frankly, to the extent that parts are being

2    moved around, and it may not be every single part, but to the

3    extent major components:  engines, propellers, landing gear and

4    other -- I'm going to say other major components, like

5    avionics, the very valuable electronics on these airplanes -- I

6    don't know if these airplanes have entertainment systems but

7    some of them might have, those might be -- also be valuable.

8          To the extent that those were simply removed from one

9    airplane at the expense of the owners of that airplane and

10   placed on another airplane, if that was done without some

11   record keeping, then I think, just as the papers address, I

12   think we've got a conversion issue.

13         And we also have an issue of fiduciary obligations to

14   account to the owners of that original airplane to the

15   extent --

16         THE COURT:  Who's got the fiduciary duty?

17         MR. ANDERSEN:  I think that the manager has that

18   fiduciary duty, Judge.  I honestly do.  I think that the role

19   of the manager here and the -- their obligations and interest

20   is very much a fiduciary obligation which is, essentially,

21   acting as a trustee.

22         THE COURT:  All right.  All right, go ahead and have

23   a seat everybody.

24         MR. ANDERSEN:  Thank you, Judge.

25         THE COURT:  Do you want to say something, Mr. Verona?

1        MR. VERONA:  On those specific questions, may I

2   address a couple of things?

3        THE COURT:  Sure.

4        MR. VERONA:  At the last hearing, you specifically

5   asked for information about industry standards.  And while we

6   can, you know, dissect the affidavits that we submitted, I

7   think it's notable that Mr. Andersen did not submit any

8   contravening affidavits.  And I think it's pretty clear that

9   that is the industry standard.

10       The question regarding parts being put back or not

11  being put back on the planes I think is addressed in all three

12  affidavits, specifically:  the Brower affidavit in paragraph

13  13, the Lewis affidavit in paragraph 7, and the Typhon

14  affidavit in paragraph 6.  And they all suggest that the parts

15  that are removed from the one plane and put on the second plane

16  remain on the second plane.

17       Now, having said that, the question about the sale of

18  the planes, I think the -- with all due respect, the more

19  appropriate question is:  What happens to the plane, not when

20  it's sold from one fractional owner to another within the

21  fleet, but what happens when it's sold out of the fleet?

22       THE COURT:  That's what my question was.

23       MR. VERONA:  Right.  And I believe that in that

24  situation, from a legal standpoint, the parts would remain on

25  the plane that they're on with the exception of the engines and

1  the props because those are separately titled, and I don't

2  think that the seller could convey clear title to a buyer

3  outside the fleet with other than engines that are titled to

4  that plane.

5          THE COURT:  The engines?

6          MR. VERONA:  The engines and the props, I'm sorry.

7          THE COURT:  Okay.

8          MR. ANDERSEN:  Your Honor, may I --

9          THE COURT:  Yes.

10         MR. ANDERSEN:  -- respond very briefly to that?  To

11 the extent the question is what happens if one of the fleet

12 airplanes is sold to a third party, someone who is not a

13 fractional owner or fractional interest at all, my

14 understanding of the program documents is that the manager has

15 a right to reacquire the interest of the fractional holders,

16 and they do this reacquisition in accordance with that

17 procedure that called for an appraisal of the shares at that

18 time.

19         And the manager then reacquires the airplane and then

20 either gives the fractional interest holders interest in other

21 airplanes or some other way -- some other way compensates them

22 for the fact that they're giving up their interest or giving

23 their interest back to the manager.

24         And I think it's the manager who would then sell the

25 airplane to the third party.  I don't think that it's

1    necessarily the fractional owners en masse that would be

2    selling the airplane to a third party.  They don't have the

3    right to do that under the program documents.  Their only right

4    is to sell it back to the manager.  The manager's got a

5    procedure for reacquiring those interests.

