IN THE UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

IN RE:                          :
                                :
AVANTAIR, INC.                  :      Case No. 8:13-bk-09719-CPM
                                :
          Debtor                :      Chapter 7
                                :
                                :
                                :
- - - - - - - - - - - - - - - x

                                U.S. Courthouse
                                801 North Florida Avenue
                                Tampa, Florida 33602
                                Held March 4, 2014

                  TRANSCRIPT OF HEARING

1-Motion of Former Executives of Avantair, Inc. for Entry of
an Order Allowing Advancement of Defense Costs, filed by
Steven R. Wirth on behalf of Creditor Steven Santo (Doc
#596); Objection to Motion of Former Executives of Avantair,
Inc. for Entry of an Order Allowing Advancement of Defense
Costs Under the Debtors' Executive Edge Policy, filed by
David Christian on behalf of Mary Peterson, Scott Piwinski
(Doc. #623); 2-Expedited Motion for Order Directing the
Distribution of Sale Proceeds from N162SL, filed by Jay
Verona on behalf of Creditor Piaggio Avanti P-180 aircraft,
mfg. serial number 1130, Federal Aviation Administration
(FAA) registration number N162SL (Doc #615).....
         *[FULL NATURE OF PROCEEDINGS CONTINUED ON NEXT PAGE]*

         BEFORE THE HONORABLE CATHERINE PEEK McEWEN
              UNITED STATES BANKRUPTCY JUDGE

         PROCEEDINGS DIGITALLY RECORDED BY COURT PERSONNEL
        TRANSCRIPT PRODUCED BY COURT-APPROVED TRANSCRIPTION SERVICE

_____

**JOHNSON TRANSCRIPTION SERVICE**
7702 Lake Cypress Drive
Odessa, Florida 33556
(813) 920-1466

*[FULL NATURE OF PROCEEDINGS CONTINUED FROM PREVIOUS PAGE]*

.....3-Motion for Entry of an Order: (i) Approving Compensation of Auctioneer; (ii) Approving Disbursement of Auction Proceeds; and (iii) Granting Relief, filed by Lynn Welter Sherman, Attorney for Trustee on behalf of Trustee Beth Ann Scharrer (Doc. #625); 4-Motion for Approval of Sale Free and Clear of Liens and to Approve Sale and Bid Procedures (N104SL), filed by Lynn Welter Sherman, Attorney for Trustee on behalf of Trustee Beth Ann Scharrer (Doc. #557) 5-Fractional Owners' Limited Joinder to Proposed Class Representatives' Objection to Former Executives' Motion for Advancement of Defense Costs Filed by Jay B. Verona on behalf of Piaggio Avanti P-180 aircraft, et al (Doc. 635)

APPEARANCES:

| | |
|---|---|
| For Beth Ann Scharrer<br>Chapter 7 Trustee | LYNN WELTER SHERMAN, Esquire<br>Adams and Reese LLP<br>101 E. Kennedy Boulevard<br>Suite 4000<br>Tampa, Florida 33602-5152<br>813-402-2880<br>lynn.sherman@arlaw.com |
| For Pinellas County Tax<br>Collector's Office | WILLIAM C. FALKNER, Esquire<br>County Attorney's Office<br>315 Court Street #6<br>Clearwater, Florida 33756<br>727-464-3354<br>bfalkner@co.pinellas.fl.us |
| For Midsouth Services<br>and Clear Aircraft | MICHAEL C. MARKHAM, Esquire<br>Johnson Pope Bokor<br>Ruppel & Burns LLP<br>403 E. Madison Street<br>Suite 400<br>Tampa, Florida 33602<br>813-225-2500<br>mikem@jpfirm.com |
| For Global Aerospace | ROGER W. CLARK, Esquire<br>The Clark Law Group<br>11400 W. Olympic Blvd.<br>Suite 1150<br>Los Angeles, CA 90064<br>310-478-0077<br>rclark@cgold.cc |
| For Proposed Special<br>Counsel to the Trustee | ROBERT F. ELGIDELY, Esq.<br>ERIC RAYMAN, Esquire<br>Genovese Joblove & Battista PA<br>200 East Broward Boulevard<br>Suite 1110<br>Fort Lauderdale, Florida 33301<br>954-453-8000<br>relgidely@gjb-law.com |

```
APPEARANCES:
(Continued)

For Global Aerospace          KEITH APPLEBY, Esquire
                              Hill, Ward & Henderson, P.A.
                              101 E. Kennedy Boulevard
                              Suite 3700
                              Tampa, Florida 33602-5195
                              813-221-3900
                              kappleby@hwhlaw.com

For Proposed Class            DAVID CHRISTIAN ATTORNEYS LLC
Representatives, Mary         3515 W. 75th Street
Peterson and Scott            Suite 208
Piwinski                      Prairie Village, KS 66208
                              913-674-8215
                              dchristian@davidchristian
                              attorneys.com

                              RYAN D. BARACK, ESQUIRE
                              Kwall, Showers & Barack
                              133 N. Fort Harrison Avenue
                              Clearwater, Florida 33755
                              727-441-4947
                              cbarack@ksblaw.com

For a Group of Fractional     JAY VERONA, Esquire
Owners of Aircraft            R. QUINCY BIRD, Esquire
                              Shumaker, Loop & Kendrick, LLP
                              101 E. Kennedy Blvd.
                              Suite 2800
                              Tampa, Florida 33602-5150
                              813-229-7600
                              jverona@slk-law.com
                              qbird@slk-law.com

For Piaggio North America     AMANDA E. CHAZAL, Esquire
                              Stichter Riedel
                              110 E. Madison Street
                              Suite 200
                              Tampa, Florida 33602
                              813-229-0144
                              achazal@srbp.com
```

APPEARANCES:
(Continued)

For Steven Santo and                STEVEN R. WIRTH, Esquire
Laurel Jepson                       Akerman Senterfitt
                                    401 E. Jackson Street
                                    Suite 1700
                                    Tampa, Florida 33602-5250
                                    813-223-7333
                                    steven.wirth@akerman.com

For Capital Holdings 100,           ADAM LAWTON ALPERT, Esquire
LLC                                 Bush Ross, PA.
                                    1801 N. Highland Avenue
                                    Tampa, Florida 33602
                                    813-224-9255
                                    aalpert@bushross.com

For Corrections                     DONALD R. ANDERSEN, Esquire
Corporation                         Gorby Peters & Associates
of America of Tennessee             2 Ravinia Drive
                                    Suite 1500
                                    Atlanta, Georgia 30346
                                    404-291-3429
                                    dandersen@gorbypeters.com

For Dallas Airmotive,               MARVIN H. MOHNEY, Esquire
Inc.                                Law Offices of Marvin R. Mohney
(Appearing by phone)                541 Bay Court
                                    Heath, Texas 75032-7630
                                    214-698-3011
                                    marvinmohney@aol.com

For Teterboro Rams                  ZACHARY P. HYMAN, Esquire
(Appearing by phone)                Berger Singerman
                                    350 East Las Olas Boulevard,
                                    Suite 1000
                                    Fort Lauderdale, FL 33301
                                    954-525-9900
                                    ZHyman@bergersingerman.com

```
APPEARANCES:
(Continued)

For LW Air and              GREGORY PLOTKO, Esquire
Lauren Weil                 Kramer Levin Naftalis & Frankel
(Appearing by phone)        1177 Avenue of the Americas
                            New York, NY 10036
                            212-715-9100
                            gplotko@kramerlevin.com


For the United States       J. STEVEN WILKES, Esquire
Trustee                     Office of United States Trustee
                            501 East Polk Street
                            Tampa, Florida 33602
                            813-228-2000
                            j.steven.wilkes@usdoj.gov


Also Present                Beth Ann Scharrer
```

1             P R O C E E D I N G S

2             (Proceedings commenced at 1:42 p.m.)

3             COURTROOM CLERK:  All rise.  Court is now in

4    session.

5             THE COURT:  Please have a seat.

6             COURTROOM CLERK:  Avantair, Incorporated, 13-9719.

7             THE COURT:  All right.  I'll call the roll for

8    phone appearances.  John Bingham with Piaggio?

9             (No response.)

10            THE COURT:  All right.  Not here.  Eric Blythe with

11   -- or on behalf of the directors and officers?

12            (No response.)

13            THE COURT:  Not here.  Zachary Hyman for Teterboro

14   Rams?

15            MS. HYMAN:  Zachary Hyman of Berger Singerman on

16   behalf of Teterboro Rams, LLC.

17            THE COURT:  Thank you.  Marvin Mohney, with Dallas

18   Airmotive?

19            MR. MOHNEY:  Present, Your Honor.

20            THE COURT:  Greg Plotko, with LW Air?

21            MR. PLOTKO:  Present, Your Honor.

22            THE COURT:  James Timko with Stearns Lending?

23            (No response.)

24            THE COURT:  All right, not here.  Anybody else on

25   the phone that I did not call?

```
 1                    (No response.)

 2           THE COURT:  All right.  Then the phone appearances

 3    are complete.  Now in the courtroom.

 4           MS. SHERMAN:  Lynn Welter Sherman, representing

 5    Beth Ann Scharrer as Chapter 7 Trustee, and Ms. Scharrer is

 6    here with me today in the courtroom.

 7           THE COURT:  All right, thank you.

 8           MR. FALKNER:  Bill Falkner, Your Honor,

 9    representing the Pinellas County Tax Collector's Office.

10           THE COURT:  All right, thank you.

11           MR. MARKHAM:  Michael Markham for Midsouth Services

12    and Clear Aircraft.

13           THE COURT:  Thank you.

14           MR. CLARK:  Good afternoon, Your Honor.  Roger

15    Clark on behalf of Global Aerospace.

16           THE COURT:  All right, thank you.

17           MR. ELGIDELY:  Good afternoon, Your Honor.  Robert

18    Elgidely of Genovese, Joblove & Battista as the proposed

19    special counsel to the Trustee.  I'm also accompanied by my

20    colleague, Eric Rayman.

21           THE COURT:  All right, thank you.

22           MR. ELGIDELY:  Thank you.

23           THE COURT:  How do you spell your last name?

24           MR. RAYMAN:  R-a-y-m-a-n.

25           THE COURT:  All right, thank you.
```

```
 1              MR. APPLEBY:  Good afternoon, Your Honor.  Keith
 2    Appleby, also on behalf of Global Aerospace.
 3              THE COURT:  All right, thank you.
 4              MR. CHRISTIAN:  Good afternoon, Your Honor.  David
 5    Christian on behalf of proposed class representatives, Mary
 6    Peterson and Scott Piwinski.  And my co-counsel, Ryan Barack
 7    is also in the courtroom.
 8              THE COURT:  How do you spell his last name?
 9              MR. CHRISTIAN:  Barack is B-a-r-a-c-k.
10              THE COURT:  All right, thank you.
11              MR. VERONA:  Good afternoon, Your Honor.  Jay
12    Verona and Quincy Bird, of Shumaker Loop & Kendrick, for a
13    group of fractional owners.
14              THE COURT:  All right, thank you.
15              MS. CHAZAL:  Good afternoon, Your Honor.  Amanda
16    Chazal on behalf of Piaggio America, Inc.
17              THE COURT:  Thank you.
18              MR. WIRTH:  Good afternoon, Your Honor.  Steven
19    Wirth of the Akerman law firm on behalf of Steven Santo and
20    Laurel Jepson.
21              THE COURT:  All right, thank you.
22              MR. ALPERT:  Good afternoon, Your Honor.  Adam
23    Lawton Alpert on behalf of Capital Holdings 100, LLC, a
24    fractional owner.
25              THE COURT:  All right, thank you.
```

1       MR. ANDERSEN:  Good afternoon, Judge.  Donald
2  Andersen on behalf of CCA.
3       THE COURT:  All right, thank you.  And others in
4  the back?  I guess the gentleman with the red shirt?
5       UNIDENTIFIED SPEAKER:  I'm just here on behalf of
6  AvAero, Judge.  I'm a corporate employee just watching these
7  proceedings.
8       THE COURT:  All right.  You're here instead of John
9  Lamoureux, who is not here today.
10      UNIDENTIFIED SPEAKER:  Well, I don't think I'm here
11  instead of John Lamoureux.  I'm just here.
12      THE COURT:  Got it, okay.  It's unusual that he
13  would not be here.  I think he's been here at every hearing.
14      MS. SHERMAN:  Your Honor, he's got a motion to
15  withdraw pending.
16      THE COURT:  Oh.  Is that on today's?
17      MS. SHERMAN:  No, Your Honor, it's not.
18      THE COURT:  Oh.
19      MS. SHERMAN:  It was just uploaded, I think, last
20  week.
21      THE COURT:  I see, okay.  All right.  There are
22  many things on the calendar.  You can tell me where you want
23  me to start.
24      MS. SHERMAN:  Your Honor, if we could start with
25  housekeeping.  I came prepared today with my little folders

1   of the orders that have been uploaded that I, at least as of

2   last night -- we were waiting on -- one was the proposed

3   order authorizing the Trustee to retain ADP to send W-2's to

4   the employees.

5          We had filed it and Your Honor -- and we got a call

6   from chambers or the case manager, I can't remember who,

7   asking us to upload a proposed order.  And I have copies

8   today or I can send copies directly to chambers if that would

9   make it easier.  I think you guys like to do electronic

10  signatures on those.

11         THE COURT:  The only one I have in my folder that

12  I can stamp is the 2004 exam proposed order that was objected

13  to, so --

14         MS. SHERMAN:  I have the ADP order and --

15         THE COURT:  So I don't have that yet.  When was it

16  uploaded?

17         MS. SHERMAN:  I want to say -- I'm not sure if it

18  was last week or the week prior, Your Honor.

19         THE COURT:  I have no idea where those would be.

20  All right.

21         MS. SHERMAN:  Your Honor, we'll just re-upload it

22  and perhaps the --

23         THE COURT:  No.  Whoa, whoa, please don't.

24         MS. SHERMAN:  Okay.

25         THE COURT:  We get confused, then we have to

1  compare two different versions and it will slow us down if we

2  can't pick up where the difference is, if there's a second

3  one in there.  And so then if we can't detect it, we'll have

4  to call you and say, "What's the difference between this one

5  and this one."  So let's find out where they are.

6            Besides the ADP order, what else?

7            MS. SHERMAN:  The proposed order approving the

8  compromise on N162SL.

9            THE COURT:  Okay.

10            MS. SHERMAN:  And authorizing the sale of N162SL.

11  And that was uploaded at the same time as 169SL, and I have a

12  feeling that perhaps there was some confusion as to whether

13  it was one order or two.  And then the proposed --

14            THE COURT:  There was one that had some typos in

15  it.  It had a different body or different -- remember there

16  was one of the -- we called somebody in this room and said,

17  "Is it this one or" -- oh, it was Gray Gibbs.  So never mind,

18  that was a different group, so --

19            MS. SHERMAN:  Okay, and then the --

20            THE COURT:  All right, that's one.  And then

21  another one?

22            MS. SHERMAN:  And the last one would be the

23  proposed order, and this is very recent that that was even

24  filed, and we were asked to submit an order authorizing the

25  retention of special counsel, which would be Mr. Elgidely and

1    Mr. Rayman's firm.

2              THE COURT:  Have you checked off -- this is not

3    an 11, as much as I sometimes wish it were.  Okay, I'm

4    looking -- okay.

5              MS. SHERMAN:  I have tracking numbers on, I think,

6    two of the three, if that is any help at all.

