## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

In Re:  Avantair, Inc.

**CORRECTIONS CORPORATION
OF AMERICA,**

      **Appellant,**

**v.**

**TRUSTEE BETH ANN SCHARRER and
THE N109SL FRACTIONAL OWNERS,**

      **Appellees.**
_____/

**Case No: 8:14-cv-1742-JSM
Bankruptcy No. 8:13-bk-09719-CPM
(Lead Case for All Consolidated Cases)**

## APPELLANTS' BRIEF IN SUPPORT OF CONSOLIDATED APPEALS

Appellants Corrections Corporation of America, d/b/a CCA of Tennessee, Inc.,  and CCA of Tennessee, Inc., (referred to herein as "CCA"), creditors of the Debtor,  Avantair, Inc., through counsel file this Brief in Support of The Currently Consolidated Appeals Pending Before this Court from the Bankruptcy Court Orders Overruling Appellants' Limited Objections to Motions to Compromise and Approval of Sales of the Fractional Share Aircraft Operated by the Debtor Avantair, and further show this Court the following:

## INTRODUCTION

This appeal depends initially on the nature of the ownership rights, if any, of the fractional share program participants.[1] The answer to this question turns upon interpretations of the role of the federal government in the regulation of aviation (federal preemption) and

---

[1] Appellee uses the talismanic label "co-owners" to refer to the fractional share program participants. Whether they are "co-owners," of what, and the extent of their rights *vis a vis* the Debtor,  among each other *inter se,* and as respects the rest of the world, are all issues that must be considered *de novo* on this appeal and may well affect the outcome of this appeal.

1

Florida property law, as much as it does upon the various agreements defining the relationship between the Debtor and the fractional share program participants. Once the rights of the fractional share participants are determined, then the remaining issue is the effect those rights have on the distribution of the proceeds from the sale by the Trustee of the fleet of aircraft operated by the Debtor under the fractional share program, and whether the Debtor's pervasive practice of removing part from certain aircraft ("donor" aircraft) for the benefit of other aircraft impacts that distribution.

## STATEMENT OF THE CASE

I.     **The Origin and Conceptual Underpinnings of Fractional Share Aircraft Use Programs**

The regulation of aviation safety is a field generally recognized as falling exclusively within the scope of federal authority. This is particularly true as respects registration of aircraft. In order for any aircraft to be operated in the United States, it must have a valid registration. While international treaties give aircraft registered outside the United States rights to operate within the United States on a temporary basis, aircraft based in the United States must be registered with the Federal Aviation Administration. Aircraft registered in the United States also must be operated in accordance with federal law, specifically the regulations established by the Federal Aviation Act of 1958, as currently amended ("FAA of 1958").  Under the FAA of 1958, these regulations are promulgated by the Federal Aviation Administration, and are codified at 14 C.F.R., Parts A through N (commonly referred to as the "Federal Aviation Regulations").

Separate and apart from registration of aircraft is the concept of *ownership* of aircraft. While there are certain citizenship requirements established for *owners* of aircraft in order

for the aircraft to be registered in the United States under the FAA of 1958 and the Federal

Aviation Regulations, federal law does not determine issues of ownership *per se*. Instead,

issues of *ownership* are determined by state law, with one significant exception. Because of

the mobile character of aircraft, Congress established the Civil Aircraft Registry in the

predecessor to the FAA of 1958, the Air Commerce Act of 1938 (the "1938 Act") to promote

the growth of air commerce by providing a single repository for recording interests in aircraft

so that those involved in transactions could be provided certainty in those transactions by

inspecting the records of a single recording office to locate interests in aircraft, rather than

attempting to identify the various recording offices in the (then) 48 states at which such

records might be established under law of each state. This would appear on its face to be a

purely ministerial function, however, the 1938 Act was a creature of its time – and recording

acts of that era typically were either pure "race" to the courthouse statutes or "race/notice"

statutes – Congress chose to define the effect of filing in the Federal Aircraft Registry as a

"race/notice" system, such that under the 1938 Act, now codified under the FAA of 1958, the

effect of recording is to grant priority to all persons holding federally recorded interests in

aircraft over all other third parties, except those of which the person holding the federally

recorded interest has "actual notice." *See Philko v. Schacket Aviation, Inc.,* 462 U.S. 406

(1983). All other issues relating to aircraft *ownership* are reserved to state law, just as in the

case of any other personal property. *Id.*

The distinction between registration and ownership is also clearly made under federal

law. Pursuant to federal statute, the registration of an aircraft to a particular entity cannot be

used as evidence of ownership. 49 U.S.C. section 44103. Thus, neither an aircraft

registration nor a a recorded interest in an aircraft is *a certificate of title* such as might be

3

issued by a state government to determine the ownership of an automobile. Indeed, the FAA has consistently opposed any effort to create certificates of title for aircraft, claiming that its mission is aviation safety and not resolving disputes as to ownership of personal property – whether airplanes or not.

Having clearly drawn this distinction between aircraft registration governed by federal law and aircraft ownership governed by state law, there are certain circumstances under which the FAA has conditioned the application of its registration and safety regulations on ownership issues. For example, there are U.S. citizenship requirements for registration of aircraft in the United States, historically dated back to before the Second World War when it was contemplated that in the event of a National Emergency, the entire fleet of U.S. registered aircraft might be called up for military service (and many in fact were during the Second World War). This system exists today, but foreign citizens, particularly foreign corporations with substantial operations in the United States in this global economy, may own U.S. registered aircraft by placing the *ownership* in the name of a United States citizen as trustee, which then registers the aircraft in the United States for the beneficial owners. This system is accepted by the FAA, which nevertheless has issued extensive regulations regarding the degree of control that the trustee must retain in order to satisfy the underlying objectives of the citizenship requirements for registration.

Similarly, the FAA Aircraft Registry has refused to record interests in "partnerships," insisting that for registration purposes an aircraft must have "owners" who can provide the FAA with a point of contact (like the trustee in the trust example) for purposes of establishing operational control over the aircraft and the compliance of its operators with Federal Aviation Regulations, particularly safety regulations. While refusing to record

4

interests in partnerships, the FAA has historically permitted registration of aircraft to specifically named "co-owners" provided each of them satisfies the requirements for U.S. citizenship.

It is against this historical background of federal registration of aircraft and recording interests in aircraft, that the fractional share concept of aircraft operation was created – first as a form of sharing aircraft operation, and then as a regulatory framework. The operation of aircraft in commercial operations subjects the operators to rigorous standards of regulation for the protection of air travelers. While these regulations form the underpinnings of the business model of major air carriers and are generally known as Parts 121 through 129, these regulations can become very onerous for smaller operators. Nevertheless, due to the poor safety record of small "shoestring" commercial operations, the FAA has chosen to continue to rigorously regulate them under a separate Part of the Federal Aviation Regulations (Part 135) involving a detailed system of operational requirements, recording requirements and inspections by FAA personnel.

