# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA / TAMPA DIVISION

CORRECTIONS CORPORATION OF AMERICA D/B/A CCA OF TENNESSEE, INC., AND CCA OF TENNESSEE, INC.

Appellants,

v.

BETH ANN SCHARRER, AS CHAPTER 7 TRUSTEE; AND THE N169SL FRACTIONAL OWNERS

Appellees.

**Case No.: 8:14-cv-1742-T-30**

---

Appeal from the U.S. Bankruptcy Court for the Middle District of Florida

*In re: Avantair Inc., Debtor.*
Bankruptcy Case No. 8:13-bk-09719-CPM

---

**Brief of the Appellee N169SL Fractional Owners**

---

**R. QUINCY BIRD**
**JAY B. VERONA**
**Shumaker, Loop & Kendrick, LLP**
101 East Kennedy Blvd, Suite 2800
Tampa, Florida 33602
Phone: (813) 229-7600
Fax: (813) 229-1660

# TABLE OF CONTENTS

Table of Contents………………………………………………………….......................1

Table of Authorities………………………………………………………........................3

Statement Regarding Oral Argument……………………………………………………...5

Statement of Basis for Appellate Jurisdiction…………………………….......................5

Statement of Issues Presented……………………………………………………...........5

Applicable Standards of Appellate Review   ……………………………………………6

Statement of the Facts and of the Case…………………………………………………8

Argument……………………………………………………………………………….....11

    I.    One who holds a registered fractional ownership interest in a Program Aircraft holds an ownership interest in common with other registered owners of that aircraft, exclusive from holders of registered fractional ownership interests in other Program Aircraft…………………………………………………………....11

        A.  The Program Documents, in unambiguous language, create a tenancy-in-common specific to a particular Program Aircraft and exclusive from the registered fractional owners of other Program Aircraft……………………...12

        B.  CCA misapplies *NetJets*, which did not address the validity and nature of the interest held by fractional title holders, but instead concluded the program manager was also an owner for limited purpose of an industry-specific tax assessment…………………………………………………………………13

    II.    Avantair's removal of parts from certain Program Aircraft and installation of those parts on other Program Aircraft does not give CCA a valid equitable claim to proceeds generated by the sale of Program Aircraft that CCA does not own...16

        A.  The Program Documents unambiguously permitted Avantair to move parts from Program Aircraft and install those parts on other Program Aircraft…...16

            i.  The plain language of the Program Documents authorized Avantair act at its discretion for the efficiency of the Program, which includes removing parts from aircraft…………………………………………16

            ii.  Alternatively, separate language of the Program Documents authorizes aircraft alterations and modifications in accordance with industry standards……………………………………………………………...17

        B.  Alternatively, if the Program Documents are ambiguous the Bankruptcy Court's finding that industry standards allow a program manager to move parts between fractionally owned aircraft was not clearly erroneous………..18

    C. Because the Program Documents authorized Avantair to move parts, CCA cannot claim an interest in other aircraft based upon the doctrine of accessions………………………………………………………………………21

III.    The Bankruptcy Court did not abuse its discretion in rejecting CCA's pooling approach on equitable grounds………………………………………………..22

    A. Truly equitable pooling is impossible without including all the Program Aircraft, and certain Program Aircraft will not be included in any adopted pooling approach………………………………………………………..22
    B. Pooling is patently inequitable to the majority of the participating "opt-in" fractional owners……………………………………………………..24
    C. Equitable pooling would undermine the fractional ownership industry and have detrimental and inequitable implications outside the industry…………25
    D. CCA had other options available and chose fractional ownership, a natural consequence of which is unequal depreciation of aircraft; pooling sales proceeds would inequitably relieve CCA from the natural consequences of its actions at the expense of other owners……………………………………26

Conclusion………………………………………………………………………………29

Certificate of Service…………………………………………………………………….30

## TABLE OF AUTHORITIES

*Chandler v. Crosby*, 379 F.3d 1278, 1288 (11th Cir. 2004)…………………………………………7

*Fall Creek Construction Co., Inc. v. Director of Revenue*, 109 S.W. 3d 165 (Mo. 2003)…14-15

*Fisher & Co., Inc. v. Dept. of Treasury*, 769 N.W. 2d 740 (Mich. Ct. App. 2009)………….14-15

*NetJets Aviation, Inc. v. Guillory*, 207 Cal. App. 4th 26 (2012)……………………………..13-15

*In re Red Carpet Corp. of Panama City Beach*, 902 F.2d 883 (11th Cir.1990)………………...7-8

*In re Sublett,* 895 F.2d 1381, 1384 (11th Cir.1990). )……………………….……………...7-8

11 U.S.C. § 363…………………………………………………………………………13, 15, 22, 29

28 U.S.C. § 158………………………………………………………………………………………5

Rule 8001 Fed. R. Bankr. P………………………………………………………………………….5

Rule 8002 Fed. R. Bankr. P. ………………………………………………………………………….5

Rule 8010 Fed. R. Bankr. P. ……………………………………………………………...….6

14 CFR Part 135………………………………………………………………...……….18, 26, 27

14 CFR Part 91 …………………………………………………………………...13, 25, 27, 28

## STATEMENT REGARDING ORAL ARGUMENT

Appellants have not requested oral argument.  The N169SL Fractional Owners (the "Fractional Owners") respectfully suggest that oral argument is not needed. The facts and legal argument are adequately presented in the briefs and this Court's decisional process would not be significantly aided by oral argument, making oral argument unnecessary. *See* Rule 8012(3), Fed. R. Bankr. P. Additionally, Corrections Corporation of America  d/b/a CCA of Tennessee, Inc., and CCA of Tennessee, Inc. ("CCA") has failed to appeal the separate orders issued by the U.S. Bankruptcy Court for the Middle District of Florida ("Bankruptcy Court") in the case *In re Avantair Inc.,* Case No. 8:13-bk-09719-CPM ("Bankruptcy Case") authorizing the sales of five aircraft operated as part of the Avantair Air Fractional Aircraft Ownership Program ("Program"), which the Fractional Owners have argued in a pending motion to dismiss moots this appeal entirely. *See* Motion to Dismiss [Dkt. 21].

