# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# TAMPA DIVISION

CORRECTIONS CORPORATION
OF AMERICA,

    Appellant,

v.

BETH ANN SCHARRER and THE
N169SL FRACTIONAL OWNERS,

    Appellees.

Case No: 8:14-cv-1742-T-30
Bank. No: 8:13-bk-09719-CPM

## ORDER

THIS CAUSE comes before the Court upon the Appeal of Corrections Corporation of America, d/b/a CCA of Tennessee, Inc., and CCA of Tennessee, Inc., creditors of the Debtor, Avantair, Inc., from the Bankruptcy Court's Amended Order Granting (i) Motion to Approve Compromise of Controversy With Fractional Owners of N169SL, and (ii) Motion to Approve Sale Free and Clear of Liens and to Approve Sale and Bid Procedures Regarding N169SL (identification number of an airplane).  After review of the parties' briefs and hearing oral argument on December 16, 2014, the Court concludes the order of the Bankruptcy Court should be affirmed.

### Standard of Review

The issue here is one of ownership of aircraft which is determined by state property law.  Because aircraft are highly mobile, there is a federal system of registration. Congress established the Civil Aircraft Registry in the Air Commerce Act of 1938 to

provide a single repository for recording interest in aircraft.[1] This recording system provided certainty in transactions involving aircraft by providing a single recording office for the inspection of records, which alleviated the need to inspect the records of each state. The effect of this recording is to grant priority to all persons holding federally recorded interests in aircraft over all other third parties, except those of which the person holding the federally recorded interest has "actual notice." *Philko Aviation, Inc. v. Schacket*, 462 U.S. 406 (1983). Other issues regarding aircraft ownership are determined by state law. The issue involved here is a mixed question of law and fact which this Court reviews on a *de novo* standard. *Chandler v. Crosby*, 379 F.3d 1278, 1288 (11th Cir. 2004).

## Background

Avantair, the debtor, operates a fleet of approximately 40 Piaggio twin engine turboprop airplanes. It sells fractional shares, usually a one-sixteenth share, in the airplanes. Individual owners of aircraft are subject to fewer restrictions from the Federal Aviation Administration (FAA) in maintenance and operation as compared to commercial carriers. These lesser regulations allow individually owned planes to operate with less maintenance and expense. The advantage of this expense savings is increased when more than one owner shares a plane.

This advantage gave rise to the fractional-share concept of aircraft operation. The FAA has accepted this fractional-share concept which it regulates in Subpart K of Part 91,

---

[1] The registration of aircraft is currently governed by the Federal Aviation Act of 1958, which replaced the Air Commerce Act of 1938.

§§ 91.1001, *et seq.* of the Federal Aviation Regulations (49 C.F.R. § 91.1001 *et seq.*). These regulations, while more rigorous than those imposed on individual owners, are less than those imposed on commercial carriers.

Avantair was one of many fractional-share operators in the United States. The business model is basically the same for all of these operators. Appellant CCA describes the typical business model, as well as that of Avantair, as follows:

> The Fractional Share Contracts typically consist of a series of linked contracts generally addressing the following: (1) a purchase agreement of a "fractional share interest" identifying a specific aircraft to which the interest is to be assigned by the fractional share operator; (2) a dry lease agreement under which the fractional share operator "leases" the aircraft (exclusively and free of charge) from the holder of the fractional share interest[;] (3) a fractional use agreement under which the fractional share participant is entitled to air transportation on board available fleet aircraft on a prescribed "on demand" basis; and an interchange agreement under which the fractional share participants are entitled to "use" the aircraft assigned to other fractional share participants.
>
> Under the Fractional Share Contracts in this case, the fractional share participant will be issued (at the discretion of the operator) an interest (typically in multiples of at least 1/16th share as mandated by the Federal Aviation Regulations) in a fractional share aircraft. The Fractional Share Contract, while providing that a Bill of Sale evidencing a co-owner status equal to its share would be recorded in the FAA Aircraft Registry (located in and commonly simply referred to as "Oklahoma City") in order to comply with the regulatory requirement of Subpart K of the Part 91 of the Federal Aviation Regulations, expressly limits the rights of the fractional share participant in the aircraft. For example, the fractional share participant does not have the right to "use" the specific aircraft, to make any decisions regarding its maintenance or upkeep, to exercise any control whatsoever over its operation, maintenance, and the qualifications, training and scheduling of its crew members. The fractional share participant has no rights to convey all or any part of its interest, other than back to the fractional share operator, may be required to transfer its interest to any other comparable aircraft within the sole discretion of the operator and at any time, may be required to assign any interest in any insurance proceeds related to the aircraft, and is not entitled to share in the proceeds from the sale of the aircraft by the fractional