6              THE COURT:  And if the manager defaults, then what?

7              MR. ANDERSEN:  Judge, I think that -- again, coming

8    back to the program documents, the interest that the fractional

9    interest holders have is actually defined by those program

10   documents.

11             And we saw the FAA bill of sale form.  But the FAA

12   bill of sale form doesn't really say anything at all.  It's a

13   very -- it's a part of what happens as part of the acquisition

14   of a fractional interest.  And so the fractional interest that

15   is acquired is no greater than whatever the fractional interest

16   holders get as a result of those program documents.

17             So I would argue that the program documents are,

18   frankly, more than just a contract.  They actually define the

19   metes and bounds of the interest that is being granted to the

20   fractional-share holder.  And so if there is a default by the

21   manager, Judge, I don't think that that necessarily grants the

22   fractional-share interest holders any greater rights than they

23   had when they started.

24             I don't think that they are in a position then just

25   to sell --

```
 1              THE COURT:  So the plane just sits there and there's
 2   a Mexican standoff?
 3              MR. ANDERSEN:  If they -- if the manager defaults
 4   with respect to the aircraft, there clearly are contractual
 5   remedies -- and I'm really thinking out loud here -- but they
 6   could include specific performance, they could include
 7   requiring the manager to make other airplanes available in the
 8   fleet, they could involve quite a few other remedies.
 9              But I don't see a default basically expanding the
10   bundle of rights that they acquired in the first place.  I
11   mean, the fact is that they chose to acquire fractional
12   interests and these fractional interests are defined by these
13   program documents.  And that's all that they get is that -- is
14   what's granted to them.
15              So I don't think that they -- because of a default
16   they'd have a right to start snatching airplanes and selling
17   them.  I don't think that they do.  And frankly, that -- it's
18   very close to where we are right now in this case.  But I don't
19   think they have the right to do that.
20              THE COURT:  Right.
21              MR. ANDERSEN:  Thank you, Judge.  And I apologize, if
22   there's any -- coming back to Mr. Verona's question, I just
23   want to clarify again that I don't think it's a situation where
24   fractional-share holders all get together and sell the airplane
25   themselves.  I don't think that's contemplated in the program
```

```
 1  documents.
 2          MR. VERONA:  I wasn't suggesting that, Judge.  I was
 3  contemplating a situation where, for whatever reason, at the
 4  end of the plane's useful life to the fleet, it would be
 5  reacquired by the manager and sold outside the fleet.  And in
 6  that situation, the original engines, or whichever engines are
 7  titled to that aircraft and props, would have to be reinstalled
 8  in order to convey clear title.
 9          THE COURT:  I get that part.  I'm talking about the
10  other parts.
11          MR. VERONA:  And I think the affidavits would suggest
12  that those need to stay on the plane.  It would just be
13  unworkable, it would be impossible to go back.  And it's the
14  same reason that the pooling approach doesn't work in this
15  case.  How you would apportion -- it's impossible to go back
16  and reconstruct these planes and undo the jigsaw puzzle and put
17  it back together again.  And that's why the pooling approach
18  just doesn't work in a situation like this.
19          MR. ANDERSEN:  And, Your Honor, if I may?  There is
20  an appraisal procedure in there to appraise the value of the
21  shares at the time the manager reacquires them.  But once
22  again, the question is:  Was the manager authorized in the
23  first place to essentially cannibalize or destroy these
24  airplanes?
25          And I think the brief that Global submitted does an
```

excellent job of going through the contract documents and

pointing out that the contract documents do include obligations

to maintain the planes in an airworthy condition, to act on the

best interest of the co-owners, provisions of that sort.  So

that if there is a -- if there is a custom and practice of

saying:  Okay, this airplane over here is on the ground and

we've got to get it flying again, and this airplane's got a

part over here and it's not going anywhere today, let's move

the part over there and that one flies and we'll get a new part

and put it over here.  That's one thing.  And that's what I

understand these affidavits to be describing.

          That's very different from what happened in this

case.