7              THE COURT:  It would be a help because they're not

8    in the case manager's folder and they're not in my folder.

9    They're not on the docket are they, Ms. Garcia?

10             COURTROOM CLERK:  Let's see.  (Reviewing docket.)

11             THE COURT:  We held back the 2004 order because

12   there was an objection, so that explains why I have one of

13   them in my folder.

14             COURTROOM CLERK:  Un-un.

15             THE COURT:  They're not there.  So why don't at the

16   end of the hearing you give us the tracking numbers and we'll

17   see if we can find them.

18             MS. SHERMAN:  Yes, Your Honor.  There's only, what,

19   600 and some odd docket entries, so it's not surprising that

20   it's hard to keep track of them all.

21             Your Honor, the first item set on the Court's

22   calendar for today was a motion to approve -- for approval of

23   sale free and clear of liens, and bid procedures on N104SL,

24   which actually has an asterisk beside it at the beginning of

25   -- at the very top of the calendar.

1          COURTROOM CLERK:  It's on the next page.

2          MS. SHERMAN:  I'm sorry.

3          THE COURT:  It's where?

4          COURTROOM CLERK:  On our next page.

5          MS. SHERMAN:  I must have printed the calendar on

6   a different day.

7          THE COURT:  I've got it on -- is it No. 4, Ms.

8   Garcia?  I've got it second to the last.

9          COURTROOM CLERK:  Right.

10         MS. SHERMAN:  I'm sorry.

11         THE COURT:  Okay.

12         MS. SHERMAN:  It's Docket No. 557.

13         THE COURT:  Yes.

14         MS. SHERMAN:  Your Honor, an order was previously

15  entered.  We had uploaded the motion to approve compromise of

16  controversy and the motion to sell.  When we came before the

17  Court at the January 15th hearing, we advised the Court that

18  we would be amending the motion to sell because it omitted an

19  exhibit which was the exhibit that listed all the lien

20  holders on it.

21         That amended motion was -- and the order that was

22  entered on the 9019 motion, which is Docket No. 610, said the

23  motion to sell was not being ruled on and that it would be

24  ruled -- reset for hearing after we filed an amended motion

25  to sell.

```
1              I'm not sure -- somehow the original motion that
2    hadn't been amended was reset for hearing.  We did get the
3    amended motion to sell today with the correct exhibit.  And
4    if Your Honor would be inclined to give us a hearing date
5    approximately two weeks from the end of this week, we should
6    be uploading a substantial number of motions to approve
7    compromise, motions to sell, and perhaps we can have a giant
8    hearing on all of them.
9              THE COURT:  Let me see what this says.  I'm looking
10   at 610.  It says that the motion was granted.
11             MS. SHERMAN:  And then it goes on --
12             THE COURT:  Objection was overruled.
13             MS. SHERMAN:  The paragraph 5, "This order is not
14   an adjudication of any issues raised by the motion to approve
15   sale free and clear of liens and to approve sale and bid
16   procedures, Doc. 557, which issues shall be resolved at a
17   subsequent hearing that shall be scheduled upon the filing of
18   an amended motion to sell, relating to N104SL by the
19   Trustee."
20             THE COURT:  Okay.  And the amended motion to sell
21   is --
22             MS. SHERMAN:  It was never -- it just got filed
23   this morning, Your Honor.
24             THE COURT:  Oh, okay.  So you just want us to --
25             MS. SHERMAN:  If we could bump this, Your Honor,
```

1    to --

2          THE COURT:  What you're saying is that this

3    shouldn't even be on the calendar because it's been

4    superseded.

5          MS. SHERMAN:  Yes, Your Honor.

6          THE COURT:  Okay.  557 isn't on for hearing,

7    Ms. Garcia.  So in the housekeeping department, in addition

8    to tracking numbers, we'll have to see if you can announce a

9    time when the -- I'm looking for it.  I don't know that it

10    has been filed.

11          MS. SHERMAN:  I believe my office --

12          THE COURT:  Do you believe it was filed today?

13          MS. SHERMAN:  It should have been, Your Honor.  My

14    office was supposed to be uploading it while I was meeting

15    with Mr. Elgidely this morning.  If it hasn't been filed

16    already, it will be filed as soon as Audrey gets back from

17    lunch.

18          THE COURT:  Do you have it?

19          COURTROOM CLERK:  No.

20          THE COURT:  Okay.  Okay, date for replacement for

21    557, okay.  All right, what else can we do?

22          MS. SHERMAN:  Your Honor, the second matter

23    that's set for hearing, which I think we're going to have

24    argument on, or at least the second in line, is the motion

25    for advancement of defense costs that was filed by Mr. Wirth.

```
1              THE COURT:  Okay.

2              MS. SHERMAN:  And Mr. Elgidely is going to be

3   handling that for the Trustee.

4              THE COURT:  Do you want to go with that now?

5              MS. SHERMAN:  Your Honor, I think the last two --

6              THE COURT:  That's fine.

7              MS. SHERMAN:  -- it doesn't matter which order we

8   take them in.

9              THE COURT:  That's fine.  Mr. Elgidely technically

10  hasn't been approved, but let's see if I can look at the

11  affidavit really quickly.

12             MR. CHRISTIAN:  Your Honor, might I be heard a

13  moment on this point?

14             THE COURT:  And you're Mr. Christian?

15             MR. CHRISTIAN:  I am, Your Honor.  David Christian

16  on behalf of the proposed class representatives.  We had a

17  chance to meet with Mr. Elgidely this morning for the first

18  time and hear about his proposed representation.

19             I'm not here to tell the Court we necessarily have

20  an objection, but my understanding is the deadline to object

21  to the Trustee's application hasn't yet passed.  And I guess

22  standing here today --

23             THE COURT:  Was there a negative notice on that?

24             MS. SHERMAN:  It was not filed -- it was not filed

25  with negative notice, Your Honor.
```

1        THE COURT:  Okay.  So what deadline are you talking

2   about?

3        MR. CHRISTIAN:  Well, Your Honor, I can't recall,

4   standing here at the podium today, precisely when the

5   application was filed, but I believe it's quite recent,

6   and we haven't even had a chance to discuss --

7        THE COURT:  I'm looking for it right now.

8        MR. CHRISTIAN:  And I guess the only reason I rose

9   is because the Court began to look the affidavit.

10       THE COURT:  Right, because -- well, it --

11       MS. SHERMAN:  It's Docket 622, Your Honor, which

12   was filed on February 21.

13       THE COURT:  Okay.  So more than ten days ago.

14   Seven plus four -- eleven days ago.  Are you aware of some

15   allegation that there's a disinterestedness issue here?

16       MR. CHRISTIAN:  No, but the proposed 35 percent or

17   40 percent contingency fee seemed large to us, and my clients

18   are concerned about dissipating the proceeds.

19       THE COURT:  Compared to what?  What are you aware

20   of with other contingency agreements that would be similar?

21       MR. CHRISTIAN:  Well, candidly, Your Honor, one of

22   the things we were going to speak to our clients about is

23   whether we propose to do it on behalf of the estate at

24   something less than that.

25       THE COURT:  I see.  Okay.

1          MR. CHRISTIAN:  But we haven't had a chance to

2     explore that.

3          THE COURT:  So who's going to argue this motion?

4          MR. CHRISTIAN:  I have no problem with Mr. Elgidely

5     addressing the motion here today.  I --

6          THE COURT:  If I don't approve him, he can't get

7     paid.

8          MR. CHRISTIAN:  I understand.

9          THE COURT:  I'm not going to do that to him either.

10         MR. CHRISTIAN:  I understand.  Well, I don't

11    know if this would help or not.  Let me say this.  My

12    understanding, based on the response that was filed by the

13    movant on this motion, yesterday or the day before, is that

14    they have a stipulation, or a stipulated order with the

15    Trustee that they want to advocate.

16         My view is that maybe it's premature to do that

17    here today, and I don't know if that cuts the Gordian knot or

18    not.

19         The reason I say that, Your Honor, is that the

20    proposed stipulated order would cap the advancement at

21    $50,000.  I was advised about -- well, a half an hour ago,

22    I guess, that the movants intend on filing shortly another

23    motion related to another case where the D's and O's are

24    Defendants, and I understand there was a third case recently

25    filed, so that the Court and the parties may be facing an

```
 1   advancement motion for three different cases by the same

 2   Defendants for advancement from the same insurance policy.

 3            And I guess our view is that rather than negotiate

 4   that in piecemeal fashion -- conceptually we don't have a

 5   problem with a cap.  That's probably the right way to resolve

 6   the issue, but obviously the amount of the cap and the number

 7   of cases it applies to are of importance in negotiating that.

 8            And so if there's going to be another motion filed

 9   this week or next week about another case or another couple

10   cases, we'd like to have that all on the table before we

11   either negotiate a resolution or before the Court rules, if

12   it becomes necessary on what the appropriate answer turns out

13   to be.

14            THE COURT:  Are there answer deadlines that are

15   ticking away?

16            MR. CHRISTIAN:  My understanding is none of these

17   cases are active and, indeed, some or all of these pieces of

18   litigation may be stayed by the automatic stay.

19            THE COURT:  Well, just because they're not active

20   doesn't mean that someone can't become active and try to get

21   a default.

22            MR. CHRISTIAN:  I'm not aware of any deadline or

23   any potential prejudice.  And I guess part of our argument is

24   there's been no showing of any deadline or any potential

25   prejudice.
```

```
 1              THE COURT:  All right.  What about it, Mr. Wirth?
 2   Are these same folks of yours Defendants in others' lawsuits?
 3              MR. WIRTH:  They are, Your Honor.  They're also --
 4   there's also a demand by the Trustee for the policy limits
 5   under two different policies, that obviously the executives
 6   and former officers and directors are going to have to
 7   defend.
 8              So I would assume that there'll be some type of
 9   motion to advance defense costs with respect to the Trustee's
10   claims as well.  But that doesn't -- I mean, Judge, we have
11   -- I represent Steve Santo and Laurel Jepson, two former
12   executives of the Debtor, who were actively involved in the
13   litigation in Pinellas County.  That litigation was commenced
14   by Mark Werner and Thomas Connor, and their former --
15              THE COURT:  Are they alleging a cause of action
16   that is -- that someone could argue belongs to the estate?
17              MR. WIRTH:  No, Your Honor.  The cause of action
18   alleged in the Werner litigation is essentially that the
19   Debtor and some of the executives sold a flight part to the
20   Plaintiffs when they knew they wouldn't be able to perform or
21   provide the services to those Plaintiffs.
22              That litigation is active.  There's a motion to
23   dismiss pending.  The movants are insureds under the policy.
24              THE COURT:  What's a flight card?
25              MR. WIRTH:  It's essentially air time.
```

```
 1              THE COURT:  Okay.

 2              MR. WIRTH:  And it's not a fractional ownership but

 3    it's a separate -- just for air time that the Debtor sold.

 4              So, Judge, they are the primary beneficiaries of

 5    the policy.  We don't think the policy proceeds are property

 6    of the bankruptcy estate.  This is a D&O policy.  The policy

 7    was purchased --

 8              THE COURT:  The Trustee has agreed to the relief

 9    that you requested?

10              MR. WIRTH:  They have, Your Honor.  The order that

11    we have agreed to essentially reserves everybody's rights

12    with respect to whether the policy or the policy proceeds are

13    property of the estate.  It makes no determination in that

14    regard.

15              It sets an interim cap with respect to Mr. Santo

16    and Ms. Jepson to advance defense costs up to $50,000, solely

17    related to the Werner litigation.

18              THE COURT:  And can that be disgorged if it's

19    determined that the proceeds belong somewhere else?

20              MR. WIRTH:  I guess that's a -- you know, that's

21    always an option to the Court.  I don't think that the

22    Court --

23              THE COURT:  I mean, every dollar that we let out

24    under the -- the policy has limits; right?

25              MR. WIRTH:  It's a $10 million policy and then
```

 1    there's another $5 million policy as well.  So there's

 2    $15 million in coverage, Your Honor.  But the insured has

 3    indicated that they are prepared to advance defense costs.

 4            I mean, if the Court doesn't allow it, it puts

 5    them in an impossible situation.  The D&Os can't defend

 6    themselves.  There could be a default entered and then the

 7    insurer is going to be responsible for --

 8            THE COURT:  That's why I asked about whether people

 9    were standing down or not.  So you don't know.

10            MR. WIRTH:  As far as I -- as far as I know, Your

11    Honor, they're not standing down with respect to the officers

12    and directors.  The Debtor was named as a Defendant in the

13    Werner litigation, but as far as I know --

14            THE COURT:  And the stay has not been lifted for

15    that purpose?  For the Debtor's adjudication?

16            MR. WIRTH:  Not that I'm aware.

17            THE COURT:  Okay.  So they have to file an answer

18    by what date?

19            MR. WIRTH:  We filed the motion to dismiss.  That's

20    pending.

21            THE COURT:  Okay.  All right, so your people can't

22    be defaulted?

23            MR. WIRTH:  Our people cannot be defaulted.

24    There's a motion to dismiss pending, but obviously counsel

25    has to be paid.

1          THE COURT:  What happens if all the officers and

2     directors come and ask me for money for defense costs?

3          MR. WIRTH:  Judge, I think they're entitled to

4     defense costs.

5          THE COURT:  How do I apportion it?

6          MR. WIRTH:  At this point, Judge, I think all we

7     have here is a motion with respect to one litigation and two

8     D&Os that are entitled to defense costs under the policy.  So

9     I guess the -- I think it probably makes sense to address

10    those as they come before the Court.

11         THE COURT:  Well, the only reason I would be

12    addressing this at all is because of the alleged effect on

13    the estate.  Because if it's outside of the estate, then I

14    have no business making an order one way or the other; right?

15         MR. WIRTH:  Well, Judge, we don't think it's

16    property of the estate.  The D&Os are the primary

17    beneficiaries.  The Debtor only has coverage in certain

18    very narrow circumstances, when there's a security claim,

19    derivative claim, or an indemnity claim, if they advanced

20    defense costs to the Defendants.  They haven't advanced the

21    defense costs --

22         THE COURT:  They're not going to.

23         MR. WIRTH:  -- the Trustee is not going to advance

24    the defense costs.  So it's virtually certain that there's

25    not going to be coverage needed for the Debtor.  The coverage

1  was for the D&Os.  That's why the policy was bought.

2           THE COURT:  Okay.

3           MR. WIRTH:  So it would substantially prejudice

4  Mr. Santo and Ms. Jepson if the Court doesn't allow the

5  defense costs to be advanced.

6           THE COURT:  Well, I'll hear from Mr. Elgidely for

7  free.

8           MR. ELGIDELY:  Thank you, Your Honor.  May it

9  please the Court.  Your Honor, the resolution that the

10  Trustee reached with counsel for Mr. Santo and Ms. Jepson

11  was, in our view, a resolution that balanced the competing

12  interests of the parties.

13           As Mr. Wirth indicated, the policy at issue is a

14  $10 million -- has a $10 million limit of liability.  And the

15  defense costs -- or the agreed initial cap for defense costs

16  that's set forth in the proposed order, is $50,000.

17           That's certainly not a nominal sum, and we

18  recognize it's a --

19           THE COURT:  It is, compared to $15 million.

20           MR. ELGIDELY:  Correct, Your Honor.  And when

21  the motion was initially filed, although our employment

22  application had just been filed, we reached out to Mr. Wirth

23  to engage in a dialogue concerning the issues and the bigger

24  picture.