In an effort to circumvent these more rigorous regulations, some operators decided to "sell" shares in the aircraft themselves to their transportation customers, making them "co-owners" to satisfy the FAA requirements that allow "owners" of aircraft to operate the aircraft themselves, or trade flight time in other aircraft, without being considered a commercial operation providing air carrier services, whether scheduled or on demand, to the public at large.  In this manner, the rigorous operational, maintenance and training requirements imposed on commercial operators, large and small, could be avoided. While such a concept of aircraft "sharing" between neighboring aircraft owners on an airport might not implicate any greater public safety concerns than each of the respective aircraft owners

operating their own aircraft, the modern computer age has enabled operators to assemble large fleets of  "shared" aircraft such that shared aircraft based by the operator throughout the United States (or the world) would be available at any time "on demand" to provide air transportation services to other "owners" with whom they had absolutely no connection other than having purchased a "share" in the fleet operated by fractional share operator.

The FAA reacted to the growth of such programs when a series of tragic accidents demonstrated that these fractional share programs were essentially unregulated commercial operations in which members of the air traveling public were being subjected to unsafe "shoestring" operations. There was clearly a need to reign in this circumvention of the Federal Aviation Regulations, but there also was an influential fractional share industry that resisted these changes. The result was a recognition of the fractional share programs, but the imposition of certain requirements for such programs – all codified in Subpart K of Part 91, (the general **non-commercial** operating regulations) at sections 91.1001 *et seq.* of the Federal Aviation Regulations (49 C.F.R. section 91.1001 *et seq.*). In return for satisfying these more rigorous regulations, an operator of a fractional share program could, if it chose, avoid the even more rigorous regulations imposed on **commercial** operators in Parts 119 through 135 of the Federal Aviation Regulations.

The essential element of the fractional share regulations under Subpart K is that the fractional share operator is considered the point of contact for the FAA with regard to all air safety matters. While the fiction continued to exist that the fractional share participants, as record "co-owners" of an aircraft, had operational control of the aircraft providing them transportation at any given time, whether "their" aircraft or any other fleet aircraft, the regulatory duty fell squarely on the fractional share operator to comply with the rigorous

requirements of Part K of Part 91 regulating the actual flight operations, aircraft condition

and aircraft maintenance, crew qualifications, training and scheduling, and all other aspects

of the operation. The fractional share participants, while titular "co-owners" would not, and,

***under the regulations, could not*** exercise anything more than fictional "operational control"

over "their" aircraft at any time (even if, as was rarely the case, they were on board "their"

aircraft rather than another fleet aircraft), much less the condition, maintenance and servicing

of the aircraft, or the qualifications, training and scheduling of the crew members. Of course,

while subject to these more rigorous operating regulations, the fractional share operators also

were fine with this concept because it was the starting point for their reservation of complete

control of all aspects of "ownership" of the fleet aircraft through a series of standard

reciprocal contracts with all of the fractional share participants entered into at the time of

their purchase of the fractional share interest. Thus, while the fractional share participants

might hold bare record "title," all aspects of beneficial ownership and control, and also the

essential property right of alienability of those recorded "title" interests, could be retained by

the fractional share operator.

## II.      The Fractional Share Contracts and the "Rights" Conveyed to the Fractional Share Participants and The "Rights" Reserved by the Fractional Share Operator.

The Fractional Share Contracts typically consist of a series of linked contracts

generally addressing the following: (1) a purchase agreement of a "fractional share interest"

identifying a specific aircraft to which the interest is to be assigned by the fractional share

operator; (2) a dry lease agreement under which the fractional share operator "leases" the

aircraft (exclusively and free of charge) from the holder of the fractional share interest ; (3) a

fractional use agreement under which the fractional share participant is entitled to air

transportation on board available fleet aircraft on a prescribed "on demand" basis; and an interchange agreement under which the fractional share participants are entitled to "use" the aircraft assigned to other fractional share participants.

Under the Fractional Share Contracts in this case, the fractional share participant will be issued (at the discretion of the operator) an interest (typically in multiples of at least 1/16[th] share as mandated by the Federal Aviation Regulations) in a fractional share aircraft. The Fractional Share Contract, while providing that a Bill of Sale evidencing a co-owner status equal to its share would be recorded in the FAA Aircraft Registry (located in and commonly simply referred to as "Oklahoma City") in order to comply with the regulatory requirement of Subpart K of the Part 91 of the Federal Aviation Regulations, expressly limits the rights of the fractional share participant in the aircraft. For example, the fractional share participant does not have the right to "use" the specific aircraft, to make any decisions regarding its maintenance or upkeep, to exercise any control whatsoever over its operation, maintenance, and the qualifications, training and scheduling of its crew members. The fractional share participant has no rights to convey all or any part of its interest, other than back to the fractional share operator, may be required to transfer its interest to any other comparable aircraft within the sole discretion of the operator and at any time, may be required to assign any interest in any insurance proceeds related to the aircraft, and is not entitled to share in the proceeds from the sale of the aircraft by the fractional share operator, provided it is assigned an interest in a comparable aircraft at the time of the sale.

### III.     The Issue of Ownership Is A Matter of State Law

Because federal law does not govern property rights in aircraft, the issue of the nature of fractional share ownership is a matter of state law. As will be discussed below, it is a

8

question of first impression under Florida law. There are no cases that have been found that define the interests of fractional share participants *vis a vis* the fractional share operator, the fractional share interest holders *inter se*, or the fractional share interest holders as to third parties. To the extent the rights of certain third parties, such as mechanics having liens on the aircraft under either Florida law or the law of any other state in which the aircraft may have been based and operated, are concerned, those liens are on the property itself and there are no cases involving the rights or obligations of specific fractional share interest holders to those third parties.

## IV.   The Demise of the Avantair Fractional Share Program and the Grounding of the Fleet of Aircraft Due to Rampant and Undocumented Cannibalization of the Fleet Leading to the Demise of the Program As A Whole.

Avantair from its base at the St. Pete-Clearwater International airport operated a fractional share program using a fleet of Piaggio twin engine turboprop aircraft. The fleet consisted of more than 40 aircraft, and Avantair was the largest operator of Piaggio aircraft in the world.  However, in the period leading up to the filing of this involuntary Chapter 7 bankruptcy by certain of the Fractional Share participants, the Avantair Fractional Share Program became distressed resulting in complaints by fractional share participants of inadequate service. Unknown to the fractional share participants, Avantair had undertaken a pervasive practice of removing parts, including life limited parts having a useful life of only a certain number of takeoffs/landings ("cycles") or flight hours, from certain aircraft and installing them on other aircraft. Additionally, the original engines and propellers, which also required periodic overhaul and inspection after a certain number of cycles or flight hours, were sent out to third party maintenance facilities for service, repair or overhaul, and, upon return, were then placed on the next aircraft that needed those components, rather than the

9

aircraft from which they came. Ultimately, this led to certain aircraft not having the operable components required to keep them in service and those aircraft then became "donor" aircraft from which parts were cannibalized in order to provide replacements for other aircraft, rather than purchasing replacement parts for those aircraft. Additionally, many of the engines and propellers in the hands of third party maintenance facilities were not returned to Avantair because it was unable to pay for the services rendered on those engines and propellers.