## STATEMENT OF BASIS FOR APPELLATE JURISDICTION

This Court has appellate jurisdiction over this case pursuant to 28 U.S.C. § 158(a)(1) and Rules 8001 and 8002, Fed. R. Bankr. P.

## STATEMENT OF ISSUES PRESENTED

Phrased more accurately and neutrally for this Court, the fundamental question presented is whether the Bankruptcy Court erred in authorizing the sales of various aircraft operated in connection with the Program ("Program Aircraft") according to the terms of a settlement agreement executed by the majority of co-owners of those Program Aircraft and the Chapter 7 Trustee that specifically requires the fifth tier/balance of the sale proceeds to be paid only to the co-owners of that particular aircraft.

Determining whether the Bankruptcy Court erred in its determination turns upon the resolution of the following issues:

1. Whether one who holds a registered fractional ownership interest in a Program Aircraft operated within the Program holds an ownership interest in common with other registered owners of <u>that</u> aircraft, exclusive from holders of registered fractional ownership interests in <u>other</u> Program Aircraft.

2. Whether CCA, by virtue of Avantair's removal of parts from certain Program Aircraft and installation of those parts on other Program Aircraft, has a valid equitable claim to proceeds generated by the sale of those other Program Aircraft; and

3. Whether the Bankruptcy Court abused its discretion in determining the pooling approach was inequitable and impractical.

## APPLICABLE STANDARDS OF APPELLATE REVIEW

CCA does not include a statement regarding the appropriate standard for appellate review in its brief, a violation of Rule 8010(a)(1)(B). The only mention of a particular appellate standard is found in a footnote to its introduction and provides no citation to authority. [Dkt. 21 at 1].

Three different standards of review may apply, depending on the issue involved: (1) *de novo*, (2) abuse of discretion, or (3) clearly erroneous.

First, the Bankruptcy Court's determination that one who holds a registered fractional ownership interest in a Program Aircraft holds an ownership interest in common with other registered owners of that aircraft, exclusive from holders of registered fractional ownership interests in other Program Aircraft, is best characterized as a mixed question of law and fact.

Federal courts review such questions on a *de novo* standard. *See Chandler v. Crosby*, 379 F.3d 1278, 1288 (11th Cir. 2004).

Second, the Bankruptcy Court rejected CCA's argument for an equitable claim to the sale proceeds from aircraft for which it is not a registered fractional owner. The standard of review for equitable determinations is abuse of discretion. *In re Red Carpet Corp. of Panama City Beach*, 902 F.2d 883 (11th Cir.1990) (equitable determinations by a bankruptcy court are subject to review under an abuse of discretion standard).

Of course, the Bankruptcy Court's rejection of CCA's equitable claim turned, in part, upon its finding that the unambiguous language of the Program Documents[1] gave Avantair "almost unfettered discretion" to manage aircraft within the Program and included the authority to move parts from one Program Aircraft to another. [Dkt. 1-17, 33:14-19]. Whether contractual language is ambiguous is a question of law, as is the interpretation of a "wholly unambiguous" commercial contract. *In re Sublett,* 895 F.2d 1381, 1384 (11th Cir.1990). Thus, whether the Program Documents unambiguously authorize the removal of parts from Program Aircraft is subject to *de novo* review. *Id.* (stating "under traditional principals of contract law the bankruptcy court's interpretation of [a contract] is a legal determination subject to *de novo* review if the contractual language is unambiguous.").

Alternatively, if this Honorable Court finds an ambiguity in the Program Documents where the Bankruptcy Court did not, the applicable standard of review is "clearly erroneous."

---

[1] The Program Documents are the contract upon which the relationship between Avantair and a particular fractional owner. The Program Documents consist of two separate agreements: (1) an Aircraft Interest Purchase Agreement ("AIPA") that conveys the interest to the fractional owner, and (2) a Management and Dry Lease Agreement ("MDLA") that authorizes Avantair to manage the aircraft in connection with the Program and provides the terms of management. Program Documents are substantially similar for all Program Aircraft, with notable differences pertaining to the particular aircraft conveyed and the price of the conveyed interest. The N169SL Program Documents are found at [Dkt 1-48]. The AIPA is found at [Dkt. 1-48 at 17] and the MDLA is found at [Dkt. 1-46 at 26]. However, for ease of reference, citations herein to particular language of the Program Documents reference section and page numbers of the AIPA or MDLA, respectively.

While the Bankruptcy Court found the Program Documents to be unambiguous, the Bankruptcy Court also made factual findings of industry standards that fractional program managers are typically authorized to remove parts from aircraft to maximize the efficiency of the fleet. *See* Dkt. 1-17, 34:7, 13-17. Findings of fact are subject to "clearly erroneous" review. *Sublett* at 1384 (finding "where [contract] language is ambiguous, however, and requires consideration of extrinsic evidence of the actual intentions of the parties, the bankruptcy court's determinations as to those intentions are findings of fact subject only to 'clearly erroneous' review").

Finally, the Bankruptcy Court found the equitable pooling approach to be cumbersome, unwieldy, impractical, and "just cannot happen" under the equitable powers afforded to it by 11 U.S.C. § 105 and the laws of equity (Dkt.___ 33:18-34:5). This is an equitable determination subject to review only for abuse of discretion. *In re Red Carpet Corp. of Panama City Beach*, 902 F.2d 883 (11th Cir.1990).