>share operator, provided it is assigned an interest in a comparable aircraft at the time of the sale.

Appellants' Brief in Support of Consolidated Appeals (Dkt. #21, pp. 7-8) (hereinafter "Appellant's Brief").

## Avantair's Bankruptcy

Avantair began experiencing financial difficulties. As its difficulties increased, Avantair increased its practice of robbing parts from one plane to keep other planes operating. Avantair has an obligation under the contracts to repair or replace the removed parts, but was neither repairing nor replacing them.

This practice and the condition of the aircraft came to the attention of the FAA shortly before Avantair's involuntary bankruptcy proceeding was filed. The FAA entered an emergency order grounding the entire fleet. Avantair ceased its operations, terminated its employees, and closed its operations leaving its fleet of aircraft parked at airports throughout the United States.

Immediately after the filing of the bankruptcy case, the Bankruptcy Court appointed a trustee. To secure maintenance records on the aircraft and to attempt to prevent theft of property used by Avantair, the trustee and its counsel undertook to secure Avantair's property located at the St. Pete-Clearwater International Airport and the Orlando International Airport. The trustee coordinated with the FAA and the aircraft manufacturer Piaggio to develop a program for recertifying the grounded aircraft.

Most of the fractional-share owners of the various planes recognized a common benefit that could be received through the Bankruptcy Court. The Bankruptcy Court was

a forum that could: (1) protect the aircraft from being foreclosed upon throughout the United States by aircraft maintenance facilities claiming possessory and non-possessory liens on the aircraft, (2) provide a common point of contact through the bankruptcy trustee to deal with the FAA and the manufacturer with regard to the on-going airworthiness issues of the various planes, (3) sell the aircraft with good title, free and clear of all liens, and (4) distribute the funds realized from the sale.

The Bankruptcy Court developed a two-step process to achieve these goals. Fractional-share owners would seek relief from the bankruptcy stay for the limited purpose of preserving an aircraft while the Bankruptcy Court would stay all lien enforcement procedures and litigation outside of the bankruptcy process. When the fractional-share owners sought to sell the plane, a motion to compromise would be filed by the trustee, which, upon notice to all of the fractional-share owners and those claiming a lien, would set forth the proposed procedures for a sale of the aircraft by the trustee to a third party free and clear of all liens. The sale would result in the payment of the liens, payment to the trustee of its fees and expenses, payment of certain other approved fees and expenses, including the costs of the sale, and the distribution of the remaining proceeds. It is the distribution of the remaining proceeds that creates the dispute involved in this appeal.

Appellant, the owner of a fractional-share interest in three aircraft, contends the funds from the sale of all aircraft in the fractional-share fleet should be distributed "share and share alike" among all fractional-share owners. Appellees, and the Bankruptcy Court, take the contrary position that each owner of a fractional-share interest should receive only a pro-rata share of the funds received for the aircraft in which it has a direct fractional-share

interest. The resolution of this dispute depends on what interest each fractional-share "owner" actually owned – actual title to personal property (the plane) or merely a right of use of a plane (to be assigned by Avantair from the fleet) for a certain number of hours.

Appellant CCA urges this Court to hold that the fractional-share owners "own" a right of use in the fleet as a whole. CCA argues that this approach reflects the true rights of the fractional-share participants and the reality that each aircraft at the time of sale was made up of parts from other aircraft in the fleet because of Avantair's pervasive practice of interchanging parts.