          THE COURT:  What actually happened.

          MR. ANDERSEN:  From what actually happened in this

case.  This was --

          THE COURT:  This is when the musical chairs -- it's

the musical chairs game.  When the music stops, what's left?

          MR. ANDERSEN:  Well, and it's different in the sense

that there was no intent, apparently, to preserve the value for

these co-owners of these aircraft.  It was simply, when this

one needs a part, rather than going to Piaggio and buying a

part or to a parts dealer and buying a part, they said:  Well,

you know, we don't really need that airplane today, or maybe

next week, or next month, or maybe it's going to need an

1  overhaul, so, you know, we don't really want to get that

2  airplane going again, so let's just take as many parts as we

3  possibly can off of that plane and destroy it.

4        And that's very different from what I even read in

5  these affidavits about a custom and practice.  They

6  specifically talked about replacing the parts that are removed.

7  And so I think --

8        THE COURT:  That's what was suppose to happen.

9        MR. ANDERSEN:  You know, and even the cases on

10  accessions and conversion talk about how those are fact-

11  intensive cases.  The question of whether, you know, the parts

12  can be removed with the expectation that they're going to be

13  replaced as opposed to being removed and never brought back

14  again so that the value of the property is diminished, is a

15  fact question.  I mean, frankly, the expectations of the owners

16  -- when I read the brief -- the 169SL brief, they talk about

17  the expectations of the owners are that this is exactly what

18  would happen.

19        And, Judge, there isn't anybody who would have

20  purchased a fractional-share interest and what they knew or

21  expected was going to be a donor airplane, that they were going

22  to buy an interest in an airplane that they knew or expected

23  was going to be cannibalized.

24        So when you go back to the expectations of --

25        THE COURT:  Nobody expected to have the contract

1 breached, I'll give you that.

2          All right.  I'm ready to rule.

3          MR. ANDERSEN:  Thank you, Judge.

4          THE COURT:  Everything, Mr. Andersen, that you have

5 said and that Global says points me to a breach of contract

6 claim, plain and simple.  This was a fractional-ownership

7 interest program, that's how it was designed.  That's how the

8 program documents read.  However, the program was not operated

9 correctly.  It was supposed to be operated in the way that you

10 just described:  a part comes off, a part replaces it later.

11          Due to financial issues or whatever, this Debtor

12 didn't conform to the obligations under the contract, and that

13 leads, again, to a breach of contract claim.

14          I accept the construction of the contract that is

15 laid out in the Shumaker memorandum.  The owners ceded almost

16 unfettered discretion to the operator of the program to operate

17 the fleet in a way that would maximize the efficiency for the

18 benefit of all, all the fractional interest holders in all of

19 the member planes.

20          And by doing that, fractional owners had to expect

21 that things would happen where planes would be down sometimes.

22 And in order to make sure that the most planes were able to fly

23 for the most amount of hours in a given period of time, that

24 some parts would go to help the flying planes, and the

25 expectation would be because the contract says this, but then

1  the other plane would be maintained.

2          In this case, again, the Debtor didn't do that.  And

3  again, that leads to me -- to be a breach of contract.

4          I don't think that the way that I read the contract,

5  which is consistent now with the memo, requires me to get into

6  any ambiguity concerning use or industry standard, things like

7  that.  However, if I'm wrong on the law, on the interpretation

8  of the contract, given its plain meaning, and there needed to

9  be some resort to testimony about industry standards, I am -- I

10 don't believe that there is a fact dispute.

11         That's why I asked you the questions that I asked

12 you, Mr. Andersen, as you certainly inferred.

13         I think that the industry standard for a fractional-

14 ownership interest program would be just like as described in

15 the three affidavits.  And I don't believe that if there had

16 been some dispute in that, somebody would have brought that to

17 my attention.