25           We also reached out to Mr. Barack.  I'm a little

1  surprised that Mr. Christian wants to roll this over because

2  before the hearing he advised myself and Ms. Sherman that

3  they could live with the proposed order that was negotiated

4  between Mr. Wirth and myself.

5        THE COURT:  You'll get your turn.  Please don't pop

6  up.  You'll get your turn.

7        MR. ELGIDELY:  But, Your Honor, the --

8        THE COURT:  Make notes of the things that you

9  disagree with.  Get some paper.  Go ahead.

10       MR. ELGIDELY:  Your Honor, clearly the policy --

11 I should say the policies -- are likely to be the largest

12 assets in this estate.  The Debtor is an owner and one of the

13 insureds under the policy -- or the policies.  And there is

14 case law that states that because of the estate's interest in

15 the policy, it clearly constitutes property of the estate.

16       But at the same time, there's also case law, as

17 Mr. Wirth indicated, that these policies exist for the

18 benefit of the officers and directors who are exposed to

19 litigation.

20       So, again, the order was crafted keeping in mind

21 these competing interests and to implement appropriate

22 safeguards that are set forth at paragraphs 5 through 9 of

23 the proposed order.

24       In those proposed paragraphs, Your Honor, and this

25 proposed protocol, the cap is set at $50,000 and the parties

```
 1  reserve all of their rights and their positions with respect
 2  to whether the policy and the proceeds constitute property
 3  of the estate, whether the automatic stay applies to these
 4  proceeds, and requires counsel for Mr. Santo and Ms. Jepson
 5  to engage in some reporting requirements with the Trustee on
 6  a monthly basis.
 7          We believe, Your Honor, that the order is
 8  appropriate, it is in the best interest of the estate and the
 9  creditor body, and we would respectfully request that the
10  Court enter the order.
11          THE COURT:  But you don't retain all rights to the
12  $50,000.  Once it's gone, it's gone.  There's no clawback.
13          MR. ELGIDELY:  Well, Your Honor, as Your Honor
14  suggested, there may be an opportunity to order disgorgement
15  of those proceeds if it's deemed appropriate.  I believe
16  the Court would have the inherent authority to order
17  disgorgement.
18          THE COURT:  Yeah, that means that some law firm
19  takes on representation in reliance of being paid and then I
20  yank it out of them?
21          MR. ELGIDELY:  Not a desirable situation, Your
22  Honor.  But, you know, these facts are less than desirable
23  and we hope that --
24          THE COURT:  Well, was that the agreed order?  Is it
25  contemplated by Mr. Wirth and his firm that he would have to
```

1    give back the 50?

2              MR. ELGIDELY:  Your Honor, it was not contemplated

3    that --

4              THE COURT:  Okay.

5              MR. ELGIDELY:  -- that $50,000 would be refundable

6    to the estate.

7              THE COURT:  Okay.  Now, Mr. Christian, what do you

8    want to disagree with?

9              MR. CHRISTIAN:  I think I'm going to be doing both

10   some agreeing and disagreeing, Your Honor.  First of all, as

11   you've already heard, the Trustee has made a policy limits

12   demand for both of the policies.  And so in case it's not

13   already clear from this record, these policies provide

14   coverage both to D's and O's and to the company.  And so

15   there is a Section 541(a) interest here.  I think that's

16   really beyond dispute.

17             That doesn't mean, however, that there's some

18   potential for either a negotiated or court-ordered resolution

19   that balances these interests.

20             And our only point, for present purposes, is to say

21   -- when we were first presented with the proposed stipulated

22   order, we did say that we could live with that resolution,

23   but we learned only five or ten minutes before this hearing

24   commenced, after we had been asked to agree to the stipulated

25   order, that in fact there would be new motions coming

1   involving the same Defendants imminently.

2            THE COURT:  Sued by different Plaintiffs.

3            MR. CHRISTIAN:  Right.

4            THE COURT:  In this --

5            MR. CHRISTIAN:  Same Defendants, same insurance

6   policy, though.  And our point, Your Honor, is that, you know

7   if it's $50,000 as interim relief, that's one thing.  If it's

8   $50,000 plus another $50,000 plus another $50,000, one on top

9   of the other, stacked seriatim over the next couple of weeks,

10  that's a different resolution.  And my only point here today

11  is:  To the extent a negotiated --

12           THE COURT:  This only asks for 50.  That's all it

13  asks for.

14           MR. CHRISTIAN:  That's correct, Your Honor.  And if

15  we're being asked --

16           THE COURT:  There is no other motion, and you can

17  argue about whether --

18           MR. CHRISTIAN:  Right.

19           THE COURT:  -- more should be let out to the same

20  people.

21           MR. CHRISTIAN:  Right.  And so if it's a negotiated

22  resolution, I'd like everybody's cards on the table so I know

23  what it is we're negotiating.  If, instead, counsel just

24  wants to proceed on the basis of the motion and do so without

25  a consensual resolution, that's his right, of course, and the

1  Court will rule how it will rule.  But I guess I'm a little

2  surprised to learn that we're going to be facing another --

3            THE COURT:  Well, forget about the ones that aren't

4  here yet because they're not here yet.

5            MR. CHRISTIAN:  Uh-huh.

6            THE COURT:  Okay.  This motion, you don't think

7  strikes a fair balance.

8            MR. CHRISTIAN:  No, Your Honor, because there's

9  been no showing that there's any activity or any potential

10 prejudice for the Defendants in these cases.  In the case we

11 brought in Federal District Court prior to the petition date,

12 the Trustee sought a preliminary injunction to prohibit us

13 from proceeding because of the precise fear of dissipating

14 these very insurance policies.

15           Now, we resolved that with the Trustee through a

16 tolling agreement, and so we've taken that issue off the

17 table so that we aren't wasting away these insurance policy

18 proceeds that potentially benefit some or all of the

19 creditors in this case.  And so --

20           THE COURT:  What do the policies cover?  Because I

21 noted that Mr. Verona says that they may cover fractional

22 owner interest claims.

23           MR. CHRISTIAN:  You know, Your Honor, I guess I

24 would answer it this way.  I don't necessarily agree with the

25 characterizations you've heard from Mr. Wirth about the

1    nature and extent of this coverage, and I think the fact that

2    that's an open issue that we can't really adjudicate today,

3    is evidenced by the Trustee's policy limits demand.

4             My understanding that, at the basis of the

5    Trustee's policy limits demand, is a combination of our

6    proposed class's employment-related claims as well as a

7    fiduciary duty and other derivative claims that might be held

8    by the company against these very Defendants and others.

9             And so I think it's the mutual view of the proposed

10   class members and of the Trustee that the combination of

11   those two large pieces of the claims base in this case alone

12   will more than exhaust both policies' proceeds.

13            Again, it's probably premature and there's

14   certainly no record here today --

15            THE COURT:  Well, how do -- because I've never done

16   this before, and I'm not embarrassed to say that.  How do

17   other courts carve up a policy where there are multiple

18   beneficiaries?  Does one get it all?

19            MR. CHRISTIAN:  There are different ways that it

20   gets resolved, Your Honor.  There are cases, and I think this

21   is where counsel's aiming in this case, where there's a

22   carveout designed to balance the competing interests in the

23   policy proceeds.  There are cases where it effectively

24   happens on a first-come, first-served basis.

25            The outcome of those cases can be fact intensive,

1    depending on the nature and extent of both the coverage and

2    the claims.  And my view is, in terms of the motion that's

3    been brought, that there's no showing of the conclusions that

4    have been asserted by Mr. Wirth in terms of the nature and

5    extent of the coverage, or the potential prejudice.

6            Again, my information is that these are not active

7    cases.  And indeed, the case that we had where the Trustee

8    was concerned about dissipation of these policy proceeds, was

9    the subject of a preliminary injunction motion and is now the

10   subject of a tolling agreement.  I think all these things can

11   be negotiated in a way that balances everybody's rights and

12   seeks to minimize litigation costs and protect these proceeds

13   for the benefit of creditors.  And by the --

14           THE COURT:  That's if everyone plays ball together,

15   but I haven't heard that the Plaintiffs that are suing Mr.

16   Wirth's clients have agreed not to set the motion to dismiss

17   for hearing.

18           MR. CHRISTIAN:  I don't know one way or the other

19   about that, and there's been no showing one way or the other

20   about the posture of that litigation.  I guess what I would

21   say is that the Bankruptcy Court and the Trustee have

22   available to them powers to deal with some of those issues

23   if it comes to that, you know.

24           And I don't want to prejudge all of that on the

25   record here today, but there are various ways in which

1    resolutions could be brought to the Court or measures taken

2    in this court to protect the legitimate interests of all of

3    these parties.

4                THE COURT:  That hasn't been done yet.

5                MR. CHRISTIAN:  It hasn't been done.  And my guess

6    is it hasn't been done because there's no imminent prejudice.

7    The Trustee brought a preliminary injunction motion against

8    our clients with great haste when the Trustee was worried

9    that we were going to start accessing those policy proceeds,

10   or otherwise force parties such as these D's and O's to

11   expend funds.

12               THE COURT:  Is there a provision in the policy for

13   advancement of costs?

14               MR. CHRISTIAN:  I don't have the policy in front of

15   me, Your Honor, I'm sorry.

16               MR. WIRTH:  There is, Your Honor.

17               THE COURT:  Is that attached to your motion?

18               MR. WIRTH:  It is.  It's attached to our response

19   that we filed two days ago.

20               THE COURT:  That's No. 635?  No.  Hold on.  645,

21   right?  645.  Let me see this thing.  Which one is it?  A, B,

22   C or D?

23               MR. WIRTH:  It is -- I believe it's Exhibit A.

24   It's Exhibit A, Your Honor.

25               THE COURT:  Okay.  (Conferring with courtroom clerk

```
 1    regarding contacting pro se Debtors.)

 2              All right.  Where do I look for the language?

 3              (Conferring with courtroom clerk regarding having

 4    law clerk contact pro se Debtors.)

 5              THE COURT:  Where am I looking?

 6              MR. WIRTH:  Judge, page 18 defines defense costs.

 7              THE COURT:  Defense costs means --

 8              MR. WIRTH:  Coverage is --

 9              THE COURT:  It says, "Consented to by the insurer."

10              MR. WIRTH:  The insurer has consented.  The insurer

11    has instructed us to file this motion essentially seeking a

12    comfort order, Judge.  I think the cases we cite in our

13    response --

14              THE COURT:  Okay, and where is the advancement?  I

15    mean, I can see that this could be reasonable and necessary

16    as determined after success.

17              MR. WIRTH:  Just give me a second, Your Honor.

18              THE COURT:  (Conferring with courtroom clerk

19    regarding half hour of time set on calendar.)

20              MR. WIRTH:  Page 9, I believe, Your Honor, is the

21    advancement provision.

22              THE COURT:  Okay.  Advancement.

23              MR. WIRTH:  And, Judge, there's a priority of

24    payment provision in the policy.

25              THE COURT:  Wait.  Let me read this first.  This
```

1    seems to contemplate that you receive bills for the costs

2    that have been incurred.  They haven't been incurred yet.

3          MR. WIRTH:  Well, there have been costs incurred,

4    Your Honor.  We've been defending them in the case and we

5    have a motion to dismiss pending.  The insurer has agreed to

6    advance defense costs with respect to the Werner litigation,

7    and they've instructed us to file this motion to get a

8    comfort order from this Court to authorize them --

9          THE COURT:  Well, it says that they have to do it

10   no later than 90 days after the insurer has received itemized

11   bills for the costs, or pre-claim inquiry costs, and I guess

12   that's a defined term.

13         And then it says, "The advance payment shall be

14   repaid to the insurer in the event and to the extent that any

15   such insured person shall not be entitled under this policy

16   the payment of such loss."

17         So how are they going to pay it back if they --

18         MR. WIRTH:  Well, if there's a determination,

19   Judge, then we'll have to deal with it at that time.  But the

20   policy, Judge, is specifically -- was specifically purchased

21   to cover the D&Os.  It has a priority --

22         THE COURT:  I understand that, okay.  But it seems

23   like you have to incur the cost and then seek it.

24         MR. WIRTH:  Well, there are costs that have been

25   incurred.  We've been defending Ms. Jepson and Mr. Santo in

1   the litigation.  We have costs that are out there.  We just

2   haven't been paid by the insurer because the insurer was

3   hesitant to pay us any funds with the bankruptcy in place.

4            Judge, there's case law in this circuit, in other

5   circuits, that routinely grant stay relief to the extent it's

6   needed for the advancements of defense costs.  Judge Ray

7   recently --

8            THE COURT:  All I'm saying is it doesn't appear

9   that the conditions precedent have been met.  Have you sent a

10  bill?

11           MR. WIRTH:  Judge, I can't say definitively that we

12  have because --

13           THE COURT:  Well, that's when the advancement --

14  that's when you're entitled to it.

15           MR. WIRTH:  But I think we -- I think we have, Your

16  Honor, because we've been defending them and we have been for

17  quite some time.

18           THE COURT:  Do you have case law that says the

19  first to ask can exhaust it?

20           MR. WIRTH:  Judge, if you look through the policy,

21  the D&Os are entitled to priority of payment, before anyone

22  else.

23           THE COURT:  Okay.  Where is that one?

24           MR. WIRTH:  That is 3(b).  Section 3(b) of the

25  policy.

```
 1              THE COURT:  That's still in Exhibit A?

 2              MR. WIRTH:  That's still in Exhibit A.  And that

 3    is --

 4              THE COURT:  Page?

 5              MR. WIRTH:  That is page 3.  3(b).  So it's our

 6    position -- and Judge Ray had just issued an order, and we've

 7    included a copy of that as well, as Exhibit C to our motion,

 8    in the SMF Energy case, where he determined if there's a

 9    priority payment provision, even if the Debtor's a named

10    insured, but there's no claims asserted against the Debtor

11    that fall within that limited category of claims covered by

12    them, then the policy proceeds are not property of the

13    estate.

14              THE COURT:  Same language?

15              MR. WIRTH:  Same language.

16              MR. ELGIDELY:  Your Honor, if I interrupt, it might

17    save the Court some time and the parties some time.  Even

18    though I'm still proposed special counsel, I'd like to make a

19    suggestion, Judge.

20              THE COURT:  Sure.

21              MR. ELGIDELY:  In light of the fact that the

22    order on my employment application has not been entered yet,

23    and there may be an objection to that application by Mr.

24    Christian's clients, as well as the fact that there appears

25    to be no exigency in the Werner suit at this time, we would
```

1    propose -- the Trustee would propose that all of the matters

2    be deferred for a short period of time so we can attempt to

3    speak with all of the, I guess, competing claims against this

4    policy, and craft an order that may be acceptable to all, or

5    take another appropriate path to resolving this matter.

6            THE COURT:  Well, we've got somebody that wants to

7    do it in an orderly fashion, we've got someone that wants to

8    get out in front, and apparently the Trustee's willing to let

9    that happen to some degree.  And I need to know what the law

10   is.  If it's first-come, first-served, Mr. Christian, why

11   should I stop?

12           MR. CHRISTIAN:  Your Honor, how I would respond to

13   that is to say that the cases that Mr. Wirth is relying on

14   routinely granting stay relief are cases where there isn't

15   the kind of competition or the threat that the competing

16   claims will exhaust the coverage.

17           And our view is that there's no reason for these

18   indemnification creditors to get a leg up on the class

19   creditors or to get a leg up on the creditors based on

20   fractional ownership claims or any other creditor of this

21   estate.