The pervasive and rampant nature of this practice came to the attention of the FAA shortly before this involuntary bankruptcy proceeding was filed, and the FAA appointed a special task force to investigate the matter. The result of that survey was an unprecedented emergency order grounding the entire fleet of aircraft because the FAA concluded that the maintenance record keeping associated with the removal and replacement of parts was inaccurate, incomplete, and in some instances fabricated, resulting in the conclusion that none of the more than 40 aircraft in the fleet could be deemed safe and airworthy based upon the  individual aircraft records, as maintained by the operator, Avantair.

The FAA then implemented a special inspection procedure whereby individual aircraft could be inspected by a certified service facility and a determination could be made that the aircraft was safe and airworthy. Nevertheless, it would still be necessary for the maintenance facility to make a mandatory logbook entry in the individual aircraft records stating that the aircraft had been subject to the Avantair maintenance program and that prior maintenance entries in the logbooks could not be relied upon of accuracy or completeness.

V. **The Bankruptcy Court Proceedings, the Formation of De Facto (not De Jure) Owner Groups, and the Section 363 Sales**

Avantair, despite continuing promises to the fractional share participants that it would

correct its problems, ceased its operations, terminated its employees and closed down its operations leaving its fleet of aircraft parked at airports throughout the United States. Groups of "co-owners" of individual aircraft for the first time were contacted by "organizers" or in some instances were organized by the more interested or aviation savvy members of a "co-ownership" group, and undertook to (a) locate the aircraft in which they had been assigned an interest; (b) secure the safety of the aircraft; and (c) take steps to assure that the aircraft were insured.

Immediately after the filing of these proceedings, the Bankruptcy Court appointed the Trustee, who then retained counsel. The Trustee and its counsel then undertook to secure the property located at the St. Pete - Clearwater International Airport and at the Orlando International Airport, to secure the maintenance records on the aircraft and otherwise take steps to attempt to prevent pilferage and theft of the property used by Avantair. The Trustee also coordinated with the FAA regarding the ongoing safety survey and the grounding of the fleet and also worked with the aircraft manufacturer Piaggio to develop a program for re-certificating the grounded aircraft.

From the outset, certain of the de facto groups of "co-owners" claimed the right to possession and the right to sell "their" aircraft. Appellant resisted those efforts, contending that the proper forum for the assembly and sale of the fleet of aircraft was in the bankruptcy proceedings. While these two positions seemed irreconcilable, a common interest soon emerged: the bankruptcy court was the only forum that would (a) protect the aircraft from being foreclosed upon throughout the United States by aircraft maintenance facilities claiming possessory and non-possessory liens on the aircraft, (b) the bankruptcy trustee was in a position to act as a representative to the FAA and the manufacturer  with regard to the

11

ongoing airworthiness issues, rather than requiring each de facto group and many of their individual members to do so, (c) and, most importantly, given the uncertain "ownership" issues pertaining to a fractional share program, the bankruptcy court was the only forum in which the aircraft could be sold with good title, free and clear of all liens. Thus, regardless of whether a fractional share participant was a member of a de facto group (and many of the fractional share participants did not choose to join these de facto groups), or sought the benefits of the bankruptcy process to realize a recovery from the fractional share interest that it had acquired in the fleet of aircraft, the common goal was to (a) protect and preserve the aircraft, (b) deal effectively with any liens claimed on the aircraft and avoid any lien litigation outside the bankruptcy forum, (c) sell the aircraft free and clear of liens in an orderly and efficient manner without incurring  undue additional expense, and (d) distribute the funds realized from the sale of the fleet of aircraft.

A two-step process was established to achieve these goals: first, certain of the "co-owners" would seek relief from the bankruptcy stay for the limited purpose of preserving that aircraft, while, in so doing, subjecting the aircraft to the jurisdiction of the bankruptcy court to stay all lien enforcement procedures and litigation outside of the bankruptcy process; and, second, at such time as certain of the "co-owners" sought to seek leave to sell the airplane, a Motion to Compromise would be filed by the Trustee, which, upon notice to all of the "co-owners" and all of the fractional share participants, as well as all those claiming a lien of any kind in the airplane, would set forth the proposed procedures for a section 363 sale of the aircraft by the Trustee to a third party free and clear of all liens, which would result in the payment of all liens, the payment to the Trustee of its fees and expenses, certain other approved fees and expenses, the costs of the sale, and, ultimately the distribution of the

remaining proceeds from the sale.

CCA, as one of the larger participants in the Avantair program, had been assigned fractional share interests in three aircraft.  CCA had taken an active role in identifying the location and condition of those three aircraft leading up to the bankruptcy. It was also clear to CCA's counsel that the conditions of the aircraft varied dramatically and that at least one of the aircraft in which it had been assigned an interest had been cannibalized and made a "donor" aircraft.  CCA had been a proponent of the bankruptcy proceedings from the start to achieve an orderly liquidation of the Avantair assets through preservation of the aircraft, the payment of those maintenance facilities that had preserved the aircraft and their engines, and then an early and efficient sale of the fractional share fleet of aircraft. CCA also made it clear, however, that the proper distribution among the fractional share participants from the sale of the aircraft in the fractional share fleet should be "share and share alike," rather than allowing the groups of participants assigned interests in those aircraft that had received the parts from the other aircraft to be unjustly and fortuitously rewarded because they had been assigned interests by the Debtor in those particular aircraft. As will be discussed below, CCA took this position because of its view of the inherent nature of ownership of interests in a fractional share program, and also because under Avantair's management, the parts of the aircraft had been removed and placed on different aircraft such that it was impossible to determine the origin of the parts on the aircraft at the time of the bankruptcy and that in order to avoid unjust enrichment, the only practical remedy was a "share and share alike," rather than a "musical chairs" form of distribution.

VI.     **The Bankruptcy Court's Ruling As to Return of Certain Parts and Distribution of Proceeds from the Sale of Aircraft and the Reasons The Orders Approving Distribution Should Be Reversed and Remanded**

Ironically, counsel for the "de facto" groups of owners was not really interested at the outset in having the aircraft sold in the true "musical chairs" manner, but insisted that at the very least the original engines and propellers, the most valuable parts of the aircraft, be returned to the aircraft of origin, regardless of where they were at the time of the bankruptcy. Thus, in seeking relief from the stay, they also sought relief to permit the return of the original propellers and engines from the aircraft on which they were then located in order to re-place them on the original aircraft.  CCA objected to this relief because under its view, if the fleet as a whole were subject to sale through the bankruptcy process, there was no need to spend up to a hundred thousand dollars **on each airplane** merely to remove, transport and physically attach each of the two, more valuable engines, to less valuable airframes. Nevertheless, the Bankruptcy Court granted this relief from the stay, with the result that these funds have now been spent locating, removing, transporting and re-placing engines and propellers to the original aircraft. While not intending to be a beneficiary of this otherwise unnecessary and wasteful process, CCA, as a "co-owner" of one of the cannibalized aircraft has now been rewarded with two engines that had previously been removed and that have since been sold at a handsome price. Thus, CCA is now, according to Appellees, one of the fractional share participants rewarded – not by the musical chairs theory that Appellees espouse – but by the one effort made under the bankruptcy process to restore value to the original "co-owners" in order to avoid the purely fortuitous effects of the "musical chairs" theory that otherwise will govern the distribution of the proceeds from the sale of the aircraft.