## STATEMENT OF THE FACTS AND OF THE CASE

Appellees offer the following alternative statement of facts and of the case:

Appellants have presented a statement of the case that is both argumentative and conclusory, mischaracterizes the order on appeal, fails to properly cite the record, and presumes facts completely outside the record on appeal.  The essence of the ongoing dispute is the appropriate distribution of the proceeds of the sale of N169SL and other aircraft flown under the Avantair Fractional Aircraft Ownership Program (the "Program") sold in connection with the Avantair, Inc. bankruptcy (the "Bankruptcy Case"). The Fractional Owners of N169SL were the first group to receive authorization to sell their aircraft in connection with the Bankruptcy Case,

thus the substantive history of this case—and the relevant portions of the record—largely focused on this particular aircraft.[2]

Importantly, the distinct groups of fractional owners all signed similar settlement agreements with the Trustee (the "Settlement Agreements").[3] The Settlement Agreements, provided for the sale of the aircraft in connection with the Bankruptcy Case with the proceeds, less any ordinary and customary actual costs or expenses paid in conjunction with the sale of the aircraft, to be distributed as follows:

1. $40,000 to the Trustee, plus 8% of net proceeds in excess of $1,000,000;[4]

2. To satisfy valid liens against the aircraft;

3. To repay co-owners for insurance, storage, maintenance, or repairs to the aircraft made prior to the sale;

4. $1,300 to Van Allen, a private firm that organized records relating to the aircraft;

5. The balance to the co-owners of the particular aircraft based upon their percentage ownership of the aircraft.

[Dkt. 1-24]. The Bankruptcy Court authorized the sale of 16 additional aircraft utilizing this distribution waterfall over CCA's objections. *See* [Bankr. Dkt. 845 (N146SL), 846 (N176SL), 855 (N162SL), 857 (N104SL), 859 (N109SL), 928 (N138SL), 929 (N134SL), 930 (N149SL) 975 (N160SL) 976 (N178SL), 978 (N136SL), 1096 (N163SL), 1197 (N105SL), 1198 (N139SL), 1199 (N175SL), and 1212 (N153SL)]. CCA thereafter appealed the entry of these

---

[2] Following the initial Bankruptcy Court ruling in favor of the N169SL fractional owners, the Bankruptcy Court approved sales of 16 similarly positioned aircraft. As each sale motion was considered, CCA raised identical objections that were overruled. *See* [Bankr. Dkt. 845 (N146SL), 846 (N176SL), 855 (N162SL), 857 (N104SL), 859 (N109SL), 928 (N138SL), 929 (N134SL), 930 (N149SL) 975 (N160SL) 976 (N178SL), 978 (N136SL), 1096 (N163SL), 1197 (N105SL), 1198 (N139SL), 1199 (N175SL), and 1212 (N153SL)]. Curiously, only 12 of the 17 orders authorizing the sale of these aircraft have been appealed, and the effect of CCA's failure to appeal all the sale orders is the subject of a pending Motion to Dismiss [Dkt. 21], and is discussed *infra*, Sec. III.A

[3] While sale procedures may differ from aircraft to aircraft (private sale, live auction, online auction, etc.), these procedures were developed in the various motions to sell. The portions of the Settlement Agreements relevant to this case are in all other respects identical, unless otherwise noted. *See infra*, n. 4.

[4] Under the Settlement Agreement relating to N169SL only, the Trustee's initial portion is $50,000 and is paid from the fourth tier of the distribution waterfall. *See* [Dkt. 1-24].

orders relating to 12 of the aircraft and the separate appeals have been consolidated with this appeal.

On November 22, 2013, the Bankruptcy Court held a preliminary hearing on (i) the Motion to Approve Compromise of Controversy with Fractional Owners of N169SL and (ii) the Motion to Approve Sale Free and Clear of Liens and to Approve Sale and Bid Procedures.  (the "November Hearing"). [Dkt. 1-16]. Prior to the November hearing, CCA (a co-owner of Program aircraft N138SL, N162SL, and N164SL) objected to the distribution of the balance of the proceeds to the co-owners of N169SL alone. [Dkt. 1-40] Instead, CCA requested that the Bankruptcy Court "pool" the balance of the proceeds for future distribution among all the Program participants whether or not such participants held a registered fractional ownership interest in the particular aircraft sold in a manner—that to this day—has yet to be clearly articulated by CCA. *Id.*

CCA's motivation to pool sale proceeds stems from the undisputed fact that when the involuntary petition was filed to initiate the Bankruptcy Case, many Program Aircraft were in various states of disrepair. *Id.* It is undisputed that Avantair removed or caused to be removed the parts from these aircraft and installed or caused to be installed of those parts on other Program Aircraft. *Id.* at 3 ("CCA is informed that the inspection of Avantair's books and records shows that the parts of the Program aircraft were freely interchanged among the aircraft in order to maximize the useful life of certain aircraft. The evidence of this practice is shown by the current condition of certain Program aircraft . . . .")

Following the November Hearing, the Court asked the parties to file additional papers addressing whether the Program Documents authorized Avantair to remove parts from Program

Aircraft and, if necessary, to file affidavits supporting their respective positions. [Dkt. 1-16, 107:12-115:25].

On December 12, 2013, the Bankruptcy Court held a second hearing on the additional memoranda (the "December Hearing"). [Dkt. 1-17]. At the December Hearing the Bankruptcy Court addressed the arguments and affidavits presented by the parties and accepted the interpretation of the Program Documents as presented by the Fractional Owners. [Dkt. 1-17, 18:22-36:6].

On January 24, 2014, the Bankruptcy Court clarified its ruling [Dkt. 1-10]. At this hearing, the Bankruptcy Court, among other things, emphasized its position that the pooling approach proposed by CCA was unduly cumbersome, impossible to effectuate and inequitable. *Id.* at 14-15.

On March 26, 2014, the Bankruptcy Court entered its Amended Order Granting (i) Motion to Approve Compromise of Controversy with Fractional Owners of N169SL and (ii) Motion to Approve Sale Free and Clear of Liens and to Approve Sale and Bid Procedures Regarding N169SL, from which the instant appeal arises. [Dkt. 1-2].

## ARGUMENT

I.     **One who holds a registered fractional ownership interest in a Program Aircraft holds an ownership interest in common with other registered owners of that aircraft, exclusive from holders of registered fractional ownership interests in other Program Aircraft.**

Appellant CCA argues that the fractional owners who participated in in the Avantair Fractional Ownership Program do not hold an ownership interest in any individual aircraft, citing only to a single, non-binding authority. However, Florida law requires an interpretation of the particular Program Documents in question. CCA's reliance on foreign case law is misplaced.