## Discussion

CCA urges this Court to apply the reasoning of the Fourth District California Court of Appeal in *NetJets Aviation, Inc. v. Guillory*, 143 Cal. Rptr. 3d 111 (Cal. Ct. App. 2012). CCA contends that NetJets, a seller of fractional interests in a fleet of aircraft, is closely analogous to the position of Avantair in this case. CCA argues that the California court considered NetJets to be "the owner of the aircraft under the applicable California constitutional and statutory tax provisions, because the fractional share owners could not transfer their interests in the aircraft without the seller's consent and could not use the aircraft other than in accordance with the fractional ownership program." Appellant's Brief (Dkt. #21, p. 18). But this misstates the holding of *NetJets*. The California court did not hold that NetJets was the "owner" of the aircraft. Rather, it held that NetJets was "in control" of the fractionally owned aircraft within the meaning of the California tax statute in question.

The California legislature enacted a statute to capture tax revenue on fractionally-owned aircraft that had been escaping taxation. NetJets challenged the statute. The statute provides that:

> (a) Notwithstanding any other law, fractionally owned aircraft that has situs in this state shall be assessed on a fleetwide basis to the manager in control of the fleet and a notice of that assessment shall be issued to that manager.
>
> * * * * *
>
> (c) A fleet of fractionally owned aircraft shall be assessed on an allocated basis. An allocation factor shall be established in each county for each fleet type of fractionally owned aircraft for which situs in this state has been established as described in subdivision (b). This allocation factor is a fraction, the numerator of which is the total number of landings and departures made by the fleet type in the county during the previous calendar year and the denominator of which is the total number of landings and departures made by the fleet type worldwide during the previous calendar year.

Cal. Rev. & Tax Code § 1161.

The California court held that NetJets was subject to the tax because it "controlled" the fractionally-owned aircraft. The California court said:

> In reviewing the legal issues *de novo*, we hold the legislation lawfully assesses a tax on the fractionally owned aircraft against respondents. For the reasons we shall explain, *post*, the tax may be assessed against respondents because they control the fractionally owned aircraft.

*NetJets*, 143 Cal. Rptr. 3d at 122.

Since *NetJets* concerns only "control," this Court must look elsewhere for resolution of "ownership." A determination of ownership begins with an examination of the documents defining the interest held by the fractional owner. In the Avantair program, these documents consist of two agreements: (1) an Aircraft Interest Purchase Agreement

7

(AIPA) that conveys the interest of fractional ownership, and (2) a Management and Dry Lease Agreement (MDLA) that authorizes Avantair to manage the aircraft in connection with the program.

The AIPA states the interest held by fractional owner is a tenancy-in-common in a particular aircraft:

> CO-OWNERSHIP.  Purchaser acknowledges that the Interest is an indivisible and undivided interest in the Aircraft and that Purchaser is a tenant-in-common with all other owners of an interest in the [particular] Aircraft (the Co-Owners).  Purchaser shall be entitled to its pro rata share of the depreciation, gain, loss, deduction, credit or any tax benefits with respect to the Aircraft and shall be severally liable for all costs and expenses chargeable to Purchaser under the MDLA and this Agreement and incurred with respect to the Aircraft.

AIPA, Sec. 15, p. 1 of 9.   And Section 16 of the AIPA provides:

> LEGAL RELATIONSHIPS.  Purchaser, Seller, and/or any other Person who may now or in the future hold any ownership interest in the Aircraft is referred to herein as a "Co-Owner". The Interest acquired by Purchaser shall be an indivisible and undivided interest in the Aircraft as a tenant-in-common with all other Co-Owners. The Program Documents are not intended to create any Time Sharing Agreement or Joint Ownership Agreement (as such terms are defined in Federal Aviation Regulation ("FAR") 91.501(c)), or any . . . other relationship by and among Purchaser and any other Co-Owners and through which any Person may be held liable for the omissions or commissions of any other Person.