18         Now, to be sure, did this particular Debtor operate

19 correctly?  No.  Because this particular Debtor breached its

20 contract by not replacing parts.  But then that leads you back

21 to the contract provision about the duty to maintain,

22 et cetera.  That breach has occurred with respect to some of

23 the fractional-interest owners' planes.  And that's a very

24 different thing from saying that ownership continues in parts

25 that have been installed on other people's planes.  The remedy

1  is the breach of contract claim.

2          And in a bankruptcy case, that's evidenced by the

3  filing of a proof of claim in an amount that is equal to the

4  value of what was promised in the contract.  And you said it

5  yourself, there are some measurements in the contract that we

6  can go by for what is the proper quantum of damages.

7          I am making this ruling with respect to the motion to

8  compromise and sell a particular plane, the plane that is

9  designated as N169SL.  I am not making this ruling in

10  connection with anybody else's plane.  I am looking at

11  specifically the lease agreement and the program agreement that

12  the group of owners on N169SL signed.

13          Somebody else's iteration of contract may have

14  different things, and the plain meaning under those may be

15  different.  The quantum of damages may be different.

16          So I'm approving the compromise and authorizing the

17  sale.  The waterfall as suggested in the compromise is

18  acceptable to the Court and no one else need be granted a right

19  to share in the net proceeds other than the current fractional

20  interest holders of N169SL.

21          Any questions?

22          (No response.)

23          THE COURT:  Let me point specifically to some of the

24  provisions.  The MLDA (sic) Section Roman VI.6 on page 7, the

25  MDLA provision at Section Roman VI.7.  So Roman VI.6 and Roman

1   VI.7.  I think when you read those two together, again, the

2   owners ceded this unfettered discretion except for, you know,

3   duties of good faith, et cetera, to the program operator.  And

4   the program operator was supposed to adhere to industry

5   standard.  The program operator did not, and that's why I get

6   -- I keep coming back around to the breach of contract claim.

7          So who gives me the proposed order?

8          MR. ANDERSEN:  Your Honor, may I ask for

9   clarification of the ruling?

10          THE COURT:  Yes.

11          MR. ANDERSEN:  And this -- Mr. Verona a moment ago

12   alluded to this issue.  With regard to engines and propellers

13   that are moved from one aircraft to the other --

14          THE COURT:  Thank you.  Engines and propellers, the

15   certified -- or what do you call it? -- registered, those

16   things, those go with the fractional owners' original plane,

17   the fuselage.  So if your engine is flying around on somebody

18   else's plane, that's your engine.

19          MR. ANDERSEN:  Thank you, Judge.

20          THE COURT:  And props.  I am assuming, though, that

21   this N169SL has the props and the engine that are registered to

22   that fuselage.

23          MR. VERONA:  Not at the current time, but we know

24   where one is.  I think Ms. Applegate's on the phone, she could

25   probably --

1          THE COURT:  Oh, that's right.  We went over this last

2    time.

3          MR. VERONA:  Maybe.  But like I said, I'm not sure

4    exactly where all the parts are.

5          THE COURT:  How is the Trustee going to sell N169SL?

6          MR. VERONA:  The agreement says that the bidding

7    would be timed based on the recovery of those items --

8          THE COURT:  Okay.

9          MR. VERONA:  -- and (inaudible).

10          THE COURT:  And then the things that are on the plane

11   now that belong to somebody else, where are those going to be

12   taken?

13          MR. VERONA:  Well, we intended, I think, Your Honor,

14   to abide by the recommendations that you made in the omnibus

15   orders on stay relief, which is that the various groups of

16   fractional owners should cooperate with each other to get the

17   original engines and props back on the appropriate planes so as

18   to make the group of planes more marketable.

19          THE COURT:  Okay.  Good.

20          All right, you had a good point, Mr. Andersen.  Your

21   engine, wherever it is, is safe in terms of title.

22          MS. SHERMAN:  N162SL has a couple of pretty good

23   engines, so that's not a bad thing.