22           The money ought to all come into the estate, we

23   agree with the Trustee in that regard, and be distributed in

24   accordance with the Bankruptcy Code.

25           THE COURT:  What do you do with this priority

1    provision?  I'm not going to rewrite the contract.

2            MR. CHRISTIAN:  Well, the Trustee's proposed

3    insurance coverage counsel hasn't been retained yet, and my

4    own view is that we get the cart before the horse if the

5    Trustee doesn't have the benefit of insurance coverage

6    experts and the Court doesn't have the benefit of briefing

7    and analysis on the particular policy language and coverage

8    issues that are before the Court.

9            I think the intervening Chapter 7 case inevitably

10   alters some of the rights and obligations.  That's why

11   Chartis is asking these guys to bring this advancement

12   motion.

13           THE COURT:  Sure.

14           MR. CHRISTIAN:  And so --

15           THE COURT:  No, it's not why.  They want a comfort

16   order.  They can read what they wrote.

17           MR. CHRISTIAN:  Well, I think they are rightly

18   concerned that obtainment of the policy proceeds on these

19   facts would violate the automatic stay.  And I think they'd

20   be right in that conclusion.  And so we're comfortable --

21           THE COURT:  Does anybody have any case law on what

22   happens when the Debtor is a co-insured and --

23           MR. WIRTH:  Judge, excuse me.  But we've cited two

24   cases in our response, both recent cases.  One from the

25   Southern District of Florida, Judge Ray, and another one --

1    THE COURT:  Yeah, I'm looking at that one right

2  now.

3    MR. WIRTH:  And another one from the MF Global case

4  in the Southern District of New York.  And in both of those

5  cases, the Debtor was a named insured but they were subject

6  to the priority of payment provisions.  And the coverage for

7  the Debtor was very limited and narrow, just as it is in this

8  case.

9    And the case that Judge Ray decided, SMF Energy, he

10  determined that the policy proceeds were not property of the

11  estate.

12    THE COURT:  Well, in that case, SMF wasn't even a

13  named insured.

14    MR. WIRTH:  They were, Your Honor.

15    THE COURT:  That's a pretty easy one.

16    MR. WIRTH:  They were, Your Honor.  If you look

17  closely at the order, they had coverage for security claims.

18  And the judge indicated --

19    THE COURT:  Well, I'm looking at what he says:  SMF

20  is not a named insured.

21    MR. WIRTH:  Well, if you look further down, Judge,

22  in the opinion, it says that there's no -- that there have

23  been no lawsuits -- and I could point you to the --

24    MR. CHRISTIAN:  Your Honor, I --

25    MR. WIRTH:  There was arguably coverage for

1    securities claims in that case.  And the judge said that

2    there was no securities claims alleged against the Debtor.

3            THE COURT:  Well, I'm just looking at page 4 when

4    he makes some specific findings.  The Debtor was just out of

5    the money completely, on page 4.

6            MR. CHRISTIAN:  Your Honor, I spend a lot of my

7    time representing insurance companies in bankruptcy cases.

8    And when -- most of the time, when we encounter these kinds

9    of issues, it's something that ends up being -- getting

10   negotiated, and I just want to --

11           THE COURT:  I know you want time so you can come

12   together and have a consensual resolution.  You know, this

13   isn't a Chapter 11 but it is like a Chapter 11, and I

14   understand that.  But in the meantime, Mr. Wirth's firm

15   isn't getting paid.

16           MR. CHRISTIAN:  And as far as I know, there's no

17   activity.

18           THE COURT:  It can happen -- well, there has been

19   activity.  He just said that they've already done work and

20   they haven't been paid.

21           MR. CHRISTIAN:  Yeah, and I don't know whether that

22   was prepetition or postpetition.  I don't know the details of

23   it at all.  And I'm not sure, based on what I heard Mr. Wirth

24   say, that he's actually sure of what all the details are.

25           And I guess my point is that there's no evidence

1    before the Court that suggests any imminent prejudice if the

2    advance motion is either deferred or denied.  And I think on

3    that basis, there's no basis to grant the relief today that

4    he's looking for.

5          THE COURT:  It's a contract.  And if everyone has

6    an equal right to it, then the first one that comes to the

7    well gets it.  Mr. Wirth, but this does say you have to have

8    filed bills, and that's a condition precedent, the way I'm

9    reading it.

10         MR. WIRTH:  Well, Judge --

11         THE COURT:  Not filed.  Issued invoices or

12   something like that.

13         MR. WIRTH:  I would be happy to supplement whatever

14   needs to be supplemented.

15         THE COURT:  Then do it.

16         MR. WIRTH:  If the Court requires us to show

17   filed --

18         THE COURT:  On its face, I cannot find entitlement,

19   because you haven't complied with something that says you

20   have to submit invoices.

21         Well, did you read it the same way as I do?  You're

22   looking at me with stressed look.

23         MR. WIRTH:  Well, I do, Judge, but --

24         THE COURT:  Okay.

25         MR. WIRTH:  But we've submitted --

1              (Unknown CourtCall appearance makes an unclear

2    remark.)

3              MR. WIRTH:  We --

4              THE COURT:  Wait a minute.  Who was that?

5              (No response.)

6              MR. WIRTH:  My understanding is we've submitted

7    invoices to the insurer, and the insurer has instructed us to

8    file the motion to advance defense costs to my firm.  We've

9    done the work.

10             THE COURT:  If you've billed them for 10 grand, why

11   are you asking for 50?  Did you bill them for an exact 50 --

12             MR. WIRTH:  Judge, it's an interim --

13             THE COURT:  Come on.  This is unusual stuff.

14   I want you to --

15             MR. WIRTH:  It's an interim cap, Judge.  There's

16   cases throughout the country that do this all the time.  And

17   if you look closely at --

18             THE COURT:  But you're asking for something that's

19   in derogation of the specific contractual language that other

20   people have a right in, too.

21             MR. WIRTH:  I don't believe we do, Your Honor,

22   and --

23             THE COURT:  Well, why didn't you ask for 10 million

24   before you've incurred that?

25             MR. WIRTH:  Well, Judge, I don't think there should

```
 1    be any cap, to be honest with you, but we've come to a
 2    reasonable agreement with the Trustee.
 3              THE COURT:  Can you look at the 3(b)?  Look at --
 4    or whatever it was that you showed me that said, "Here's the
 5    process."
 6              MR. WIRTH:  Yes.
 7              THE COURT:  What have you submitted to them in
 8    terms of the dollar amount that you want to be paid now that
 9    you have billed for?  That's what this thing says.
10              MR. WIRTH:  Right.  I don't have that number here
11    as I stand before the Court --
12              THE COURT:  Okay.
13              MR. WIRTH:  -- but it would only -- the order that
14    we're seeking the court authority for would only allow us to
15    give bills to the insurance company and to seek advancements
16    of the defense costs up to an interim cap of $50,000.  We
17    would not exceed that until we come back to court and ask for
18    more, to the extent necessary.
19              THE COURT:  Well --
20              MR. ELGIDELY:  Your Honor?  Your Honor, if I may?
21    Your Honor, we have a situation here where Mr. Wirth is
22    correct and Mr. Christian is also correct, and that's where
23    the case law comes down.
24              This policy is property of the estate, is subject
25    to the automatic stay, but it also exists for the benefit of
```

1    the officers and directors who are subject to being sued and

2    the pending suits that were referenced in court today,

3    specifically the Werner suit.

4            In addition, the priority of payment provision of

5    the policy --- the priority of payment provision of the

6    policy provides for payment of defense costs and losses by

7    the officers and directors before it's paid to the officers

8    and directors.  And that's why the --

9            THE COURT:  In accordance with --

10           MR. ELGIDELY:  Absolutely, Judge.  In accordance

11   with the policy provisions.

12           THE COURT:  Right.

13           MR. ELGIDELY:  And that's where the case law comes

14   down to, is --

15           THE COURT:  Good.  We'll deal with all the -- this

16   policy issue on March the 21st at 1:30.  By then, you're

17   going to have to show me entitlement.  But, you know, the

18   automatic stay can't -- you can't be using that as a sword

19   when other people have an equal right to the same stuff.

20           Just because you're a Debtor-in-Possession doesn't

21   mean you get the right to hold it hostage when other people

22   have a right to it.  And if it really is first-come, first-

23   served on a working policy, then who am I to say that people

24   that have an equal right in it should be held at bay?

25           MR. ELGIDELY:  Agreed.

1          MR. WIRTH:  And, Judge, just for the record, it's

2     our position and I think --

3          THE COURT:  It's just a week -- two weeks but --

4          MR. WIRTH:  It's our position and the position of

5     the officers and directors generally, I believe, that this is

6     not property of the bankruptcy estate and the stay is not

7     applicable, but I guess that's for another -- for another

8     day.

9          THE COURT:  They're a named beneficiary and --

10    we'll hash all this out -- don't set anything on Avantair,

11    though, for that afternoon, Ms. Garcia.  It's just going

12    to be these policy issues and if there's any legitimate

13    opposition to Mr. Elgidely's application.  Thank you.

14         COURTROOM CLERK:  At that time?

15         THE COURT:  Whenever they want it.

16         MS. SHERMAN:  And, Your Honor, that's also on Mr.

17    Elgidely's application?

18         MR. PLOTKO:  Your Honor, this is Gregory Plotko.

19    May I be heard?

20         THE COURT:  Who is this?

21         MR. PLOTKO:  Greg Plotko, on behalf of LW Air and

22    as well as Lauren Weil, who's a former director.

23         THE COURT:  Uh-huh.

24         MR. PLOTKO:  I was wondering if the Court would

25    allow for other submissions ahead of the 21st, because we

1   think we have a different reading of the policy as well.

2           THE COURT:  Yeah.  All opposition can be made at

3   that hearing or before.

4           MR. PLOTKO:  Okay, thank you.

5           THE COURT:  And I don't know how you -- I mean,

6   maybe there's a page I didn't just look at, but I thought I

7   just read the germane portions.

8           We'll only deal with the application with respect

9   to Mr. Elgidely, if there's some opposition, so --

10          MR. CHRISTIAN:  Your Honor, in terms of scheduling,

11  I don't know others' calendars, but I have a preference for

12  earlier is better in the day.

13          THE COURT:  All right.  Where do you come from?

14          MR. CHRISTIAN:  Chicago.

15          THE COURT:  You want to get here earlier?

16          MR. CHRISTIAN:  Well, because I'd likely have to

17  come in the night before regardless, and I want to get out.

18          THE COURT:  Oh.  Depends on what the weather is in

19  Chicago.

20          MR. CHRISTIAN:  Well, amen to that, Your Honor.

21          MS. SCHARRER:  It's still winter.

22          MR. CHRISTIAN:  Right.

23          MR. ANDERSEN:  Your Honor, I'm Don Andersen,

24  representing CCA.  And obviously CCA is a substantial

25  creditor and may have an interest in this, and I've got a

1   wedding the afternoon of the 21st.  So the earlier -- if I

2   were to do it by phone, the earlier would be better, too,

3   because my nephew's getting married in the afternoon.

4           THE COURT:  All right.  9:30 on the 21st.  We'll

5   take up No. 596, 623, 635, which is Mr. Verona's, and anybody

6   else that wants to file an objection, or make an objection

7   orally at that hearing.  But back it up with specific

8   contract language.

9           MR. WIRTH:  Judge, is there a way that we can set a

10  deadline for a few days before the hearing for submissions so

11  we can appropriately respond?

12          THE COURT:  All right.  If you want to draft a

13  proposed order, I will apply Rule 7008 to this contested

14  matter, and so everyone would have to have theirs in by

15  March 14th.

16          MR. WIRTH:  Thank you, Your Honor.

17          MR. CHRISTIAN:  Thank you.

18          THE COURT:  Supply the proposed order, okay?

19          MR. WIRTH:  Sure will.  Thank you.

20          THE COURT:  And then figure out how you serve it

21  because there's apparently 600 or a million people you have

22  to serve.

23          MR. WIRTH:  Very well, thanks.

24          THE COURT:  I'm told that you can do that by email

25  somehow.

1        MR. CHRISTIAN:  Thank you, Your Honor.

2        THE COURT:  All right, thank you.

3        Okay, well, that takes care of the first and last

4   things on my calendar.  At least it kicks it down the road.

5        MS. SHERMAN:  Yes, Your Honor.  The next item I

6   showed on my docket, which I know is out of order, was Docket

7   No. 615, which was the expedited motion for order directing

8   the distribution of sale proceeds filed by Mr. Verona on

9   behalf of N162SL.

10       The Trustee has filed a motion for the entry of an

11  order authorizing the disbursement of the sale proceeds,

12  which is also set for hearing today, which is Doc. 625.  And

13  I understand that, you know, Mr. Verona or Mr. Bird wants to

14  be heard on that motion but I think 625 moots 615.

15       THE COURT:  Okay.  Let me go back to Mr. Wirth.

16  Put the hearing time in that proposed order too, as well.

17       MR. WIRTH:  I will, Your Honor.

18       THE COURT:  Well, I guess we're going to get a

19  bunch of opposition to disbursement of proceeds at the owner

20  level.

21       MR. BIRD:  Not a bunch of opposition, Your Honor.

22  Frankly --

23       THE COURT:  Are you kidding me?  Mr. Andersen is.

24       MR. BIRD:  Well, not --

25       THE COURT:  He's got this thing preserved for

1    appeal.

2         MR. BIRD:  Well, not from --

3         THE COURT:  Global is.

4         MR. BIRD:  Not from the settling owners at least,

5    Your Honor.  Not from our clients.  I believe the only issue,

6    and I --

7         THE COURT:  Well, duh.

8         MR. BIRD:  Well --

9         THE COURT:  Of course you want it disbursed, so you

10   all wouldn't be objecting to that.  I think we need to have

11   Ms. Sherman go ahead and walk me through what she wants me to

12   do and then we'll take objections.

13        MS. SHERMAN:  Thank you, Your Honor.  The motion to

14   sell -- when we sold property at the auction, we had three

15   buckets, for lack of a better word.  We had the bucket that

16   was the 162SL property, the parts, the hull and the engines.

17        We had the bucket that was the Debtor's property in

18   which the Pinellas County Tax Collector asserted a lien,

19   which was the second bucket.  And then we had all the spare

20   parts and ground service equipment and other property that

21   wasn't N162SL property and in which the tax collector didn't

22   assert a lien.  So we had three different buckets.

23        Mr. Starman, the auctioneer, kept track of every

24   item that was sold and he put them into three different

25   buckets.  And we have attached to the motion to approve

1   disbursement an itemized listing of the N162SL bucket which

2   was Exhibit A, itemized listing of the tax lien property

3   which is Exhibit B, and an itemized listing of the non-tax

4   property.  And it includes an itemized listing as well as the

5   proceeds of sale for that particular item.

6          The next thing Mr. Starman did was he allocated the

7   expenses incurred in connection with the auction sale among

8   the N162SL property, the tax lien property and the non-tax

9   property.

10          And so what he did on the advertising expenses was

11   he allocated the total advertising expenses based on gross

12   sale proceeds.  And so the tax collector, who only got

13   roughly 70,000 out of the proceeds of sale, got a smaller

14   percentage of the advertising expenses than did the non-tax

15   property, than did 162SL.  And so those were all allocated.