More significantly, CCA objected to the distribution of the proceeds from each sale of an aircraft only to the "co-owners" of that aircraft on the grounds that the proceeds should be distributed among the fractional share owners as a group "share and share alike" based on their

respective shares in the fleet. CCA also objected on the further grounds that, even if each aircraft was "owned" only by the fractional share participants in that aircraft, then none of the aircraft at the time of its sale, according to the FAA investigation, could reliably be said to be made up of its original parts, and therefore the distribution of the proceeds should not be limited to that group of "co-owners" in the original aircraft.  Instead, the proceeds from the sale of each aircraft should be distributed among all of the fractional share participants to reflect the reality that each aircraft at the time of the sale was made up of parts from other aircraft in the fleet. Such distribution would ameliorate the purely fortuitous unfairness to those fractional share participants assigned interests only in the truly "cannibalized" aircraft and the unjust enrichment to those that were the beneficiaries of Avantair's desperate, distressed and unlawful (at least from the standpoint of the FAA recordkeeping) removal of parts during the final period of its decline in order to avoid the inevitable collapse of its operations.

The Bankruptcy Court heard extensive oral argument and briefing on this issue of distribution of the "last tier of the waterfall," and held that the proceeds from each sale should be limited to those fractional share participants ("co-owners") assigned an interest in the particular aircraft. The Bankruptcy Court rejected CCA's argument that the fractional share interest holders were not the "owners" of the individual aircraft, and held that under the Fractional Share Program documents, Avantair's permitted "use" of the aircraft included the removal of  the individual parts from each of the aircraft for use on other aircraft. The Bankruptcy Court based its decision on its interpretation of the contracts, and, if there was any ambiguity, on evidence of custom and practice of other fractional share operators, notably NetJets, that used parts from fleet aircraft to be placed on other aircraft in the fleet. Additionally, the Court found that contract documents required Avantair to maintain the individual aircraft in airworthy condition, thereby

requiring it to replace the parts removed from individual aircraft, and that the failure to replace the parts gave rise to an unsecured contract claim (that presumably will have to be resolved at some future point in these proceedings as the fractional share participants attempt to show the amount by which the "value" of each of "their" aircraft was diminished by this breach of contract). (See transcript of December 12, 2013 hearing). Notably, in a subsequent hearing to memorialize its ruling, the Bankruptcy Court also stated that in addition to the original grounds for its ruling, it also was finding that the distribution proposed by CCA was impractical and would be unduly burdensome. (See transcript of January 24, 2014 hearing).

CCA has filed this appeal contending that the proper distribution based upon the ownership rights granted by the debtor to the fractional share participants to "use" aircraft of the fractional fleet (not even "their own" aircraft) for a period of "time" dictated by the size of their fractional share interests in the fleet aircraft should dictate the amount of the proceeds that each should recover from the sale of the fractional share fleet of aircraft, and on the grounds that the most equitable, practical and administrable method of distribution is simply to determine each participant's share in the fleet as a whole, and then to allocate that pro rata share of the remaining proceeds from the sale of the fleet as a whole among the fractional share participants for purposes of distribution. Other than the distribution of funds from one aircraft, which was sold at less than the average price,[2] all of the funds from the sale of aircraft to date can be distributed in this manner. Moreover, once it is determined that the Debtor and the fractional share participants are either the owners of all of the aircraft in the fractional share fleet or that all of the aircraft in the fractional share fleet likely contain valuable components from other aircraft in the

---

[2] CCA objected to this distribution, but the objection was overruled by the Bankruptcy Court and the proceeds were sent by Appellee's counsel without direction to CCA's counsel. CCA decided to accept this distribution because it is clearly less than the average distribution for which CCA contends on this appeal. In the event of any further distribution, CCA obviously will credit the amount of this single distribution toward any amount to be subsequently distributed.

fleet, then all of the fractional share aircraft, wherever they were located at the time of the filing of the involuntary bankruptcy, will need to be turned over to the Trustee for a Section 363 sale in accordance with the same procedure that has been successfully used to date.

## QUESTIONS PRESENTED

Thus, the fundamental questions presented on this appeal are essentially two-fold:[3]

(1) Are the fractional share participants "owners" of any particular aircraft at all based upon the overall interests retained by Avantair under the Program Documents, such that they are entitled to the exclusive distribution of the proceeds from the sale of that aircraft; and

(2) If the fractional share participants are "owners" of a particular aircraft, do the various groups of "owners" have claims *inter se* when the parts of their aircraft are cannibalized and placed on other aircraft, unjustly enriching the "owners" of other aircraft, such that those claims of the group of "owners" of cannibalized aircraft to the proceeds of sale of a particular aircraft, which is the beneficiary of that program of cannibalization, cannot be ignored and must be recognized for purposes of distribution.

Neither of these issues can be resolved simply by the talismanic contention that each group of fractional share participants were the "owners" and therefore should be entitled to the exclusive distribution of the proceeds from that aircraft.

## ARGUMENT AND CITATION OF AUTHORITY

---

[3] The fundamental questions set forth above are believed to be comprehensive and dispositive of all of the specific issues on this appeal, but if further detail is required, Appellant also incorporates herein by reference the specific issues presented on appeal previously filed in support of this appeal.

I. **The Debtor Retained An Ownership Interest In the Fractional Share Aircraft Such That The Individual Fractional Share Interest Holders Are Not Owners Of Individual Fleet Aircraft, Even Though Granted "Record" Title In Specific Aircraft for FAA Regulatory Purposes.**

The leading fractional share operator in the United States is NetJets, and its rights in the fleet of aircraft that it operates were determined as a matter of state law in *NetJets Aviation, Inc. v. Guillory*, 207 Cal. App. 4th 26; 143 Cal. Rptr. 3d 111 (2012). The California Court of Appeals found that the seller of the fractional interests, NetJets, which would be analogous to the Debtors in this case, was properly considered the owner of the aircraft under the applicable California constitutional and statutory tax provisions, because the fractional share owners could not transfer their interests in the aircraft without the seller's consent and could not use the aircraft other than in accordance with the fractional ownership program.