**A. The Program Documents, in unambiguous language, create a tenancy-in-common specific to a particular Program Aircraft and exclusive from the registered fractional owners of other Program Aircraft.**

The Bankruptcy Court's order is based upon the concept that a fractional owner of a Program Aircraft holds its interest in common with the other registered owners of the same aircraft, exclusive of the registered fractional owners of other aircraft. Since the interest held by a fractional owner is a tenancy-in-common in the particular aircraft, the disposition of sale proceeds is controlled by the plain language of 11 U.S.C. § 363(j), which requires the proceeds of co-owned property to be distributed to the "co-owners of such property . . . and to the estate, the proceeds of such sale . . . according to the interest of such . . . co-owners, and of the estate." 11 U.S.C. § 363(j).

The Program Documents unambiguously define the interest conveyed to the fractional owner as a tenancy-in-common. The AIPA reads, in relevant part:

> *CO-OWNERSHIP.  Purchaser acknowledges that <u>the Interest is an indivisible and undivided interest in the Aircraft and that Purchaser is a tenant-in-common with all other owners of an interest in the [particular] Aircraft (the Co-Owners). Purchaser shall be entitled to its pro rata share of the depreciation, gain, loss, deduction, credit or any tax benefits with respect to the Aircraft</u> and shall be severally liable for all costs and expenses chargeable to Purchaser under the MDLA and this Agreement and incurred with respect to the Aircraft.*

AIPA, Sec. 15, p. 1 of 9 (emphasis added).

Moreover, Section 16 of the AIPA reads, in relevant part:

> *LEGAL RELATIONSHIPS.  <u>Purchaser, Seller, and/or any other Person who may now or in the future hold any ownership interest in the Aircraft is referred to herein as a "Co-Owner".</u> The Interest acquired by Purchaser <u>shall be an indivisible and undivided interest in the Aircraft as a <u>tenant-in-common with all other Co-</u>*

> <u>Owners.</u> *The Program Documents are <u>not</u> intended to create any Time Sharing Agreement or Joint Ownership Agreement (as such terms are defined in Federal Aviation Regulation ("FAR") 91.501(c)), <u>or any . . . other relationship by and among Purchaser and any other Co-Owners and through which any Person may be held liable for the omissions or commissions of any other Person.</u>*

AIPA, Sec. 16, p. 2 of 9 (emphasis added).

It is irrefutable that the plain language of the AIPA is *prima facie* evidence that when the Program Documents a fractional owner receives a tenancy-in-common in <u>that</u> aircraft only, and is a co-owner of <u>that</u> aircraft only along with the other registered owners of <u>that</u> particular aircraft, and possibly with Avantair.

**B. CCA misapplies *NetJets*, which did not address the validity and nature of the interest held by fractional title holders, but instead concluded the program manager was also an owner for limited purpose of an industry-specific tax assessment.**

CCA relies on *NetJets Aviation, Inc. v. Guillory*, 207 Cal. App. 4th 26 (2012) for the proposition that the Fractional Owners hold something other than the tenancy-in-common interest conveyed by the AIPA. This reliance is misplaced. While this court is not bound by the *NetJets* decision, when read correctly, the case actually supports the Fractional Owners' position.

The court in *NetJets* did not address the validity or nature of registered fractional owners' interest in the fractionally owned aircraft. Instead, the court looked at whether the program manager could *also* be considered an owner. At issue in *NetJets* was whether—for purposes of assessment under a state statute specifically taxing fractionally owned aircraft as personal property—a program manager exercised sufficient control over the program aircraft it manages to be considered an "owner" of aircraft it managed for taxation purposes. if it did not also hold a registered title interest in such aircraft. In fact, the *NetJets* court, in dicta, acknowledged a

13

registered fractional owner's interest to be valid and in some respects superior to the undefined ownership interest under which the state sought to assess the manager, stating:

> _It is undisputed that Respondents [i.e., the manager] owns (sic) some fractional shares in various planes_. . . _The Assessors do not base their claim that Respondents can be directly assessed on Respondents' ownership of some fractional shares._ Respondents, for their part, do not seem to dispute that, assuming the tax on the fractionally owned aircraft is lawful, they would be liable for some portion of the tax assessment attributable to their share of the ownership of an aircraft.

_Id._ at n. 6 (emphasis added); _see also NetJets_ at n.7 (analogizing the subject legislation directed toward fractional program managers with a separate statute "_utilized to facilitate collection where the _true owner_ was liable for the tax but unknown or inaccessible as a practical matter_")(emphasis added). _NetJets_ is not a case about minimizing, invalidating, or re-defining the interests held by registered fractional owners. It is a case about whether, for the limited yet practical purpose of personal property tax assessment, the program manager may also be considered an owner and thereby legally assessed property taxes.

Additionally, the cases upon which _NetJets_ relies all support the proposition fractional owners of aircraft hold a valid, indivisible, tenacy-in-common. In _Fall Creek Construction Co., Inc.v. Director of Revenue_, 109 S.W. 3d 165 (Mo. 2003), the Missouri Supreme Court affirmed a use tax imposed on a fractional owner. Among the arguments rejected by the Missouri Supreme Court was that the fractional owner did not exercise sufficient dominion or control over the aircraft to be properly taxable. _Id._ at 171-72. In _Fisher & Co., Inc. v. Dept. of Treasury_, 769 N.W. 2d 740 (Mich. Ct. App. 2009), the Michigan Court of Appeals affirmed a decision placing tax liability on a fractional owner, finding "the fact that plaintiff has contracted away some (or

even most) of its practical control over its airplane does not preclude from having purchased it. It is therefore clear that there was a transfer of tangible personal property and a contemporaneous but nevertheless separate contract for services involving that property. *Id.* at 743. Certainly, states have taken different approaches with how to assess taxes on fractionally owner aircraft: some assess the fractional owners directly and other assess the manager (who presumably then passes the tax on the participating co-owners). Neither *NetJets, Fall Creek*, nor *Fisher* take the position that the fractional owners have anything less than the property interest conveyed by the applicable program documents.