AIPA, Sec. 16, p. 2 of 9.

The MDLA provides broad rights of control to Avantair, but the grant of a large bundle of rights does not overcome the parties' agreement as to ownership.  As one court has pointed out, "to relinquish control over something is itself the exercise of an ownership right."  *Fisher & Co. v. Dep't of Treasury*, 769 N.W. 2d 740, 742 (Mich. Ct. App. 2009).

This Court is persuaded by the reasoning of the Missouri Supreme Court in *Fall Creek Construction Co. v. Director of Revenue*, 109 S.W. 3d 165 (Mo. 2003). In that case, Fall Creek, a real estate development company, sought review of a ruling of an administrative hearing officer that it was liable for use tax on its fractional-ownership interest in aircraft enrolled in a fractional-ownership program. Fall Creek had purchased fractional interests in two aircraft from Raytheon Travel Air Company. It entered into four separate agreements for each aircraft: an aircraft purchase agreement, a joint ownership agreement, a management agreement, and an interchange agreement. *Id*. at 167.

These four agreements provided approximately the same rights to the fractional-share operator as did CCA to Avantair in the MDLA involved in this bankruptcy proceeding. The Court described those rights as follows:

> While the purchase agreement places restrictions on the fractional owners, the bill of sale recites that Raytheon "does … hereby sell, grant, transfer and deliver all rights, title, and interests in and to an undivided … interest in such aircraft unto: Fall Creek Construction Company, Inc." The FAA recognizes Fall Creek and other co-owners as legal owners of a partial interest in each particular aircraft. Additionally, Fall Creek depreciates the aircraft on its accounting ledgers.
>
> The joint ownership agreement provides that co-owners place the aircraft into the master interchange program and agree that they are all tenants in common with respect to the aircraft. The co-owners waive any right to partition and agree to divest themselves solely in accordance with the governing documents.
>
> Under the management agreement, co-owners hire Raytheon to manage the aircraft. Owners pay a separate monthly management fee and a variable hourly rate for flight hours. Raytheon manages aircraft scheduling and must make reasonable efforts to obtain the owner's actual aircraft before providing a similar aircraft under the interchange program. Raytheon must also: (1)

> have the aircraft inspected, maintained, serviced, repaired, overhauled and tested; (2) maintain all required aircraft records and logs; (3) provide pilots, pilot training, pilot medical examinations and pilot uniforms; (4) provide hangaring and tie-down space, in-flight catering, flight planning, weather services, and communications; (5) maintain insurance on the aircraft; and (6) provide consulting regarding FAA issues, warranty claims, and insurance matters.
>
> The master interchange agreement requires each owner to participate in the master interchange program by sharing its aircraft with other participants in the program. If an owner's aircraft is unavailable, Raytheon may substitute another similar aircraft from among the 110 aircraft in the program. Under the program, a participant informs Raytheon of the date and destination of the trip. Raytheon arranges for a program aircraft to carry the participant. Raytheon or the pilot determines whether the aircraft will fly to a location due to adverse weather conditions or other restrictions. However, the owner is in "operational control" of the aircraft while in the air and may direct the pilot to an alternate destination.

*Id.* at 167-68 (footnote omitted).

Fall Creek contended, as does CCA here, that it did not actually own an interest in a particular aircraft, but merely had the right to use any aircraft in the interchange program for a specified number of hours per year. The *Fall Creek* court rejected that argument and held:

> Here, the purchase agreement is unambiguous. It states that "Buyer desires to purchase from Seller, and Seller desires to sell to Buyer, the undivided property interest … in the aircraft…." Were this Court to look beyond the four corners of the purchase agreement, other governing documents would also evidence Fall Creek's intention to purchase property interests in the aircraft. Raytheon executed a bill of sale indicating that it "does … hereby sell, grant, transfer and deliver all rights, title, and interests in and to an undivided … interest in such aircraft" to Fall Creek. Further, the separate master interchange agreement specifically states that it is "an arrangement whereby a person leases *his airplane* to another person in exchange for equal time, when needed, on the *other person's airplane*…." (emphasis added). The purchase agreement clearly and unambiguously demonstrates that Fall Creek intended and understood that it was purchasing an interest in tangible personal property—the aircraft.