24          THE COURT:  That's all its got.

25          MR. ANDERSEN:  My Spanish is not real good, but mas y

1 menos, Your Honor.

2          THE COURT:  Thank you.  I don't know what that means.

3          MR. ANDERSEN:  More or less.

4          THE COURT:  Oh, okay.  Well, menos, yeah.

5          Okay, so who gives me the order?  Mr. Verona?

6          MR. VERONA:  I can certainly do that, Your Honor.

7          THE COURT:  Okay.  We took care of this one.  We took

8 care of Teterboro.  Now we have to deal with N162SL.

9          MS. SHERMAN:  Your Honor, N162SL is an easier issue.

10 It's similar to the N169SL with the exception that the --

11          THE COURT:  Of the waterfall.

12          MS. SHERMAN:   -- the waterfall.  The Trustee's piece

13 comes out first, and it's $40,000 plus 8 percent of the net

14 proceeds in excess of a million dollars, and it comes out

15 first.  And the last here, which was the net proceeds piece,

16 was to be divided as determined by the Bankruptcy Court.

17          We're probably going to need to leave it that way,

18 Your Honor.  A new wrinkle is Mr. Alpert is here representing a

19 client who owns a one-thirty-second interest.  We have a plane

20 that sold more than 100 percent of, and we're going to have to

21 figure out once the plane is sold --

22          THE COURT:  How can that be?  I thought the interests

23 were limited to one-sixteenths.

24          MS. SHERMAN:  Your Honor, that's another -- well --

25          THE COURT:  Isn't that what the contract says?

1        MS. SHERMAN:  Is it one-sixteenth or is it 16 owners

2   under Part 91(a)?  The bankruptcy lawyers can't split that

3   hair.

4        Mr. Alpert's client, I believe, is looking at the FAA

5   records and some international records to see where things

6   were.  What had happened was there were some occasions when

7   people were selling things -- transferring things.  They'd come

8   back to the Debtor and then they're reissued in the new name.

9   And so sometimes the FAA records don't accurately reflect where

10  things were.  And there are occasions -- this is not the only

11  one -- where more than 100 percent of a plane, it appears, was

12  sold.

13       So we will work with Mr. Alpert and the fractional

14  owners of N162SL.

15       THE COURT:  You can't sell something that doesn't

16  exist.

17       MS. SHERMAN:  Well, we're selling the plane.  The

18  plane exists.  There's just --

19       THE COURT:  I mean the fractional -- I mean, if you

20  can only sell 16 things and you only have 16 things to sell,

21  then the 17th thing you can get nothing.

22       MR. ALPERT:  Your Honor, we're not objecting to the

23  sale itself.  I think that the interest would apply to the

24  proceeds to be determined by the Bankruptcy Court at a later

25  date.  So I --

```
 1              THE COURT:  Yeah, but let me -- can we maybe not

 2   leave this open for too much argument in the future?  Can I not

 3   just include the same ruling as I just made on the N169SL and

 4   limit the proceeds to those who have an ownership interest in

 5   the --

 6              MR. ALPERT:  You will have to determine --

 7              THE COURT:  -- unit?

 8              MR. ALPERT:  -- at some point who has an ownership

 9   interest.

10              THE COURT:  Not that.  But in terms of --

11              MS. SHERMAN:  Yes, Your Honor.  We can limit this to

12   the fractional owners of this plane I believe.

13              MR. ALPERT:  Correct.

14              MS. SHERMAN:  Mr. Andersen, is there --

15              MR. ALPERT:  Correct.  We would be --

16              THE COURT:  In other words, it's not opening up Mr.

17   Gibbs's group to come in and dip into the proceeds.

18              MR. ALPERT:  Understood.  Understood.  One more quick

19   point.  There is a difference in the waterfall in that this

20   agreement has something not included in the N169 agreement,

21   that the fractional owners get paid their legal fees first

22   before -- and it's not clear which of the fractional owners get

23   paid their legal fees first.  That's a clause that's written

24   into the waterfall that simply wasn't in the N169.  And I guess

25   we would have a problem with some getting their legal fees,
```

1 some not getting their legal fees.