16          And then there was other expenses allocated

17   directly to a particular bucket of property, moving N162SL

18   had its own bucket of expenses specifically as to them,

19   moving the furniture had their own bucket, and then

20   everything else had its own bucket.  So the expenses were

21   all allocated and those are set forth on Exhibit D, the

22   proposed allocation.

23          Also on Exhibit D was the auctioneer's proposed

24   commission with respect to each bucket of property.  And that

25   was based upon the order that approved his retention and the

1  commission that he was supposed to get off each bucket of

2  property.  So in our motion, we're seeking authority to

3  approve, first of all, the commission and expense

4  reimbursements to Mr. Starman --

5          THE COURT:  Let's start here.  Does anyone object

6  to that?  Commission and expenses to Mr. Starman.

7          MR. BIRD:  Yes, we do, Your Honor.

8          THE COURT:  You do?

9          MR. BIRD:  Yes, Your Honor.  The Trustee correctly

10  describes these three buckets, but our objection is solely

11  based on the allocation of marketing expenses based on the

12  gross sale proceeds.

13          Your Honor, I know it's not a lot of money but it's

14  just simply not right.  It's silly after the --

15          THE COURT:  Tell me what's not right.  And give

16  me what page.  Maybe I should print out each of these pages.

17          MR. BIRD:  Sure, Your Honor.  I think the

18  easiest way to look at it would be Document 625-4, which

19  is Exhibit D.

20          THE COURT:  Right, which -- so I should print out

21  each of these pages?  Well, all four pages?

22          MS. SHERMAN:  I think page 3 of 4 is the bucket for

23  162SL.

24          MR. BIRD:  Right.  Correct.  So at least page 3 of

25  -- yes, correct.

1          THE COURT:  Let's see.  Let me get all of them, all

2    four pages.  (Printing pages.)  Actually, there's three

3    pages.  The first is just a cover page.

4          Okay, starting with the first page, it looks like

5    there are expenses there on -- they're nominal.

6          MS. SHERMAN:  The first page, Your Honor, which is

7    -- at the top says Doc. 625-4, page 2 of 4 is the tax

8    collector's bucket, and they had --

9          THE COURT:  Where it says Lot D payout?

10         MR. BIRD:  Yes.

11         THE COURT:  Okay.  Are you objecting to those

12   expenses?

13         MR. BIRD:  No, Your Honor.

14         THE COURT:  Okay.  All right, the next page says

15   Lot B, as in boy, payout, N162SL.

16         MR. BIRD:  That's correct, Your Honor.  Those are

17   the --

18         THE COURT:  And what do you object to here?

19         MR. BIRD:  Your Honor, we're objecting to 30

20   percent of the total marketing costs being allocated to the

21   N162SL owners based upon gross sales proceeds.

22         Your Honor will recall that N162 opted in to the

23   auction at a somewhat late date, and both engines original to

24   the 162 were sold for roughly half a million dollars in

25   aggregate, as well as various parts and the hull of N162SL,

1    which only generated $6,000.  In total, Your Honor, I believe

2    there were 56 auction lots attributable to this Bucket B for

3    162.

4            And just frankly, the fractional owners were not

5    party to the agreement between the Trustee and Starman.

6    That's maybe less important than just the fact that for 54

7    items, 30 percent of the sales proceeds -- and I understand,

8    Your Honor, it's, in the big swing of things, $5,400.

9            However, the fractional owners were not consulted

10   on this.  And distribution according to a method conceived by

11   the Starman Brothers Auctioneers and without consultation of

12   the --

13           THE COURT:  What would they have paid to get the

14   similar exposure?

15           MR. BIRD:  Similar exposure, I can't speak to that,

16   Your Honor, but under the settlement agreement between the

17   Trustee and the fractional owners, marketing costs were the

18   responsibility of the Trustee.

19           And I understand that the fractional owners did

20   benefit from being --

21           THE COURT:  Is that so?  Then why are we arguing

22   about reasonableness.

23           MR. BIRD:  Well, Your Honor, I didn't want to --

24           THE COURT:  It's really just that it shouldn't be

25   on there at all?

1          MR. BIRD:  Your Honor, it was a small amount of

2     money and truthfully we attempted to neg --

3          THE COURT:  Is your argument it shouldn't be on

4     there at all because the marketing expenses were supposed to

5     be borne by the Trustee?

6          MR. BIRD:  Yes, Your Honor.  The position is --

7          THE COURT:  And I approved that?  I approved the

8     use of the courthouse without paying the rent?  Is that what

9     I did?  Shame on me.  If I did that, Ms. Sherman --

10         MS. SHERMAN:  Your Honor, I will confess that

11    I don't believe that was what that said but --

12         MR. BIRD:  Well, no attempt to mischaracterize,

13    Your Honor.

14         MS. SHERMAN:  -- you know, we were in a rush at the

15    end to get this auction in, Your Honor.

16         MR. BIRD:  This is what we do know, Your Honor.

17    The agreement between the Trustee and the auctioneer, Starman

18    Brothers was solely between the Trustee and Starman Brothers.

19    You can look, it is attached to Document 389.

20         THE COURT:  Of course, but you all knew you were

21    going to be benefitted by this.

22         MR. BIRD:  Right.

23         THE COURT:  So you want to opt in and get all the

24    benies but pay none of the expenses.

25         MR. BIRD:  No, Your Honor.  We --

1        THE COURT:  If I said that, I said it.  And I said

2   it wrong.  I shouldn't have done it.  No other sale will

3   happen that way; I can guarantee you that.

4        MR. BIRD:  Absolutely.  And we are working on

5   negotiating to allow sale procedures to be amended upon

6   mutual agreement between fractional owners and the Trustee

7   to avoid this in the future.  And, again, we do understand --

8        THE COURT:  Can you point out the language so that

9   you can help the lady, please?

10        MR. BIRD:  Sure.

11        THE COURT:  What page and what is the docket

12   number?

13        MR. BIRD:  We'll look at -- the N162 settlement

14   agreement can be found in Docket No. 455-1.

15        THE COURT:  Okay.

16        MR. BIRD:  And that is the expedited motion to

17   approve compromise of controversy with fractional owners of

18   N162SL.

19        Attached thereto is Exhibit A, which is the

20   settlement agreement between the Trustee and the fractional

21   owners.  And as an exhibit to that, Your Honor, is a proposed

22   motion for sale.

23        THE COURT:  Is that the order?

24        MR. BIRD:  No, Your Honor.  There was no order --

25   no written order issued on the sale of 162SL.  That's my

1    recollection.  There was an oral ruling, I believe, on

2    December the 12th but no written order was ever written.

3    If Your Honor recalls, there was kind of a backup with the

4    clawback notices and needing to get the auction done.  And

5    we understand that, and we commend the Trustee in getting the

6    auction actually executed in the relatively short amount of

7    time, especially across a holiday,

8              THE COURT:  Okay, the settlement agreement, what

9    page or what paragraph?

10             MR. BIRD:  Well, Your Honor, I think the salient

11   point here is found actually in Exhibit E to the settlement

12   agreement, which is the form motion to sell, which I think

13   was the agreement under which the fractional owners were

14   operating.

15             Paragraph 10 of that, which, if you're looking at

16   Document 455-1, is found on page 29 of 32.  Paragraph 10

17   reads, "Advertising:  Unless otherwise agreed in writing by

18   the settling owners, as defined in the settlement agreement,

19   the Trustee proposes to publish the notice of sale in the

20   form attached hereto as Exhibit A electronically under its

21   website, which may include air classifieds" --

22             THE COURT:  Where does it say it's at her expense?

23             MR. BIRD:  Well, Your Honor, it does say, "Unless

24   otherwise agreed in writing by the settling owners."

25             THE COURT:  No, that's just where they're going to

1    advertise it.  Where does it talk about the carve-up of the

2    expenses?

3              MR. BIRD:  Well, Your Honor, I think that's one of

4    the issues with the lack of an actual sale order in this

5    instance.  And, again, I almost hate to take the Court's time

6    on this because it's such a relatively small amount of time.

7              THE COURT:  You know, if you've charged your client

8    more than $5,045 or whatever this is, then this is a net

9    loser.

10             MR. BIRD:  Well, Your Honor, maybe at this point in

11   time --

12             THE COURT:  It's $5,180.25.

13             MR. BIRD:  Your Honor, we did attempt to settle

14   this before the hearing with the Trustee.  Obviously we

15   understand we're not trying to get a windfall from

16   participating in the auction, nor I believe are the

17   fractional owners getting such a windfall, paying 17 and

18   12 percent commission on the sale of the engines.

19             THE COURT:  Yes, I understand that they're doing

20   that, and you all opted in, and I would assume you would have

21   thought there would be some advertising costs for everyone to

22   share in.

23             MS. SHERMAN:  Your Honor, they --

24             THE COURT:  Is there no transcript out there that

25   the word "prorated costs" appears?

1          MS. SHERMAN:  Your Honor, what happened was the --

2     if you look at the motion to sell, which is appended to the

3     motion to approve compromise of the settlement agreement,

4     which is the Document 455-1 --

5          THE COURT:  Yes.

6          MS. SHERMAN:  -- that Mr. Bird was referring to.

7     That contemplated a different sale procedure.  It didn't

8     contemplate an auction.  When we came before the Court at the

9     last minute at the hearing held on December 12, 2013 at

10    10:45, we wanted to get this plane in the auction.  The

11    auction was happening January 10th.  We were all in a rush,

12    but everybody wanted it in the auction.

13         And the proposed order that we uploaded didn't say

14    -- not only does this Exhibit 455 not, one, say who bears the

15    expense, but since the Trustee was the seller and the person

16    signing the deed and doing everything, it necessarily said

17    in Exhibit 455-1 that the Trustee would be doing the

18    advertising.

19         You're correct, it doesn't allocate the expense.

20    But the order talks about -- that we uploaded, which was

21    agreed to by all the parties, says, "The Trustee is

22    authorized to sell the airplane free and clear of liens on

23    the terms and conditions set forth in the order granting

24    emergency application to employ Mr. Starman as auctioneer,"

25    which is Doc. 460.  And Doc. 460 clearly contemplates a

1    reimbursement of expenses.

2         I don't think in point and fact that we sat down on

3    the record and said this means they do or don't pay a portion

4    of the advertising costs.  Frankly, Your Honor, everybody was

5    in a rush to get this plane included.  I think they certainly

6    benefited from the advertising.  There was a very, very, very

7    big crowd at this auction.

8         If this property had been sold on its own without

9    all the other parts and pieces and without all the

10   advertising Mr. Starman had done --

11        THE COURT:  Where was the advertising done?

12        MS. SHERMAN:  Your Honor, I believe it's set forth

13   on Exhibit D, is a list of all the places where Mr. Starman

14   advertised that's -- we're back to Exhibit D to our motion.

15        And it's -- if you look at page, Doc. 625-4, which

16   is the N162 bucket, which is page 3 of 4 of that docket,

17   it's Aircraft Dealer Banner, Aircraft Sender, Avi Trainer,

18   Barnstormers, Constant Contact, ILS Broadcast, Parts Base,

19   Plane Facts, Publication Printing, Catalogs, Tampa Bay Times,

20   Tama Bay Tribune and Trade-A-Plane.

21        THE COURT:  What's Publication Printing?

22        MS. SHERMAN:  I think that's printing the paper

23   copies.

24        THE COURT:  Oh.

25        MS. SHERMAN:  That's my guess.  That were handed

1    out to people.

2            MR. BIRD:  Well, Your Honor, if that's the

3    lion's --

4            THE COURT:  Okay.  I'll set it for a trial and you

5    bring in what you think that these people would have paid.

6    Assuming that they don't do all these copies, where would

7    they have advertised to have their planes sold by them?

8            MR. BIRD:  Well, Your Honor, that's I don't think

9    what either the fractional owners or the Trustee wants.  All

10   we were saying is that if we have 5 percent of the items sold

11   and ostensibly 5 percent of the space on these publications

12   that cost $11,200 times roughly three to get to the total

13   cost, that 30 percent of the cost --

14           THE COURT:  Hey, you can argue it with the case

15   law.  Do you say three buckets and then 33-1/3 percent across

16   the board, which would be more than -- because it's your

17   bucket and then you would have more 30 percent -- but that

18   would be a fair way to do it too.  Or do you prorate it

19   according to the dollars brought in?  We'll have a trial on

20   it.

21           I mean, this is -- to be fighting over $5,000 in a

22   case of this magnitude, with all the conveniences that this

23   venue provides, is really kind of silly, but I'll give you

24   the hearing.  Do you want to say something, Mr. Andersen?

25           MR. ANDERSEN:  Judge, the only thing I would say is

1   that my client has a fractional share interest in 162SL.  It

2   is not one of the fractional share owners that claims this

3   benefit here.

4           I negotiated with Ms. Sherman so we could get this

5   airplane into the auction so it wouldn't be -- you know,

6   taken away from the airport or whatever the heck was going to

7   happen to it, and it wouldn't incur any more costs to any of

8   the fractional owners.  It could be sold quickly with no

9   further costs and no further anything.  So this is certainly

10  not our position, Judge.

11          THE COURT:  Okay.

12          MR. ANDERSEN:  We negotiated.  We understood that

13  this airplane was going to be marketed by this auctioneer and

14  there are costs associated with it.

15          THE COURT:  We're just -- you know, we're just

16  trying to do something that's equitable for everybody to be

17  able to use this convenient venue rather than chase around

18  the country, literally, with forklifts or pilots or whatever

19  you want to do, and I'm -- you know, on its face, it looks

20  like a reasonable thing.

21          You could allocate it according to the bucket or

22  you could allocate it according to the dollars.  And, you

23  know, the winners are getting a prorated hit based on their

24  winningness of dollars, is what I think the logic is.  Is

25  that right?

1          MS. SHERMAN:  Your Honor, that was the basis for

2     the allocation.  For instance, the tax collector's lot -- and

3     to the extent we take this total number and we say that we

4     re-allocate it differently, it will come out of the estate's

5     bucket, we'll get a bigger share, and it will come out of the

6     tax collector's bucket.

7          Again, it's perhaps not a terribly huge sum, but it

8     is going to defer disbursement to the tax collector, it will

9     disburse disbursement to the fractional owners of N162SL who

10    filed the expedited motion in the first place, to get the

11    money.  And if we need to come try and we need to come and

12    have a trial, I suppose we can.  It means no disbursements

13    will be made to any of the bucket holders.

14         At the very least today, Your Honor, I would like

15    the approval -- how we allocate it is something else -- to

16    let Mr. Starman be reimbursed --

17         THE COURT:  Yes.

18         MS. SHERMAN:  -- for his expenses and be paid his

19    commission --

20         THE COURT:  Yes.

21         MS. SHERMAN:  -- and I guess the rest of us can

22    wait until we're old and gray to get our share of the auction

23    proceeds.