As the California Court of Appeals noted in *NetJets*, a fractional owner does not enter into not a "simple contract" to purchase a fractional interest but a number of interrelated operating agreements controlling the ownership interests in the aircraft: (1) a purchase agreement by which the owner acquires an undivided share in an aircraft and agrees not to transfer its interest without the respective seller's consent, agrees to use the aircraft exclusively in the program, transfers possession of the aircraft back to the seller, and grants seller the right to repurchase the fractional interests under specific conditions; (2) a management agreement, by which the fractional owner gives the seller the exclusive right to manage the aircraft, and agrees to pay a monthly management fee and an hourly fee for the time the aircraft is used, and by which the seller agrees to staff, provide pilots for and maintain the aircraft, and retains the right to use the aircraft when not being used by a fractional owner; (3) an owner's agreement, by which each fractional owner agrees that the

aircraft will be used exclusively in the fractional ownership program, and (4) a master interchange agreement or dry lease agreement, by which all fractional owners agree that they will participate in the fractional ownership program under the relevant operating agreements, and that the aircraft for which the owner is on title will be used in the program.  Given the restraints on alienation, possession, ownership and operation of the aircraft in the program, it is clear that the fractional owners were not simply taking a "specific ownership interest in a particular aircraft."

As noted by the California Court of Appeals, fractional share programs create a "hybrid form" of general and commercial aviation and for tax purposes:

. . . . "Record title is, of course, neither conclusive evidence of legal title nor a synonym for ownership."

207 Cal. App. 4th 26, 46, 2012 Cal.App. LEXIS 725, ***35 (Cal.App.4th Dist. 2012).

The California Court of Appeals came to the conclusion that for tax purposes the fractional share fleet manager satisfied the California constitutional and statutory definition of an owner for tax purposes, stating that " 'the terms 'owner' and 'owned' may be so defined as to include a person possessing such interest in property that he has lawful possession of it.'"

In that case the Court of Appeals rejected the trial court's determination that NetJets did not have lawful possession or control of the fleet of fractional share aircraft for the following reasons:

The fractional owners cannot transfer their interests in the aircraft without [NetJet's] consent (although the consent cannot be unreasonably withheld). The fractional owners may not use the aircraft other than within the fractional ownership program. [NetJets] retains the right to sell additional shares of the fractionally owned aircraft, and retain possession of the aircraft except when a fractional owner is using the

aircraft. [NetJets] [has] the refight to repurchase the fractional ownership interests after five year, or if the fractional share owner materially breaches any of the operative agreements. [NetJets] maintain[s] the aircraft, obtain[s] insurance for the aircraft, and provide[s] staff and piloting services for the aircraft (unless the fractional owner chooses to provide its own pilot, who must by approved by [NetJets]). [NetJets] handles scheduling of the aircrafts use. The fractional owners pay [NetJets] a monthly maintenance fee, as well as an hourly fee when they are actually using the aircraft. When any aircraft is not being used by one of the fractional owners, [NetJets] retain[s] the right to use the aircraft for their own purposes. These purposes may include use of the aircraft to train pilots or for marketing their fractional use programs. [NetJets] may also lease the aircraft directly to nonfractional owners or to third parties who in turn sell their aircraft time to nonfractional owners; in either event, [NetJets] is making money on the aircraft which is not shared with the fractional owners. The fractional owners are never guaranteed that when they use their fractional interest, it will be the aircraft in which they actually own a share. [NetJets] retain[s] the right to transfer a fractional owner's interest in one aircraft to another aircraft of equal or greater value.

207 Cal. App. 4th 26, 44, 2012 Cal.App. LEXIS 725, ***29 (Cal.App.4th Dist. 2012).

In the present case, Avantair exercised almost identical control over the fractional share fleet – so much so that Appellees submitted affidavits to the Bankruptcy Court from NetJets' executives explaining the degree of control customarily retained by fractional share operators over the fleet – in order to support their extraordinary contention that the "use of the aircraft" retained by the fractional share operator included the right to "use" its component parts on other aircraft, and that the fractional "owners" of the "donor" aircraft had authorized such removal so that they could claim no rights to the proceeds from the sale of other aircraft in the fleet made up of the constituent parts of the "donor" aircraft.

It is clear that the only title granted to the fractional share interest holders is "record" title for the purposes of "recording" a Bill of Sale in the FAA Aircraft Registry to satisfy the regulatory requirements that enable such fractional share operators to circumvent the regulations that would apply if the fractional share operator was the "owner" of the aircraft and was providing air transportation services to the participants in the program – which is

exactly what in substance is occurring. Thus, the question is whether under Florida law, an entity that retains all aspects of beneficial ownership of the property, and also the lawful and inalienable right through the documents that result in the transfer of record title of the property, to exclusive possession, control and alienability of the property, retains an "ownership" interest in the property. To say that such a record title holder is, or such record title holders are, the exclusive "owner[s]" of the property under Florida law and applicable bankruptcy law, when not granted any right of possession or control of the property or any interest in the property by which they could benefit from the property or it use, and the grantor had retained all of those rights, and for which the record title holder had *only* received in return the limited right to "use" *similar* property, subject to the complete control of the grantor, would turn the law of property on its head. It is clear that, at the least, the Debtor has retained an ownership interest in the aircraft, albeit a "hybrid" form of property interest, retaining all of the interests of ownership other than record title, and with respect to which record title, it also retains control of the fundamental right of alienability under the terms of the granting documents.

II.     **Even If the Fractional Share Participants Are Considered the Exclusive Owners of Specific Aircraft, the Proceeds From the Sale of Aircraft That Have Not Been Determined to Be In Their Original State [and Therefore The Beneficiaries of Parts From Other Aircraft] Should Not Be Limited to The Fractional Share Participants in That Aircraft.**

   A.     **The Distribution of the Proceeds From the Sale of the Aircraft Sold Under Section 363 of the Bankruptcy Code Should Not Be limited to Those Claiming a Fee Simple Interest In The Original Aircraft**

Because through the course of the operation of the Avantair program, the fractional share interest holders have acquired interests in each other's aircraft as a result of the intermingling of parts and components, the distribution of the proceeds from the sale of any one Program aircraft

21

should not be limited to fractional share interest holders originally assigned to that aircraft.

**B.  In the Absence of The Right to Convey Title, Interchangeable Parts Removed From One Aircraft and Placed on Another, Do Not Establish Rights in Those Claiming Interests in The Other Aircraft Under the Doctrine of Accessions**

In *Bancorp Leasing & Financial Corp. v. Stadeli Pump & Constr., Inc.*, 303 Ore. 545,

739 P.2d 548 (Ore. 1987), the Oregon Supreme Court described the doctrine of accessions as to

interchangeable auto parts as follows:

> Briefly stated, the common-law rule of accession is that "[w]hen the goods of two different owners are incorporated together, the title to the resulting product goes to the owner of the principal goods."
>                                     * * *
> The common-law doctrine of accession was taken from Roman law by Bracton and was said by Blackstone to have been grounded on the right of occupancy.
>                                     * * *
> Accession did not occur through the mere physical attachment of goods. The incorporation of the goods had to be such that the component goods <u>could not be recovered</u>, as with ink and parchment in a writing, or could be recovered only at substantial economic cost, as with thread interwoven into a garment.
>                                     * * *
> In the United States, the severability limitation came to be a rule that "the principle of accession does not apply when the attached articles can be separated and removed from the principal thing without damage to the latter." Brown, *supra*, § 6.3, at 52. The leading case articulating this rule, *Clark v. Wells*, 45 Vt 4, 12 Am Rep 187 (1872), is factually somewhat similar to the present case. In *Clark* the plaintiff made a conditional sale of wheels and axles that he used to repair a wagon.
>                                     * * *
> Where, however, <u>the added part is owned by a third party</u>, as in this case, or where a third party has a security interest in the part, <u>under the common law courts ordinarily will not conclude that the part acceded to the vehicle unless it is not severable</u>.