CCA clearly misapplies *NetJets*. Although the Fractional Owners do not concede the estate has an interest in Program Aircraft outside of the compromise reached in connection with the Bankruptcy Case, the limited holding of *NetJets* actually provides an example of why the Fractional Owners compromised with the Trustee and sold their aircraft under Section 363 of the Bankruptcy Code, as litigating the nature and extent of the Trustee's interest in each Program Aircraft would have been costly and uncertain. *See* AIPA, Sec. 16, p. 2 of 9. *NetJets*, even if it were binding on this Court, has no more impact on the nature, extent, and validity of the interests held by the Fractional Owners than does the Fractional Owners' compromise with the Trustee.

The Program Documents create a tenancy-in-common specific to a particular Program Aircraft. Co-owners include holders of registered fractional ownership interests in the aircraft and—to an undetermined extent—the Trustee as successor to Avantair's interest. This interest, under the unambiguous language of the Program Documents, is valid co-ownership and is exclusive from holders of registered fractional ownership interests in other Program Aircraft. As such, even on *de novo* review, CCA has failed to demonstrate any reversible error by the Bankruptcy Court.

II.   **Avantair's removal of parts from certain Program Aircraft and installation of those parts on other Program Aircraft does not give CCA a valid equitable claim to proceeds generated by the sale of Program Aircraft that CCA does not own.**

Appellant CCA argues that CCA is entitled to share in the proceeds from other Program Aircraft because of the movement of parts from some Program Aircraft to others. However, the removal of parts from Program Aircraft and installation in other Program Aircraft was fully authorized by the Program Documents and does not give rise to equitable claims inconsistent with the clear effect and import of the Program Documents.

A.   **The Program Documents unambiguously permitted Avantair to move parts from Program Aircraft and install those parts on other Program Aircraft.**

The Program Documents unambiguously grant Avantair broad discretion to act on behalf of owners with regards to an aircraft in order to efficiently conduct the Program, which includes the ability to move parts from one Program Aircraft to another. Avantair was specifically authorized by the unambiguous language of the Program Documents to (i) act upon the aircraft at its discretion, and (ii) modify or alter the aircraft in compliance with industry standards. *See* MDLA Terms and Conditions, Sec. VI.67, pages 7-8 of 11.

i.   **The plain language of the Program Documents authorized Avantair act at its discretion for the efficiency of the Program, which includes removing parts from aircraft.**

Under the Program Documents, Avantair has broad discretion to act on behalf of owners with regard to an aircraft in order to efficiently conduct the Program. This section also waives a co-owner's right to prior notification and approval of any actions on the aircraft. The MDLA Terms and Conditions, Sec. VI.6, page 7 of 11 reads, in relevant part:

> *Authorization to Act.* <u>*Manager shall be authorized to take all*</u> <u>*actions on behalf of Owner or with respect to the Aircraft as may*</u> <u>*be necessary or advisable, in its sole discretion,*</u> *to (i) comply with* *or give effect to the terms and conditions of the Program*

> *Documents, (ii) protect the interests of the Co-Owners with respect to the Aircraft, (iii) safeguard the Aircraft, or (iv) <u>provide for the efficiency of the Program</u>. Nevertheless, Manager may (but shall not be required to) request, by notice to each Co-Owner, that such Co-Owner approve on or prior to a specified date any action with respect to the Aircraft specified in such notice. . . . In all other cases, however . . . such action shall be deemed approved . . . and Manager shall be authorized to take such action.*

*Id.*

The plain language of the above section authorizes Avantair to "take all actions . . . with respect to the Aircraft . . . in its sole discretion, to . . . provide for the efficiency of the Program." *Id.* Removing parts from a grounded aircraft and installing those parts onto an otherwise airworthy aircraft benefits the program at large by keeping costs and delays to a minimum while keeping as many aircraft flying as possible. It is precisely the type of "action" for which Avantair received explicit contractual authorization from each fractional owner and does not give rise to equitable claims inconsistent with the clear effect and import of the Program Documents. Thus, even when reviewed *de novo*, the Bankruptcy Court's finding that the Program Documents allowed Avantair to move parts from one Program Aircraft to another is not reversible error.

> ii.     **Alternatively, separate language of the Program Documents authorizes aircraft alterations and modifications in accordance with industry standards.**

While the above language cited in Section I.A.i, *supra,* is clearly broad enough to encompass and authorize the removal of parts from aircraft, some reliance on the industry standard is arguably unavoidable because the unambiguous language of the Program Documents makes reference to the industry standards. For example, MDLA Terms and Conditions Sec. VI.7, p.8, reads, in relevant part:

> *Aircraft Modifications. <u>Manager may, in its sole discretion, at Owner's expense, upgrade, alter or modify the Aircraft to</u> (i) comply with Manager's interpretations of FAR, (ii) <u>be consistent</u>*

> *with industry standards, (iii) comply with, or otherwise permit the*
> *Aircraft to be operated under, FAR Part 135, (iv) maintain the*
> *marketability of the Aircraft, or (v) provide for consistency in*
> *equipment, accessories or parts with respect to the Aircraft and*
> *any other Program Aircraft.*

*Id.*

This section allows Avantair to "alter" and "modify" aircraft for a number or reasons, including compliance with industry standards and "consistency in equipment, accessories or parts" between Program aircraft. *Id.* Therefore, removing parts as part of an accepted industry standard practice is specifically and unambiguously authorized by the Program Documents.

Of course, this provision should not be read in a vacuum. When viewed in the context of Avantair's broad authorization to act for the sake of Program efficiency found in Section VI.6 (and cited in Section I.A.i., *supra*), Avantair's authority can be summarized as follows: *First,* Avantair had the right to take any action with respect to an aircraft, in its sole discretion and without notice to co-owners, to maximize the efficiency of the Program. MDLA Terms and Conditions, Sec. VI.6, page 7 of 11. *Second,* Avantair had the right to "upgrade, alter, or modify" the aircraft in order to adhere to industry standards. MDLA Terms and Conditions, Sec. VI.7, page 8 of 11, When read together, the plain meaning of the contract indicates that the co-owners intended to authorize Avantair to remove parts and equipment from the fractional owner's aircraft at Avantair's sole discretion for installation in other Program Aircraft.