10

> Despite this unambiguous contract language, Fall Creek argues that an "essence of the transaction" test should determine the nature of the transaction. Fall Creek claims that its ownership of the physical aircraft is merely incidental and that the true nature of the transaction is one for transportation services. Clearly this was a complex transaction between sophisticated parties designed to maximize regulatory and tax advantages. However, the mere fact that the purchase agreement was executed along with other agreements does not render the contract ambiguous nor does it change the nature of Fall Creek's interest. Extrinsic evidence of contractual intent, including a determination of the "essence of the transaction," is necessary only if the contract contains an ambiguity. There is no ambiguity as to Fall Creek's purchase of fractional interests in the aircraft; therefore, an "essence of the transaction" analysis is not necessary.
>
> Fall Creek unambiguously purchased an undivided fractional ownership interest in two aircraft as evidenced by the purchase agreement. The mere fact that it entered into additional management agreements with Raytheon does not change the nature of Fall Creek's ownership interest.

*Id.* at 170.

The reasoning of *Fall Creek* was later followed by the Michigan Court of Appeal in *Fisher & Co. v. Department of Treasury*, 769 N.W. 2d 740. In *Fisher & Co.* the court dealt with a corporate taxpayer's challenge of the assessment of a use tax on the fractional ownership of an aircraft. Fisher & Company contended that it did not own a fractional interest in an actual airplane, but that, in reality, its "purchase" was of a particular number of hours of flight time to be provided by a corporate travel-services provider. And it argued that, taken as a whole, its rights in the airplane fell far short of anything a lay person would recognize as ownership.

The Michigan appellate court held that the transaction was in fact the purchase of a fractional interest in personal property, an airplane:

11

> We appreciate the fact that, at the end of the day, plaintiff ultimately just wanted to have on-demand corporate jet transportation without the need to purchase and maintain a whole airplane. However, the dispositive issue is not so much plaintiff's motivation as what *actual transaction* plaintiff entered into. The documents involved all reflect a sale of an ownership interest in an airplane, coupled with a contractual arrangement under which multiple airplane owners shared maintenance, administration, and access to their airplanes. In effect, this is a time share in an item of tangible personal property; in this case, an airplane.
>
> \* \* \* \* \*
>
> The transaction involved was, therefore, a purchase of tangible personal property coupled with a contract controlling how that personal property would be used. The fact that plaintiff has contracted away some (or even most) of its practical control over its airplane does not preclude plaintiff from having purchased it. It is therefore clear that there was a transfer of tangible personal property and a contemporaneous but nevertheless separate contract for services involving that property.

*Id.* at 742-43.

Like the purchasers in *Fall Creek* and *Fisher & Co.*, CCA is described in its purchase documents as a tenant-in-common co-owner, has retained some rights of control, has the right to borrow against its interest, and may claim its portion of the expenses, including depreciation, of a particular aircraft on its tax return. Therefore, for the same reasons expressed in *Fall Creek* and *Fisher & Co.*, this Court concludes that the fractional interest held by CCA and the other co-owners in this bankruptcy case is an undivided interest as tenants-in-common in personal property, an aircraft. The distribution of the proceeds remaining from the sale of each aircraft should be distributed to the co-owners of that aircraft as ordered by the Bankruptcy Court.

It is therefore ORDERED AND ADJUDGED:

1. The Order of the Bankruptcy Court is hereby AFFIRMED.

      2.      The Clerk of Court is directed to close this case.

**DONE** and **ORDERED** in Tampa, Florida, this 23rd day of December, 2014.

_____
JAMES S. MOODY, JR.
UNITED STATES DISTRICT JUDGE

<u>Copies furnished to:</u>
U. S. Bankruptcy Judge Catherine P. McEwen
Counsel/Parties of Record

S:\Even\2014\14-cv-1742 bk appeal.docx

13