2          THE COURT:  Why is that in there?

3          MR. ANDERSEN:  Judge, Ms. Applegate may be on the

4 phone too, and I think she and I discussed that.  These are the

5 same provisions that Mr. Alpert's referring to.  I think the

6 thought was that -- I think in the original proposed draft of

7 that agreement, order, there was a provision in there for legal

8 fees to be paid.

9          And what we negotiated was that those are only the

10 legal fees that are customary and necessary with regard to

11 selling the airplane so that it wouldn't pick up things like

12 our legal fees for arguing about this or Ms. Applegate's legal

13 fees for arguing about this.  It's just supposed to be whatever

14 the legal fees are that --

15          THE COURT:  Closing-cost type of legal fees.

16          MR. ANDERSEN:  Exactly, Judge.  That's my

17 understanding of it.  And I want to defer to Ms. Applegate

18 because that's just (inaudible).

19          MR. ALPERT:  With that representation, we'd be fine

20 with that, but certainly Ms. Applegate can clarify.

21          MS. SHERMAN:  Your Honor, I'm reading from a Doc. 44

22 -- 455-1, page 3 of 32, which is the actual settlement

23 agreement, and that tier of the waterfall would just -- which

24 is letter (C):  For commissions or fees, including legal fees,

25 to be incurred relating to the sale of the aircraft under this

1    -- capital A -- Agreement.

2             So it is in fact so limited, I believe --

3             THE COURT:  Okay.

4             MS. SHERMAN:  -- by the agreement itself.

5             THE COURT:  Okay.  And you agree with that, Ms.

6    Applegate?

7             MS. APPLEGATE:  Yes, I do, Your Honor.

8             THE COURT:  Okay.  Fine.  Then I'm going to approve

9    the --

10            MR. ANDERSEN:  Judge -- I apologize for interrupting

11   -- I just wanted it to be clear, on 162SL, this is the -- this

12   is the aircraft in which CCA has a substantial interest, and I

13   know that there are other fractional-share interest holders on

14   this aircraft.  By essentially consenting to this order, we

15   wouldn't want to prejudice our rights with regard to any

16   potential appeal from the Court's ruling on 169SL.  And that's

17   -- we want to get the airplane into the auction.

18            THE COURT:  That's fine.

19            MR. ANDERSEN:  But I just want to make sure --

20            THE COURT:  Say that in the order.

21            MR. ANDERSEN:  Thank you, Judge.

22            THE COURT:  Since you mentioned that, I did -- I have

23   one "forgot me" on the ruling.  I didn't deal with the two use

24   sections of the two different documents.  I do construe them to

25   be, as part of both contracts, to be really part of one

1  integrated transaction.  And I didn't say what I thought about

2  the word "use."

3        I think that "use" is defined by what was reserved to

4  the program operator to do and what the owners ceded the

5  program operator to do.  That's by the -- in other words, use

6  is a general thing, and the two sections that I mentioned,

7  Roman VI.6 and .7 gives some specificity to that.

8        However, if someone thinks that use is -- there's an

9  ambiguity there, it's a latent ambiguity, and I would resolve

10 that latent ambiguity in the same way as I would use the

11 industry standards, and that is, I would look to the industry

12 standards.

13        And there is no dispute of fact that the industry

14 standard would suggest that the use is as described in the

15 three affidavits, which is:  take parts off, get them in the

16 air, make the program be efficient, go and get a replacement

17 part and put it on the other aircraft from which the original

18 part came.

19       Except, again, this Debtor breached the contract by not

20 getting replacement parts, thereby giving rise to breach of

21 contract claims, not claims of title.  I'm finished.