24         MR. BIRD:  Well, Your Honor, that's unnecessary at

25    this point.  And, again, it was not our intention to either

```
 1    hold up the process -- as the Trustee's counsel knows, we are
 2    certainly proponents of advancing this process as quickly as
 3    possible.
 4              I think at this time we will withdraw the objection
 5    for the purposes of moving this forward and in a spirit of
 6    cooperation in moving forward with the Trustee's counsel as
 7    well.  So at this point in time, Your Honor, I'm not quite
 8    sure there's anything more in dispute so far as this calendar
 9    item.
10              THE COURT:  You know, it's like 1 percent of the
11    gross proceeds.  You know what I did is I just took out the
12    Publication Printing.  And if you all had done just those
13    minimal things, it's $5,800.  It's more than what the
14    allocation was.  And I have to conclude that these things all
15    look like they're reasonable places to publish, so -- I mean,
16    I can't even put an In Memoriam thing, you know, for the
17    Tampa Tribune at much less than $588.  I mean, you can't do
18    it that cheap if you don't share but -- so you're withdrawing
19    that one.
20              MR. BIRD:  We will withdraw it.
21              THE COURT:  Okay.  So I'm going to approve the
22    commission and the expenses.  So that's done.
23              MS. SHERMAN:  Your Honor, thank you.  And --
24              THE COURT:  No?  There's more?
25              MR. CLARK:  Your Honor, I just -- Roger Clark on
```

1    behalf of Global Aerospace.  I just wanted to make the note

2    procedurally that by my silence on this disagreement over

3    whether any of the funds in the 162 bucket go to the

4    commissioner, that by our silence, that Global Aerospace is

5    not waiving any objection that it has to Docket No. 615,

6    which is the expedited motion for directing the rest of the

7    sale proceeds from 162.  I think --

8                THE COURT:  We're not there yet.

9                MR. CLARK:  And I just wanted to make sure that --

10               THE COURT:  No, no.  You and Mr. Andersen --

11               MR. CLARK:  -- that we're not waiving our position.

12               THE COURT:  -- I fully expected you all to chime in

13   about the waterfall.

14               MR. CLARK:  Yes.  Thank you.

15               MS. SHERMAN:  All right.  So piece one, Your Honor,

16   was the auctioneer's expenses and commission.  Your Honor,

17   what we're proposing to do is, rather than Mr. Starman wire

18   all the money to our firm trust account and then us wire

19   money back to him to reimburse him, to allow Mr. Starman to

20   deduct the respective amounts being set forth --

21               THE COURT:  Yes.

22               MS. SHERMAN:  -- from the respective pots.  And

23   we'll put that in the order because I know that --

24               THE COURT:  That's fine.

25               MS. SHERMAN:  -- the cash flow is of concern.

1          THE COURT:  That's fine.

2          MS. SHERMAN:  On the tax collector's bucket --

3          THE COURT:  Anybody have any problem with paying

4    the tax collector?

5          MS. SHERMAN:  We want to pay him, the tax

6    collector, the proceeds after deducting the auctioneer's

7    commission and auctioneer's expenses, and that would be net

8    proceeds of $35,902.17.

9          THE COURT:  Anybody have a problem with that?

10   They're first priority.

11          (No response.)

12          THE COURT:  Okay.  That part's done.

13          MS. SHERMAN:  The second --

14          THE COURT:  So the page that says Lot D, as in dog,

15   Payout Pinellas County Tax Commissioner, that one's done.

16   We've disposed of that one.

17          MS. SHERMAN:  Okay.  Your Honor, the next question

18   -- I'll go to the easy one.  We have the Trustee -- from the

19   non-tax property, there was $1,028,120.69 that was to go to

20   the Trustee after payment of the auctioneer commission and

21   the Trustee's pro rata share of the expenses.  And we would

22   propose that that money be held in a segregated account with

23   all liens to attach to proceeds.

24          If Your Honor will remember, Mr. Plotko's clients

25   and some others have asserted a blanket lien on everything,

1    and that's yet to be resolved.  And we would propose to put

2    that in a segregated account, hold it there pending further

3    order of the Court, and that would be --

4              THE COURT:  Segregated and interest-bearing.

5              MS. SHERMAN:  Ms. Scharrer, is that something you

6    can do with your bank?

7              MS. SCHARRER:  I should be able to.

8              MS. SHERMAN:  Okay.  We should be able to.  You

9    know, Trustee accounts are kind of weird, Your Honor.  If we

10   have any problem with that, we'll file a follow-up order.

11             THE COURT:  Okay.

12             MS. SHERMAN:  And the last pot of money was the

13   N162SL pot.  After payment of the auctioneer's commission and

14   expenses, the amount of that was $493,559.31.

15             THE COURT:  And X-amount goes to the Trustee off

16   the top?

17             MS. SHERMAN:  Your Honor, Exhibit E to our motion,

18   which is Document 625-5, we start with that net proceeds of

19   sale.  Under the agreement with the landlord -- and these

20   were all the first tier of the waterfall, the first and

21   second tier.  AvAero was to get $11,000 for storage.

22             N163SL, by agreement with the fractional owners,

23   they had paid some money to Teterboro Rams for engine

24   maintenance and repair, and the agreement was that they

25   could be reimbursed 10,000 out of the proceeds of sale.

1          TPE advanced the record -- costs of copying the

2    records so that potential purchasers could do due diligence,

3    and the agreement reached with TPE was that they would be

4    reimbursed $3,500 out of the proceeds of sale.

5          TPE also removed the engines so that they could

6    be picked up by the purchaser from plane N163SL.  And the

7    agreement the fractional owners and the Trustee reached with

8    TPE was that they could be paid 5,000 out of the proceeds of

9    sale.

10          And last, was the Trustee's share of the proceeds,

11   which was $40,000, which leaves a net balance of $424,059.31

12   available for the last three levels of the waterfall.

13          The last three levels of the waterfall, Your Honor,

14   were the expenses incurred by fractional owners that advanced

15   money.  We're not privy to that information.  The $1,300 --

16          THE COURT:  So somebody has to file that.

17          MS. SHERMAN:  Your Honor, what we're proposing to

18   do is disburse that amount to the Shumaker Loop & Kendrick

19   trust account for disbursement in accordance with the

20   settlement agreement.  The Trustee really doesn't have a dog

21   in the fight once we get down to the last three levels.  One

22   of the last levels was the 1300 to Van Allen Group for

23   records.  They've been paid.

24          So it's really which fractional owner gets how

25   much.  And also, which fractional owners advanced expenses

1  and have attorneys' fees that are compensable out of the

2  third level of the waterfall.

3         So our proposal was to go ahead and get that money

4  disbursed to the Shumaker, Loop & Kendrick trust account and

5  then together with, I guess, Mr. Andersen, who I think has

6  all the rest of the fractional owners on that plane, they can

7  figure it out how to divvy it up amongst themselves.  And

8  perhaps if they can't, come back to Your Honor for further

9  guidance if there's any disputes.

10         THE COURT:  But he really doesn't want me to do it

11  that way.  He wants --

12         MS. SHERMAN:  Well, I know Mr. Andersen --

13         THE COURT:  I mean, he wants it but he doesn't want

14  it.

15         MS. SHERMAN:  Well, Mr. Andersen, I know, has an

16  issue that he wants to raise as far as that goes, and I

17  suspect that Mr. Clark may as well, as to what's going to

18  happen to the last tier of the waterfall.

19         THE COURT:  Right.  It's the waterfall, yeah.

20         MS. SHERMAN:  So I'm going to -- that's our

21  proposal, Your Honor, but I think Mr. Andersen has a

22  different view on life.

23         THE COURT:  Okay.

24         MR. ANDERSEN:  Judge, if I may be heard briefly.  I

25  think the solution that Ms. Sherman has proposed presents a

1    good framework.  The starting point for our solution to this

2    would be that just as the situation with the liens, these

3    funds could be placed in a segregated account for the

4    Trustee.  The Trustee could have a segregated account for

5    the proceeds rather than Mr. Verona's trust account.

6         We do have some concerns there.  You know, Mr.

7    Verona represents one group of claimants.  You know, our

8    client is adverse to that group of claimants.  We really

9    don't want to have any -- well, let me go right to the point

10   here.

11        Our overall solution would be that those funds

12   be held pending a subsequent order of this Court, and that

13   that order would be issued in due course, depending upon the

14   result of our appeal, which once the request for --

15        THE COURT:  So you want to use me instead of

16   putting a bond up.

17        MR. ANDERSEN:  Well, I hadn't thought of it that

18   way, Judge.  I mean, I seriously hadn't thought of it that

19   way.  I think the funds -- I think we're all mutual claimants

20   to the funds.  And as you said a moment ago, we have some

21   entitlement -- I mean, whichever way it turns out --

22        THE COURT:  Yeah.

23        MR. ANDERSEN:  -- we've got some entitlement to it.

24   But I think we would be more comfortable if it were in a

25   segregated account held by the Trustee, to be disbursed only

 1    upon further order of the Court in due course as to what --

 2              THE COURT:  What about the loss of use to the --

 3              MR. ANDERSON:  -- hasn't managed to resolved.

 4              THE COURT:  If you lose the appeal, what about the

 5    loss of use to the fractional owners who are not allowed to

 6    get their hands on their money?

 7              MR. ANDERSEN:  I'm not sure --

 8              THE COURT:  It takes a long time to get through the

 9    appellate process if you stop at the District Court and then

10    go up to the Eleventh Circuit.  So you're not looking at

11    anything this year.

12              MR. ANDERSEN:  I understand, Judge.  I do

13    understand, it's a substantial period of time.  And quite

14    honestly, I hadn't -- I'm not familiar, as I stand here

15    today, with the bond requirements for an appeal.

16              THE COURT:  Well, you'd have to get a stay pending

17    appeal, which I'm not going to prejudge that, but I know that

18    the likelihood of success on the merits is key among the four

19    prongs -- or however many prongs there are.

20              And I probably wouldn't go that way, which means

21    then you'd have to get the stay at the District Court level.

22    But if you didn't get the stay at the District Court level,

23    and you didn't want the monies disbursed, you'd have to do

24    something, I guess.

25              MR. ANDERSEN:  Post a bond at that point.

1          THE COURT:  Yeah.

2          MR. ANDERSEN:  I think that would be the

3   appropriate thing.  Well, and each of those steps ultimately

4   may be necessary, but in terms of the relief today, if

5   these funds need to be disbursed, if they were placed in a

6   segregated account --

7          THE COURT:  I mean, what do you do -- I mean, how

8   -- look at this -- just look at this, okay?  Unquestionably,

9   the engines go with the ownership group, right?

10         MR. ANDERSEN:  They --

11         THE COURT:  And we don't have a waterfall program

12  that says, well, give them the engine money.  Everything's

13  being held up.  Give them the prop money.  Everything's being

14  held up.  And what you really wanted to share in was the

15  other stuff; right?

16         MR. ANDERSEN:  Well, actually, Your Honor, in --

17  actually, Your Honor, our view of it is that all of the

18  fractional share owners should participate in the proceeds

19  from the sale of all the fractional share airplanes, based on

20  their percentages, whatever they happen to be.  Our client

21  has percentages of 12-1/2, 12-1/2 percent, 3 percent, so it

22  comes up to something like 25 percent or a quarter of an

23  airplane somewhere.

24         And, you know, other fractional share interest

25  holders also may have multiple interests.  I mean, I think

1   Mr. Verona's group, and I'm not absolutely sure of the

2   numbers, but I think they may represent about 250 of the

3   fractional share interest holders.  I think there are

4   somewhere near 600.  And candidly, Your Honor, I think our

5   view of it is more beneficial to the overall group of

6   fractional share holders.  And that -- and so --

7           THE COURT:  Not for ones -- I mean, the engine

8   is -- everyone agreed, the serial-numbered big parts,

9   whatever, props, engines, they go with the people that --

10  I mean, those are owned.

11          MR. ANDERSEN:  Well, but that's actually what we'll

12  challenge on appeal, Judge, because our view is that while

13  they may be allocated to that particular airplane, I mean,

14  they may --

15          THE COURT:  I don't even have all the airplanes.

16  Not everyone wants to opt in.  How are you going to

17  functionally have that result happen?

18          MR. ANDERSEN:  Well, Judge, I think --

19          THE COURT:  Yeah, we could --

20          MR. ANDERSEN:  I think that they --

21          THE COURT:  You know, to punish the people that opt

22  in, I don't know.  Again, I don't think it's fair.  We gave

23  them a convenient forum and -- you know, are you going to go

24  get the other airplanes and bring them in so that we can

25  carve up everything?  Who's going to get them and bring them

1  here?

2          MR. ANDERSEN:  Judge, I think --

3          THE COURT:  All of them.  100 percent of them.

4          MR. ANDERSEN:  I think it's --

5          THE COURT:  Because if you're going to prorate

6  against all aircraft, they've all got to be here.

7          MR. ANDERSEN:  I think in order for them to sell

8  their interest, to sell these airplanes free and clear, I

9  think there's a substantial number that are waiting to decide

10 whether to opt in or not.  I think a large share of them will

11 opt in.

12         And whether we ultimately have to go and file some

13 proceedings and say the others are property of the estate and

14 they also should be sold through the estate, I mean, that

15 ultimately may occur.  But I think that's ultimately going to

16 be the --

17         THE COURT:  They're not property of the estate.

18 The other ones.  You can't -- if you want to prorate against

19 100 percent of the universe of planes, you have to get them

20 here, and not all of them -- there's not all of them that are

21 connected to this case via an ownership interest by the

22 estate.

23         MR. ANDERSEN:  Well, and I may be --

24         THE COURT:  They were just the former

25 administrator.

1              MR. ANDERSEN:  I beg your pardon?

2              THE COURT:  The Debtor was just the former

3       administrator of those planes.

4              MR. ANDERSEN:  Well, is the Court --

5              THE COURT:  It just doesn't work.  There's a

6       breakdown in the logic.  You can't get them all here, so you

7       can't prorate against all of them.

8              MR. ANDERSEN:  Well, I don't -- and I don't really

9       want to re-argue things, Judge, but our view of it is that if

10      one takes -- and this is a fundamental difference, I guess.

11      If one takes the program documents, which the Court has now

12      seen in some detail -- and we have our disputes about the

13      program documents.  But it's very clear from those program

14      documents that what the fractional share interest holders

15      received was a very limited interest.

16             They couldn't transfer the airplanes.  If the

17      airplanes were sold, they weren't entitled to share in the

18      proceeds from them.  They were just going to be given a

19      chance to get into another airplane.  All the indicia of true

20      ownership, the right of control, the right of possession, the

21      right of alienability, none of those were transferred to the

22      fractional share interest holders.  This is what we'll argue

23      on appeal, Judge.

24             And consequently, you know, the fact that they may

25      have received a piece of paper that said bill of sale,

```
 1   candidly, I was thinking about this --
 2             THE COURT:  Well, if they never have any rights at
 3   the end, how can anyone argue a conversion claim under an
 4   insurance policy?
 5             MR. ANDERSEN:  Judge, I am not arguing -- that's
 6   not --
 7             THE COURT:  I know that.
 8             MR. ANDERSEN:  That's not my argument.
 9             THE COURT:  I know that's not yours but it's
10   somebody's in this room.
11             MR. ANDERSEN:  Well, it is and I've had
12   conversations --
13             THE COURT:  Can't have it both ways.
14             MR. ANDERSEN:  And I'm not -- you know, frankly,
15   Judge, let me just be real direct.  I haven't studied the
16   policy that carefully.  I don't -- I think the better course
17   -- and this is a nice way to put it.  The better course
18   for clients like my client is to get a fair share of a
19   distribution from the sale of these airplanes.
20             And if the fractional share interest holders did
21   not acquire the interest that would entitle them to claim as
22   their own all of the proceeds from that particular airplane
23   which they were assigned by Avantair an interest, for
24   whatever reason, then -- you know, then I think my client
25   is -- and many others, the other 350.
```

1          THE COURT:  Well, this Trustee has not sought to

2    bring anything else into the estate.