*Id.* at 551-555, 739 P.2d at 551-553 (emphasis added).

In *Bank of America v. J. & S. Auto Repairs*, 143 Ariz. 416; 694 P.2d 246; (Ariz. 1985),

the Arizona Supreme court also described the doctrine of accessions to interchangeable auto

parts:

> On the second issue, we must determine whether the motor and other detachable parts were ***accessions***.

\* \* \*

The court *__in__ Atlas* stated:

> "The plaintiff contends that the engine *__in__* the car became so much an integral part of it that under the doctrine of *__accession__* replevin lay for the whole car.  *__In__* these days when the various parts of *__an__* automobile are easily removed and replaced, or interchanged, often without materially affecting the structure of the car, that doctrine has its obvious limitations.  Indeed, it easily lends itself to a reduction ad absurdum.  Suppose a thief has stolen three automobiles of the same make and he constructs a car by taking the chassis from one, the engine from another, and the body from the third; which of the owners of the stolen automobiles *__in__* such *__a__* case could claim the reconstructed car?
>
> \* \* \*
>
> It is clear that the engine could now be taken out of the reconstructed car without damage to the body or the chassis.  Of course the engine had very substantial value as compared to the value of the whole car.

\* \* \*

We believe that the cases such as *Atlas* and *Havas* holding that detachable parts are not *__accessions__* are better reasoned and provide *__a__* more equitable result than *Lincoln Bank* and *Allied Investment* by preventing *__a__* complete windfall to the chattel owner.

\* \* \*

The principle was not designed or intended to give the owner of the chattel more than he had to start with, but it was intended to assure he would not obtain his chattel *__in a__* condition of less value or usefulness than before it was changed by *__a__* third party.

\* \* \*

Thus, where *__a__* motor and parts can be removed and the garageman offers to remove the parts, he should be entitled to either the parts, with removal performed at his expense, or the value of the parts.  We hold that if they can be removed without damaging the vehicle, detachable parts added to *__a__* motor vehicle are not *__accessions__*.  Whether certain parts can be removed without damage or injury to *__a__* vehicle is *__a__* factual question that must be determined *__in__* each case.

*Id.* at 420-423, 694 P.2d at 250-253 (emphasis added). *See also In re Lyford*, 92 B.R. 222,

1982 Bankr. LEXIS 3686 (Bankr. D. Me. 1982).

In *Brown & Root v. Ring Power Corp.*, 450 So. 2d 1245 (Fla. 5th D.C.A. 1984), the

Court  held that under Florida law the good faith purchaser of the personal property from a

person that did not own the property did not acquire title to the property, subject to the rule that a

"voidable title may be successfully perfected by the ultimate buyer who purchases for valid

consideration and <u>without notice of the title defect</u> where the rightful owner lost possession through conversion following entrustment," citing *Carlsen v. Rivera,* 382 So.2d 825 (Fla. 4th CCA 1980), and Section 672.402 *Fla. Stat.* (1981). Of course, any purchaser of any of the Avantair aircraft will be on notice of this bankruptcy and of the claims of others in the Avantair fleet of aircraft and their component parts.

> **C.    Where the Partition of the Proceeds Among Those Actually Having An Interest In the Current Aircraft Is Not Practical, The Bankruptcy Court, As A Court Having Equitable Jurisdiction, May Provide A Method of Sale And Distribution That Maximizes the Value of the Program Aircraft Fleet and Distributes That Fund In Accordance with the Respective Interests of the Fractional Share Holders**

The Bankruptcy Court has the equitable power to establish a method of distribution of the proceeds from the sale of Program aircraft that will result in a just, equitable and efficient distribution in accordance with the respective interests of all of the fractional share interest holders. Such a distribution would be similar to the *cy pres* distribution approved in class actions where it may be impractical to distribute a common fund in precisely the manner required to compensate each member of the class with precision, but by distributing the common fund in the next best manner, the Court can avoid unjust enrichment and can achieve a just and equitable distribution. *See Masters v. Wilhelmina Modeling Agency, Inc.,* 473 F.3d 1423 (2d Cir. 2007).

## CONCLUSION

For the foregoing reasons, CCA respectfully requests that the orders under review in this Consolidated Appeal be reversed and remanded and that Appellants' objections to the distribution of the proceeds from the sale of each fractional share aircraft solely to the "Fractional Owners" claiming originally assigned interests in that aircraft be sustained, and that the granting of the Motion to Approve Settlement and the Motion to Approve Sale be conditioned upon an alternative method of distribution among all of the fractional share

participants in the Avantair program in which such proceeds are distributed pro rate "share and share alike" based on the fractional share interest of each participant in the fractional share fleet, or in such other alternative manner as this Court deems just and proper.

Respectfully submitted, this 6th day of October, 2014.

TAYLOR ENGLISH DUMA LLP

By:   *//s// Donald R. Andersen*
        Donald R. Andersen  Florida
        Bar No. 0927953
1600 Parkwood Circle, Suite 400
Atlanta, Georgia 30339
Main: 770.434.6868
Fax: 770.434.7376
dandersen@taylorenglish.com

Attorneys for Appellants, Corrections Corporation of America, d/b/a CCA of Tennessee, Inc., and CCA of Tennessee,

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I have this day served a true and correct copy of the foregoing CORRECTIONS CORPORATION OF AMERICA, D/B/A CCA OF TENNESSEE, INC., AND CCA OF TENNESSEE, INC. BRIEF OF to all persons receiving notice by CM/ECF and upon those individuals and entities listed in Exhibit "A" hereto by U.S. Mail, first class, postage prepaid.

This 6th day of October, 2014.

TAYLOR ENGLISH DUMA LLP

By: *//s// Donald R. Andersen*
  Donald R. Andersen
Florida Bar No. 0927953
1600 Parkwood Circle, Suite 400
Atlanta, Georgia 30339
Main: (770) 434.6868
Fax: (770) 434.7376
dandersen@taylorenglish.com

Attorneys for Appellants,
Corrections Corporation of
America, d/b/a CCA of Tennessee,
Inc., and CCA of Tennessee, Inc.