### B. Alternatively, if the Program Documents are ambiguous the Bankruptcy Court's finding that industry standards allow a program manager to move parts between fractionally owned aircraft was not clearly erroneous.

Although the Bankruptcy Court found the Program Documents to be unambiguous, it alternatively found that moving parts from one aircraft to another within the same program is common in the fractional ownership industry. The Bankruptcy Court reviewed the provided

affidavits of several industry experts: (1) Mr. Ronald Brower, Esq., Corporate Secretary and Associate General Counsel at NetJets, Inc.; (2) Mr. Jim Lewis, an experienced FAA certified power plant technician; and (3) and Mr. Ty Kronk, Director of Maintenance for NetJets Aviation, Inc.. {Dkt. 1-48, 37-43].

Mr. Brower outlines the general expectations of parties entering into an agreement with a fractional ownership program manager in paragraph 10 of his affidavit:

> *Once an aircraft has been sold to a group of fractional owners, it goes under the day-to-day oversight of the fractional program manager.  In keeping with the fractional owners' expectations, the program manager seeks to maintain and operate the fleet of fractional aircraft as efficiently as possible.  Often this involves rotating the aircraft components off of one fractional aircraft of a given type for inspection, repair, or overhaul before it is reinstalled and used either on the same aircraft or on an alternative aircraft of the same type in the fractional fleet.*

[Dkt. 1-48 at 38.]. The removed parts are installed on other aircraft to increase program efficiency, especially when needed to respond to unforeseen maintenance issues. Mr. Lewis says, in paragraph 8 of his affidavit:

> *The practice of removing a serviceable part from one aircraft (unofficially termed "cannibalization") and installing it on another aircraft is fairly common among fleet operators, and permitted under FAA regulations.  This is typically accomplished to solve for an immediate need for a part in order to meet flying schedule requirements.*

[Dkt. 1-48 at 41.] According to Mr. Brower, managing a fractional fleet in this manner increases the utility of the program at large. The Brower Affidavit continues in paragraph 11:

> *Swapping components among aircraft like this can enable the managed fleet of fractional aircraft to operate a greater number of*

> *flights for the collective of fractional owners than any individual aircraft could alone do for a single owner or small group of direct owners. The practice is administered in a way that is consistent with traditional principals of property law as well as with the FAA's regulations. The value of the fractional aircraft is preserved basically by the required use of like types of components in each aircraft and by compliance with applicable safety regulations.*

[Dkt. 1-48 at 43].

Not only is parts removal common, it is also permanent. "*Once a component is attached to another aircraft, then that item becomes a part of that new aircraft.*" [Dkt. 1-48 at 39.]. (emphasis added).

Once a part has been removed from a Donor Plane, the missing part is generally replaced in the ordinary course of business. Mr. Ty Kronk, in his affidavit at paragraph 6 states, "*The missing part routinely is obtained later and installed before the donor aircraft needs to be placed back into flight activity.*"[5] [Dkt. 1-48 at 43]. (emphasis added).

Thus, the industry standards can be summarized as follows:

1. Removing parts from aircraft is common, and within the expectation of parties entering into a fractional ownership agreement;

2. Parts, once removed and installed on a recipient aircraft, are never restored to the original aircraft;

3. Removing parts for installation elsewhere in the fleet allows the program manager to conduct the program efficiently, especially with regards to unforeseen maintenance issues; and

---

[5] It is important to note that ordering a replacement part is a separate act from removing the part from the Donor Plane in the first place. When done properly, the net result of the exchange is an increase in value of the Donor Plane to the extent the replacement part is worth more than the removed part. If Avantair breached an obligation to the Donor Plane owners, it was not by removing an existing part, but by failing to order and install the new part as it should have done in accordance with industry standards.

4. When done properly, the part moved from the aircraft is replaced with a serviceable part and the aircraft is thereafter returned to service within the fleet.

Assuming, *arguendo*, that Avantair did <u>not</u> fully comply with industry standards in removing and reinstalling parts, CCA's claim is against Avantair for breach of contract, pursued through a proof of claim in the Bankruptcy Case. CCA's claim is <u>not</u> against the Fractional Owners.  In light of the evidence presented to Bankruptcy Court—both by the unambiguous language of the Program Documents and the above affidavits—Avantair was indeed authorized to move parts from one Program Aircraft and install the parts on another Program Aircraft. It was not clearly erroneous for the Bankruptcy Court to have found, as an alternative to its holding that the Program Documents are unambiguous, that the standard industry practice allows a program manager to move parts from one Program Aircraft, and to apply this industry standard as parol evidence to resolve any ambiguity.

Based on the plain, unambiguous language of the Program Documents, Avantair had broad discretion to act on behalf of owners with regards to an aircraft in order to efficiently conduct the Program, which includes the right to move parts from one Program Aircraft to another. Even this Court finds the Program Documents ambiguous to this point, the Bankruptcy Court's findings of fact showing that industry standards permit a program manager to move parts from one aircraft to another in a fractional fleet, are not clearly erroneous. The Bankruptcy Court orders should be upheld.

### C. Because the Program Documents authorized Avantair to move parts, CCA cannot claim an interest in other aircraft based upon the doctrine of accessions.

CCA argues that Avantair wrongfully removed parts from its aircraft, which gives CCA a claim against the aircraft upon which the parts were installed based on the doctrine of accessions.

This is a red herring. As explained in section I.A and I.B, *supra*, Avantair was authorized by the Program Documents to move parts from one Program Aircraft to another. Because Avantair's actions were not wrongful, the property interest held by the co-owners of aircraft from which parts were removed was extinguished when Avantair removed the part for use in a second aircraft, and the doctrine of accessions simply is not triggered. As properly concluded by the Bankruptcy Court, if Avantair's failed to restore an aircraft following the removal a part, the remedy is a breach of contract action, not a claim against the owners of the recipient aircraft. **R.**

CCA is not entitled to share in the proceeds from other Program Aircraft because the movement of parts from some Program Aircraft to others was fully authorized by the Program Documents. The Bankruptcy Court did not commit reversible error when it reached this conclusion, and the applicable orders should be upheld.