22        MS. SHERMAN:  Your Honor, back to N162SL.  There was

23 one other wrinkle on this -- well, it's not really a wrinkle.

24 The motion to compromise provides that liens would be paid from

25 the proceeds of sale.  There was only one lien on this

1  particular plane and it's the lien asserted by the landlord

2  AvAero.

3        You will be pleased to know that that lien and what

4  is going to happen with this plane has been resolved.  The

5  terms of the resolution are set forth in an email from Ms.

6  Applegate to Mr. Lamoureux sent this morning -- it's No. 12 --

7  at 9:23 a.m., and will be incorporated in the order.

8  Essentially the fuselage of the plane -- it is a bad donor

9  plane:  no wheels, wings can't be removed.  You can't really

10 get it out of the hangar unless you saw it apart.  And you'd

11 have to close down lanes of traffic or transport it by

12 helicopter.  It's a mess.

13       So Mr. -- AvAero has agreed to allow this plane to

14 continue to be stored in the hangar until seven days after the

15 auction when --

16       MR. LAMOUREUX:  It was five -- it's January 15th,

17 Your Honor.

18       MS. SHERMAN:  -- when it will be removed by the

19 purchaser.  And we've agreed on what the storage fee to be paid

20 from the proceeds of sale to AvAero will be.  It's all set

21 forth in that email.  And I'll leave it to Mr. Verona and Ms.

22 Applegate and Mr. Lamoureux as to whether they need to read

23 that onto the record or whether the reference to the email is

24 enough.  But we'd like to include that in the order, and then

25 we won't need to file an adversary to determine extent,

1 | validity and priority of --

2 |         MR. LAMOUREUX:  That's correct, Your Honor.  Let me
3 | just tell you, the amount of the lien is $11,000.  The date for
4 | the removal is the 15th.

5 |         THE COURT:  How are they going to get it out of
6 | there?

7 |         MR. LAMOUREUX:  Well, hopefully a purchaser -- that
8 | will be the purchaser's responsibility.  But if it's not
9 | removed, AvAero and the owners are going to work together on
10 | how do we remove it from there and sort of the actual cost of
11 | removal my client would be reimbursed for.

12 |         But we've already begun those discussions on what
13 | happens if it doesn't sell or the purchaser doesn't pick it up,
14 | what are we going to have to do.  And we are talking about
15 | that:  Can it be moved?  Where can it be moved?  How can it be
16 | stored?  And those are issues we're going to have to resolve.

17 |         THE COURT:  What did Ms. Sherman mean when she said
18 | that the wings can't be taken off?

19 |         MR. LAMOUREUX:  Apparently, Your Honor, on many types
20 | of these aircrafts, the wings are actually bolted on.

21 |         THE COURT:  So unbolt them.

22 |         MR. LAMOUREUX:  You can't because the wings are all
23 | part of one gigantic fuselage.  There is no bolts.  They are
24 | formed for --

25 |         THE COURT:  They're welded on?

1          MR. LAMOUREUX:  I don't even know if they're welded.

2   But you can't unscrew them.  And so to remove these, I've been

3   told, is that the wings will have to be chopped off and the

4   fuselage itself may even have to be cut in half in order to put

5   it on a flatbed and remove it.

6          Now, hopefully we won't have to deal with those

7   issues.  But if those issues come up on the 15th, we will have

8   to deal with those.  And we've already begun --

9          THE COURT:  Somebody's going to have to deal with

10   them.

11          MR. LAMOUREUX:  You're right.  And we are starting

12   those discussions on, what the heck, we did --

13          THE COURT:  Maybe Ms. Chazal's client can help you.

14          MR. LAMOUREUX:  Pardon?

15          THE COURT:  Ms. Chazal's client may be able to make

16   some recommendations.

17          Are you all selling the fuselage separately from the

18   engines?  Obviously you are.