3          MS. SHERMAN:  Your Honor, for the record, it's the

4    Trustee's position that the Trustee does in fact have an

5    interest in every aircraft.  The fact that it hasn't been

6    asserted adversely to owner groups yet, it doesn't change the

7    fact that that's the Trustee's position.  So to the extent

8    anybody wants to determine silence is acquiescence for the

9    record --

10         THE COURT:  Then how do you square --

11         MS. SHERMAN:  I don't think it's appropriate to

12   argue it today.  It's not relevant to what we're talking

13   about.

14         THE COURT:  Okay.  How do you square that with the

15   waterfall, then, that only goes to one group, if --

16         MS. SHERMAN:  Well, that's whether the Debtor has

17   an interest in the claim.  The rights of the owners *inter se*

18   are totally different issues.  There's the owner-on-owner

19   issues and there is the Trustee -- does the Trustee have a

20   right in the individual planes by virtue of what the Debtor

21   retained.

22         And maybe the owners all have an interest as

23   general unsecured creditors then, derivative of the Trustee's

24   interest, but Avantair, it's our position, did retain an

25   interest in the airplanes under the program documents.

```
1            THE COURT:  But the Trustee's not seeking to

2   liquidate all of the other airplanes and prorate it --

3            MS. SHERMAN:  Your Honor, at this point the Trustee

4   is not seeking to liquidate -- has not decided to fight the

5   fight with anybody that hasn't agreed to settle with the

6   Trustee.  But that is still an issue that remains open.

7            THE COURT:  I see.  So what you're going to do

8   is at the end of the day abandon because it would be too

9   expensive, et cetera, for those that don't want to come

10  involuntarily.

11           MS. SHERMAN:  Perhaps, Your Honor.

12           THE COURT:  Uh-huh.

13           MS. SHERMAN:  As it stands right now, it's not cost

14  effective to go fight that fight, but that's not to say that

15  if it changed we wouldn't.

16           THE COURT:  Uh-huh.  Okay.

17           MR. ANDERSEN:  So, Your Honor, and I understand

18  the Court's point with regard to the length of time for the

19  appeal and potentially the obligation to post a bond and

20  those are things that could come in due course.  But we

21  feel that we'd be irreparably injured if the -- number one,

22  we feel it'd be very difficult if these funds were in

23  Mr. Verona's trust account, to have to go --

24           THE COURT:  You don't know Mr. Verona.  He's not

25  taking them anywhere.
```

1          MR. ANDERSEN:  Oh, I -- where is he?  He's right

2     here.  I've come to know Mr. Verona and I don't --

3          THE COURT:  Okay.  They're not going anywhere if

4     they're in his trust account.  They're not going anywhere.

5          MR. ANDERSEN:  Well, we'd feel more --

6          THE COURT:  I mean, they could.  They could go

7     somewhere if you don't get a stay.

8          MR. ANDERSEN:  We would -- well, then, Your Honor,

9     the order could --

10         THE COURT:  You've already appealed, right?

11         MR. ANDERSEN:  No, because we're waiting for the

12    request for reconsiderations to be heard -- Mr. Clark's

13    request for reconsiderations to be heard.

14         THE COURT:  Well, that slowed down the program.

15    That's dangerous.

16         MR. ANDERSEN:  Well, that's not -- and that's

17    something, Judge -- I don't know where Mr. Clark is.  He was

18    here a moment ago.

19         THE COURT:  He's behind you.

20         MR. ANDERSEN:  Oh, okay.  I mean, he has some

21    issues that --

22         THE COURT:  That's not even set for today.

23         MR. ANDERSEN:  I know that.  I know, Judge.  I know

24    it's not.

25         THE COURT:  Every judge will tell you, you know,

1    don't file motions for reconsideration.  That just allows us

2    to fix it and make it harder to get overturned on appeal.

3            MR. ANDERSEN:  He decided to do it on his own,

4    Judge.  I can't -- I was --

5            THE COURT:  We appreciate that because if we've

6    overlooked something, then we can make it stronger.

7            MR. ANDERSEN:  I understand that, too, Judge.  I've

8    been a lawyer long enough to know that that may be the --

9            THE COURT:  Well, that's not set for hearing, so --

10           MR. ANDERSEN:  No, it's not.  All I'm simply saying

11   is that with regard to disbursement of the funds as proposed

12   by the Trustee, I mean, our preference would be --

13           THE COURT:  What legal basis --

14           MR. ANDERSEN:  -- that they go into a --

15           THE COURT:  What legal basis --

16           MR. ANDERSEN:  -- segregated account.

17           THE COURT:  What legal basis is there for me to

18   withhold approval based on the fact that I've got an order

19   that says they need to go over there?

20           MR. ANDERSEN:  That you have an order that says

21   they need to go --

22           THE COURT:  The money needs to be disbursed

23   according to the agreement.

24           MR. ANDERSEN:  I don't think that order's quite

25   been entered, Judge.  I think there's an approval of the

1   settlement, and there's the right to an appeal from the

2   Court's ruling on that, but I don't think there's an order

3   yet saying that the funds are to be disbursed.  I don't think

4   there is.

5            THE COURT:  Isn't that what was contemplated?

6            MS. SHERMAN:  I'm sorry, Your Honor.  The order --

7            THE COURT:  He's saying that the settlement just

8   approves a mechanism.  It doesn't approve -- it doesn't give

9   anybody the right to receive the disbursements.

10           MS. SHERMAN:  The order says the net proceeds from

11  the sale of N162SL shall be disbursed in accordance with the

12  terms of the settlement --

13           THE COURT:  Shall be.

14           MS. SHERMAN:  -- agreement and this order.  The

15  Court hereby finds that the, quote, net proceeds to be

16  distributed pursuant to paragraph 4(e) of the settlement

17  agreement shall be distributed only among the fractional

18  owners of N162SL.

19           THE COURT:  That's the order.

20           MS. SHERMAN:  The Court reserves jurisdiction to

21  resolve any disputes concerning the identity or proportionate

22  interests owned by any purported fractional owner of N162.

23           THE COURT:  All right.  There is a motion for

24  reconsideration pending, so I guess I do need to hear that.

25           MS. SHERMAN:  Your Honor, there isn't as to N162SL

 1   because that's the order that's never been signed.

 2           THE COURT:  Oh.  Oh, that's the --

 3           MS. SHERMAN:  It's been uploaded but it hasn't been

 4   signed.

 5           THE COURT:  That's the one -- that's the other one,

 6   the 109 or whatever.

 7           MS. SHERMAN:  169SL is the one --

 8           THE COURT:  169.

 9           MS. SHERMAN:  -- that Mr. Clark has a motion for

10   reconsideration on.

11           MR. ANDERSEN:  So, I mean -- and this is just the

12   dilemma.  We've all wanted to get 162SL amended to get it to

13   the Court.  In fact, we sent it to the Court at one point

14   because we were concerned about the timing of an appeal and

15   everything.  But we all want to get it done, but it hasn't

16   been done yet so --

17           THE COURT:  We don't know where it is, so that's

18   part of the homework.

19           MR. ANDERSEN:  I think Ms. --

20           THE COURT:  Well, I don't have an order yet, so

21   it's premature for me to say -- it's premature for me to

22   act on an order that's not been entered, so -- but I intend

23   to rule the way I ruled unless somebody turns me around

24   on a motion for reconsideration.  And the motion for

25   reconsideration that's pending as to the other one

1  doesn't really affect the waterfall issue.

2          MR. ANDERSEN:  Well, Judge, I mean, it  --

3          THE COURT:  It's just the conversion issue.

4          MR. ANDERSEN:  It actually -- I mean, any

5  disbursement on any -- either N104SL and 109SL, which haven't

6  been sold yet -- N169SL, as far as I know, hasn't been sold

7  yet.  But ultimately when it is sold, Your Honor, at that

8  point, I mean, we would ask for the same relief, and we may

9  need to do it in terms of -- in the form of a motion to stay.

10         But in any event, pending the appeal --

11         THE COURT:  Well, I don't have an order yet.

12 I have to get one entered once we find it.

13         MR. VERONA:  Okay.  So you're not going to

14 authorize disbursement until the order's entered?

15         THE COURT:  That's right.

16         MR. VERONA:  Okay.  Can we add the -- if they're

17 going to file -- I'm presuming we're going to have that order

18 entered in the next day or two.

19         THE COURT:  If someone can tell me where it is.

20         MR. VERONA:  Right.  And I guess they would have 14

21 days to file a motion for reconsideration at that point.

22         THE COURT:  Correct.

23         MR. VERONA:  Which would make it too early to hear

24 that on March 21st.

25         THE COURT:  That's correct.

1                    MR. VERONA:  Okay.

2                    THE COURT:  I don't want to -- look what happened

3      today with Grand Reserve.  This could not have been a half an

4      hour hearing, so I can't -- I don't want to add anything to

5      the insurance policy docket.

6                    MR. VERONA:  No.  I'm just suggesting that if

7      we could maybe set another hearing out a couple of weeks

8      later because, you know, these N162 owners, including

9      Mr. Andersen's client, have taken a huge bath in this case,

10     and they'd like to get the money that --

11                   THE COURT:  I understand.

12                   MR. VERONA:  You know, and this is just a --

13                   THE COURTS:  And he's going to tie it up somehow on

14     appeal.

15                   MR. VERONA:  There was no objection filed to the

16     motion to disburse other than, I think, by us --

17                   THE COURT:  Wait a minute.  There's no objection

18     requirement.  Was it filed on negative notice?

19                   MS. SHERMAN:  No, Your Honor, it was not.

20                   THE COURT:  Okay.  There's not -- you know that

21     Rule 8 doesn't apply unless you ask it to be applied.  He

22     just stood up and made his objection.

23                   MR. VERONA:  I understand.

24                   THE COURT:  He just stood up and made his

25     objection.

1          MR. VERNA:  I understand.

2          THE COURT:  So don't say that he didn't file it.

3    It's not required.

4          MR. VERONA:  So if we could maybe anticipate these

5    things and set it out --

6          THE COURT:  Yes.  28th.  Right, Ms. Garcia?

7          MR. ANDERSEN:  Your Honor, if I may -- and I

8    apologize but I have a -- I do have plans to go with my wife

9    to a meeting, at which I'm speaking, in Arizona.  And I think

10   that's the -- I think I'll be gone at that time.

11          If we could do it maybe the second week of April?

12          THE COURT:  Let's see.  People want their money.

13          MR. ANDERSEN:  Your Honor, we have no objection to

14   the disbursement as proposed by Ms. Sherman, other than on

15   this waterfall issue, Your Honor.

16          THE COURT:  Right.

17          MR. ANDERSEN:  And I really don't want to hold that

18   up in any way.  The only objection I've got is --

19          THE COURT:  Well, I can enter a partial order.

20   I'll enter a partial order on the motion for entry of an

21   order.  The tax collector bucket, the Debtor bucket is

22   approved.  The expenses from the Lot B payout, N162, are

23   approved, and the takeouts that you mentioned that are in

24   the next exhibit are approved.  But the rest of it, hold it.

25   It's the 424,059.31, hold those pending further order of the

 1  Court.

 2          MS. SHERMAN:  Your Honor, I had -- and we can -- if

 3  it's not going to go into Mr. Verona's trust account, if it

 4  could go into mine instead to be disbursed, only pursuant to

 5  subsequent order of the Court.  Ms. Scharrer tells me that

 6  she gets charged for having bank accounts and so --

 7          THE COURT:  I know.  It's astronomical.

 8          MS. SHERMAN:  -- and so we don't get charged for

 9  having bank accounts.  If I could hold it in our firm's IOLTA

10  account --

11          THE COURT:  Okay, can we --

12          MS. SHERMAN:  -- until we resolve this issue.

13          THE COURT:  Can we include that in the --

14          MS. SHERMAN:  It'll be in the order approving the

15  auctioneer, all that order.

16          THE COURT:  But I'm talking about that middle

17  bucket too.  The bucket that was for -- that's for the

18  benefit of allegedly a blanket lienor.

19          MS. SHERMAN:  I think Ms. Scharrer was going to put

20  that into an interest-bearing account, not an --

21          THE COURT:  Right.

22          MS. SHERMAN:  -- IOLTA account.

23          THE COURT:  Not a what?

24          MS. SHERMAN:  Not an IOLTA account.

25          THE COURT:  Right, but she's still going to get

1   charged on that.

2            MS. SHERMAN:  I don't know that she is, Your

3   Honor.

4            MR. WILKES:  J. Steven Wilkes on behalf of the

5   United States Trustee for Region 21.  At this time, the

6   United States Trustee would object to the disbursement of

7   estate funds or potential estate funds into IOLTA accounts

8   that are not protected under 11 U.S.C. 345.

9            THE COURT:  Well, it would be an interest-bearing

10   account.

11            MR. WILKES:  It has to have the protections of 345

12            THE COURT:  In a depository.

13            MR. WILKES:  Interest-bearing accounts are

14   irrelative.

15            THE COURT:  Right, but --

16            MR. WILKES:  They have to be backed up with

17   additional securities.  We are talking about over $400,000 in

18   this one transaction here, and the FDIC does not insure that

19   amount of money.

20            THE COURT:  Well, who does?

21            MR. WILKES:  The bank has to pledge additional

22   securities.  IOLTA accounts are not subject to that --

23            THE COURT:  Well, she's not proposing IOLTA.  She's

24   proposing a separate interest-bearing trust account.  But

25   you're saying it's above the threshold of insurability?

1        MR. WILKES:  Well, it has to be with an approved

2   depository.

3        THE COURT:  Yeah, a designated depository.

4        MR. WILKES:  And if it's Ms. Sherman's IOLTA

5   account, that's not in an approved --

6        THE COURT:  It's a trust account that's non-IOLTA,

7   a separate interest-bearing --

8        MR. WILKES:  But it's not the Trustee's account;

9   that's what I'm trying to say.  It is Ms. Sherman's account.

10       THE COURT:  Well, it'd be --

11       MR. WILKES:  Well, not Ms. Sherman's, but her law

12  firm's account.

13       THE COURT:  It'd be a trust account that is for the

14  benefit of the estate.

15       MR. WILKES:  The Trustee for the estate has to

16  maintain possession of estate proceeds.

17       THE COURT:  Well, we have it where Chapter 11's may

18  require dual signatures.

19       MR. WILKES:  That's a Chapter 11, Your Honor.

20       THE COURT:  Dual sigs.  That doesn't work in a

21  Chapter 7?

22       MR. WILKES:  Say it again.

23       THE COURT:  Dual signatures?

24       MR. WILKES:  No.  Dual signatures does not really

25  work.

```
1              THE COURT:  So there's a special rule on 7's?

2              MS. SHERMAN:  What was the statutory citation

3   again?

4              MR. WILKES:  345.

5              MS. SHERMAN:  How about if the order recites that

6   it will be held in a separate account that qualifies for --

7              THE COURT:  That complies with the rules.

8              MS. SHERMAN:  And we'll get with Mr. Wilkes on the

9   exact verbiage on where that is.

10             THE COURT:  Good.

11             MS. SHERMAN:  If we can make it interest-bearing,

12  Your Honor, we will.  I'm not sure once it's collateralized

13  whether they still pay interest on it.

14             THE COURT:  Okay.  But the thing is, you hold back

15  the 424,059.31 pending further order of the Court.

16             MS. SHERMAN:  Yes, Your Honor.

17             THE COURT:  And Ms. Garcia will try to find some

18  time on April the 4th, maybe.

19             MS. SHERMAN:  Your Honor, we were hoping --

20             THE COURT:  Nope, that doesn't work.

21             MS. SHERMAN:  -- perhaps if we could hear the

22  motion for reconsideration at the same time we hear all the

23  sale motions.  I know that there apparently is a season for

24  selling airplanes.

25             THE COURT:  When?
```

1        MS. SHERMAN:  If we could have it toward the end of

2   March.  I think May is when everybody turns into pumpkins

3   because summer holiday happens.