Exhibit A

| | |
|---|---|
| Dallas Airmotive, Inc.<br>c/o CT Corporation System, Registered Agent<br>1200 Pine Island Road<br>Plantation, Florida 33324 | Intercontinental Jet Service Corp.<br>c/o Dennis Braner, Registered Agent<br>3322 N. 74th E. Avenue<br>Tulsa, OK 74115 |
| Garrett Enterprises, LLC<br>c/o Steve Blume<br>11300 43rd St. North<br>Clearwater, Florida 33762 | LLS Flight Services, II, LLC<br>c/o Ohana Advisors<br>899 Northgate Drive, Suite 301<br>San Rafael, California 94903 |
| Douglas DeMartin<br>86 Morris Ave<br>Summit, New Jersey 07901 | Piedmont Hawthorne Aviation LLC<br>c/o National Research, Ltd., Inc.,<br>Registered Agent<br>155 Office Plaza Drive<br>Tallahassee, Florida 32301 |
| Piedmont Hawthorne Aviation, LLC<br>1500 City West Blvd., Ste. 600<br>Houston, Texas 77042 | Access Aviation Maintenance Services, Inc.<br>3028 Peacekeeper Way<br>McClellan, California 95652 |
| Air Maresca LLC<br>PO Box 698<br>Potsdam, New York 13676 | Willowbrook Marketing, LLC<br>4700 Belleview Ave.<br>Suite 415<br>Kansas City, MO 64112 |
| Big Sky Aviation, Inc.<br>7020 Georgia Avenue<br>West Palm Beach, Florida 33405 | Access Aviation Maintenance Services, Inc.<br>c/o Mary Crone, Registered Agent<br>3028 Peacekeeper Way<br>McClellan, California 95652 |
| Paul B. Loyd, Jr.<br>108 Shasta Drive<br>Houston, Texas 77024 | Western Avionics, Inc.<br>c/o Stanley Erickson, Registered Agent<br>19300 Ike Jones Road<br>Santa Ana, California 92707 |
| Big Sky Aviation, Inc.<br>c/o Lawrence Blair, Registered Agent<br>405 N. Military Trail<br>West Palm Beach, Florida 33415 | Signature Flight Support Corporation<br>c/o Michael J. Crosnicker, Esq.<br>LeClairRyan<br>70 Liden Oaks, Suite 210<br>Rochester, New York 14625 |
| AGI Holding Corporation<br>2575 Vista Del Mar Drive<br>Venture, California 93001 | GO-MAV, Inc.<br>c/o E.W. Sezna<br>9200 Sunset Blvd. Penthouse #22<br>Los Angeles, California 90069 |
| Lofino's Management Aviation, LLC<br>c/o Michael Lofino<br>3255 Seejay Drive | Constant Aviation, LLC<br>c/o Michael A. Rossi, Registered Agent<br>355 Richmond Road |

| | |
|---|---|
| Dayton, OH 45430<br>Bristol Metro, LLC<br>c/o Scott C. Looney<br>227 20th Street #100<br>Newport Beach, CA 92663 | Richmond Heights, Ohio 44143<br>Joe Kaminkow<br>3449 Linveille Lane<br>Lexington, Kentucky 40513 |
| Constant Aviation, LLC<br>Hopkins International Airport<br>5211 Secondary Road<br>Cleveland, Ohio 44135 | Access Aviation Maintenance Services, Inc.<br>c/o Mary Crone, Registered Agent<br>3208 Peacekeeper Way<br>McClellan, California 95652 |
| Sky One Holdings, LLC<br>d/b/a Skylimo Air Charter<br>Fort Lauderdale Executive Airport<br>5302 NW 21st Terrace<br>Fort Lauderdale, Florida 33309 | Sky One Holdings, LLC<br>d/b/a Skylimo Air Charter<br>c/o Corporation Service Company, Registered Agent<br>1201 Hays Street<br>Tallahassee, Florida 32301 |
| Teterboro Rams LLC<br>c/o Ryan Cino, Manager<br>233 Indutrial Ave., Hangar 3<br>Teterboro, New Jersy 07608 | Davita Inc.<br>c/o Jim Gustafson<br>601 Hawaii St.<br>El Segundo, California 90245 |
| Staff Aloft LLC<br>c/o Todd Figi<br>6101 Vista de la Mesa<br>La Jolla, California 92037 | Tiffany A DiIorio, Esq.<br>Lynn Welter Sherman, Esq.<br>Adams and Peese LLP<br>101 East Kennedy Blvd., Suite 4000<br>Tampa, Florida 33602 |
| Robert F. Elgidely, Esq.<br>Genovese Joblove & Battista, P.A.<br>200 East Broward Boulevard, Suite 1110<br>Fort Lauderdale, Florida 33301 | Robert B. Glenn, Esq.<br>Glenn Rasmussen, P.A.<br>100 South Ashley Drive, Suite 1300<br>Tampa, Florida 33602 |
| J. Steven Wilkes, Esq.<br>Office of United States Trustee<br>501 East Polk Street<br>Tampa, Florida 33602 | Bruce W. Akerly, Esq.<br>Cantey Hanger LLP<br>1999 Bryan Street, Suite 3330<br>Dallas, Texas 75201 |
| B. Gray Gibbs, Esq.<br>Law Office of B. Gray Gibbs<br>100 Second Avenue south<br>Suite 101-S<br>St. Petersburg, Florida 33701 | Intercontinental Jet Service Corp.<br>3322 N. 74th E. Ave.<br>Tulsa, Oklahoma 74115 |
| AJE Aviation LLC<br>7835 S. Peoria Street<br>Englewood, Colorado 80112 | OnCall Corporate Jet Repair<br>7120 Hayvenhurst Avenue<br>Suite 108<br>Van Nuys, California 91406 |
| Axcess Aviation Maintenance Services, Inc. | Piedmont Hathorne Aviation LLC |