### III.    The Bankruptcy Court did not abuse its discretion in rejecting CCA's pooling approach on equitable grounds.

The Bankruptcy Court properly interpreted the Program Documents and thus did not abuse its discretion in rejecting the equitable claim asserted by CCA against aircraft upon which parts removed from CCA's aircraft may have been installed and approving the distribution of sale proceeds according to 11 U.S. C. § 363.

#### A.  Truly equitable pooling is impossible without including all the Program Aircraft, and certain Program Aircraft will not be included in any adopted pooling approach.

There are a number of aircraft that are and will remain outside the reach of any pooling approach adopted by the Bankruptcy Court, which makes a truly equitable pooling of sale proceeds impossible. These aircraft fall into one of two categories: The first category consists of

aircraft whose co-owners have not settled with the Trustee and have no intention of ever selling their aircraft in connection with the Bankruptcy Case. In these cases there will be no sales proceeds from these aircraft as title will never change hands. The second category consists of the five aircraft for which CCA failed to appeal the applicable orders within the allowed windows, including one aircraft CCA co-owns. These five aircraft sold for an aggregate price of $3,800,000, and include one aircraft for which CCA is a registered fractional owner. The period to file notices of appeal with respect to these five aircraft has expired and CCA's failure is a jurisdictional bar to any future appeals. Accordingly, the proceeds from the sales of these five aircraft in the second category are now out of reach of an eventual pooling of sale proceeds.

CCA's failure to appeal the sale orders of these five Program Aircraft has made the continued pursuit of its requested relief futile. The cornerstone of CCA's pooling approach— although never well-defined—has always been that equity demands the sale proceeds from *every* opt-in Program Aircraft be available for equitable distribution. For example, in CCA's Response to Motion to Modify Stay of Distribution Pending Appeal [Dkt. 18], CCA stated that the prospective inability to recover disbursed sales proceeds from certain owners "would frustrate the objective of implementing the 'share and share alike' remedy sought by appellants . . . ." [Dkt. 18 at 9-10].

Again, in CCA's main brief the requested relief requires full participation, providing, "the proceeds from the sale of each aircraft should be distributed among all the fractional share participants to reflect the reality that each aircraft at the time of the sale was made up of parts from other aircraft in the fleet." [Dkt. 21 at 15]. (emphasis added).

Finally, when this issue was before the Bankruptcy Court CCA argued "fair distribution" required the Bankruptcy Court to establish a  "common fund . . . from the net remaining proceeds

from the sale of the Program aircraft, and then a distribution is made pursuant to a method that recognizes that the funds should be distributed [in an equitable manner] to "each fractional share interest holder."  [Dkt. 1-40 at 6]. (emphasis added).

Thus, it follows from CCA's own argument that a pooled distribution that does not include the all Program Aircraft would be inequitable. First, it would establish two separate sets of rules governing similarly positioned owner groups yielding disparate treatment and inequitable results; second, it would allow CCA to operate under both sets of rules since it; and third, it would be without $3,800,000 in aggregate sales proceeds from opt-in Program Aircraft.

### B. Pooling is patently inequitable to the majority of the participating "opt-in" fractional owners.

It would be patently inequitable to force the Fractional Owners, many of whom have elected to invest significant capital into their aircraft prior to sale, to share the profits of their investment with someone who did not contribute to the investment. Some co-owner groups have already invested hundreds of thousands of dollars under the belief that a recertified aircraft will sell for more than an "as, is" aircraft and the investment is worth the risk.

Similarly, though the settlement agreements with the estate the various ownership groups were able to select the sale method. Some groups sold their aircraft at a live auction with an auctioneer and incurred the cost of a live auction and an auctioneer at a cost of about 10% of the sale proceeds. Other groups elected to sell through an online auction to save the cost of a live auction. Still other groups sold through a private auction where no auctioneer was employed. It would be inequitable to reduce the sale proceeds of a group that elected not to pay an auctioneer in order to compensate another group who elected to have an auctioneer. Finally, some groups entered into direct sales with third parties without receiving any other bids. It is possible these

groups would have received a higher return if they had auctioned their aircraft, and their failure to do so should not result in other groups having to take less.

### C. Equitable pooling would undermine the fractional ownership industry and have detrimental and inequitable implications outside the industry.

Under the Program Documents fractional owners could finance the acquisition cost of the fractional ownership interest and secure the purchase with a lien on the fractional interest in the aircraft. The pooling approach would circumvent their rights as lenders that have properly recorded liens on the specific fractional interest and are entitled to the proceeds from the sale of any financed interests up to the amount financed.

Additionally, after Avantair ceased operations some co-owners elected to buy out their co-owners and now have obtained 100% ownership of their aircraft. Approximately 75 fractional ownership interests have been bought and sold since the bankruptcy commenced. The price paid for these fractional interests was based upon the condition of the aircraft being sold. Pooling would detrimentally affect these bona fide purchasers.

Finally, many fractional owners in this case and thousands of owners outside of this case have filed taxes based on the understanding that they own an undivided fractional interest in an aircraft. A decision that fractional ownership is not true ownership would be render thousands if not tens of thousands of tax filings incorrect. It would also be taking a contrary position to the findings of the FAA who deems fractional ownership private ownership and has thus applied the regulations under Part 91 to fractional ownership.

The Program Documents allow a fractional owner to finance its interest as long as it does not encumber any more than its particular fractional share. The Program Documents state that the fractional owner is responsible for all taxes associated with its fractional ownership and that

the fractional owner also receives all of the tax benefits for its fractional ownership. The Internal Revenue Service has recognized fractional ownership and even allowed

A determination of equity needs to consider the totality of the circumstances. A decision to pool sale proceeds would require the Bankruptcy Court to redefine or invalidate the co-ownership interest of the Fractional Owners, and thus the Bankruptcy Court did not abuse its discretion when it rejected CCA's pooling approach.