19          MS. SHERMAN:  Yes, Your Honor.  It's going to be sold

20   in bits and pieces.  The engines are sitting on N163SL (sic)

21   and they will be sold in place with the purchaser's obligation

22   to remove those engines from that plane and transport them

23   wherever they want.  The propellers, every bolt -- there's a

24   shelf next to this plane that has a lot of the parts, the

25   avionics and the cowlings and all the things that came off this

plane.  And the auctioneer's recommendation was that we would
make far more selling this plane as bits and pieces than trying
to reassemble it and sell it as a whole because there are so
many things in fact missing.

So it will be sold --

THE COURT:  Okay.  So those parts are going to be
claw outs from the general auction because those parts,
everyone agrees, belong to the N162SL.

MS. SHERMAN:  That's correct, Your Honor.  They will
be included in the auction, and the auctioneer will track these
parts separately to the extent anybody else opts in or wants to
include things in the auction.

Certain of the computers that the Tax Collector has a
lien on, those are going to be tracked separately as well.
There's some sort of program where you treat it as different
consigners, you know, when you have, like, a group auction.
He's got a program, so he just labels these as things go in
that this is the N162 --

THE COURT:  And the avionics that you're selling as
part of N162, they didn't come from some other plane.  Maybe
they did, but it doesn't matter because of my ruling.

MS. SHERMAN:  They're tagged as last removed from
162SL either with tags, serial numbers, are sitting on a shelf
that has a big N162SL sign on it.  So they were able to verify
that these are in fact off of 162SL.

1          THE COURT:  But maybe not the originals.

2          MS. SHERMAN:  Probably not the originals.

3          THE COURT:  It doesn't matter because of my ruling.

4          MS. SHERMAN:  Yes, Your Honor.

5          MR. LAMOUREUX:  In addition, Your Honor -- we will

6   deal with this at a subsequent hearing -- we've also reached an

7   agreement with the Trustee with respect to additional time that

8   they're going to need to (indiscernible) for a variety of

9   different reasons, we've reached agreements with respect to

10  that.  Certain assets that are going to be excluded from the

11  auction, some miscellaneous matters that we've reached

12  agreement; it's in emails.  And we'll deal with those issues at

13  the next hearing.  But I at least wanted to let the Court

14  know --

15         THE COURT:  Okay.  And do I have a proposed order on

16  the thing about moving from the -- the stuff behind the roll-

17  door, the furniture --

18         MR. LAMOUREUX:  That has been submitted, Your Honor.

19         THE COURT:  Okay.  All right.

20         MR. LAMOUREUX:  Okay?  Thank you, Your Honor.

21         MR. VERONA:  Your Honor, one very minor correction.

22  The email that lays out the final version of this agreement was

23  sent at 10:07 a.m., not at 9:23 a.m.  There was one minor

24  change deleting engines and propellers.

25         MR. LAMOUREUX:  That's correct, Your Honor.  I've got

1   it if I need to read it, but Mr. Verona's correct.

2            THE COURT:  Okay.  Fine.  Thank you all.

3            Interesting argument.  I mean, we talked about this

4   on the very first day, someone had to make a decision on what

5   is a plane.  And now, at least with respect to two planes, we

6   know what the plane is.  Thank you.

7            And we'll let the record be noted that Ms. Scharrer

8   is here.  Thank you.

9                    (Hearing concluded at 11:58 a.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATE OF TRANSCRIBER


I certify that the foregoing is a correct transcript prepared to the best of my ability from the digitally recorded audio proceedings and logs in the above-entitled matter.




_____    January 21, 2014
Marilyn L. Taylor, CVR          Date
Transcriber



FEDERALLY CERTIFIED TRANSCRIPT AUTHENTICATED BY:

_____
Kimberley S. Johnson, CVR-CM
Certified Verbatim Reporter Master

JOHNSON TRANSCRIPTION SERVICE
7702 Lake Cypress Drive
Odessa, Florida 33556
(813) 920-1466