4        THE COURT:  No, but when do we have all the other

5   sale motions set?

6        MS. SHERMAN:  We don't, Your Honor.  And if we

7   could have kind of an omnibus date for all the motions to

8   approve compromise, motions to approve sales, and then the

9   N169SL motion for reconsideration, sort of a marathon --

10  they're all related -- and perhaps hear them sometime before

11  the end of March.

12       I think the judge said the 21st wasn't going to

13  work because we need all that time to hear the D&O motion

14  and she only has a half an hour.

15       MR. CLARK:  Your Honor, if I may.  Just to point

16  out to Ms. Sherman and also the Court, the primary motion for

17  reconsideration is 169 but we filed a companion motion that

18  adopts the arguments in the 169 motion in regard to 104.  And

19  I believe it's 109, or is it 107?  109 or 107.

20       MS. SHERMAN: It's 109.

21       MR. CLARK:  And we'll do the same thing with 162

22  once the Court enters the order approving the compromise of

23  that.  And, you know, as the Court knows from the motion, is

24  that two of our issues is the Court's interpretation of the

25  program documents plus also making what we believe were

1    factual determinations based on what were or were or not the

2    actual practices of Avantair, as opposed to how that

3    contrasts to the industry practices.

4            And then also in terms of the third level of the

5    waterfall, if the Court makes it determination solely on

6    equitable grounds without relying on interpretation of the

7    program documents and without making certain evidentiary

8    conclusions about the actual practices of Avantair, Global

9    Aerospace would --

10           THE COURT:  Are you going to be able to put on a

11   witness that says at the time that a part was taken off, it

12   was the then-present intent of Avantair -- the then-present

13   intent that that part would never be replaced or sought to be

14   replaced?

15           MR. CLARK:  Well, Your Honor, given sufficient time

16   to develop an evidentiary record, I think that is what would

17   be developed.  In fact, that's what the FAA itself, in terms

18   of its emergency orders concluded, that Avantair --

19           THE COURT:  Now, wait.

20           MR. CLARK:  -- was running amuck.

21           THE COURT:  Did they conclude that at the time the

22   part was taken off, there was the then-present intent not to

23   replace it or seek to replace it?  I don't think that those

24   orders said that.  I think they said "if they aren't being

25   replaced," which is different from "did they have the then-

1    present intent not to do it."

2            MR. CLARK:  As best I can glean from those FAA

3    orders, is that the FAA concluded that there was a systematic

4    practice of Avantair of turning certain aircraft into donor

5    aircraft without making any attempt to maintain them as

6    airworthy, which under the FAA regulations is improper --

7    and also according to the program documents is improper,

8    because Avantair owed an obligation to each individual

9    fractional owner to maintain the airworthiness of that

10   aircraft and not to turn the aircraft into a donor aircraft.

11           THE COURT:  And when they run out of money --

12           MR. CLARK:  Then they --

13           THE COURT:  -- then what?

14           MR. CLARK:  Well, they owed obligations to the

15   fractional not to turn the aircraft into donor aircraft, but

16   it's even worse than that --

17           THE COURT:  They stopped.  They shut down.

18           MR. CLARK:  Well, only because the FAA shut them

19   down and grounded the fleet.

20           THE COURT:  I thought that they shut them down

21   before -- that they shut down before --

22           MR. CLARK:  They shut them down twice.

23           THE COURT:  -- the grounding orders got in.

24           MR. CLARK:  That may vary in terms of the actual

25   sequence but there was an FAA investigation underway, I

1    believe, which they were very much aware of.

2            But in terms of the -- as we pointed out in our

3    motion for reconsideration, if the Court based its decision

4    only on equitable grounds without construction of the program

5    documents or evidentiary conclusions, then our position on

6    that third level of the waterfall could very well be

7    different.

8            And our concern as to how the Court's interpreting

9    those program documents and the evidentiary conclusions that

10   the Court may have made at this point --

11           THE COURT:  I thought it was pretty simple.

12   There's a breach of contract.  They didn't do what they

13   committed to do.

14           MR. CLARK:  Yes.  And as we've also pointed to,

15   that in some instances where Avantair was acting contrary to

16   the program documents, then under the law of Florida and

17   other places, they're probably guilty of conversation as

18   well.

19           But I also wanted to point out, though, we have

20   these companion motions for reconsideration.  In terms of

21   timing, Your Honor, I know Mr. Andersen has an issue with the

22   28th.  I just wanted to point out to the Court --

23           THE COURT:  And the 21st in the afternoon.

24           MR. CLARK:  I will -- the 21st is fine with me in

25   the morning at any time.  The following week, the first week

```
 1    of April, I have longstanding promises to take my young son

 2    to be on a college tour with him visiting colleges, because

 3    that's his spring break, so I'd just kind of request the

 4    Court not to schedule it during the first week of April if

 5    that's at all possible, so --

 6              THE COURT:  We'll look at some time.

 7              MR. CLARK:  Thank you.

 8              THE COURT:  I didn't give anybody on the phone a

 9    chance to argue in opposition to the waterfall aspect, but I

10    think since we're sort of freezing the money at this point

11    and setting the disbursement issue for further consideration

12    after the order approving the compromise is entered, I don't

13    think you need to chime in now.  I'm looking at the calendar.

14              MR. HYMAN:  Your Honor, this is Zachary Hyman on

15    behalf of Teterboro Rams.

16              THE COURT:  Yes?

17              MR. HYMAN:  We do not feel any need to voice any

18    objections at this juncture.  Thank you very much for giving

19    us the opportunity to be heard.

20              THE COURT:  All right.  And you're actually going

21    to get paid something out of this first round of orders;

22    right?

23              MR. HYMAN:  Teterboro does not have any interest

24    in N162, so unfortunately we are not going to be paid.

25              THE COURT:  Oh.
```

1              MR. HYMAN:  We're still in the process with N104

2    and N109.  We're negotiating with the Trustee and fractionals

3    about that.  And the fractional owners and the Trustee have

4    been fantastic in ensuring that we get timely payment on

5    N-169.  Thank you, Your Honor.

6              THE COURT:  That's good.

7              What do you see, Ms. Garcia, in April?

8              COURTROOM CLERK:  Are you thinking a half day?

9              THE COURT:  Yup.

10             COURTROOM CLERK:  April 28th is a possibility but I

11   have to check.  There's a bunch of defendants in this one

12   adversary.

13             THE COURT:  Is that a Tom Lash setting?

14             COURTROOM CLERK:  It is.

15             THE COURT:  Set it on top of there.  You know, he's

16   kept us with placeholders for a lot of stuff and we'll move

17   them if we need to.

18             MR. VERONA:  Your Honor, I know you're very busy.

19   Ms. Applegate has explained to me that come May the season is

20   over for selling these planes until, you know, next winter,

21   so if it --

22             THE COURT:  Well, get them sold.

23             MR. VERONA:  You know, we'd like to, but the

24   problem is, you know, with motions for reconsideration

25   and appeals -- I mean, we'd like to get these motions for

```
 1   reconsideration heard because if you deny them and they don't

 2   put up a bond, then we can then proceed.  So I'm just asking

 3   is there any way we can do it a little earlier than the end

 4   of April?  You had suggested some time in the afternoon of

 5   the 21st.

 6             THE COURT:  Except that you just heard that he

 7   can't be here, and he is the one that's objecting.

 8             You know, Ms. Garcia, if you'll look at March 24th,

 9   we could probably move all those four things that are in the

10   afternoon; couldn't we?  And we could move those to the 28th.

11             COURTROOM CLERK:  We could do that.

12             THE COURT:  We could give you the 24th in the

13   afternoon.

14             MR. VERONA:  Thank you, Your Honor.  And, Your

15   Honor, could I request also that we include in that hearing

16   -- we had filed a motion to take a 2004 exam of Dallas

17   Airmotive.  They filed an objection.

18             THE COURT:  Right, and there's an objection.

19             MR. VERONA:  We'd like to have that scheduled at

20   the same time, if possible.

21             THE COURT:  Yes.

22             MR. MOHNEY:  That's fine, Your Honor.

23             THE COURT:  That's Mr. Mohney?

24             MR. MOHNEY:  It's Marvin Mohney --

25             THE COURT:  Okay.
```

1          MR. MOHNEY:  Marvin Mohney for Dallas Airmotive.

2          THE COURT:  3/24 at 1:30.  We will have as a

3    placeholder for motions to sell and so forth.  If I were you

4    all, if you want to take advantage of the season and you want

5    the -- why don't you all just sell them -- is this a plane

6    that the Trustee has an interest in?

7          MS. SHERMAN:  Your Honor, there are a number of

8    other planes, in addition to 104, 109, 162 and 169, that have

9    acknowledged that the Trustee has an interest in their plane,

10   and we have settlement agreements that are in --

11         THE COURT:  Okay.  And, you know, maybe you all

12   need to talk because you don't want to sell it through this

13   mechanism if you're going to have to share in the waterfall.

14   And by agreeing to expose it to that challenge, you know,

15   that's a risk that you have to take.

16         Maybe you just say, you know, don't settle with the

17   Trustee if the Trustee doesn't have an interest in it, and go

18   take it and sell it somewhere else.

19         MS. SHERMAN:  That has its own set of issues, Your

20   Honor.  And you're litigating with Mr. Andersen somewhere

21   else perhaps --

22         THE COURT:  Fine.

23         MS. SHERMAN:  -- or lots of Mr. Andersens.

24         MR. VERONA:  That's why owners are opting in

25   because --

```
 1            THE COURT:  Well, then they opt in with a risk.

 2   Why don't you just get them all sold and then fight about the

 3   waterfall?

 4            MR. VERONA:  Well, then we're talking about

 5   modifying the sale procedures to make it more efficient and

 6   more quick so that --

 7            THE COURT:  If you do that, I'll give you time

 8   before then, as long as the waterfall issue doesn't -- you

 9   know, isn't the problem, which will then hang up everything.

10            MR. VERONA:  Well, I'm sure the waterfall issue is

11   going to be a problem, from Mr. Andersen's standpoint, no

12   matter what we agree to as far as procedures for selling.

13   I think that the planes need to be sold, the monies need

14   to be --

15            THE COURT:  No, listen.

16            MR. VERONA:  Yes.

17            THE COURT:  You're not understanding.

18            MR. VERONA:  I'm sorry.

19            THE COURT:  If you leave the waterfall issue for

20   another day for the ones that need to be sold, then you don't

21   have a motion for reconsideration.  You're going to fight

22   about money at a point in the future, but the planes get sold

23   in the season.  Sell them all and then fight about the money.

24            MR. VERONA:  I think that's -- I think we're saying

25   the same thing.
```

1          THE COURT:  He's not going to object to that.

2          MR. VERONA:  Well, he's not going to -- I don't

3   think he's going to object to them being sold, no.

4          THE COURT:  Right.

5          MR. VERONA:  I agree.

6          THE COURT:  Okay.

7          MR. ANDERSEN:  Your Honor, just -- and to make it

8   very clear, this could all be done very quickly.  Whatever

9   objection I made to 169SL would just apply to the proceeds,

10  and I understand the Court would -- you know, the issues I've

11  got on appeal, in terms of whatever airplanes are sold and

12  whatever proceeds may not be disbursed and how that's going

13  to be handled in the future.

14         THE COURT:  But if the sale procedure is modified

15  to say, let's sell them, and the last tier of waterfall will

16  be determined in another contested matter, then all the

17  planes can get sold tomorrow.

18         MR. ANDRESEN:  Precisely, Your Honor.

19         THE COURT:  Are you going to use the same guy?

20         MR. VERONA:  There's another auctioneer that we're

21  talking about using to actually sell these additional planes.

22         THE COURT:  Okay.  Well, anyway, if you can refine

23  that -- I mean, what's getting you hung up is you've got

24  something in there that's allowing you to get hung up, but

25  you don't have to do it that way.

1            Fortunately, this one got sold and now we are only

2    arguing about money.

3            MR. VERONA:  Correct.

4            THE COURT:  Okay.  We'll see everybody back on

5    March the 24th at 1:30.

6            COURTROOM CLERK:  And that's on 625 and the balance

7    of it?

8            THE COURT:  It's on the balance of 625, it's on all

9    motions for reconsideration on that plane or any other plane

10   where there's that allegedly offensive waterfall provision.

11           MS. SHERMAN:  And, Your Honor, can that also be on

12   N104SL motion to sell, N109 motion to sell, and any other

13   motions to sell that get filed before the end of the week?

14           THE COURT:  Let me just say this.  If you don't

15   have anything in them with the waterfall, and everyone agrees

16   to sell it, I'll enter an order at the end of this week.

17           MS. SHERMAN:  Your Honor, we have lien holders that

18   we have to provide notice to and some other folks, so --

19           THE COURT:  Well, I mean, how can we do that?

20           MS. SHERMAN:  I'm afraid we're going to have to

21   have a hearing on --

22           THE COURT:  Okay.

23           MS. SHERMAN:  -- the actual motions to sell.

24           THE COURT:  Then March --

25           MS. SHERMAN:  Maybe not the compromise, but the

1   motion to sell piece.

2           THE COURT:  That's fine.  March 24th is for sale

3   issues.  March 21 is for insurance issues.

4           Now, on the housekeeping, will you just please

5   email us the tracking numbers?

6           MS. SHERMAN:  I'll hand them up to Ms. Garcia

7   before I go, Your Honor.  I have printed copies.

8           THE COURT:  And, let's see.  We'll add the -- oh,

9   well, you just said you're going to do the amended motion on

10  N104; right?

11          MS. SHERMAN:  If it hasn't already been done, it

12  will be done.

13          THE COURT:  That will be, then, that same March

14  24th.  Okay.

15          MS. SHERMAN:  Yes, Your Honor.

16          THE COURT:  All right.  So just email us the

17  tracking numbers and we'll try to find --

18          MS. SHERMAN:  Maybe we'll try and coordinate with

19  either the case administrator or Ms. Garcia to make sure that

20  we have all -- we're all on the same page as to what's going

21  to be heard on that date.

22          THE COURT:  The case manager will have no clue.

23  We are now going to no real responsibility for digits.  We

24  are going to --

25          MS. SHERMAN:  So maybe we'll coordinate with

1    Ms. Garcia to make sure we've got everything --

2              THE COURT:  Only with her, yes.

3              MS. SHERMAN:  Thank you, Your Honor.

4              THE COURT:  All right, thank you.

5              (Proceedings concluded at 3:30 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATE

        I certify that the foregoing is the official
verbatim transcript prepared on an expedited basis to the
best of my ability from the logs and digitally-recorded audio
proceedings of the above-entitled matter.




_____          March 10, 2014
Cheryl Culver (CER, CCR)                  Date
Transcriber




        I certify that the foregoing is a federally
certified transcript authenticated by:

_____
Kimberley S. Johnson (CVR-M)
Certified Verbatim Reporter Master

JOHNSON TRANSCRIPTION SERVICE
7702 Lake Cypress Drive
Odessa, Florida 33556
813-920-1466
kgjjts@aol.com