| | |
|---|---|
| c/o Mary Crone, Registered Agent<br>3028 Peacekeeper Way<br>McClellan, California 95652 | c/o National Research, Ltd., Inc. Registered Agent<br>155 Office Plaza Drive<br>Tallahassee, Florida 32301 |
| AJE Aviation LLC<br>c/o Alan Jensen, Registered Agent<br>1107 W. Reid Ave.<br>North Platte, NE 69101 | Westcliff Air, LLC<br>c/o Robert Lepofsky, Manager<br>70 Westcliff Road<br>Weston, MA 02493 |
| Piedmont Hawthorne Aviation, LLC<br>1500 City West Blvd., Ste. 600<br>Houston, Texas 77042 | Landmark Aviation<br>c/o Matthew Wright, General Manager<br>104600 N. Airport Drive<br>Scottsdale, Arizona 85260 |
| Teterboro Rams LLC<br>c/o Ryan Cino, Manager<br>233 Industrial Ave., Hangar 3<br>Teterboro, New Jersey 07608 | Westcliff Air, LLC<br>c/o Paul E. George, Registered Agent<br>8 Grove Street, Suite 400<br>Wellesley, MA 02482 |
| Intercontinental Jet Service Corp.<br>c/o Capitol Services, Inc., Registered Agent<br>1675 S. State Street, Suite B<br>Dover, DE 19901 | OnCall Corporation Jet Repair, Inc.<br>c/o Raul Zenteno, Registered Agent<br>16811 San Jose Street<br>Granada Hills, California 91344 |
| MC of Washington, Inc.<br>c/o Greg Kubicek<br>P.O. Box 87970<br>Vancouver, Washington 98687 | John J. Murphy<br>Two Turtle Creek Village<br>3838 Oak Lawn Ave. Ste. 777<br>Dallas, Texas 75219 |
| Big Sky Aviation, Inc.<br>c/o Lawrence Blair, Registered Agent<br>405 N. Military Trail<br>West Palm Beach, Florida 33415 | Landmark Aviation<br>c/o Matthew Wright, General Manager<br>14600 N. Airport Drive<br>Scottsdale, Arizona 85260 |
| MC of Washington, Inc.<br>c/o Robert McDonald<br>101 Lomo Dr.<br>Jefferson City, MO 65109 | Versa Capital Management, Inc.<br>2929 Arch Street<br>27th Floor<br>Philadelphia, PA 19104 |
| Teterboro RAMS, LLC<br>c/o Ryan Cino, Manager<br>233 Industrial Ave.<br>Hanger 3<br>Teterboro, New Jersey 07608 | Axcess Aviation Maintenance Services, Inc.<br>c/o Mary Crone, Registered Agent<br>3028 Peacekeeper Way<br>McClellan, California 95652 |
| Ronald  James Sawyer II<br>5605 Pacific Blvd. Apartment 3204<br>Boca Raton, Florida 33433 | Sky Realty, LLC<br>Scott Sibley<br>930 So. Fourth St., Ste. 100<br>Las Vegas, Nevada 89101 |
| Liberty Lane Service Company, LLC<br>W. Gregory Harville<br>One Liberty Lane, Ste., 100<br>Hampton NH 03842 | Voyager Land Acquisitions, LLC<br>Roger A. Bruhn<br>Scotto International, Inc.<br>8640 South Peoria, Suite 100<br>Tulsa, Oklahoma 74132 |
| Data Dynamics, Inc.<br>Terry McGowan<br>140 N. Stephanie St.<br>Henderson, Nevada 89074 | George Villere and Frances G. Villere<br>4717 St. Charles Ave.<br>New Orleans, LA 70115 |
| Voyager Land Acquisitions LLC | AJE Aviation LLC |

| | |
|---|---|
| PO Box 700217<br>Tulsa, Oklahoma 74170 | c/o Alan Jensen, Registered Agent<br>88 Inverness Circle East<br>#A204<br>Centennial, Colorado 80112 |
| AJE Aviation LLC<br>PO Box 630010<br>Littleton, Colordo 80163 | Robert Scott d/b/a Palm Springs Aircraft<br>Maintenance Service<br>145 N. Gene Autry Trail<br>Palm Springs, California 92262 |
| C.C.A. of Tennessee Inc.<br>10 Burton Hills Blvd.<br>Nashville, TN 37215 | Skyline Aviation Services, Inc.<br>c/o Steve Santo, CEO<br>27 Wright Way<br>Fairfield, New Jersey 07004 |
| McRey Group, Inc.<br>c/o Elizabeth M. Borg, Registered Agent<br>121 Michigan Ave.<br>Auburn, AL 36830 | McRey Group, Inc.<br>c/o Betty M. Fuller, Director<br>585 Hamilton Hills Drive<br>Auburn, AL 36830 |
| Piedmont Hawthorne Aviation, LLC<br>c/o Landmark FBO, LLC, Manager<br>1500 Citywest Blvd. Suite 500<br>Houston, Texas 77042 | Epps Air Service, Inc.<br>c/o E. Patrick Epps, Registered Agent<br>1 Aviation Way, PDK Airport<br>Chamblee, GA 30341 |
| MSP Aviation, LLC d/b/a MSP Jet Center<br>3700 East 70th Street<br>Minneapolis, MN 55450 | MSP Aviation, LLC d/b/a MSP Jet Center<br>c/o Timothy P. Ashenfelter, Manager<br>5573 Bartlett Blvd<br>Mound, MN 55364 |
| Wiggins Airways, Inc.<br>c/o James H. Thomforde, Sr.,<br>President and CEO<br>1 Garside Way<br>Manchester, NH 03103 | E. Edward McVaney<br>1201 Green Oaks Drive<br>Greenwood Village, CO 80121 |
| John Ferguson<br>11 Tealbriar Circle<br>The Woodlands, Texas 77381 | Vamp Corporation<br>2801 North Ocean Blvd.<br>Gulf Stream, FL 33483 |
| Carog I, LLC<br>c/o Tom Ogburn<br>900 E. Northside Drive<br>Fort Worth, TX 76102 | Devan Enterprises Corp.<br>441 Jarvis Street<br>Toronto, ON M4Y2G8 |
| Glen Brook Aviation Inc.<br>100 W. Coliseum Blvd.<br>Ft. Wayne, IN 46805 | Hancock Mgmt. Partners Inc.<br>6607 N. Scottsdale Road<br>Scottsdale, AZ 85250 |
| Harrison Investment and Cascon Inc.<br>90747 Diamond Ridge<br>Eugene, OR 97408 | Jet Boli, Inc.<br>4311 Oak Lawn Ave.,<br>Suite 640<br>Dallas, TX 75219 |
| Hall Capital LLC<br>c/o Fred J. Hall, Manager<br>9225 Lake Hefner Parkway, Suite 200<br>Oklahoma City, OK 73210 | Hall Capital LLC<br>c/o Gary F. Fuller, Registered Agent<br>10th Floor, TWOL Leadership Square<br>211 N. Robinson<br>Oklahoma City, OK 73102 |
| Oser Communications Group, Inc.<br>c/o Lee M. Oser, Jr., Registered Agent | Rendezvous LLC<br>c/o Jeff Dishner |

| | |
|---|---|
| PO Box 30520<br>Tuscan, AZ 85751 | 591 West Putnam Ave.<br>Greenwich, CT 06830 |
| Klingbeil Capital Management, Inc.<br>c/o Kevin Kaz, CFO<br>200 California Street, Suite 300<br>San Francisco, California 94111 | Klingbeil Capital Management, Inc.<br>c/o George R. Nickerson, Registered Agent<br>21 W. Broad Street, 11th Floor<br>Columbus, OH 43215 |
| Klingbeil Capital Management, Inc.<br>c/o Anne K. Ryan, Registered Agent<br>615 Front Street<br>San Francisco, California 94111 | All Around Aviation, LLC<br>c/o Cochise Rounds, President<br>12888 Highway 6 South<br>Suite 116<br>Sugar Land, Texas 77498 |
| Avantair, Inc.<br>4311 General Howard Drive<br>Clearwater, FL 33762 | Beth Ann Scharrer<br>Trustee<br>P.O. Box 4550<br>Seminole, FL 33775 |
| Coventry Air, LLC<br>335 Millicent Way<br>Shreveport, LA 71106 | AvAero Services LLC<br>c/o Mark Dessy, Managing Member<br>P.O. Box 1708<br>El Segundo, CA 90245 |