> **D. CCA had other options available and chose fractional ownership, a natural consequence of which is unequal depreciation of aircraft; pooling sales proceeds would inequitably relieve CCA from the natural consequences of its actions at the expense of other owners.**

There are various private aviation solutions available outside of full aircraft ownership, and CCA purchased several fractional ownership interests with Avantair instead of one of numerous other options; equity should not intervene to relieve CCA of the consequences of its actions.

Fractional ownership is different from any other private aviation product on the market. The entry level of private aviation is ad hoc charter service flown under 14 CFR Part 135 and generally arranged through an air charter broker. The charter customer is not an owner of the aircraft and the flight is considered commercial. Under this arrangement, a customer calls a charter broker requesting a specific trip and the broker provides an aircraft that will meet the customer's needs on a trip-by-trip basis. The customer controls the departure time for the flight and can fly into and out of a larger number of airports not serviced by scheduled air carriers. Charter has tremendous convenience associated with its "ad hoc" nature. There is no commitment, there is no capital outlay, and there is no requirement that you acquire aviation

expertise.  Additionally, 14 CFR Part 135 regulations hold pilots, aircraft, operations and even passengers to a higher safety standard than pertains to someone providing his own transportation.

A second way to fly privately is by purchasing a jet card or block charter, also operated under 14 CFR Part 135. Under this arrangement a customer generally pre-pays for a certain number of flight hours on a particular make and model of aircraft. Whenever the customer flies, the total number of flight hours flown is debited from the card. When the flight hours are exhausted, the customer has no further obligation to buy another card. Most large fractional programs have one or more affiliated flight card programs. Notably, Avantair offered a jet card called the Edge card, yet CCA instead purchased a fractional ownership interest from Debtor

A third alternative for private air transportation is fractional ownership, at issue in this case. Fractional ownership programs are operated pursuant to 14 CFR Part 91(k). Pursuant to the Program Documents, the co-owners of a particular Program Aircraft agree to lease their plane to other participating co-owners of fleet aircraft on a non-exclusive, first-come first-served basis, and to receive in exchange the right to the use the other fleet aircraft. *See* MDLA Sec. 18, p. 3 of 11. This arrangement necessarily means flight time will not be the same between Program Aircraft. Because each Program Aircraft contains more than 100 time-controlled parts, the necessary effect of the exchange agreement is that certain aircraft will depreciate faster than other as a result.

At the time the fractional ownership interest is purchased, a FAA form 8050-2 (Aircraft Bill of Sale) is completed for the sale of the undivided fractional interest and filed with the FAA registry. This bill of sale—along with the purchase agreement—transfers ownership of the fractional interest to the fractional owner. The fractional owner then elects to put the aircraft into full management with the fractional provider, similar to whole aircraft management, as described

below. Typically, each 1/16[th] interest entitles the fractional owner to 50 flight hours per year. This concept has proven successful because an ownership share allows the owner to access the entire fleet of aircraft managed by the provider, facilitating both scheduling flexibility and aircraft type/size selection. No different than the purchase of any personal property, fractional owners take the risk in value at the time of purchase and when the interest is sold receive the fair market value for their interest.

The final type of private air transportation is whole aircraft ownership. Just like fractional ownership, whole aircraft owners fly under 14 CFR Part 91 and a purchase agreement and a FAA 8050-2 are signed and ownership is transferred to the buyer of the whole aircraft at the time of purchase. The whole aircraft owner may, just like in fractional ownership, place the aircraft with a full service management company. The management company provides any number of services including, but not limited to, fleet insurance policies, maintenance, scheduling, pilot services, and records keeping.

CCA's investment in a fractionally owned Program Aircraft may have failed, but equity cannot and should not intervene to redefine property law and rewrite contracts to allow CCA to recover from the sale of aircraft it does not own at the expense of that aircraft's actual owners. Fractional ownership is a sophisticated private aviation option with nuanced risks and benefits, but Corrections Corporation of America—the largest private corrections company in the United States whose 2013 earnings totaled $1.7B—is certainly a sophisticated investor.[6] Bankruptcy Court did not abuse its discretion when it rejected CCA's pooling approach and did not commit reversible error. The Bankruptcy Court's orders should be upheld.

## CONCLUSION

---

[6] http://investing.businessweek.com/research/stocks/earnings/earnings.asp?ticker=CXW. Retrieved October 27, 2014.

The Bankrutpcy Court correctly decided these issues when it authorized the sale of the aircraft pursuant to 1 U.S.C. § 363 in connection with the Bankruptcy Case and found that registered fractional owners hold an undivided, tenancy-in-common interest specific to a particular Program Aircraft. CCA does not have a claim—equitable or legal—to the sale proceeds of any Program Aircraft other than those for which it is a registered fractional owner because it contractually authorized Avantair to move parts from its Program Aircraft and install those parts on other Program Aircraft, as evidenced by both unambiguous language of the Program Documents and  the record evidence of industry standards. The Bankruptcy Court's findings in this regard are not reversible error.

Neither was it reversible error for the Bankruptcy Court to find, within its discretion, that the pooling approach was inequitable and cumbersome. The Bankruptcy Court orders should be upheld.

Submitted this 27th  day of October, 2014.

**SHUMAKER, LOOP & KENDRICK, LLP**

By:   /s/ R. Quincy Bird
**Jay B. Verona, Esq**.
Florida Bar No. 352616
**C. Philip Campbell, Esq.**
Florida Bar. No. 0160973
**R. Quincy Bird, Esq.**
Florida Bar No. 105746
101 East Kennedy Blvd., Suite 2800
Tampa, Florida 33602
Phone: (813) 229-7600
Fax: (813) 229-1660
*Counsel for Appellees N169SL Fractional Owners*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I have this day served a true and correct copy of the foregoing

Motion via ECF to all persons receiving notice by CM/ECF.

This 27th Day of October, 2014.

/s/ R. Quincy Bird
Attorney